If an MCD should malfunction, then appropriate action shall be taken in accordance with other provisions of this Department Manual.

The MCD system shall be used to aid in the dispatching and servicing of calls for service while reducing the amount of voice radio usage. See Department Manual 300.27, **Response Management**, for guidelines on which priority calls should be dispatched via the MCD system. Follow-up information may be transmitted over the MCD system.

The Communications Division personnel shall use voice communications as the primary assignment medium in all instances in which an officer's safety would be best served by having other field personnel aware of the officer's location and assignment.

## Keeping Notes on Police Activities

After completion of training in the MCD system, employees shall keep notes on police matters and all entries and inquiries shall conform to established procedures and guidelines.

## Disruptive Activities

Officers shall not perform any action that would cause disruption of their MCD or another MCD or cause interference with the reasonable supervision of officers.

## Reporting Equipment Problems

Any problems encountered with MCD equipment shall be immediately reported to the on-duty supervisor and the Fleet Coordinator. If the problem cannot be resolved or there is an equipment failure, the Office of Internal Audit of Information Technology should be contacted for repairs.

## Abuse of Alteration of Equipment

Employees operating the MCD system shall exercise reasonable care of the equipment. Employees shall be held responsible for any damage resulting from intentional abuse of negligence (e.g., spilled drinks or food, paper clips). No alterations, except those made by the Office of Internal Audit of Information Technology shall be allowed.

## Related Department Manual Policies and Reference Material

- 200.01, **Keys, Passwords, and Personal Identification Numbers**
- 200.24, **Extra Employment**
- 200.30, **Police Computer Systems**
- 200.31, **Acceptable Use of Computers**
- 300.10, **Motor Vehicle Pursuits**
- 300.24, **General Broadcasts**
- 300.27, **Response Management**
- 400.05, **State Property**
- 400.14, **Criteria to Submitting Incident Reports**
- 400.15, **Police Records**
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.03 Computer Use Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.20 Information Resources & Technology Privacy Policy

**200.30**

# Police Computer Systems

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

This Department Manual Policy establishes a set of strict guidelines for governing access to and use of the department's centralized computer systems.

This Department Manual Policy applies to all employees.

## Authorization and Use

Authorized use of centralized police computer systems is restricted to the following:

a. Entries, modifications, and inquires on local, state, and national computers.

b. Dispatching.

c. Prisoner bonding.

d. Information necessary for the efficient and expeditious performance of the department's operations.

The centralized police computer systems are intended solely as an aid to employees in the performance of their assigned responsibilities. Employees shall limit their system activities to those necessary to accomplish their assigned responsibilities. Security clearance and access to information is restricted to official police business and does not permit any employee access to information for personal reasons.

## Use of Information

Much of the information available through the centralized police computer systems contains confidential and sensitive data that must be carefully controlled to ensure the department is in compliance with applicable local, state, and federal guidelines. Any employee accessing police files or obtaining information from a centralized police system shall be held accountable for the appropriate and correct use of the information and for the proper disposal of the information.

Information obtained through the computer shall not be considered probable cause to arrest. Information received through the computer should be considered in conjunction with other information about the circumstances of an offense before any arrest decision is made.

## Security

Based on the nature of their duties, most classified personnel shall be granted access to computerized police information, including, but not limited to, incident reports and general name and personnel inquiries. However, when an incident report is flagged "Confidential" by an investigator, only the investigator that initiated the flag can authorize access to the report. Civilian employees shall not receive security access to any police information system unless authorized by the Captain.

Each employee who uses a personal computer, laptop, or mobile device to access centralized police systems shall be held accountable for its proper operation and shall be responsible for each transaction made. Each employee shall use a unique user name and password to access a police computer system. Employees shall not reveal their name of password or allow anyone else to use those credentials to gain access to any TSUDPS computer system.

Employees who forget their computer or software passwords must contact the Office of Internal Audit of Information Technology to get it reset. At the earliest opportunity the employee shall sign on to the centralized computer system and change the temporary password to something known only to the employee.

## Responsibility

The Office of Internal Audit of Information Technology is responsible for monitoring and managing all TSUDPS personal computers, laptops, and mobile devices that access centralized police computer systems and for maintaining the integrity of TSUDPS's computer network and related systems.

## Reporting Equipment Problems

Any problems encountered with TSUDPS computer equipment should be immediately reported to the technology coordinator. If the problem cannot be resolved, the service desk for the Office of Internal Audit of Information Technology should be contacted.

## Abuse of Equipment

Employees operating a police computer system shall exercise reasonable care of the equipment. Employees shall be held responsible for any damage resulting from intentional abuse of negligence (e.g., spilled drinks or food, paper clips).

## Related Department Manual Policies and Reference Material

- 200.01, **Keys, Passwords, and Personal Identification Numbers**
- 200.29, **Mobile Computing Devices**
- 200.31, **Acceptable Use of Computers**
- 400.05, **State Property**
- 400.16, **Media Relations**
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.03 Computer Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.17 Password Security Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.20 Information Resources & Technology Privacy Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.28 Personal Identifiable Information Policy

# Acceptable Use of Computers

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Except as provided by this Department Manual Policy, all computers or networked systems owned, leased, rented, or under the control of the department shall be used for business purposes in service the interests of the university and department. Except as provided by this Department Manual Policy, any data (e.g., file, program, email) created (whether on- or off-site) on a department owned or controlled computer or networked system is the property of the department.

This Department Manual Policy applies to all employees.

## Definitions

**Computer.** For purpose of this Department Manual, computer includes, but is not limited to, any personal computer, laptop computer, tablet computer, smartphone, or any other device that is owned or controlled by the department and is capable of accessing network or Internet resources.

**Disruption.** This term includes, but is not limited to, network sniffing, pinged floods, packet spoofing, denial of service, and forged routing information for malicious purposes.

**Networked System.** For purposes of this Department Manual this term refers to any department owned or controlled Internet, Intranet or Extranet related systems. This also includes workstations, desktops, laptops, tablets, or server systems, and the hardware and software to operate those systems.

**Malicious Programs.** Viruses, worms, email bombs, Trojan horse codes, or other destructive or disruptive programs.

**Security Breach.** This term includes, but is not limited to, accessing data the employee is not intended to receive or logging into a computer, server, or account the employee is not expressly authorized to access.

**Spam.** Unauthorized or unsolicited messages sent to a large number of recipients via the Internet. Also, the act of sending spam.

## Directives

All networked systems, computer equipment, software, operating systems, and storage media, as well as network accounts providing email, Internet browsing, or file transfer protocols that are owned, leased, rented, or controlled by the department are to be used for business purposes in serving the interests of the university and department and users in the course of normal operations. The department does not prohibit the limited use of networked system for personal use. Brief personal usage of 3–5 minutes to check email, the weather forecast, or news sits are examples of acceptable use of department computers for personal reasons. However, employees are responsible for exercising good judgment regarding personal use.

Each office, division, and unit are responsible for creating guidelines concerning the use of department owned or controlled computers and networked systems. In the absence of such policies, employees shall be guided by department regulations regarding personal use. If there is any uncertainty, employees shall consult with their supervisor before using a networked system.

Texas Southern University **Department of Public Safety**

# Audit Information

For security and network maintenance purposes, authorized individuals within the department may monitor equipment, networked systems, and network traffic at any time. The department reserves the right to audit any department owned or controlled networked system on a periodic basis to ensure compliance with this policy.

## Security and Proprietary Information

Any information accessed via a networked system may be classified as confidential (e.g., law enforcement private information, organizational strategies, specifications, telephone and contact lists, and research data). Employees shall prevent unauthorized access to this information.

Employees shall keep passwords and personal identification numbers (PINs) secure and shall not share accounts (see Department Manual 200.01, **Keys, Passwords, and Personal Identification Numbers**). Authorized users are responsible for the security of their passwords, PINs, and accounts. System level user passwords and PINs shall be changed upon request by the Office of Internal Audit of Information Technology.

Any computer that connects to a networked system, regardless of who actually owns the computer, shall be:

 a. Protected and continually scanned by approved anti-virus software.

 b. Maintained to current levels of protection.

 c. Configured to obtain operating system patches and updates for the Office of Internal Audit of Information Technology or an authorized software vendor.

All serves and desktop, laptop, and work-station computers shall be secured with a password-protected screensaver with automatic activation feature set at 10 minutes or less. Employees shall log off their computers if they are going to be away from it for more than two hours. All tablet computers shall have an idle times screen-lock secured with a six-digit PIN.

Because information contained on portable computers (e.g., laptops, tablets) is especially vulnerable, special care shall be exercised. At a minimum, the use of a unique password or PIN shall be used. Some data is extremely sensitive and employees are strongly encouraged to have multiple layers of protection on these files.

All postings by employees from a department email address to a newsgroup shall contain a disclaimer stating, "The opinions expressed are those of the author and not necessarily those of the department," unless they are posted in the course of business duties.

## Using Data From an Outside Source

Employees shall use extreme caution when dealing with all email attachments, especially those received from unknown senders, or unexpected attachments from known senders. Emails frequently carry malicious programs that can easily, quickly, and irrevocably destroy or corrupt all data within a computer, server, or networked system and compromise the entire TSUDPS computer network.

Employees shall use extreme caution using any data brought in from an outside source. When outside data is used, employees shall first scan the files for malicious programs before downloading or using the information, even if the data comes from the employee's personal computer.

Employees shall use extreme caution when using USB drives (thumb drives) from unknown or untrusted sources. Simply inserting a USB drive containing malicious software can easily, quickly, and irrevocably destroy or corrupt all data within a computer, server, or networked system and compromise the entire TSUDPS computer network.

# Unacceptable Use of Computers

Under no circumstance is an employee authorized to engage in any activity that is illegal under local, state, federal, or international law.

The following subsections include lists of prohibited activities that are by no means exhaustive, but attempt to provide a framework for activities that fall into the category of unacceptable use of computers.

# Prohibited Computer and Networked System Activities

Employees shall not:

a. Violate the rights of any person or company protected by copyright, trade secret, patent or other intellectual property laws, or similar laws or regulations. This includes, but is not limited to, the installation or distribution of "pirated" materials or other software products that are not appropriately licensed for use of the department.

b. Copy or use copyrighted material including, but not limited to, digitization and distribution of photographs, music, or literary works that are not authorized. This also includes the installation of any copyrighted software for which the department or the end user does not have an active license.

c. Export software, technical information, or encryption software or technology that is not authorized. The appropriate level of management shall be consulted prior to exporting any material in question.

d. Intentionally introduce malicious programs into the network or server.

e. Reveal their account password or PIN to others or allow the use of their account by others (See Department Policy 200.01, **Keys, Passwords, and Personal Identification Numbers**). This includes family and other household members when work is being done at home.

f. Use any department equipment to actively engage in procuring or transmitting material that is in violation of sexual harassment of hostile workplace laws (see Department Manual 200.17, **Discrimination, Harassment, and Other Prohibited Conduct**).

g. Make fraudulent offers of products, items, or services originating from any department account.

h. Make statements about warrant. Expressed or implied, unless it is within the scope of assigned duties.

i. Commit security breaches or disruptions of network communication, unless these duties are within the scope of assigned duties.

j. Conduct port scans or security scans unless otherwise authorized by the Office of Internal Audit of Information Technology.

k. Execute any form of network monitoring that intercepts data not intended for the employee's host, unless it is within the scope of assigned duties.

l. Circumvent user authentication or security of any host, network, or account.

m. Interfere with or deny service to any user other than the employee's host (e.g., denial of service attack).

n. Use any program, script, or command, or send messages of any kind with the intent to interfere with or disable a user's terminal session, via any means, locally or via the networked system.

o. Provide information about or a list of department employees to any party outside the department without the express direction of the Chief of Police or other authorized department entity.

Personnel are reminded that criminal history checks are restricted to official police business. Employees are accountable for the correct use and dissemination of this information.

## Prohibited Email and Communication Activities

There are no exceptions to these prohibited activities. Employees shall not:

a. Send junk mail, span, or other advertising material including sales solicitations of any type to individuals who did not specifically request such material.

b. Harass any person (see Department Manual 200.17, **Discrimination, Harassment, and Other Prohibited Conduct**) via email, telephone, or any type of paging or communication device, whether through language, frequency, or size of messages.

c. Use of forge email header information that is not authorized.

d. Create or forward "chain letters" or "Ponzi" or other "pyramid" schemes of any type.

e. Solicit email for any other email address, other than that of the poster's account, with the intent to harass or to collect replies.

f. Send from or through TSUSPS's network system or any other service provider unsolicited email that advertises any group or service sponsored by the department.

g. Post or spam the same of similar non-business related messages to large numbers of Usenet newsgroups.

## Enforcement

Any employee found intentionally violating this policy shall be subject to disciplinary, civil, or criminal actions.

## Related Department Manual Policies and Reference Material

- 200.01, **Keys, Passwords, and Personal Identification Numbers**
- 200.17, **Discrimination, Harassment, and Other Prohibited Conduct**
- 200.29, **Mobile Computing Devices**
- 200.30, **Police Computer Systems**
- 400.05, **State Property**
- 400.15, **Police Records**
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.05.11 Sexual Harassment Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.05.13 EEO/Non-Discrimination Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.03 Computer Use Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.10 Email Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.12 Internet Use Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.17 Password Security Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.20 Information Resources & Technology Privacy Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), Personally Identifiable Information Policy

# Disposition of Arrested Juveniles

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The Texas Southern University Department of Public Safety shall follow established procedures in the arrest and disposition of juveniles.

This Department Manual Policy applies to all employees.

## Arrest of Juveniles

Officers may be called upon to assume custody of juveniles who have been accused of delinquent violations ranging from status offenses to capital felonies.

Because the police are governed by the Family Code as well as specific guidelines approved by the Juvenile District Court of Harris County, all personnel should understand that procedures for dealing with juvenile suspects differ significantly from those used for handling adults.

The department's policy in dealing with juveniles is one of intervention and correction, whenever feasible.

When dealing with juveniles, employees shall limit their response to resistance and physical contact to only the amount reasonably necessary to protect themselves or others, to effect an arrest, or to bring an incident under control.

Officers assuming custody of a juveniles may exercise one of three options for prisoner disposition:

a. They may release the juvenile in the field to a parent, legal guardian, custodian, or other responsible adult.

b. They may transfer custody of the juvenile to a department approved juvenile facility.

c. They may return the juvenile to the school they attend if that school is in session and the school principle or designee, or school police officer agrees to assume responsibility for the juvenile for the rest of the school day.

All dispositions require approval from an on-duty supervisor.

## Reporting Procedures

When officers have taken a juvenile to a department approved juvenile facility, reports concerning a juvenile in custody or public service transportation shall be completed prior to end of the officer's shift.

An incident report that includes the following information shall be made when a juvenile is released without being taken to a department approved juvenile facility.

a. The juvenile's name, address, date of birth, sex, and race.

b. Physical description of the juvenile (e.g., height, weight, hair and eye color).

c. Any alias or nickname used by the juvenile.

d. The school the juvenile attends (or last attended if no longer in school) and the juvenile's grade level.

e. Location the juvenile was arrested, the offense, and the circumstances surrounding the arrest.

f. Names, address, and home and work telephone numbers of the juvenile's parents or legal guardians, even if the juvenile was released to someone else.

g. Name, address, and home and work telephone numbers of the person to whom the juvenile was released.

h. The receiving person's relationship to the juvenile.

i. The name of the on-duty supervisor authorizing the release.

## Traffic Citations

Traffic citations cannot be issued to juveniles younger than 10 years of age. A juvenile younger than 10 years of age should be returned to a parent, legal guardian, or custodian, or to any other responsible adult with the approval of the juvenile's parent or legal guardian.

Traffic citations may be issued to juveniles 10 through 16 years of age at the officer's discretion and as outline below.

a. A juvenile 10 through 13 years of age may be issued a traffic citation but shall not be assigned a court date. The issuing officer shall print the word "juvenile" at the top center of the citation. The issuing officer shall then complete and incident report.

b. A juvenile 14 through 16 years of age who commits a traffic related violation may be issued a traffic citation for improper operation of a vehicle (e.g., ran a red light, ran a stop sign, speeding, bicycle associated offenses). A court date shall be assigned and the issuing officer shall write "Bring One Parent to Court" at the top of the citation.

## Non-Traffic Citations

Non-traffic Class C misdemeanor citation cannot be issued to juveniles younger than 10 years of age.

Non-traffic Class C misdemeanor citations may be issued to juveniles 10 through 16 years of age at the officer's discretion and in accordance in sections *Arrest of Juveniles and Reporting Procedures* of this Department Manual. For applicable offenses, the officer must complete an incident report that includes the ticket numbers, court number (if any), and the date and time required to appear (if applicable).

A juvenile 10 through 16 years of age may be issued a citation for Class C misdemeanor Public Intoxication and released to a parent, legal guardian, custodian, or responsible adult.

A juvenile 10 through 16 years of age may be issued a citation for violation of the Curfew Ordinance. In addition, parents or legal guardians may be cited for allowing violations of the curfew. Whether or not a citation is issued, an incident report must be completed and included all information under section *Reporting Procedures*.

All other non-traffic Class C misdemeanor citations issued to juveniles 10 through 16 years of age shall be issued as outlined below.

a. A juvenile 10 through 13 years of age may be issued a non-traffic Class C misdemeanor citation but shall not be assigned a court date. The issuing officer shall print the word "juvenile" at the top center of the citation. The issuing officer shall then complete an incident report.

b. A juvenile 14 through 16 years of age may be issued a non-traffic Class C misdemeanor citation. The issuing officer shall write the admonishment to "Bring One Parent to Court" at the top of the citation. For applicable offenses, the officer shall write the incident number on the citation.

Court dates for all non-traffic juvenile citations shall be set for the officer's regular arraignment court, date, and time. The court's internal filing and docket system shall automatically divert these cases to the Juvenile Court.

## Municipal Court Arrest Warrants

Officers shall not bring juveniles to the department approved juvenile facility or a police station for a traffic warrant. The warrant shall instead be left on file and may be executed when the juvenile becomes 18 years of age.

Officers are reminded that an incident report is still required when a juvenile is released without being taken to a department approved juvenile facility.

## Arrest Procedures

Particular care must be exercised to ensure that a juvenile is not detained in or committed to a compartment of a jail or lockup facility in which adults arrested for, charged with, or convicted or crimes are detained or committed. Juvenile prisoners shall be kept separated from adult prisoners both physically and by sight and sound. Officers shall give the dispatcher the starting mileage and destination location when transporting a juvenile.

A jail prisoner shall not be automatically sent to a department approved juvenile facility because of a claim to be a juvenile. A supervisor shall assist in determining the correct age of the suspected juvenile. The prisoner shall not be transferred to a department approved juvenile facility unless proof of a juvenile age is conclusive or age cannot be verified.

When a prisoner who was originally believed to a juvenile is found to be an adult, officers shall work with the officers at the juvenile facility. The adult prisoner shall be transferred to appropriate custody in an expedient manner.

Officer shall follow procedures in Department Manual 300.21, **Driving While Intoxicated**, when handling juveniles who are arrested for driving while intoxicated.

The following procedures shall be following for any juvenile that is brought to the TSUDPS for the purpose of investigation and/or identification:

a.   The officer taking the juvenile into custody shall, as soon as practical, notify the juvenile's parent, guardian, or custodian.

b.   The interview and/or interrogation shall be conducted with no more than two officers present in the room with the juvenile.

c.   The juvenile shall be allowed to converse with his/her parent(s), guardian, attorney, or custodian when requested by the juvenile.

d.   The interviewing officer shall have the responsibility of notifying the juvenile of the procedures followed by law enforcement personnel during the investigation, arrest, report, booking, release, and possible referral to the Harris County Juvenile Probation Department.

e.   The holding of a juvenile for the purpose of investigation and/or identification shall not be an unreasonable amount of time, but in no instance for more than six (6) hours.

f.   The juvenile must be referred, released from custody, or transported to the Harris County Juvenile Probation Department within the six (6) hour period.

g.   The juvenile shall be informed of his/her rights before being interrogated.

# Electronic Monitoring Devices

Officers who have detained a juvenile based on reasonable suspicious or have probable cause to arrest a juvenile who is wearing an electronic monitoring device shall contact the Harris County Juvenile Probation Department to determine if the individual is wanted for a probation violation.

# Records

All jail records, arrest blotters, photographic images, and fingerprints must be purged from all adult files if a prisoner is discovered to be a juvenile in jail custody. The juvenile prisoner and all jail documents pertaining to the juvenile shall be released to the jail facility.

Police Department files and records regarding a juvenile are neither open to public inspection nor may their contents be disclosed to the public. Inspection of the files and records is permitted by the Juvenile Courts, Juvenile Probation Department, district attorney, or members of other law enforcement agencies when necessary for the discharge of their official duties.

## Related Department Manual Policies and Reference Material

- 300.02, **Effecting Arrests and Searches**
- 300.21, **Driving While Intoxicated**
- 400.14, **Criteria for Submitting Incident Reports**
- Texas Southern University Department of Public Safety Standard Operating Procedure, Juvenile Procedures / Arrest and Reports

# Overtime Compensation

*Reference: Supersedes all prior conflicting Policies and Directives*

## Policy

Overtime compensation for nonexempt classified and civilian employees shall be made in accordance with federal and state statutes and the City of Houston Code of Ordinances.

Federal and state law recognize the department's right to manage an employee's assignment, shift, and days off for the best interest of the department and the community, and to ensure all essential police services are provided. Although exempt officers are considered exempt from overtime compensation for all intents and purposes under the Fair Labor Standards Act, the department shall compensate exempt officers as set forth herein with exempt time compensation for hours worked in excess of the number of hours in the exempt officer's regular workday.

This Department Manual Policy applies to all classified employees who hold the rank of police officer, or sergeant, or other classified employees, nonexempt and exempt and civilian employees who are not exempt where specifically provided (e.g., supervisors)

## Definitions

**Adjusted Shift.** A variation from a nonexempt employee's regularly scheduled shift as posted on the employee's current divisional personnel record. The variation must occur within the same workday.

**Classified Employee.** For purposes of this Department Manual, the term classified employee may be used interchangeably with the term officer as defined below.

**Exempt Officer.** For the purposes of this Department Manual, an exempt officer is a classified employee who holds the rank of lieutenant or captain or above.

**Exempt Time Compensation.** Pay earned for hours worked in excess of the number of hours in the exempt officer's regular workday and in accordance with the provisions outlined in this Department Manual Policy. Exempt Time Compensation is considered assignment pay and shall be calculated as straight time pay.

**Extra Hours.** The hours in excess of forty (40), when hours actually worked during a work week are fewer than forty (40), but total hours for pay including paid leave and holidays exceeds forty (40) hours.

**Flextime or Flexing.** The adjustment of regular workday hours (e.g., 8- or 10-hour shift) by an exempt officer to make up for a reduced workday or an extended workday.

**Nonexempt.** Refers to an employee whose job classification is covered by the Fair Labor Standards Act (FLSA) as being eligible for overtime compensation. For the purposes of this Department Manual, this includes classified employees with a pay grade equivalent of sergeant or below.

**Pay Period.** See Department Manual 200.08, **Work Hours.**

**Special Events.** Special Events shall be defined as any activity or event sponsored or hosted by any "External" company, group and/or entity regardless of participation by TSU campus community members.

**Straight Time Pay.** As used in the Department Manual Policy, straight time pays refers to exempt time compensation earned and paid on an hour-for-hour basis with the amount calculated on duty the exempt officer's base and longevity pay.

# Calculation of Overtime

Nonexempt classified and civilian employees shall earn overtime compensation after they have worked in excess of 40 hours in the workweek. Paid leave and/or holidays taken are not counted as hours worked for purposes of determining overtime hours. Only productive hours worked during that work week are counted.

When calculating overtime compensation, quarter-hour time block shall be used for time entered into the payroll system. If an officer works eight minutes or more of a quarter-hour block, then the entire 15-minute block shall be approved for compensation. When less than eight minutes in a time block worked, credit for that time block shall not be granted.

Except as otherwise noted in this Department Manual or related policies, all overtime earned shall be compensated at the rate of time and a half.

Overtime pay shall be calculated at the officer's rate of pay at the time the overtime was earned.

# General Rules

Travel from home to work or the reverse is not hours worked for purposes of the FLSA. See section *Call-Ups and Special Assignments and Call-Back Pay* for exceptions.

Officers and nonexempt civilian employees shall not work overtime without prior authorization from the appropriate supervisor.

All overtime shall be justified as serving a specific department function or need.

Authorizing overtime for the specific purpose of allowing an officer to receive overtime compensation is strictly prohibited, unless it can be established that the adjustment is in the best interest of the department. The authorizing supervisor must properly document the reason for the adjustment on all appropriate forms.

Additionally, intentional or careless working off the clock is prohibited. Officers and nonexempt civilian employees who under-report or rail to report hours worked are subject to disciplinary action. Supervisors who allow such action shall also be subject to disciplinary action. Unless otherwise allowed by law, the following applies:

    a.  Officers and nonexempt employees may not waive their rights to or refuse compensation for overtime worked.

    b.  Supervisors shall not order or suggest to officers or nonexempt civilian employees to waive their right to or refuse compensation for overtime worked. See also section *Denial or Removal of Overtime Compensation*.

Buddy Punching, whether it results in overtime compensation or not, is prohibited. Employees shall refer to Department Manual 200.08, **Work Hours** for further information regarding Buddy Punching.

# Eligibility For Exempt Officers

Exempt officers shall not work in excess of the number of hours in the exempt officers' regular workday without prior authorization from the appropriate supervisor.

Work in excess of the number of hours in the exempt officer's regular workday must be justified as serving a specific department function or need.

Exempt officer shall be eligible for exempt time compensation for hours worked in excess of the number of hours in exempt officers' regular workday, including all time actually worked in accordance with this Department Manual Policy.

When calculating exempt time compensation, quarter-hour time blocks shall be used for time entered. If an exempt officer has worked eight minutes or more of the quarter-time block, then the entire 15-minute block shall be approved for exempt time compensation. When less than eight minutes in the time block are worked, credit for that time shall not be granted.

Exempt time compensation shall be earned on an hour-for-hour basis at straight time pay for exempt officers holding the rank of lieutenant or captain or above or civilian equivalent.

## Flextime For Exempt Officers

Exempt officers shall not be authorized to flex their shift for the purpose of earning exempt time compensation. Supervisor, however, may approve an exempt officer to flex his shift in order to meet department needs even if it results in the exempt officer earning exempt time compensation that would have not been earned had the shift not been flexed. Employees shall refer to Department Manual 200.08, **Work Hours** for other directives regarding flextime.

## Call-Ups and Special Assignments

### Call-Ups for Nonexempt Employees

When off-duty officers are ordered by a supervisor to report immediately to a specific location for a department action other than court attendance, overtime compensation shall be authorized from the time the officer receives notification and shall continue until the officer is released from the last location to which he was ordered to report.

The travel time allowed for compensation must be realistic in association and not have an appearance of impropriety.

### Call-Ups for Exempt Employees

When, without prearrangement, off-duty exempt officers are required to report immediately to a specific location for a department action other than court attendance, exempt time compensation shall be authorized from the time the exempt officer receives the notification and shall continue until the officer departs from the last location requiring department action.

The travel time allowed for exempt time compensation must be realistic in association and not have an appearance of impropriety.

### Special Assignments

When a supervisor notifies an officer to report to a specific location and at a specific time to perform a needed police action (e.g., parades, demonstrations), overtime compensation shall be authorized from the officer's arrival time or the time the officer was scheduled to report to the event location, whichever is later.

## Call-Back Pay

If, after a nonexempt civilian employee's scheduled hours of work have ended and without prearrangement, the nonexempt employee is ordered by a supervisor to report immediately to a specific location for a department action, overtime compensation shall be authorized from the time the employee receives the notification and shall continue until the employee is released from the last location to which he was ordered to report.

The travel time allowed for compensation must be realistic in association and not have an appearance of impropriety. Travel time shall not apply to prescheduled overtime, end of shift hold-overs, or responses made via telephone or other electronic device, which shall continue to be compensated based on time actually worked at the applicable straight or overtime rate.

## Special Events

Each member of the TSUDPS may be required to work Special Event duty as needed. Special Event duty will be hours worked other than normally scheduled hours, and will be compensated in accordance with established federal, state, and University guidelines.

## Compensation

Employees scheduled for special events will be compensated for a minimum of four hours for an event except when a group fails to show for their event, the officer will be compensated for two hours or when a group show, but cancels the event due to unforeseen events, the officer will be compensated for two hours.

## Holidays

All eligible employees who are required to work on a scheduled holiday are entitled to equivalent time off with pay to be taken during the following twelve (12) month period.

## Daylight Saving Time

At the beginning of Daylight Saving Time, which occurs each year on the second Sunday in March at 0200 hours, clocks are adjusted forward one hour. Nonexempt officers whose scheduled shift is shortened by one hour due to the change in time shall have the option of either one of the following:

a.   Burning one hour of accumulated leave.

b.   Working one hour directly before or directly after their regularly scheduled shift.

The Captain shall ensure officers' time is accounted for accordingly. The Captain shall also ensure a coordination of efforts between shifts when officers to elect to work one hour directly before or after their regularly scheduled shift.

At the end of Daylight Saving Time, which occurs each year on the first Sunday in November at 0200 hours, clocks are adjusted backward one hour. Prior to the first Sunday in November of each year, the Captain shall determine the appropriate staffing levels necessary to provide adequate police services for the extended shift when the end of Daylight Saving Time occurs. The Captain shall generate a sign-up list and ask for volunteers to work the additional hour on such date for overtime. If vacancies exist after everyone has been officered the opportunity to volunteer, the division shall utilize a seniority list to fill any vacancies remaining. Seniority shall be used in conjunction with each officer's preference to determine which officers will be permitted to go off duty after having worked the number of hours in the extended shift. Overtime shall be paid in accordance with section *Calculation of Overtime*.

## Earn and Burn

The department prohibits the practice is known as "Earn and Burn" in which an employee burns some personal leave time in order to work an overtime program and earn overtime. Described below are prohibitions regarding Earn and Burn.

Officers and nonexempt civilian employees shall not use or be allowed to use (burn) any type of leave (straight time) and earn overtime compensation during the same shift.

Furthermore, if an officer or nonexempt civilian employee burns unscheduled leave for a regularly scheduled shift in the 24-hour period before or after working any overtime program, an Earn and Burn violation has occurred unless one of the exceptions noted below applies.

The following are exceptions and shall not constitute violations of the Earn and Burn policy.

a. **Manpower Shortages, Emergency Call-Ups, Call Backs, or Special Assignments.** The captain has the authority to give approval for officers or nonexempt civilian employees to work an overtime program due to manpower shortages, emergency call-ups, call backs, or special assignments even though the officer or nonexempt civilian employee has burned scheduled leave. The Captain's approval must be documented on the paperwork for overtime.

b. **Exception Circumstances.** If an officer or nonexempt civilian employee burns unscheduled leave due to unforeseen, exceptional circumstances (e.g., family emergency) in the 24-hour period before or after working an overtime program and it is deemed appropriate by the below designated supervisor, the following shall apply:

   1. *When the employee burns up to and including half of the employee's regularly scheduled shift* (e.g., 4 hours of an 8 hour shift), a supervisor may approve the employee to work an overtime program. The supervisor may also determine a violation has not occurred if the time burned occurs after working an overtime program. The supervisor's approval shall be documented on the paperwork for overtime.

   2. *When an employee burn more than half of the employee's regularly scheduled shift* due to exceptional circumstances, the Captain may approve the employee to work an overtime program The Captain may also determine a violation has not occurred if the time burns occurs after working an overtime program. The Captain's approval shall be documented on the paperwork for overtime.

If an Earn and Burn violation occurs, the officer or nonexempt civilian employee may be prohibited from working any overtime program in the future and may be investigated in accordance with the department's disciplinary system. The Captain shall make the final determination of whether an employee is prohibited from working an overtime program. Additionally, the Captain has the final decision on questions regarding the *Earn and Burn* policy.

## On-Duty Training

Officers, nonexempt and exempt, and nonexempt civilian employees shall adjust their shift to attend on-duty training when such training falls outside their regularly scheduled shift. If the on-duty training falls on the officer's regular day off, the supervisor shall adjust the officer's days off.

Officers and nonexempt civilian employees attending on-duty training are eligible for overtime compensation if the training causes the employee to exceed 40 hours of time actually worked in the work week.

Officers shall have their arrival and departure times certified by a member of the training staff. Except as provided above, overtime may be authorized only to avoid a negative impact on division operations.

## Travel Time Gap

Except as noted below, there must be a non-compensated travel time gap between an officer's and nonexempt civilian employee's end of shift and the beginning time of an overtime assignment and vice versa. The travel time gap must be realistic in association and not have an appearance of impropriety. Calculation of travel time gap shall consider the time of day, traffic, weather, and distance traveled. If travel is required, the minimum travel time gap shall be no less than 15 minutes.

When officers or nonexempt employees are traveling to an overtime assignment in a privately owned vehicle, the requirement of a travel time gap applies. There is no travel time gap requirement when officers are traveling to an overtime assignment using a Department or State owned or controlled vehicle or when no travel is required.

## Documentation of Overtime

Employees requesting overtime compensation shall document the overtime on their weekly payroll report and submit to their supervisor.

## Supervisor Responsibilities

Supervisors shall not delegate their authority to approve overtime compensation requests to non-supervisory personnel.

Supervisors shall ensure travel time gaps and requests for overtime and travel compensation are reasonable, proper, and in accordance with the rules for overtime compensation as outlined in this and other applicable Department Manual Policies and related materials.

Supervisors shall ensure that times on overtime on the weekly payroll report do not overlap with the officer's regular shift. Supervisors must pay special attention when officers adjust their shift or take off partial days.

Overtime on the weekly payroll report shall not be approved if it contains obvious inaccuracies. The weekly payroll report shall be returned to the officer for correction or explanation to the satisfaction of the supervisor. Except for obvious inaccuracies noted above, supervisor shall refer to section *Denial or Removal of Overtime Compensation*, if the overtime compensation request does not comply with this Department Manual Policy.

Supervisors shall not make changes on a submitted weekly payroll report. Corrections shall be made by the submitting officer.

## Denial or Removal of Overtime Compensation

Unless there is an obvious inaccuracy on a weekly payroll report for which an explanation or correction is needed as set f;or above in section *Supervisor Responsibilities*, officers who have worked overtime cannot be denied compensation.

It is the department's stance to compensate questionable overtime and then an inquiry shall be conducted. If the overtime worked is questionable, supervisors shall approve it, note their concerns, submit it, and then conduct an inquiry.

If an inquiry concludes the officer should not have received overtime compensation, it shall be arranged to have the overtime amount removed from the officer's pay. Furthermore, supervisors discovering an overtime violation shall adhere to the requirements of reporting employee misconduct set out in Department Manual 200.19, **Investigation of Employee Misconduct**.

When a determination is made that an officer should not receive overtime compensation, a copy of the weekly payroll report and a written explanation shall be provided to the officer. The original weekly payroll report and a copy of the written explanation shall be forwarded to the Captain immediately. The original documentation shall be filed in the officer's personnel/overtime file.

Officers who wish to appeal overtime compensation denial or removal shall follow the departmental grievance process detailed in Department Manual 200.25, **Employee/Grievance Complaint Resolution**.

## Related Department Manual Policies and Reference Material

- 200.08, **Work Hours**
- 200.19, **Investigation of Employee Misconduct**
- 200.25, **Employee/Grievance Complaint Resolution**
- Code of Ordinances City of Houston, Texas
- Texas Southern University Department of Public Safety Standard Operating Procedure, Special Events / Overtime
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.02.03 Overtime/Compensatory Time
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.03.04 Leave of Absence Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.05.03 Discipline and Termination Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.05.12 Work Schedules
- U.S. Department of Labor, Fair Labor Standards Act (FLSA)

# Vehicle Use and Assignment
### Reference: *Supersedes all prior conflicting Policies and Directives*

## Policy

Department vehicles are assets belonging to or under the control of the Texas Southern University Department of Public Safety and are provided to employees for the purpose of carrying out police missions. All department vehicles are allocated to division or assigned to specific personnel through the authority and approval of the Chief of Police.

This Department Manual Policy applies to all employees.

## Definitions

**State Vehicle (a.k.a. Department Vehicle).** For purpose of this Department Manual Policy, there terms are used interchangeable to refer to a vehicle owned or leased by the Texas Southern University Department of Public Safety.

**Operational Necessity.** The fact of being critical to operational continuity and/or functions in fulfillment of the mission of the Texas Southern University Department of Public Safety. As applied in this Department Manual Policy, take-home assignments, either permanent or rotational, are determined by operational necessity when vehicle resource availability is immediately required or expected.

**Out-of-Town Travel.** A destination to which it cannot be reasonably expected that an employee can travel, conduct business, and return within a business day.

**Permanent Take-Home Vehicle.** A department vehicle assigned to an employee who, because of assignment and/or job duties, is deemed to have a perpetual need for a take-home vehicle with storage privileges based on, but not limited to, operational necessity. The employee is generally assigned to a division in which employees are on-call and often are:

   a. Routinely called out to perform an assignment beyond normal duty hours.

   b. Require to report directly to various work sites.

   c. Required to carry and/or maintain specialized equipment.

**Primary Household.** For purposes of this Department Manual Policy, a primary household is where an employee resides on a regular basis. This includes an employee's true, fixed, principal, and permanent home to which that employee intends to return and remain even though currently residing elsewhere. The Chief of Police reserves the right to make the final determination of primary household considering evidence such as, but not limited to, driver licenses, voter registration rolls, homestead exemptions, property tax rolls, registered utilities, and mailing addresses.

## General Guidelines

No employee has a right or entitlement to the use of a department vehicle. Employees, by nature of job assignments and responsibilities, will be assigned and/or allowed to use department vehicles at the discretion of the Chief of Police.

Employees who operate a department vehicle shall adhere to the rules and restrictions outlined in this Department Manual Policy and other applicable department policies.

Employees shall adhere to the reporting requirements of relevant Department Manual Policies.

See Department Manual 400.04, **Employees Facing Legal Action** and 400.08, **State Vehicle Crashes**.

Driving a motor vehicle is an essential job function necessary to the carrying out of the duties of a police officer. Therefore, all classified employees shall maintain a current valid Texas driver license.

On an annual basis, the department shall obtain and review the driving record of each employee. Employees shall be disqualified from driving a State vehicle if they:

    a. Do not have current valid Texas driver license.

    b. Have been convicted of a felony involving the use of a motor vehicle.

    c. Have been convicted of DWI or DUI within 36 months prior to review.

    d. Have been convicted of any combination of three moving violations or at-fault crashes within 36 months prior to review.

Neither the State nor the department is required to find or create a new position to accommodate an employee who has been disqualified from driving on department business. The disqualified employee may apply for a posted position anywhere in the department or university, including the employee's own department, for a non-driving position for which the employee qualifies.

## Assignment of Take-Home Vehicles

Only the Chief of Police may authorize the assignment of take-home department vehicles.

All employees who have received authorization to have a take-home vehicle are reminded that the authorization is valid for only the residence address and job assignment and duties listed at the time of approval.

## Mileage Radius Limit

All employees authorized a take-home vehicle must reside within a 30-mile radius (one way) from the Texas Southern University Department of Public Safety in the General Service Building located at 3443 Blodgett Avenue, Houston, Texas. The Deputy Chief of the requesting employee may make an exception to this mileage limit up to a 50-mile radius (one way) from the General Service Building (3443 Blodgett).

The determination of the distance from the General Service Building shall be based on the primary household of the employee. The distance shall be a straight line measurement of miles. If it is questionable whether an employee's primary household is within the applicable mileage radius limit the employee shall prepare and submit correspondence and clarifying the nature of the ambiguity.

No employee may park a department vehicle at a non-assigned location and then continue his daily commute beyond the applicable mileage radius limit in order to circumvent the intent of this Department Manual. Employees shall not operate department vehicles for non-City business driving outside the area that includes Harris County and its surrounding counties (Montgomery, Liberty, Chambers, Galveston, Brazoria, Fort Bend, and Waller). Travel directly to and from the employee's permanent work assignment(s) is excluded from this policy and is governed by the applicable take-home vehicle mileage radius limit.

## Operating Rules For Department Vehicles

Employees operating a department vehicle shall do so in a safe and responsible manner. Employees shall operate motor vehicles in accordance with the applicable laws of the state of Texas and the City of Houston. Employees shall adhere to any operating rules provide by department policy. Department Vehicles:

a.   Shall be used only as authorized by department policy.

b.   Shall be driven by only authorized department employees, unless approved by a supervisor or directed by a policy employee during an emergency.

c.   Shall be driven by employees who possess a valid and appropriate Texas driver license. The Chief of Police reserves the right to require Defensive Driving Certification (DDC) training or any other training on a routine or special bases for any employee who operates a department vehicle. An employee who causes a motor vehicle crash while driving a department vehicle regardless of previous DDC training attendance shall be required to make every reasonable attempt to successfully complete DDC training.

d.   Shall be parked in a legal manner except during emergency situations.

e.   Shall not be placed in motion until the driver and all passengers have been fastened in their available seat restraints (e.g., seat belts and should harnesses).

f.   Shall be inspected by the employee before being driven for any unsafe condition, disrepair, or damage shall be reported to a supervisor immediately.

g.   Shall not be modified without prior authorization from the appropriate department official.

h.   Shall not be used to haul any type of cargo unless the cargo is properly secured and the height of the cargo is such that it will safely pass under obstructions along the intended route.

i.   Are subject to all tolls, parking, or other fees associated with driving a department vehicle and utilizing such service. Employees shall be personally liable for any citations or violations of this provision. It is incumbent on employees to register their take-home vehicle license plate for appropriate toll road access privileges. Toll and other fees may be reimbursed upon the presentation of appropriate documentation.

j.   Shall be kept clean (see section Care and Maintenance of Vehicles of this Department Manual).

k.   May be used for out-of-town travel to conduct department business with prior approval of the Chief of Police or designee when this mode of travel is the most cost effective.

l.   May be subject to additional restrictions regarding operation and use at the discretion of the Chief of Police.

Consumption of alcoholic beverages in a department vehicle by a driver or passenger is prohibited. No alcoholic beverage container shall be allowed in a department vehicle unless it is in the scope of the employee's duties or responsibilities (See Department Manual 200.03, **Drug Free Workplace**).

Employees shall not drive a department vehicle under the influence of alcohol or a controlled substance. Employees using prescription or non-prescription medication or substances having side effects that may hinder or impair safe driving shall not drive a department vehicle.

Utilizing earphone or non-emergency use of electronic devices while driving a department vehicle is prohibited. The use of cellular telephones in hands-free mode is permitted.

Employees are prohibited from using any tobacco product or electronic cigarette or charging an electronic cigarette in a department vehicle. See Department Manual 200.12, **Smoking, Tobacco Use, and Electronic Cigarettes**.

Employees operating department vehicles shall conduct a vehicle check upon taking care, custody, and control of the vehicle to ensure that no weapon, narcotic, or item of evidence is in

the vehicle prior to operation. All vehicles used for patrol type functions shall be checked at the beginning and end of each shift, as well as immediately after transporting a prisoner, suspect, or citizen for any reason. All other department vehicles shall be searched immediately prior to and immediately following the transportation of a prisoner, suspect, or citizen for any reason.

Employees shall ensure no bumper sticker, sign, or insignia is placed anywhere on a department vehicle without the authority of the Chief of Police.

## Attention to Duty

Classified employees, at all times while operating a department vehicle, shall maintain radio contact with the department. Officers shall monitor the radio channel corresponding to the area through which they travel. Officers shall serve as a supplementary force to the regular police units, taking appropriate police action when necessary.

Civilian employees, at all times while operating a department vehicle, shall be prepared to notify the police dispatcher of any situation warranting immediate police action.

## Care and Maintenance of Vehicles

All department vehicles shall receive regular preventative maintenance checks. The fleet officer shall check vehicles for preventive maintenance checks and ensure they are scheduled and completed. If a major repair problem is needed during the check, the vehicle shall remain in the shop until the problem is corrected. Notification of such action shall be given to the appropriate division or individual.

Employees with take-home vehicles are responsible for ensuring that all required maintenance is performed. Replacement vehicles may be provided with proper authorization for take-home vehicles due to regular preventative maintenance or repair.

All employees who drive a department vehicle shall:

    a.   Secure the vehicle and all department owned items in the vehicle.

    b.   Empty the vehicle interior of debris and trash after each use.

    c.   Keep the interior and exterior of the vehicle clean and presentable.

    d.   Add fuel to the vehicle under their control when needed.

    e.   Routinely check tire air pressure and fluid levels, particularly engine oil, when filling up with gas.

## Vehicle Abuse

The fleet officer shall report through the appropriate chain of command any known abuse or neglect of a police motor vehicle. The Chief of Police may revoke privileges for the use of department vehicle for an employee found to abuse, neglect, or otherwise keep a department vehicle in an unpresentable condition.

Employees may be held liable for damages to vehicles and required to make full restitution to the department for repair costs in cases of vehicle abuse. Vehicle abuse includes, but is not limited to:

    a.   Excessively racing a cold engine.

    b.   Continuing to operate a vehicle or item or equipment when engine instruments or waning lights indicate malfunctions.

    c.   Overloading a vehicle or using if for purposes other than those for which it was designed.

    d.   Failing to ensure that the appropriate preventative maintenance is accomplished.

## Disabled Vehicles

When a department vehicle needs to be serviced or repaired, employees shall:

    a.  Take the vehicle to assigned or nearest garage facility.

    b.  Park the vehicle in the appropriate lot.

    c.  Inform the fleet officer of the needed service or repair and where the vehicle is located.

Employees operating a department vehicle that becomes disabled shall notify the dispatcher and remain with the vehicle until it is removed by a department approved wrecker.

## Vehicle Insurance

Employees are insured by the Texas Southern University Department of Public Safety for liability to a third person arising from operation, maintenance, or use of motor vehicles owned or leased by the department.

Employees need not carry insurance riders to provide liability coverage for the operation, maintenance, or use of motor vehicles owned or leased by the department; therefore, no reimbursement for such riders is honored by the department.

## Related Department Manual Policies and Reference Material

- 200.03, **Drug Free Workplace**
- 200.12, **Smoking, Tobacco Use, and Electronic Cigarettes**
- 400.04, **Employees Facing Legal Action**
- 400.08, **State Vehicle Crashes**
- 400.10, **Emergency Management**
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.06.01 Drug-Free Campus

# Emergency Notification

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Texas Southern University Department of Public Safety personnel shall inform individuals of emergency and death messages in a sensitive, compassionate, and timely manner.

Except as authorized by this or another Department Manual Policy, employees shall not release the name of any deceased person until the next of kin has been officially notified.

The Department Manual Policy applies to all employees.

## Requests From Other Agencies

The department's Communication Division is responsible for processing requests from other governmental agencies to deliver emergency and death messages.

When Communication Division personnel receive a request from an outside agency to deliver an emergency or death message, the message shall be assigned to a field officer in the area of the message destination for delivery.

The responding field officer shall do all of the following:

    a.   Contact the dispatcher for further details regarding the emergency or death message.

    b.   Deliver the message personally to a responsible individual, preferably an adult.

    c.   Contact a supervisor for further instructions if unable to deliver the message personally.

    d.   Notify the dispatcher of the outcome after completing the assignment.

## Officer-Involved Incidents

In the event that a citizen is seriously injured or killed as a result of a department related vehicular crash, a supervisor shall be responsible for notifying the next of kin as soon as possible.

The Captain shall be responsible for notifying the next of kin as soon as possible in all other situations involving a citizen who is seriously injured or killed as the result of an officer-involved incident.

## Seriously Injured Officer

Except as noted below, no employee shall release the name of any seriously injured or deceased officer to a representative of the media. After the officer's next of kin has been notified, the TSU public information officer or any person designated by Chief of Police shall release the name to the media.

If the seriously injured or deceased officer's immediate family resides outside the greater Houston area and no other close family member resides within the greater Houston area, the injured officer's supervisor shall notify the Chief of Police. The Chief of Police or designee shall request a law enforcement agency close to the family's residence to personally contact the officer's family. The Chief of Police or designee shall provide a telephone number the family may call for more specific information.

## Related Department Manual Policies and Reference Material

- 400.08, **State Vehicle Crashes**
- 400.10, **Notification and Emergency Management**
- 400.15, **Police Records**
- 400.16, **Media Relations**
- Texas Southern University Department of Public Safety Standard Operating Procedure, Line of Duty Death/Serious Injury to Member

**200.36**

# Workers' Compensation

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The Texas Southern University (TSU) has a program by which eligible employees who suffer a compensable injury in the course and scope of their employment with the TSU may receive workers' compensation benefits in accordance with state statute and Texas Department of Insurance (TDI).

The TSU's Office of Injured Employee Counsel is responsible for the internal administration and processing of workers' compensation claims. Employees having questions regarding occupational injuries of workers' compensation benefits and claims should contact the Office of Injured Employee Counsel for assistance.

This Department Manual policy applies to all employees.

## Definitions

**Adjuster.** An employee of the Third Party Administrator who investigates and adjudicates insurance claims.

**Communicable Disease.** See Department Manual 200.28, **Communicable Disease Policy**.

**Exposure.** Confirmed contact with an infectious agent, such as through inhalation, percutaneous inoculation (puncture or cut by a sharp object), or contact with an open wound, non-intact skin, or mucous membrane.

**Fraud.** When a person knowingly or intentionally conceals, misrepresents, or makes a false statement to deny, obtain, or prolong workers' compensation benefits or insurance coverage or otherwise profit from the deceit.

**Injury.** The damage or harm to the physical or neurological structure of the body and those diseases, conditions, or infections naturally resulting from the damage or harm. This term also includes occupational illness that is a bodily injury or health impairment resulting from exposure to conditions of the recovering employee's physical environment and/or work area.

**Injury Leave.** Leave authorized by Section 14-226 of the City of Houston Code of Ordinances and Section 143.073 of the Texas Local Government Code and accorded to a recovering employee who sustains an injury or illness in the course and scope of employment with TSUDPS.

**Occupational Injury.** An injury, disease, or illness sustained in the course and scope of employment with the TSUDPS.

**Third Party Administrator (TPA).** Independent administrator contracted by the Texas Southern University to be responsible for the adjudication of workers' compensation claims including payments to recovering employees and health care providers in compliance with the law.

**Treating Physician.** For the purpose of this Department Manual, an individual, group, or facility authorized by the department and the TDI to direct the medical treatment of a recovering employee.

**Treating Physician's Statement.** A document provided by an authorized health care provider after an office visit with an injured employee. The treating physician's statement must contain the following information: the date of the office visit, the date of the incident, the name and contact information of the health care provider completing the statement, the current work status of the injured employee, the range of dates covered by the statement, and the employee's work and/or activity restrictions, if any.

# Injured On Duty (IOD) Forms, Etc.

The following injured on duty (IOD) and workers' compensation forms and related information sheets are available through the department and with the Office of Employee Legal Counsel.

Affidavit of Exposure to a Communicable Disease. Affidavit completed by an injured employee and used to request mandatory testing of the source of an exposure to a communicable disease.

**Employee's First Report of Injury.** Injured employees complete this form to provide the Office of Risk Management with information pertaining to the circumstances surrounding an injury and what has happened since the date of injury.

**Notice of Injured Employees Rights and Responsibilities.** Informs the employees of their rights and responsibilities with the Office of Injured Employee Counsel and the Texas Workers' Compensation System.

**State Office of Risk Management (SORM) Authorization for Release of Information.** This document is required immediately after sustaining a work-related injury to enable SORM to obtain, from healthcare providers, copies of relevant medical documents that will assist in the handling of the claim.

**State Office of Risk Management (SORM) Employee's Election Regarding Utilization of Sick and Annual Leave for General Employees.** This form allows injured employees to elect to use accrued sick leave or accrued annual leave for time missed from work due to the work-related injury.

**State Office of Risk Management (SORM) Employee Notification Packet.** A packet provided to the injured employee to give them notice of the network requirements for work-related injuries and illnesses.

**State Office of Risk Management (SORM) Witness Statement.** This form is used for any witness statements and information of witnesses who witnessed the incident.

**State Office of Risk Management (SORM) Workers' Compensation Network.** This form is filled out for the injured employee to acknowledge that they received Notice of Network Requirements on how to get health care under workers' compensation insurance.

**Supervisor's Report of Incident, Injury or Illness.** Form to be filled out by the supervisor who is informed of an employee's work-related injury.

## Employee's Initial Duties

Employees who are injured or potentially exposed to a communicable disease while in the course and scope of employment with the Texas Southern University Department of Public Safety (TSUDPS) shall:

a.  Immediately notify or arrange for the notification of a supervisor. This shall be done, if physically possible, no later than 24 hours following the time of the injury or exposure.

b.  Seek immediate medical attention if necessary and avoid any activity that may aggravate the injury. Employees shall seek medical attention from a treating physician who accepts workers' compensation patients. Failure to treat with an approved treating physician may make the employee ineligible for benefits under the Texas Workers' Compensation Act.

c.  Review, initial, and sign the necessary forms with a supervisor, if physically possible. Employees shall follow the rules and procedures listed on the Notice of Employees Rights and Responsibilities.

d. Employees who have potentially been exposed to a communicable disease shall also submit to baseline blood tests with ten calendar days following the exposure to a communicable disease. Employees shall complete the required injured on duty (IOD) forms including the Affidavit to Exposure to a Communicable Disease. Additionally, employees shall review and adhere to procedures outlined in Department Manual 200.28, **Communicable Disease Policy**.

## Supervisor's Initial Duties

It is the supervisor's responsibility to ensure that all of the initial IOD forms and required workers' compensation forms and documents are completed and forwarded to the Office of Injured Employee Counsel within 24 hours after being made aware of the injury or event, or as soon as practicable. Upon being notified of an occupational injury or potential exposure to a communicable disease, a supervisor shall:

a. Arrange for prompt medical treatment of the employee, if necessary.

b. Advise employee to seek medical attention from a treating physician that accepts workers' compensation patients. Failure to treat with an approved treating physician may make the employees ineligible for benefits under the Texas Workers' Compensation Act.

c. Initiate the process of filing workers' compensation claim by competing the required IOD paperwork. Completely fill out the Supervisor's Report of Incident, Injury or Illness form as soon as possible, but no later than 24 hours after being made aware of the injury or event. The incident number shall be documented in the comments section of the form.

d. Review with the employee, the Notice of Injured Employee's Right and Responsibilities. Additionally, supervisors shall request for the employee to complete, sign, and date the SORM Authorization for Release of Information form.

    If the employee refuses to initial, sign, or date any of the IOD forms, the supervisor shall document the refusal on each form that the employee refused to acknowledge. The supervisor shall also have a witness sign and date the form noting the refusal.

e. Report the claim to the Office of Injured Employee Counsel as soon as possible, or within 24 hours after being made aware of the injury or event.

f. Forward a copy of the completed IOD forms to the Office of Injured Employee Counsel within 24 hours following the report of injury or exposure.

g. Provide the injured employee with a copy of all completed IOD forms and workers' compensation information documents including:

    1. Supervisor's Report of Incident, Injury or Illness
    2. Notice of Injured Employees Rights and Responsibilities
    3. SORM Employee Notification Packet

h. Provide the employee on the Family Medical Leave Act (FMLA), if applicable. FMLA notice is require whenever an employee reports a condition covered under FMLA guidelines (see Department Manual 200.08, **Work Hours**).

Supervisors do not have the authority to authorize medical treatment or benefits. However, supervisors may inform a treating physician that a claim of occupational injury shall be or has been reported to the Third Party Administrator (TPA) and direct the treating physician to the TPA for authorization for treatment.

# Employee's Subsequent Duties

Employees who have reported an occupational injury or possible exposure to a communicable disease while in the course and scope of employment with TSUDPS shall follow certain subsequent procedures including:

a. Immediately report any change in their work status to their supervisor, assigned adjuster, and the Office of Injured Employee Counsel.

b. Immediately report to their supervisor any condition preventing them from performing any of the essential functions of their job duties and any directive form their treating physician that may affect their work status.

c. Contact the TPA after each doctor's appointment to advise the adjuster of updated medical and work status.

d. Provide supervisors with all pertinent information relating to the injury including information that could facilitate recovery and expedite the return to duty.

e. Remain available on a daily basis to receive telephone calls from the adjuster, Office of Injured Employee Counsel, a supervisor, or other department personnel. Typically such telephone calls should be made between 9 a.m. and 5 p.m. There may be allowances for medical care, TSU business appointments, or meetings with the Texas Department of Insurance (TDI) or the TPA.

f. Receive and return telephone calls and respond to all correspondence concerning the workers' compensation claim.

g. Cooperate fully and in a timely manner with all reasonable requests by any supervisors, the TSU, TPA, or a treating physician. These requests may include, but are not limited to, the scheduling or conducting of any personal visits, obtaining second opinions concerning the medical or work status, or providing documentation.

## Prohibited Activities

Employees who have filed a workers' compensation claim and are on injury leave, shall not engage in activity that is in direct violation of their treating physician's orders including, but not limited to:

a. Working any extra employment. For purposes of this Department Manual, certain income-making efforts (e.g., in-home day care, Web design, telemarketing, online actions) are considered to be extra employment.

b. Engaging in part-time or full-time for pay or as a volunteer.

c. Self-employment.

d. Working for any other person whether for a profit or for a non-profit, firm, business, or corporation.

## Training

Injured employees shall obtain authority and release from their treating physician in order to attend any training while on injury leave. Employees needing a waiver for any department of other mandatory training shall write correspondence to the Captain through the chain of command.

# Scheduled and Unscheduled Leave

The use of scheduled or unscheduled leave for vacation purposes while an employee is on injury leave is prohibited unless the employee submits one of the below items to his supervisor and complies with restrictions as provided by the treating physician to recuperate from the injury.

    a.  A letter or report from the treating physician releasing and giving approval for the employee to use such leave.

    b.  Any update forms from the treating the physician releasing the employee to duty with restrictions.

# Returning To Duty

Upon returning to work, employees shall submit documentation and include a statement from the treating physician that the employee may return to full duty or to duty with restrictions.

# Supervisor's Subsequent Duties

If the incident involves an Internal Affairs issue requiring correspondence, the issue shall be addressed in separate correspondence from the injury documentation.

Supervisors shall forwards all forms and treating physician's statements to the Office of Injury Employee Counsel after they are received from an injured employee. When a supervisor is made aware of any form that reflects that an employee may return to work with restrictions, the supervisor shall take the required steps to have the employee return to light duty status.

# Employee Contacts

Supervisors shall maintain contact with injured employees while they are on injury leave either by telephone or personal visits. Supervisors shall document the date, time, and results of any contacts. The purpose of maintaining contact with the injured employee is to determine the employee's status and to assist in any manner to facilitate recovery and expedite the return to duty.

Daily contact is not necessary if it is obvious from the nature of the injury that the employee shall be absent for a considerable length of time. Unless otherwise directed by the employee's Captain, supervisors shall contact an employee on injury leave at a minimum of once a week.

Lieutenants shall contact an employee who is on injury leave between the fifth and tenth consecutive calendar days of the IOD absence. After the initial contact, lieutenants shall repeat this process on a weekly basis.

The Captain shall contact any employee who has been on injury leave for 30 consecutive calendar days. After the initial contact, the Captain shall repeat this process every two weeks.

# Personal Visits

Supervisors shall conduct a scheduled or unscheduled personal visit with any employee who has been on injury leave for 30 consecutive calendar days. Supervisors shall continue to conduct personal visits with the injured employee at a minimum of once every 30 consecutive calendar days until the employee returns to duty. Personal visits may take place at the employee's home or place of recovery. Each supervisor shall report the details, date, and time to each visit to the Office of Injured Employee Counsel within 24 hours following each visit.

Telephone contacts or personal visits may occur outside the employee's scheduled shift. Should a supervisor have reason to believe an injured employee is feigning injury or perpetrating fraud, the supervisor shall immediately cease all communication with the employee, notify the Office of Injured Employee Counsel, and follow the procedures in Department Manual 200.19, **Investigation of Employee Misconduct**.

## Record Keeping and Confidentiality of Medical Records

Each division shall maintain a log for each employee who is on injury leave status. The log shall be updated daily to document all contacts made with the IOD employee or other concerned persons (e.g., spouse, relative, physician).

Contacts shall be documented whether initiated by the injured employee, an employee, or another concerned person. The data collected for the log shall include, but is not limited to:

a.  Dates, times, type of contact made, and its duration.

b.  The name of the person or employee who initiated the contact.

c.  A brief note outlining the contact.

Each division shall also maintain a workers' compensation file with all documentation, copies of forms, correspondence, notes, and updates that concern or relate to each IOD incident.

Employee-related medical information acquired by supervisors or other employees shall be kept confidential. All medical records pertaining to workers' compensation are confidential.

Access to or discussion of such information or records are restricted to persons who need to know in order to supervise the injured employee, conduct an investigation, or coordinate leave and benefits.

## Workers' Compensation Fraud

Under Section 418.001 of the Texas Labor Code, a person may be prosecuted for the state jail felony offense of fraudulently obtaining workers' compensation benefits. Any employee who has reason to believe another employee is fraudulently obtaining workers' compensation benefits shall be immediately report this information to the Office of Injured Employee Counsel and IAD. IAD shall conduct an investigation into the incident.

## Firearms Qualification

If an injury or illness prevents an officer from qualifying with or safely handling a firearm, the employee shall immediately notify a supervisor and shall follow procedures in Department Manual 300.01, **Firearms and Qualification**.

## Drug Testing

When an employee is absent for over 30 consecutive calendar days for any reason, the employee's supervisor shall instruct the employee to submit a drug test immediately upon returning to work (see Department Manual 200.03, **Drug Free Workplace**).

## Related Department Manual Policies and Reference Material

- 200.03, **Drug Free Workplace**
- 200.08, **Work Hours**
- 200.19, **Investigation of Employee Misconduct**
- 200.28, **Communicable Disease Policy**
- 200.40, **Temporary Alternative Assignments**
- 300.01, **Firearms and Qualification**
- 400.10, **Emergency Management**
- 400.17, **Assistance to Employees Involved in Critical Incidents**
- 28 Texas Administrative Code, Chapters 120–180, Texas Workers' Compensation Rules
- Code of Ordinances City of Houston, Texas, Section §14-185
- Code of Ordinances City of Houston, Texas, Section §14-226
- Texas Labor Code, Section §401.011, General Definitions
- Texas Labor Code, Section §418.001, Penalty for Fraudulently Obtaining or Denying Benefits
- Texas Local Government Code, Section §143.073 and Section §143.1115

**200.37**

# Contact With Representatives From Foreign Governments

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Employees are obliged under international custom and treaty laws to recognize immunity of certain diplomats. However, employees shall not ignore or condone the commission of crimes.

There are different categories of diplomats, some of whom enjoy greater immunities than other. Therefore, on initial contact, employees shall assume diplomats enjoy the privilege of diplomatic immunity until it is determined otherwise.

All incidents involving diplomats or persons claiming diplomatic immunity shall be investigated. Any questions can be directed to the United States Department of State (DoS) at 202-647-1727.

This Department Manual Policy applies to all employees.

## Definitions

**Diplomat.** A representative of a foreign government or an immediate family member of the representative. This term includes various categories of persons assigned to Embassies, Consulates and International Organizations (e.g., the United Nations).

**Diplomatic Immunity.** A principle of international law by which certain foreign government officials are not subject to the jurisdiction of local courts and other authorities for both their official and, to a large extent, their personal activities. Immediate family members may have the same rights and privileges as the diplomat.

**Honorary Consuls.** American citizens or permanent resident aliens who perform consular services on a part-time basis. Honorary consuls, unlike career consuls, are permitted to engage in other businesses. Honorary consuls have immunity for official acts only and immunity from the obligation to provide evidence as witnesses only in respect to official acts. They do not enjoy personal inviolability and may be arrested if circumstances otherwise warrant. Family members enjoy no immunity or personal inviolability.

The United States Department of State (DoS) is responsible for issuance of official identification cards for all honorary consuls and all representatives of foreign governments.

## Procedural Guidelines

### Personal Inviolability

Whenever a person detained claims to be a diplomat or claims to have diplomatic immunity, the person's official status shall be verified as described below in the Responsibilities subsections. Until the status of the person is confirmed, officers shall not do any of the following:

    a.  Handcuff the person

    b.  Search the person

    c.  Search any of the person's property

    d.  Search the person's vehicle

The only exception to the above policy regarding personal inviolability is if there are circumstances in which the diplomat's safety or public safety is in imminent danger, or it is apparent that a serious crime may be otherwise committed. In these situations, officers may intervene to the extent

necessary to halt such activity. This includes the power of officers to defend themselves from personal harm.

### Officer's Responsibilities

Whenever an officer is on a scene involving a diplomat or a person claiming diplomatic immunity and the officer needs to detain the person, the officer shall immediately call a supervisor.

An incident report shall be completed for all cases involving diplomats no matter the outcome of the event. Upon completion of the incident report, officers shall forward a copy of the incident report to DoS.

### Field Supervisor's Responsibilities

The supervisor notified about a situation concerning a diplomat or a person claiming diplomatic immunity shall immediately go to the scene, collect all relevant information regarding the identity of the person detained, and immediately contact the Deputy Chief.

If an arrest is made of a diplomat and a supervisor transports the diplomat, the transporting supervisor shall notify a jail supervisor of such arrest.

### Deputy Chief Responsibilities

The Deputy Chief that is contacted about an incident concerning a diplomat or a person claiming diplomatic immunity shall contact the DoS to determine the person's immunity status. The Deputy Chief shall then forward this information to the field supervisor.

The Deputy Chief shall instruct the field supervisor on whether the diplomat is to be released or whether an arrest is permissible.

If the diplomat has immunity status, the investigating officer shall gather pertinent information to complete an incident report and immediately release the diplomat.

If the DoS approves the arrest of an immune diplomat, the Deputy Chief shall immediately contact the Chief of Police to receive authorization for the hold.

Foreign government representatives that do not have diplomatic immunity shall be handled in accordance with established department procedures.

## Traffic Enforcement

Stopping a diplomat and issuing a traffic citation does not constitute an arrest or detention is permitted. However, the diplomat may not be compelled to sign the citation.

In all cases, details of the traffic stop shall be documented in an incident report and forwarded to the Deputy Chief. In addition, a copy of each citation shall be immediately sent to the Deputy Chief, to be handled in accordance with DoS guidelines.

If an officer determines further action beyond the issuance of a traffic citation is warranted necessitating the need to detain such person, the officer shall follow the procedural guidelines set forth above in section Procedural Guidelines.

## Driving While Intoxicated

When a diplomat or person claiming diplomatic immunity is suspected of driving while intoxicated, officers shall follow the procedural guidelines set forth above.

Diplomats suspected of driving while intoxicated, but believed to have immunity, may be offered field sobriety and intoxilyzer testing. However, the taking of these tests may be compelled. The results of the testing shall be included in the officer's incident report.

If an officer determines that the diplomat is too impaired to drive safely, the officer shall not permit the individual to continue driving. Depending on the situation, an officer may utilize one of the following options:

    a.  Allow a passenger to drive if the passenger is unimpaired and holds a valid driver license.

    b.  Allow the diplomat to call an unimpaired person with a valid driver license to drive the diplomat to his destination.

    c.  Call a taxi for the individual.

    d.  Drive the diplomat to his destination.

## Vehicle Disposition

A vehicle of a diplomat with immunity cannot be searched, impounded, or booted. However, if the vehicle presents a public safety issue if left at the scene (e.g., a traffic hazard on the freeway), it may be towed to address the safety concern (e.g., move the vehicle a sufficient distance to clear the freeway).

Thereafter, the highest ranking officer on the scene shall contact the Deputy Chief to discuss the proper disposition of the diplomat's vehicle.

The Deputy Chief may discuss the property disposition of a diplomat's vehicle with the DoS on a case-by-case basis.

If a diplomat's vehicle is suspected of being stolen or used by an unauthorized person in the commission of a crime, the vehicle shall be handled as any other vehicle in accordance with department policy.

## Miscellaneous Information

**Driver Licenses.** Diplomats are not required to have a Texas driver license, but are issued a driver license by the Office of Foreign Missions, DoS.

**Honorary Consul Special License Plates.** The Texas Department of Public Safety may issue special license plates for persons who are honorary consuls authorized by the United States government to perform consular duties.

**Inspection Stickers.** Inspection stickers are not required on vehicles with DoS license plates.

**Insurance.** If it is determined that a diplomat vehicle is being operated without insurance, officers shall contact the Deputy Chief, who shall in turn contact the DoS for guidance.

**License Plates.** Diplomatic vehicles are licensed and registered by the DoS. Such license plates are the property of the DoS and not the property of the diplomat. Whenever an officer receives information about a lost, stolen, or misused diplomatic license plate, an incident report shall be generated immediately and a copy of the incident report shall be forwarded to the Deputy Chief.

**Passports (all persons).** When an officer receives information about any lost, stolen, or recovered passport, an incident report shall be generated and a copy of the incident report shall be forwarded to the Deputy Chief. Any recovered passport shall be tagged in the property storage facility.

Prisoners' passports are considered personal property and shall be inventoried with the prisoners' property in accordance with jail procedures.

## Related Department Manual Policies

- 200.35, **Emergency Notification**
- 300.18, **Property and Evidence**
- 300.26, **Class C Misdemeanors**
- 300.41, **Required Booking Information and Procedures**
- 400.10, **Emergency Management**
- 400.14, **Criteria for Submitting Incident Reports**

# Immigration

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The purpose of this Department Manual is to establish the policy of the Texas Southern University Department of Public Safety regarding illegal aliens.

Undocumented alien status is not, in itself, a matter for local police action. Unlawful entry into the United States is not to be treated as an on-going offense occurring in the presence of a local police officer. TSUDPS officers may not stop or apprehend individuals solely on the belief that they are in this country illegally.

## Background

The City of Houston has attracted many residents from countries outside the United States. A number of these residents are not citizens, are undocumented and live in Houston without legal sanction. The Texas Southern University Department of Public Safety is committed to the principle that effective law enforcement depends upon good relationships between the Department and the community it serves. As police officers, we must rely upon the cooperation of all persons, including citizens, documented aliens, and undocumented aliens, in our effort to maintain public order and combat crime.

## Procedures

Officers shall not make inquiries as to the citizenship status of any person, nor will officers detain or arrest persons solely on the belief that they are in this country illegally. Officers will contact the Immigration and Customs Enforcement (ICE) regarding a person only if that person is arrested on a separate criminal charge (other than a class C misdemeanor) and the officer knows the prisoner is an illegal alien.

In keeping with this policy, officers are prohibited from participating in ICE raids where the primary purpose is the arrest of persons for their undocumented status. TSUDPS officers will assist ICE agents on criminal matters of mutual concern, but only when requested and only in situations in which the involved TSUDPS officers will be clearly exercising their police powers under the laws of the State of Texas. Even in these limited circumstances officers shall obtain authorization from the Deputy Chief prior to participation.

# Seniority

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Seniority is used throughout the department as a factor in making decisions relative to personnel issues including, but not limited to, time off and shift assignments. Generally, employees with more seniority shall be allowed to exercise their preferences on these matters before employees with less seniority.

Other types of seniority may be provided by the law, City/State policies, or other department policies. This policy does not apply to situations in which other specific provisions exist.

This Department Manual Policy applies to all employees below the level of the Captain.

## Definitions

**Management Need.** A specific, defined operational or management objective.

**Mid Manager.** Any employee having supervisory authority above the level of a first-line supervisor and below the level of the Captain.

**Personnel Requirements.** The combination of job skills, knowledge, work experience, interest of the employee, etc., required for a particular assignment.

**Time in Grade.** Time spent at a certain classified rank or civilian job classification.

## Employment Date

The calculations for employment dates shall be determined as indicated in the following subsections.

### Civilian Employees

The employment date for civilian employees is the date they began employment with the Texas Southern University and/or the Department.

### Classified Employees

The employment date for classified employees is the first day of their employment as a police officer with Texas Southern University Police department.

### Employment Date Adjustments

Employment dates shall be appropriately adjusted for rehire situations in which civilian or classified employees have prior employment service with Texas Southern University. Such adjustments shall preserve the rehired employee's past seniority as determined appropriate by the Texas Southern Department of Public Safety and the Texas Southern University's Department of Human Resources & Payroll Services.

Absences for military leave for service with the armed forces of the United States do not affect employment date calculation or an employee's position on a promotional list. Also, unpaid leave of absence and disciplinary suspensions totaling 90 calendar days or less in any 36-month period do not affect employment date calculations or an employee's position on a promotional list.

Employment dates shall be appropriately adjusted for unpaid leaves of absences and disciplinary suspensions that are over 90 calendar days in duration as follows. All disciplinary suspensions are all other unpaid leaves of absence, employment dates shall be adjusted for the entire duration of the absences totaling in excess of 90 calendar days in any 36-month period.

## Determining Classified Seniority

Classified employees' seniority is determined as indicated below. Should a tie in seniority ranking remain, the lowest employee/T number shall determine the highest seniority.

**Police Officer Rank**

Seniority for employees of the rank of police officer is determined by their employment dates.

**Sergeants and Lieutenants**

Seniority within each rank for sergeants or lieutenants shall be determined by their time in grade. Seniority for sergeants or lieutenants having identical time in grade who are on the same promotional list is determined by their position on said promotional list.

## Determining Civilian Seniority

Civilian seniority shall be determined by the time they have worked in a job classification or job group with the Texas Southern University, the Texas Southern University Department of Public Safety, or by their employment dates.

**General Guidelines**

The following procedural guidelines pertain to the application of seniority:

a. Seniority operates within the assigned divisions only.
b. Employees may not bump other employees from their current positions, scheduled time off, or shifts. However, employees who have leave approved prior to being moved, reassigned, or transferred shall, when possible, be allowed to take the leave as originally scheduled.
c. Seniority becomes effective on the transfer date.

**Time Off and Vacancies**

Divisions or sections with special scheduling or assignment issues may modify the procedures listed in this section. Any alternative procedures shall follow the policy in this section as closely as practicable.

**Time Off**

Seniority is the primary criterion used for scheduling time off (except for multiple holiday periods). For scheduling time off, seniority shall be applied to only the same shift of the same section of a division.

**Exceptions**

Seniority shall not be the only factor considered in filling assignments, making schedules, or assigning shifts. The Captain shall also consider management needs and personnel requirements in making such decisions. The department may place employees in those assignment for which they are best suited or which best suit the department, regardless of seniority.

When application of seniority creates a void in personnel requirements within a particular assignment, the Captain shall make assignments and schedules according to the needs of the division.

When the application of seniority may have to be modified or suspended due to unusual circumstances such as division reorganization or division downsizing, written justification for such action shall be submitted to the Chief of Police for approval. Guidelines for modifying the application of seniority in such instances shall be included in this correspondence.

The Chief of Police, or designee, has the right to make any decisions or changes regarding changes or assignments with personnel.

## Related Department Manual Policy

• 200.08, **Work Hours**

# Temporary Alternative Assignments

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The department shall attempt to provide opportunities for injured or ill employees to return to productive work as soon as possible in accordance with Texas Department of insurance (TDI) regulations.

Temporary alternative assignments, when available, are for eligible personnel who, because of limited impairment, are temporarily unable to perform their regular essential job functions but are capable of performing alternative assignments.

This Department Manual Policy applies to all employees.

### Definitions

**Eligible Personnel.** Any full time commissioned, non-commissions, or civilian member of the department who, because of limited impairment, is temporarily unable to perform their regular essential job functions, but is capable of performing alternative assignments.

**Family and Medical Leave Act (FMLA).** Federal law providing up to 12 weeks of annual leave for workers in addition to leave provided by this agency due to illness, injury, or certain other family conditions/situations.

**Occupational Injury.** An injury, disease, or illness sustained in the course and scope of employment with the Texas Southern University Department of Public Safety.

**Temporary Alternative Assignment.** A temporary alternative assignment is a modification of an employee's present position that does not require performing all the essential job functions. A temporary alternative assignment is designed to allow an employee who is injured, ill, or unable to work at a full-duty capacity to perform tasks that are within the specific restrictions set by the employee's treating physician.

**Texas Workers' Compensation Work Status Report (DWC Form-73).** A report by an occupationally injured employee's treating physician indicating the work status and activity restrictions of the injured employee. The DWC Form-73 also serves as a release to any type of temporary alternative assignment or a return to full duty with no restrictions.

**Treating Physician.** A physician who is directing the medical treatment of an injured or ill employee.

**Treating Physician's Statement.** A document provided by an authorized health care provider after an office visit with an injured or ill employee. The treating physician's statement must contain the date of the office visit, the name and contact information of the health care provider completing the statement, the current work status of the injured employee, the range of dates covered by the statement, and the employee's work and/or activity restrictions or a statement with an effective date that the employee can return to work without restrictions. A treating physician's statement does not include information related to a specific diagnosis.

## Occupational Injury or Illness

When applicable, efforts shall be made to provide an employee with a transitional duty assignment when the employee is unable to perform his essential duties due to an occupational injury or illness. Employees with occupational injuries or illnesses shall be given priority in temporary alternative assignments. If adequate space and work is available, temporary alternative assignments may be offered to employees who are recovering from non-occupational injuries or illnesses.

## Initial Request for Temporary Alternative Assignments

Within 24 hours after being released by the treating physician to work a temporary alternative assignment, the employee shall provide his immediate supervisor a Texas Workers' Compensation Work Status Report (DWC Form-73) or medical certificate to support the impairment signed by the treating physician's.

The request for temporary alternative duty and the physician's statement shall be forwarded to the Chief of Police who shall make a recommendation regarding the assignment.

## Non-Occupational Injury or Illness

Employees with non-occupational injuries or illnesses may also request to be place on a temporary alternative assignment. Personnel injured or disabled in the line of duty shall be given preference in initial assignment to temporary alternative duty.

The above guidelines in section *Occupational Injury or Illness* should be followed to request a temporary alternative assignment from a non-occupation injury or illness.

### Temporary Alternative Duty Assignments

Temporary alternative duty assignments may be drawn from a range of technical and administrative areas that include but are not limited to the following:

    a.  Administrative functions

    b.  Clerical functions

    c.  Desk assignments

    d.  Report taking

    e.  Communications

### Temporary Alternative Duty Assignment Restrictions

Employees on temporary alternative duty assignment status shall not wear any portion of a department issued uniform, unless approved by the Chief of Police. Employees in plainclothes shall not display their official police identification card, badge, or weapon in any location other than a police department facility or complex.

Employees on temporary alternative duty assignments status shall not work extra employment. For more details on extra employment refer to Department Manual 200.24, **Extra Employment**.

Employees on temporary alternative duty assignments shall refrain from injurious or strenuous activity that may hinder recovery or return to full duty. Such employees shall comply with the treating physician's recommendations to recuperate.

## Returning To Full-Duty Status

When an employee is released to full-duty status by the treating physician, the employee shall request to return to full-duty status.

The employee shall provide his immediate supervisor the completed DWC Form-73 or treating physician's statement indicating the employee can return to work with no restrictions. The supervisor shall send the documentation to the Chief of Police.

With the approval of the Chief of Police, employees may be returned to their previous assignment.

Employees will not lose benefits or privileges except as may be imposed by state law, City ordinance, or department policy.

## Captain Responsibilities

The Captain is responsible for initiating a written referral to the Chief of Police about an employee who, because of personal injury, illness, or possible mental issue:

a. Appears to be unable to perform all of the essential job functions and such condition has lasted or is expected to last more than 90 calendar days.

b. Is unable to work or is working at less than full capacity for more than 90 calendar days.

The above referral requirement applies whether or not the employee is on a temporary alternative assignment and whether the employee is experiencing an occupational or non-occupational injury or illness. Referral to the Chief of Police is not required for pregnant employees. The Captain may also refer an employee to the Chief of Police before 90 calendar days if warranted.

In addition to a description of the injury, illness, or possible mental issue forming the basis for the referral, the Captain's correspondence should also include:

c. The date the FMLA packet was provided to the employee and if the employee accepted or decline the FMLA coverage.

d. The number of days the employee was or has been absent from work as a result of the injury, illness, or mental issue.

e. If applicable, information on the employee's temporary alternative assignment duty status (date started, location of assignment, duties and responsibilities of assignment).

The Captain shall keep all reports regarding the employee and maintain a temporary alternative assignment file separate from personnel files to store all paperwork related to temporary alternative assignment duty requests.

## Related Department Manual Policies and Reference Material

- 200.08, **Work Hours**
- 200.36, **Workers' Compensation**
- 400.17, **Assistance to Employees Involved in Critical Incidents**
- Code of Ordinances, City of Houston, Texas, §14-185
- Texas Local Government Code, §143.1115
- 28 Texas Administrative Code, Chapters 102-180, Texas Workers' Compensation Rules
- Texas Southern University Department of Public Safety Standard Operating Procedure, Temporary Alternative Assignments
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.03.02 Family and Medical Leave Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.03.04 Leave of Absence Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.05.12 Work Schedules

# Personnel Files

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The Texas Southern University Department of Public Safety (TSUDPS) maintains personnel files on TSUDPS employees. TSUDPS maintains personnel files for internal administrative use and in accordance with applicable federal and state laws and policy and procedures.

This Department Manual Policy applies to all employees.

## Definitions

**General Personnel File.** The personnel file of an employee maintained by the Office of the Chief of Police that generally contains copies of all documents related to an employment with TSUDPS including applications, employee evaluations, commendations, disciplinary actions, and other documents.

## Contents of Files

Unless specifically prohibited by law, employees' personnel files maintained by TSUDPS may contain records and information regarding any personnel matter. These files contain three sections:

a. Administrative:
1. Application
2. Personal History Statement
3. Inventory of Physical Status
4. Fingerprint Cards
5. Birth Certificate
6. Marriage License
7. PA Form
8. Physical Examination Report
9. DD-214

b. Performance Evaluation:
1. Performance Evaluations
2. Letters of Commendation
3. Letters of Criticism
4. Collision Review Board Results
5. The Result of any Disciplinary Action

c. Education:
1. Copy of High School Diploma
2. Certificates from all Schools and Seminars
3. Transcript of College Credits
4. Copy of Degree Certificates
5. Listing of In-Service Schools Attended
6. Any and all Records Pertaining to Education
7. Copy of TCOLE Certifications

## Access To Files

The personnel information maintained by the department is intended to be confidential and may be protected from release of access by applicable law. Access or release of such information shall be restricted to those having a legitimate need for the information or when authorized or required by law. All requests for access to or release of personnel information shall be placed in the applicable personnel file for record.

Employees may review all contents of the General Personnel File maintained by the department regarding their employment. Requests for an appointment to review a file should be made to the employee's immediate supervisor. The supervisor will contact the Office of the Chief of Police and schedule an appointment for removing the file to the conference room or other designated area. Scheduling the appointment and place for examination will be authorized by the Chief of Police or designee. The supervisor will be present while the employee examines their file. The supervisor is responsible for obtaining and returning the employee's file.

Supervisors who wish to examine the files of subordinates on their own shift will request an appointment for removing the file to a place of examination. The time, date, and signature of the supervisor will be entered on the checkout sheet attached to the folder.

## Copies of Files

No copies of personnel files will be made without permission being granted by the Chief of Police or designee. Persons no longer employed by TSUDPS, may request copies of records by submitting a proper request pursuant to the Texas Public Information Act.

## Retention of Files

All General Personnel Files are maintained permanently by TSUDPS. When an employee separates from the department due to resignation, retirement, termination, etc., the employees file shall be kept indefinitely.

## Release of Information

Personnel records and information in any personnel file maintained by TSUDPS may not be released by the department to any outside agency or person requesting such information relating to an employee, except as required or allowed by applicable law.

Requests for release of personnel records shall be handled in compliance with the procedures outlined in Department Manual 400.15, **Police Records**, which may require the review and approval of the Chief of Police and the Office of General Counsel before department records are released. TSUDPS may require the requestor to provide written approval from the employee.

## Related Department Manual Policies and Reference Material

- 200.21, **Commendations, Employee Awards, and Nominations**
- 200.25, **Employee/Grievance Complaint Resolution**
- 400.15, **Police Records**
- §143.089, Texas Local Government Code
- Texas Southern University Department of Public Safety Standard Operating Procedure, Review of Personnel Records
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 08.03.01 Open Records Policy

# CHAPTER 3:
## LAW ENFORCEMENT OPERATIONS

Mary Young

*Executive Director and Chief of Police*
*Texas Southern University, Department of Public Safety*

# Firearms and Qualification

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Officers shall carry only those firearms that meet department standards. Officers are responsible for attaining and maintaining proficiency in the use of approved firearms they carry and shall obey all department policies and procedures related to firearms control.

Except as noted in this policy, officers shall only carry those firearms listed in Attachment A of this policy. All approved weapons used by officers in the performance of their official duties shall not be altered from the manufacturer specifications nor changed in any way that affects the safety or function of the weapons.

All primary, back-up, and off-duty weapons shall be professional and conservative in appearance and shall be, except as noted herein, of a blued, black, or silver finish. Officers shall not adorn their firearms with any symbol or design other than the standard manufacturer emblem, or with any equipment or additions not listed in this policy.

A description including the make, model, and serial number of all firearms carried by each officer shall be registered with the Texas Southern University Department of Public Safety.

Lieutenants shall ensure officers under their command comply with the firearms policies and procedures contained in this policy.

This Department Manual Policy applies to all employees.

## Definitions

**Academy Firearms Range.** The firearms training facility located at an Academy firearms complex (e.g., Houston Police Department Academy range personnel).

**Academy Range Personnel.** Texas Commission on Law Enforcement (TCOLE) certified firearms instructors assigned to an Academy firearms range. These officers have the authority to remove anyone from an Academy firearms range for unsafe practices.

**Attempt to Qualify.** When an officer during an official qualifying line scored by Academy range personnel shoots and attempts to pass the appropriate firearms qualification course with a firearm the officers intends to carry.

**Back-Up Weapon.** A firearm that meets the guidelines set forth in this policy, that is registered in the department's firearms registration database as a back-up weapon, and that may be carried only as described in this policy.

**Off-Duty Weapon.** A handgun registered in the department's firearms registration database and that may be carried in an off-duty capacity once guidelines set forth in this policy are met. An off-duty weapon may also be carried as a back-up weapon when all criteria and qualifications are met.

**Plainclothes.** For the purpose of this policy, plainclothes refers to all manner of dress other than approved department uniforms.

**Primary Weapon.** A handgun that meets the guidelines set forth in this policy, that is registered in the department's firearms registration as a primary weapon, and that may be carried alone.

**Qualification.** When an officer during an official qualifying line scored by Academy range personnel shoots and passes the appropriate firearms qualification course with a firearm the officer intends to carry.

**Shoulder Fired Weapon.** A shotgun or carbine that meets the guidelines set forth in this policy, that is registered in the department's firearms registration database, and that may be carried only with a primary weapons if the officer is in police uniform, on duty, or working police-related extra employment.

**Under the Influence of Alcohol.** Any measurable amount of alcohol in a person's blood, breath, or urine.

# Primary Weapon

Excepted as noted in the policy, officers shall carry a primary weapon for which they hold current qualification while in police uniform, on duty, or working police-related extra employment. Regardless of assignment or exceptions outlined in this policy, all officers shall qualify annually with an approved primary weapon on the department's primary weapon course as outlined in this policy.

## Uniformed Officers

Only the weapons listed under Uniformed Officers in Attachment A are approved primary weapons for officers while in uniform.

## Plainclothes Officers

Only the weapons listed under Plainclothes Officers in Attachment A are approved primary weapons for officers while in plainclothes. Plainclothes officers are authorized to "Open Carry" their weapon while on duty and in public view, but they shall adhere to the following requirements:

    a.   Officers will display their badge on their belt or waistband next to their weapon

    b.   Officers will display their official TSUDPS identification

    c.   Officers will carry a pair of handcuffs and at least one additional loaded magazine for a semi-automatic handgun, or an additional loaded speed-loader when carrying a revolver

Officers who do possess a license to carry handgun issued by the State of Texas may be excluded from the plainclothes authorized weapons in attachment A as the law applies.

## Undercover Officers

Officers working in an undercover capacity shall carry a weapon included in the primary weapons list for uniformed or plainclothes officers in Attachment A.

Exceptions to the above paragraph are dependent upon the nature of the officer's assignment and the types of operations in which he is involved. With the exception of rifles and fully automatic weapons, the Captain may authorize an officer working in an undercover capacity to carry as a primary weapon any firearm that will enable the safe completion of operations.

If an officer is authorized to carry a weapon described in Section *Back-Up Weapons* in this policy, as a primary weapon during a particular operation, the officer shall be currently qualified with the weapon on the department's off-duty weapon course prior to the operation.

If the Captain approves a weapon that does not meet any of the above criteria, the officer shall be currently qualified with the weapon on the department's off-duty weapon course prior to the operation.

If a particular operation makes it impractical for an officer to carry a firearm, the Deputy Chief may authorize the involved officer to not carry a firearm for the duration of the assignment.

## Off-Duty Weapons

Officers who are off-duty are not required to carry a firearm, and may be specifically prohibited from doing so by Department Manual 200.03, **Drug Free Workplace** or *Section Limitation* of this policy.

Officers are reminded that even if they elect not to carry a firearm while off duty, there are considered to be a Texas Southern University Department of Public Safety police officer 24 hours a day, 7 days a week. Officers shall remain responsible for complying with all department policies and procedures, and are still required to take appropriate action when required. If unarmed, appropriate action may including contacting 9-1-1 or the police dispatcher about a crime in progress rather than attempting to make an arrest.

If an off-duty officer not wearing a police uniform and not working police-related extra employment elects to carry a handgun, the officer shall carry a primary weapon of an off-duty weapon that matches one of the following descriptions:

a. **Revolvers.** Revolvers must be double action and chambered for .38 special or larger cartridges. Revolvers must have a barrel length of at least two inches, but not more than six and half inches.

b. **Semiautomatic pistols.** Semiautomatic pistols must be chambered for .380 caliber cartridges or larger and have a barrel length of at least two and half inches, but not more than six inches.

Handguns carried off duty must hold a minimum of five rounds of ammunition.

Officers shall complete the off-duty qualification course prior to carrying an off-duty weapon.

Officers who do possess a license to carry handgun issued by the State of Texas may be excluded from the Off-Duty authorized weapons in attachment A as the law applies.

## Back-Up Weapons

While in police uniform, on duty, or while working police-related extra employment, officers are not allowed to carry a back-up weapon alone without an approved primary weapon.

While off duty and not wearing a police uniform and not working police-related extra employment, officers are not allowed to carry a back-up weapon alone without an approved primary or off-duty weapon.

Except as noted in this policy, the department approved back-up weapons described in the following subsections are the only firearms officers may carry in addition to their primary weapon if the officer is in police uniform, on duty, or working police-related extra employment.

## Handguns

Back-up handguns must be .22 caliber or larger (.25 caliber is prohibited) and have a barrel length of two to four inches. If an officer's back-up handgun is a revolver it must be double action. Back-up handguns must hold at least five rounds of ammunition. Officer shall follow the same qualification guidelines as stated in section *Off-Duty* Weapons. Back-up handguns shall be carried in a concealed and inconspicuous manner.

## Shotguns

Officers who successfully complete a TCOLE approved 8-hour Tactical Shotgun training course and appropriate qualification course may carry a shotgun as a back-up weapon while in uniform, on duty, or working police-related extra employment. Officers shall qualify annually and shall demonstrate a working knowledge of the specific shotgun. Academy range personnel shall inspect shotguns at the time of qualification for compliance and unauthorized modifications.

Only those shotguns listed in Attachment A have been approved by the department.

Officers who desire to carry shotguns not currently approved by the department shall submit their requests in writing to the Chief of Police for approval. Each shotgun submitted to the Chief of Police for approval must meet a list of requirements and shall be inspected and approved by Academy range personnel.

Only shotguns having all of the following features shall be approved by the department:

    a.  12 gauge

    b.  Pump or semiautomatic

    c.  Dual action bars (applicable to pump action shotguns)

    d.  Cross-bolt safety

    e.  Minimum barrel lengths must conform to the provisions of the Texas Penal Code, Chapter 46, barrel length must be least eighteen inches, with a minimum overall length of twenty-six inches, but the barrel length shall not exceed twenty-two inches.

    f.  Black, blued, or silver finish

    g.  Bead or iron sights

    h.  Loading and ejection through two different ports

    i.  No optical devices

Shotguns may have folding or retractable stocks. Pistol-grip only shotguns are not approved. No shotgun with an exposed hammer shall be utilized.

Officers shall transport shotgun in the trunk or cargo area of the vehicle inside a case or in a department approved and installed rifle rack in the driver compartment of a department patrol vehicle provided the officer has completed the requisite training.

## Carbines

Officers of any rank who successfully complete all portions of the requisite carbine rifle training may carry approved carbines as a back-up weapon while in uniform, on duty, or working police-related extra employment. Once trained, officer shall qualify annually in a manner dictated by the department and shall demonstrate a working knowledge of the specific carbine.

Only the carbines listed in Attachment A are approved for qualification and deployment. The AR-15 style carbine with a barrel length of 16 to 20 inches and an overall length of more than 26 inches is an approved carbine. AR-15 style, short barrel rifle (SBR) carbines with a barrel length as short as 10 inches are also approved carbines provided the officer completes the appropriate federal paperwork, registers the carbine, and per federal law keeps a copy of the federal proof of registration and tax stamp in his possession at all times while possessing the SBR carbine. Approved carbines may have retractable or folding stocks.

Approved carbines shall be black in color. Multicolor or camouflage carbines are prohibited.

Approved carbines must have iron sights and may in addition have electronic optic sights as listed in Attachment A. Allowable electronic optical sights must have no magnification and shall be mounted either with a quick release return to zero mount or in a manner that allows the immediate use of the back-up iron sights should the electronic optic fail for any reason. Officers may add an approved 3X magnification on the approved carbine as listed in Attachment A. The magnifier must be mounted in such a way that it does not interfere with the normal operation of the rifle, iron sights, and authorized optical sight. The magnifier should not be used in close quarter situation and must be mounted on the top rail of the rifle using a flip-to-side mount. Officers must complete a four hour training course for the use of a 3X magnifier and qualify with the carbine.

Only .223 caliber, 55-grain soft point ammunition shall be used for deployment with an approved carbine.

No officer shall carry a rifle or carbine of a type of configuration differ that specified in this policy unless specifically authorized in writing by the Chief of Police.

Once the requirements outlined in this policy are met, officer shall transport carbines in the trunk or cargo area of the vehicle inside a care or in a department approved and installed rifle rack in

the driver compartment of a department patrol vehicle. Carbines shall be stored with a magazine seated in the magazine well, the safety engaged, and the chamber empty.

Officers may only respond and deploy with an approved carbine in any high-risk situation in which a suspect:

    a. Possesses a rifle, assault rifle, machine gun, or shotgun.

    b. Possesses or used body armor.

    c. Employs measures that put any officer at a tactical disadvantage that cannot be overcome with a handgun.

Officers may also respond with a carbine at any special threat situation as long as the requirements in Department Manual 300.25, **Special Threat Situations**, are also satisfied.

No officer shall carry a fully automatic weapon unless the Chief of Police has authorized its use as part of a job assignment.

## Ammunition

Soft-pointed or hollow-point ammunition shall be utilized. Except with approval by the Chief of Police, no officer shall carry any of the following types of ammunition in any weapon.

    a. Armor piercing

    b. Tracer ammunition

    c. Glaser safety slug

    d. Rat shot

    e. Frangible ammunition

    f. Non-expanding full metal jacket

All shotgun shall be loaded with "00" or No. 4 buckshot. Slugs may be used upon completion of the approved training course.

## Grips

All weapons carried while an officer is in uniform, on duty, or working police-related extra employment shall have black or brown grips made of wood, plastic, metal, or rubber

Grips shall not be adorned with emblems or designs other than the standard manufacturer logo.

## Holsters

Approved uniform holsters are listed in Attachment A of this General Order. The following procedures regarding uniform holsters shall be followed.

    a. Holsters shall not be modified in any way.

    b. Each holster is to be used for only the particular weapon or configuration for which it was made.

    c. Officer shall bring their "Sam Browne" and uniform holsters when reporting to qualify. Academy range personnel shall inspect the holsters to ensure they are in good working order and are appropriate for the type and configuration of weapons the officers are carrying.

    d. If an officer needs a new holster for a new approved weapon, the officer shall qualify at an Academy firearms range and qualify with the new weapon and holster.

    e. Officer may, at their own expense, purchase and wear custom-made holsters, provided the holsters meet all criteria and specifications set forth for the official department approved holsters.

Prior to wearing any alternative holster, officers shall demonstrate proficiency with the holster to Academy range personnel.

g. Officers shall demonstrate proficiency when transitioning to a different approved holster before using it on duty.

## Sights

Firearms shall not be altered to accommodate laser sights; nor shall officers carry firearms with laser sights unless approved by the Chief of Police.

Red Dot Sights (RDS) are allowed for use on a primary weapon, but they must meet the following requirements and the approved systems and holsters listed in Attachment A.

a. Manufactured weapon with slide cutout mound ready to accept RDS (e.g., Glock 17 MOS, Glock 19 MOS, Smith and Wesson M&P C.O.R.E, Sig Sauer RX line)

b. Aftermarket milled sliders are prohibited

c. Iron Sights are required (i.e, Suppressor Sights or Leupold Rear Sight attachment)

d. Complete an 8-hour training course and qualify with the weapon using the RDS

## Weapon-Mounted Lights

The use of weapon-mounted lights on carbines, shotguns, or handguns is an option for officers upon successful completion of the requisite training. Officers who wish to use weapon-mounted lights are responsible for purchasing an appropriate weapon-mounted light and holster according to the specifications listed in Attachment A of this policy.

## Personal Firearms

Officers often own or possess firearms for which they have no reasonable expectation of being called upon to use while acting in a police capacity (e.g., firearms normally used only for hunting or as part of a personal collection). Firearms possessed solely for such purposes and are never carried while the individuals are acting in capacity of police officers, need not be registered with the department.

## Carrying A Firearm

In compliance with Department Manual 200.02, **Conduct and Authority**, officers, regardless of rank or assignment, while in the State of Texas are required to take prompt, effective, and appropriate police action with respect to violations of the law coming to their attention whether they are on or off duty, unless doing so would compromise the safety of an officer working in an undercover capacity. Therefore, officers are encouraged to carry firearms that meet department standards at all times while in the State of Texas.

Officers are reminded that when taking action that involves the use of a firearm, the trigger finger shall remain outside of the trigger guard and "indexed," unless the officer has clear sights on a threat and is prepared to shoot.

Officers shall see Department Manual 200.02, **Conduct and Authority**, for information regarding off-duty intervention protocol while in the State of Texas.

Section 46.15 of the Texas Penal Code, "Non-applicability" (to police officers) states that restrictions for carrying weapons as outlined in sections 46.02 and 46.03 of the Texas Penal Code do not apply to police officers while on or off duty. Officers shall see Department Manual 200.16, **Carrying Concealed Firearms**, for information regarding carrying a concealed firearm outside the State of Texas.

While in plainclothes, officers, regardless of rank or duty status, shall carry their firearm in a manner that is not exposed to public view.

## Limitations

Limitations apply to officers carrying firearms in the following areas and circumstances.

    a. **Courts.** While attending court, officers shall adhere to the court's policy regarding the carrying of firearms and shall surrender their firearms if a bailiff so requests.

    b. **Psychiatric Wards.** Armed officers shall not enter any facility's psychiatric ward except under the most serious of circumstances, and then only after having received approval from the physician in charge of the unit, or in the absence of the physician in charge, any on-duty physician in the unit.

    c. **Under the Influence of Alcohol.** City Ordinance prohibits officers from exercising the authority of their office while off duty and under the influence of alcohol. Therefore, officers who are under the influence of alcohol and not engaged in the performance of their assigned work duties shall not carry firearms.

    d. Under the Influence of Medication. Officers shall exercise prudence when taking prescribed or over-the-counter medications that may impair their physical or mental faculties. Medication affect individuals differently and numerous medications come with warnings that may cause drowsiness or other impairing side effects. Officers who take medication or a combination of medications that they know will cause impairment or that have a high probability of causing impairment shall not carry a firearm. Officers shall not carry a firearm while experiencing impairing side effects from any medication.

## Airports and Aircraft

Airports. Armed officers who want to enter the sterile area of an airport shall advise the proper authorities of their intentions to do so before entering the airport security checkpoint. Officers shall present any documents or law enforcement credentials necessary to verify their identity, and shall comply with the decision of airport authorities to allow or deny access.

Aircraft. Officers shall limit a request to carry a firearm abroad an aircraft to a situation in which a weapon is required to ensure the safe completion of a law enforcement mission.

Prior to air travel, officers are required to complete the "Law Enforcement Officers Flying Armed" training program available with the Houston Police Department Airport Division (IAH).

A National Law Enforcement telecommunication System (NLETS) message to Transportation Security Administration (TSA) personnel shall be submitted for any officer flying armed. An NLETS message shall be generated for each direction of travel.

In order to obtain the NLETS messages of authorization, officers with an operational need to fly armed shall at least 48 hours in advance submit to the Chief of Police a written request that contains the following information:

    a. Officer's name
    b. Employee/T-Number
    c. Mobile telephone number
    d. Escorted individual type
    e. Escorted individual's name
    f. Name of airline
    g. Flight numbers
    h. Flight dates
    i. Departing airports
    j. Connecting airports
    k. Final destination points

The above information shall be complete and accurate and is necessary for all flights that are leaving, connecting, or returning to the City of Houston.

Once approved, a copy of the Chief of Police's authorization letter shall be forwarded and used to generate requests via NLETS. The reply from TSA shall contain a unique eight-digit alphanumeric identifier. Once received, the reply message shall be forwarded to the requesting officer in the most expedient manner possible for presentation to the appropriate authorities at the airport.

## Qualification With Firearms

All personnel who are newly employed by the Texas Southern University Department of Public Safety who currently hold a TCOLE Peace Officer License must qualify with their firearm before being commissioned as an officer.

Officers are authorized to carry only those handguns and shoulder fired weapons with which they have qualified with during the qualification period or on any qualification schedule determined by the Chief of Police. Officers shall maintain current qualification with all firearms they intend to carry per the guidelines in this policy. All firearms shall be registered with the department.

All officer shall qualify annually with an approved primary weapon prior to qualification with any other weapon. Qualification with a primary weapon shall be on the primary weapons course at an Academy firearms range. Qualification with firearms shall also be performed at an Academy firearms range. Regardless of which Academy firearms range an officer uses, the officer shall comply with the facility's policies.

Failure to qualify with a firearm or not attempt to qualify with a previously authorized firearm shall result in that weapon not being eligible for use as an on- or off-duty weapon.

"Modular" firearms, such as a Sig Sauer P320, enable the user to change the frame size, barrel length, and caliber of the firearm while still retaining the same serial number. Officers are authorized to carry a modular firearm, on or off duty, only in the configuration in which the officer has qualified and as authorized in Attachment A. If an officer changes the frame size, barrel length (e.g., from full size to compact), or caliber, the officer must qualify with the firearm in the additional configuration in order to receive authorization to carry it in the additional configuration.

## Firearms Range Safety and Conduct

Upon arrival at the Academy firearms range, offices, while wearing their Sam Browne, shall render all firearms safe by using a clearing barrel at the range and unloading their firearms and ensuring the firearms are empty. This shall be done before going into any Academy firearms range building. Semiautomatic handguns shall have the magazine out and the slide locked back and shall be placed in the holster. Revolvers shall have the cylinder open and be carried with the fingers through the topstrap. Shotguns shall have the forearm to the rear with the action open and the safety engaged (safety on). Carbines shall have the magazine out, the bolt locked to the rear, and the safety engaged (safety on).

Upon leaving an Academy firearms range, officer reloading firearms may do so only at the clearing barrel.

Unsafe acts will not be tolerated at an Academy firearms range. Officers may be dismissed from the firearms range by Academy range personnel for the entire day for any unsafe act.

Proper dress code by the Academy range personnel shall be enforced (e.g., no shorts, no sleeveless shirts, and no open flip flop shoes, sandals, or open-toe shoes). While on the firearms range officers shall display official department identification or wear an official department uniform. Officers attempting to qualify, practice, or attend firearms related training shall bring a department approved duty belt, duty holster, and reloading devices. All body armor shall be worn at the range, with or without an official approved uniform.

Mobile telephone use is prohibited while at Academy firearms range locations. Use of mobile telephones while at Academy firearms range locations shall subject the user to being removed from the firearms range.

The following rules and safety guidelines should be followed:

a. Never treat a firearm as though it were unloaded.
b. Never point a firearm at anything you are not willing to destroy.
c. Visitors and spectators are not allowed on the range or in the range parking area.
d. All unholstered firearms must be pointed downrange.
e. In case of a malfunction of the firearm or ammunition, the officer shall keep the firearm pointed downrange, until the malfunction can safely be cleared.
f. All firing will cease instantly at the cease to fire command.
g. Ammunition or equipment provided for use at the range will not be removed from the range.
h. Officers shall wear the same holster for qualification as for normal duty assignment.

## Conducted Energy Devices

Annually when qualifying with their primary weapon, officers shall also demonstrate proficiency with the functions and features of their department approved conducted energy device (CED) to designated Academy personnel. See Department Manual 300.16, **Conducted Energy Devices**, for more information and requirements.

## When to Qualify

All sworn personnel who are licensed as peace officers by TCLOE and commissioned as peace officers by the Texas Southern University Department of Public Safety, shall demonstrate annually firearm proficiency through the Department's Firearms Qualification program during the qualification period. Qualification shall be required for each firearm the officer carries for law enforcement purposes. The annual qualification period is August 1st-15th, unless otherwise determined by the Texas Southern University Department of Public Safety Chief of Police.

All personnel who are licensed as peace officers by TCOLE, and commissioned as an officer are required to qualify in accordance with the qualification schedule as determined by the Chief of Police.

## Qualification Content

Annual qualification includes demonstration to Academy range personnel of a working knowledge of each officer's primary weapons, off-duty weapons, and back-up weapons as outlined in this policy and as dictated by Academy range personnel.

## Passing Score

To pass the qualification examination, a range score of at least 75 percent is required. Officers shall not carry any firearm for which their score was less than 75 percent.

Scoring shall be based on the below criteria:

| SCORE (PERCENT) | MEDAL |
| --- | --- |
| 75-79.8 | Qualified |
| 80-84.8 | Marksman |
| 85-94.8 | Sharpshooter |
| 95-98.8 | Expert |
| 99-100 | Distinguish Expert |

## Qualification Documents

The Firearms Proficiency Control Officer will maintain a copy of all qualification records, and a copy to be placed in the officer's personnel file.

Each officer will complete a qualification record slip setting forth the description, serial number, range score (pass/fail), and date of qualification for each firearm used by the officer for law enforcement purposes.

## Location and Administration

All qualification session are to be conducted at an Academy firearms range as designated by the Chief of Police.

## Inspections of Weapons

Prior to qualification, Academy range personnel will inspect all firearms to determine condition and compliance with Texas Southern University Department of Public Safety policy. Academy range personnel have the authority to prohibit the use of any firearm on the range. If a firearm is not permitted to be used on the range, the officer's Captain is to be notified in writing of the circumstances, including a description of the firearm and pertinent information relating to it. The officer shall not carry the firearm until any deficiencies or discrepancies are corrected, and the firearm has been re-inspected and approved by the Academy range personnel.

## Failed Attempt To Qualify

All handguns and shoulder fired weapons for which officers do not hold current qualification shall not be carried by officers until they have qualified with those weapons.

## Failing Primary Weapon Qualification

Any officer who attempts but fails to qualify with an approved primary weapon on the primary weapons course by the end of the scheduled time determined by the Chief of Police or who experiences three failed attempts to qualify with a primary weapon, shall notify their lieutenant in writing by the next workday.

Any officer who attempts but fails to qualify with an approved primary weapon on the primary weapons course by the end of the scheduled time determined by the Chief of Police shall not work an assignment that requires the officer to be armed and shall not work police-related extra employment until that officer passes the qualification standards with an approved primary weapon.

The officer shall immediately report to his/her lieutenant and surrender their issued Texas Department University of Public Safety badge and identification credentials. The officer shall be admonished that he/she shall not perform law enforcement functions or carry a firearm until such time as remedial training is complete and qualification requirements are met.

The involved lieutenant will confer with the Captain to determine the civilian work assignment of the employee until successful completion of remedial firearm training and qualification, if available. The officer shall be immediately assigned to a civilian/clerical position that does not require a Peace Officer License to discharge the duties of a peace officer.

Any officer who attempts but fails to qualify with his/her approved primary weapon on the primary weapons course, or experiences three (3) failed attempts to qualify, shall notify the Captain in writing by the next workday.

Any officer who fails to qualify after three attempts with an approved primary weapon on the primary weapons course shall be required to schedule and attend four hours or redress firearms

training with qualification range instructors. Officers who then fail to shoot a passing score of 75 percent or higher, shall immediately notify the Chief of Police in writing. The Chief of Police may require the officer to attend a sixteen hour remedial firearms training course or terminate the officer.

The four-hour and sixteen-hour redress firearms training shall be done on duty.

## Supervisors' Responsibilities

Upon receiving written notification of an officer's failure to qualify as described above, it is the immediate supervisor's responsibility to ensure that corrective measures are taken until the officer is able to qualify with an approved primary weapon.

For officers who primary weapon qualification has expired, corrective measures shall include assigning the officer to duties that do not require the officer to be armed and ensuring the officer does not carry a firearm until qualification standards have been met. This includes suspending the officer's police-related extra employment.

## No Attempt To Qualify

All records relating to officers not attempting to qualify with a primary weapon to be maintained by the Captain.

Except as noted below, officers who make no attempt to qualify during the scheduled time with an approved primary weapon shall be subject to appropriate disciplinary action. Such action may include voluntary reassignment, relief from duty, or dismissal from service.

Officers who make no attempt to qualify during the scheduled time with an approved primary weapon shall not be assigned to duty that requires them to be armed and shall not be allowed to work police-related extra employment until qualification requirements are met.

## Legitimate Reason

Officers who have a legitimate reason for not attempting to qualify with an approved primary weapon during the scheduled time shall not be subject to disciplinary action, but shall notify the Captain. Some examples of legitimate reasons include, but are not limited to, authorized absences, documented illnesses, and special assignments.

The Captain shall inform the Deputy Chief in writing of the officer's legitimate reason for not attempting to qualify. Officers shall attempt to qualify as soon as possible after returning to a normal duty assignment.

## Physical Disability

Officers who are physically unable to qualify with an approved primary weapon during the scheduled time shall not be subject to disciplinary action, but shall provide sufficient, acceptable documentation to the Captain justifying the nature and extent of the disability. Pregnant officers shall be classified as unable to qualify after appropriate documentation is provided.

The Captain shall inform the Deputy Chief in writing of an officer's inability to qualify due to a physical condition. The disabled officer is responsible for making arrangements to qualify when returned to full-duty status.

Any officer who has been declared physically unable to qualify shall not be assigned to any duty requiring the officer to be armed and shall not be allowed to work police-related extra employment until the officer has passed the qualification standards with an approved primary weapon.

## Authorization To Carry Firearms

Department authorization for officers to carry any firearms requires that officers meet all pertinent specifications of this policy. Authorization to carry any approved firearm automatically

expires 12 months after the last qualification. Except as noted in this policy, officers shall complete the qualification procedure described in this policy by the date for any firearms the officers intend to carry.

An officer who fails to qualify within a 12-month period is in violation of TCOLE Rules (217.21 Firearms Proficiency Requirements), and may be subject to a suspension or revocation of his/her TCOLE license resulting in forfeiture of his/her status as a peace officer.

## Related Department Manual Policies and Reference Materials

- 200.02, **Conduct and Authority**
- 200.03, **Drug Free Workplace**
- 200.13, **TSUDPS Badges and Identification Cards**
- 200.16, **Carrying Concealed Firearms**
- 200.18, **Appearance and Grooming**
- 200.20, **Separation and Reinstatement**
- 200.24, **Extra Employment**
- 200.36, **Workers' Compensation**
- 300.02, **Effecting Arrests and Searches**
- 300.11, **Handling Persons Exhibiting Mental Health Crisis**
- 300.12, **Response to Resistance**
- 300.16, **Conducted Energy Devices**
- 300.25, **Special Threat Situations**
- 400.24, **Training**
- Texas Government Code, Chapter 411, Subchapter H, Texas Statutes
- Texas Occupations Code, Chapter 1701, Subchapter H, Texas Statutes,
- Texas Penal Code, Chapter 46
- Texas Southern University Department of Public Safety Standard Operating Procedure, Duty Weapons / Lethal & Less-Lethal
- Texas Southern University Department of Public Safety Standard Operating Procedure, Firearms and Qualification Standards

# Attachment A
# Approved Weapons, Holsters, and Weapon-Mounted Lights

## PRIMARY WEAPONS

### Uniformed Officers

All semi-automatic primary weapons listed on this Attachment A are authorized in the 9mm, .40 caliber, .45 caliber, .38 caliber, 10mm, and .357 caliber and all revolvers are authorized in .357 caliber, .38 caliber, 9mm, .41 caliber, .44 caliber, and .45 caliber. All barrel lengths for semi-automatic weapons must be between 3.5" and 6" and revolvers must be between 3.5" and 6.5."

### Glock

9mm models 17/17C and 19/19C

.40 caliber models 22/22C and 23/23C

.45 caliber model 21

10mm model 20 and 29

.357 caliber models 31, 32, and 33

### Sig Sauer (includes "R" models)

9mm model P226, P229, P320, P210, P225-A1, P365, and SP2022

.40 caliber models P229, P226 (DA/SA or DAK), P320, and SP2022

.45 caliber models 227R-45B or BSS, P220, and P320

.357 caliber models P226, P329, P229, and P320

10mm caliber model P220

### Smith & Wesson

9mm model M&P 9

9mm revolver model 986 and 929

.40 caliber model M&P 40

.45 caliber model M&P 45

.45 caliber revolver models 325, 625

.357 caliber models 686, 686 SSR, 627, 586, 27, 686, 686 Plus, 19 Classic, 66, 627 V-Comp, M&P R8, and 586

.38 caliber revolver models 686, 686 SSR, 627, 67, 27, 10, 586, 686 Plus, 64, 19 Classic, 66, 627 V-Comp, and M&P R8

.41 caliber revolver model 57

.44 caliber revolver models 629 V-Comp, 29, 629, 329PD, and 69

### Arcadia Machine & Tool (AMT)

9mm models Backup and On Duty (Variant 1 or 2)

.40 caliber models Backup and On Duty (Variant 1 or 2)

.45 caliber models Backup, Hardballer II, and On Duty (Variant 1 or 2)

10mm models Javelina (Variant 1 or 2)

### Beretta

9mm models 92X, M9A3, Px4 Storm Carry, 92G Elite LTT, APX, Langdon M9, 92A1, M9A1, and 92FS INOX,

.40 caliber models APX and 96A1

### Colt

9mm models Gold Cup NM, Competition SS, and WC LW Commander

.45 caliber models Government Model, Gold Cup NM, Competition SS, LW Commander, and Gold Cup Trophy

10mm models Delta Elite Rail

.357 caliber revolver model King Cobra

### Heckler & Koch

9mm models VP9SK, VP9 Tactical, and VP9, P30, P30L, P2000, USP, USP Compact, and USP Tactical

.40 caliber models VP40, P30, P30L, P2000, USP, and USP Compact

.45 caliber models HK45, HK45 Tactical, HK45 Compact, and HK45 Compact Tactical

### Kimber

9mm models Micro 9 and EVO SP

.45 caliber model California

### Llama

.45 models Max

### Ruger

9mm model 3301

.357 caliber revolver models SP101 (5771), GP 100 (1702, 1704, 1705, 1707, 1771, 1773, 1740, 1759, 1762, 1768, 1772, 1776, 1777), Super GP 100 (5065), and Redhawk (5059)

.44 caliber revolver models GP 100 (1770) and Redhawk (5043, 5044, 5014, 5030, 5058)

.45 caliber revolver model Redhawk (5050)

### Springfield Armory

9mm models XD, XD-M, and ED-E

.40 caliber models XD and XD-M

.45 caliber models XD and XD-M

10mm model XD-M

### Walther

9mm models Q4 TAC, PPQ M2, PPQ Classic, PPQ SC, Q5, P99, CCP M2, CCP, Creed, and PPX

.40 caliber models PPQ M2, P99, and PPX

.45 caliber model PPQ 45

### Plainclothes and Off-Duty Officers

All primary weapons listed under the Uniformed Officers section, plus (All barrel lengths for semi-automatic must be between 2.5" and 6" and revolvers must be between 2" and 6.5.")

### Glock

.380 caliber model 42

9mm model 43 and G26

.40 caliber model G27

.45 caliber model G30

### Sig Sauer

.380 caliber model P238

9mm model P938

### Smith & Wesson

.380 caliber model Shield

### Arcadia Machine & Tool (AMT)

.380 caliber model Backup

### Beretta

.380 caliber model Pico

9mm model Nano

### Colt

.380 caliber model Mustang Lite

9mm model Defender

.38 special revolver model Cobra

### Heckler & Koch

9mm model P30SK

### Kimber

9mm model Micro 9 ESV

### Ruger

.380 caliber models LC380 (3253), LCP (3701, 3752, 3790, 3791, 3734), LCP II (3750, 3758, 3767, and 3757)

9mm caliber models EC9s (3283), LC9s (3260), LC380 (3253)

### Walther

.380 caliber model PK380

### Shoulder Fired Weapons

### Shotguns

Benelli: 12 gauge, models M1 Super 90 and M2 Super 90

Remington: 12 gauge, model 870

### Carbines

AR-15 style, .223 caliber

AR-15 style, Short Barrel Rifle (SBR), .223 caliber, with federal tax stamp

### Uniform Holsters

Safariland 070 SS III

Safariland 6360 ALS

Safariland 6360 RDS

Holsters to accommodate handguns with weapon-mounted lights shall be the appropriate ALS or approved threat level III holster specifically designed for the handgun and weapon-mounted light to be used.

## Weapon-Mounted Lights

### Handgun Light Requirements

- LED or incandescent light, with shock buffer, that must generate a minimum of 110 lumens
- Factory designed to affix to the light rail of a handgun
- Fixed mounted – no portable mounts
- Ambidextrous manual pressure switch – no pressure pad switches
- No laser–flashlight combination

### Shotgun and Carbine Light Requirements

- All shotguns must use an integrated (built-in) fore-end weapon-mounted light device
- LED 2or incandescent light, with shock buffer, that must generate a minimum of 110 lumens
- Factory designed to affix to the weapon
- Ambidextrous manual pressure or pressure pad switch
- No laser–flashlight combination

### Approved Red Dot Sights For Primary Weapons

- Trijicon
- Leupold
- Sig Sauer
- Burris
- Vortex
- Shield

### Approved 3X Magnifier For Carbines

- Aimpoint
- L–3/Eotech 3x

# Effecting Arrests and Searches

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The highest regard possible shall be given to arrested individuals' and officers' safety and well-being.

Prisoners shall be thoroughly searched at the time of the arrest and by each employee in the chain of custody to ensure no weapons, contraband, or evidence remains on the prisoner.

Except as noted in this policy, all persons under arrest shall be properly handcuffed behind the back prior to being thoroughly searched and shall remain handcuffed while being transported in any police vehicle.

This Department Manual Policy applies to all employees.

## Definitions

**Body Cavity Search.** A search involving the internal physical examination or probing of all body cavities.

**Gender Identity.** An individual's innate identification as either male or female, although it may not correspond to the individual's body or gender as assigned at birth.

**Interlocking.** A technique used to accomplish the arrest or restraint of a violent person by handcuffing the wrists and ankles together behind the back.

**Positional Asphyxia.** An impairment of the respiratory system due to body positioning that results in the reduction of oxygen or the increase of carbon dioxide in the bloodstream and tissues.

**Strip Search.** A search of an individual requiring the removal of some or all of the clothing to allow visual inspection of the breasts of a female or the genitalia of either sex.

**Systematic Search.** A thorough search of a prisoner including removing the prisoner's shoes and socks for inspection.

**Transgender.** An umbrella term that describes individuals whose gender identity is different from their assigned sex at birth.

## Jurisdiction

Officers may exercise full police powers within the Texas Southern University community and the City of Houston.

Outside the limits of the Texas Southern University community and the city limits of Houston, but within the state of Texas, officers may arrest without warrant a person who commits an offense in the officer's presence or view. Arrests made outside the Texas Southern University community and the Houston city limits should, whenever possible, be made in cooperation with the law enforcement agency having primary jurisdiction in order to facilitate the presentation of the person arrested before a magistrate as required by the Code of Criminal Procedure.

For additional parameters, refer to the Texas Code of Criminal Procedure, Chapter 14, *Arrest Without Warrant*.

## Procedures For Identifying Persons To Be Arrested

Officers shall properly identify the person to be arrested as the one for whom a warrant has been issued or probable cause established, by physical description or any other identification information.

Texas Southern University **Department of Public Safety**

If it is necessary to establish identity before a person is booked into jail on a warrant, the fingerprints shall be checked through the automatic fingerprint identification system (AFIS).

In cases where identification is inconclusive, the person shall be photographed and an incident and supplement report shall be generated, documenting the suspect's physical description, address, vehicle information, circumstances involved.

## Types of Arrest

### Arrest with a Warrant

The duties to arrest, definitions, requisites, issuance, scope, authority, and execution of arrest warrants is outlined in Chapter 15 of the Texas Code of Criminal Procedure. It is the duty of every peace officer to execute an arrest warrant whenever it is within his/her power to do so.

Officer shall follow the guidelines outlined in this policy for arresting prisoners and refer to Department Manual 300.19, **Warrant Service Procedures** for additional information.

### Arrest without a Warrant

Under Title 1, Chapter 14 of the Code of Criminal Procedure, officers can make an arrest without a warrant when an offense is committed within the view of the officer or a magistrate. An officer may make a warrantless arrest only if he/she has enough personal knowledge or reliable information to constitute probable cause upon which an arrest warrant could be issued, if time permitted.

### Discretion

Under certain circumstances for good cause consistent with public interest, an officer may decide not to arrest even through probable cause exists. This section does not apply to certain incidents of Family Violence or Protective Order which require specific action(s) to be taken by a Peace Officer.

Factors which the Officer may properly consider in determining not to arrest are:

a. The victim must positively state that he/she is not interested in prosecuting the offender because they only desire restitution or the arrest would result in an additional burden to the victim.

- A supervisor shall be immediately notified in all cases involving a felony.

- The officer will complete an incident report documenting the circumstances.

b. When a Class C Misdemeanor has been committed and probable cause exists to believe the person to be arrested has committed the offense, an officer may issue a citation and release the person to his or her own recognizance. Factors to be considered are:

- Positive identification is provided through acceptable documents such as driver's license, military identification, etc.

- Resident of Texas, and preferably Harris County.

- Must provide a physical address, not a P.O. Box.

- No outstanding warrants.

- Has the physical and mental condition of a responsible person.

- Has a medical problem or condition which requires attention or treatment.

Each circumstance/incident is different and any appropriate discretionary action to be considered should be evaluated on a case by case basis. A supervisor shall be contacted anytime there is a question on what appropriate action should be taken.

A citation shall not be issued for the offense of Public Intoxication or Domestic Violence.

## Legal Warning

When suspects are arrested, they shall be told as soon as possible they are under arrest and the charge of cause for the arrest.

If custodial interrogation is to take place, suspects shall be given the legal warnings as set out in the Texas Code of Criminal Procedure.

## Response To Resistance

When dealing with citizens, suspects, or prisoners, employees shall limit their use of force and physical contact to only the amount reasonably necessary to protect themselves or others, to effect an arrest, or to bring an incident under control. See Department Manual 300.12, **Response to Resistance**.

## Suspects Who Ingest Contraband

The department's primary objectives in dealing with suspects who are believed to have ingested narcotics or other contraband are the preservation of life and safety of the officer. The secondary objective is to preserve and recover evidence whenever possible.

Officers are prohibited from choking and/or restricting the airway of a suspect in an attempt to extract contraband from the suspect's mouth. Officers using reasonable force to extract contraband from a suspect's mouth should be cognizant of the risks and dangers associated with putting the officer's hands in or near the suspect's mouth.

Employees should be aware of and look for potential signs of distress following an ingestion, which could include, but are not limited to, loss of consciousness, trouble breathing, choking, profuse sweating, non-responsiveness, loss of mobility, and/or vomiting.

When an employee reasonably believes that a suspect has ingested narcotics or other contraband, which could present a health hazard, the employee shall immediately summon emergency medical personnel to provide assessment and treatment.

When a suspect has been transported to a medical facility after ingesting narcotics or other contraband, the arresting officer shall:

    a.  Notify a supervisor as soon as practical.

    b.  Advise the attending physician of the situation, including an estimate of the amount of time elapsed since the ingestion and, if possible, the type, quantity, and packaging of the item(s) ingested.

    c.  Generate an incident report or supplement that includes a detailed statement of the incident, medical treatment received (if known), and any actions taken by those on the scene.

Employees are advised that when a suspect ingests narcotics or other contraband and evidence is destroyed, they are to consult with the appropriate district attorney's office to discuss the acquisition of a search warrant, if necessary, and the possibility of filing all applicable charges including, but not limited, to, Tampering with Evidence.

In the event that, after medical evaluation, medical personnel release the prisoner back to the officer, the officer shall:

    d.  Immediately transport the prisoner to the designated jail facility.

    e.  Document in the offense report that the prisoner "possibly ingested narcotics/contraband."

    f.  Notify a jail supervisor and jail personnel of the incident upon arrival at the jail facility.

# Restraints and Transportation

## Handcuffs

An exception to the handcuff policy is if a medical or specific physical conditions (e.g., suspects age or size) precludes handcuffing behind the back. Then the prisoner shall be secured in the safest possible manner before being placed in a police vehicle.

If a prisoner cannot be handcuffed, the transporting officer shall clearly document the reasons and specific justifications for not doing so in the incident or supplement report. The safety of the officer and the suspect or prisoner must be assured before the decision to transport without handcuffs is made. Unless otherwise approved by a supervisor, only two-officer units shall transport prisoners without handcuffs.

Whenever handcuffs are used, they shall be secured by double-locking the cuffs to prevent them from being inadvertently tightened. Officers shall not tighten handcuffs to the extent that circulation is impaired, or allow handcuffs that are clearly interfering with circulation to remain tightening. Prisoners who remain handcuffed for an extended period of time shall be checked often to ensure proper blood circulation.

## Transporting

When placing a prisoner in a police vehicle, officer shall position the prisoner's back toward the upper back seat with the prisoner sitting upright and facing forward. Officer shall then property secure the prisoner in the seat restraint (seat belt and shoulder harness). The transporting officer shall watch the prisoner and ensure the prisoner does not become entangled in the seat restraint and that the seat restraint does not wrap around the prisoner's neck.

If the design or configuration of the transporting vehicle is such that it cannot safely transport a prisoner in accordance with this policy, a more appropriate unit shall be dispatched.

Transport vehicles shall be searched for contraband prior to and after transporting prisoners or suspects.

## Interlocking Technique

The interlocking technique shall be used by only officers trained in and utilizing the approved interlocking device.

No changes, alterations, or modifications are permitted to approved leg restraints or interlocking devices.

In all arrest or transporting situations, especially those involving an interlocking technique, employees shall ensure prisoners are placed in a position that enables them to breathe freely and is the most comfortable position possible. Additionally, while officers may use their weight to initially gain control over a prisoner and to maintain control if necessary, officers are to use caution that the resulting compression of the chest or abdomen does not interfere with the prisoner's breathing.

**WARNING: DO NOT leave the prisoner face down when using the interlocking technique as positional asphyxia may occur.**

Interlocking is meant only as a temporary measure and suspects must be released from the interlocked position as soon as it safe and practical.

A prisoner who initially appears to be in little or not distress after being interlocked may still develop respiratory difficulties. Therefore, whenever the interlocking technique is used:

a. A supervisor shall be dispatched to ensure the technique conforms to department policies.

b. The prisoner shall be transported by only a two-man unit unless otherwise approved by a supervisor.

When the interlocking is used, officer shall:

    c. Ensure there are at least 12 inches between the interlock (wrist to ankle).

    d. Constantly ascertain the prisoner's condition.

    e. Maintain verbal contact with and keep a close watch on the prisoner.

## Use of Spit Covers

Officer may encounter individuals who attempt to spit on them or others. Due to the potential health hazards associated with bodily fluids, officers shall have the option of employing department-issued spit covers on aggressive individuals. The use of a spit cover shall be only in response to the behavior exhibited or the immediate threat made by the person. Only department-issued spit covers shall be used. Spit covers shall be applied as described below:

    a. Officers shall first handcuff the person before attempting to apply the spit cover.

    b. When practicable, officers shall wear protective gloves when applying and removing a spit cover.

    c. When applying a spit cover, officers should safely approach the individual from the rear and place the spit cover over the person's head. This is the best accomplished with at least two officers.

    d. The suspect's head gear and eyewear should be removed prior to a spit cover being applied.

    e. Officers shall ensure that the spit cover is in a position to allow the suspect adequate ventilation for nasal breathing and sight afforded by the mesh.

Spit covers shall not be used on anyone who is vomiting, having difficulty breathing, bleeding profusely from the mouth or nose area, or exhibiting signs of lethargy or drowsiness.

Spit covers shall not be used on anyone who has been sprayed with oleoresin capsicum (OC) and who has not been properly decontaminated.

Under no circumstances shall a person wearing a spit cover be left unattended; officers shall constantly monitor the suspect due to the risk of asthmatic attack, vomiting, and/or suffocation.

If a suspect should spit on an officer or other public servant, the officer shall contact the appropriate district attorney's office to discuss possible felony harassment charges. Officers are reminded that the use of spit covers constitutes a response to resistance and shall be reported as described in Department Manual 300.12, **Response to Resistance**. Transporting officers shall notify jail personnel in the event a spit cover was used on a suspect.

Spit covers are to be used once and then disposed. Officers shall not reapply a used spit cover. If a subsequent application is required for the same individual, a new spit cover shall be used. Due to possible biological contamination, spit covers shall be disposed of properly as described in Department Manual 200.28, **Communicable Disease Policy**.

If a spit cover has been applied to an individual who subsequently dies in custody, the spit cover shall be placed in an evidence bag pursuant to the evidentiary property procedures outlined in Department Manual 300.18, **Property and Evidence**.

## Search

### Persons

### Terry Frisk/Pat Down:

When an officer temporarily detains a person without probable cause because the officers has a reasonable suspicion that the person has committed, is committing, or is about to commit a

crime and has a reasonable belief that the person may be armed and presently dangerous, the officer may perform a limited protective search for weapons of the outer clothing and of those areas which may be within the suspect's wingspan and therefore pose a danger to the officer.

## High Risk Search:

Persons who must be immediately transported out of the area for the safety of an officer shall be handcuffed behind the back and searched for weapons. This high risk search shall include the outer garments, waist, groin, hip areas, ankles, and feet. Immediately upon reaching a safer environment, the officer shall stop and perform a systematic search of the person.

If a weapon is located on a person being searched, steps should be immediately taken to prevent the person from gaining access to it. Once it is safe to do so, the weapon shall be removed from the person.

## Search Incident to Arrest:

Whenever practicable, person searches shall be performed by employees of the same sex or gender identity as the prisoner. When an officer of the opposite sex or gender identity searches a prisoner, that officer shall document the justification for the search in an incident or supplement report.

If the gender of an individual needed to be searched comes into question, officers should respectfully inquire as to whether the individual identified transgender. When an individual self-identifies as transgender, officers shall not question this identity absent articulable, compelling reasons; nor shall an officer inquire about intimate details of an individual's anatomy to determine gender. Officers needing to search a person who identifies as transgender, should, when practicable, conduct the search based on the gender with which the individual identifies.

An employee who searches a person shall document the search and results in an incident or supplement report. Whenever practicable, officers should have a witness to the search. An officer taking custody of a prisoner shall search the prisoner for weapons and contraband even if the prisoner was searched by another officer.

If an officer becomes aware of the presence of contraband or evidence on a person, whether as the result of a search, Terry pat down, or the receipt of credible information, the officer shall attempt to safely secure the contraband or evidence.

## Evidence or Contraband in Sensitive Areas:

If an officer has reasonable suspicion that evidence, contraband, or a weapon is located in a sensitive area of a person's body, including the person's genitalia, breasts, or buttocks, the officer may conduct an inspection, which includes questioning, to determine the nature of the contraband and whether it poses a danger to the person or the officer.

An inspection of the sensitive area may be conducted in the field or in a department facility. Officers shall take steps to ensure that the privacy and dignity of the person being searched is maintained and, if necessary, the person should be shielded from public view. A supervisor shall be contacted and make the scene prior to any inspection of a sensitive area. This does not include a body cavity search.

If contraband cannot be easily and safely removed, a supervisor shall be called to the scene. The supervisor shall determine if the removal of contraband in the field can be safely accomplished and if not, shall then consider the effectiveness of conducting a strip search. The supervisor shall have the person transported to a police or department facility by a two-officer unit and the person shall be handcuffed and closely monitored.

If the suspect is under arrest and there continues to be reasonable suspicion that a weapon or contraband is being concealed, a strip search may be conducted in compliance with the parameters set out in this policy.

If the suspect is not under arrest, but fully-documented consent is obtained, a strip search may be conducted in compliance with the parameters set out in this policy. If the suspect does not give consent and there is reasonable suspicion that a weapon or contraband is being concealed, a supervisor shall contact the district attorney's office to determine if the facts support an exigency that would serve as an exception to the warrant requirement.

## Strip Search:

Permission to perform a strip search shall be obtained from a supervisor prior to the search. Strip searches shall be conducted:

a.   Discreetly and with the utmost respect for the suspect's privacy or dignity.

b.   By an officer of the same sex or gender identity as the prisoner.

c.   In a private and secure room. Public strip searches are prohibited.

d.   With the minimum number of police personnel necessary during the strip search. Whenever practicable, officers should have witness to the search. Nonpolice personnel should be present only as an extreme necessity.

Following a strip search, an incident or supplemental report shall be generated and shall include the result of the search and the names and identifying information of all persons who witnessed or participated in the search.

## Body Cavity Search:

Body cavity searches may be conducted only subsequent to an arrest when there is probable cause to believe that weapons, contraband, or other evidence of a crime has been concealed in a body cavity. Only medical personnel at medical facilities shall conduct body cavity searches.

A supervisor shall be notified of the necessity to conduct a body cavity search prior to the search. Upon approval from the supervisor, the prisoner shall be transported to the closest available hospital. The supervisor shall ensure that all necessary documents (e.g., consent form, SEARCH WARRANT) are presented to medical personnel with the prisoner.

A police officer shall accompany the prisoner to the hospital and take possession of any weapons, contraband, or evidence discovered during the search. The prisoner shall be booked into jail by the police officer when the search is complete.

Body cavity searches shall be conducted privately and with the suspect's dignity as a consideration. A minimum number of medical and police personnel shall be present.

Whenever a body cavity search is conducted, an incident report shall be initiated or supplemented containing the following information:

a.   The name of the supervisor who authorized the search.

b.   The probable cause for the search.

c.   The date, time, and location of the search.

d.   The names and identifying information of all persons who witnessed or participated in the search.

e.   Results of the search.

## Vehicles

Officers may search a vehicle when at least one of the following applies:

a.  There is probable cause to believe that there is evidence of a crime within the person's reach.

b.  The officer reasonably believes a search is necessary for the officer's own safety (weapon).

c.  Contraband is found in plain view.

d.  The search is related to the suspect's arrest.

Inventory of a vehicle is required when a vehicle is to be towed in order to protect the property of the suspect or owner from theft and to protect the Texas Southern University Department of Public Safety from claims of theft. The inventory will include closed and unlocked containers. The results of an inventory will be documented on the tow slip and/or in the narrative section of the offense report.

## Property

Officers may search a residence or other premises without a search warrant or consent when any of the following exigent circumstances apply:

a.  A person is in imminent danger.

b.  The escape of a suspect.

c.  Reasonable belief that a suspect poses a danger to the public and/or officers on a scene.

d.  A welfare check of the property for persons who may need medical assistance.

e.  Reasonable belief that contraband or evidence is about to be destroyed.

The above is not an exhaustive list of exigent circumstances. Officers shall continuously assess the situation as the scene develops and additional factors are revealed in order to make the appropriate decision in regards to searches.

## Consent Search

Both federal and state constitutions provide every individual with the right to be free from unreasonable searches and seizures. Consent to search is considered a waiver of what would otherwise be a warrant requirement and, as such, the waiver must be voluntary and knowing. When a person consents to a search the officer shall remember the following:

a.  A person with a possessory or proprietary interest in the property or place to be searched may give consent.

b.  A person can refuse to consent to search. However, if consent is granted, the person remains in control of the search and may limit the scope of the search or revoke the consent entirely.

c.  All searches shall be conducted with dignity and courtesy. Officers shall also explain to the person being searched the reason for the search and how the search will be conducted.

d.  When the search involves property, the property being searched, when feasible, shall be returned to its original condition prior to the search.

## Search Protocol

When practical, the voluntary consent should be obtained in writing or audio recorded form. Non-written or non-recorded consent shall be fully documented in an incident report if one is generated. When an incident report is not generated, such as a traffic stop, full documentation must be included in the required database entry.

Officers shall use the online Consent to Search digital fill-in form on the internet. Officers may utilize any other approved Consent to Search forms. Any exceptions require approval by the Chief of Police.

Employees are reminded that consent for biological searches are reminded that these types of searches have specific protocols, may require specific training, and shall be conducted in consultation with any investigators and the district attorney's office. These specific types of consensual searches shall always be documented in the appropriate incident report.

If the person granting consent is not present during the search, as in the case of electronic or digital devices that are removed to a police facility for examination, the case investigator shall provide the owner of the property a telephone number where the investigator may be contacted. If the property to be searched is being removed by officers not assigned to the investigator handling the investigation, those officers shall provide the person granting consent the telephone number to the proper investigator.

## On-Scene Supervisor Responsibilities

On-scene supervisors shall:

a. Make the scene of all consent searches of residences, buildings, businesses, and other premises. Vehicle searches do not require the presence of a supervisor.

b. Supervise the entire consent to search process once they arrive on scene.

c. Ensure the citizen giving consent to search has the authority to give a consent to search.

d. Ensure any consent to search form is accurate and complete. Supervisors shall ensure the signature of the individual giving consent is obtained and documented on the form.

e. Review any consent to search form and sign the completed form.

If a supervisor is unable to be at the scene in a reasonable amount of time, the officer shall, with approval from the supervisor, continue the investigation. The supervisor, however, is expected to arrive on the scene as soon as practicable and shall supplement the original incident report documenting the circumstances.

## Documentation of Consent

Documentation of consent may be necessary in defending the search in court.

## Verbal Consent

When an officer receives only verbal consent to proceed with a search, the officer shall document the outcome of that consent to search request (granted, refused, withdrawn) in the racial profile system as a "non-vehicle" entry and in an incident report if an incident report is created. In the case of a vehicle at a traffic stop, supporting documentation shall be found in the entry made in either the racial profile system or an Electronic Ticket Writer device.

## Recorded Documentation

Audio/video recording shall be handled under the appropriate department guidelines, depending on the type of audio/video recording and should be considered evidence for the investigation. If an officer records a verbal consent to search request, the officer shall document the outcome of that consent to search (granted, refused, withdrawn) in the racial profile system as a "non-vehicle" and in the incident report if an incident report is created.

## Consent Form Disposition

Any paper consent to search form should be uploaded with the incident report and tagged into the property secured facility.

## Data Collection

All consensual searches involving vehicles relating to traffic stops shall be documented in either the racial profile system or an Electronic Ticket Writer device, but not both.

All consent to search requests involving non-traffic related incidents shall be documented in the racial profile system. When an officer completes a written consent form, receives verbal consent, or records consent on a recording device, the officer shall document the outcome of that consent to search request (granted, refused, withdrawn) in the racial profile system as a "non-vehicle" entry.

## Data Reporting

The Captain or designee shall compile and place consent to search data into an annual report.

# Restrictions

Off-duty officers shall not initiate traffic stops using a non-TSUDPS marked police vehicle equipped with emergency equipment unless the officer suspects felony activity (not including Evading as a state jail felony) and the officer's vehicle meets the requirements as stated in Department Manual 300.10, **Motor Vehicle Pursuits**. If an off-duty officer does initiate a traffic stop using a motor vehicle qualified by this policy, the officer shall immediately notify dispatch of the stop location and request that a supervisor respond to the scene.

Off-duty officers shall not arrest traffic violators on sight unless the violation poses an immediate threat of bodily injury.

An officer, whether on or off duty, shall not arrest any person involved in a personal dispute involving the officer or a member of the officer's family unless there is an immediate threat of serious body injury or death. If police action is required, the officer shall contact dispatch and request that a police unit and a supervisor be dispatched to the scene to investigate the incident. Also, if police action is required and the suspect's identity is unknown or cannot be determined, the officer may detain such person.

Officers shall not communicate in any manner, directly or indirectly, information that may delay an arrest. Officers shall not enable persons who have committed criminal acts to escape to arrest or punishment, dispose of property or goods obtained illegally, or destroy evidence of unlawful activity.

Officers shall not exercise police authority while under the influence of any drug, medication, alcoholic beverage, or substance that affects the normal use of mental or physical faculties. In the case of alcohol, "under the influence" means having any measurable concentration of alcohol in one's blood, breath, or urine.

## Related Department Manual Policies and Reference Materials

- 200.07, **Americans with Disabilities Act**
- 200.28, **Communicable Disease Policy**
- 200.32, **Disposition of Arrested Juveniles**
- 300.05, **Handling and Transporting Prisoners and other Persons**
- 300.10, **Motor Vehicle Pursuits**
- 300.11, **Handling Persons Exhibiting Mental Health Crisis**
- 300.12, **Response to Resistance**
- 300.13, **Restraint Devices**

- 300.18, **Property and Evidence**
- 300.19, **Warrant Service Procedures**
- 300.20, **Handling Publicly Intoxicated Persons**
- 300.21, **Driving While Intoxicated**
- 300.22, **High Risk Vehicle Approaches**
- 300.26, **Class C Misdemeanors**
- 300.28, **Labor Disputes**
- 300.35, **Foot Pursuits**
- 300.42, **Filing Proper Charges**
- 300.44, **Treatment of Prisoners, Suspects, and other Citizens**
- 300.48, **Sexual Assaults**
- 400.14, **Criteria for Submitting Incidents Reports**
- Texas Code of Criminal Procedure, Chapter 14
- Texas Code of Criminal Procedure, Chapter 15
- Texas Southern University Department of Public Safety Standard Operating Procedure, Searches Warrant and Warrantless
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.06.03 Communicable Disease Policy

# Racial Profiling Prohibited

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

This policy establishes the police department's policy against the practice of racial profiling as set out in federal laws concerning racial profiling and discriminatory practices. Discrimination in any form, including racial profiling, is strictly prohibited and the department shall take immediate and appropriate action to investigate allegations of discrimination.

This Department Manual Policy applies to all employees.

## Definitions

**Bodily Injury.** For the purpose of this policy, physical pain, illness, or any impairment of physical condition.

**Criminal Profile.** A profile (not to include race) based on collective experience that groups characteristics commonly observed in relation to a particular type of criminal activity (e.g., drug courier, drug transactions).

**Motor Vehicle.** For the purpose of this policy, a vehicle with a motor including a motor boat.

**Motor Vehicle Stop.** An occasion in which a peace officer stops a motor vehicle for an alleged violation of a law or ordinance, or for another investigative purpose and the stop results in the detention of the driver or passenger. For example, a detention of one or more persons sitting in an automobile parked in a parking lot would not be a motor vehicle stop unless the vehicle was clearly in operation.

**Race or Ethnicity.** A person's particular descent, including Asian or Pacific Islander, Black, Hispanic or Latino, Alaska native or American Indian, or White.

**Racial Profiling.** Any law enforcement–initiated action based solely on an individual's race, ethnicity, or national origin rather than on the individual's behavior or information identifying the individual as having engaged in criminal activity.

**Suspect Description.** Information commonly reported by a complainant or witness at or near the time of a criminal offense that includes, but is not limited to: gender, race, physical attributes (height, weight, race, facial hair, etc.), clothing description, involved vehicle, location, and direction of travel.

## Scope

Racial profiling pertains to any law enforcement–initiated action based on an individual's race, ethnicity, or national origin. The policy against racial profiling does not preclude the use of race, ethnicity, or national origin as factors in a detention decision. Race, ethnicity, or national origin may be legitimate factors in a detention decision when used as part of the description of a specific suspect for whom an officer is searching.

Examples of racial profiling include, but are not limited to, the following:

    a.  Initiating a motor vehicle stop on a particular vehicle because of the race, ethnicity, or national origin of the driver of the vehicle.

    b.  Stopping or detaining the driver of a vehicle based on the determination that a person of that race, ethnicity, or national origin is unlikely to own or possess that specific make or model of vehicle.

    c.  Stopping or detaining an individual based on the determination that a person of that race, ethnicity, or national origin does not belong in a specific part of town or a specific place.

d.  Allowing race to enter into a criminal profile in which the characteristic activities being observed are likely to be conducted regardless of race.

   For example, characteristics often associated with a drug courier (short trips to and from areas of high drug activity, tickets paid for cash, nervous/furtive surveillance of surrounding areas, etc.) do not depend on a person's race.

e.  Allowing a suspect's race, given as a part of a suspect's description, to play an overly broad role in developing reasonable suspicion to support the detention of a person. The person detained should generally fit the totality of the description provided (e.g., a description that contains a particular race and gender shall not necessarily support detaining all persons of that race or gender).

Further, race and gender should serve to exclude persons from detention when appropriate. For example, if the suspect description includes a particular vehicle being occupied by persons of a particular gender and race, officers should not detain a vehicle matching the described vehicle if the officer can determine that the occupants do not match the race and gender description prior to stopping the vehicle.

The term racial profiling is not relevant as it pertains to witnesses, complainants, or other citizen contacts.

## Supervisor Responsibilities

Supervisors will be apprised of all racial profile complaints involving personnel under their command.

It is the responsibility of the first line supervisors to monitor the activities of their personnel and to identify potential racial profile activity.

Lieutenants will accomplish a quarterly review of a sampling of body camera footage of traffic stops and citizen contacts as well as reports generated as a result of these incidents and activities. This review will be documented and forwarded to the Captain with findings and recommendations.

All supervisors will be particularly alert to potential patterns and practices of their personnel that may indicate racial profiling and treatment of individuals.

## Data Collection of Motor Vehicle Stops

The Code of Criminal Procedure (CCP), Article 2.132 and 2.133, mandate the collection of specified data for motor vehicle stops conducted by peace officers. The CCP delegates the responsibility to collect such data for all law enforcement agencies in the state of Texas to the Texas Commission on Law Enforcement (TCOLE).

Upon conducting a motor vehicle stop, officers shall collect all of the following information on the driver of the motor vehicle and any other person who is searched, arrested, or issued a citation as a result of the stop:

a.  A physical description of the person, including:

   •  The person's gender; and

   •  The person's race or ethnicity as stated by the person or, if the person does not state the person's race or ethnicity, as determined by the officer to the best of the officer's ability.

b.  Whether the officer knew the race or ethnicity of the individual detained before detaining that individual.

c.  The initial reason for the stop.

d.  Whether the officer conducted a search as a result of the stop.

e.  The reason for the search, including whether:

   •  The person detained consented to the search.

- Any contraband or other evidence was in plain view.
- Any probable cause or reasonable suspicion existed to perform the search.
- The search was performed as a result of the towing of the motor vehicle or the arrest of any person in the motor vehicle.

f.  Whether any contraband or other evidence was discovered in the course of the search and a description of the contraband or evidence.

g.  Whether the officer made an arrest as a result of the stop or the search, including a statement of whether the arrest was based on a violation of the Penal Code, a violation of a traffic law or ordinance, or an outstanding warrant, and a statement of the offense charged.

h.  The street address or approximate location of the stop.

i.  Whether the officer issued a citation as a result of the stop.

j.  Whether the officer used physical force that resulted in bodily injury during the stop.

Officers shall enter the above data into one of the department's data collection systems by the end of each shift to "document" each concerned individual. The department currently has the following two methods for entry of such data:

k.  The departments racial profile system.

l.  The hand-held ticket writers.

## Who Must be Documented

Officers shall document the driver of every motor vehicle stopped by entering the required collected data into one of the above data collection systems. Additionally, any passenger who becomes a part of a stop through arrest, search, or ticketing shall be documented. For example, an officer stops a vehicle with numerous occupants for running a red light. The violation observed is for the driver and, unless the officer expands the stop to include the passengers, only the driver would be documented.

## Stop Dispositions: Arrests and Tickets

An arrest means a subject was taken into custody to be placed in jail or transferred to another agency. Citations shall be documented as Ticketed and not as Arrested. In those specific cases in which a person involved in a stop has been arrested and issued as a citation, the disposition Arrested and Ticketed shall be used.

## Occupant Type

An occupant is either a driver or passenger. These are the only permissible entries.

## Data Reporting

The Captain or his/her designee shall maintain information collected from traffic stops in which a citation is issued or arrest made (based on the traffic stop). The information shall include:

- The race or ethnicity of the individual detained
- Whether a search was conducted and, if so, whether the person detained consented to the search.

Annually, the Captain or his/her designee shall submit a compilation of the information (as identified in this section) from the previous year to the Deputy Chief.

Annually, by March 1, the Deputy Chief will cause an Annual Report of information (as identified in this section) collected during the previous year to be submitted to the Chief of Police for disposition.

This annual report will not include information that is specific to the identity of the officer(s) or the citizen(s) involved.

# Complaint Process

The department shall accept complaints from any person who believes he or she has been stopped, searched, or inappropriately ticketed or arrested based on racial profiling.

No person shall be discouraged, intimidated, or coerced from filing such a complaint, or discriminated against because he or she filed such a complaint.

Any Department personnel contacted by a person who wishes to file such a complaint will immediately contact a supervisor who will respond to the scene. The supervisor shall advise the complainant of the complaint process procedures and document the complaint. All complaints will be forwarded to the Deputy Chief, who will review and process the complaint in accordance with Internal Investigation Policy procedures.

All complaints of bias-based profiling, upon conclusion will be forwarded to the Chief of Police, and will contain findings, suggestions for disciplinary action, or changes in policy, training, or tactics.

Dependent on the findings of each complaint as well as the specific factors involved, corrective measures will be taken to remedy violations of this policy. Corrective measures may include but are not limited to, training, counseling, policy review, and discipline up to and including termination of employment.

On an annual basis, a statistical summary of all racial profiling complaints which will include the findings as to whether each case was sustained, not sustained, or exonerated.

# Training

Training related to racial profiling will be provided to classified personnel. This training will be provided in coordination with the Texas Southern University Department of Public Safety Training Coordinator, and will include TCOLE required curriculum involving:

a.  Annual legal update training

b.  Cultural Diversity Training

c.  Training as established by TCOLE

d.  Training as established by TSUDPS

e.  Training as established by Law Enforcement Management Institute of Texas (LEMIT)

## Related Department Manual Policies and Reference Materials

- 200.19, **Investigation of Employee Misconduct**
- 200.24, **Extra Employment**
- 300.06, **Body Worn Cameras**
- Texas Code of Criminal Procedure, Article 2.132
- Texas Code of Criminal Procedure, Article 2.133
- Texas Code of Criminal Procedure, Article 2.134
- Texas Southern University Department of Public Safety Standard Operating Procedure, Racial Profiling
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.05.01 Complaint and Grievance Policy

# Bicycle, Segway, and Cart

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The Texas Southern University Police Department (TSUPD) is conducive to the utilization of bicycle, Segway, and cart patrol on the TSU campus and the surrounding community to assist in police and security response, as well as enhancing community relations.

This Department Manual Policy applies to all employees.

## Patrol Duties

Officers who are assigned to bicycle, Segway, and cart patrol will be responsible for the following policies and procedures:

a. Bicycle, Segway, and carts will only be assigned and used by officers who have completed required training.

b. Bicycle, Segway, and cart officers will have the same security responsibilities as patrol officers assigned in other areas, but with emphasis on areas that are not drivable by patrol vehicles.

c. Bicycle, Segway, and cart officers will emphasize positive citizen contact and community relations within the interior portions of the Texas Southern University campus.

d. Bicycle, Segway, and cart officers will patrol all areas of the University but will concentrate on those areas which are most populated or least accessible to patrol vehicles.

e. Bicycle, Segway, and cart officers may be assigned calls as necessary but should be willing to respond to calls when they are closer than other assigned officers or better suited to respond because of their vehicle type.

f. Bicycle, Segway, and cart patrol officers should concentrate on:

- Community Relations
- Parking lot patrol
- Parking violations
- Crime Prevention activities
- Increased visibility
- Safety and legal education activities
- Patrolling other areas not accessible to patrol vehicles, like campus open areas

g. Supervisors shall assign bicycle, Segway, and cart officers to specific areas of responsibility based on identified crime trend requirements.

h. Bicycle, Segway, and cart patrol officers will not conduct traffic stops on motor vehicles. If a traffic stop is necessary, officers will notify dispatch personnel who will dispatch a marked patrol unit.

i. Bicycle, Segway, and cart officers may use sidewalks, paths, grass or any other areas as long as it is done in conjunction with a law enforcement objective and in a manner providing safety to students, staff, faculty, visitors, and the officer.

j. Bicycle, Segway, and cart officers will perform and initiate pro-active police and security patrol activities.

k.  During severe inclement weather, the shift supervisor should use appropriate discretion in assigning bicycle, Segway, and cart patrol duties.

l.  Bicycle, Segway, and cart patrol officers are expected to participate in other university activities related to bicycling, utilization of the Segway, and cart.

j.  Bicycle, Segway, and cart officers will not ride in such a manner as to endanger the safety of citizens, officers, or damage their equipment.

m.  Bicycle officers may take their bicycles into buildings for safekeeping when necessary.

n.  Segway and cart officers may not take their Segways or carts into buildings, but should park them in a secure location and ensure the key is not left in the Segway or Cart.

## Duty Hours

Bicycle, Segway, and cart officers will be deployed as dictated by the on-duty supervisor. The last 15 minutes of the shift is to be used for storage of the bicycle, Segway, or cart.

## Bicycle, Segway, and Cart Equipment and Security Measures

It is the responsibility of each bicycle, Segway, and cart officer to properly maintain and secure their assigned bicycle, Segway, or cart.

### Bicycle Patrol

At the beginning of each shift, officers assigned to bicycle patrol will complete the following:

- Ensure proper tire inflation

- Ensure all bolts are tight and secure

- Ensure all moving parts are properly lubricated

- Ensure the bicycle is properly cleaned and maintained

- Ensure that all of the equipment assigned to the bicycle is operational and accounted for

At the end of each shift, the bicycles will be stored and properly secured in the West or East Garage storage room.

It is mandatory that all bicycle officers wear protective head gear at all times while operating the Bicycle.

### Segway Patrol

At the beginning of each shift, officers assigned to Segway patrol will complete the following:

- Ensure Segway is fully charged

- Ensure proper tire inflation

- Ensure the Segway is properly cleaned and maintained

- Ensure that all of the equipment assigned to the Segway is operational and accounted for

Segway officers will exercise reasonable care when parking Segway's to ensure they are parked in a secure area with the ignition key removed.

At the end of each shift, the Segway will be stored and properly secured in the West Garage storage room.

It is mandatory that all Segway officers wear protective head gear at all times while operating the Segway.

**Cart Patrol**

At the beginning of each shift, officers assigned to cart patrol will complete the following:

- Ensure the cart is fully charged or filled with fuel

- Ensure proper tire inflation

- Ensure the cart is properly cleaned and maintained

- Ensure that all of the equipment assigned to the cart is operational and accounted for

Cart officers will exercise reasonable care when parking carts to ensure they are parked in a secure area with the ignition key removed.

At the end of each shift, the cart will be stored and properly secured in the West Garage General Service Sally Port.

## Inspections

The department's fleet manager will submit a quarterly operational readiness inspection report to the Deputy Chief of Police regarding bicycles, Segway, and carts. The reports are due January 1, April 1, July 1, and October 1.

# Handling and Transporting Prisoners and Other Persons

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

While handling or transporting prisoners or other persons, employees shall treat all persons with dignity and respect and shall follow the procedures outlined in this Department Manual.

This Department Manual Policy applies to all employees.

## Safety and Security of Prisoners

When a person is taken into custody, employees are responsible for that person's safety. Employees shall be cognizant of the well-being of all prisoners and shall respond appropriately if prisoners are in danger, whether intentionally or unintentionally.

Employees observing circumstances believed to be an immediate threat of serious injury or death to any prisoner (including those in the custody of another employee) shall do all of the following:

    a.   Take custody of the prisoner.

    b.   Take the appropriate actions necessary to prevent injury to the prisoner.

    c.   Immediately notify a supervisor.

    d.   Submit a written report of the incident to the Chief of Police through the chain of command.

In these circumstances, the arresting officer is still responsible for submitting the incident report related to the original arrest.

All persons under arrest shall be properly handcuffed behind the back prior to being thoroughly searched and shall remain handcuffed while being transported in any police vehicle. Multiple prisoners transported in a prisoner van may be security by a multiple prisoner transport chain. If a medical or specific physical condition precludes handcuffing behind the back, the prisoner shall be secured the safest way possible manner before being placed in a police vehicle.

Employees shall not place or leave any object capable of inflicting injury or death in a location accessible to a prisoner or suspect. Employees shall thoroughly check any area intended to house a suspect or prisoner or to placing that person in that area (e.g., police vehicles, holding cells, offices, and interview rooms).

All police vehicles shall be thoroughly searched immediately following the transportation of any prisoner, suspect, or other citizen.

Traffic stops shall not be conducted while transporting prisoners unless a violator's actions pose an immediate threat to public safety and no other officer is available to stop the vehicle. Officers shall make every effort to follow the vehicle until another officer arrives. If no other officer is available, the officer should stop the vehicle taking into consideration the totality of the circumstances of the situation and follow the procedures for leaving a prisoner unattended in a life-threatening situation.

Prisoners shall not be left unattended in police vehicles unless employees can maintain visual contact with them. The only exception to this policy is if an officer is responding to a life-threatening situation and must immediately exit the police vehicle. Under this circumstance, officers shall notify the dispatcher as soon as possible of their situation and the location of their police vehicle so another officer can be dispatched to assist and take custody of the prisoner. When abandoning their police vehicle in response to an emergency, officers shall take the vehicle's keys with them.

## Health of Prisoners

When handling or transporting prisoners, officers shall be conscientious or prisoners who need immediate medical attention or have known medical issues. For prisoners experiencing serious or life-threatening medical conditions and depending on the circumstances, officers shall either transport the prisoner or have an ambulance transport the prisoner to the hospital to receive medical attention. Officers shall follow the procedures outlined in section Transporting Prisoners to Medical Facilities.

Prisoners who received medical assistance on scene or at a hospital and have been released by medical personnel shall be taken to jail. The officer shall inform jail personnel of the prisoner's medial issues upon arrival at the jail. Officers shall document the prisoner's physical condition in the incident report along with details of the officer's actions.

## Transporting Prisoners or Other Persons

Whenever possible, prisoners shall be transported in vehicles with protective screens. Employees shall transport only as many persons as can be safely carried at one time in a police vehicle. Employees shall ensure that the numbers being transported does not exceed the number of functioning seat restraints (e.g., seat belts and shoulder harnesses) in the police vehicle. Vehicles shall not be placed in motion until the driver and all passengers have been fastened in their seat restraints.

The following persons shall be transported in separate vehicles, unless the persons have been arrested as a result of the same incident or the transporting vehicle is a prisoner van or bus equipped with multiple, separate, and secure holding compartments.

    a. Adult and juvenile prisoners.

    b. Prisoners of the opposite gender or gender identity.

    c. Prisoners and persons who are not under arrest (except as noted below).

Employees shall not transport a domestic violence suspect and victim in the same vehicle at the same time.

A person who is not under arrest shall not be transported with a prisoner unless it is hazardous to leave the person at the scene. A person who is not arrested shall not be left in an area of potential danger and shall not be left on the side of a freeway. Another police officer may be called to transport a non-prisoner away from a dangerous area. Any person being placed in a police vehicle is subject to a weapons search.

### Transporting Notification

When transporting a person, employee who have access to a mobile computing device (MCD), shall document all of the following information utilizing their MCD:

    a. Origin and destination of the transport.

    b. Gender or gender identity of the person being transported (e.g., if the suspect identifies as a male than the officer shall enter "male" in the message screen to the dispatcher regardless of what is displayed on the prisoner's identification).

Employees who do not have access to an MCD and who conduct an on-view investigation that requires a person to be transported shall notify the dispatcher that they do not have access and shall provide the above listed information to the dispatcher. The dispatcher shall enter the information into the computer aided dispatch (CAD) event.

The ethnicity of the person being transported shall not be broadcast. The dispatcher shall provide time checks on departure and arrival. All transports shall be made via the safest, most direct route.

### Transporting Persons With a Physical Disability

Employees shall exercise due care in transporting persons who are physically disabled or who require special equipment. Wheelchairs, crutches, prostheses, and other necessary medical equipment shall be transported with the person.

When transporting a person aided by a mobility device (e.g., wheelchair, walker, or crutches), a supervisor shall be called to the scene. The supervisor shall determine the most appropriate means of transporting the person (e.g., using a patrol vehicle or calling for a paratransit vehicle). At no time shall a person with a mobility limitation be transported in the rear of a transport van. The supervisor shall remain on the scene to monitor the loading of the person.

Information as to the method of transport shall be documented in the call history and incident report if generated.

### Transporting Violent Prisoners or Persons Exhibiting Mental Health Crisis

When transporting a violent prisoner or a person exhibiting mental health crisis, officers shall use approved restraints (e.g. handcuffs) to ensure their safety and that of the person, remaining mindful that persons in crisis can be very unpredictable. Employees are expected to use sound judgment in deciding on the type and amount of physical restraint to be used and on the most appropriate mode of transporting such a person.

See Department Manual 300.02, **Effecting Arrests and Searches**, for additional information and policies regarding positional asphyxia, use of spit masks, and the interlocking technique. Also see Department Manual 300.11, **Handling Persons Exhibiting Mental Health Crisis**.

## Transporting Prisoners To Medical Facilities

Employees transporting a prisoner to a medical facility for treatment shall assist the admission clerk in acquiring the necessary information from the prisoner.

At least one officer shall ride in the ambulance transporting a prisoner to a medical facility if any of the following situations exist:

  a.  The person is suspected of a felony.

  b.  The prisoner is violent or combative.

  c.  The officer's presence is requested by ambulance personnel.

When a prisoner requires transportation to a medical facility, the attending jail medical specialist shall determine the method of transportation. If an ambulance is required, the jail medical specialist shall call for an ambulance and notify a jail supervisor.

Prisoners with charges, NeuroPsychiatric Center (NPC) referrals, and Southeast Texas Crime Information Center (SETCIC) and U.S. Immigration and Customs Enforcement (ICE) prisoners requiring nonemergency medical care shall be transported by the arresting officer. If the arresting officer is not available, the dispatcher shall assign any officer immediately available to transport the prisoner to the medical facility.

If a prisoner with charges is transported by ambulance, the assigned officer shall meet the ambulance at the medical facility and remain with the prisoner. The assigned officer shall contact a supervisor to determine whether or not another officer shall be assigned as a relief officer. The lieutenant shall review and evaluate the circumstances surrounding a prisoner's hospitalization to determine whether the prisoner shall be guarded. See Department Manual 300.14, **Guarding Prisoners at Area Hospitals**.

# Absent Without Leave (AWOL) Prisoners

Prisoners arrested solely for being absent without leave (AWOL) from the military shall be transported directly to the county jail in the county where the arrest occurred.

## Related Department Manual Policies

- 200.07, **Americans with Disabilities Act**
- 200.19, **Investigation of Employee Misconduct**
- 300.02, **Effecting Arrests and Searches**
- 300.09, **Dealing with the Deaf or Hard of Hearing**
- 300.11, **Handling Persons Exhibiting Mental Health Crisis**
- 300.12, **Response to Resistance**
- 300.13, **Restraint Devices**
- 300.14, **Guarding Prisoners at Area Hospitals**
- 300.44, **Treatment of Prisoners, Suspects, and other Citizens**
- 300-20, **Handling Publicly Intoxicated Persons**
- 400-10, **Emergency Management**

# Body Worn Camera

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The Texas Southern University Department of Public Safety recognizes the benefits of using Body Worn Cameras in pursuit of our mission to enhance the quality of life throughout the community. By working cooperatively with citizens to prevent crime, enforce the law, preserve the peace, and provide a safe campus environment. The use of Body Worn Cameras will assist the department in its efforts to foster transparency, promote accountability, and improve our ability to carry out our mission.

The Texas Southern University Department of Public Safety shall utilize Body Worn Cameras to assist officers in their efforts to enhance police professionalism, improve transparency, and preserve recorded evidence of their interactions with the public. Body Worn Cameras have the potential to improve community relations, strengthen public trust in law enforcement, reduce the number of citizen complaints, resolve allegations of misconduct by officers, increase department accountability, and improve officer training and evaluation.

This Department Manual Policy applies to all employees.

## Definitions

**Body Worn Camera (BWC).** A recording device that is capable of recording, or transmitting to be recorded remotely, video and audio; and worn on the person of a peace officer, which includes being attached to the officer's clothing. The BWC does not include surreptitious recording devices used in undercover operations.

**Digital Recordings.** For the purpose of this policy, digital recordings consist of video footage, which may include audio, captured by the BWC and stored digitally.

**Docking the BWC.** The process by which an employee causes videos previously recorded onto the BWC to be uploaded to the shift designated hard drive.

**Event Mode.** The mode in which the BWC has been activated by the officer and is actively recording an event. The term "activate" shall be used to indicate that a BWC has been places in event mode.

**Law Enforcement Activity.** Any event during which an officer exercises his or her police authority or conducts any type of investigation, whether consensual or otherwise.

## Integrity Of Video Recordings

The use of any body worn camera (BWC) not issued by the department, including mounts, charges, or other devices, is prohibited unless approved by the Chief of Police. All digital recordings from any BWC shall be used for official law enforcement purposes only and are the property of the Texas Southern University Department of Public Safety.

## BWC Equipment

The BWC shall be affixed to the front of each officer's uniform above the horizontal midline of the torso so that it is clearly visible to persons with whom the officer comes into contact. The positioning of the BWC shall enable the BWC to capture the best recording possible of the officer's scene and interactions with persons on the scene. It is the officer's responsibility to ensure that the BWC is properly affixed to his/her uniform so that no obstructions interfere with proper recording.

Unless authorized by the Chief of Police, employees shall not disassemble the camera or attempt to access the internal storage, files, programs or configuration of the BWCs either wirelessly or by direct connection.

## Training For Body Worn Camera Use

Any officer issued a BWC shall be trained in the operation of the equipment prior to its use. Lieutenants shall ensure that all officers under their command are trained in the proper use of the BWC in accordance with current departmental policy.

Each officer that receives a BWC shall familiarize themselves with each component and fully understand how to use the device appropriately and in accordance with this policy. Any officer not familiar with the BWC should inform their supervisor prior to being issued the BWC. The Lieutenant(s) are to ensure that all personnel that are issued a BWC will attend the above training.

## Supervisor Responsibilities

Any supervisor who becomes aware that an officer has a malfunctioning or defective BWC shall determine whether the BWC can be replaced or repaired prior to the officer reporting for assignment. If a supervisor determines that there is not a BWC available, the supervisor may authorize the officer to report for assignment without BWC equipment.

Sergeants shall review relevant BWC recordings prior to submitting any administrative reports as they relate to incidents involving response to resistance (R2R), pursuits, or Department vehicle crashes.

The Captain and sergeants will conduct monthly reviews of at least three (3) randomly selected recordings in order to assess officer performance as well as flag videos that may be appropriate for training purposes.

If a complaint is associated with a recorded event, or an officer believes an incident may generate a complaint, the supervisor will ensure the video is flagged for indefinite retention and, if necessary, restrict access to the video.

## Officer Responsibilities

Officers Issued a BWC shall:

a. Be responsible for the care and custody of all BWC equipment assigned to the officer.

b. Ensure the BWC used is assigned to them.

c. Inspect the assigned BWC device daily to ensure that there is no visible damage and that the device is in proper and working order.

d. Immediately report a dead battery or any malfunction or loss of BWC equipment to a supervisor. If authorized to work an assignment without fully functional BWC equipment, the officer shall notify dispatch of the authorization, including the supervisor's unit number.

e. Upload videos into the shift designated hard drive by the end of the shift or as soon as practical immediately following a significant event.

## Activation of The BWC

Officers shall place the BWC in activate mode to record all law enforcement activities regardless of the dispatch status. Officers shall continue to recording until the law enforcement activity is completed or until there is a reason, permitted by this policy, to deactivate the BWC. Officers are not required to cease recording an event, situation, or circumstance solely at the demand of a citizen. The BWC shall be activated as follows:

a. **Priority One or Two call for service.** Activate upon being dispatched or when driving to the call regardless of dispatch status.

b. **Any other call for service.** If a vehicle is being used, activate prior to exiting the vehicle. If a vehicle is not being used, activate prior to arrival.

c. **University's Student Code of Conduct.** If there is probable cause or reasonable suspicion of a crime and/or administration violation of the University's Student Code of Conduct, BWC's should be activated at the beginning of the encounter or incident.

d. **Self-initiated law enforcement activity.** (e.g., traffic or pedestrian stop) or On-View Incident (e.g., being flagged down). Officers shall activate BWCs prior to taking any police action, including vehicle and foot pursuits. In all cases, BWCs shall be activated prior to turning on emergency equipment.

e. **Search or arrest warrant.** Officers equipped with a BWC shall record during the execution of any search warrant or arrest warrant and during all consent searches, including building searches.

f. **Prisoner or passenger transports.** Officers equipped with a BWC shall record all prisoner or passenger transports, regardless of the gender of the prisoner or passenger. The entire transport shall be recorded.

For prisoner transports, officers may elect to have the BWC facing the rear passenger compartment of the vehicle. Once officers are in a secured jail facility with surveillance cameras, the BWC may be deactivated.

When a prisoner or passenger is transported by a two-man unit, both officers shall be required to record with the BWC during the transport.

When the officer arrives at the Joint Processing Center, upon entering the "Sally Port Vestibule," which leads into the JPC from the sally port, officers shall deactivate their BWC. Officers shall continue to record with the BWC until entering the "Sally Port Vestibule." The BWC shall not be turned off while the officer is in the sally port with a prisoner. This also applies to suspects being processed inside the JPC for Driving While Intoxicated offenses.

g. **Hostile or contentious interaction.** There may be times when an officer is interacting with the public and the discussion becomes unexpectedly hostile or contentious. As soon as an officer determines that this is likely to occur or is occurring, the officer shall immediately activate the BWC.

## Discretionary Uses

Officers may, but are not required to:

a. Record informal or casual encounters with members of the public.

b. Record person who confidentially provide information for law enforcement procedures.

## Failure To Activate BWC

Although the BWC is required to be activated prior to initiating a law enforcement activity, there may be circumstances that require an officer to act immediately in order to ensure his or her safety or the safety of others. In those situations, it may be impractical or unreasonable for the officer to activate the BWC before taking police action. In these instances, the officer shall activate the BWC as soon as it is safe to do so to ensure that the remainder of the incident is properly recorded.

If an officer is required to activate his or her BWC and fails to do so, the officer shall immediately after the conclusion of the event, use the BWC to record his or her explanation or reasoning as to why the BWC was not activated. If this situation occurs, the officer shall notify his supervisor and document the reason for not activating the BWC in the incident report or call slip.

An officer's justification for failing to activate the body worn camera because it is unsafe, unrealistic, or impractical shall be based on whether a reasonable officer under the same or similar circumstances would have made the same decision. If the department determines an officer was unjustified in failing to activate the BWC when required to do so, the officer may be subject to disciplinary action up to and including indefinite suspension.

## Deactivation of Body Worn Camera

Deactivating a BWC in regards to a law enforcement activity is governed by the following guidelines. Except as specifically provided otherwise in this policy, an officer's BWC may be deactivated only when:

   a.   All contacts with the public on the scene are completed.
   b.   All arrests have been made and arrestees have been transported to a secure jail facility by a transporting unit. Officers in the transporting unit shall adhere to section Activation of the BWC of this policy.
   c.   Conferring with an undercover officer.
   d.   Approved by a supervisor on extended scenes.

Officers are reminded that the BWC shall be activated when in a hospital or medical facility for official police business including, but not limited to, criminal investigations, mental health documentation, or a dying declaration. However, hospital assignments may be considered extended scenes requiring supervisor approval for BWC deactivation.

If the department determines an officer was unjustified in deactivating his or her BWC, the officer may be subject to disciplinary action up to an including indefinite suspension.

## Muting of Body Worn Camera

Once an incident or situation has evolved beyond the immediate preliminary encounter and has stabilized, if it becomes necessary to discuss the specifics of the event, investigation, or case with another officer or supervisor in furtherance of the investigation, the body worn camera may be temporarily muted during these discussions. If the body worn camera is muted, that will also be recorded on the video and documented in the incident report.

## Special Circumstances

The section addresses special circumstances in which additional guidance regarding the use of BWCs is needed.

### Traumatic Events

Officers are sometimes called on to respond to scenes where persons, including witnesses and complainants, may have been traumatized (e.g., a scene of a sexual assault). While officers are encouraged to use their BWCs when it is prudent to do so, they may use their discretion in choosing to deactivate their BWC when recording the person might inhibit the officer's ability to obtain a full and candid statement from a complainant or witness. This does not include domestic violence scenes except as below. Officers shall audibly note the reason prior to deactivating. The BWC shall be activated once the contact with that individual has ceased and until the remainder of the investigation is complete.

## Family Violence

If an officer encounters a person during an investigation that the officer believes to be a victim of family violence and who refuses to cooperate with the investigation while being recorded by the officer's BWC, the officer shall briefly explain the department's policy with regard to recording interactions to attempt to alleviate the concerns. If the person continues to object to being recorded, the officer shall cease attempts to interview that person and make contact with a supervisor. The supervisor contacted shall ensure that a supervisor reports to the officer's scene.

Once at the scene, the supervisor shall make contact with the possible victim and attempt to resolve any issues related to being recorded. In the rare instance the supervisor is unable to remedy the person's concerns, the supervisor should authorize the investigation to continue while the BWC is deactivated long enough to obtain a statement from the individual. The BWC shall be activated once the contact with that individual has ceased and until the remainder of the investigation is complete.

## Driving While Intoxicated

During encounters with drivers who are suspected of Driving While Intoxicated (DWI), officers shall use BWCs and any mobile video equipment that is available to record any field sobriety tests before proceeding to an intoxilyzer testing facility. Officer shall continue to record until the suspect is released or placed into a secured jail facility.

## Response to Resistance (R2R)

Officers involved in R2R incidents captured by BWCs shall follow the applicable policies regarding the R2R and reporting of R2R in Department Manual 300.12, **Response to Resistance**. When feasible, an officer involved in R2R incident may, but is not required to, review the BWC recording before completing the incident report. The supervisor conducting the R2R review shall review video recordings of all R2R incidents.

If an officer is unable to upload the BWC video to the designated shift hard drive due to illness or injury, the supervisor who has been made aware of the officer's inability to upload the video shall be responsible for ensuring that the video is uploaded as soon as practicable.

In critical incidents such as officer-involved shootings, in-custody deaths, or other officer-involved incidents that result in a person's bodily injury or death, a supervisor shall take custody of all involved BWCs at the scene and ensure that they are transferred to the internal affairs personnel.

## Extra Employment

When working police-related extra employment, all officers and supervisors who have been assigned a BWC are required to activate their BWC to record all law enforcement activities occurring during their extra-employment consistent with this policy. Only the shift supervisor may dock the BWC in order to upload previously recorded audio and video to the shift hard drive. It is the responsibility of the officer to ensure the BWC is fully charged prior to working extra employment.

## Special Events

Special events and crowd control situations present unique tactical and safety concerns for both the public and law enforcement. Examples of such events include demonstrations, major sporting events, festivals, and parades. Supervisors tasked with coordinating the response to such events shall have the discretion to order officers to record portions of or the entire special event.

## Privacy Concerns

Officers shall not have BWCs while inside restrooms, dressing rooms, or locker rooms unless officers are entering in response to an ongoing emergency of a crime that is still in progress, there is reason to believe that a suspect is still inside a location, or other exigent circumstances exist.

## Prohibited Usage

Unless approved by the Chief of Police, officers are prohibited from making copies of digital evidence for non-law enforcement purposes or uploading digital evidence to public or social media sites at any time. While viewing a BWC recording for official purposes, officers shall not take a screen shot or make any separate recording of the BWC recording.

Under Texas Occupations Code Section 1701.659, it is a Class A misdemeanor for a peace officer or other employee of the department to release a recording created with a body worn camera without permission of the department.

Recordings made by officers while performing their police duties shall not be shared or used for personal gain or entertainment.

The BWC is for official use only and shall not be used to record:

    a.  Personal or non-work related activity.

    b.  Department roll calls, locker rooms, restrooms, or administrative activities.

    c.  Conversations of fellow employees without their knowledge during routine activities not related to enforcement.

    d.  Conversations with any law enforcement personnel that involve briefings or tactical operations or plans.

    e.  Lineup proceedings or associated briefings.

    f.  Department meetings including, but not limited to, administrative meetings, committee meetings, mediations, counseling, and in-service training.

    g.  Inside police facilities unless taking law enforcement action.

    h.  During "walk-throughs" following officer-involved shootings.

## Processing Inadvertent Sensitive BWC Recordings

If there is an inadvertent sensitive video made (e.g., while using the restroom or dressing and/or undressing in a locker room), the officer should notify a supervisor. A same-sex supervisor shall view the video and ensure that there were no policy violations recorded and that no misconduct was observed. The supervisor shall notify the Deputy Chief to have the video access restricted.

## Documentation In Incident Reports

The BWC recording is not a substitute for a thorough and complete original or supplement report.

For incidents requiring an officer to complete an incident report, officers shall ensure each BWC recording is documented in the incident report. The fact that a recording was made shall be documented in all reports and any corresponding documentation associated with the incident including, but not limited to, crash report, Vehicle Pursuit Report, Conducted Energy Device (CED) report, R2R report.

Any officer responding to a scene as a secondary unit shall notify the primary unit if their BWC was activated while on the scene or any scene associated with the incident and provide his name and employee/T-number to the primary unit.

The primary unit shall include in the narrative of the incident report references of all employees (by name and employee/T-number) whose BWCs captured recordings on the primary unit's scene or on any scene associated with the incident being reported.

Officer shall continue data collection as required by Department Manual 300.03, **Racial Profiling Prohibited**, regardless of whether they are utilizing a BWC.

## Repair and Maintenance

Upon notification of equipment malfunction or damage, a shift supervisor shall be notified and have the responsibility of notifying the Captain for any replacement equipment or parts.

## Use of Digital Evidence For Training Purposes

There may be instances when officers and supervisors believe a recording incident has training value. In such cases, a supervisor shall send correspondence via his chain of command to the Deputy Chief for consideration.

## Requests For Recordings

### Employee Requests

An officer seeking a copy of BWC video for reasons other than official departmental purposes shall make a request in writing through the chain of command to the Deputy Chief stating the specific reasons for requesting the video.

### Texas Public Information Act (TPIA) Requests

Recordings captured during the scope of an officer's duties may be subject to release to the public under applicable laws. All requests from persons for BWC video copies or viewing shall be referred to the department's Office of Public Affairs. These requests shall be handled in accordance with Chapter 552 of the Texas Government Code (Public Information Act), Chapter 1701 of the Texas Occupations Code, and departmental procedures.

### Requests from Other Law Enforcement Agencies and Criminal Prosecutors

The United States Attorney's Office, the District Attorney's Office of Harris County, and Municipal Prosecutors shall not be required to make requests in writing to the Chief of Police for copies of or access to BWC recordings and shall refer to the Office of Technology Services.

The department shall require that any other requests for BWC videos from other law enforcement agencies be made in writing to the Chief of Police.

### Related Department Manual Policies and Reference Material

- 200.01, **Keys, Passwords, and Personal Identification Numbers**
- 200.19, **Investigation of Employee Misconduct**
- 200.30, **Police Computer Systems**
- 200.31, **Acceptable Use of Computers**
- 200.33, **Overtime Compensation**
- 300.03, **Racial Profiling Prohibited**
- 300.08, **Firearm and Soft-Impact Weapon Discharges**
- 300.12, **Response to Resistance**
- 300.18, **Property and Evidence**

- 300.21, **Driving While Intoxicated**
- 400.15, **Police Records**
- Texas Government Code, Chapter 552
- Texas Occupation Code, Section 1701.651 through 1701.663
- Texas Southern University Department of Public Safety Standard Operating Procedure, Body–Worn Camera Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.03 Computer Use Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.12 Internet Use Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.17 Password Security Policy

**300.07**

# Campus Trespassing Notice
**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Texas Southern University Department of Public Safety strives to provide a safe and welcoming environment for students, staff, faculty, and visitors, who have legitimate University business on campus. However, there exist individuals who for no other reason but to engage in suspicious activity and have no legitimate business on Texas Southern University property, except to engage in disruptive behavior. Those individuals will be issued a Campus Trespass Notice and requested to leave Texas Southern University property. This is provided that there are no criminal charges being pursued by the officer.

Under the authority of the Texas Education Code, section 51.209. *Unauthorized Persons; Refusal of Entry, Ejection, Identification.* The governing board of a state institution of higher education or its authorized representatives may refuse to allow persons having no legitimate business to enter on property under the board's control, and may eject any undesirable person from the property on his refusal to leave peaceably on request. Identification may be required of any person on property.

Section 51.204 *Trespass, Damage, Defacement.* It is unlawful for any person to trespass on the grounds of any state institution of higher education of this state or to damage or deface any of the buildings, statues, monuments, memorials, trees, shrubs, grasses, or flowers on the grounds of any state institutions of higher education.

This Department Manual Policy applies to all employees.

## Related Reference Material

- Texas Education Code, Section 51.204
- Texas Education Code, Section 51.209

# Firearm and Soft-Impact Weapon Discharges

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

All firearm and soft-impact weapon discharges by an officer other than for training or lawful recreational purposes shall be immediately reported and investigated as set forth herein.

Whenever an officer discharges a firearm and causes bodily injury, serious bodily injury, or death to a person, the department shall ensure the appropriate report is completed and submitted to the Texas Attorney General's Office and to the TSUDPS Office of Public Affairs in accordance with state law.

TSUDPS personnel may ask for assistance from the Houston Police Department, the Harris County Sheriff's Office, or the Texas Department of Public Safety for assistance with an incident.

This Department Manual applies to all employees.

## Definitions

**Bodily Injury.** An injury causing physical pain, illness, or any impairment of the function of any bodily member or organ.

**Firearm.** Any handgun, rifle, or shotgun (not including soft-impact weapon).

**Serious Bodily Injury (SBI).** An injury that creates a substantial risk of death or that causes death, serious permanent disfiguration, or protracted loss or impairment of the function of any bodily member or organ.

**Soft-Impact Weapon.** An intermediate weapon that is a distinctly marked shotgun designated for the exclusive use of soft-impact munitions.

## Duty To Carry Firearm

Each Officer is required to have a firearm in his/her immediate presence. However, personnel not yet licensed as peace officers by the Texas Commission on Law Enforcement (TCOLE) and commissioned by Texas Southern University Department of Public Safety as peace officers, may not carry firearms. (This does not apply to License to Carry Holders (LTC), while off duty).

## Discharge of Firearm Or Soft–Impact Weapon

The Communications Division is to be notified anytime an employee of the Texas Southern University Department of Public Safety discharges a firearm or soft-impact weapon, whether the employee is in the course of his/her official duties or off-duty.

In those instances where notification of the Communications Division is required, complete reports of all factors surrounding the incident (to be submitted by all personnel witnessing or having pertinent information regarding the incident) must be submitted to the employee supervisor within eight (8) hours of the incident.

## Requesting Medical Personnel and Providing First Aid

Anytime an officer discharges a firearm of soft-impact weapon, whether inside or outside the Texas Southern University Campus or the City of Houston, and a person sustains bodily injury or serious bodily injury (SBI) or is struck by a munition from a soft-impact weapon, the officer shall immediately request medical personnel to the scene.

If the officer who discharged the firearm or soft-impact weapon is unable to perform this task, the most senior officer at the scene shall make the request.

While awaiting medical emergency services, officers shall provide first aid to their level or training without any reasonable delay, taking into consideration that the first priority of all officers is scene safety. Mitigating any potential threats prior to providing first aid shall remain the most important task, because once treatment begins, officers may quickly lose any tactical advantage due to the fact they will be kneeling or crouched and/or have their attention diverted during the assessment and rendering of first aid.

## Inside The Texas Southern University Department of Public Safety Jurisdictions Discharge of Firearm or Soft-Impact Weapon With Injury, SBI, or Death To Person

An on-duty supervisor shall be immediately dispatched to the scene to conduct an investigation and complete a supplemental or original incident report whenever an officer discharges a firearm or soft-impact weapon and an injury, SBI, or death of a person occurs.

### Officer's Responsibilities

The officer who discharged the firearm or soft-impact weapon shall do the following:

a.  Immediately request medical personnel.

b.  Immediately notify the communication division.

c.  Complete a supplemental or original incident report, as applicable. The report shall document the original calls for service; the names, employee numbers, and assigned divisions of all employees present when the discharge occurred; and the circumstances surrounding the firearm or soft-impact weapon discharge.

d.  Follow any applicable procedures in Department Manual 300.12, **Response to Resistance**.

### Communication Division's Responsibilities

Upon receiving notification, the communication division shall notify the employee's immediate supervisor, Captain, Deputy Chief, and Chief of Police. The communication division shall also notify the District Attorney's Office Shooting Team and Internal Affairs and may ask for assistance from the Houston Police Department, the Harris County Sheriff's Office, or the Texas Department of Public Safety for assistance with an incident.

### Supervisor's Responsibilities

Upon notification, the supervisor shall follow the procedures for a major crime scene (e.g., preserve the scene, separate witnesses, etc.). In case of employee injury, the supervisor shall notify the command staff in order for the next of kin to be notified.

The supervisor shall ensure that all body worn cameras are collected and preserved, as well as any other evidence.

### Assigned Investigator's Responsibilities

Upon notification, the assigned investigator will conduct a thorough investigation regarding the incident. The investigator's supervisor will ensure that this investigation is conducted. The investigator shall forward the report of the investigation to the Captain.

### Captain's Responsibilities

The Captain shall place the officer on five (5) days of administrative leave and ensure that the officer attends a post-incident debriefing with a University or Department approved counselor. Upon completion of the five (5) day administrative leave, The Captain will ensure that the officer is placed on a minimum of five (5) days of administrative duties.

This administrative leave/duty status may be extended until completion of staff review of the investigation and based on the recommendations of the counselor.

## Internal Affairs Responsibilities

Internal Affairs shall conduct a thorough investigation regarding the incident and forward the report to the Chief of Police.

## Inside The Texas Southern University Department of Public Safety Jurisdictions Discharge of Firearm or Soft-Impact Weapon With No Injury To Person

An on-duty supervisor shall be immediately dispatched to the scene to conduct an investigation and complete a supplemental or original incident report whenever any of the following incidents occur with the TSUDPS jurisdiction.

a. An officer unintentionally discharges a firearm and it does not result in any bodily injury or SBI to any person.

b. An officer discharges a firearm toward an animal or shoots an animal and it does not result in any bodily injury or SBI to any person.

c. An officer discharges a soft-impact weapon, intentionally or unintentionally, and it does not result in any bodily injury or SBI to any person.

If any of the preceding scenarios occur, employees shall adhere to the procedures outlined in this section.

## Officer's Responsibilities

The officer who discharged the firearm or soft-impact weapon as described above shall do the following:

a. Immediately request medical personnel, if any person sustains injury and/or is struck by a munition from a soft-impact weapon.

b. Immediately notify the communication division.

c. Complete a supplemental or original incident report, as applicable. The report shall document the original calls for service; the names, employee/T-numbers, and assigned divisions of all employees present when the discharge occurred; and the circumstances surrounding the firearm or soft-impact weapon discharge.

d. Comply with section Firearms and Soft-Impact Testing, of the policy if the incident involved an unintentional discharge of a firearm or soft-impact weapon without any bodily injury or SBI to any person.

e. Follow any applicable procedures in Department Manual 300.12, **Response to Resistance**.

If the officer who discharged the firearm or soft-impact weapon is unable to perform the tasks noted in items (a) through (c) above, the most senior officer at the scene shall perform such tasks.

## Communication Division Responsibilities

Upon receiving notification, the communication division dispatcher shall notify the officer's immediate supervisor and lieutenant.

## Supervisor's Responsibility

Upon receiving notification, the supervisor shall do the following:

a. Respond and proceed immediately to the scene.

b. Ensure injured persons are treated.

   c. Conduct an investigation into the incident regarding any property damage, justifications for weapon usage, and safety procedures.

   d. Collect and submit all evidence related to the firearm or soft-impact weapon discharge incident in accordance with Department Manual 300.18, **Property and Evidence** and 300.12, **Response to Resistance**.

   e. Direct the officer to comply with section Firearm and Soft-Impact Weapon Testing, of this policy if the incident involved an unintentional discharge of a firearm or soft-impact weapon without bodily injury or SBI to any person.

   f. Write and submit to the Chief of Police correspondence describing the incident and summarizing the findings of the investigation.

   g. Complete an original or supplemental incident report, as applicable.

   h. Follow any applicable procedures in Department Manual 300.12, **Response to Resistance**.

   i. Report any findings of improper actions on the officer's part to the lieutenant.

### Assigned Investigator's Responsibility

Upon notification, the assigned investigator will conduct a thorough investigation regarding the incident. The investigator's supervisor will ensure that this investigation is conducted. The investigator shall forward the report of the investigation to the Captain.

## Discharge of Firearm or Soft-Impact Weapon Outside The Jurisdiction of The Texas Southern University Department of Public Safety Including Extra Employment

### With Injury, SBI, or Death to a Person

Anytime an involved officer discharges a firearm or soft-impact weapon while outside the jurisdiction of TSUDPS, including while working extra employment, and there is injury, SBI, or death to a person the officer involved shall:

   a. Immediately request medical personnel to the scene.

   b. Notify the communication division as soon as possible.

   c. Contact the law enforcement agency having jurisdiction.

   d. Fully comply with any additional investigations that ensue.

The following requirements shall be completed:

   e. The communication division shall notify the employee's immediate supervisor and lieutenant, an on-duty supervisor, the Deputy Chief, the Chief of Police, Internal Affair investigator, the District Attorney's Shooting Team and the University General Counsel.

   f. The Internal Affairs investigator shall submit, in writing, a report of the incident detailing the employee's involvement, based on interviews with the employee or other witnesses, and on information from the other agency's investigation.

   g. All members of the TSUDPS will cooperate fully with the other agency's investigation and give assistance as requested.

   h. Follow any applicable procedures in Department Manual 300.12, **Response to Resistance**.

### With No Injury to a Person

Anytime an involved officer discharges a firearm or soft-impact weapon while outside the jurisdiction of TSUDPS, including while working extra employment, and there is no injury to a person, the officer involved shall:

a. Notify the law enforcement agency having jurisdiction as soon as possible.

b. Fully comply with any reporting requirements of or investigation conducted by the law enforcement agency have jurisdiction.

c. Notify the communication division and an on-duty supervisor regarding the incident.

d. Comply with section Firearms and Soft-Impact Weapon Testing, of this policy.

e. Follow the applicable documentation requirements noted below.

f. Follow any applicable procedures in Department Manual 300.12, **Response to Resistance**.

## Officer's Documentation Requirements

Officers who discharge a firearm or soft-impact weapon (intentionally or unintentionally) while outside the jurisdiction of TSUDPS, shall request a copy of any report generated by the law enforcement agency having jurisdiction over the incident and submit it to his or her immediate supervisor for evaluation. If the law enforcement agency having jurisdiction refuses to provide the officer with a copy of the report, the officer shall document this in correspondence through their chain of command to the Deputy Chief.

If no report is generated by the law enforcement agency having jurisdiction, the officer shall generate correspondence fully explaining the firearm or soft-impact weapon discharge incident and sent it through the chain of command to the Deputy Chief.

## Firearm and Soft-Impact Weapon Testing

Officers who unintentionally discharge a firearm or soft-impact weapon and it does not result in any bodily injury or SBI to any person shall immediately secure that weapon and take it out of service. The officer shall not carry that weapon for on- or off-duty use until it has been cleared by a functionality test performed by Academy firearms range personnel.

## Related Department Manual Policies and Reference Material

- 300.01, **Firearms and Qualification**
- 300.06, **Body Worn Camera**
- 300.12, **Response to Resistance**
- 300.16, **Conducted Energy Devices**
- 300.18, **Property and Evidence**
- 300.22, **High Risk Vehicle Approaches**
- 300.33, **Animal Bites**
- 400.10, **Emergency Management**
- Texas Southern University Department of Public Safety Standard Operating Procedure, Accidental Discharge of Firearm- No injuries

# Dealing With The Deaf or Hard of Hearing
**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The Department Policy establishes procedures for all employees when they encounter persons who are deaf or hard of hearing. Employees are required by the Americans with Disabilities Act (ADA) to ensure effective communication with individuals who are deaf or hard of hearing (DHH) that includes effectively giving information to and receiving information from DHH persons.

The preferred method of communication and/or auxiliary aids and services requested by a DHH individual shall be honored unless there is confidence that there are other equally effective means of communication.

## Definitions

**ADA Coordinator.** Departmental representative designated by the Chief of Police who shall resolve grievances concerning liability and/or use of auxiliary aids and services.

**American Sign Language (ASL).** The predominant sign language of the deaf communities in the United States and most English speaking parts of Canada. Other dialects may exist but ASL is the official sign language that is accepted by ADA Title II entities.

**Auxiliary Aids and Services.** Includes deaf services videos, placards, certified interpreters, written notes, VRI (video remote interpreting), and other effective methods of making aurally delivered materials available to individuals with hearing impairments.

**Certified Interpreter.** A person who holds an advanced or master level certification with the Board of Evaluation of Interpreters (BEI) or who is certified through the Registry of Interpreters for the Deaf (RID).

**Video Remote Interpreting (VRI).** A video telecommunication service that uses video conferencing through a device to interpret American Sign Language (ASL). Interpreters utilized via this service are certified interpreters.

## Patrol/Field Response

Whether at the scene of a call for service or on-viewed incident, or simply interacting with a member of the public, upon becoming aware that a member of the public is deaf or hard of hearing, department employees shall focus on establishing effective communication.

Primary consideration should be given to this DHH person's preferred choice of communication and/or auxiliary aids and services. While this may require calling an interpreter to the scene if requested by the deaf or hard of hearing person, effective communication may in some situation be achieved through a series of written notes, gestures, and lip reading.

When an officer is unable to communicate effectively with a DHH person, the officer may ask dis-patch to see if there are any persons available to interpret to come to the scene. A certified interpreter may be called to the scene with permission of Captain.

If the arresting and/or the transporting officer is aware that the suspect is DHH, he shall be responsible for advising the suspect of the reason for the arrest in the most effective means of communication reasonably available. The officer shall verbally advise jail personnel that the suspect is DHH when placing the suspect in custody of jail personnel.

# Prisoner Booking Procedures

Arrested DHH suspects shall be booked only into a designated jail facility where a VRI device is available. It shall be the responsibility of the transporting officer to inform jail facility personnel where the DHH person is being booked and that the person is DHH.

When a DHH person is booked into a jail facility, the transporting officer shall document in an incident report that the person is DHH. The officer shall include in the narrative of the incident report the name and employee number of the jail facility personnel who was notified that the person being booked is DHH.

# Captain Responsibilities

Only the Captain can authorize the use of on-scene certified interpreters. When an on-scene certified interpreter is used, the interpreting company will forward an invoice to the Captain. Upon receipt of the invoice, the Captain shall authorize the payment if the invoice is correct and then forward the invoice to the Office of Budget and Finance.

If the Captain has managerial oversight over a VRI device or similar device shall ensure that the device is maintained for operational readiness.

# Shift Supervisor's Responsibilities

Shift supervisors shall ensure that all employees on their shift are familiar with the location and the usage of the VRI device or similar device.

If malfunctions are discovered or occur after normal business hours, the shift supervisor who is notified by the employee who discovered the malfunction shall ensure that the Office of Internal Audit and Information Technology is contacted immediately.

During the shift transition, the supervisors working the shift in which the malfunction was discovered shall ensure that a work order number is posted on the device and shall inform the relieving shift supervisors of any malfunctions of the VRI device or similar device.

Any HHD device shall be tested at minimum once a month and the test shall be recorded  in the usage log that should always be located next to the device.

# Related Department Manual Policies and Reference Material

- 200.07, **Americans with Disabilities Act**
- 200.32, **Disposition of Arrested Juveniles**
- 300.05, **Handling and Transporting Prisoners and Other Persons**
- 300.21, **Driving While Intoxicated**
- Alcoholic Beverage Code, Section 106.041
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.05.15 Americans with Disability Act/504 Policy

# Motor Vehicle Pursuits

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The Texas Southern University Department of Public Safety places the highest value on the life and safety of its officers and the public of large. This value must be accommodated in a police officer's duty to apprehend persons who have committed or are committing a violation of the law. The methods the department establishes to enforce the laws are intended to minimize the risk of injury to officers and citizens alike.

The driver of an authorized vehicle shall drive with due regard for the safety of all persons and is responsible for all consequences of reckless disregard for the safety of others.

This Department Manual Policy applies to all classified and communication personnel.

## Definitions

**Motor Vehicle Pursuit.** A motor vehicle pursuit occurs when an officer operating an emergency vehicle attempts to stop or apprehend a suspect who refuses to stop while operating a motor vehicle. The suspect must exhibit one of the following types of conduct:

    a.  A willful disregard for personal safety or the safety of others in an attempt to avoid arrest.

    b.  A refusal to obey an officer's repeated signal to stop.

## Authorized Pursuits

The decision to engage in a motor vehicle pursuit is highly dependent on the ability of an officer, supervisor, or Captain to continually assess the need to pursue versus the risk of injury involved in engaging in the pursuit.

## Officer's Responsibilities

Officers may initiate or continue a pursuit only if all the following requirements are met:

    a.  An officer in good faith reasonably believes that under the circumstances the need to immediately apprehend the suspect outweighs a clear risk of harm to the public in initiating or continuing the pursuit.

    b.  As required by department policy and Texas Supreme Court case law, officers must constantly evaluate the risk and factors involved when initiating or continuing a pursuit. These factors include, but not limited to:

        •  The seriousness of the crime to which the officer is responding.

        •  Whether an officer's immediate presence is necessary to apprehend a suspect or to prevent injury or loss of life.

        •  Alternative courses of action, if any, available to achieve a comparable result.

    c.  In addition to the above factors, officers shall continually evaluate:

        •  Knowledge about the suspect being pursued. If enough information exists to file a warrant, officers shall be expected to discontinue the pursuit.

        An exception to this standard is permissible or captain responsible for overseeing the pursuit to continue based on the assessment of requirements as listed above.

- The nature of the offense, if known.
- The observable driving behavior of the suspect being pursued (e.g., is the suspect driving while intoxicated or is the suspect driving recklessly).
- Relative performance capabilities of the vehicle being pursued.
- Road conditions.
- Weather.
- Population density.
- Vehicular and pedestrian traffic.
- The presence of other persons in the police vehicle.

d.  Officers shall continually assess the nature and severity of harm their actions would cause (including injuries to bystanders as well as the possibility of a crash would prevent the officer from arriving on scene or assisting in the apprehension of the suspect), the likelihood any harm would occur, and whether the risk of harm would be clear to a reasonably prudent officer.

While evaluating all the listed factors, officers shall constantly assess the need to immediately apprehend the suspect versus the risk of injuring themselves, the public, or the suspect.

## Supervisor's Responsibilities

The designated on-duty field supervisor:

a.  Shall be in command of the pursuit. The field supervisor shall immediately advise the dispatcher if the pursuit should continue based on communication and the assessment of the circumstances.

b.  Shall monitor all radio communications related to the pursuit and make every effort to ensure only authorized units participate in the pursuit. Whenever time and air traffic allow, supervisors assigned to a pursuit shall affirmatively break the air and remind officers:

- To maintain their professional composure.
- That the pursuit shall result in a high-risk vehicle approach (as set out in Department Manual 300.22, **High Risk Vehicle Approaches**).
- That the officers should, if possible, use their vehicles for cover and concealment while attempts to establish communication with the occupant of the vehicles are made.

c.  Shall continually assess the motor vehicle pursuit and its changing circumstances relative to the points stressed by the Texas courts as outlined in section *Officer's Responsibilities* items (b) and (c) above. Also, periodically, as prompted by the dispatcher, the supervisor shall state whether the pursuit should continue or direct the pursuit be terminated.

d.  May terminate the pursuit immediately if it is determined that officers have sufficient information to establish both probable cause for the criminal activity and the identity of the suspect, making the filing of a to-be warrant feasible.

e.  Shall order any response necessary, appropriate, and within department policy to terminate the pursuit.

f.  May become involved in the pursuit if in close proximity and provided the supervisor's police vehicle has emergency equipment.

g.  Shall immediately go to the scene where the pursuit has ended and take command.

h.  Shall supplement the original incident report documenting all supervisory actions taken during the pursuit. For pursuits lasting less than fifteen minutes, the supervisor must review all available information from the pursuit and supplement the incident report with any available relevant or pertinent information (e.g., automated vehicle location [AVL] records, unit histories, body worn camera videos) within five calendar days following the pursuit.

## Communications Dispatcher Responsibilities

The communications dispatcher will advise pursuit vehicles of any known hazardous conditions in the area of the pursuit (e.g. accidents, closed streets, etc.)

The dispatcher will be responsible for advising other units on all channels of the fact that a motor pursuit is taking place. Other pertinent information to be conveyed should include:

a.  A description of the vehicle and occupant(s) when known.

b.  Location, direction of travel, and rate of speed.

c.  Known reasons for the chase.

d.  The radio channel upon which the chase is being conducted.

Units that are out of service during the broadcast of the vehicular pursuit will be advised of circumstances (as time allows) when returning to service.

During the motor vehicle pursuit, dispatch personnel will use any available information to further develop and ascertain the possible identity of the fleeing driver and/or occupants, plus attempt to discover other possible reasons for which the individual(s) might be fleeing. Developed information may play an important part in the future apprehension efforts of the individual(s) should an immediate apprehension effort fail.

See section *Participating Units*, for additional details.

The dispatcher may also ask for canine or helicopter assistance from a neighboring agency.

## Management's Responsibilities

### Shift Lieutenant

Although the actual management of the pursuit is the responsibility of the field supervisors, the designated shift lieutenant shall assess the reasonableness of continuing the pursuit using the same parameters listed in section *Officer's Responsibilities*, items (b) and (c) of this policy.

The shift lieutenant shall continue to closely monitor pursuits and maintain contact with field supervisors and dispatchers until the event ends. If any time the shift lieutenant's assessment indicates the pursuit should not continue, then the shift lieutenant shall order termination of the pursuit.

If the shift lieutenant is unavailable for any reason, another on-duty lieutenant or captain shall be designated to fulfill this responsibility.

For motor vehicle pursuits that last fifteen minutes or more or if a unit from another jurisdiction becomes involved in the pursuit, a shift lieutenant must review all available information from the pursuit and must supplement the original report with any available relevant or pertinent information.

### Captain's Responsibilities

Captains shall be held accountable for ensure this policy is followed. Captains shall ensure compliance through training and counseling, and when obvious and purposeful deviations occur, by initiating an internal affair investigation.

# Vehicles Eligible To Use In Pursuits

## TSUDPS Marked Vehicles

An officer may initiate or continue a pursuit only if all the following requirements are met. The officer's TSUDPS marked police vehicle is:

    a.  Equipped with working emergency lights and sirens.

    b.  Believed to be in sound mechanical condition including, but not limited to, brakes, steering, and police radio systems.

A pursuit initiated by a two wheel motorcycle shall be reassigned to the first arriving marked patrol unit. The motorcycle officer shall proceed to the termination point of the pursuit if the suspect is apprehended.

Vehicles transporting prisoners, witnesses, suspects, complainants, or other nonpolice personnel shall not be used to initiate or participate in a pursuit.

## TSUDPS Unmarked Vehicles

An officer may initiate or continue a pursuit only, if all of the following requirements are met. The officer's TSUDPS unmarked police vehicle is:

    a.  Equipped with emergency lights (e.g., in the grill or by a light bar on the dash or rear deck) AND sirens.

    b.  Believed to be in sound mechanical condition including, but not limited to, brakes, steering, and police radio systems.

    c.  Driven by an officer in uniform or by an officer who is otherwise readily identifiable as an TSUDPS officer.

Officer initiating or continuing a pursuit while in an TSUDPS unmarked police vehicle meeting the criteria listed above shall immediately notify dispatch and yield to the first arriving marked patrol unit.

If an officer in an unmarked vehicle has probable cause to believe that a criminal offense has taken place and that it warrants immediate action, they may attempt to follow the fleeing vehicle until a marked TSUDPS marked vehicle equipped with operable emergency lights and siren enters into pursuit of the fleeing vehicle. The Officer is reminded that without audible and visual signals in operation they are not exempt from adhering to the traffic laws when pursuing another vehicle.

Parking Enforcement Vehicles shall not become involved in motor vehicle pursuits.

## Personal Vehicles and Vehicles Used for Extra Employment

An off-duty officer in a non-TSUDPS vehicle that is equipped with emergency lights and sirens and is clearly marked as a police vehicle, as defined in the Transportation Code Sec. 541201(1)(A), may initiate a traffic stop and a pursuit only if the pursuit is initiated because of suspected felony activity. This does not include evading as a state jail felony. If a pursuit qualified by this policy is initiated, the officer shall immediately notify dispatch and yield to the first arriving marked patrol unit.

An off-duty officer in a non-TSUDPS or personal vehicle, even a vehicle equipped with emergency equipment (e.g., temporary light bars and/or siren for use in extra employment), shall not initiate a traffic stop or pursuit even if exigent circumstances exist.

# Notifying Dispatcher

Officers initiating a pursuit shall promptly notify the dispatcher a pursuit situation exists. The dis-patcher shall determine if it is necessary to switch the incident to another dispatch channel or to keep the incident on the existing channel.

All other officers shall immediately refrain from non–emergency radio transmissions on that channel. The information transmitted to the dispatcher should include the following:

    a.  Unit number.

    b.  Present location.

    c.  Where the pursuit began.

    d.  Direction of travel.

    e.  Reason for the pursuit.

    f.  Description of the fleeing vehicle (e.g., make, model, color, license number).

    g.  Description and number of occupants in the fleeing vehicle.

    h.  Estimated speed of the fleeing vehicle.

Whenever possible, the dispatcher shall prompt the supervisor managing the pursuit to confirm that the pursuit is authorized to continue.

Officers shall remember it is important that his or her voice be as normal and coherent as possible and to not shout during radio transmissions.

If the patrol unit is a two officer unit, it will be the responsibility of the passenger to handle radio communications during the actual pursuit.

The officer should keep the dispatcher informed of the direction of travel and any other information deemed appropriate. It is particularly important that the reason for the pursuit (e.g., traffic violation, robbery suspects, etc.) be established.

## Participating Units

When notified of a pursuit, the dispatcher shall designate the initial pursuing vehicle as the primary unit. The dispatcher shall also designate a secondary unit and a field supervisory unit.

Unless the field supervisor approves additional units, the primary and secondary units shall be the only police vehicles authorized to pursue the fleeing vehicle. A field supervisor may approve additional units  if any of the following situations exist.

    a.  There are an insufficient number of officers in the authorized units to safely effect an arrest.

    b.  An authorized unit is unable to continue the pursuit, or the dispatcher has been informed an authorized unit is terminating its involvement. In this case, the field supervisor shall authorize replacement units as needed.

    c.  There is a likelihood that the suspect has a deadly weapon.

## Restrictions

Officers shall not:

    a.  Pursue a fleeing vehicle by driving the wrong way on a freeway.

    b.  Pursue a fleeing vehicle while operating a vehicle without emergency equipment or without the emergency equipment activated.

    c.  Drive along the side or in front of a fleeing vehicle in an attempt to force the vehicle from the roadway.

    d.  Attempt to slow or stop a fleeing vehicle by positioning the unit directly in front of the fleeing vehicle.

    e.  Ram or bump a fleeing vehicle in an attempt to force it from the roadway.

    f.  Continue the pursuit if the primary unit or any on–duty supervisor orders the pursuit discontinued.

    g.  Discharge a firearm to disable or stop a fleeing vehicle (see Department Manual 300.12, **Response to Resistance**) or fire a warning shot.

h. Use a privately-owned vehicle in any part of a pursuit or as a termination technique.
i. Use tire deflation devices on controlled access freeways.
j. Use barricades or other obstructions (e.g., roadblocks) set across a roadway to stop or prevent the escape of a fleeing vehicle.

## Termination of Pursuits

Any of the following personnel may terminate a pursuit:
a. Officer in the primary unit.
b. On-duty officer holding the rank of sergeant or above.
c. The officer knows the suspect's identity and knows that the suspect is wanted for a traffic misdemeanor on nonviolent felony.
d. The distance between the officer and the suspect is such that, in order to continue the pursuit, it would place the officer and/or the public in unreasonable danger.
e. The primary officer loses visual contact with the suspect for an extended period of time (over 20 seconds). This is not to imply that the officers must cease looking for the suspect, but must slow the pursuit after loss of contact.
f. When there is clear and unreasonable danger to the officer, fleeing suspect, and/or any other persons. This may be due to excessive speed, reckless driving techniques, or erratic driving by the suspect which exceeds the performance capabilities of the vehicles or the drivers.
g. When the danger created by the pursuit outweighs the necessity for immediate apprehension.

The decision to terminate a pursuit by an on-duty supervisor other than the field supervisor managing the pursuit must be made with the same diligence as stated throughout this policy.

The assessment of this information shall be in accordance with the factors and variable listed in section *Officer's Responsibilities*, items (b) and (c) of this policy.

## Documentation of A Pursuit

### Officer's Duties

Officers shall document the pursuit incident in a thorough incident report containing a detailed description of the vehicle, suspect information, if possible, other pertinent facts, and witness information. If a decision is made not to pursue a known suspect or a pursuit is terminated in accordance with restrictions set out in this policy, officers shall still complete a thorough incident report so an officer or investigator an attempt to locate the suspect and file a warrant at a later date.

If a crash occurred from the pursuit, an officer shall complete a crash report.

### Supervisors' and Management's Duties

The on-duty field supervisor and any involved supervisor must supplement the original incident report documenting all supervisory actions taken during the pursuit and must list all units who participated in the pursuit.

If a crash resulted in a fatality or serious bodily injury, the supervisor shall contact the Houston Police Department, Harris County Sheriff's Office, or the Department of Public Safety for assistance with the crash investigation.

The shift lieutenant shall supplement the original incident report if the motor vehicle pursuit lasts fifteen minutes or more or if a unit from another jurisdiction becomes involved in the pursuit.

## Interjurisdictional Pursuits

The communication dispatcher, with the approval of the field supervisor managing a pursuit, shall notify outside law enforcement agencies when this department is involved in a pursuit in the out-side agency's jurisdiction. The person notifying the outside agency shall specify whether the call is a request for assistance or a courtesy notification with no participation requested.

Officer may become involved in another agency's pursuit either inside or outside TSUDPS's jurisdiction if a TSUDPS field supervisor authorizes the participation and any of the following are true:

    a.   The other agency requests assistance.

    b.   It is clear the other agency's unit is unable to request assistance.

    c.   The emergency nature of the situation dictates the need for assistance.

All department pursuit policies shall be followed whenever an employee is involved in any pursuit.

## Public Statements Following Pursuits

After a pursuit has ended, officer shall refer all media requests for a statement to the designated field supervisor involved in the pursuit. Upon request of the media, the designated field supervisor may make a limited statement to the media or defer to a higher-ranking on-scene supervisor. Initial statements shall be limited to preliminary factual information and the statements shall be in compliance with Department Manual 400.16, **Media Relations**.

An on-duty department or TSU public information officer (PIO) shall make all scenes of pursuits that result in a fatality.

## Related Department Manual and Reference Material

- 200.02, **Conduct and Authority**
- 200.26, **Unit and Radio Numbering**
- 200.29, **Mobile Computing Devices**
- 200.34, **Vehicle Use and Assignment**
- 300.02, **Effecting Arrests and Searches**
- 300.12, **Response to Resistance**
- 300.22, **High-Risk Vehicle Approaches**
- 300.23, **Crash Investigations**
- 300.24, **General Broadcasts**
- 300.25, **Special Threat Situations**
- 300.27, **Response Management**
- 400.08, **State Vehicle Crashes**
- 400.10, **Emergency Management**
- 400.14, **Criteria for Submitting Incident Reports**
- 400.16, **Media Relations**
- Texas Transportation Code, Section 546
- Texas Southern University Department of Public Safety Standard Operating Procedure, Emergency Driving in Non-Pursuit and Pursuit Situations

# Handling Persons Exhibiting Mental Health Crisis

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Incidents involving persons displaying symptoms of mental health crisis may be volatile and unpredictable. For safety purposes, when available resources allow, two officers shall be dispatched to incidents or calls for service when available information indicates the involvement of persons exhibiting symptoms of mental health crisis.

The Texas Commission on Law Enforcement (TCOLE) requires all police officers to complete a 40-hour Mental Health Peace Officer/CIT course. Officers who have completed this training are referred to as "Crisis Intervention Trained" (CIT) officers.

Whenever reasonably possible, the department will utilize CIT officers to respond to incidents or calls for service involving persons displaying symptoms of mental health crisis.

This Department Manual Policy applies to only classified employees and communication personnel.

## Definitions

**Boarding Home.** An establishment that furnishes in one or more buildings, lodging to three or more persons with disabilities or elderly persons who are unrelated to the owner of the establishment by blood or marriage, and provides residents with community meals, light housework, meal preparation, transportation, grocery shopping, money management, laundry services, or assistance with self- administration of medication, but does not provide personal care services as defined by Section 247.002, Texas Health and Safety Code to those persons.

**Crisis Intervention Trained (CIT) Officer.** An officer who has successfully completed the TCOLE 40-hour Mental Health Peace Officer/CIT course.

**Excited Delirium.** A state of extreme mental and physiological excitement, characterized by extreme agitation, hypothermia, hostility, exceptional strength, or endurance without fatigue.

**Medical Condition.** For the purposes of this policy, a medical condition is a physical injury, illness, or condition other than a psychological disorder or mental illness.

**Mental Health Crisis.** A condition in which a person exhibits behavior indicative of severe psychological or mental impairment thereby causing concern for the welfare and safety of the person, another person, or the general public.

**Notification of Emergency Detention.** A standard notification form that allows a state of Texas peace officer to hold a person who is suspected of being mentally ill for psychological evaluation because the person is an immediate threat to himself or another person.  This form does not require notarization.

**Order of Protective Custody.** A warrant, signed by a probate judge, granting Harris County Precinct One constables the authority to pick up a person for an emergency psychiatric evaluation.

**TCOLE 40-hour Mental Health Peace Officer/CIT Course.** Instruction on recognizing signs and symptoms of mental illness along with verbal deescalation skills to assist in handling persons in mental health crisis. Commonly referred to as "CIT" training.

# Authority To Apprehend

The authority to apprehend a person by using the Notification of Emergency Detention form is granted under section 573.001, Texas Health and Safety Code. A peace officer without a warrant may take a person into custody if both of the following apply.

- a. The officer has reason to believe that the person is mentally ill and because of the mental illness, there is a substantial risk of serious harm to the person or others unless the person is immediately restrained.

- b. The officer believes that there is not sufficient time to obtain an Order of Protective Custody before taking the person into custody.

    The "substantial risk of serious harm to the person or others" requirement cited in item "a" above may be demonstrated by either of the following:

- c. The person's specific recent behavior, overt acts, attempts, or threats that were observed by or reliably reported to the officer.

- d. Evidence of severe emotional distress and deterioration in the person's mental condition to the extent that the person cannot remain at liberty.

Officer may form the belief that the person meets the above criteria for apprehension based on either of the following:

- e. Information from a credible person.

- f. Conduct of the person or the circumstances under which the person is found.

Taking a person into custody using a Notification of Emergency Detention form is protective rather than punitive in nature. Officer shall not file both criminal charges and a Notification of Emergency Detention.

## Forms

- a. **Notification of Emergency Detention.** See "Notification of Emergency Detention" in the Definition section of this policy.

- b. **Receipt and Notice of Rights for Seized Firearms.** A form used by a law enforcement officer who seized a firearm from a person taken into custody, and not in connection with an offense involving the use of a weapon or an offence under Chapter 46, Penal Code, to provide the person with a written copy of the receipt for the firearm.

- c. **Receipt and Notice of Rights for Seized Firearms – Additional Items.** A supplemental form used by a law enforcement officer to document any and all additional firearms (more than the first three firearms) including ammunition being seized.

- d. **Code of Criminal Procedure Art. 18.191. Disposition of Firearm Seized From Certain Persons With Mental Illness.** A form used by a law enforcement officer to provide a person with written notice of the procedure for the return of a firearm.

- e. **Houston Center for Sobriety Public Intoxication – Jail Diversion Form.** A single-page form used to document information about a person being admitted to the Sobering Center.

## Facilities

Officers should utilize the following primary facilities when transporting persons in need of emergency psychiatric evaluation.

### NeuroPsychiatric Center

> NeuroPsychiatric Center (NPC)
> 1502 Taub Loop
> Houston, Texas 77030
> 713-970-4747 (Police officer only)
> 713-970-4600 (Public information)

The NPC is an emergency mental health crisis center, not a medical facility. Persons requiring medical attention shall not be taken to this facility.

The Notification of Emergency Detention form shall be completed by the officer if the person is not being charged with a crime and cannot or will not voluntarily sign in.

### Ben Taub General Hospital

> Ben Taub General Hospital (Ben Taub)
> 1504 Taub Loop
> Houston, Texas 77030
> 713-873-2636 (Police officers only)

If a person exhibiting mental health crisis is transported to Ben Taub General Hospital for a medical condition and is not being charged with a crime and refuses or is unable to voluntarily sign in for treatment, the Notification of Emergency Detention form shall be completed by the officer.

### Michael E. DeBakey VA Medical Center

> Michael E. DeBakey VA Medical Center
> 2002 Holcombe Boulevard
> Houston, Texas 77030
> 713-794-8709

Prior to transporting any person for a mental health evaluation, officers should inquire if the person is a military veteran. Veterans in crisis are accepted at the VA Medical center for either voluntary or involuntary treatment.

Eligible U.S. military veterans exhibiting mental health crisis and requiring emergency mental health treatment, may be taken to the emergency room of the VA Medical Center if they have not committed a crime greater than a Class C misdemeanor offense. If the person has committed a crime greater than a Class C misdemeanor, see section *Harris County Charges*.

The following procedures shall be followed when dealing with a military veteran who is exhibiting mental health crisis.

a. Officers shall verify eligibility requirements for U.S. Department of Veterans Affairs (VA) services by calling the Eligibility Officer at 713-794-7288 during business hours. After hours, officers shall call the medical administrative assistant at 713-791-1414, extension 308. When verifying VA eligibility, officers are required to provide the last name of the veteran and the last four digits of the veteran's social security number.

b. After confirmed eligibility, officers shall transport the veteran to the emergency room of the VA Medical Center.  After hours, officers shall use Entrance #70 located on Old Spanish Trail.

c. Upon arrival officers shall request the VA Medical Center Police Service to conduct a custody exchange from local law enforcement in case of violent behavior.

If the officer is not able to confirm eligibility with the VA due to lack of information and the officer believes the person is a veteran, the officer should call NPC and ask the NPC staff for assistance

with determining whether or not the person is a veteran. If the person cannot be confirmed as a veteran, the officer shall transport the person to the NPC or if any medical treatment is needed, to Ben Taub.

## Hospital Diversion

In the event that NPC and Ben Taub are both on diversion and not accepting persons in mental health crisis, officers may utilize a special circumstance option of using a local hospital that has an emergency room facility. Officers shall complete the Notification of Emergency Detention form and submit it to hospital staff accepting the person into their facility.

# Incident Reports

Officers shall complete an incident report for any incident in which a person is exhibiting mental health crisis. The incident report shall include a statement that the officer believes the person evidences mental illness based on specific recent behavior, overt act, attempts, or threats that were observed by or reliably reported to the officer. The title of the report shall be the criminal offense committed, with it noted about the mental illness. If no criminal offense was committed, the incident report shall be titled Investigation (Mental Illness).

If a person has committed a crime, regardless of whether or not charges are filed, the person should not be listed as a suspect.

If the person has not committed a crime and is being handled for only mental health purposes, the individual should be listed as a complainant. For such incidents, officers may supplement or original Investigation (Mental Illness) incident report involving the same individual if the original and subsequent incidents occurred in the same calendar year.

For any incident resulting in a Notification of Emergency Detention form, officers shall document the name of psychiatrist who examined the person exhibiting mental health crisis.

If the individual has a License to Carry (LTC) handgun license or is a licensed commissioned security guard, officers shall document these facts in the incident report and, if possible, include the LTC number and the name of any security company employing the individual.

# Harris County Charges

## Serious Offenses

When dealing with persons in Harris County who are exhibiting mental health crisis and who have committed a serious offense (Class B misdemeanor or greater), the officer shall follow the most applicable of the options listed below:

## Option 1 – District Attorney Declines Charges

If a suspect who is exhibiting mental health crisis commits a Class B misdemeanor or greater offense and the complainant does not want to file charges or the District Attorney declines charges, the officer shall transport the suspect to the NPC, Ben Taub, or, if eligible, the VA Medical Center.

If the suspect does not voluntarily sign in and is believed to be mentally ill, and because of that mental illness there is substantial risk of serious harm to the person or another person unless immediately restrained, the officer shall complete the one-page Notification of Emergency Detention form. Once this form has been completed and accepted by hospital staff, the officer may return to duty. No criminal charges shall be filed with this option.

## Option 2 – District Attorney Accepts Charges

Texas Southern University Department of Public Safety officer who book a prisoner exhibiting mental health crisis into JPC are NOT required to transport the prisoner to the NPC to obtain a

Brief Psychiatric Assessment form. Officers shall notify the appropriate JPC staff that the prisoner is exhibiting mental health issues, but the DA accepted charges.

Officers are reminded that JPC reserves the right to reject any incoming prisoners who are deemed to be medically unstable. In this event, officers shall request a Houston Fire Department (HFD) ambulance be sent to the location for transportation.

## Option 3 – District Attorney Diverts Charges
## (Judge Ed Emmett Mental Health Diversion Center)

This mental health diversion program has a goal to divert non-violent, low level offenders who are not in crisis and not a danger to themselves or others away from the criminal justice system, thus allowing them to receive stabilizing care to treat the mental health condition fostering the offending behavior. The Diversion Center offers alternatives to incarceration for people with mental illness, developmental disabilities, and/or neurocognitive disorders who come into contact with the criminal justice system for low level offenses, such as criminal trespass.

The officer should follow the following procedures:

    a. The program is for offenders whose mental health issues appears to have affected the offending behavior, but the individual does not appear to be a mental health crisis.

    b. If the officer needs additional information to help determine if jail diversion is appropriate, they may consult with the Joint Processing Center Triage Diversion Desk at 346-286-1299.

    c. Inform the complainant of whether or not the suspect appears to be in need of mental health services and discuss charging option and/or diversion options with the complainant prior to contacting the District Attorney Intake office.

    d. Call the District Attorney Intake and inform them of the totality of the circumstances, including whether or not the complainant wants to file charges, to include the officer's thoughts regarding what is best for the incident's resolution.

    e. If charges are diverted, transport the suspect to the Diversion Center at 1215 Dennis Street and complete the one-page jail diversion form that will include the name of the ADA diverting charges, the offense diverted, and the incident number.

See section *Jail Diversion* for additional details.

## Option 4 – Serious Medical Condition and Exhibiting Mental Health Crisis

If a suspect who is exhibiting mental health crisis is charged with a serious Class B misdemeanor or greater offense, but has a serious medical condition requiring treatment at hospital, the suspect shall be transported to a hospital by an HFD ambulance.

If the suspect is not stabilized within one hour, another officer may file charges while the suspect remains in the hospital and in the custody of the primary officer. Once the suspect is considered medically stable for transport, officers shall book the suspect into JPC.

## Risk-of-Harm Incidents

Officers shall take into custody any person exhibiting mental health crisis and who has committed an offense or has committed a Class C misdemeanor if the person poses a substantial risk to themselves or another person unless restrained.

## Voluntary/Involuntary Treatment

All mentally ill individuals detained due to a risk-of-harm incident and who are in need of emergency mental health treatment should be taken to the NPC or, if eligible, the VA Medical Center.

A person not charged with an offense may voluntarily sign in for treatment. Once the person has signed in and has been accepted by hospital staff, the officer may return to duty.

If the person refuses or is unable to voluntarily sign in for treatment, the officer shall complete a Notification of Emergency Detention form. Once this form has been completed by the officer and the person has been accepted by the hospital staff, the officer may return to duty.

If the person is not diagnosed with a mental condition, the officer or another officer shall do one of the following:

 a. Transport the person to JPC and file the appropriate charges.

 b. Return the person to his or her residence.

 c. Return the person to the scene of the incident.

Class C misdemeanor charges shall not be filed if the person is admitted to the NPC.

### Medical Condition – Ben Taub General Hospital

If a person exhibiting mental health crisis has a medical condition that requires treatment by a medical facility, the officer shall utilize Ben Taub General Hospital when possible. Officers should call Emergency Medical Services (EMS) only if the person has a medical condition that requires immediate attention. Officers shall not call for an ambulance to transport persons with only psychiatric symptoms.

If Ben Taub General Hospital diagnoses a person with a medical condition that requires treatment at a medical facility and determines the person to be mentally ill, but the person refuses or is unable to voluntarily sign for treatment, the officer shall complete a Notification of Emergency Detention form and present it to the Ben Taub Psychiatric Unit. Once this form has been completed and accepted by the hospital staff, the officer may return to duty.

Class C misdemeanor charges shall not be filed if the suspect is admitted to the Ben Taub Psychiatric Unit.

### Family Member/Citizen Referral

Family members of an individual with mental illness and other citizens who inquire about emergency treatment shall be referred to the Harris County Clerk's Office, Warrant Division. After business hours, citizens shall be referred to the NPC.

Any adult concerned about the welfare of a mentally ill person may file an application for temporary court ordered mental health services at the Warrant Division of the Harris County Clerk's Office, located at 2800 South MacGregor Way.

## Diversion Program

 Judge Ed Emmett Mental Health Diversion Center

 1215 Dennis Street

 Houston, Texas 77004

### Eligibility Criteria for the Diversion Center

There are several criteria that must be met before a low level offender can be accepted into the Judge Ed Emmett Mental Health Diversion Center.  They are as follows:

 a. Criminal charges are diverted by the District Attorney's office.

 b. Class C offenses in lieu of actual arrest and incarceration only when jail diversion is deemed more appropriate by the arresting officer.  (Excludes diverting written citations).

c.   Participation by the offender is voluntary.

d.   No individuals under 18 years of age.

e.   No violent criminal history.  (Exceptions may be considered on a case by case basis).

f.   No registered sex offenders.

g.   Non-combative/Non-violent.

h.   Must be identified by a state issued identification, AFIS, or is known by the officer.

i.   No serious medical conditions/mental health crisis.

l.   No open warrants for arrest.

m.   No pending detained by immigration and Customs Enforcement.

## Juveniles

Officers shall use Department Manual 200.32, **Disposition of Arrested Juveniles**, for additional information for juvenile dispositions. Juveniles (15 years of age and under for mental health purposes) exhibiting mental health crisis shall be transported to NPC (Ben Taub if medical treatment at a hospital is needed) and handled as outlined in this section.

### Juveniles in Need of Emergency Mental Health Treatment

Juveniles in need of emergency mental health treatment may be transported to NPC or Ben Taub without a parent. The NPC or Ben Taub staff will conduct an assessment and determine if the juvenile requires emergency mental health treatment. If treatment is necessary, the officer shall complete a Notification of Emergency Detention form. Once this form is completed and accepted by the NPC or Ben Taub staff, the officer may return to duty.

### Juveniles Not in Need of Emergency Mental Health Treatment

If a juvenile is transported to NPC or Ben Taub for psychiatric evaluation but found not to be in need of immediate mental health treatment, hospital staff will not be able to provide treatment without parental consent. For this reason, the officer shall remain with the juvenile until a parent or guardian is contacted and arrives.

If a parent or guardian cannot be located, the officer shall contact Harris County Protective Services to act as guardians. Then the officer shall make a child protective services report by calling the law enforcement telephone number for the Statewide Intake Division of the Texas Department of Family and Protective Services (often referred to as CPS). Officer shall list the state control number and the name of the person taking the report in the incident report. Because each situation involving a juvenile is different, officers should adhere to the requests of the NPC or Ben Taub staff when releasing custody of a juvenile to Harris County Protective Services.

## Mental Health Peace Officer/Crisis Intervention Trained (CIT) Course

Officers and sergeants who have successfully completed the TCOLE 40-hour Mental Health Peace Officer/CIT course are required to attend the annual eight-hour Advanced CIT class.

## Handling and Transporting Persons Exhibiting Mental Health Crisis

### Handcuffing

Anyone exhibiting mental health crisis and being transported to a jail facility or a facility for a mental health evaluation shall be handcuffed and search in accordance with Department Manual 300.02, **Effecting Arrests and Searches**.

### Searches

Anyone exhibiting mental health crisis, regardless if charges are filed or not, shall be searched for weapons and contraband prior to being placed in a police vehicle to be taken to a mental health facility for assessment for treatment. See section Seizure of Firearms from Persons Exhibiting Mental Health Crisis  of this policy.

### Securing Officers' Weapons at the NPC

Officers are not required to remove their conducted energy device (CED) when processing a con-sumer for an emergency detention at the NPC. However, officers shall remove and secure their firearms during this process at the NPC. Lockers are provided for officers in the NPC Security Office at the rear entrance of the facility.

Officers are reminded that when responding to a call for service incident at the NPC, they are to proceed as stated in Department Manual 300.27, **Response Management**. Officers are not to remove their firearm or CED until the scene has been secured. Once the scene has been secured and an individual needs to be escorted to the rear entrance of NPC for a mental health evaluation, officers are to follow the above protocol.

## Seizure of Firearms From Persons Exhibiting Mental Health Crisis

### No Criminal Charge

Officers are authorized under state law to seize firearms in the possession of a person being taken into custody with a Notification of Emergency Detention. Officers seizing firearms shall tag the firearm in the property storage facility.

Officers who seize a firearm from a person taken into custody under Section 573.001, Texas Health and Safety Code and not in connection with an offense involving the use of a weapon or an offense under Chapter 46, Penal Code, shall immediately provide the person all of the following:

  a.  A written copy of the receipt for the firearm (Receipt and Notice of Rights for Seized Firearms and, if applicable, Receipt and Notice of Rights for Seized Firearms – Additional Items).

  b.  A written notice of the procedure for the return of a firearm (Code of Criminal Procedure, Art. 18.191. Disposition of Firearm Seized from Certain Persons With Mental Illness).

### Criminal Charges

Officers who retrieve firearms from individuals who are both exhibiting mental health crisis and being charged with a criminal offense shall tag the firearm in the property storage facility. Officers are reminded to complete an incident report per section, Incidents Reports.

## Excited Delirium:  Description and Behaviors

Officer periodically come into contact with individuals exhibiting bizarre behavior. This behavior is often a result of mental illness, alcohol intoxication, drug influence, uncontrolled anger, or a combination of these factors. However, in some cases bizarre behavior may be associated with a serious medical condition called excited delirium, which in some cases may be fatal. Regardless of the cause of the bizarre behavior, responding officers should take the reasonable actions necessary to protect themselves and others from serious bodily injury or death.

Excited delirium is usually drug-related (e.g., cocaine or crack, PCP or "angel dust," methamphetamine, amphetamine), but can occur in non-drug users as well, especially individuals with a diagnosis of bipolar disorder or schizophrenia. Excited delirium is a low frequency, high risk event, and it is most often a medical condition necessitating a response by emergency medical personnel.

Excited delirium may follow four possible sequential stages: elevated temperature, agitated delirium, respiratory arrest, and death. Responding officers may not be able to immediately recognize that a person is suffering from this medical condition and the final diagnosis of this medical condition will need to be determined by medical professionals. Individuals in a state of excited delirium may display some or all of the following behaviors:

    a.  Unfounded fear or panic

    b.  Shouting or nonsensical speech

    c.  Hallucinations or paranoia

    d.  Uncontrollable shaking

    e.  Extreme hyperactivity and thrashing about to the point of exhaustion

    f.  Unexplained strength or endurance

    g.  Aggression towards others or objects

    i.  Profuse diaphoresis (extreme sweating)

    j.  Animal style behavior (e.g., rapid breathing, grunting, biting, scratching)

    k.  Severe widening of the eyes (eyes open wide enough to see white all around the iris)

    l.  Impaired thinking, disorientation, panic, or ignoring obvious injuries

    m.  Excessive emotions (rear, rage, apathy)

## Excited Delirium: Officer Response

When encountering a person suspected of experiencing excited delirium, officers should call for adequate back-up prior to engaging the individual and should not approach the person without back-up unless it is necessary to prevent serious harm or death to the individual or another person.

When encountering a person suspected of experiencing excited delirium, responding officers should consider using some or all of the following strategies, when reasonable under the circumstances.

    a.  Notify the dispatcher to send Houston Fire Department's (HFD) Advanced Life Support (ALS) to the scene. Personnel on ALS ambulances are paramedics and are able to medically sedate the person. Provide the behavior signs and wait for HFD to arrive before making contact with the person.

    b.  Request additional officers before making contact with the person.

    c.  Exhibit a calm demeanor.

    d.  Eliminate stimuli (e.g., flashing lights, flashlights).

    e.  Call the person by the first name if it is known.

    f.  Avoid displaying threatening behavior.

    g.  Avoid commands; make requests.

    h.  Isolate and contain the person or crime scene until HFD arrives.

    i.  Give the person plenty of space.

### Taking A Person Into Custody

When taking a person suspected of experiencing excited delirium into custody, officers may use their weight to initially gain control over the person and to maintain control, if necessary. However, officers are to use caution that the resulting compression of the chest of abdomen does not interfere with the person's breathing.

In all arrest or transporting situations, especially those involving someone suspected of experiencing excited delirium, employees shall ensure individuals are placed in a position that enable them to breathe freely and is the most comfortable position possible.

**Interlocking Technique**

When taking a person suspected of experiencing excited delirium into custody, it is important that officer realize the potential for positional asphyxia as defined in Department Manual 300.02, **Effecting Arrests and Searches**. Officers shall ensure individuals are placed in a position that enables them to breathe freely.

Additionally, officers should be aware that high temperatures and humidity aggravate excited delirium. Individuals who are obese or heavy are at an increased risk of positional asphyxia. A person who suddenly becomes quiet or who no longer resists should be immediately assessed to ensure adequate breathing and the presence of a pulse.

## General Methods For Interacting and Handling Persons Exhibiting Mental Health Crisis

- Stay calm
- Be patient; avoid "crowding" the individual
- Maintain as much eye contact as possible but respect that different cultures are not comfortable, nor do they feel it appropriate to look someone in authority in the eye
- Whenever possible, provide a quiet place (car or room) free of as many distractions, noise, and activity as possible
- Listen
- Take notes as necessary but concentrate on not only what the individual is saying but also notice body posture and other nonverbal communication
- Ask questions that are open-ended beginning with WHO, WHAT, WHERE, HOW; avoid asking WHY
- Repeat what you are told back to the consumer
- Use first names
- Give instruction or directives one at a time and allow time for the person to comply
- Do not play into any delusions or hallucinations
- If inconsistencies are demonstrated, do not expect reason or logic to control their actions
- Explain the advantages of cooperating and disadvantages of not
- Be skeptical of the individual's promises
- Do not put yourself at risk, based on the individual's judgment or sincerity
- Request assistance

## Related Department Manual Policies and Reference Material

- 200.32, **Disposition of Arrested Juveniles**
- 300.1, **Firearms and Qualification**
- 300.2, **Effecting Arrests and Searches**
- 300.05, **Handling and Transporting Prisoners and Other Persons**
- 300.16, **Conducted Energy Devices**
- 300.20, **Handling Publicly Intoxicated Persons**
- 300.26, **Class C Misdemeanors**
- 300.27, **Response Management**
- 400.14, **Criteria for Submitting Incident Reports**
- City of Houston, Ordinance, No. 2013-674
- Texas Code of Criminal Procedure, Article 18.191
- Texas Health and Safety Code, Section 247.002
- Texas Health and Safety Code, Section 573.001
- Texas Penal Code, Chapter 46

# Response To Resistance

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The Texas Southern University Department of Public Safety places its highest value on the life and safety of its employees and members of the community.

This policy applies to all employees. The term employee(s) applies to both classified and civilian employees within the context of the application of this policy. This policy does not grant civilian employees any authority beyond the authority they have under the Texas Penal Code, the Texas Code of Criminal Procedure, or City of Houston Ordinances.

Employees are authorized by law to use force to protect themselves or others, to effect an arrest, or to maintain custody of those arrested. When dealing with members of the community, suspects, or prisoners, employees must use only the amount of force reasonably necessary to protect themselves or others, to effect an arrest, or to bring an incident under control, even if under the circumstances the law would allow the use of greater force.

This Department Manual Policy applies to all employees.

## Definitions

**Bodily Injury.** An injury causing physical pain, illness, or any impairment of the function of any bodily member or organ.

**Deadly Force.** Force that is intended or known to cause or in the manner of its use or intended use is capable of causing death or serious bodily injury.

**Discharge of a Conducted Energy Device (CED).** For purposes of this policy, the firing of a CED, whether intentional or accidental unless specified otherwise. This term includes using a CED in a drive stun manner.

**Firearm.** For purposes of this policy, any handgun, rifle, or shotgun (not including soft-impact weapon).

**Force.** Force is meant to describe actions taken to compel a person to comply with law enforcement objectives.  See also the definition of reportable force in section Reportable Force (RF) of this policy.

**Intermediate Weapons.** Within the context of this Policy, Intermediate weapons include:

    a.   Baton

    b.   Oleoresin capsicum (OC) spray

    c.   Soft-impact weapon (e.g., beanbag shotgun)

    d.   Conducted energy device (CED) (e.g., stun gun or Taser®)

**Involved Officer.**  An officer (regardless of rank) who used reportable force.

**On-Duty Supervisor.** For the purposes of this policy, an on-duty supervisor is one that is on duty and who did not use reportable force.

**Reportable Force (RF).**   Reportable Force (RF) is force that requires specific notification and documentation of the RF incident.  See section Reportable Force (RF) of this policy, which describes RF.

**Serious Bodily Injury.** An injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

**Soft-impact Weapon.** A soft-impact weapon, which is an intermediate weapon, is a distinctly marked shotgun designated for the exclusive use of soft-impact munitions.

## General Response To Resistance Principles

Response to Resistance must be objectively reasonable based on the totality of the circumstances. The circumstances justifying the initial use of force may change during the course of an event. It is the duty of all employees to constantly assess the situation and adjust the response to resistance accordingly. Employees who use force against any person must detail the specific reasons for using such force.

Civilian employees are not permitted to carry any intermediate weapon or firearm in the performance of their duties.

Officers shall not display any intermediate weapon or firearm in an unprofessional or unsafe manner.

Anytime an employee uses reportable force, whether on duty, or off duty, or at extra employment, a supervisor must be notified as set forth herein.

## Duty To Intervene

Any employee present and observing another employee using force that is beyond that which is reasonable under the circumstances shall, when in a position to do so, safely intercede to prevent the use of such force. Employees shall immediately report these observations to an on-duty supervisor.

Also, refer to Department Manual 300.05, **Handling and Transporting Prisoners and Other Persons**.

## Reportable Force (RF)

Reportable force (RF) does not include mere police presence, including the presence of a K-9, verbal commands, handcuffing, or escorting without resistance, or when an OC device is pointed at a person.

Reportable force includes, but is not limited to, the use of any of the following:

    a. Empty hand tactics (e.g., grabbing, pushing, pressure points, forcing arms behind back, taking a suspect to the ground, leg sweeps)

    b. Baton when a person is struck

    c. OC spray when any one of the following occurs:

        1. Intentionally sprayed in the direction of a person whether contact is made or not

        2. Accidentally sprayed and there is contact with a person

    d. Conducted energy device when any one of the following occurs:

        1. It is pointed at a person

        2. Intentionally discharged and directed at a person whether contact is made or not

        3. Accidentally discharged and a person is struck

    e. Soft-impact weapon when any of the following occurs:

        1. It is pointed at a person

        2. Intentionally discharged, except when the discharge is directed toward an animal and it does not result in bodily injury to any person

        3. Accidentally discharged and it results in bodily injury to any person

    f. Firearm when any one of the following occurs:

        1. It is pointed at a person

        2. Intentionally discharge, except when the discharge is directed toward an animal and it does not result in bodily injury to any person

        3. Accidentally discharged and it results in bodily injury to any person

    g. K-9 with bites

    h. Interlocking

## Intermediate Weapons

Before carrying or using any intermediate weapon, an officer must be currently certified with the intermediate weapon.

Intermediate weapons shall be carried or used as issued or authorized by the department. No changes, alterations, or modifications are permitted. It is within the officer's discretion to determine when the use of an intermediate weapon is necessary and which intermediate weapon is appropriate for the situation.

## Batons

Unless deadly force is warranted, baton strikes shall be made only to areas of the body below the shoulders and only with the degree of force necessary to counter resistance or establish control of the suspect. Additionally, there are circumstances that occur when flashlights may also be used as batons. Strikes made with flashlights must be made in accordance with the same guidelines as those made with batons.

## OC Spray

The department does not furnish officers with OC spray or related equipment. However, once certified for on-duty use, officers are authorized to carry OC spray and related equipment. Uniformed officers carrying OC shall store the canisters on their duty belts in an appropriate case.

## Soft-Impact Weapons

Sergeants and officers who are assigned or who check out a soft-impact shall inspect the soft-impact weapon prior to signing on duty. If the sergeant or officer observes any new damage, missing parts, or defective equipment, the sergeant or officer, as applicable, shall notify his supervisor before signing on duty.

Unless deadly force is warranted, officers shall not target soft-impact weapons for munition impacts above a person's shoulders.

## Conducted Energy Devices (CED)

For detailed information on the policies and procedures regarding CEDs, see Department Manual 300.16, **Conducted Energy Devices.**

However, for a synopsis of initial notification and documentation requirements, see sections *Notification of Reportable Force and Documentation of Reportable Force* below.

## Use of Deadly Force

The use of deadly force shall be limited to those circumstances in which officers reasonably believe it is necessary to protect themselves or others from the imminent threat of serious bodily injury or death. Officers shall consider their immediate surroundings and the safety of uninvolved persons before using deadly force.

Officers shall not justify the use of deadly force by intentionally placing themselves in imminent danger. Officers are prohibited from using firearms in the following ways:

a. Firing warning shots

b. Firing at fleeing suspects who do not represent an imminent threat to the life of the officer or another person

c. Firing at suspects whose actions are a threat to only themselves (e.g., attempted suicide)

## Moving or Fleeing Vehicle

Officers must be mindful that it is very unlikely that a firearm will disable or stop a vehicle. Furthermore, disabling the driver of a moving vehicle creates unpredictable circumstances that may cause the vehicle to crash or injure other officers or uninvolved persons. Persons who may be

in the vehicle or in the area who pose no threat are also placed at risk when an officer discharges a firearm at an approaching vehicle.

When confronted with a potential suspect in a moving vehicle, officers must be mindful of any available cover and concealment. Moving to a position of tactical disadvantage maximizes officer safety and minimizes the need to use deadly force.

Accordingly, officers shall not discharge a firearm or soft-impact weapon at a moving vehicle unless a person in the vehicle is immediately threatening the officer or any other person with serious bodily injury or death by means other than the vehicle itself. An officer in the path of an approaching vehicle shall attempt to move to a position of safety rather than discharging a firearm or soft-impact weapon at a vehicle or any of the vehicle's occupants.

In the rare and exigent circumstances, as viewed from the perspective of a reasonable officer, where the vehicle is being used as a deadly weapon with the apparent intent to immediately inflict or cause serious bodily injury or death, the use of deadly force would be authorized.

Also, officers shall not discharge a firearm of soft-impact weapon from a moving vehicle.

For additional information, see Department Manual 300.10, **Motor Vehicle Pursuits** and 300.22, **High-Risk Vehicle Approaches**.

## Proper Utilization of Intermediate Weapons and Firearms

Unless an officer has a reasonable belief there is an imminent threat of serious bodily injury or death to the officer or another person, the officer shall not use weapons for which the officer has not received requisite training or provide weapons to others to use when such persons have not received requisite training.

## Other Department Manual Policies

The policies in this Department Manual policy do not negate further requirements contained in other policies such as:

    a.  300.08, **Firearm and Soft-Impact Weapon Discharges**

    b.  300.16, **Conducted Energy Devices**

    c.  200.19, **Investigation of Employee Misconduct**

    d.  400.14, **Criteria for Submitting Incident Reports**

Employees shall refer to other applicable policies to ensure compliance with additional, requisite procedures.

## Use of Spit Covers

Please see Department Manual 300.02, **Effecting Arrests and Searches** for policy and proper procedures for applying spit covers.

## On-Duty Supervisor Response Required

Upon notification of RF incident, the on-duty supervisor shall respond and proceed immediately to the scene unless one of the exceptions delineated below applies. However, an on-duty supervisor is always required to respond when interlocking is used in accordance with Department Manual 300.02, **Effecting Arrests and Searches**.

An on-duty supervisor is not required to respond to the scene in the following circumstances:

    a.  **Pointing/Empty Hands Exception**.  This is when RF solely involves an officer:

        1.  Pointing a CED, soft-impact weapon, and/or firearm at a single person or multiple persons and/or

        2.  Using empty hand tactics and all of the following apply:

    a). There is no visible injury

    b). The person does not lose consciousness

    c). The person does not complain of any bodily injury

b. **Extra Employment Exception**. This is when RF occurs while an involved officer is working extra employment and only if all of the following apply:

    1. A supervisor is working extra employment at the same location.

    2. The involved officer immediately notifies that supervisor.

    3. That supervisor does not use reportable force

    4. The reportable force does not involve the discharge of a firearm or soft-impact weapon, or result in serious bodily injury to any person.

c. **Outside the jurisdiction of TSUDPS exception**. This is when an RF incident does not fall within the previous exceptions yet both of the following apply:

    1. The RF occurs outside the limits of the TSUDPS jurisdiction

    2. A classified supervisor, lieutenant of above, has determined that an on-duty supervisor does not have to respond to the scene after giving consideration to the proximity of the reportable force to a TSUDPS supervisor and severity of injury.

## Notification of Reportable Force

Anytime an involved officer is involved in a reportable force (RF) whether on duty or off duty including extra employment, an on duty supervisor shall be notified as set forth below. Also, see section Documentation of Reportable Force for documentation requirements.

### Involved Officer's Responsibilities

**Requesting Medical Personnel:**

Anytime an involved officer uses RF, whether on duty or off duty including during extra employment, the involved officer shall immediately request medical personnel to the scene when any of the following occurs:

    a. A person sustains any physical/bodily injury from the discharge of a firearm

    b. A person sustains serious bodily injury

    c. A person is struck by munition from a soft-impact weapon

    d. A person is sprayed with OC

    e. A person is darted by a CED in the head, neck, groin area, or breast (male or female) or the person sustains physical trauma indirectly associated with the CED use (e.g., injuries from falls)

    f. As otherwise needed

If the involved officer is unable to request medical personnel as set forth above, the most senior officer at the scene shall make the request.

### On Duty:

If an RF occurs when the involved officer is on duty, whether inside or outside the TSUDPS jurisdiction, the involved officer shall immediately notify an on-duty supervisor. The involved officer shall choose the best method of requesting an on-duty supervisor to respond to the scene (e.g., via the dispatcher, radio, computer). If the involved officer is unable to make immediate notification to an on-duty supervisor, the most senior officer at the scene shall make notification.

**Inside the TSUDPS Jurisdiction, Off Duty Including Extra Employment:**

If an RF occurs inside the TSUDPS jurisdiction when the involved officer is off duty including extra employment, the involved officer shall immediately notify the communications dispatcher unless the Extra Employment exception applies. Anytime a supervisor is working at the same extra employment location, the involved officer shall notify this supervisor of the RF incident. If the involved officer is unable to make immediate notification as set forth above, the most senior officer at the scene shall make such notification.

If the Pointing/Empty Hand exception applies, in addition to notifying the dispatcher, the involved officer shall as soon as possible notify an on-duty supervisor at the division where the involved officer is assigned. "As soon as possible" means at the earliest time during the operational hours of the involved officer's division when an on-duty supervisor is working.

**Outside the TSUDPS Jurisdiction, Off Duty Including Extra Employment:**

If the RF occurs outside the TSUDPS jurisdiction when the involved officer is off duty including extra employment, the involved officer shall immediately do both of the following:

    g.   Contact the law enforcement agency having jurisdiction

    h.   Notify an on-duty TSUDPS supervisor of the RF incident

The involved officer shall verify if an on-duty TSUDPS supervisor will or will not be responding to the scene.

When the Extra Employment exception applies, the involved officer shall immediately notify the supervisor who is working the same location of the RF incident.

When the Point/Empty Hand or Outside TSUDPS exception applies, the involved officer shall as soon as possible notify an on-duty supervisor at the division where the involved officer is assigned. For the purposes of this subsection, as soon as possible means at the earliest time during the operational hours of the involved officer's division when an on-duty supervisor is working.

**Other:**

If an injury in not apparent at the time of arrest and the arresting officer is made aware of it later, that officer shall immediately notify an on-duty supervisor. Furthermore, the officer shall document the RF as set forth in section Documentation of Reportable Force.

## Communications Dispatcher's Responsibilities

### Notification to an On-Duty Supervisor

### Inside the TSUDPS Jurisdiction, On Duty

Upon receiving notification of an RF incident occurring inside the TSUPDS jurisdiction the communications dispatcher shall immediately notify an on-duty supervisor.

### Inside the TSUDPS Jurisdiction, Off Duty Including Extra Employment

Upon receiving notification of an RF incident occurring inside the TSUDPS jurisdiction when the involved officer is off duty including extra employment, the communication dispatcher shall immediately notify an on-duty supervisor, unless the Pointing/Empty Hand exception applies.

### Notification to the Captain:

The communications dispatcher shall immediately notify their communications supervisor and the communications supervisor shall immediately notify the Captain when any of the following RF incidents occur:

a. A firearm is discharged

b. A soft-impact weapon is discharged

c. A CED is either of the following:

    1. Intentionally discharged and directed at a person whether contact is made or not

    2. Accidentally discharged and a person is truck

d. A person sustains serious bodily injury

e. The RF occurs outside the TSUDPS jurisdiction when the officer is on duty

## Supervisor's Responsibilities

The supervisor who responds to the scene shall first check to see if anyone is injured and shall ensure the injured are treated.

The supervisor shall immediately contact the Captain when any one of the following occurs:

a. A firearm is discharged

b. A soft-impact weapon is discharged

c. A CED is discharged

d. A person sustains serious bodily injury

In addition to the notification requirements set forth above, anytime the on-scene investigation reveals violations of department policy regarding the response to resistance, the supervisor shall contact the Internal Affairs Supervisor.

## Captain's Responsibilities

In additional to the notification requirements set forth in Department Manual 300.08, **Firearms and Soft-Impact Weapon Discharges**, and 300.16, **Conducted Energy Devices**, the Captain shall make the below notifications.

## Notification to Internal Affairs, the Deputy Chief, and the Chief of Police

The Captain shall immediately notify internal affairs, the Deputy Chief, and the Chief of Police of an RF incident when any one of the following occurs:

a. A firearm is either of the following:

    1. Intentionally discharged, except when the discharge is directed toward an animal and it does not result in bodily injury to any person

    2. Accidentally discharged and it results in bodily injury to a person

b. A soft-impact weapon is discharged, and it causes serious bodily injury to a person

c. A person sustains serious bodily injury

## Involved Officer is On Duty:

Upon receiving notification of an RF incident occurring when the involved officer is on duty, whether inside or outside of the TSUDPS jurisdiction, the Captain shall ensure that an on-duty supervisor is immediately notified.

Furthermore, when the RF incident occurs outside the TSUDPS jurisdiction and the Ponting/ Empty Hand Exception does not apply, the Captain shall determine whether an on-duty supervisor should respond to the scene after giving consideration to the proximity of the RF incident to TSUDPS and the severity of injury. The Captain shall inform the involved officer whether an on-duty supervisor will or will not be responding to the scene.

## Involved Officer is Off Duty Including Extra Employment:

### Inside the TSUDPS Jurisdiction

Upon receiving notification of a RF incident occurring inside the TSUDPS jurisdiction when the involved officer is off duty including extra employment, the Captain shall ensure an on-duty supervisor is immediately notified of the RF incident unless the Pointing/Empty Hand or Extra Employment exception applies.

### Outside the TSUDPS Jurisdiction

When the Pointing/Empty Hand or Extra Employment exception does not apply, the Captain shall determine whether an on-duty supervisor should respond to the scene after giving consideration to the proximity of the RF to TSUDPS and the severity of the injury.

The Captain shall inform the involved officer whether an on-duty supervisor will or will not be responding to the scene.

### Internal Affairs, the Deputy Chief, and the Chief of Police

With regards to RF incidents occurring outside the TSUDPS jurisdiction, depending on various factors such as the RF incident's proximity to TSUDPS, internal affairs, the Deputy Chief, and/or the Chief of Police may respond the scene to conduct an investigation in cooperation with the agency having jurisdiction.

## Documentation of Reportable Force

### Involved Officer's Responsibilities

### Required Documentation:

Unless the Pointed Weapons exception applies, which is noted directly below, each involved officer that uses RF shall do all of the following:

    a. Complete an original or supplement incident report, as applicable

    b. Complete the Response to Resistance Form

    c. Thoroughly document the suspect's actions and the officer's response. (See also "Details Within the Incident Report" later in this subsection).

The documentation requirements include when the involved officer uses RF while on duty or off duty including during extra employment whether inside or outside the TSUDPS jurisdiction.

### Pointed Weapon Exception to Completing an Incident Report and Response to Resistance Form:

When the RF solely involves pointing a CED, soft-impact weapon, and/or firearm at a single person or multiple persons and there are multiple involved officers on the same call, the RF that involves pointing a CED, soft-impact weapon, and/or firearm at a single person or multiple persons may be documented in one incident report and one response to resistance form by the primary officer or one of the involved officers (hereinafter referred to as Pointed Weapons exception).

Additionally, when the Pointed Weapons exception involves pointing any of the aforementioned weapons at multiple persons, the officer completing the documentation shall do all of the following:

    d. List identifying information of one person (e.g., suspect) on the Response to Resistance form

    e. List all officers who used this type of RF on the Response to Resistance form

    f. Document the other persons' (e.g., suspects) identifying information on the narrative of the incident report

When the Pointed Weapons exception applies, each involved officer who solely pointed a CED, soft-impact weapon, or firearm at any person shall provide his name, employee/T-number, and assigned unit number to the officer who will be completing the incident report and Response to Resistance form.

Furthermore, when the Pointed Weapons exception applies, the officer completing the incident report and the Response to Resistance form shall list the names, employee/T-numbers, and assigned unit numbers of all involved officers who pointed their CED, soft-impact weapon, or firearm at any person. The officer shall also thoroughly document the suspect's actions and officer's response as well as document which on-duty supervisor was notified of the RF.

## Time Frame to Complete the Incident Report and Response to Resistance Form:

### On Duty

If an RF occurs when the involved officer is on duty, the incident report and Response to Resistance form shall be completed prior to the end of the involved officer's shift.

### Off Duty Including Extra Employment

If an RF occurs when the involved officer is off duty including extra employment, the involved officer shall do one of the following:

    g. Immediately complete an incident report and Response to Resistance form

    h. Immediately provide the requisite information to the department by any method approved by the department so that an incident report and Response to Resistance form can be completed immediately. When the involved officer provides the requisite information using this option, at the first opportunity upon returning to duty the involved officer shall review the incident report and Response to Resistance form and the many any necessary corrections.

### Details within the Incident Report:

In addition to the below specifications, involved officers shall also comply with all applicable documentation requirements in Department Manual 300.16, **Conducted Energy Devices**, and 300.08, **Firearms and Soft-Impact Weapon Discharges**.

Incident reports involving RF shall contain the following information:

    i. The name and employee/T-numbers of:

        1. All employees on the scene at any time during the response to resistance incident.

        2. The on-duty supervisor who responded to the RF incident or the on-duty supervisor who was notified when an on-scene response to not required.

        3. The supervisor in the lockup or detention facility where the prisoner was booked.

    j. The unit number of responding medical personnel, if applicable.

    k. The employee's specific reasons for the response to resistance. The documentation shall thoroughly explain what force was used and why it was used. This shall include a detailed description of all actions taken by the officer and by the person against whom the force was used. When describing the suspect's actions, the report shall not be simplified to conclusory statements (e.g., the suspect was acting crazy, resisting, combative, making a furtive gesture). Rather, a detailed description of the suspect's specific action(s) that led to the amount of force used shall be included (e.g., the suspect was punching, kicking, pushing, twisting/pulling away).

l.  The part of the person's body receiving the strike, hit, spray, or injury.

m.  Location on the person's body of any known injury, even if the injury was not obtained as part of the incident.

n.  Any other pertinent information related to any offense committed.

In an event that necessitates the response to resistance by more than one officer on a single suspect, each officer who used force shall write his own supplement report to the primary officer's original respond unless the Pointed Weapons exception applies. The supplement report shall include, but is not limited to:

o.  The specific reason(s) for using force as described directly above in item "k."

p.  The part of the person's body receiving the force.

## Supervisor's Responsibilities

### When an On-Scene Response is Required:

When an on-duty supervisor is notified and required to respond to an RF incident as provided herein, the on-duty supervisor shall do all of the following:

a.  Review each involved officer's incident and/or supplement report

b.  Review all applicable Response to Resistance forms

c.  Review all BWC footage from each officer involved in the incident

d.  Complete a supplement to the original incident report

e.  Complete the Response to Resistance Report After-Action Report.

### When an On-Scene Response is Not Required:

If an on-duty supervisor is not required to make the scene of an RF incident as specifically provided in this policy (e.g., the Pointing/Empty Hand, Extra Employment, or Outside TSUDPS jurisdiction applies) yet an on-duty supervisor does not respond to the scene, the on-duty supervisor is not required to complete a supplement to the original incident report.

When an on-duty supervisor is notified of RF that falls within the Pointing/Empty Hand exception or Outside the TSUDPS exception, the on-duty supervisor that is notified by the involved officer shall do all of the following:

e.  Review each involved officer's incident and/or supplement report

f.  Review all applicable Response to Resistance form(s)

g.  Review all applicable body worn camera footage

h.  Complete the Response to Resistance After-Action Report

The review and documentation requirements under the "Supervisor's Responsibilities" subsection are the responsibility of the on-duty supervisor who is notified of the RF.

### Supervisor Working Extra Employment with an Involved Officer:

When the Extra Employment exception applies, the supervisor working extra employment with the involved officer and who is notified of the RF shall do all of the following:

i.  Review each of the involved officer's incident and/or supplement report

j.  Review all applicable Response to Resistance form(s)

k.  Review all applicable body worn camera footage

l.  Complete the Response to Resistance After-Action Report

m.  Complete a supplement to the original incident report. However, a supplement report does not have to be completed by the supervisor if the RF solely involves:

1. The involved officer pointing a CED, soft-impact weapon, and /or firearm at a single person or multiple persons and/or
2. The involved officer using empty hand tactics when all of the following apply:
   a). There is no visible injury
   b). The person does not lose consciousness
   c). The person does not complain of any bodily injury

## Details within the Supplemental Incident Report:

Supervisors supplements shall include, but are not limited to, whether or not he suspect has sustained any visible injuries, the identity of such injuries, the identity of such injuries, injuries complained of by the suspect that are not visible, and whether or not the suspect refused medical transport.

In addition to the above specifications, supervisors shall also comply with further documentation requirements contained in Department Manual 300.16, **Conducted Energy Devices** and 300.08, **Firearm and Soft-Impact Weapon Discharges**.

## Review and Completion of Reports:

Within five calendar days after an RF incident, the supervisor, as indicated in the "Supervisor's Responsibilities" subsection, shall:

n. Review the incident report, Response to Resistance form, and any applicable body worn camera footage to ensure the incident was properly documented and in compliance with department policy.

o. Complete the Response to Resistance After-Action Report

Upon completion of the above requirements, the supervisor shall forward the documentation through the supervisor's chain of command up to the Deputy Chief.

## Lieutenant's and Captain's Responsibility

The lieutenant and captain of the supervisor who completed a Response to Resistance After-Action Report shall complete a review of the After-Action Report within five calendar days after the time of receipt.

## Deputy Chief's Responsibilities

The Deputy Chief shall review the Response to Resistance After-Action Report documentation to ensure that appropriate action is taken if deemed necessary (e.g., additional training for the involved officer).

## Jail Booking or Police Station Lockup Facility

Officers shall notify an on-duty jail supervisor at the police station lockup facility, whichever is applicable, before booking a prisoner who has been injured, struck, hit, or sprayed by any weapon or other form of force causing bodily injury.

## Response To Resistance By Civilian Employees

If a civilian employee while on duty uses force against a person, the civilian employee shall immediately notify their supervisor.

If the on-scene investigation reveals violations of department policy regarding the response to resistance, the supervisor shall contact internal affairs for direction.

Civilian employees using any response to resistance shall document the incident. The on-duty supervisor notified of the response to resistance incident by a civilian employee shall ensure an incident report is completed as required.

# Annual Analysis of Response To Resistance Incidents

a.  Each Captain and/or Lieutenant shall review all reports generated by employees under his/her command involving response to resistance.

b.  Each Captain and/or Lieutenant shall conduct an analysis of these reports to determine any trends, patterns, or tendencies that may indicate a need for training, counseling, or further administrative review.

c.  Each Captain and/or Lieutenant shall submit an annual report, not later than March 1 of each year, to the Deputy Chief detailing any patterns or trends involving response to resistance which may require additional training, equipment, or policy modifications.

# Administrative Leave And/Or Administrative Duty Status

Immediately following an employee's involvement in an incident where the response to resistance or other actions that result in serious bodily injury or death of a person, the Captain shall assign the employee to administrative leave or administrative duty status or whatever is applicable according to Human Resources (Please see Texas Southern University MAPPS).

Should the determination be that the employee is placed on administrative leave status, or whatever Human Resources determines is applicable the employee's lieutenant will prepare the appropriate documents for submission as required by current payroll procedures.

Should the determination be that the employee is placed on administrative duty status, or whatever Human Resources determines is applicable the Captain shall assign the employee to administrative duties.

Within five (5) days of assigning an employee to administrative leave or administrative duty status, or whatever is determined by Human Resources, the Captain will complete a preliminary review of the incident and may:

a.  Extend the administrative leave and/or administrative duty assignment, or

b.  Return the employee to regular duty.

The administrative leave and/or administrative duty status may extend until completion and staff review of the Internal Affairs investigation.

While on administrative leave and/or administrative duty or whatever is applicable according to Human Resources, the employee shall attend counseling.

Assignment to administrative leave or administrative duty status is non-disciplinary with no loss of pay. This duty is designed to:

a.  Address the personal and emotional needs of the employee involved in the response to resistance, and

b.  Assure the community that facts surrounding the case are fully and professionally investigated.

# Extra Employment While on Administrative Leave and/or Administrative Duty

An employee assigned to administrative leave or administrative duty status in accordance with this procedure, who wishes to engage in extra employment, shall submit a written request to his/her Captain. The Captain shall determine if the employee may engage in the requested extra employment and will notify the employee in writing.

## Related Department Manual Policies and Reference Material

- 200.11, **Personnel Early Warning System (PEWS)**
- 200.19, **Investigation of Employee Misconduct**
- 200.24, **Extra Employment**
- 300.01, **Firearms and Qualifications**
- 300.02, **Effecting Arrests and Searches**
- 300.05, **Handling and Transporting Prisoners and Other Persons**
- 300.06, **Body Worn Camera**
- 300.08, **Firearm and Soft-Impact Weapon Discharges**
- 300.10, **Motor Vehicle Pursuits**
- 300.13, **Restraint Devices**
- 300.16, **Conducted Energy Devices**
- 300.18, **Property and Evidence**
- 300.21, **Driving While Intoxicated**
- 300.22, **High-Risk Vehicle Approaches**
- 300.25, **Special Threat Situations**
- 300.35, **Foot Pursuits**
- 400.10, **Emergency Management**
- 400.14, **Criteria for Submitting Incident Reports**
- 400.17, **Assistance to Employees Involved in Critical Incidents**
- Texas Southern University Department of Public Safety Standard Operating Procedure, Accidental Discharge of Firearm-No Injuries
- Texas Southern University Department of Public Safety Standard Operating Procedure, Conducted Electrical Weapons (TASER) Policy
- Texas Southern University Department of Public Safety Standard Operating Procedure, Duty Weapons / Lethal & Less-Lethal
- Texas Southern University Department of Public Safety Standard Operating Procedure, Use of Force
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.03.04, Leave of Absence Policy

# Restraint Devices

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Use of restraints to secure prisoners is limited to the following Texas Southern University Department of Public Safety approved restraining:

a.   Double locking handcuffs

b.   Flex – cuffs

c.   Belly chain

d.   Leg restraints (the term "hog–tying" shall not be utilized)

e.   Double locking leg shackles

f.   Hobble

All prisoners or persons in custody will be handcuffed behind their backs and remain so restrained while being transported to processing or a detention facility.

## Related Department Manual Policies

• 300.02, **Effecting Arrests and Searches**

• 300.05, **Handling and Transporting Prisoners and Other Persons**

• 300.12, **Response to Resistance**

**300.14**

# Guarding Prisoners at Area Hospitals
**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Officers shall use sound judgment to prevent the escape of a prisoner receiving medical treatment. When possible, officers shall maintain visual contact with the prisoner during treatment. The at-tending physician is the final authority in such matters.

Officers shall remain within reasonable proximity to the prisoner during medical procedures that exclude their presence.

Officer shall at all times consider their personal safety and the safety of the medical staff and the prisoner. This Department Manual Policy applies to all classified officers.

## General Responsibilities

Patrol units will have primary responsibility for the prisoner until the prisoner is returned to the jail, transferred to Harris County Sheriff's Department, a To-Be Warrants has been filed, or the prisoner is released as otherwise required.

## Exceptions

The shift lieutenant shall review and evaluate the circumstances surrounding a prisoner's hospitalization to determine whether the prisoner should be guarded.  The shift lieutenant shall consider the following:

 a. The current manpower needs of the division.

 b. The degree of incapacitation of the prisoner.

 c. The seriousness of the crime charged (e.g., class A or B misdemeanor).

 d. Any circumstances surrounding the prisoner's arrest indicating the prisoner could be targeted for retaliation.

If the shift lieutenant authorizes the prisoner the be left unguarded, the shift lieutenant shall obtain an updated status at least every four hours on the unguarded prisoner. Because of federal medical privacy laws, hospitals may be unwilling to disclose the prisoner's status; therefore, the shift lieutenant must be prepared to detail an officer to check on the prisoner's status.

Shift lieutenants shall ensure the next shift lieutenant is briefed about the prisoner. The oncoming shift lieutenant shall conduct an independent review to determine if the prisoner needs to be guarded. When the prisoner's condition improves sufficiently and becomes capable of flight from the hospital, the prisoner shall be guarded.

## Officer's Responsibilities

Officers assigned to guard a prisoner requiring hospitalization and who has been charged with a Class B misdemeanor or greater offense shall notify a supervisor.

Officers shall give a supervisor all information needed to complete the Prisoner's Hospital Report form. This information shall include the prisoner's name, race, sex, and location of confinement (floor, room, or ward number), the charge, as well as any other pertinent information.

Officer's guarding prisoners shall contact a supervisor one hour prior to the end of their shift regarding the status of the hospitalized prisoner. Officers shall remain at their assigned post until they are relieved or a supervisor terminates the assignment.

Prisoners in custody at a medical facility shall be allowed visitors only with a supervisor's approval.

Officers assigned to relief duty for hospital guard assignments shall proceed directly to the assignment without any stops other than those approved by a supervisor.

## Supervisors' Responsibilities

When a supervisor is informed an officer is guarding a prisoner who has been charged with a Class B misdemeanor or greater offense, the sergeant shall determine if the prisoner should be transferred to the custody of the Harris County Sheriff's office (HSCO). The supervisor shall contact a HSCO Transportation Division supervisor and come to a mutually agreed upon time for transfer of that prisoner. If no time can be agreed upon, the patrol unit shall maintain responsibility for the prisoner until such time the HCSO agrees to the transfer.

When an officer is assigned to guard a prisoner, the supervisor shall ensure the relieving supervisor is made aware of the hospital assignment. The supervisor shall have the responsibility of ensuring the officer is relieved in a timely manner. This process shall continue until the prisoner's status changes.

When a supervisor is informed the prisoner no longer needs to be guarded, the supervisor shall immediately notify the officer on guard and terminate the assignment.

If the hospitalized prisoner has yet to be charged, the supervisor shall determine whether the criteria has been met to file a To-Be Warrant (see section To-Be Warrants). In all of the above circumstances supervisors shall notify the Captain.

## Prisoner's Pretrial Release Bond

The jail supervisor initiating the prisoner's Hospital Assignment Card shall relay all pertinent information to the Pretrial Services Agency. The agency shall determine if the prisoner qualifies for a pretrial bond.

If a pretrial release bond is issued, the bond shall be forwarded to the jail bonding office for processing. The supervisor notified shall instruct the officer guarding the prisoner to contact the jail booking supervisor and follow the instructions required to finalize the prisoner's release.

## BEN TAUB HOSPITAL PRISONERS

The HSCO guards prisoners taken to Ben Taub Hospital when all the following are true:

a. Class B or greater charges have been filed with Harris County.

b. The prisoner has been assigned to a room or bed. The hospital, doctor's name, and room number or bed number must be included in the narrative of the charges.

c. Charges are filed and returned by the Harris County District Attorney's (DA) Office.

Note: To be certain the charges have been approved and returned by the DA's Office, check the DA Log Section in DIMS. There must be an asterisk (*) along with the wording "DA has accept-ed" in the DIMS 10 Section of the charges. If not, immediately follow-up with the DA's Office to ascertain if additional information is needed.

Officers guarding such a prisoner shall notify a supervisor to initiate transfer of custody to the HCSO. The TSUDPS supervisor shall call the HSCO Transportation Desk at 713-566-5074 and determine if a deputy is available to take custody of the prisoner.

If a deputy is available, an officer shall be assigned by the supervisor to deliver the prisoner's property (including clothing) to the Joint Processing Center and completing the blind booking process on the prisoner.

If a deputy is not available, the supervisor shall notify the guarding officer of the estimated transfer time. Overtime for pay is authorized for a unit to relieve the on-duty officer sitting on the prisoner and the on- duty unit can return to duty.

Officers shall continue to guard the prisoner until effectively transferred to the custody of HSCO or a To- Be Warrant has been filed.

Officers shall notify a jail supervisor and the on-duty supervisor when the transfer is complete.

## To-Be Warrants

To-Be Warrants may be filed on hospitalized prisoners if all the following circumstances exist:

  a. The Harris County District Attorney's (DA) Office has approved the filing of a To-Be Warrant.

  b. The prisoner has a serious medical condition requiring hospitalization.

  c. The prisoner is a non-violent offender.

  d. The prisoner has been positively identified through AFIS (Automated Fingerprint Identification System), a valid federal or state issued identification, or through personal knowledge of the arresting officer.

  e. The prisoner is not believed to be a flight risk.

If charges have already been filed, the charging document must not have been assigned to a court.

## Procedures

The guarding officer must contact a supervisor to evaluate whether the above outline criteria for filing a To-Be Warrant have been met. If charges have already been filed in the case and the charging document has been assigned to a court, the procedures outlined in section Prisoner Pretrial Re-lease Bond shall be followed. Should the criteria be met for filing a To-Be Warrant, the following procedures shall be followed:

  a. The supervisor shall assign an officer to contact the Harris County DA's Office to discuss the nature of the case and charges. Only the Harris County DA's Office may authorize the filing of a To-Be Warrant on a suspect in custody.

  b. A completed offense report must be entered into the records management system.

  c. Charges through DIMS (DA Intake Management System) may be entered from a remote location at the Harris County DA's Office along with the probable cause statement.

  d. Without exception, the above referenced documents shall be presented in person to the District Attorney's Office for review.

  e. The assigned officer shall present the charges to a magistrate. The To-Be Warrant process should be initiated only if a magistrate can reasonably be located. A magistrate is available 24 hours per day at the Harris County Criminal Justice building.

  f. Officers shall advise the district attorney and the magistrate that, upon the warrant being signed, the prisoner shall be left unguarded at the hospital.

  g. A supplement documenting the To-Be Warrant information must be entered immediately.

  h. Upon completing the previous steps, the officer assigned to obtain the To-Be Warrant shall notify the jail booking supervisor regarding the prisoner's final release. The guarding officer shall remain with the prisoner until such time the prisoner's release has been completed and approved by a jail supervisor and the on-duty supervisor.

## Related Department Manual Policies

• 300.05, **Handling and Transporting Prisoners and Other Persons**
• 300.12, **Response to Resistance**
• 300.27, **Response Management**

# Student Life Referral

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## POLICY

Texas Southern University's Student Code of Conduct ("Code") has been developed for the express purpose of acquainting students with the rules and regulations of Texas Southern University (also referred to as "University" and "TSU") necessary to ensure the orderly conduct of its students while attaining its lawful goals and objectives.

The Student Code of Conduct establishes the University's internal disciplinary system. Texas Southern University has both the right and obligation to promulgate discipline as a necessary part of the University's educational process and to ensure the attainment of the University's lawful goals and objectives.

Authority to administer the Student Code of Conduct and student judiciary systems is delegated to the Vice President for Student Services/Dean of Students. In addition, the University reserves the right, for educational purposes, to review any action taken by civil and criminal authorities regarding students. It also has the obligation to introduce counseling and/or disciplinary action if the student's conduct has interfered with the University's exercise of its educational objectives or responsibilities to its members. Disciplinary action taken on this basis shall conform to the terms of the Student Code of Conduct.

Texas Southern University supports the concept of educational discipline. A student admitted to Texas Southern University accepts the responsibility to conform to all Texas Southern University rules and regulations. When a student is not a danger to the university community, or when a repetition of misconduct is unlikely, the University will make an effort to educate the student through a sanction; but should the student demonstrate unwillingness to obey the rules governing conduct, the student will be subjected to the following sanctions: expulsion, suspension, disciplinary probation, disciplinary warning, disciplinary reprimand and any enforcement needed to administer a fair standard of discipline for violations. Students are expected to adhere, and will be held accountable for adhering, to all federal, state, and local laws in addition to all university policies and regulations.

The Code applies to conduct that occurs on University premises; at activities sponsored, conducted, or authorized by the University or by registered student organizations; and to off-campus conduct that adversely affects the University community and/or the pursuit of its objectives. Each student shall be responsible for his/her conduct from the time of application for admission through the actual awarding of a degree, even though conduct may occur before classes begin or after classes end, as well as during the academic year and during periods between terms of actual enrollment (and even if their conduct is not discovered until after a degree is awarded). The Code shall apply to a student's conduct even if the student withdraws from school while a disciplinary matter is pending.

### Officer's Responsibilities

In all incidents which may involve a violation of the Student Code of Conduct by a Texas Southern University student, a Student Life Referral shall be completed in its entirety, and submitted on the day of the incident.

# Conducted Energy Devices

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Conducted energy devices (CEDs) are intermediate weapons and are not substitutes for lethal force. However, officers who use force against any person must be able to state in detail the specific reasons for using force. CEDs are authorized for use against suspects who are actively resisting or exhibiting active aggression, or to present individuals from harming themselves or others.

In every situation in which a CED is discharged (air cartridge firing or drive stun), even if a suspect is not struck or stunned, officers shall notify the dispatcher and write a detailed report and the on-scene supervisor shall write a supplement. See section CED Discharge Outside the TSUDPS Jurisdiction of this policy for exceptions.

This Department Manual Policy applies to all employees.

## Definitions

**Activation.** The act of depressing a CED trigger causing the CED to arc or to fire probes.

**Active Aggression.** A threat or overt act of an assault (through physical or verbal means) coupled with the present ability to carry out the threat or assault that reasonably indicated that an assault or injury to any person is imminent.

**Actively Resisting.** Physically evasive movements to defeat an officer's attempt at control, including bracing and tensing in an aggressive manner, pushing, or verbally signaling a clear and deliberate attempt to avoid or prevent being taken into or retained in custody. This also includes the suspect persisting with aforementioned activities after being given the opportunity to comply with an officer's commands.

**CED Cycle.** Duration of CED electrical discharge following CED activation.

**Conducted Energy Device (CED).** A weapon primarily designed to disrupt a subject's central nervous system by means of discharging electrical energy sufficient to cause uncontrolled muscle contractions and override an individual's voluntary motor responses.

**Darted.** When a suspect is struck by the probes (darts) fired from the CED.

**Discharge.** The intentional firing of a CED. This term also includes using a CED in a drive stun manner.

**DPM.** A CED's digital power magazine (battery).

**Drive Stun.** When a CED with no air cartridge or a spent air cartridge is placed in direct contact with the body of an individual or an animal and discharged. This is generally the secondary option for the CED.

**Excited Delirium.** A state of extreme mental and physiological excitement, characterized by extreme agitation, hypothermia, hostility, exceptional strength, or endurance without fatigue.

**Exigent Circumstances.** Circumstances that would cause a reasonable person to believe a prompt action is necessary to prevent physical harm from occurring to anyone.

**Laser Pointing (Red Dotting).** Unholstering and pointing a CED at a person or animal and activating the laser-aiming device.

**Passive Resistance.** Physical actions or a lack thereof that do not prevent the officer's attempt to control. It is a tactic of civil disobedience and labor dispute (e.g., a person who remains in a limp, stiff, or prone position, refuses to comply with simple directions, participates in a sit-in, locks arms in a chain, or blocks an entry way).

**Red Dotting.** See Laser Pointing.

**Secondary Injury.** Physical trauma indirectly associated with CED use (e.g., injuries from falls).

**Sensitive Areas.** A person's head, neck, or groin area, or a male or female breast.

**Stun.** The proper term for using a CED to jam and override the central nervous system or cause uncontrollable contractions of muscle tissue when a suspect is darted or drive stunned.

**Taser.** See Conducted Energy Device.

**Taser Control Supervisor.** An individual who has been appointed by the Chief of Police or designee to manage the Department's Taser program.

**Unintentional Discharge.** Any time a CED air cartridge fires due to mechanical failure of the device or other inadvertent cause.

## Certification and Training

Before carrying or using a CED, an officer must have current model-specific certification. Supervisors shall ensure their subordinates who carry a CED have initial and recertification training and are maintaining current certifications.

Officer shall use only CEDs and CED-related equipment (DPMs, air cartridges, and holsters) that are approved by the department. No changes, alterations, or modifications are permitted to the device or he related equipment without specific approval from the Chief of Police.

## Personal CEDs

Officers are not permitted to use personally owned CEDs.

## Use of CEDS

Officer must realize CEDs will not eliminate all physical confrontations posed by suspects.

Officer should give warning to a suspect prior to activating the CED unless to do so would place any other person at risk.

Officers shall not justify the use of a CED by intentionally placing themselves in imminent danger. Officers shall not display a CED in an unprofessional or unsafe manner.

Unless exigent circumstances exist, officers should not use a CED on a person:

a. Sprayed with any chemical by any person outside the department.

b. Simply to protect property against destruction or damage.

c. Only passively resisting.

d. Handcuffed.

e. Known to be mentally ill, but not actively resisting or attempting to harm himself or others.

f. Pregnant, elderly, or visibly frail, or on young children.

g. Fleeing as sole justification for use of CED. However, if officers believe it is necessary to immediately effect an arrest to protect the public from a violent suspect, they are justified to use their CED on an assault or a suspect who has committed a violent crime and/or is attempting to avoid apprehension.

   h.  Who is in a location where a fall may cause substantial injury or death.

   i.  Who is only verbally non-compliant.

   j.  In close proximity to gas fumes, methamphetamine labs, aerosol chemical agents, or other flammable or combustible environments.

   k.  Who is suspected of possessing or wearing an improvised explosive device (IED).

Officers shall keep CED cycling to a minimum, especially against persons in an excited delirium, and use only the force necessary to apply authorized restraint devices and effect an arrest. Officers shall constantly reassess the circumstances after each CED cycle.

Officers are authorized to use a CED on an animal to prevent injury to themselves or others. CEDs shall not be discharged from a moving vehicle or at a moving vehicle or its occupants.

Laser pointing (a.k.a. "red dotting") can be an effective psychological tool. However, officers shall refrain from abusing the use of the CEDs laser pointer and should refrain from intentionally red dotting sensitive areas.  Officers should not red dot a person or animal unless the situation warrants the use of a CED.

Unless exigent circumstances exist, no more than one officer should activate a CED against a suspect at a time.

## CED Discharge Inside The TSUDPS Jurisdiction

### Discharge

Whenever a CED is discharged, the officer shall immediately notify the dispatcher. If the officer is unable to notify a dispatcher, the most senior officer or any supervisor at the scene shall contact the communications division.

Anytime officers discharge a CED in the direction of an individual or animal, whether contact is made or not, they shall notify the dispatcher and write a detailed incident or supplement report. The on-scene supervisor shall conduct an inquiry and write a supplement report.

### Unintentional Discharge

If an unintentional discharge occurs in a non-field situation (e.g., during roll call) and the supervisor determines the incident was an unintentional discharge and there is no injury or damage to property, the supervisor shall forward a letter to the Captain outlining the circumstances of the unintentional discharge. Other reporting requirements outlined in this Department Manual are not required for such non-field unintentional discharges.

### Serious Bodily Injury or Death to a Person

Serious bodily injury is defined in Department Manual 300.12, **Response to Resistance**. If an officer discharges a CED and a serious bodily injury or death occurs, the officer shall notify the dispatcher. The dispatcher shall dispatch a supervisor to the scene and contact the Captain regarding the incident. The Captain shall notify internal affairs, the Deputy Chief, and the Chief of Police. Officer shall also following the applicable procedures in Department Manual 300.08, **Firearm and Soft-Impact Weapon Discharges**.

### Officer's Responsibilities

Whenever an officer discharges a CED, that officer shall notify the dispatcher, who shall dispatch a supervisor. The officer shall generate an incident report or supplement an existing incident report and complete the response to resistance form. If more than one officer discharges a CED during an incident, each officer shall supplement the incident report describing his or her actions and

observations and complete the response to resistance forms. The incident or supplement report shall document the following guidelines:

    a.   Identify all officers on the scene when the CED was discharged.

    b.   Identify all officers who discharged a CED during the incident.

    c.   Specifically state the reason to justify the discharge including the suspect's behaviors and actions, and any statements made by the suspect. The event shall be detailed in the report and not simplified to a statement such as "he was acting crazy," or "she failed to follow my commands."

    d.   Specify the number of trigger activations.

    e.   Describe the location on the suspect's body where the CED made contact either with darts or by drive stun.

    f.   Identify the person who removed the darts (name and affiliation).

    g.   Describe the medical condition of the suspect and where and by whom the suspect was trans-ported.

    h.   Identify the person at the jail who was notified that the suspect was darted or drive stunned by a CED.

    i.   Identify the name of the medical facility the suspect was transported to and the name of the person who was notified that the suspect was darted or drive stunned by a CED (if applicable).

Officers shall complete the incident or supplement report and the response to resistance form prior to going off duty.

## Communication Dispatcher Responsibilities

When notified of a CED discharge, the dispatcher shall send a supervisor to the scene. The dispatcher shall also notify the Captain of the CED discharge.

## Supervisor's Responsibilities

The supervisor dispatched to a CED incident shall be in charge of the scene unless serious bodily injury or death occurs.  In any case, the supervisor shall conduct an inquiry, review all body worn camera footage, and write a detailed supplement report of the CED incident. Supervisors shall also follow the applicable procedures in Department Manual 300.08, **Firearm and Soft-Impact Weapon Discharges**.

If a supervisor discharges a CED, another supervisor shall be dispatched to the scene to conduct the supervisory inquiry, watch all body worn camera footage, complete a supplement report, and other required paperwork and notifications.

The supervisor responding to the scene shall first check to see if anyone is injured. The Houston Fire Department shall be contacted if the suspect has been darted in a sensitive area or has sustained secondary injuries or if otherwise needed. Then the supervisor shall conduct the supervisory inquiry of the CED incident and gather sufficient information to perform the following tasks:

    a.   Contact the Captain.

    b.   Notify the owner of any animal that was darted or drive stunned.

    c.   Ensure photographs are taken of the dart impact site, drive stun site, or any related injuries and that the photographs are tagged for evidence. If the dart's locations are in sensitive areas such as groin or a breast, an officer of the same gender or gender identity shall take the photographs.

d. Contact Internal Affairs if the supervisor has any questions or his/her on-scene inquiry reveals a violation of department policy regarding the response to resistance as stated in Department Manual 300.12, **Response to Resistance**. Any observed misconduct shall be reported and investigated in accordance with Department Manual 200.19, **Investigation of Employee Misconduct**.

e. Issue new air cartridges.

f. Ensure data from body worn cameras involving CED cases are downloaded before going off duty.

g. Ensure each officer involved wrote any required incident or supplement report and completed the response to resistance form before going off duty and that the report contains sufficient details justifying the CED activation.

h. Within five days following the incident, review the incident report and all accompanying supplement reports to ensure inclusion of all necessary facts.

i. Within five days following the incident, write a detailed supplement report of the CED incident. (See below.)

j. Upon completion, forward copies CED download data and incident and supplement reports to the chain of command.

k. The Taser Control Supervisor shall download the Taser report and attach it to the response to resistance report.

l. The Taser Control Supervisor shall review the response to resistance report and the offense report for each deployment of a CED, including non-intentional discharges.

m. Any CED that is involved in a response to resistance incident where there is hospitalization, serious bodily injury, death or suspected wrongful use shall be taken immediately to an approved property storage facility to be tagged as evidence.

The supervisor's supplement report shall include all of the following:

n. Name and employee number of the officers discharging a CED.

o. Describe the location of dart strikes or drive stun.

p. Name and affiliation of the person who removed the darts.

q. Medical condition of the suspect and whereabout by whom the suspect was transported.

r. Make, model, and serial number of the CED and the serial number of the air cartridges used.

s. CED download data, including the date, time, number of activations, and duration of the CED cycles. A CED download shall be done for each CED device that was discharged during the incident. The date range of the download shall be sufficient to capture the time period from the beginning of the officer's shift until the discharge.

The narrative of the supervisor's supplement shall include:

t. Date and time the supervisor arrived at the scene.

u. Officer, witness, suspect, or reportee statements that are not included in the incident or supplement reports.

v. A brief statement reiterating the officer's justification to activate the CED.

w. A brief statement that the supervisor reviewed the incident report and it contains all of the required facts in accordance with this policy.

# CED Discharge Outside The TSUDPS Jurisdiction

## Serious Bodily Injury to a Person

If officers are outside the TSUDPS jurisdiction and discharge their CED and serious bodily injury or death of a person occurs, officers shall immediately contact the law enforcement agency having jurisdiction, appropriate medical personnel, and the Captain.  The below procedures shall the be followed:

    a.  Upon receiving notification, the Captain shall immediately notify Internal Affairs, the Deputy Chief, the Chief of Police, and the officer's immediate supervisor.

    b.  Depending on the incident's proximity to TSUDPS, Internal Affair, the Deputy Chief, and the Chief of Police may respond to the scene. If personnel are sent to the scene, the Captain shall notify the agency having jurisdiction over the situation regarding the approximate of their arrival.

        1.  If Internal Affairs go to the scene, they shall conduct an investigation in accordance with TSUDPS policies and procedures.

        2.  If the Deputy Chief and/or the Chief of Police go to the scene, they shall conduct an investigation in cooperation with the agency having jurisdiction and write a supplement report.

    c.  Unless otherwise directed by a supervisor, the officer involved in the incident shall generate an incident or supplement report as soon as possible.

## No Serious Bodily Injury to a Person

If an officer is outside the TSUDPS jurisdiction and discharges a CED and there is no serious bodily injury to any person, the below listed procedures shall be followed:

    a.  The officer involved in the CED discharge shall, as soon as possible, notify the responsible agency having jurisdiction and the Captain.

    b.  The officer shall fully comply with the investigation conducted by the responsible agency.

    c.  The officer shall obtain a copy of any report generated from the investigation and forward the copy through the chain of command to the Deputy Chief with a cover letter explaining the CED discharge incident.

    d.  If no report is generated, the officer shall write a letter explaining the CED discharge incident and send it through the chain of command to the Deputy Chief.

# CED Evidence

The unique air cartridge number that correlates with the Anti–Felon Identification (AFID) tags shall be documented in all CED incident reports.

CED probes and AFID tags shall be collected and preserved as evidence only for incidents with:

    a.  A suspect has been darted in a sensitive area or has sustained a serious bodily injury.

    b.  A suspect has sustained a secondary injury needing medical treatment.

    c.  An officer has sustained an injury needing medical treatment and the injury is related to the CED incident.

    d.  Officers believe the CED evidence may be needed in a future investigation or hearing.

If CED probes are not collected for evidence, they shall not be left at the scene or simply thrown away. Officers shall consider the probes as "used needles" or "sharpes" wasted and they shall be disposed of in proper "sharpes" disposal receptacles located at any jail facility or with permission in any other proper disposal receptacles (e.g., at hospitals and in ambulances).

## Carrying A CED

Officer trained in the use of and issued a CED shall wear it at all times while wearing the official uniform, even while working extra employment, except as authorized by a policy or as directed by a supervisor. The CED shall be worn in cross-draw manner as approved by the department.

Officers may also carry an approved cartridge pouch for carrying a spare CED air cartridge (in lieu of attaching the air cartridge to the handle of the CED). However, the department does not furnish this pouch and it must be purchased by the officer.

Officers in plainclothes, whether on or off duty, are not required to carry a CED. However, officers who have been issued a CED should carry it when there is an expectation of making an arrest or when participating in an arrest situation.

All plainclothes or off-duty officers who carry a CED shall abide by the same use policies as uniformed officers. A CED carried by an on-duty plainclothes officer shall be carried in an approved holster attached to the officer's belt in a cross-draw manner. A CED may also be carried in a purse or a pack, but the device should be housed in a protective holster or case.

## CED Spark Test

Officers shall conduct a five-second spark test at the beginning of their shift in order to keep the internal CED capacitor charged and to avoid a delayed spark or software corruption. If there is a delayed response during the test, officers shall conduct an additional five-second spark test.

Uniformed officers working extra employment shall conduct a five-second spark test at the beginning of their extra employment. The test shall be conducted out of the public view.

Officers may test their CEDs more frequently if there is an operational reliability concern (e.g., the unit gets wet or dropped). When the CED is tested for reliability concerns, a supervisor must be present and the circumstances regarding the test must be documented.

All officers who are not mandated by this policy to carry their issued CED on a daily basis or at extra employment shall conduct a spark test at least once a week.

## Damaged, Malfunctioning, or Wet CEDS

When replacement of a CED is needed, offices shall follow the replacement procedures outlined in section CED, DPM, Holster or Air Cartridge Replacement of this policy.

### Damaged or Malfunctioning CEDs

Officers shall not carry any CED that shows obvious signs of damage (beyond normal wear) or is malfunctioning.

If a CED is dropped or officers think there may be a problem with their CED, they shall conduct a thorough inspection of the unit looking for any possible signs of damage (e.g., broken central information display or a cracked laser or flashlight lens) before it is used.

Warning: Officers are advised even after a CED has been checked and no apparent damage is found, the CED may accidentally discharge when the safety switch is placed up (Armed) position.

### Wet CEDs

Warning: A CED exposed to extreme moisture may discharge with the safety switch still in the down (Safe) position due to short-circuiting of the electronic components.

### Static Electricity

Warning: A CED exposed to extreme amounts of static electricity may discharge with the safety switch still in the down (Safe) position due to short-circuiting of the electronic components.

## CED Inspection Procedures

When a CED malfunction, is suspected of being damaged, or becomes wet or exposed to extreme moisture, officer shall not move the safety switch to the up (Armed) position until the following procedures are performed:

    a.  Immediately remove the air cartridge and do not replace it until the device is checked as described below and functions normally.

    b.  Remove the CED's DPM.

    c.  Thoroughly inspect the CED for damage or moisture.

    d.  If exposed to moisture or rain, wipe the CED thoroughly with a dry cloth.

        1.  If there is any visible moisture inside the DPM well, officer shall follow the procedures outlined in section CED, DPM, Holster or Air Cartridge Replacement of this policy.

        2.  If no moisture if found in the DPM well, officers shall ensure all components are completely dry for at least 24 hours before reinserting the DPM.

    e.  If no damage is detected and the CED is thoroughly dried (after the 24-hour waiting period), insert the DPM and then place the safety switch in the up (Armed) position. If the weapon discharges without pulling the trigger, place the safety switch in the down (Safe) position and remove the DPM. The CED is unsafe and is not to be used in any manner. Officer shall then follow the steps in section CED, DPM, Holster or Air Cartridge Replacement of this policy.

    f.  If the weapon does not accidentally discharge, officers shall conduct a full five-second spark test in front of a supervisor. A rapid pulse should occur and the discharge should occur and the discharge should stop after five seconds. Officers shall conduct the wet and damaged test in front of a supervisor.

    g.  If the CED does not operate normally, place the safety switch down (Safe) position, remove the DPM, and follow the guidelines in section CED, DPM, Holster or Air Cartridge of this policy.

    h.  If the CED functions normally, place the safety switch in the down (Safe) position and replace the air cartridge.  The device can now be carried.

## Dart Removal

Any CED certified officer may remove CED darts from suspects if there is no indication for medical personnel to be called to the scene.

In addition to those situations in which an ambulance would normally be called to a CED scene, medical personnel shall be immediately summoned to the scene if any of the following are true:

    a.  A person is darted in a sensitive area.

    b.  A dart is deeply embedded for easy removal.

    c.  The person exhibits an adverse reaction.

    d.  The person has a significant secondary injury.

Under unusual circumstances and if there are no signs of acute injury or illness, suspects may be transported to a jail facility with CED darts still embedded (e.g., there is a need to immediately remove the suspect from the scene as a matter of scene or suspect control or there is an anticipated delay in the arrival of medical personnel).  There, jail medical staff can remove the darts.

## Jail Booking

Before booking a prisoner, who has been darted, officers shall notify he jail medical screener that the suspect has been darted or drive stunned by a CED.

## CED, DPM, Holster or Air Cartridge Replacement

When any CED equipment (CED, DPM, holster, or air cartridge) needs replacing for any reason, the following steps shall be followed:

  a. Officer shall immediately notify their supervisor of the reason a replacement is needed.

  b. The supervisor shall determine if a replacement is warranted.

  c. Upon approval from a supervisor, the officer shall advise Taser Control Supervisor to obtain CED equipment replacement.

  d. CED equipment may be exchanged by only the employee assigned the equipment requiring replacement.

### Lost, Stolen, or Damaged CED Equipment

When loss, theft, negligence, or abuse of a CED or any CED equipment occurs, officers and supervisors shall report the incident. In order for officers to obtain any CED equipment due to loss, theft, negligence, or abuse, they shall follow the procedures listed earlier in this section and also provide copies of the following documents:

  a. The incident report with the serial number of the item (if applicable) listed in the report.

  b. The supervisor's administrative letter to the Captain.

### Returning CED Equipment Due to Retirement or Separation

Officers retiring or separating from the department must turn in their issued CED and all CED equipment with the department.

### Related Department Manual Policies and Reference Material

- 200.18, **Appearance and Grooming**
- 200.19, **Investigation of Employee Misconduct**
- 200.20, **Separation and Reinstatement**
- 300.01, **Firearms and Qualification**
- 300.08, **Firearm and Soft-Impact Weapon Discharges**
- 300.10, **Motor Vehicle Pursuits**
- 300.12, **Response to Resistance**
- 300.18, **Property and Evidence**
- 300.22, **High Risk Vehicle Approaches**
- 400.10, **Emergency Management**
- 400.17, **Assistance to Employees Involved in Critical Incidents**
- Texas Southern University Department of Public Safety Standard Operating Procedure, Conducted Electrical Weapons (TASER) Policy
- Texas Southern University Department of Public Safety Standard Operating Procedure, Duty Weapons / Lethal & Less-Lethal
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.05.03 Discipline and Termination Policy

# Use of High Occupancy Vehicle (HOV) Lanes

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The Metropolitan Transit Authority of Harris County permits on-duty Peace Officers in official Texas Southern University Department of Public Safety owned/leased vehicles to use HOV lanes during normal hours of operation. Prior notification of Metro is not required; however, officers in unmarked vehicles should be prepared to provide identification when entering or using the lanes.

Single-passenger use of HOV lanes in personal vehicles is prohibited, and employees of the Texas Southern University Department of Public Safety who do so shall be subject to disciplinary action.

This Department Manual Policy applies to all employees.

# Property and Evidence
**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Department rules and regulations and local, state, and federal laws, will govern the maintenance, storage, and disposition of all property that comes into the custody of the Texas Southern University Department of Public Safety.

This Department Manual Policy applies to all employees.

## General Definitions

**Chain of Custody.** A list of each person who has care or custody of property from the time it is taken into custody until it is offered into evidence in court, returned to the rightful owner or caretaker, or destroyed. Each time property is transferred from one person or location to another it will be documented in an original incident or supplement report.

**Lock Box.** An approved, secure device that stores property or evidence.

**Off-Site Storage Facility.** Any property storage facility other than the TSUDPS owned facility.

**Property Hold.** The prohibited release of the property.

**Property Storage Facility.** Any location that is authorized by the Chief of Police to house property on a long-term basis.

**Storage Bin.** See Lock Box.

## Property Definitions

**Abandoned Property.** Any property that has been in the custody of the Texas Southern University Police Department for a period of not less than 90 days, that a court of competent jurisdiction has determined that the identity of the actual owner of the property cannot be determined, or that the owner has been finally determined by the court and notified of the right to reclaim the property, but has failed to do so within 30 calendar days.

**Evidentiary Property.** Any created, purchased, or seized items that may be used as evidence. Controlled substances are not included in this definition and will be handled according to TSUDPS policies and procedures.  Below is a list of the types of evidentiary property:

- **Created Property.** Any property created for sole purpose of being used as evidence (e.g., DWI and crime scene videotapes or ballistic comparisons). This does not include division files (e.g., statements, confessions, and photo arrays).

- **Purchased Property.** Any property or props purchased with department approved funds to further a criminal investigation (e.g., clothing, cameras, and video equipment).

- **Seized Property.** Any non-purchased property seized or obtained for evidence to further a criminal investigation or for any law enforcement reason (e.g., a prohibited weapon found during a family disturbance investigation).

**Lost/Found Property.** Property that is not listed as or alleged to have been stolen, and based upon the totality of circumstances does not appear to constitute evidence of a crime, and ownership of the property is not in dispute.

**Prisoner's Property.** Any property in the legal, physical possession of a suspect at the time of arrest that will not be used as evidence but is taken into protective custody (e.g., billfold, purses, identification, jewelry, items in the pockets, bicycles, firearms).

**Property of Undetermined Ownership.** Any property, including stolen property that has had no lawful owner finally determined by the court; has not been deemed abandoned; or has not been ordered returned or otherwise disposed of by the court.

**Stolen Property.** Includes any property alleged to have been stolen.

## Procedures

Employees will not convert to their own use, alter, conceal, falsify, destroy, remove, tamper with, or withhold any property held in connection with an investigation or other official action.

Whenever employees acquire custody of property, they become responsible for it. Responsible employees will properly tag the property and place it in the appropriate lock box or property storage facility before the end of their tour of duty unless authorized by a supervisor.

Employees may transfer responsibility for property to another employee however, they must indicate the transfer by supplementing the original incident report.

When employees accept responsibility for property, they become the responsible party until the property is properly disposed of or responsibility is transferred to another.

If the responsibility for property is transferred to another division, the division initiating the transfer will supplement the original incident report. The supplement report will indicate the division taking responsibility for the property and the name of the authorizing person (who must be a supervisor assigned to the receiving division).

Employees placing property in or retrieving property from a property storage facility will follow that facility's regulations concerning property handling. Documentation of the employee placing property in or retrieving property from a property storage facility must be included so that a record of the chain of custody will be maintained. If the property is lost or damaged due to negligence, the negligent party may be subject to disciplinary action and restitution. The property storage facility will maintain current, accurate, and complete information (including a record of the chain of custody) on all property stored or disposed of under its responsibility. All off-site property storage facilities will comply with any applicable policies and procedures of the department.

## Reports and Forms

### Original Incident Report

Any employee who originally takes custody of property is responsible for making an original incident report. All original incident reports will include:

a. Identification of the property as evidence, lost, prisoner's, stolen, or undetermined ownership.

b. Thorough description of each article including all reference numbers.

c. Name and information regarding the person from whom the property was obtained.

d. Location where the property was obtained.

e. Name and address of anyone claiming ownership of the property.

f. Circumstances of the acquisition.

g. Names of all persons in the chain of custody and all divisions having a hold on the property.

h. Location where the property is stored.

i. Indication whether the property was checked TCIC and NCIC.

All stored property will be tagged under the original incident number and the officer shall fill out the departmental evidence/property custody document and attached to the incident report. A departmental item tag shall be completed and affixed to the property.

## Supplement Report

When property is logged in or out or transferred, a supplement to the original report will be made by the employee handling the property. When authorizing division disposes of property, a supplement report will be made.  These reports will include:

- a. Thorough description of the property.  This includes all reference numbers.
- b. Location and the name of the person from whom the property was obtained.
- c. Description of how the employee came into possession of the property and why.
- d. Names of all persons in the chain of custody.
- e. Disposition of the property.

## Authorization For Property and Evidence

Before property is placed in a lock box or property storage facility, the employee must receive authorization from a supervisor and place the information in the original incident report and on the property storage facility receipt or lab submission form.

## Request By Others For Viewing of Evidentiary Property

The custodian of evidence will handle all requests and court orders to view evidentiary property tagged in a property storage facility. When assistant district attorneys, investigators, or officers of a court want to view evidentiary property, the custodian of evidence must be presented with a Harris County District Attorney's Office form prior to viewing.

When a court order authorizes a person (e.g., defense attorney) to evidentiary property, that person must report to the custodian of evidence, and the custodian of evidence will do the following:

- Escort or Meet the authorized person at the property storage location.
- Remain present with the evidentiary property during any viewing.

## Temporary Release of Property

Property may be temporarily removed from a property storage facility for no more than 14 calendar days without the Captain's approval and only for the following reasons:

- Court appearance
- Laboratory analysis
- Further investigation

Property temporarily released from a property storage facility to an authorizing division becomes that division's responsibility. Employees must obtain the Captain's approval when temporarily checking out property for more than 14 calendar days.

To remove property, employees must furnish incident number and Captain's authorization. The employee must also complete and sign a Temporary Release form for documentation in the chain of custody. The employee shall also supplement the case showing the date and time the property was checked out, the reason for checking it out, and the date and time the property was returned.

## Disposal and Disposition of Property

All property that is placed on hold, returned to the owner or caretaker (hereinafter called owner), destroyed, or disposed of through the direction of the Deputy Chief and the custodian of evidence and will be handled and processed in accordance with the Texas Code of Criminal Procedure and

city ordinance. No property will be released to the owner, or otherwise disposed of until all property is no longer needed.

Upon written authorization from the Chief of Police, an off-site property storage facility may dispose of property.

The custodian of evidence is responsible for ensuring the timely disposal of property.

The person from whom the property was seized will be notified by certified mail, return receipt requested, when all the following are true.

The property is not:

    a.  Identified as stolen.

    b.  Classified as undetermined ownership.

    c.  Illegal to possess.

    d.  Needed for trial.

If any property is not disposed of within 90 calendar days from the date placed into a property storage facility, the property storage facility will notify the Captain requesting disposition information. All requests for disposition will be answered within 20 calendar days from the date of the request. If the property must continue to be held, the signature of the appropriate lieutenant must be placed on the disposition request. Also, the employee detailing the reason for the hold must complete a supplement to the incident report.

## Evidentiary Property

### Created Property

Items created by the department to enhance an investigation and which may be needed for future identification will be stored in a property storage facility.

Evidence created for comparison (e.g., chemical comparison, plaster casts) must be submitted to the lock box or property storage facility after the analysis is complete.

Video or audio evidence will be handled according to the guidelines of the division that created the evidence.

### Purchased Property

All property purchased to enhance an investigation, and which is not illegal to possess (e.g., surveillance equipment, special clothing) will be listed and fully described in inventory. Each item listed in the inventory will have a department inventory number assigned to it. It is not necessary for a department inventory number to be physically attached to the property if the property is being used in an investigation and the inventory number would compromise the investigation. The inventory number must be cross-referenced to the property in the division's inventory list.

Property of Texas Southern University that becomes evidence in a criminal investigation will be released to the University Department to which it belongs when no longer needed as evidence. Unless physically impossible, the inventory number sticker will be placed on the property when it is no longer used as an investigation tool or prop.

### Seized Property

Whenever possible, officers who seize property that is legal to possess will complete and issue a Property Receipt form to the rightful or claimed owner. One copy will be issued to the owner and one copy will accompany the seized property to the property storage facility. If ownership is claimed without proof, the words "Claimed Ownership" will be written on the receipt and tag. The owner's receipt is used to claim property.  Officers will detail recovery information in a supplement to the original incident report.

## Debit/Credit Cards, Licenses, Checks, and Affidavits

All debit/credit cards, licenses, checks, affidavits, or other documents (hereinafter collectively referred to as documents) suspect of being stolen or used in the commission of a forgery or fraud will be tagged in the lock box or property storage facility.

When a document is recovered without an arrest, the officer recovering the property will complete an original incident report for investigation or make a supplement, whichever is appropriate.

Under no circumstances will the officer seizing a document damage or destroy it.

## Ordnance and Explosives

When explosives and related hazardous evidence are recovered, the HPD Bomb Squad should be notified for assistance. The evidence includes, but is not limited to, any explosive device, military ordnance, pyrotechnics, or gas and smoke canisters. This type of evidence will be handled according to any Bomb Squad procedures.

## Firearms and Ammunition

a. **Loaded Weapons.** Firearms that are loaded, suspected of being loaded, or having a jammed round or casing in the chamber or barrel will not be tagged into any property storage facility. The firearm must be made safe prior to tagging.

b. **Ammunition.** Seized ballistic evidence (e.g., spent bullets, shell casings, etc.) recovered from any location or firearm which is to be examined will be tagged in the lock box or property storage facility.

c. **Municipal Prisoner's Firearms.** Whenever a firearm is seized from a suspect arrested only for a municipal offense, the arresting officer will make an original incident report. The report will describe the circumstances of the arrest and the disposition of the firearm. The firearm will be tagged at the Harris County Institute of Forensic Sciences, 1861 Old Spanish Trail.

## Counterfeit Currency

Counterfeit currency, whether seized or purchased, will be tagged as U.S. Secret Service evidence. The following procedures for tagging counterfeit currency should be followed:

a. In cases where counterfeit currency has been seized but no arrest has been made, the counterfeit currency should be tagged in the lock box or property storage facility.

b. In counterfeit currency cases where a suspect has been arrested, officers should contact the Secret Service 24-hour Duty Desk (713-868-2299) before tagging the counterfeit currency in the lock box or property storage facility. A Secret Service agent will be available between 0700 and 2200 hours, Monday through Friday. An answering service will have an agent promptly return call at all other times.

c. Property other than documents, credit cards, videotapes, or counterfeit currency that is collected during a forgery or fraud investigation should be tagged in the lock box or property storage facility.

## Narcotics

Officers who seize narcotics will submit them to the lock box or property storage facility.

Officers will list all weights and counts as approximate values. Any official testing will indicate the exact weight or count in its report.

### Field Tests on Controlled Substances

If a controlled substance must be field tested, a small sample of the suspected substance should be taken out of the container and the field test performed in a separate vessel. After the field test, the test vessel should be rinsed thoroughly and discarded.

Employees will not perform field tests on trace amounts of powder or items such as syringes, spoons, pipes, or other paraphernalia that contain residues. Field tests will not be done on any single dosage unit.

## Lost Property

Property that comes into the custody of the department that is categorized as "Lost/Found" may be returned to the owner or tagged in the lock box or property storage facility until the owner can be identified and located. Regardless of the disposition of the property, an incident report will be generated.

## Prisoner Property

All prisoner property accepted by the jail will be handled according to the jail policy and procedures. Certain items cannot be accepted into the jail because of space and safety reasons (e.g., bulk items, bicycles).  This type of prisoner property will be taken to the property storage facility for storage.

Whenever prisoner property is to be stored in a property storage facility, it will be documented in the incident report. If the arrest does not otherwise require an incident report, the submitting officer will create one and list the property within.

### Related Department Manual Policies and Reference Material

- 300.02, **Effecting Arrests and Searches**
- 300.06, **Body Worn Camera**
- 300.12, **Response to Resistance**
- 300.16, **Conducted Energy Devices**
- 300.20, **Handling Publicly Intoxicated Persons**
- 300.21, **Driving While Intoxicated**
- 300.26, **Class C Misdemeanors**
- 300.36, **Towing**
- 300.41, **Required Booking Information and Procedures**
- 300.40, **Asset Seizure and Forfeiture**
- 400.05, **State Property**
- Texas Southern University Department of Public Safety Standard Operating Procedure, Evidence

# Warrant Service Procedures

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Texas Southern University Department of Public Safety officers may serve criminal warrants within the TSUDPS jurisdiction. Officers may also serve civil warrants, including mental health warrants only when specifically directed to do so by a magistrate.

Officers may execute search warrants issued by any magistrate's court having jurisdiction, but only if the location to be searched is with the TSUDPS jurisdiction. If the location to be search is outside the TSUDPS jurisdiction, officers shall seek the assistance of the police department, county sheriff, or precinct constable responsible for that jurisdiction.

If an officer is directed by a supervisor to serve a criminal warrant outside the TSUDPS jurisdiction, the officer shall call the local law enforcement agency responsible for that jurisdiction and request assistance in executing the warrant. If the time delay involved is likely to result in the subject fleeing from the location, the officer may serve the warrant.

Officers are not to permit private investigators or any other citizen to participate in the running of an open warrant. With the approval of the Captain or higher authority, officers may permit members of the media, employees of the district attorneys' office, grand jurors, or citizens on a ride-along to view a warrant service from a safe distance. Barring this special authorization, citizens are not to accompany or be provided any information concerning the timing or details of a warrant execution.

This Department Manual Policy applies to all employees.

## Obtaining Warrants

The Harris County Sheriff's Office is responsible for maintaining all criminal warrants filed for Harris County. These files are available to officers 24 hours a day, 7 days a week. Harris County warrants can be obtained at the Harris County Sheriff's Office, Criminal Warrants Division.

## Due Diligence/Prioritization

All warrants shall be executed with due diligence and in accordance with the statutes of limitation. Officers' attention to warrants shall be based on the seriousness of the original offense. In general, warrants for which the original offense involved a violent felony shall receive priority attention over less serious offenses.

If an officer reasonably believes that the person named on a warrant may flee or if the information needed to arrest the suspect is known to be current, the officer shall give such warrants immediate attention.

In all cases, officers shall supplement the original incident report after attempting to serve a warrant, whether or not the attempt was successful.

## Information From Citizens On Outstanding Warrants

If an officer receives information from a citizen about a wanted suspect, the officer shall first verify that the warrant is active and then contact the concerned department and investigators to verify that execution of the warrant will not interfere with any ongoing investigation. After obtaining these verifications, the officer shall notify his or her supervisor, request permission to execute the warrant, and then execute the warrants.

## Confirmation Of Warrants Held By The Harris County Sheriff's Office

If the Harris County Sheriff's Office has an arrest warrant on a suspect, an officer should confirm that the warrant is still valid by contacting the Harris County Sheriff's Office, Criminal Warrants Division prior to attempting an arrest.  The employee confirming the warrant should obtain the following information:

     a.  Type of warrant (bond forfeiture, motion to revoke probation, "to-be," indictment)

     b.  Warrant number, court of jurisdiction, and date the warrant was issued

     c.  Bond amount

     d.  Name of the Harris County deputy confirming the warrant

In addition to the above items, if the arrest warrant is a "to-be" warrant the name of the originating agency and the original case number should also be obtained for future reference.

If the suspect is arrested, the arresting officer shall immediately advise Harris County Sheriff's Office, Criminal Warrants Division personnel of the arrest, and request they place the warrant in the "Hold Box." This will prevent officers from trying to execute warrants that have already been served.

## Documenting Warrant Service Attempts

Officers who attempt to serve a warrant shall supplement or write an original report whether or not the warrant was successfully served. The report shall contain all the details of the warrant service attempt.  If the warrant service attempt was unsuccessful the narrative shall include any additional information that the officer was able to obtain as the suspect's hang-outs, place of employment, vehicles driven, new address, etc.

It shall be the responsibility of the officer who attempted to serve the warrant to ensure that the proper report has been entered.

## Related Department Manual Policies and Reference Material

- 300.02, **Effecting Arrests and Searches**
- 300.11, **Handling Persons Exhibiting Mental Health Crisis**
- Texas Code of Criminal Procedure, Article 15.17 and 15.18
- Texas Southern University Department of Public Safety Standard Operating Procedure, Searches Warrant and Warrantless

# Handling Publicly Intoxicated Persons

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

When appropriate and available, officers are encouraged to use alternatives for handling persons who are in violation of Texas Penal Code, Section 49.02, Public Intoxication. When circumstances meet the criteria outlined in this Department Manual, officers shall divert publicly intoxicated individuals to the custody of a responsible adult or the Houston Center for Sobriety (herein referred to as the "Center") as an alternative to arrest.

The goal of diverting such persons from the criminal justice system is to reduce the use of criminal justice resources and to assist individuals in receiving needed services.

This Department Manual Policy applies to all employees.

## Definitions

**Active Aggression.** A threat or overt act of an assault (through physical or verbal means) coupled with the present ability to carry out the threat or assault that reasonably indicates that an assault or injury to any person is imminent.

**Intoxicated.** Not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a control substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body; or having an alcohol concentration of 0.08 or more.

**Public Intoxication.** A person commits an offense if the person appears in a public place while intoxicated to the degree that the person may endanger himself or another person.

## Authority

State law (Code of Criminal Procedure, Article 14.031) authorizes a peace officer to take or send a publicly intoxicated person to certain places under certain conditions.  The law states that:

In lieu of arresting an individual who is not a child as defined by Texas Family Code, Section 51.02 and who commits an offense under Texas Penal Code, Section 49.02, a peace officer may release the individual if:

    a.   The officer believes detention in a penal facility is unnecessary for the protection of the individual or others; and

    b.   The individual:

        1.   Is released to the care of an adult who agrees to assume responsibility for the individual; or

        2.   Verbally consents to voluntary treatment for chemical dependency in a program in a treatment facility license and approved by the [Texas Department of State Health Services], and the program admits the individual for treatment.

The Center is able to serve as the responsible adult under the state law referenced in item "b(1)" above.

## Persons Not Eligible For The Center

The following persons are not eligible to be transported to the Center:

a. Intoxicated individuals less than 18 years of age. State law does not allow the Center to accept anyone less than 18 years of age.  These individuals shall be handled in the following manner:

   1. Persons seventeen years of age and charged with public intoxication may be released to a parent or legal guardian or arrested and placed in a jail.

   2. For juveniles (less than 17 years of age) investigated for public intoxication, see Department Manual 200.32, **Disposition of Arrested Juveniles**.

b. Intoxicated individuals who are unconscious, bleeding from a head injury, or experiencing a serious medical condition.  (Officers shall request medical personnel to evaluate the individual.)

c. Intoxicated individual's displaying signs of active aggression. (Individuals shall be transported to a jail).

d. Intoxicated individuals who are exhibiting signs of being suicidal and/or having a mental health crisis. (Individual shall be transported to the NeuroPsychiatric Center [NPC] at Ben Taub Hospital.)

e. Intoxicated individuals who cannot be identified as noted in this Department Manual. (Individuals shall be transported to a jail).

f. Intoxicated individuals with a Class C or higher warrant.  (Individuals shall be transported to a jail.)

g. Intoxicated individuals who are also being charged with a Class C offense involving violence, narcotics, vice, or criminal mischief, or any greater offense.  (Individuals shall be transported to a jail.)

h. Intoxicated individuals who are suspect of driving under the influence of alcohol or other drugs. (Individuals shall be processed in accordance with Department Manual 300.21, **Driving While Intoxicaed**.)

i. Intoxicated individuals with an Immigration and Customs Enforcement detainer. (Individuals shall be transported to a jail.)

## Procedures

As set forth above, when circumstances meet the criteria outlined in this Department Manual, officers shall divert publicly intoxicated individuals to the custody of a responsible adult or the Center as an alternative to arrest.

Accordingly, whenever either of the below exists, supervisor approval is required to place an individual in a jail instead of taking the person to the Center or releasing custody of the person to a responsible adult:

a. An individual is arrested solely for public intoxication.

b. An individual arrested for public intoxication to be charged with a less serious Class C misdemeanor offense not involving violence, narcotics, vice, or criminal mischief.

Officers deciding to place an individual in a jail when either of the above applies shall request a field supervisor to the scene. Upon notification, the field supervisor shall immediately respond to the scene. Supervisors shall not grant permission to place the individual in a jail without being present at the scene. The arresting officer shall explain to the responding supervisor why the individual

requires placement in a jail. The arresting officer shall document the approving supervisor's name, employee number, and reason for placing the individual in a jail in the offense report.

If an individual is intoxicated on a substance other than alcohol, such as marijuana, glue, pain, or any other drug, the individual shall be handled in the same manner as if he were under the influence of alcohol.

For individuals accepted by the Center or who are released to a responsible adult, officers shall not issue a Class C citation for the offense of public intoxication.

## Other Less Serious Class C Charges

If an individual arrested for public intoxication is to be charged with a less serious Class C misdemeanor offense not involving violence, narcotics, vice, or criminal mischief, the officer shall issue a citation for the less serious Class C misdemeanor charge(s) when the person is taken to the Center or is released to the custody of a responsible adult.

If the individual is unable or refuses to sign the citation, the officer shall complete the Refused/ Unable to Sign Affidavit form.  See Department Manual 300.26, **Class C Misdemeanors**.

## Medical Conditions

Officers observing persons whom they believe to be intoxicated are reminded that certain medical conditions can be mistaken for intoxication. Officers shall check for a medical identification bracelet or other similar item that may indicate the person has a medical issue.

Any detainee who exhibits signs of possible acute alcohol intoxication (alcohol poisoning) or other serious medical condition shall be evaluated by Emergency Medical Services. If responding medical personnel determine that the individual requires transportation to a hospital for further treatment, officers may assist, but shall not transport the intoxicated person themselves. If a person is not being charged with a crime and does not pose an immediate threat to medical personnel, there is no need for officers to follow medical personnel to the medical facility.

Identifiable symptoms of acute alcohol intoxication may include:

    a.  Unconsciousness or semi-consciousness

    b.  Repeated episodes of vomiting

    c.  Vomiting while sleeping or passed out and not waking after vomiting

    d.  Inability to walk or stand

## Identification

If an officer believes it is necessary to take an intoxicated individual into custody for his or her own safety or for the public's safety, the officer shall check the person's identification and check for outstanding warrants or fugitive status.

Prior to an individual being taken to the Center, officers shall verify the person's identity. Some form of government issued photo identification is preferable. If this or other photo identification is not available, officer shall use the department's computer system, mobile computing device, portable Automated Fingerprint Identification System, mug shot identification system, etc. to confirm the validity of the personal information provided by the person in custody.

Intoxicated individuals without satisfactory identification, but known to the officer, may be transported to the Center based on the officer's familiarity with the individual.

Unsatisfactory identification requires officers to transport intoxicated individuals to a jail with the criminal charge of public intoxication.

### Search and Transport

Officers shall release all eligible nonaggressive adult individuals (age 18 years or older) found to be publicly intoxicated to the custody of a responsible adult of the Center for Sobriety located at 150 N Chenevert St., Houston, Texas. At the Center, officers shall enter the facility using the marked "Police Entrance."

When transporting publicly intoxicated individuals, officers shall handcuff, search, and transport them in the same manner as prisoners in accordance with Department Manual 300.02, **Effecting Arrests and Searches** and 300.05, **Handling and Transporting Prisoners and Other Persons**.

If an intoxicated individual is found to be in possession of illegal weapons, illegal narcotics, or contraband, officers shall contact the District Attorney's Office to seek appropriate charges. If charges are accepted the individual shall be placed in jail.

If charges not accepted by the District Attorney's Office, the intoxicated individual shall be released to the custody of a responsible adult of the Center. Officers shall tag all firearms, illegal weapons, illegal narcotics, and contraband according to department policy and complete and incident report. These items shall not be left at the Center.

## Processing At The Center

### Property

Center personnel are responsible for the inventory, safekeeping, and return of all property to individuals processed through the Center.

### Medical Screening

All individuals transported to the Center will be subject to a brief medical evaluation by personnel at the Center. If medical issues are present that are beyond the scope of the services at the Center, personnel at the Center will assume custody of the intoxicated individual and arrange for medical transportation. Officers are not required to wait while medical transportation is arranged.

### Documentation

Officers utilizing the Center shall complete the Center's public intoxication jail diversion form available in the officer work area at the Center. Officers shall leave a copy of the form with the Center staff. No incident report is required unless circumstances and addressed in Department Manual 400.14, **Criteria for Submitting Incident Reports**, are present.

## Removing Individuals From The Center

During the Center's intake procedure the trained staff may reject the admission of a person for specific reasons. When this occurs the officer will be given a rejection slip with the reasons listed. Depending on the reason the officer may be directed to NPC or the jail. Upon arrival at the appropriate location, officers shall give the rejection form to the staff to assist in processing.

On occasion Center personnel may find it necessary to request a police response to the location in order to address the criminal behavior of an individual placed at the Center. Officers responding to calls for service at the Center must remain cognizant of the fact that any decision to arrest must be based on probable cause that a crime has occurred. Officers responding to the Center shall clearly establish the elements of the offense existing at the time they respond (e.g., assault, threat, criminal mischief).

Intoxicated individuals who remain within the Center may not be charged with public intoxication because the Center shall not be considered a public place.

Individuals who choose to leave the Center may be charged with public intoxication if the responding officer determines that the individual is intoxicated, appears in a public place, and is a danger to himself or others.

If an individual is to be arrested for the offense public intoxication, it shall be based on the officer's observations at the time of responding to the call for service at the Center and not based on the observations of the officer who originally brought the individual to the Center.

Officers responding to calls for service from the Center to deal with persons at the Center for criminal violations shall request a supervisor to the scene for authorization prior to arresting and removing the person from the Center.  Officers shall inform the jail staff the individual was a "Sobering Center Client."

## Related Department Manual Policies and Reference Material

- 200.32, **Disposition of Arrested Juveniles**
- 300.02, **Effecting Arrests and Searches**
- 300.05, **Handling and Transporting Prisoners and Other Persons**
- 300.11, **Handling Persons Exhibiting Mental Health Crisis**
- 300.16, **Conducted Energy Devices**
- 300.18, **Property and Evidence**
- 300.21, **Driving While Intoxicated**
- 300.26, **Class C Misdemeanors**
- 300.41, **Required Booking Information**
- 400.14, **Criteria for Submitting Incident Reports**
- Texas Code of Criminal Procedure, Article 14.031
- Texas Family Code, Section 51.02
- Texas Penal Code, Section 49.02, Public Intoxication

# Driving While Intoxicated
**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The Texas Southern University Department of Public Safety shall investigate and, if probable cause exits, arrest and charge persons who violate the driving while intoxicated (DWI) laws of the state of Texas. As part of the department's efforts to ensure the safety of members of the community and emergency responders, officers who become aware of or have knowledge of a possible intoxicated driver shall investigate the incident to determine if probable cause exists to make an arrest for DWI. This includes if the offense occurs on private property open to public use. A lesser charge of a traffic violation or public intoxication shall not be filed in lieu of the DWI charge. An officer who is found to have failed to investigate a suspected intoxicated driver shall be subject to disciplinary action up to and including indefinite suspension.

This Department Manual Policy applies to all employees.

## Definitions

**Child.**  A person who is 10 years of age or older and under 17 years of age.

**Minor.**  A person who is under 21 years of age.

## DWI Facility

After arresting a DWI suspect and properly disposing of the suspect's vehicle, the officer shall transport the prisoner to the nearest police facility capable of processing a DWI suspect.

An intoxilyzer facility identified by the Texas Southern University Department of Public Safety, The Texas Department of Public Safety Breath Alcohol Testing Program, or the District Attorney's Office shall be utilized for processing a DWI arrest. Unless participating in a joint DWI take force operation, the breath test shall be conducted in the same county as the arrest.

Upon arrival at the police DWI facility capable of processing a DWI suspect, the arresting officer shall:

    a.  Ensure prisoners are handcuffed at all time while in the video section except while being recorded or given an intoxilyzer (breath) test.

    b.  Complete all applicable forms.

**Note:** Employees should be sensitive to the fact there are health conditions (e.g., diabetic shock) that appear as intoxication. Leaving such conditions untreated could cause death or severe  injury to the prisoner. Employees having reason to believe such a condition could be present shall call an ambulance to evaluate the prisoner's medical condition.

## DWI Evidence Technicians

There are DWI evidence technicians on duty during all shifts to assist officers with their DWI cases. DWI evidence technicians' responsibilities shall include:

    a.  Administering breath tests.

    b.  Drawing blood on DWI suspects.

    c.  Administering standardized field sobriety tests.

    d.  Assisting officers with completing paperwork.

    e.  Maintaining a sign-in log sheet and blood kit sign-out log.

**Violent DWI Prisoners**

Violent prisoners shall remain handcuffed and shall be taken directly to a designated jail facility. Violent prisoners shall not be taken into a video room to be recorded or given a breath test. In such cases, the arresting officer shall compete applicable Driver Improvement Center (DIC) forms, indicating the prisoner refused a breath test and document in the incident report why a breath or blood specimen was not obtained.

## Intoxilyzer (Breath Test)

Before requesting a breath specimen, the arresting officer shall complete a criminal background check on the suspect to determine whether or not the suspect qualifies for a mandatory specimen (see section Blood Test). If the suspect does qualify for a mandatory blood specimen then the arresting officer shall request blood from the suspect and execute a Mandatory Blood Specimen form (THP-51) only in the event the suspect refuses to provide the required specimen.

If the arresting officer is assisted by an evidence technician at the DWI processing facility, the officer must remain present during the entire time the evidence technician is conducting the breath test and video recording. Since the evidence technician is not a sworn peace officer, the arresting officer shall read the Statutory Warning (DIC-24) to the suspect on the video recording and request the specimen of breath and/or blood.

The arresting officer is responsible for completing the following procedures prior to the administration of a breath test from the suspect:

a. Read aloud the DWI statutory warning.
b. Furnish the prisoner with a copy of the DIC-24 (Statutory Warning).
c. Explain the charges.
d. Request the taking of a specimen of breath or blood in order to analyze and determine the alcohol concentration.

Once a specimen is requested and the prisoner provides a breath specimen of 0.08 or higher, the arresting officer shall compete the Peace Officer's Sworn Report form (DIC-23). The arresting officer shall also complete the Notice of Suspension form (DIC-25) and give the prisoner the Driver's Copy, which outlines the procedures for requesting an administrative hearing regardless if the suspect has a license or not.

### Refusal or Failure of Breath Test

In DWI arrests in which a person either refuses to be tested or fails the breath test, the arresting officer is required to confiscate the person's Texas driver license, if the person has a license, and issue a DIC-25 (Notice of Suspension) to any person refusing to provide a specimen.

When the license is confiscated, the arresting officer shall paper clip (not staple) the Texas driver license to the Administrative License Revocation (ALR) forms and submit the package to be filed. The ALR forms include the following:

a. Peace Officer's Sworn Report (DIC-23).
b. Statutory Warning (DIC-24).
c. Notice of Suspension (DIC-25). The officer shall give the prisoner the Diver's Copy, which outlines the procedures for requesting an administrative hearing regardless if the suspect had a license or not.
d. Other equivalent forms applicable to a commercial vehicle (DIC-55, DIC-57).

If the suspect refuses to be processed or provide a breath specimen, then one of the following, as applicable, shall occur:

e.  If the arresting officer in the field is equipped with a body worn camera, the officer shall record the refusal on the body worn camera by reading aloud the Statutory Warning (DIC-24) verbatim. The officer shall give the suspect an opportunity to sign the DIC-24 indicating that the suspect has refused to provide a specimen. If the suspect does not sign the DIC-24, the officer shall check the box on the DIC-24 indicating that the suspect refused to provide a specimen and also refused to sign the DIC-24. The officer shall document in the incident report that the refusal was recorded on the officer's body worn camera. The officer shall proceed to a designated DWI facility, complete the process, and file the appropriate charge.

f.  If the suspect refuses to provide a breath specimen while being processed at a designated DWI facility, the intoxilyzer operator shall give the suspect an opportunity to sign the DIC-24 indicating that the suspect has refused to provide a specimen. If the suspect does not sign the DIC-24, the intoxilyzer operator shall check the box indicating that the prisoner refused to sign the DIC-24.

Officers shall follow the procedures listed in section *Suspects Registering Less Than 0.08 Breath-Alcohol Content* when handling prisoners who pass the breath test and yet appeared to be impaired.

## Video Session

The arresting officer shall notify a DWI evidence technician when a prisoner is ready to be video recorded to complete the intoxilyzer procedures.  The following procedures shall be completed:

a.  The reading of the DIC-24 and all breath testing shall be video recorded. It is not required to record the 15-minute waiting period.

b.  Obtain the prisoner's criminal history and driver license records including FBI, state ID, and SPN numbers, if available.

c.  Complete all necessary incident reports.

d.  Enter charges in the District Attorney Intake Management System (DIMS).

e.  Book the suspect into jail.

The arresting or transporting officer shall deliver all original completed forms including the DIC forms, breath test slip, and video tracking form to the appropriate TSUDPS employee who handles the DWI process.

## Blood Test

### Mandatory Blood Specimen

If a suspect refuses the officer's request for a voluntary blood sample after the officer reads the suspect a DIC-24 (Statutory Warning), a blood sample shall be required from a suspect if any of the following circumstances existed regarding the same incident:

a.  At the time the suspect was arrested, the officer reasonably believed that a person died or may die as a result of the crash and the suspect's intoxication was the cause of the crash.

b.  At the time the suspect was arrested, the officer reasonably believed that a person other than the suspect had experience serious bodily injury as a direct result of the crash and the suspect's intoxication was the cause of that crash.

c.  At the time the suspect was arrested, the officer reasonably believed that someone other than the suspect suffered bodily injury and was transported from the scene for medical treatment.

d. The officer had information from a credible source that the suspect has two more prior convictions, flying while intoxicated, boating while intoxicated, or assembling or operating an amusement ride while intoxicated.

e. The officer had information from a credible source that the suspect had a child 14 years of age or younger in the vehicle at the time the suspect committed the offense.

f. The officer had information from a credible source that the suspect has been convicted of DWI with a child passenger, intoxication assault, or intoxication manslaughter.

If a specimen is required, the arresting officer shall request the taking of a blood specimen. If the suspect refuses a blood specimen, the officer shall complete and submit a Mandatory Blood Specimen form (THP–51). The officer shall then contact a District Attorney and complete an affidavit for a search warrant blood draw. Once the warrant is completed, notarized, and signed by a judge, the officer shall have the suspect's blood drawn. Requested or required blood samples shall be drawn by only qualified medical personnel on duty at a hospital or medical facility, a qualified technician provided by District Attorney's Office, or a qualified technician at the DWI processing facility.

There may be certain situations or exigent circumstances in which an officer cannot wait for a war-rant prior to having blood drawn. In these cases, the officer shall contact the on-call Vehicular Crimes Prosecutor to have blood drawn.

DWI blood vials shall be tagged in the property storage facility. This shall allow for timely refrigeration of the evidence prior to lab analysis.

## Refusal of Blood Test

If a suspect refuses to provide a blood specimen at the request of the officer and further refuses to allow the taking of a specimen when there is a mandatory requirement or search warrant for a specimen, then the officer shall use the minimal force necessary in order to obtain the specimen.

## No Refusal Programs

The District Attorney's Office may conduct a "No Refusal Night." On these nights the suspects shall be processed as requested by the District Attorney's Office and the officer shall complete an application for a search warrant for a specimen of the suspect's blood if the suspect refuses to provide the legally required specimen. The District Attorney's Office may provide a qualified technician that can be used to execute the blood warrant, and if they do not, the officer shall proceed to a hospital or medical facility where a qualified technician is on duty.

## Blood Search Warrants

During any shift, officers shall contact the Intake Division at the District Attorney's Office for assistance completing an application for a blood warrant. In these cases, the officer shall be required to take the prisoner to a hospital or medical facility **if there is not a DWI evidence technician or no-refusal nurse on duty**. The officer shall be responsible for returning the warrant to the district clerk's office after it has been executed.

During "No Refusal Nights" the District Attorney's Office shall provide the personnel needed to secure a warrant and execute the warrant at the location where the "No Refusal Night" is implemented.

## DWI Suspect's Personal Blood Sample

If a DWI prisoner has already given a sample of breath, the prisoner may request a blood sample be drawn by a person of the suspect's own choosing if all of the following conditions are met:

    a.   The sample is taken by a physician, registered nurse, or qualified technician.

    b.   The prisoner agrees to pay for the expense of the drawing and analysis of the sample.

    c.   The blood sample is taken within two hours following the arrest.

    d.   The person drawing the blood sample must come to the prisoner to take the sample. The person must also furnish the required equipment to properly take the sample.

## Suspects Registering Less Than 0.08 Breath–Alcohol Content

If a suspect has less than 0.08 breath–alcohol content and the arresting officer believes the prisoner is under the influence of another substance, the officer shall contact an on-duty supervisor. The on-duty supervisor shall attempt to arrange for the prisoner to be evaluated by a Drug Recognition Ex-pert (DRE). The evaluation shall be conducted at a designated DWI facility with a video room. A DRE shall not be requested until after a breath test has been administered. There is no requirement that a suspect's breath specimen be 0.00 for a DRE to be called, only that the impairment does not appear to match the test result. If the suspect refuses a breath test, the arresting officer shall contact an assistant district attorney to apply for a search warrant.

The on-duty supervisor shall contact the Houston Police Department, the Harris County Sheriff's Office, or the Texas Department of Public Safety dispatcher to determine if a DRE is available through these agencies. The DRE officer from another agency shall determine the location for the evaluation to be conducted.

If the suspect passes a DRE's evaluation and probable cause exists for filing other charges, the arresting officer shall contact an assistant district attorney for approval to file the other charges.

If the suspect passes all tests and evaluations and has a level of alcohol less than 0.05 and no other charges are filed, the arresting or transporting officer shall make an effort to recover the suspect's vehicle. If the suspect has a level of alcohol greater than 0.05, officers shall not attempt to recover the suspect's vehicle. The DWI traffic case report along with the DIC-24 and breath test slip shall be completed and submitted with the word "PASSED" written on the front of the report.

An operator of a commercial vehicle with a Gross Vehicle Weight Rating (GVWR) of 26,001 pounds or greater shall be read a DIC-55 (Statutory Warning), which states that the driver shall be disqualified for a refusal test result of 0.04 or greater. The officer shall confiscate the driver license and provide him with a DIC-57 (Notice of Disqualification), and provide the appropriate TSUDPS employee with the license and paperwork to be forwarded to the Texas Department of Public Safety (DPS).

## Drug Recognition Expert (DRE)

A DRE shall be called for all fatal crashes when the at-fault driver is not deceased. If fault cannot be determined prior to a crash reconstruction being completed, the DRE shall be called. Once a determination has been made that a DRE is needed at the scene, the driver/suspect shall be detained as a possible criminal suspect. Before, during, and after the completion of the evaluation, the DRE is responsible for communicating directly with the Vehicular Crimes Prosecutor to determine any charges. If the suspect is intoxicated, it is the responsibility of the DRE to gather the information necessary to file the appropriate charges.

A DRE shall be called if a TSUDPS employee is possibly under the influence of an intoxicant or at the request of any supervisor.

Cases involving fatal crashes or IAD investigations shall be handled by only DREs meeting qualifications set forth by the Agency DRE Coordinator. If one is not on duty, an off–duty DRE shall be requested by an on–duty supervisor.

## Urine Specimen

If a suspect refuses to take the intoxilyzer test or the blood test, but submits to having a urine sample taken, a refusal shall be indicated on the DIC–23, DIC–24, and DIC–25 for the tests refused by the prisoner.

A urine specimen may be taken from a prisoner when any of the following are true.  The suspect:

    a.   Consents.

    b.   Was driving any commercial vehicle.

    c.   Is suspected of being under the influence of drugs and has been examined by a DRE who then requests the urine sample.

## Children and Minors Driving Under The Influence

### DWI Suspects Under 17 Years of Age

DWI suspects under 17 years of age shall be taken to the intoxilyzer testing room and given the opportunity to submit a breath test, but the request to give a specimen must be video recorded. If the juvenile refuses the intoxilyzer test, a blood specimen shall not be requested unless the juvenile has an attorney present. If it is a case in which a mandatory blood specimen could normally be taken, a search warrant shall be completed and the specimen shall be taken without waiting for consent from an attorney. All paperwork should be turned into the appropriate TSUDPS employees for the DWI and juvenile process.

Juveniles shall be kept separate from adults both physically and by sight and sound. The juvenile suspect and copies of the paperwork shall be turned over to the appropriate TSUDPS employee who handles the juvenile process. Additionally, officer shall follow all procedures in Department Manual 200.32, **Disposition of Arrested Juveniles**, when handling juveniles.

### DWI Suspects Under 21 Years of Age

Adult DWI suspects who are under 21 years of age shall be investigated the same as any other DWI suspect. If during the investigation an officer determines that the suspect does not meet the legal definition of intoxication but has any detectable amount of alcohol, the suspect should be charged with the Class C offense of Minor Driving under the Influence of Alcohol or Minor DUI. A minor commits an offense if the minor operates a motor vehicle in a public place, or a watercraft, while having any detectable amount of alcohol in the minor's system.

**Note: The following does not apply to suspects who are under 21 years of age AND have been arrested for DWI.**

If a suspect is going to be charged with Minor Driving under the Influence of Alcohol, officers shall complete the following:

    a.   Read the DIC–24 to the suspect.

    b.   Complete the DIC–23 and DIC 25.

    c.   Provide the suspect with a copy of both the DIC–24 and DIC–25 prior to release or booking into a jail facility.

    d.   Turn in all DIC paperwork with the driver license to the appropriate TSUDPS employee so that it can be delivered to DPS.

    e.  Confiscate the suspect's driver license if it is a Texas license.

    f.  Issue a traffic citation titled "As a Minor Driving Under the Influence of Alcohol."

    g.  Tow the suspect's vehicle if a parent or registered owner of the suspect's vehicle cannot come to the scene.

Officers shall not allow a minor to drive away from a scene after issuing a citation for Minor DUI.

## Authorization for a Child's Breath or Blood Specimen

An officer who takes a child into custody and who has reasonable grounds to believe that the child has been operating a motor vehicle in a public place while having any detectable amount of alcohol in the child's system shall do one of the following:

    a.  Take the child to a place to obtain a specimen of the child's breath or blood.

    b.  Arrange for intoxilyzer processing and video recording of the child in an adult processing office of a law enforcement agency.

## Breath Specimen: Child Can Submit or Refuse Without Attorney

A specimen shall not be taken if a person refuses to submit to the taking of a specimen designated by a peace officer. A child taking into custody may submit to the taking of a breath specimen or refuse to submit to the taking of a breath specimen without the concurrence of an attorney, but only if the request made of the child to give the specimen and the child's response to that is video recorded.

## Blood Specimen: Child Can Submit or Refuse With Attorney Only

A child cannot voluntarily submit to a blood specimen on his own; the child and his attorney would have to agree to give up the child's rights.

## Search Warrants and Mandatory Blood Draws

In the event that a juvenile is arrested for DWI and one of the situations exists that mandates the officer take a blood specimen, the officer shall complete the THP–51 and complete a search warrant in order to obtain a specimen of the juvenile's blood as outlined in section *Blood Test*, subsection "Mandatory Blood Specimen."

If a juvenile is arrested for DWI refuses to provide a specimen of breath as requested by the officer (on video), the officer may apply for a warrant to have an authorized specimen taken from the juvenile. In those instances, the juvenile shall be processed as outline in section *Blood Test*, subsection "Blood Search Warrants." Remember that the juvenile shall be kept separate from adult prisoners during this process.

## Related Department Manual Policies and Reference Material

- 200.32, **Disposition of Arrested Juveniles**
- 300.02, **Effecting Arrests and Searches**
- 300.06, **Body Worn Cameras**
- 300.12, **Response to Resistance**
- 300.18, **Property and Evidence**
- 300.20, **Handling Publicly Intoxicated Persons**
- 300.23, **Crash Investigations**
- Texas Family Code, Section 52.02
- Texas Transportation Code, Section 724.013

# High Risk Vehicle Approaches

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Officers shall have a back-up unit before attempting a high-risk vehicle stop (felony stop) or attempting the arrest of high-risk suspects who refuse to exit a vehicle. A supervisor shall make the scene of all high-risk traffic stops.

Before approaching any vehicle considered high risk, officers shall first attempt to establish verbal communications with suspects. Officers shall maintain a position of advantage during this attempt while also remaining mindful of potential crossfire situations. A high-risk suspect's actions, along with the occupants' actions, age, and physical limitations, shall dictate any further course of action for officers on the scene based on this and all related Department Manual.

This Department Manual Policy applies to all classified employees.

## Background

The department has identified three vehicle approach situations posing a high risk:

    a. Attempting apprehension of armed or possibly armed suspects.

    b. Attempting apprehension subsequent to a fresh pursuit when some of all of the occupants remain inside the vehicle.

    c. Attempting apprehension subsequent to a fresh pursuit when the suspect has exited the vehicle but remains in close proximity to the vehicle.

Armed suspects in a vehicle have a superior tactical position with respect to officers attempting an approach. In addition, an approaching officer's line of sight may be disrupted by window tinting or the vehicle itself. The inability to view the occupants of a vehicle poses an extreme hazard to approaching officers as well as vehicle occupants.

Additionally, when a potentially armed suspect has exited a vehicle but remains in close proximity to the vehicle, the suspect poses a substantial risk or reentering the vehicle or utilizing the vehicle to gain a tactical advantage, thereby placing the officer in a compromised and potentially dangerous situation.

## High–Risk Vehicle Approach Situations

High–risk vehicle approach situation are when suspects in a vehicle are being confronted by officers and any of the following apply:

    a. Suspects are believed to possess deadly weapons.

    b. Suspects are believed to have been involved in criminal activity involving the use of deadly weapons.

    c. Suspects have engaged officers in fresh pursuit as defined by Department Manual 300.10, **Motor Vehicle Pursuits**.

It is not necessary for the suspects to remain in the vehicle to be considered a high-risk vehicle approach situations (see section Background item (c)).

## Procedures

In the above situations officers shall adhere to the following guidelines after the vehicle has stopped:

a. Attempt to establish verbal communications with suspects while remaining a position of advantage.

b. If verbal communications can be established, have the suspects exit the vehicle one at a time.

c. Each suspect shall be secured before others are made to exit the suspect vehicle.

d. If a suspect flees from the vehicle, officers shall use their discretion in making an apprehension in accordance with existing department procedures.  See Department Manual 300.35, **Foot Pursuits**.

e. If a suspect flees from the vehicle, officers shall adhere to the guidelines set forth in Department Manual 300.12, **Response to Resistance** and 300.10, **Motor Vehicle Pursuits**.

f. If a high-risk suspect refuses to comply with officers and the suspect is known to be or suspected of being armed, officers shall use the policy guidelines set forth in Department Manual 300.25, **Special Threat Situations**.

## Related Department Manual Policies

- 300.02, **Effecting Arrests and Searches**
- 300.05, **Handling and Transporting Prisoners and Other Persons**
- 300.08, **Firearm and Soft-Impact Weapon Discharges**
- 300.10, **Motor Vehicle Pursuits**
- 300.12, **Response to Resistance**
- 300.16, **Conducted Energy Devices**
- 300.25, **Special Threat Situations**
- 300.35, **Foot Pursuits**
- 400.14, **Criteria for Submitting Incident Reports**

# Crash Investigations

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## POLICY

Motor vehicle crashes represent a major cause of death, personal injury, and financial loss. Employees shall follow the procedures and priorities for handling crash investigations in this Department Manual Policy.

This Department Manual Policy applies to classified employees and communication personnel.

## ASSIGNMENT OF CALLS

Upon receiving a citizen's request for a crash investigation, the dispatcher shall send an officer to the scene to investigate the crash.

Unless one of the following situations applies, no investigation is required and the officer shall issue a Texas Department of Transportation *Driver's Crash Report* (Form CR-2), also known as a "blue form", for citizens to complete and submit per the form instructions. A citizen merely demanding a crash report is not a required reason for an officer to conduct an investigation.

a. Someone was injured in the crash.

b. A driver involved in the crash is or appears to be intoxicated.

c. A driver involved in the crash does not have a driver license.

d. A driver involved in the crash is unable to provide proof of financial responsibility.

e. A vehicle involved in the crash is not mechanically able to be driven from the scene.

f. Federal, state, county, or State property and/or vehicle are involved.

g. A hit-and-run collision occurred.

h. A school bus (public or private) is involved.

i. The motor vehicle crash involved a bicyclist or pedestrian.

Unless one of the aforementioned situations applies, dispatchers shall instruct citizens to move their vehicles to a safe location off the freeway or roadway and to exchange information.

If a party insists that an officer respond to the scene or an officer on-views or is flagged down concerning a minor vehicle crash, the arriving officer shall make an inquiry. If no investigation is required and none of the aforementioned situations applies, the officer shall issue a Texas Department of Transportation *Driver's Crash Report* (Form CR-2), also known as a "blue form," for citizens to complete and submit per the form instructions. A citizen merely demanding a crash report is not a required reason for an officer to conduct an investigation. If the circumstance allow a blue form to be issued at the scene, a blue form may also be issued at a police station.

A Houston Police Department, Harris County Sheriff's Office, or Texas Department of Public Safety shall be called to motor vehicle crashes involving any of the following:

j. A fatality

k. Failure to stop and render aid (FSRA) with serious bodily injury

l. Any law enforcement vehicle or any fire department vehicle

m. Catastrophic or life-threatening injury.

## Crashes On Private Property

Officers shall investigate motor vehicle crashes that occur on private property only when they result in serious bodily injury or death. Private property includes private residential property or the property of a garage parking lot for which a charge is made for storing or parking a motor vehicle.

For crashes occurring on "public" private property (e.g., shopping center parking lots, apartment parking lots), the only violation for which for which officers may issue a citation is backing not in safety. The only charges that may be filed involving a crash on "public" private property are:

    a.  Failure to stop and give information (FSGI)

    b.  Failure to stop and render aid (FSRA)

    c.  Driving while intoxicated, intoxication assault, et.

## Crash Scene Management

Unless circumstances allow for issuance of Driver's Crash Report (blue form), officers on the scene of a vehicle crash shall manage the scene, conduct an investigation, gather crash scene information, and complete a crash report as outlined in this Department Manual.

Vehicles involved in minor crashes are to be removed from the freeway or roadway to crash investigation sites or other safe places that will not distract the attention or other drivers.

At major or fatal crash scenes, officers not directly involved in the investigation shall direct traffic around the scene. The scene supervisor is responsible for ensuring that police officers direct traffic at the appropriate locations in order to return traffic flow to normal as quickly as possible.

Officers responding to a crash scene involving a fatality, potential fatality, or an FSRA with serious bodily injury shall ensure that the HPD, HSCO, or TxDPS has been notified for assistance.

Whenever possible, officer shall photograph State equipment or State property involved in a crash. Private photographers may take photographs of any crash or crime scene, unless doing so interferes with the on-scene investigation.

Unless other instructed by a supervisor (including outside agency supervisors), officers shall clear crash scenes as quickly as possible after obtaining all crash scene information necessary to complete a crash report. If officers respond to a crash scene that involves a fatality or potential fatality, they are to protect the scene until the arrival of HPD, HSCO, or TxDPS officers, who shall take control of the scene. Officers shall complete crash reports only after crash scenes are cleared.

Any portion of a vehicle or its load is considered a part of that vehicle. This includes a trailer whether it is damaged or not. For crashes involving oil spills or the loss of a load, cleanup crews and heavy equipment (e.g., front-end loaders) are available 24 hours a day from the Texas Department of Transportation.

Officer may contact the Houston Police Department Truck Enforcement Unit to assist on a crash involving a commercial vehicle with a gross vehicle rating of 10,001 pounds or greater, under any of the following circumstances:

    a.  Fatality traffic crashes

    b.  Crashes involving road closures

    c.  All hazardous materials incidents

    d.  Major freeway incidents

    e.  Crashes involving any State vehicle

    f.  Crashes involving any law enforcement vehicle or any fire department vehicle

    g.  Lost or shifted loads and any other circumstances that create a danger to public safety.

## Crash Information

Officers shall ensure that the following information is exchange between the parties involved in a crash:

a. Name and address of drivers

b. Driver license information

c. Motor vehicle liability insurance information (not amounts of insurance coverage)

d. License plate number of the vehicles involved

e. Vehicle identification number (VIN) printed the VIN plates of the vehicles involved.

Crash victims who want a copy of crash report should be advised to wait 10 calendar days from the date of the crash before requesting a copy. Citizens can purchase a copy of their crash report via the Internet.

It is important that officers obtain all authorized proof of financial responsibility information from the drivers involved in a crash and that they list this information on the crash report. If a driver does not have proof of financial responsibility, which may be presented via a cellular telephone, the crash report shall include the number of the citation issued to the uninsured driver. If a driver claims to have proof of financial responsibility or produces an expired proof of financial responsibility card, officers must attempt to verify the proof of financial responsibility by conducting a registration check through the TexasSure program using a mobile computing device (MCD) or the dis-patcher, prior to noting this on the crash report and issuing the driver a citation.

While gathering information needed for the crash report, officers are required, if physically possible, to note the VINs by personally observing the VIN plate on each involved vehicle as opposed to obtaining the VINs from other sources.

Officers responding to a fatal or possible fatal crash scenes shall make every effort to keep witnesses on the scene until a crash investigator arrives. While officers may not detain persons who are only witnesses, officers should stress the importance of the witness statement and encourage them to remain on the scene. In general, any restraint or detention of a person that amounts to a seizure is unreasonable unless justified by reasonable suspicion or probable cause. Officers should at a minimum obtain name, address, and telephone numbers of all witnesses that need to leave the scene of the crash so that they can provide a statement to investigators at a later time.

In conducting a crash investigation involving serious bodily injury or death, if an officer determines that the suspect who is at fault or caused the crash does not have a valid driver license or proof of financial responsibility, the investigating officer shall document these facts in an incident report.

If an officer determines that a crash involving a driver who intentionally hit another vehicle, person, or property, this is not an FSGI or FSRA incident. The officer shall complete an incident report for the appropriate offense instead of a crash report.

## Crash Violations

The violation of law that causes a collision shall be known on the citation with the word "accident" in parenthesis following the charge.  For example:

a. Ran red light (accident)

b. Changing lanes not in safety (accident)

c. Failure to control speed (accident) shall be used in most rear-end collisions with a moving vehicle and collisions with a parked automobile.

d.  Following too closely (accident) shall be used in all other appropriate incidents.

After completing an investigation, the officer should issue the property citation to the violator in a motor vehicle crash.  Valid reasons for not issuing a citation are listed below:

e.  Minor damage to the vehicles involved

f.  Mechanical failure that occurred at the time of the crash (e.g., it was not pre–existing)

g.  No damage to the complainant's vehicle

h.  Violator could not be determined

i.  Double violation committed (there were contributing minor violations by more than one involved driver)

j.  Unable to place driver behind the wheel

k.  Person has diplomatic immunity (see Department Manual 200.37, **Contact with Representatives of Foreign Governments**)

l.  A greater charge was filed (e.g., driving while intoxicated or driving under the influence of drugs)

m.  Extenuating circumstances, such as road hazards that caused the crash

If a citation is not issued, one of the reasons listed above shall be entered in the narrative section of the crash report.

Any and all citations written are set in the officer's regular traffic court and turned in after they have been logged in on the appropriate crash report.

Citations issued as a result of crash investigations must contain the incident number and must be separated from other citations.

## Crash Reports

### Officer's Responsibilities

FSGI, FSRA, and fatality incidents require both a crash report and an incident report. Officers shall not list the suspect as "charged" on the crash report unless charges have been filed. To support the ability to identify the suspect in such incidents, officers should include the following information in the incident report narrative:

a.  Detailed suspect description

b.  Suspect vehicle description

c.  Circumstances of the offense

d.  Witness statements describing their observations

e.  Whether or not a driver or witness can identify the suspect

f.  If the complainant wants to pursue criminal charges

When investigating an FSGI or FSRA incident, officers shall check the "Hit and Run" box on the crash report. If an individual is claiming injury but there is no visible injury apparent to the officer, the incident report title shall reflect "FSGI." The incident can be upgraded to FSRA at a later time if needed. The title of the incident report shall reflect "FSRA" if the incident involves an obvious or confirmed injury or death to a person.

## Notifications

When a crash involves five or more fatalities, officers shall contact the National Transportation Safety Board (NTSB) at their 24-hour telephone number, 202-314-6290.

The Harris County District Attorney's Office has a specialized unit to assist with the investigation of certain incidents involving motor vehicles. Any officer investigating an incident described below shall notify an on-duty supervisor, which who then shall contact the Vehicular Assault/Traffic Safety Team in the DA's Office.

a. Any vehicular incident, accidental or intentional, that results in serious bodily injury to a child less than 15 years of age.

b. Any vehicular incident, accidental or intentional, involving a fatality or homicide (excluding incidents in which the only potential suspect is deceased).

## Related Department Manual Policies and Reference Material

- 200.37, **Contact With Representatives of Foreign Governments**
- 300.10, **Motor Vehicle Pursuits**
- 300.21, **Driving While Intoxicated**
- 300.36, **Towing**
- 300.45, **Handling Dead Bodies Exposed to Public View**
- 400.08, **State Vehicle Crashes**
- 400.10, **Emergency Management Texas Transportation Code**
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.06.04 Driver Safety Policy

# General Broadcasts

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The department shall maintain systematic guidelines for the origination, dissemination, and control of General Broadcasts/Lookouts and pickup information of suspects, vehicles, and missing persons. Guidelines shall also be maintained for Communications Division personnel concerning the broadcasts of all calls for service.

This Department Manual Policy applies to all employees.

## Definitions

**Calls for Service Broadcast.** A means by which a dispatcher announces a call that is holding at a specific location. It is intended solely for dispatching and managing calls for service and units. It is not considered a General Broadcast/Lookout.

**General Broadcasts/Lookouts.** Files in the Computer Aided Dispatch system that contain information about crimes, wanted persons, missing persons, or vehicles. They may have a general or specific interest to police operations.

**Preliminary Pickup Information.** Information relayed over the radio or via the Computer Aided Dispatch/Mobile Computing Device (CAD/MCD) systems prior to entering a complete General Broadcast/Lookout. Preliminary information is relayed as soon as possible to expedite the apprehension of suspects, the location of victims or missing persons, or the dissemination of critical information for the safety of officers.

## Broadcasts

General Broadcasts (or Lookouts) are intended to provide police officers and investigators information that may be essential to their safety and the apprehension of suspects. A General Broadcast/Lookout may be initiated by any of the following:

 a. Citizens (reporting incidents)

 b. TSUDPS officers (responding to incidents)

 c. Other law enforcement agencies (reporting or responding to incidents)

 d. TSUDPS Dispatch (receiving information from officers)

 e. Communications personnel and dispatchers (receiving information from citizens)

Communication personnel and dispatchers may enter General Broadcasts/Lookouts on possible stolen vehicles or vehicles that may have been used in the commission of a crime. An entry should be made only after a call for service has been entered.

Dispatchers may enter General Broadcasts/Lookouts with information relayed to them from classified personnel. An entry shall be made only after an initial response by a unit on a call for service or an on-viewed incident. Responding officers are in the best position to determine if information should be disseminated.

### Transmitting Original Pickup Information

If the initial information regarding crimes such as aggravated robberies, kidnappings, assaults, auto thefts, or missing persons indicates the need for dissemination of preliminary pickup information, this information shall not be transmitted over the CAD/MCD systems as a General

Broadcast/Lookout until the dispatcher has received more complete information via the telephone, the police radio, or the MCD system.

Once provided to the dispatcher, the complete pickup information shall be disseminated as a General Broadcast/Lookout and maintained in accordance with these guidelines. Records shall be kept in the CAD system on all General Broadcast/Lookout requests and transmissions.

If a dispatcher determines information received over the telephone should be broadcast immediately, the dispatcher shall broadcast the preliminary information over the radio channel.

### Stolen Vehicles and Suspect Vehicles in General Broadcasts/Lookouts

Vehicles may be involved in incidents in a variety of ways, but auto thefts are the most frequently reported incidents involving vehicles.

When vehicles are reported as stolen or used in the commission of a crime such as a robbery or burglary and General Broadcast/Lookout for a vehicle is entered in CAD, the retention time for the General Broadcast shall be only one day.

## Use of Information

Information from General Broadcasts/Look-outs or preliminary pickup information shall not be considered probable cause to arrest. Information received can be considered in conjunction with other information regarding the circumstances of the offense before any arrest decision is made.

## Related Department Manual Policies

- 200.26, **Unit and Radio Numbering**
- 200.29, **Mobile Computing Devices**
- 300.10, **Motor Vehicle Pursuits**
- 400.18, **Auto Theft Reports**

# Special Threat Situations

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The Texas Southern University Department of Public Safety can utilize the Houston Police Department's Special Weapons and Tactics (SWAT) Detail and Hostage Negotiation Team (HNT) in special threat situations defined in this Department Manual Policy or any special teams from the Harris County Sheriff's Office (HCSO) or the Texas Department of Public Safety (TxDPS). The primary goal is such situations is the safe release of all hostages and the successful termination of the operation without the loss of life.

This Department Manual Policy applies to all classified employees.

## Definitions

**Active Shooter.** One or more suspects who participate in a random or systematic shooting spree, demonstrating intent to continuously harm others. An active shooter's overriding objective appears to be that of mass murder rather than other criminal conduct such as robbery or hostage taking.

**Barricaded Suspect.** Any person who:

a. Has demonstrated capability and/or stated the intent to cause death or serious bodily injury to any person, including himself, and

b. Has achieved tactical superiority by location or the use of a physical obstruction (e.g., an open field, a building, a vehicle, any natural or man-made barrier).

**Debriefing/Interviewing.** Questioning designed to obtain all useful information for a formal report.

**Face-to-Face Communications.** Communications in which an officer in the kill zone is not using cover or concealment and is able to see and be seen by the suspect.

**Hostage Situation.** Any incident in which the possibility exists or the available information indicates that a barricaded suspect may be holding a hostage.

**Inner Perimeter.** The area of containment closest to the suspect.

**Kill Zone.** Any area in which a suspect can fire or use a weapon that could kill or injure a person.

**Objective.** The physical location where a barricaded suspect or hostage is believed to be located.

**Outer Perimeter.** The area of containment that prevents outsiders from interfering with or being endangered by the threat situation.

**Safe Route.** Directions to the scene for responding officers that direct them around the kill zone.

**Sniper.** A person who causes or attempts to cause death or bodily injury to another person by discharging a firearm from an initially concealed position.

**Special Threat Situation.** Any situation involving a sniper, barricaded suspect, hostage situation, active shooter, terrorist activity, or threatened suicide involving a weapon or from an elevated structure such as a bridge or building.

**Terrorist Activity.** Any in-progress act of violence or threat thereof that creates or is designed to create fear of death or imminent bodily injury in the minds of others and is intended to intimidate governments or citizen populations in the pursuit of goals that are generally political, religious, or ideological.

## General Guidelines

When informed of a possible special threat situation, the dispatcher's shall immediately direct a patrol supervisor to the scene. Simultaneously, the dispatch supervisor shall ensure that the on-duty supervisor is aware of the possible special threat situation.

The first supervisor on the scene shall verify that a special threat situation exists and shall update the command staff with all available information. The command staff will then make all the necessary notification to ensure the proper resources are activated.

The police response to all special threat situations is an active shooter, officers shall follow the concepts and principles taught in approved Active Shooter training courses.

## Special Threat Response

Although any resource of the department may be used to resolve a special threat situation, the TSUDPS may use resources from other departments. The following resources are the primary teams that should be used for a special threat response:

- a. Patrol officers and supervisors
- b. HPD SWAT Detail
- c. HPD HNT
- d. Any resources from HCSO or TxDPS

## Patrol Officer Responsibilities

The first officers to arrive at the scene shall:

- a. Notify the dispatcher that a possible special threat situation exists and request a patrol supervisor to the scene.
- b. Confine the suspect to the smallest area possible by establishing an inner perimeter.
- c. If possible, determine if contact with the suspect by telephone is available. Officers shall not use face-to-fact communication with an armed suspect without prior approval from the highest ranking supervisor on scene or the HPD HNT coordinator.
- d. Maintain communications with the suspect only if it stabilizes the situation, but shall avoid constantly contacting a suspect who refuses to communicate.
- e. If communications are established, stabilize the emotionally distraught or violent suspect by doing or refraining from doing the following:
  1. Communicate by telephone if possible.
  2. Express a willingness to help through positive statements. Do not make threatening or intimidating remarks.
  3. Do not beg or plead with the suspect.
  4. Do not agree to any demands made by the suspect.
  5. Do not allow family members or any non-law enforcement personnel to speak with the suspect without prior approval from the highest ranking supervisor or the HPD HNT coordinator.
- f. Relay, via mobile computing device (MCD) or telephone, the following information to the dispatcher as soon as it becomes available:
  1. Description of the suspect and any weapons.
  2. Location and number of hostages.
  3. Possible avenues of escape.

4.  Safe routes and location to where additional units should respond.

g.  Detain all witnesses for interviewing.

h.  Upon being relieved, immediately report to the on-duty supervisor or command post for debriefing.

i.  Remain at the scene until debriefed and released by the command staff.

## Officer Originally Assigned to the Call

Except as noted below, the officer originally assigned to the call is responsible for completing the original incident report and filing charges when necessary. If the officer is unable to remain at the scene, the officer may be relieved by the on-scene supervisor after both of the following have occurred:

a.  The patrol supervisor has verified the officer completed the original incident report including all details up to the time that HPD SWAT or HPD HNT personnel took control of the scene.

b.  The patrol supervisor has assigned another patrol officer to replace the original officer. This replacement officer shall stand by to take custody of any prisoner, file charges when necessary, and supplement the original incident report.

If circumstances warrant having another special team handle the original incident report, the officer originally assigned to the call shall supplement the report, if requested to do so.

## Patrol Supervisor Responsibilities

The first on-scene patrol supervisor shall do all of the following:

a.  Confirm a special threat situation exists, notify the command staff without delay regarding the details of the incident, and provide the command staff with a direct telephone number to the on-scene supervisor.

b.  Give the dispatcher all pertinent information about the special threat situation (e.g., the current location, the number of suspects, and the number of hostages) as soon as the information becomes available.

c.  Establish and supervise a mobilization point to which all patrol personnel shall report.

d.  Provide to the highest ranking supervisor a diagram of the outer perimeter showing the radio numbers/unit numbers and locations of all patrol units along the perimeter.

## Patrol Captain or Duty Lieutenant Responsibilities

The concerned captain or duty lieutenant shall do all of the following:

a.  Go to the scene and assume overall command of operations until relieved by a higher ranking supervisor.

b.  Ensure patrol officers man the outer perimeter until relieved by officers taking over the scene.

c.  Ensure the establishment of a command post and a press information center.

d.  Ensure a radio channel is used to establish communication for all personnel responding to the scene.

## Highest Ranking Supervisor On-Scene

Upon arrival of the highest ranking supervisor shall:

a.  Assume overall command of on-scene operations and determine which containment and assault tactics to use.

b. Obtain maps of the area and a floor plan of the objective.

c. Gather all intelligence from debriefings of HPD SWAT Detain and HPD HNT personnel.

d. Determine if HPD Homicide Division should be contacted to conduct an on-scene investigation.

e. Call on other resource needed to successfully conclude the operation (e.g., Patrol, Psychological Services, Legal Services).

f. Maintain liaison with concerned agencies and other jurisdictions.

Once the inner perimeter has been manned by HPD SWAT Detail personnel, only the highest ranking supervisor can order the planned discharge of firearms. However, with respect to self-defense of the defense of others, all police officers involved in a special threat situation are governed by the policy established in Department Manual 300-12, Response to Resistance.

## Communications Division

When notified of a possible special threat situation, dispatchers shall:

a. Dispatch a supervisor to the scene.

b. Inform the command staff.

c. Assign an emergency radio frequency with recording capability to be dedicated solely to the special threat situation.

d. Obtain pertinent information from field units including, but not limited to, the location, description and number of suspects, number of hostages, a safe route, and an on-scene supervisor's telephone number.

## Command Staff

When notified of a special threat situation, the command staff shall make needed notifications, but not limited to, HPD SWAT and HPD HNT.

The command staff shall ensure that a direct telephone number is obtained from the reporting on-scene supervisor and then immediately provide the telephone number to any additional personnel responding to the scene in an effort to facilitate communications.

## Jurisdictional Responsibility

If a hostage victim is a foreign official or an official guest of the United States, jurisdiction is shared concurrently by the Federal Bureau of Investigation (FBI) and the local law enforcement agency. If control of the situation was initiated by the local agency, operational command is retained by the local agency unless the FBI clearly indicates that it wants to assume command of the situation. If the FBI assumes command, it also becomes responsible for terminating the operation.

If the special agent in charge of the FBI's Houston office of the designee (e.g., the senior agent at the scene) indicates that jurisdiction remains concurrent, decisions shall be made jointly by the command staff and the senior FBI agent at the scene. During operations in which the responsibility is deemed to be concurrent, every effort should be made to ensure mutual agreement in the decision-making process prior to conducting tactical operations.

If a hostage situation results from the commission of a federal crime (e.g., bank robbery), jurisdiction is shared concurrently by the FBI and the local agency. If control of the operation was initiated by the local agency, control is retained by it until the senior FBI agents indicates that the FBI wants to assume exclusive responsibility.

The highest ranking on-scene supervisor is responsible for releasing control of the operation to the FBI.

**Related Department Manual Policies**

- 300.10, **Motor Vehicle Pursuits**
- 300.12, **Response to Resistance**
- 300.29, **Weapons of Mass Destruction**
- 300.22, **High Risk Vehicle Approaches**
- 300.27, **Response Management**
- 300.29, **Weapons of Mass Destruction**
- 300.32, **Bomb Threats, Explosive Devices, Explosions**
- 300.35, **Foot Pursuits**
- 400.10, **Emergency Management**
- 400.16, **Media Relations**

# Class C Misdemeanors

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

Unless otherwise directed by policy, persons who commit serious Class C misdemeanors (e.g., offenses involving or related to violence, narcotics, vice, breaches of the peace, or criminal mischief) shall normally be incarcerated. If extenuating circumstances make incarceration unwarranted, officers shall seek approval from form a supervisor before issuing a citation to a serious Class C violator.

Persons who commit less serious Class C misdemeanors (e.g., traffic violations and regulatory offenses) shall normally be issued citations. In some circumstances, it may be necessary to incarcerate a violator to accomplish the police mission. Any decision to do so shall be consistent with the department's values and principles. For department policies and procedures regarding parking violations, see Department Manual 300.37, **Parking Citations**.

This Department Manual Policy applies to classified employees only.

## Definitions

**Abbreviated Incident Report.** An incident report that lacks property information and a narrative and that is entered into the report system for statistical or historical data purposes or for capturing an incident in the department's uniform crime reporting information. An abbreviated incident report shall be generated instead of a complete incident report only for certain incidents specified by the department.

**Citation.** A ticked issued for a Class C misdemeanor.

**E-Citation.** A citation issued for a Class C misdemeanor generated on an electronic citation writing machine. To book an arrestee in jail on a new Class C municipal charge the e-citation must be used.

**Identifying Information.** Data useful in identifying and locating an individual:
   a. Name
   b. Date of birth
   c. Social security number
   d. Driver license number
   e. Addresses:  home and work
   f. Telephone numbers:  home, other
   g. Any other pertinent information that would help to identify and locate an individual

## Citations

Except as otherwise noted herein, officers may issue citations by using either a citation book or an electronic citation machine.

When using a citation book, officers shall print all information on citations completely and accurately to ensure their names and employee/T–numbers are legible on the court's copies of the citations. All blank lines on the citation form shall have the appropriate information entered on them.

Officers shall ensure the incident number, any complainant and witness identifying information, and other information necessary to process a municipal complaint is documented on the front of the court's copy utilizing all available blank spacing on the citation when possible. Only then can any remaining information be placed on the back of the citation.

## Citation Books

Citation books will be issued in numerical number. All numbered tickets, included spoiled or voided, will be turned in when all the tickets in the book have bene used.

Civilians shall not check out or use Class C misdemeanor citation books.

## Traffic Citations

Violators who agree to sign the citation and who are operating a Texas licensed vehicle shall not be booked on a speeding charge if it is the only violation for which they are charged. Violators who agree to sign the citation and who are operating a Texas licensed vehicle shall not be booked on a failure to show proof of financial responsibility charge if it is the only violation for which they are charged.

Violators charged only with speeding and whose state of residence is part of the Nonresident Violator Compact of 1977 shall not be booked on the charge.

Violators charged with both speeding and failure to show proof of financial responsibility or other violations, regardless of residence, may be booked on the charges in accordance with section *Authorization for Incarceration* of this Department Manual Policy.

Violators driving another state's licensed vehicle, or a resident of another state that is not participating in the Nonresident Violator Compact of 1977 may be booked on any citation in accordance with section *Authorization for Incarceration* of this Department Manual Policy.

## Refused or Unable to Sign

Officers shall advise violators who refuse to sign a citation that signing the citation is not an admission of guilt, but rather an acknowledgment of receiving a citation and a promise to appear in court at the designated time.

If a violator still refuses to sign the citation, the officer shall print *Refused to Sign* on the line set aside for the violator's signature. Refusal to sign a citation shall not be a basis for taking a violator into custody. The officer shall release the violator if there are no other charges.

After releasing the violator, the officer shall compete a *Refused/Unable to Sign Affidavit* form and attach it to the citation. The affidavit must be notarized immediately. The citation and affidavit shall be forwarded to the officer's immediate supervisor for review by the end of the officer's shift.

If a violator is unable to sign a citation as a result of severe injury, the officer shall print Unable to Sign Due to Injury on the line provided for the violator's signature. The officer shall complete a *Refused/Unable to Sign Affidavit* form and attach it to the citation. The affidavit must be notarized immediately. The citation and affidavit shall be forwarded to the officer's immediate supervisor for review by the end of the officer's shift.

## Class C Theft Citations

Citations shall be issued for Class C theft cases (including, but not limited to, shoplifting incidents) when the value of the stolen items is under $100 and when the suspect's identity is verifiable (e.g., valid identification).  Arrest for thefts under $100 shall be made only with proper supervisory authorization.

When issuing a citation for Class C theft, officers shall document the following information on the e-citation or on the front of the court's copy of the citation form.

  a.  Incident number
  b.  All stolen items – listed on the citation directly after where the violation is written
  c.  Complainant and witness identifying information
  d.  Who has care, custody, and control of the stolen items
  e.  Who initially detained the suspect
  f.  Retail value of the stolen items

Officers are required to complete a person check on all suspects prior to issuing a citation or generating an incident report.

In addition to the citation, officers shall complete an abbreviated incident report so the theft can be included in the department's statistical data and uniform crime reporting (UCR) information. It is not necessary to enter property or a narrative in an abbreviated incident report.

Complete incident reports shall continue to be generated for theft cases for which no citation is issued.

In cases of shoplifting, officers are also to document whether or not a trespass warning was given to the suspect by the place of business. This may be documented in the complete incident report if one is generated, or it may be documented in the call slip when only an abbreviated incident report is generated.

## Voiding or Dismissing Citations

Citations may be voided or dismissed. Requests for citations to be voided or dismissed shall be allowed only for one or more of the following reasons:

    a.   Error in writing the citation

    b.   Other charges filed in county or district court

    c.   Inappropriate charge

### Voiding Citations

To void a citation (except parking citations), all copies of the citation must be gathered and word VOID shall be written across the entire front of all copies. The issuing officer shall write the reasons for voiding the citation on the back of the citation.

For procedures regarding voiding parking citations, see Department Manual 300.37, **Parking Citations. Dismissing Citations.**

A citation (except parking citations), that has been forwarded to the courts cannot be voided and may be dismissed only by an official request from the Chief of Police and agreement by the courts prosecutor or by other process of law.

## Special Situations

### Trespassing on School Property

Unless otherwise authorized by a supervisor, officers shall handle trespassing on school property incidents by incarcerating the violator and filing the appropriate trespassing complaint. Officers shall include the complete name and address of the school as well as the complainant and witness identifying information in the detail or notes section of the complaint. Officers shall initiate an incident report and list the incident number on the e-citation.

If a supervisor authorizes an officer to write a citation for trespassing on school property without making an arrest, the officer shall list the incident number and complainant and witness identifying information on the e-citation or the front of the court's copy of the citation.

For all trespassing on school property citations, the name of the school shall be listed on the citation following the appropriate charge (e.g., Trespassing on school property – Smith Elementary School).

### Towing Vehicles When Drivers Fail to Produce a Driver License

If an officer determines a vehicle should be towed and the sole reason is that the driver does not have a driver license, the officer shall seek a supervisor's permission prior to towing the vehicle. Officers are not required to tow a vehicle if the sole reason for the tow is that the driver does not have a driver license and the officer is not making a custodial arrest. The officer's decision to seek a supervisor's permission to tow a vehicle in situations described above shall be reasonable and

based on the principles of sound judgment, taking into consideration whether further operation of the vehicle would constitute a danger to the public to warrant towing the vehicle.

### Municipal Courts Houston Homeless Court (HHC) Program

Officers shall not arrest individuals participating in the Houston Homeless Court (HHC) program solely for their outstanding municipal warrants. An individual claiming to be a participant in the HHC program should possess and provide officers with appropriate documentation. Individuals should at least possess a *Promise to Appear* form or officers can confirm their participation by calling the Coalition for the Homeless of Houston/Harris County at 713-739-7514.

## Authorization For Incarceration

Field supervisors, when present at an arrest scene, shall review the arrest of a violator who has committed a less serious Class C misdemeanor. Except as noted below, a supervisor shall, prior to booking, review the arrest of a violator who has committed a less serious Class C misdemeanor.

Officers shall obtain the authorization of a supervisor prior to booking a person who has committed a less serious Class C misdemeanor unless one or more of the following circumstances exist. The violator:

    a.  Does not possess sufficient identification.

    b.  Has outstanding warrants.

    c.  Shall be charged with more serious offenses.

In all cases, jail supervisors have the authority to divert officers and their prisoners to other locations due to the medical condition of the prisoners or jail overcrowding. Officers shall generate an incident report if the jail rejects a suspect for medical reasons.

A supervisor's review and approval is not required to incarcerate a person who committed a serious Class C misdemeanor. If extenuating circumstances make incarceration unwarranted, officers shall seek approval from a supervisor before issuing a citation Class C violator.

The following options are available to supervisors when considering officers' requests to book or charge a violator:

    d.  Approve the request for incarceration.

    e.  Order a citation issued to the violator.

    f.  Order the violator released without action being taken.

## Related Department Manual Policies and Reference Material

- 200.32, **Disposition of Arrested Juveniles**
- 200.37, **Contact with Representatives of Foreign Governments**
- 300.02, **Effecting Arrests and Searches**
- 300.05, **Handling and Transporting Prisoners and Other Persons**
- 300.11, **Handling Persons Exhibiting Mental Health Crisis**
- 300.18, **Property and Evidence**
- 300.20, **Handling Publicly Intoxicated Persons**
- 300.28, **Labor Disputes**
- 300.36, **Towing**
- 300.37, **Parking Citations**
- 300.38, **Traffic Violations by Legislatures and Military Personnel**
- 300.42, **Filing Proper Charges**
- 400.14, **Criteria for Submitting Incident Reports**
- Texas Southern University Department of Public Safety Standard Operating Procedure, Serial Accountability for Citations

# Response Management
**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The department has standards and procedures for managing response to calls for service and events and Texas Southern University Department of Public Safety (TSUDPS) unit activity.

Response management is primarily based on the level of the threat to human life and/or property and is considerate of the safety of citizens and officers.

This Department Manual Policy applies to all employees.

## Definitions

**Assist Event.** Any event for which emergency assistance is requested by or for any police or fire department personnel.

**Call Code.** A code that represents the type of event, offense, or incident for which a call for service or on-view activity is being entered.

**Call for Service or Event.** A record of a caller's request for police service or an event on-viewed by an officer that is entered into the Computer Aided Dispatch (CAD) system. Also referred to as a call.

**Call Type.** The type of call, offense, or incident represented by a call code. Also event type.

**Computer Aided Dispatch (CAD).** The Computer Aided Dispatch (CAD) system, consists of the software and hardware that facilitates the management of calls for service and unit activity, among other functions.

**Crisis Intervention Trained (CIT) Officer.** An officer who has successfully completed the Texas Commission on Law Enforcement (TCOLE) 40-hour Mental Health Peace Officer/CIT course.

**Mobile Computing Device (MCD).** Formerly known as mobile data terminal, an MCD consists of the software and hardware that facilitates communications of data between field personnel and stationary users or sources included, but not limited to, the CAD system, the department's records management system and Intranet Portal, the Internet, and various federal, state, and local databases approved for law enforcement use.

**Priority Response Code (PRC).** A code (e.g., "E" or one through nine) given to police calls for service that reflects the urgency and determines the manner or response based upon a specific set of standards.

**Response Time.** The elapsed time from when a call for service or event is received by the dispatcher to the time the first officer arrives at the scene.

**Travel Goal.** The target responding time for officers once they have received the call. This sometimes referred to as "drive time." Officers are to strive to obtain this goal even through the travel goal is not mandatory. Officers should be prepared to explain their inability to achieve these goals.

## Call Management

### Dispatcher Authority

The dispatcher speaks with the authority of the Chief of Police. Officers are to respond promptly to the dispatchers and carry out their assignments courteously and promptly. Communications personnel and field supervisors may make reassignment of calls with due consideration of all relevant information to better carry out the police mission.

## Response Priority

Response priority is designated by the priority response code (PRC) and dictates whether an emergency, immediate, direct, or delayed response is most appropriate (see below chart). When responding to any priority call for service or event, officers shall drive with due regard for the safety of themselves, fellow officers, and citizens.  This section defines the various Response priorities.

| RESPONSE TYPOLOGY | | |
|---|---|---|
| Response Priority | Description | Queue Standard |
| E | Assist the officer or firefighter or pursuit | Immediate |
| 1 | Life threatening in progress | 1 Minute |
| 2 | Life threatening just occurred; property crime in progress | 5 Minutes |
| 3 | Life threatening delayed report; property crime just occurred | 18 Minutes |
| 4 | Serious criminal incidents delayed reports; non-emergency police response calls | 23 Minutes |
| 5 | Minor property crime; municipal offense; check by to confirm service request; possible referrals | 30 Minutes |
| 6 | Self-initiated police action | 35 Minutes |
| 7 | Used to document a citizen was referred to some other entity; a General Broadcast – For Your Information (GBF) was initiated by dispatcher; no dispatch of patrol units required | None |

*Priority "E" (Emergency)*

Priority "E" represents assist the officer or firefighter or pursuit situations, and assumes that a potential threat to life of the potential threat to life or the potential threat of serious bodily injury to an officer or firefighter is in progress. Pursuit situations are outlined in Department Manual 300.10, **Motor Vehicle Pursuits.**

A standard response to priority "E" calls for service is by uniformed officers in marked vehicles with the use of emergency lights and a siren and who remain at this response level until a supervisor, a unit, or dispatcher advises the situation is under control. When advised of such, officers who have not arrived on the scene shall reduce their response to the priority dictated by the dispatcher, but shall continue to the scene unless otherwise instructed by a patrol supervisor or dispatcher.

A non-standard response to priority "E" calls includes officers who may be near a priority "E" call while in plainclothes and/or unmarked vehicles and who, when responding to the call, shall respond as quickly as they can safely do so.

Any responding unit that may be delayed for any reason (e.g., heavy rain, coming from a location of considerable distance from the call location) shall advised the dispatcher by radio only as to the circumstances causing the delay so that the dispatcher can make adjustments on responding units.

**Queue Standard:** Immediate

**Travel Goal:** One minute

**Patrol Response:** Emergency lights and siren

## Priority One

Priority one assumes that a potential threat to life or the potential threat of serious bodily injury is in progress, and is used for all urgent calls other than assist the officer or firefighter or pursuit calls.

A standard response to priority one calls for service is by uniformed officer in marked vehicles with the use of emergency lights and a siren. However, if circumstances are such that the officer believes that an optional response (priority one silent, priority two, or lower) is most appropriate, then the officer may opt to run the call in that mode, but the dispatcher must be immediately advised of the deviation from the standard response.

Any responding unit that may be delayed for any reason (e.g., coming from a considerable distance, heavy rain) shall advised the dispatcher by radio only as to the circumstances causing the delay so the dispatcher can make adjustments on responding units. The dispatcher retains the discretion to request officers to send a message via the mobile computing device (MCD) when responding to preserve the radio air for emergency traffic.

**Queue Standard:** One minute

**Travel Goal:** Five minutes

**Patrol Response:** Emergency lights and siren

## Priority Two

Priority two calls for service represent in-progress property crimes and/or a potential threat to human welfare, and assume that if not in-progress, the event recently occurred or response to the scene is urgent.

Standard response to priority two calls for service is without emergency equipment. However, if the situation clearly warrants the use of emergency equipment, the officer has the option to use that mode, but that decision must be immediately communicated verbally to the dispatcher.

Any responding unit that may be delayed for any reason (e.g., heavy rain, coming from a considerable distance from the call location) shall advise the dispatcher by radio only as to the circumstances causing the delay so that the dispatcher can make adjustments on responding units. The dispatcher retains the discretion to request officers to send a message via the MCD when responding to preserve the radio air for emergency traffic.

**Queue Standard:** Five minutes

**Travel Goal:** Five minutes

**Patrol Response:** No emergency lights or siren shall be used unless the officer has additional information justifying the use of emergency equipment.

## Priority Three

Priority three calls are incidents in which no known emergency exists, but should be handled expeditiously because of the potential for the situation to escalate or the potential for criminal activity to occur.

**Queue Standard:** Eighteen minutes

**Travel Goal:** Five minutes

**Patrol Response:** No emergency lights or siren shall be used unless the officer has additional information justifying the use of emergency equipment. Officers responding to priority three calls for service shall obey all traffic laws.

## Priority Four

Calls under this priority involve the delayed reporting of criminal incidents that are serious in nature. Priority four calls also include incidents such as minor crashes and other incidents when the reporting of the necessary information is required in an expeditious manner.

**Queue Standard:** Twenty-three minutes

**Travel Goal:** Five minutes

**Patrol Response:** No emergency lights or siren shall be used unless officer has additional information justifying the use of emergency equipment. Officers responding to priority four calls for service shall obey all traffic laws.

## Priority Five

Calls under this priority involve delayed reports of criminal incidents that are non–violent in nature such as property crimes, various silent 9-1-1 calls, and certain alarm calls.

**Queue Standard:** Thirty Minutes

**Travel Goal:** Five minutes

**Patrol Response:** No emergency lights or siren shall be used unless the officer has additional information justifying the use of emergency equipment. Officers responding to priority five calls for service shall obey all traffic laws.

## Priority Six

Priority six consist of self-initiated activities that originate with an officer rather than the dispatcher or other external sources. These activities do not involve on–view investigations in which an officer is "flagged down," but are initiated solely by an officer's own actions. The officer shall advise the dispatcher as to the nature of the event. The dispatcher can then create an event slip containing the appropriate priority six call code.

Events that result from an officer being "flagged down" and that would have likely been or should have been reported to TSUDPS should be given the appropriate code that best describes the event. This coding shall be done by the dispatcher based on information provided by the field officer.

**Queue Standard:** None

**Travel Goal:** Immediate

## Priority Seven

Priority seven consists of activities in which the dispatcher can refer complainants, reportees, or witnesses to another source to obtain incident assistance. Priority seven also consists of incidents for which the information is needed only on an advisory basis and/or an incident number needs to be generated. In this case, the dispatcher shall create an event slip and the dispatcher shall broadcast the information to the patrol area for all personnel to hear on an information only basis and then dispose of the call using GBF (General Broadcast – For Your Information).

**Queue Standard:** None

**Travel Goal:** As time permits

# Call Prioritization

## Call Prioritization

Response priority (e.g., "E" or one through seven) is accomplished through the dispatcher and the Computer Aided Dispatch (CAD) system and is generated based upon the answers given by callers.

When the call for service record is transmitted to a dispatcher, the call type may be upgraded or downgraded by the dispatcher under the following conditions:

a. A dispatcher may upgrade the call for service based upon information in the call slip or received from a call taker, a dispatch supervisor, field personnel, or citizen that indicates a change in the threat level to life or property. Ungraded priorities must conform to the parameters set forth in the response priorities definitions in section *Call Management* of the Department Manual Policy.

b. A dispatcher with approval from a supervisor may downgrade a call for service when additional information indicates a change in the level of threat to life or property. Downgraded priorities must conform to the parameters set forth in the response priority definitions listed in section *Call Management* of this Department Manual Policy.

Assignment of calls for service to field units should be made according to the appropriate priority. Assignments of high priority calls shall be made before assignments of lower priority calls. Units may be preempted from lower priority calls to respond to higher priority calls. Unless proper justification exists, dispatchers, officers, and sergeants shall always ensure the highest priority calls in queue are assigned first.

**Note:** Officers shall NOT volunteer to accept lower priority calls via the radio or MCD when higher priority calls remain in queue unless a clear and defensible reason is provided.

# Responsibilities During Priority "E," One, and Two Calls For Service

## Dispatcher Responsibilities

As soon as priority "E," one, or two call for service is received, the dispatcher shall immediately as-sign it to an available unit and then voice the call. If no unit is available, the dispatcher shall preempt any unit or assign a sergeant to respond to the call in accordance with the provisions of this Department Manual.

The dispatcher may preempt any field unit from a meal break, another out-of-service activity, or lower priority call for service to respond to a priority "E," one, or two call.

Dispatchers shall adhere to the following procedures when handling in-progress, life-threatening situations:

a. Dispatchers shall voice all calls.

b. Dispatchers shall dispatch back-up units and a supervisor when appropriate.

c. Dispatchers shall "close the air" to other radio traffic except for other priority "E" or priority one calls being worked simultaneously.

d. Dispatchers shall use the MCD to aid in dispatching of lower priority calls for service to reduce the amount of radio usage.

Dispatchers shall not general broadcast (GB) and priority "E," one, or two calls as a primary mean of attempting to assign the call to a field unit. These calls shall be directly assigned to the appropriate unit. Priority "E," one, two, and three calls for service shall be dispatched by voice.

Follow–up information may be transmitted over the MCD unless the information affects officer safety or changes the nature of the scene, in which case the information shall be voiced. Communications personnel shall use voice communications as the primary assignment medium in all instances in which an officer's safety would be best served by having other field personnel aware of the officer's location and assignment.

## Officer Responsibilities

When responding to priority "E," one, or two calls for service with the use of emergency equipment, officers must drive with due regard for the safety of themselves, fellow officers, and citizens. Units are to travel directly to the scene and not stop any traffic violators or other persons for minor offenses.

Field personnel shall notify the dispatcher via the radio when enroute to and arriving on priority "E," one, or two calls for service, unless otherwise directed. Responding officers must advise the dispatcher by radio of any delays in their response, as well as all status updates such as enroute, arrived, under control, or clear. Field personnel are responsible for updating their unit status in a timely and proper fashion. Deviations from established procedure shall not be condoned.

While field personnel are on duty, they shall be directly available via radio and MCD or at least by radio if not in their vehicle. If not available, they must obtain authorization from a supervisor and relay the authorizing supervisor's name or unit number to the dispatcher.

## Field Supervisor Responsibilities

For priority "E," one, or two call for service, supervisors shall perform the following responsibilities:

a. Receive assignments to check for victims, preserve and identify evidence, and hold the scene until a field officer arrives at the scene.

b. Ensure that a proper response is made by the appropriate number of units according to the priority code.

c. Decide whether to recommend the dispatcher modify some aspect of the response, when such modification is warranted (e.g., additional information is received).

d. Ensure the dispatcher has been properly notified as soon as the situation has been adequately controlled and no additional units are required.

e. Ensure units are not needed at the scene are immediately returned to service.

## Extended High Priority Events

When a priority "E" call for service, a pursuit, or a similar critical incident is of an extended nature and the Houston Police Department or Harris County Sheriff's Office Special Weapons and Tactics (SWAT) Detail or any other specialized unit must be called to the scene, the dispatcher shall perform the following responsibilities as soon as possible:

a. Advise all involved units to switch to a channel determined by the dispatcher or supervisor.

b. Advise all other units to refrain from using the designated emergency channel.

## Assist Event

When there is a request for emergency assistance for or from any agency's police officer or firefighter, the procedures described below shall be followed:

a. Because the officer initiating the assist event is usually the best judge of what resources are required to control the situation, the dispatcher shall abide by the requesting officer's preferences, if possible. If those preferences cannot be communicated, dispatch personnel shall determine which units shall respond to the assist event or pursuit and which response priority is appropriate.

b. If the officer requesting assistance does not specify his location or the number of units needed, or sufficient information is not available, or if a citizen rather than an officer initiates the call, a basic response team consisting of all of the following shall be dispatched to the scene:

1. Two units sent priority one
2. Two units sent priority two
3. A supervisor sent priority one
4. If possible, request a helicopter unit

c. Emergency equipment shall be used for all assist events.

d. Units not dispatched to the assist event shall not use the police radio until on-scene personnel have downgraded the incident and the dispatcher has officially cleared the radio channel.

e. Responding units shall immediately advise the dispatcher of their arrival. As soon as the situation is under control, the first unit on the scene shall provide an evaluation of the situation to the dispatcher.

## Responsibilities During Priority Three, Four, and Five Calls For Service

### Dispatcher Responsibilities

When a priority three, four, or five call for service is received, the dispatcher shall:

a. Assign the call as follows to any available unit before it exceeds the queue standard:

1. All priority three calls for service shall be dispatched by voice.
2. Priority four and five calls for service shall be dispatched via the MCD only, unless officers do not have immediate access to the MCD. However, communications personnel shall use voice communications as the primary assignment medium in all instances in which an officer's safety would be best served by having other field personnel aware of the officer's location and assignment.

b. If no unit is available and the call has not exceeded the queue standard, hold the call until a unit becomes available.

c. Make certain that calls requiring back-up have a secondary unit or a field supervisor dispatched as back-up.

When any call for service goes past the queue standard time and there are no units available, the dispatcher shall:

d. Notify a sergeant. The sergeant's unit number and his instructions how to handle the past queue call shall be documented in the call for service slip to indicate notification of the past queue call.

e. Work in conjunction with the sergeant to assure that proper service of these calls is accomplished.

f. If no other options are available, assign a call to an available sergeant. It is the supervisor's responsibility to respond to the call or see that the call is handled expeditiously.

g. Document in the call slip what action was taken.

h. Continue working with the sergeant whenever additional calls exceed the queue standard.

## Officer Responsibilities

A priority three, four, or five call for service requires a directed response, which means the officer must proceed to the call without unnecessary delay. However, if while responding, the officer on-views a situation more serious than the call assignment, then:

 a. The officer must immediately inform the dispatcher of his location and activity.

 b. Once the immediate situation has been handled, the officer must proceed directly to the originally assigned priority three, four, or five call unless dispatcher has already reassigned the call.

 c. If the on-viewed situation is one in which the officer cannot proceed to the assigned call in a timely manner, the officer must inform his supervisor of the situation causing the extended delay.

Officers who volunteer to handle calls for service from their MCDs must take the highest priority calls first (e.g., priority three versus priority four or five), unless their proximity to a call is so close it necessitates they take the lower priority call first.

## Field Supervisor Responsibilities

For priority three, four, or five calls for service, field supervisors may utilize and draw from whatever resources are available to them. While doing so they shall continue to monitor the police service needs. Available options for field supervisors to service a call include, but are not limited to:

 a. Ensure that a proper response is made by the appropriate number of units, according to the priority code.

 b. Preempt a unit from an existing call.

 c. Assign the call to an available unit.

 d. Reassign a unit from a lower priority call or special assignment.

 e. Call the complainant and, depending on the nature of the call and the circumstances, discuss possible alternative service delivery options.

 f. Reprioritize the call if aware of circumstances that warrant the change.

 g. Handle the call personally.

If while enroute to a priority three, four, or five call for service, an officer on-views an incident that will cause an extended delay in responding to the original call and officer has notified the supervisor of such, the supervisor shall exercise one of the following options:

 h. Advise the officer to disregard the original call for service and proceed to handle the on-viewed situation. If this option is exercised, the field supervisor must decide what alternate unit is to run the original call and communicate that information to the dispatcher.

 i. Approve an extended delay in response and direct the officer to handle the on-viewed situation and then proceed to the original call for service. If this option is exercised, a field supervisor must ensure that the reportee on the call is informed of the delay.

 j. Advise the officer to clear the on-viewed situation and to proceed directly to the assigned call.

Regardless of which option the field supervisor chooses for servicing the call, the call must be handled without further delay. Field supervisors shall be held accountable for the dispatch and arrival times of a call once the responsibility for servicing the call has been transferred to the field supervisor from the dispatcher.

## Priority Six, Self-Initiated Activities

Priority six includes events, activities, or administrative duties an officer self-initiates. These events are to be handled by the dispatcher, officer, and supervisor in the manner dictated by the officer who initiates the action.

When an officer self-initiates an event:

    a.   The officer shall advise the dispatcher of his location and request that a "self-initiated" event slip be created that best represents the nature of the event.

    b.   The dispatcher shall assign a priority six call code and manage the event.

However, if an officer is "flagged down" by a citizen or "on-views" an event that would have likely been or should have been reported to the Police Department had the officer not arrived on the scene:

    c.   The on-viewing officer shall advise the dispatcher that he has been flagged down, shall advise the dispatcher of the nature of the event, and shall handle the incident in accordance with TSUDPS policy.

    d.   The dispatcher shall create an event slip and assign the appropriate call code that matches the event being reported by the officer. A priority six call code shall not be used in these cases. Rather, the call code that best matches the event shall be used.

## Priority Seven, Information Only

The priority seven, "Information Only," event slip provides a necessary method for recording and tracking relative to certain calls for service and dispatcher activities (e.g., placing dispatcher notes in system, GB on a speeding vehicle with no further information). Further, the priority seven response code provides a means for "closing" or completing certain calls that do not require a field unit response.

## Crisis Intervention Trained (CIT)

The Crisis Intervention Trained (CIT) program consists of patrol officers who have successfully completed the TCOLE 40-hour Mental Health Peace Officer/CIT course. The goal of the program is to utilize CIT officers, whenever reasonably possible, to respond to incidents or calls for service involving persons displaying symptoms of mental health crisis.

When dispatchers receive a call requiring a CIT response, an available CIT unit shall be located using the designated identifying symbol located on the dispatcher's CAD screen. CIT calls shall not be general broadcasted and then placed in queue.

If a CIT unit is not available for a CIT call, the dispatcher shall send an appropriate patrol unit. In this event, the dispatcher is to advise the patrol unit that no CIT unit is available. The officer dispatched to the scene shall evaluate the situation based on the information and circumstances. If the officer reasonably concludes that a CIT officer is necessary, the scene officer shall request the dispatcher to preempt a CIT unit. The dispatcher, in accordance with the officer's request, shall contact the closest CIT unit that is available and preempt, and dispatch the CIT unit to the requested scene. In the event there is no preemptible CIT unit available, the officer shall then contact a patrol supervisor and advise him of the situation.

When requested to check by with a patrol unit, CIT officers do not automatically assume responsibility of the call.  That decision should be mutually agreed upon by those officers handling the scene.

CIT officers shall always attempt to peacefully resolve scenes or situations involving persons exhibiting mental health crisis in accordance with CIT officer training and as outlined in Department

Manual 300.11, **Handling Persons Exhibiting Mental Health Crisis**. If at any time the incident meets the criteria of a special threat situation as defined by Department Manual 300.25, **Special Threat Situations**, a supervisor shall be notified.

### Priority One and Two CIT Calls

Dispatchers shall follow normal procedures for dispatching a unit to a priority one or priority two CIT call; however, due to the nature of these calls, every effort should be made to dispatch a CIT officer as the primary unit. If the CIT unit is not dispatched as the primary unit, then the dispatcher shall send a CIT unit as back-up as soon as possible.

## Assignment of Back-Up Units

Dispatchers shall send at least two officers to scenes involving of the following:

a.  Priority "E" or priority one call

b.  CIT call

c.  Weapon

d.  High-priority, in-progress event

e.  Disturbance

f.  Situation in which officer safety is in question

Calls involving large crowds and call requiring traffic control shall have an appropriate number of back-up units assigned.  The dispatcher shall ask the affected sergeant for input.

The dispatcher has the discretion to assign back-up units to calls that would not normally necessitate more than one field unit. If a field unit expresses a back-up unit is not needed on a call, the dispatcher has the authority to assign a back-up unit as a safety precaution.

When officers on scenes request additional units, (thereby exceeding two units at the scene) or when there are more than two units dispatched to the scene along with the additional units, regardless of the priority of the call.

## Signing On For Duty

Each field officer that signs on for duty shall notify the dispatcher of the following:

a.  The unit number.

b.  The unit is signing on and is in service.

c.  The number of officers assigned to the unit.

d.  If the unit is hosting a ride-along participant.

Officers shall sign on for duty via radio or MCD with the dispatcher within 20 minutes after the beginning of the shift whether they are in service or not. Officer shall advise the dispatcher, and give the authorizing supervisor's name or unit number when they are unable to go on duty within 20 minutes after the start of the shift or when they are held out of service.

If a roll call sergeant anticipates a roll calls hall be extended, it is the roll call sergeant's responsibility to advise the dispatcher that the shift shall be signing on late. Officers shall not be required to notify the dispatcher of the late sign on in such instances.

## Signing Off From Duty

If field officers sign off from duty early, they shall notify the dispatcher of the supervisor's name or unit number that authorized the early off-duty time.

If an officer is dispatched to a call for service while enroute to the station to go off duty or otherwise needs to work past the normal off-duty time, the officer shall request authority to do so

from an on-duty supervisor. After completing the assignment, the officer shall inform the dispatcher of the disposition of the call for service and then go off duty. Officer shall report to the appropriate supervisor before leaving the station.

Once a shift has ended, officers shall sign off from duty with the dispatcher upon arrival at the station. It is the responsibility of the dispatcher to ensure that all units have properly notified the dispatcher of their off-duty status. If an officer fails to notify the dispatcher of off-duty status, the dispatcher shall notify a supervisor to determine what the correct status is.

## Emergency Notification Via Radio Communications

If an officer requires immediate, uninterrupted access to a radio channel, the officer should state his assigned unit number and immediately follow this transmission with the words "emergency traffic." The dispatcher shall acknowledge receipt of the transmission, secure the radio channel for the officer's exclusive use, and notify a supervisor.

## Catastrophic Loss of Communication

In the event of catastrophic radio and computer (MCD) failure, all on-duty personnel, including supervisors, are to report to the station. Once there, a supervisor shall provide information, equipment, and assignments consistent with the particular emergency and the orders of the Chief of Police. Communications, assignments, and specific duties shall be developed by the Chief of Police for each emergency and distributed via department communications.

For more information regarding mobilization during catastrophic events, see Department Manual 400.10, **Emergency Management**.

## Related Department Manual Policies and Reference Material

- 200.08, **Work Hours**
- 200.26, **Unit and Radio Numbering**
- 200.29, **Mobile Computing Devices**
- 300.10, **Motor Vehicle Pursuits**
- 300.11, **Handling Persons Exhibiting Mental Health Crisis**
- 300..25, **Special Threat Situations**
- 400.10, **Emergency Management**
- Texas Southern University Department of Public Safety Standard Operating Procedure, Emergency Driving in Non-Pursuit and Pursuit Situations
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.03.04 Leave of Absence Policy
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 02.05.12 Work Schedules
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.03.01 Fire and Physical Safety
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.06.22 Security Standards Policy

# Labor Disputes

**Reference:** *Supersedes all prior conflicting Policies and Directives*

## Policy

The department shall monitor labor disputes to ensure the constitutional right to assemble, preserve the peace, and enforce local, state, and federal laws.

This Department Manual Policy applies to classified employees only.

## Primary Considerations

Classified employees are to treat labor disputes as situations requiring special restraint and judgment. Generally, enforcement efforts shall be concentrated on law violations affecting life, property, and the right to access.

Classified employees shall maintain a neutral posture and avoid the appearance of law enforcement bias toward management or labor. This includes, but is not limited to, activities such as parking on company property or accepting food or refreshments from either side.

Classified employees shall avoid actions that could incite riot conditions (e.g., arresting picketers on the scene for minor violations). Ordinarily, technical violations of a regulatory nature, such as picketing and labor laws, shall not be enforced through on-scene arrests. Officers shall not make on-scene arrests for minor violations unless authorized by a supervisor and after consultation with the District Attorney's Office.

When a serious violation occurs in the presence of an officer, the officer shall address the incident promptly. The security of all involved is the primary consideration. The officer shall consult with a supervisor and the District Attorney's Office in determining the most appropriate course of action.

An allegation of a serious violation not occurring in the presence of an officer shall be investigated as any other incident. In these instances, if warranted, it is preferable to make an arrest away from the strike location after acquiring a warrant. Supervisory authority must be obtained before making an on-scene arrest in these situations.

## Patrol Officer Responsibilities

Patrol officers shall be responsible for doing the following during labor disputes:

a. Take action necessary to immediately preserve the peace and prevent the destruction of property.

b. Request that the dispatcher send a supervisor to the scene.

c. Request additional units if necessary.

## Patrol Supervisor Responsibilities

After arriving at the scene of a labor dispute, the patrol supervisor shall assess the situation and ensure that the Command Staff is notified. Information shall be forwarded to the Command Staff by mean other than an unsecured radio channel (e.g., mobile computing device [MCD], telephone, secured radio channel, or in person).

The patrol supervisor is responsible for ensuring enough officers respond to the labor dispute to control the scene. Additionally, the patrol supervisor is responsible for authorizing officers to make arrests at the scene of the labor dispute. Supervisors may set up temporary headquarters if conditions require. Facilities of management of labor are not to be used as temporary headquarters.

# Texas Southern University Office of General Counsel

The TSU Office of General Counsel shall provide legal advice to the supervisors on labor disputes.

## Related Department Manual Policies

- 300.02, **Effecting Arrests and Searches**
- 300.05, **Handling and Transporting Prisoners and Other Persons**
- 300.12, **Response to Resistance**
- 300.26, **Class C Misdemeanors**
- 400.10, **Response Management**

**300.29**

# Weapons of Mass Destruction

*Reference: Supersedes all prior conflicting Policies and Directives*

## Policy

All chemical, biological, radiological, nuclear, or explosive (CBRNE) incidents, real or hoax, shall be treated as significant events. Procedures specified in Department Manual 400.10, **Emergency Management**. Police officers, firefighters, paramedics, and others are considered to be first responders when responding to incidents involving or suspected of involving CBRNE weapons.

This Department Manual Policy to all employees.

## Definitions

**Biotoxin.** Poisonous substance produced by a living organism.

**CBRNE.** The five categories of weapons of mass destruction (WMD) materials including chemical, biological, radiological, nuclear, and explosive.

**Cold Zone.** The designated area where there is no contamination and that contains the command post, the staging area, and other support functions necessary to control the incident. This area may also be referred to as the "clean zone" or "support zone."

**Consequence Management.** Activity performed primarily by the Houston Fire Department (HFD) after a CBRNE attack that may include isolating the hazard area, caring for victims, performing decontamination, administering emergency medical treatment, and recovery.

**Emergency Decontamination.** Rapid but methodical decontamination of individuals near the scene of the incident that is designed to save lives by removing the contaminating agent from the victim. This activity is performed primarily by HFD utilizing large amounts of water and is accomplished in the warm zone.

**Emergency Medical Services (EMS) Personnel.** HFD paramedics and other medical personnel, including doctors and nurses, at the scene of large-scale disasters.

**HAZMAT.** Hazardous material.

**HAZMAT Personnel.** HFD personnel who deal with any solid, liquid, or gas that has the capability or producing adverse effects on the health and safety of people or other living organisms.

**Hot Zone.** The area immediately surrounding the CBRNE material, extending for enough to prevent the spread of adverse effects to persons outside this designated zone. Hot zone is also referred to as the restricted zone, exclusion zone, danger zone, or kill zone.

**Inner Perimeter.** The area designated as a control line surrounding the warm zone. A line between the outside edge of the warm zone and the cold zone.

**Mass Decontamination.** Rapid decontamination of several persons simultaneously that is designed to quickly reduce the effects of the contaminant and limit the spread of the CBRNE agent. This activity is performed primarily by HFD utilizing large amounts of water and may occur in the hot zone before victims are allowed to go to individual decontamination stations in the warm zone.

**Outer Perimeter.** The area designated as a crowd control line surrounding the incident. A line between the general public and the outside edge of the cold zone.

**Pathogen.** Disease causing agent.

**Personal Protective Equipment (PPE).** Protective equipment worn by individuals and designed to provide protection from the hazard present. PPE can range from something as simple as a long-sleeved shirt to cover unprotected skin to a completely encapsulated gas-tight suit with self-containing breathing apparatus.

**Warm Zone.** The area between the hot zone and cold zone where personnel and equipment decontamination occur. It includes control points for access to the hot zone. This area may also be referred to as the "contamination reduction zone."

**Weapon of Mass Destruction (WMD).**

   a. Any explosive, incendiary, or poison gas: bomb, grenade, rocket having a propellant charge of more than four ounces (113 grams), missile having an explosive or incendiary charge of more than one-quarter ounce (7 grams), mine, or device similar to the above.

   b. Any weapon involving toxic or poisonous chemicals.

   c. Any weapon involving a biological agent or disease organism.

   d. Any weapon that is designated to release radiation at a level dangerous to human life.

## General Considerations

Response to a weapon of mass destruction (WMD) incident is very similar to the response to a hazardous material incident as described in Department Manual 400.10, **Emergency Management**. The following are three primary differences between a WMD incident and a hazardous material incident:

   a. A WMD incident is more likely to involve material with greater toxicity and more severe consequences. Therefore, the required response is commensurately larger and more complicated.

   b. A WMD incident is always a crime because the purpose is to kill or seriously injure people. Therefore, the scene of WMD attack shall be processed as a crime scene.

   c. A reported WMD incident may be a hoax perpetrated by someone with the intent of creating fear and chaos. Reporting a hoax EMD threat is a criminal act. Therefore, every WMD incident, real or hoax, shall be investigated.

## Safety Guidelines

Safety of first responders is critically important. If the first responders become contaminated, ill, or incapacitated, then they become part of the problem and cannot effectively rescue victims or initiate other critical actions that could serve to mitigate the situation and prevent other persons from becoming events.  Officers shall utilize time, distance, and shielding as protective actions.

Officers responding to WMD incident shall adhere to the following guidelines.

   a. Assess the situation before doing anything.  Officers shall not rush in and risk becoming victims.

   b. Focus on the hazard and how to avoid it. Officers shall not taste, eat, intentionally smell, or touch anything at the scene of a chemical, biological, radiological, nuclear, or explosive (CBRNE) incident.

   c. Remain vigilant for any additional devices designed specifically to injure first responders and hamper the initial response.

   d. Immediately notify the dispatcher what is seen and heard, if there is any distinct odor noticed upon arrival at the scene, what the wind direction is, and what actions are necessary.

# Methods of CBRNE Attack

## Chemical Attack

A chemical attack is the spreading of toxic chemicals with the intent to do harm. The toxicity of chemicals varies greatly. Some are acutely toxic (e.g., cause immediate symptoms); others are not. Chemicals in liquid or vapor form generally lead to greater exposures than chemicals in solid form.

Many variables affect the concentration of a chemical including wind and the volatility of the chemical. The release of toxic chemicals in closed spaces (e.g., tunnels, airports, financial centers) could deliver doses high enough to injure or kill a large number of people.  In an open area, a toxic chemical cloud (plume) would become less concentrated as it spreads and would have to be released in large quantities to produce mass casualties.

Dissemination methods used for a chemical attack include the following:

   a.  Ventilation systems of a building.

   b.  Misting, aerosolizing devices, or sprayers.

   c.  Passive release (e.g., container of chemical left open).

   d.  Bombs, mines, or other explosive devices that contain chemicals other than those used to create the explosion.

   e.  Improvised chemical devices that combine readily available chemicals to produce a dangerous chemical.

   f.  Sabotage of buildings or vehicles containing chemicals.

   g.  Introduction of toxins in the food or water supply.

## Biological Attack

A biological attack is the intentional release of a pathogen or biotoxin against humans, plants, or animals. Dissemination methods used for a biological attack include the following:

   a.  Aerosol dispersal of an agent in the air from sprayers or other devices.

   b.  Intentionally contaminating water or a food supply.

   c.  Human carriers as transmitting agents by coughing, through body fluids, or by contaminating surfaces.

   d.  Contact with infected animals or contaminated animal products.

   e.  Insects naturally spread some agents such as plague bacteria (vector-borne illnesses) and potentially could be used in an attack.

   f.  Physically distributed through a mail carrier service or other means.

## Radiological Attack

A radiological attack is the use or spreading of radioactive material with the intent to do harm. This attack could deliver radiation doses high enough to cause immediate health effects or fatalities in a large number of people or may not be immediately identified.

Due to potentially lethal levels of radiation emitted form medical or industrial sources, this type of attack can be performed covertly (e.g., no dissemination needed) or overtly (e.g., sprayed, scattered, explosion).

A "dirty bomb" is one type of radiological dispersal device that uses a conventional explosive to disperse radioactive material over a targeted area and is primarily used to:

   a.  Contaminate facilities or places where people live and/or work, disrupting lives and livelihoods.

   b.  Cause anxiety in those who think they are being or have bene exposed.

## Nuclear Attack

A nuclear attack is the use of a device that produces a nuclear yield. A nuclear explosion is caused by an uncontrolled chain reaction that splits atomic nuclei (e.g., fission) or combines atomic nuclei (e.g., fusion) to produce an intense wave of heat, light, and air pressure.

Although a nuclear device is difficult to construct, this attack has the largest impacted area.

## Explosives

An improvised explosive device (IED) attack is the use of a "homemade" bomb and/or destructive device to kill, destroy, incapacitate, harass, or distract. Because they are improvised, IEDs can come in many forms, ranging from a small pipe bomb to a sophisticated device capable of causing massive damage and loss of life.  An IED can be:

    a.  Carried or delivered in a vehicle.

    b.  Carried, placed, or thrown by a person.

    c.  Delivered in a package by a common carrier (e.g., mail carrier).

    d.  A secondary or entrapment device.

For proper response to explosive threats, see Department Manual 300.32, **Bomb Threats, Explosive Devices, Explosions**.

# Responsibilities

This section outlines the responsibilities regarding an incident involving a CRBNE material.

## First Responding Officers

Upon arrival at the scene of an incident determined to involve a CBRNE material, the first responding officers shall do the following:

    a.  Notify the dispatcher of the signs and symptoms of the victims and keep the dispatcher updated. Provide the dispatcher with a specific location for a victim collection area where HAZMAT and emergency medical services (EMS) personnel can respond.

    b.  Request HAZMAT and EMS personnel.

    c.  Request a supervisor.

    d.  If possible and if circumstances permit, stay upwind, uphill, and upstream of the contaminate in order to avoid possible contact and advise all officers and citizens to do the same.

    e.  Establish and keep clear entry and exit corridors for numerous responding emergency vehicles.

    f.  Protect the scene as a crime scene.

    g.  Notify the Command Staff as soon as information becomes available and provide updates.

Responding officers shall work closely with HAZMAT and EMS personnel to secure and stabilize the scene and rescue victims. Consistent with Department Manual 400.10, **Emergency Management**, officers shall defer to Houston Fire Department (HFD) officials regarding critical information necessary to ensure their safety. Officers shall defer to the judgement of HFD supervisors with respect to the establishment of the hot zone, warm zone, and cold zone. HFD shall have the primary responsibility for consequence management at the scene of a CBRNE incident.

## First Supervisor on the Scene

The first responding supervisor shall complete the "Seven Critical Tasks" listed in Department Manual 400.10, **Emergency Management**, with the advice and cooperation of HFD personnel and in the context of establishing the hot zone, warm zone, and cold zone. Additionally, the first responding supervisor shall:

    a. If merited, notify the dispatcher and request that a radio channel be dedicated for the incident.

    b. Notify the Command Staff without delay and provide an update regarding the scene and all victims.

    c. Allow only specially trained and equipped first responders to operate within the inner perimeter and only if they are wearing the appropriate personal protective equipment (PPE). The level of PPE required for warm zone and hot zone operations shall be determined by HFD based on the threat present.

    d. As soon as the inner perimeter is established and the warm zone is defined, initiate a log that contains the names and employee number/T-numbers of all TSUDPS personnel who enter or have been inside the inner perimeter. This log shall continue throughout the incident and list the entry and exit times of all TSUDPS personnel entering or leaving the warm zone and/or hot zone.

    e. Ensure any additional resources are staged in the cold zone.

## Dispatcher

The dispatcher shall follow the below procedures during CRBNE incidents:

    a. Dispatching a field supervisor and a patrol unit to the scene.

    b. Notifying HFD for a HAZMAT and EMS response, and providing a precise description of signs and symptoms of the victims.

    c. Notify the Command Staff.

## Command Staff

The Command Staff shall notify the following:

    a. Additional needed resources including the Houston Police Department Bomb Squad and Special Weapons and Tactics (SWAT) Detail. These officers are specifically trained and equipped to enable them to conduct law enforcement operations in a WMD environment.

    b. The Texas Southern University Office General Counsel.

    c. Federal Bureau of Investigation (FBI). By presidential directive, the FBI is the lead federal agency for incidents involving CRBNE terrorism. Any CBRNE weapon is a federal crime.

    d. City of Houston's Office of Emergency Management (OEM).

    e. Other resources as necessary.

In addition, the Command Staff shall maintain readily available reference material so that they can answer basic questions about sign and symptoms, incubation periods, and other information relative to the most common known CBRNE threats.

## On-Duty Lieutenant

The on-duty lieutenant shall do the following:

    a. Go to the scene of the CBRNE incident and obtain an incident briefing from on-scene personnel to ensure everyone is working cooperatively and efficiently.

    b. Determine the number of officers necessary to secure the scene, to set the inner and outer perimeters, to establish scene access control points, and to provide security and support operations as required.

    c.   Coordinate with the Command Staff for the use of Houston Police Departments Special Response Group (SRG) activation, if necessary.

    d.   Ensure that a log is being kept of all TSUDPS personnel entering and leaving the warm zone and/or hot zone.

    e.   In the case of a potential hoax with no victim symptoms are apparent, the lieutenant shall determine and evaluate the credibility of the initial information and its source.

## Decontamination

On-scene mass decontamination and/or emergency decontamination of individuals may be necessary to save lives and to limit the spread of the CBRNE agent. HFD personal shall perform the decontamination with law enforcement support to maintain order and issue directions.

All persons leaving the hot zone shall be considered to be contaminated. Every effort short of arrest or use of physical force should be made to get all contaminated persons to remain in the warm zone until they are properly decontaminated. Officers shall attempt to get voluntary compliance with the decontamination procedures.

A number of persons, particularly those who do not feel symptoms, may refuse to comply with decontamination directives and insist on leaving the scene. Based on information from EMS personnel, officers shall advise those persons leaving the scene to seek medical evaluation as soon as possible. If possible, the name and contact information of persons potentially contaminated should be recorded for future reference.

## Police Personnel and Weapons

All police personnel leaving the hot zone shall remain in the warm zone until evaluated by HFD and decontaminated if necessary.

If the HFD incident commander at the scene deems it necessary, all police personnel required to do so shall submit to emergency decontamination in accordance with HFD procedures. This includes decontamination of all firearms, which shall be done at the scene by HFD using water or other mixture deemed appropriate by HFD.

After the decontamination procedure, officers shall retain possession of their firearms. All other police equipment and personal property, including vehicles, shall be left at the scene if the HFD incident commander so order.

## Hoax Incidents

The absence of victim symptoms or other evidence to support the credibility of a CBRNE incident would suggest the possibility of a hoax incident. A hoax incident that causes a large-scale response can be just as effective for a terrorist from the standpoint of inconvenience to potential victims, bystanders, and the public in general. A hoax incident may result in the disruption of social institutions and have an adverse impact on local businesses and government resources. In addition, terrorists may use a hoax incident to test the timeliness or effectiveness of a local response.

Officers answering a call for service or investigating an incident that involves a CBRNE threat with no information or evidence to support the credibility of the threat shall:

    a.   Not touch or move anything that is supposed to be contaminated with a CBRNE agent.

    b.   Isolate the area.

    c.   Request a supervisor.

    d.   Ask the dispatcher to contact HFD for a HAZMAT response.

    e.   Contact the Command Staff to report the potential CBRNE incident.

If such actions are deemed appropriate by the HFD HAZMAT team supervisor, and HFD HAZMAT team shall evaluate the situation, recover CBRNE material, and conduct decontamination procedures.

In any case, the incident report shall list all potential victims that health officials can contact them at a later date if further precautionary measures are needed. Each potential victim shall be given instructions about personal precautionary measures that should be taken after leaving the scene. This information will be available from EMS or HAZMAT personnel.

In the event of a telephone threat with nothing else to support it, the threat should be handled similar to a bomb threat as described in Department Manual 300.32, **Bomb Threats, Explosive Devices, Explosions**. The person with care, custody, and control of the location involved should make any decision regarding evacuation.

## Related Department Manual Policies and Reference Material

- 300.25, **Special Threat Situations**
- 300.30, **Hate Crimes**
- 300.32, **Bomb Threats, Explosive Devices, Explosions**
- 400.05, **State Property**
- 400.10, **Emergency Management**
- Texas Southern University Department of Public Safety Standard Operating Procedure, Emergency Recall
- Texas Southern University Manual of Administration Policies and Procedures (MAPP), 04.03.01 Fire and Physical Safety