### NOTICE OF DISQUALIFICATION
### TEMPORARY DRIVING PERMIT

DIC-57 (Rev. 9/01)

_____   _____   _____

SUBJECT'S NAME                                               DL NO./STATE                DOB

ADDRESS _____

PHYSICAL DESCRIPTION (if unlicensed)  Race: _____  Sex: _____  Height: _____  Weight: _____  Eyes: _____  Hair: _____

DATE OF ARREST: _____  TIME OF ARREST: _____  COUNTY OF ARREST: _____

**PURSUANT TO TEX. TRANS. CODE ANN. CHAPTER 522, YOUR COMMERCIAL DRIVING PRIVILEGE WILL BE DISQUALIFIED FOR ONE YEAR (THREE YEARS IF TRANSPORTING HAZARDOUS MATERIAL REQUIRED TO BE PLACARDED), EFFECTIVE 40 DAYS AFTER THE DATE YOU RECEIVE THIS NOTICE, BECAUSE YOU:**

☐ **REFUSED** to provide a specimen or specimens of breath, blood, or urine to determine your alcohol concentration or the presence in your body of a controlled substance or drug while operating a commercial motor vehicle.

☐ **PROVIDED** a specimen of breath, blood, or urine, and an analysis of the specimen showed an alcohol concentration of .04 or greater while operating a commercial motor vehicle.

> **If your Texas driver license was confiscated, this document will serve as your temporary driving permit and authorizes the operation of non-commercial and commercial motor vehicles. It is subject to the same restrictions and endorsements as your Texas driver license. This permit does not provide you with any driving privileges if you do not have a Texas driver license or if your Texas driver license is expired, suspended, revoked, cancelled, or disqualified. This permit is effective immediately for the operation of non-commercial motor vehicles and will become effective beginning 24 hours from the time of your arrest for the operation of commercial motor vehicles. This permit is valid for 40 days from the date of service shown below. If you request a hearing, this permit will remain in effect until the administrative law judge makes a final decision in your case.**

Driver License Confiscated:   ☐ **Yes**   ☐ **No**   If no, explain _____

**Date Notice Served:** _____

_____
Officer's Signature

_____
Officer's Printed Name

_____
Agency

_____
Telephone No.

| **FOR DEPARTMENT USE ONLY** |
|---|
|  |

### DRIVER INFORMATION

**You may request a hearing to contest the disqualification by calling (800) 394-9913, faxing (512) 424-2650 or writing the Texas Department of Public Safety, Driver Improvement Bureau, at PO Box 4040, Austin, Texas 78765-4040.** All correspondence must include the following information: Full name, date of birth, driver license number and state, current mailing address, home and daytime telephone numbers, date and county of arrest, arresting agency, arresting officer, whether the test was failed, or refused, and such other information as requested by the Department. Please specify if you wish to have your hearing by telephone or in person. **The request for hearing must be received by the Texas Department of Public Safety no later than 15 days after you receive or are presumed to have received notice of suspension. Failure to request a hearing within this time is a waiver of your right to a hearing.** You will be notified of the date, time, and location of your hearing. You will be required to pay a $125 reinstatement fee to the Texas Department of Public Safety, Driver Improvement Bureau, PO Box 15999, Austin, Texas 78761-5999, in addition to any other fees required by law.

**DPS Copy—White**          **Driver's Copy—Yellow**

## AVISO DE DESCALIFICACIÓN
## PERMISO PROVISIONAL PARA CONDUCIR

DIC-57S (Rev. 2/18)

---

NOMBRE DEL INDIVIDUO                                           NO. DE LICENCIA/ESTADO      FECHA DE NACIMIENTO

DOMICILIO

DESCRIPCIÓN FÍSICA (si no tiene licencia)  Raza:     Sexo:     Estatura:     Peso:     Color de Ojos:   Color de Cabello:

FECHA DE DETENCION:              HORA DEL DETENCION:              CONDADO DEL DETENCION:

**EN CUMPLIMIENTO CON EL CÓDIGO TEX. TRANS. CODE ANN. CAPÍTULO 522, SU PRIVILEGIO DE CONDUCIR VEHICULOS COMERCIALES SERÁ CANCELADO POR UN PERIODO DE UN AÑO (TRES AÑOS EN EL CASO DE TRANSPORTAR MATERIALES PELIGROSOS QUE DEBEN SER IDENTIFICADOS CON PLACA), EFECTIVO A PARTIR DE 40 DÍAS DESPUÉS DE LA FECHA EN QUE USTED RECIBA ESTE AVISO, PORQUE USTED:**

☐ **SE NEGÓ** a proporcionar una muestra o muestras de aliento, sangre u orina para determinar la concentración de alcohol o la presencia en su cuerpo de una sustancia controlada o droga mientras que conducía un vehículo comercial.

☐ **PROPORCIONÓ** una muestra de aliento, sangre u orina, y un análisis del espécimen mostró una concentración de alcohol de .04 o superior mientras que conducía un vehículo comercial.

**Si su licencia de conducir en Texas fue decomisada, este documento servirá como su permiso provisional para conducir y le autoriza conducir vehículos que no sean comerciales y vehículos comerciales. Está sujeto a las mismas restricciones y anotaciones de su licencia de conducir de Texas. Este permiso no proporcionará ningún tipo de privilegios de conducir si no posee una licencia de conducir de Texas o si su licencia de conducir de Texas esta vencida, se ha suspendida, revocada, cancelada o descalificada. Este permiso está en vigencia inmediatamente para conducir vehículos que no sean comerciales y será efectivo a partir de 24 horas desde el momento de que fue detenido por conducir un vehículo comercial. Este permiso es válido durante 40 días a partir de la entrega de este aviso, igual que la fecha de aviso que esta anotada abajo. Si usted solicita una audiencia, este permiso permanecerá en efecto hasta que un juez administrativo tome una decisión final sobre su caso.**

Confiscaron la licencia de conducir:        **Si** ☐        **No** ☐        Si la respuesta es no, explique el motivo

**Fecha de entrega de este aviso:**

| | |
|---|---|
| | SÓLO PARA USO DEL DEPARTAMENTO |
| Firma del oficial | |
| Nombre impreso del oficial | |
| Agencia/Corporacion Policial | |
| No. de Teléfono | |

### INFORMACIÓN PARA EL CONDUCTOR

**Ud. puede solicitar una audiencia para protestar contra la decisión de descalificación llamando al (800) 394-9913, o enviando un fax al (512) 424-2650 o por escrito al Departamento de Seguridad Pública de Texas, Oficina de Mejoramiento del Conductor (Texas Department of Public Safety, Driver Improvement Bureau), P.O. Box 4040, Austin, Texas 78765-4040.** Toda la correspondencia debe incluir la siguiente información: nombre completo, fecha de nacimiento, número de licencia de conducir y estado, dirección de correo actual, números de teléfono de domicilio y de uso diario, la fecha y el condado de su detención, corporación policial que efecto la detención, nombre del oficial que efecto la detención, si la prueba ha fallado o negado, así como cualquier otra información solicitada por el Departamento de Seguridad Publica. Por favor avise por teléfono o en persona si desea una audiencia. **La solicitud de una audiencia debe ser recibida por el Departamento de Seguridad Pública de Texas (Texas Department of Public Safety) no más de 15 días después de que Ud. reciba o que se supone que ha recibido el aviso de la suspensión. Su falta de solicitar una audiencia dentro de este periodo de tiempo si considera una renuncia de su derecho de tener una audiencia.** Usted será notificado de la fecha, hora y lugar de la audiencia. Será necesario que usted pague el costo de $125.00 dolares para el restablecimiento de su licencia al Departamento de Seguridad Pública de Texas (Texas Department of Public Safety), la Oficina de Mejoramiento del Conductor, PO Box 15999, Austin, Texas 78761-5999, además de cualquier otra tarifa exigida por ley.

**Copia del DPS-Blanco        Copia del conductor-Amarillo**



**TEXAS**
Health and Human
Services

Texas Department of State Health Services
John Hellerstedt, M.D.
Commissioner

**MEDICAL ADVISORY BOARD  FOR DRIVER LICENSING**
Texas Department of State Health Services
P.O. Box 149347
Austin, TX 78714-9347
(512) 834-6700 - FAX (512)834-4501

## LAW ENFORCEMENT MEDICAL EVALUATION REQUEST

Print Name of Driver, Last Name, First Name, MI: _____

Driver License Number: _____ or Social Security Number: _____

Address of Driver*: _____

_____

 *List driver's current mailing address even if different from address printed on license.

Date of Birth:  Month: _____ Day: _____ Year: 19_____

Explain specific limitations to driving for this patient:

_____

_____

_____

_____

_____

REMARKS:

_____

_____

_____

_____
Signature and Number of Officer

_____
Print Last Name, First Name, MI

_____
Agency

_____
Date

https://www.dshs.texas.gov/medical-advisory-board/

revised 6/17

This form may be copied



HPD Incident #: _____
Date and Time: _____

# WITNESS ADMONISHMENT
# (AVISO A TESTIGOS)

Mi nombre es (letra de imprenta) _____; y yo entiendo
la lengua española:   Si: _____   No: _____   Iniciales: _____

Yo entiendo que voy a ver individuos para poder identificar o eliminar sospechosos. Al terminar el proceso me
pedirán que indique mis observaciones.   Iniciales: _____

Se le advierte a usted que:

1. El individuo que cometió la ofensa puede o no puede estar presente.

2. Usted no tiene que escoger a ningún individuo y es igualmente importante absolver de toda sospecha a personas
   que no están implicadas en el crimen así como es importante identificar a personas que se cree son responsables
   por el crimen.

3. La investigación continuará se identifique a un individuo o no.

4. Los individuos presentados pueden no aparecer exactamente como aparecían al momento que ocurrió el crimen
   debido a cambios en el pelo, bigote, barba, o la ropa.

5. Los individuos presentados serán colocados sin ningún orden.

6. Usted no discutirá el procedimiento de identificación con otros testigos.

7. Cuando está participando en el proceso de identificación, no hará gestos o sonidos o dirá cosas que otros testigos
   puedan ver o escuchar.

8. Cuando esté participando en el proceso, no buscará ayuda del administrador.

9. Al administrador se le prohíbe darle aviso o información sobre su selección o falta de selección.

10. Si usted está participando en la vista de fotografías, usted permanecerá en una posición de tal manera que nadie
    más incluyendo el administrador pueda ver las fotografías.

Yo he leído estos avisos, o me los han leído; y entiendo muy bien lo que se espera de mí en este proceso.

♦ Nombre en letra de imprenta del testigo en este proceso: _____

♦ Firma del testigo: _____   Fecha: _____   Hora: _____

♦ Interpreter (Print Name): _____   Interpreter (Signature): _____

**************************************************************************

## POLICE DEPARTMENT USE ONLY
## (PARA USO EXCLUSIVO DEL DEPARTAMENTO DE POLICIA)

HPD Employee Observations:
_____
_____
_____
_____
_____
_____

HPD Employee: _____   _____   Employee No.: _____
                      (Print Name)                    (Signature)



HPD Incident #: _____

Date and Time: _____

# WITNESS ADMONISHMENT

My name is (Print) _____ ; and I can understand the English language:   Yes: _____   No: _____   Initials: _____

I understand that I will be viewing individuals for the purpose of identifying and eliminating suspects. Upon completion of the procedure I will be asked to indicate my observations.   Initials: _____

You are admonished that:

1.  The individual who committed the offense may or may not be present.

2.  You are not required to select any individual and that it is equally important to clear persons not involved in the crime from suspicion as it is to identify persons believed to be responsible for the crime.

3.  The investigation shall continue whether or not an individual is identified.

4.  Individuals presented may not appear exactly as they did at the time of the incident because features such as head hair, facial hair, and clothing are subject to change.

5.  Individuals presented will be positioned in random order.

6.  You shall not discuss the identification procedure with other witnesses.

7.  While participating in the viewing, you shall not speak or make gestures or outcries that may be seen or heard by other witnesses.

8.  While participating in the viewing, you shall not look for guidance from the administrator.

9.  The administrator is prohibited from providing feedback to you regarding your selection or non-selection.

10. If you are participating in the viewing of a photo spread, you shall remain in a position so that no one else including the administrator can see the photo spread.

I have read the above admonishments, or they have been read to me; and I understand what is expected of me for this viewing procedure.

♦ Printed name of witness viewing the procedure: _____

♦ Witness Signature: _____   Date: _____   Time: _____

♦ Interpreter (Print Name): _____   Interpreter (Signature): _____

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## POLICE DEPARTMENT USE ONLY

HPD Employee Observations:

_____
_____
_____
_____
_____
_____

HPD Employee: _____   _____   Employee No.: _____
                    (Print Name)                         (Signature)





**Agency Number:** ____          **Policy Number**: _____

# Automobile Accident Procedure

**If an accident involving any University owned or rental vehicle has just occurred, take any emergency actions that are necessary and follow these steps:**

1. Call 911 immediately so an official accident report will be prepared.  Inform 911 of serious injuries that could require emergency equipment/personnel to be dispatched to the scene.

2. Obtain the following information to complete the *Automobile Accident Report*.

| Other Driver/Vehicle Information: |
| --- |
| Name: _____ Day Time Phone #: (    ) _____ Home Phone #: (    ) _____ |
| Address: _____ City: _____ County: _____ State: ___ Zip: _____ |
| Email: _____ Drivers DL #: _____ DL State: ___ DOB: _____ |
| Year: _____ Color: _____ Make: _____ Model: _____ Lic Plate#: _____ |
| Vehicle Owner's Name: _____ Policy Holder's Name: _____ |
| Auto Insurance Carrier: _____ |
| Policy #: _____ Auto Insurance Carrier Phone #: (    ) _____ |
| Number of people in the other vehicle:_____ (Circle appropriate):  Driver / Front Passenger / Back right |
| Passenger / Back left Passenger / Other (explain) _____ _____ |
| (use back of form for additional information) |

**Notice specific details of the damages to all vehicles/property involved. These details will need to be provided on the** *Automobile Accident Report.*  **If you have a digital camera or a camera phone, take pictures of the vehicles involved and the accident scene.**

3. Provide the state agency automobile insurance ID card to the police. The automobile insurance ID and this blank reporting form should be in the glove compartment of the vehicle.  (After use of this form, please replace it with another blank form.)

4. Complete the enclosed *Automobile Accident Report* immediately and return the original to the state agency insurance contact (listed below) *within 24 hours of the accident.*

5. Contact your insurance contact at your state agency to report the claim and provide this completed Automobile *Accident Report.*
**Name & Phone: Mellany Patrong      Email: patrongmw@tsu.edu**
The insurance contact will use this completed form to add the claim information into the SORM property and casualty claims database.

**Refer all inquiries about the accident from individuals, insurance carriers, or attorneys to Mellany Patrong.  <u>Do not</u> make any statements about the accident to anyone without first notifying Ms. Patrong.**

# Vehicle Accident Report

Collect information and complete both pages of this form immediately after an accident occurs. The original report should be hand delivered to the state agency insurance representative's office within one business day of the accident (pending injuries). If you have any questions, please call the state agency insurance representative

(Name)    **Mellany Patrong**                                    Ph. # ( 713 )    313 - 6859

## General Information:

Date of Accident: _____ Time: _____ ☐ AM    ☐ PM

Location of Accident: _____

City: _____ County: _____ State: _____

Authority Contacted: _____ Report #: _____

Responding Officer: _____

List any traffic violations/citations given to any drivers: _____

_____

_____

Weather Condition: _____ Road Condition: _____ Visibility: _____

Detailed description of physical conditions at location of vehicle accident:

_____

_____

Detailed description of activity leading to vehicle accident _____

_____

_____

_____

Detailed description of any other factors that contributed to this accident: _____

_____

_____

_____

Details of injured persons in the State agency vehicle (provide name, relationship to the state agency and injury):

_____

_____

Witness name(s) and Phone #(s): _____

_____

_____

## Describe Damage to Vehicle:

Identify which parts of the vehicles came into contact with each other i.e. "My left rear bumper was hit by his right front as he tried to avoid rear ending my car": _____

_____

_____

*(Page 1 of 3)*

## Your                                                e

(Draw a                                              elow):

Key symbol                                           id you notice danger?_

**My Re**

**State Agency Driv...**

Name: _____

Driver's License # ____

Home Address: __

City: _____

Home Phone: (

Agency Departmen...

Work Phone #: (

Purpose for using...

_____

**State Agency Veh...**

Year: _____ Make:____

VIN: _____

Describe damage t...

_____

**Other Driver Info...**

Driver Name: ____

City: _____

Wk Phone #: (

Driver DL#: _____

Owner Name: ____

Insurance Compan...

Insurance Policy #...

Number of photos...

Any obvious prior dam...

**Other Vehicles I...**

Year: _____ Make...

Please list passeng...

_____

_____

Describe damage...

_____

_____

Signature of State...

*(Page 3 of 3)*

in your vehicle_____

__ Employee ID: ___

_____Date of Bir...

_____

___State: _____

s: _____

___ Job Title: _____

rvisor: _____

_____

_____

_____

_____De...

te #: _____

_____

_____

_____

page):

ss: _____

_ Zip:_____Hm...

_____

tate:_____ Dr...

: Wk Phone #: (   )__

_____Phone #: (

__ Agent: _____

d all vehicle damage?

_____

_____

__License Plate #: __

and any injuries: ___

_____

_____

_____

_____

Signature of Supervi...



**Department of Public Safety**

3443 Blodgett Avenue  |  General Services Building  |  Houston, Texas 77004

Office: 713-313-7000  |  Email: tsudps@tsu.edu

**From:** Le, Hao <Hao.Le@tsu.edu>
**Sent:** Friday, December 2, 2022 6:45 PM
**To:** Benjamin Hall <bhall@thlf.us>; MyTeam <myteam@thlf.us>
**Subject:** Administrative Leave with Pay

Dear Ben:

I sent you correspondence yesterday on behalf of our VP of Business & Finance/CFO regarding your client being placed on immediate administrative leave with pay. I have been apprised that your client showed up today on the University campus in complete disregard of her administrative leave. I would ask that you advise your client and remind her regarding the conditions of her administrative leave, which is to refrain from:

1. Being on campus grounds,
2. Attending University-sanctioned events,
3. Utilizing any University-owned items (e.g., vehicle, uniform, keys, computer, mobile telephone, etc.), and
4. Retaliation.

## Hao Le
*Chief Compliance Officer & General Counsel*

**TSU** TEXAS SOUTHERN UNIVERSITY
Office of General Counsel

Office: 713-313-7470 | Fax: 713-313-1906
Hannah Hall, 340
3100 Cleburne Street, Houston, TX 77004
www.tsu.edu

This e-mail is confidential. Please do not forward. If this e-mail is delivered to an unintended recipient, please delete immediately without storing any of the content. Thank you.

**CAUSE NO. 2022-77744**

| | | |
|---|---|---|
| **MARY YOUNG** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Petitioner,* | § | |
| | § | |
| | § | |
| **v** | § | **HARRIS COUNTY, TEXAS** |
| **TEXAS SOUTHERN UNIVERSITY,** | § | |
| **AND RESPONSIBLE TSU AGENTS** | § | |
| | § | |
| *Respondent.* | § | **127ᵀᴴ JUDICIAL DISTRICT** |

---

### PETITIONER'S FIRST NOTICE OF RESPONDENT TSU'S DELIBERATE VIOLATIONS OF TEMPORARY RESTRAINING ORDER

---

To the Honorable District Court Judge:

Petitioner, TSU Police Chief Mary Young ("Petitioner"), files this First Notice of Respondent TSU's Deliberate Violations of Temporary Restraining Order and shows the following:

### Short History of Proceedings

1. This is a mandamus action. Petitioner is seeking a mandamus to compel Texas Southern University ("TSU") to comply with non-discretionary Texas law.

2. Two Harris County district judges (Engelhardt and Morris) have already recognized the need for emergency relief in this case because of TSU's disregard of mandatory state law governing how complaints against licensed peace officers are to be conducted. *Cf.* Section 614.022 and 614.023, Texas Government Code. On December 1, 2022, Judge Morris

issued the TRO to stop TSU's *ultra vires*[1] and illegal acts.   On December 2, 2022, Judge Engelhardt granted Petitioner's emergency motion for expedited discovery to prepare for the upcoming temporary injunction hearing.   Both judges listened to TSU's protests against the need for a TRO and rejected them.

### Restrictions Imposed in the TRO

3.   The TRO found that TSU was threatening to engage in unlawful employment actions against Petitioner in violation of mandatory Texas law.   And, such actions would deprive Petitioner of "guaranteed statutory rights under Texas law" which money could not redress.   Consequently, the TRO restrained TSU from engaging in any of the following conduct:

a) threatening to, attempting to, purporting to, or taking any adverse employment or disciplinary action against Petitioner until the court can conduct a hearing on Petitioner's request for a temporary injunction, …

b) taking any further actions, failing to take necessary actions, that would damage, impair, frustrate, put at risk, jeopardize, and/or delay in any way the completion of the items addressed in (a)…

TSU received actual notice of the TRO on December 1, 2022, when the court and Petitioner's counsel electronically and personally served same on TSU's counsel.

### TSU Intentionally Violates the TRO (First Notice)

4.   Less than 2 hours of being served with both the TRO and signed expedited discovery order, TSU affirmatively took actions to disregard the order:

---

[1] Texas Supreme Court has held that *ultra vires* acts of a governmental official are not protected by sovereign immunity.  See *The City of El Paso v. Heinrich*, 284 S.W.3d 366 (2009)

a)  In an email dated December 2, 2022, at 5:17 PM, TSU purports to have emailed the undersigned counsel with a letter placing Petitioner on administrative leave.  See attached **Exhibit 1**.

b)  On the same day, at 6:53 PM, TSU employee Devi Bala circulated throughout the TSU police department telling the entire police department that a Sergeant Bobby Brown was being appointed interim police chief of the TSU police department.  See attached **Exhibit 2**.

c)  On Saturday, December 3, 2022, Petitioner's undersigned Counsel asked TSU's General Counsel —one of five lawyers TSU had at the TRO hearing— to advise his client to comply with the TRO.  TSU's counsel did not respond

d)  Early Saturday morning, December 3, 2022, Petitioner filed an Emergency Motion for Contempt and to Enforce Emergency Temporary Restraining Order and served a copy on TSU's counsel.  See attached **Exhibit 4.**  Neither TSU nor its counsel responded.

e)  On Sunday, December 4, 2022, Petitioner's attorney again advised TSU's counsel that the University was in violation of the TRO and that Petitioner would not obey any TSU instructions that violated the TRO.  She also advised that she intended to continue to show up for work and perform as TSU police chief and that she  would submit to arrest if TSU was intent on violating the court-issued TRO.  See attached **Exhibit 5**.

f)  On Monday morning, December 5, 2022, at approximately 8:00 AM, Petitioner showed up for work at her TSU police office only to learn her TSU-issued card key to enter the building had been deactivated.  She also learned that access to her police

email account had been disabled.  See attached **Exhibit 6**, photo of Petitioner's police screen showing the computer account had been disabled.  The undersigned counsel wrote TSU's General Counsel Le and asked him to instruct his client to comply with the TRO.  See attached **Exhibits 3 and 3a.**[2]  General Counsel Le did not respond.  Petitioner also learned that the purported "interim chief" had already been "pinned" by TSU as the interim police chief in direct violation of the TRO.

g)  TSU's General Counsel Le possessed actual knowledge of the TRO and was required to comply with it and to inform his client to do the same.  He did not! Mr. Le deliberately violated the TRO himself when he sent out an email within hours of the  hearing purporting to prevent Petitioner from doing her job as TSU police chief.  In writing, he instructed Petitioner not to 1) come on campus, 2) attend university-sanctioned events, 3) utilize any university equipment (vehicles, uniform, keys, computer, mobile telephone, etc.), etc.  See attached **Exhibit 7**.

TSU and General Counsel Le obviously don't respect court orders, just like they don't believe they have to comply with the mandatory state law.  This court must do something to curb TSU's lawlessness.

### Requested Relief

5.  TSU's and Mr. Le's conduct is not accidental!  It is deliberate and repetitious.  Such lawlessness must be sent a strong message that court orders are to be obeyed.  No one is above the law—not even a University or its General Counsel.  Petitioner asks the court to enter

---

[2] The undersigned counsel also accompanied Petitioner at work to ensure the TRO was followed.

an order of contempt and to enter sanctions to address the misconduct in at least the following particulars:

    a)  Order TSU to pay $10,000 for each of its prior violations of the TRO (~$50,000);

    b)  Prepare and forward to the Texas State Bar an Order of Reprimand for General Counsel Hao Le for knowingly and deliberately violating the court order; and

    c)  Enter a standing order that TSU and/or Le shall pay an additional $15,000 for each future violation of the court's TRO or any other order of the court in this matter.

    6.     Petitioner asks that TSU and Mr. Hao Le be ordered to appear and show cause why they should not be held in contempt of court and be ordered to pay at least the monetary sanctions and suffer the penalty requested above. A suggested order will be supplied at the hearing on this matter.

Respectfully submitted,

**THE HALL LAW GROUP, PLLC**

*/s/ Benjamin L. Hall, III*
**Benjamin L. Hall, III**
State Bar No. 08743745
**Ryan Finnegan**
State Bar No. 24119322
530 Lovett Boulevard
Houston, Texas 77006
Telephone: (713) 942-9600
Facsimile:  (713) 942-9566
Email: bhall@thlf.us
Email: rfinnegan@thlf.us

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document was served via the Court's electronic filing system on counsel for Respondent on December 5, 2022.

/s/ *Benjamin L. Hall, III*
Benjamin L. Hall, III

# EXHIBIT 1-1

-------- Original message --------

From: Devi Bala <devi.bala@tsu.edu>

Date: 12/2/22 5:17 PM (GMT–06:00)

To: "Young, Mary" <Mary.Young@TSU.EDU>

Subject: Administrative leave with pay

Dear Chief Young,
Please see attached.

Best regards,

*Devi Bala, CPA*
*VP Business & Finance/CFO*



Office: 713-313-1183

Hannah Hall, Suite 116

3100 Cleburne Street, Houston, TX 77004
www.tsu.edu



Correspon....1.2022.pdf
812 KB

# EXHIBIT 1-2



Texas Southern University
Division of Business & Finance
3100 Cleburne Street, Hannah Hall #116
Houston, Texas 77004
Phone: (713) 313-1382
Devi.Bala@tsu.edu | www.tsu.edu

December 1, 2022

Via E-mail: bhall@thlf.us, myteam@thlf.us

Ms. Mary Young
c/o Mr. Ben Hall, Esq.
The Hall Law Group, PLLC
530 Lovett Blvd.
Houston, Texas 77006

**Subject**: Notice of Temporary Relief of Duties

Dear Chief Young:

On August 25, 2022, our Acting Chief Audit Executive, Ms. Darlene Brown, presented you with a signed written complaint. The complaint relates to your actions as the University's Chief of Police. Resulting from the investigation, there is evidence to prove the allegations of your misconduct, which violates the following policies:

- 02.05.06 – Fraud Policy,
- 02.05.05 – Ethics & Conflict of Interest,
- 02.02.01 – Pay Guidelines for Staff Employees, and
- 02.02.03 – Overtime/Compensatory Time.

Effective immediately, you are temporarily relieved of your duties as Chief of Police with pay until further notice. The University will make an ultimate decision on your employment status. Throughout the duration of this paid administrative leave, we request that you refrain from being on campus grounds, attending University-sanctioned events, and utilizing any University-owned items (*e.g.*, vehicle, uniform, keys, computer, mobile telephone, etc.) until such a time as you are otherwise notified.

You are directed not to attempt to contact anyone concerning the above-identified investigation, anyone who has made allegations, anyone who is a witness to the allegations, or anyone providing information to the investigation and/or complaint. You are further directed not to retaliate in any shape, form, or fashion, against anyone who has made allegations, anyone who is a witness to the allegations, and/or anyone providing information to the investigation and/or complaint.

Retaliation is defined under University policies as any act, including an adverse personnel action, that has the effect of punishing a person for making a complaint or otherwise participating in an investigation of a complaint, including any act of intimidation, harassment, threats, coercion or discrimination. Any contact with or retaliation against persons involved in the matters identified above, in violation of the directives issued in this letter and University policies, will result in immediate disciplinary action.

1

If you have any questions or concerns about this matter, please call Yolanda Edmond, Sr. Assoc. Vice President of Human Resources & Payroll Services. The Office of Human Resources is located in Hannah Hall, Suite 126, or (713) 313-7521. We appreciate your co-operation in this matter.

Sincerely,

Devi Bala
Vice President of Business & Finance/CFO

# EXHIBIT 2

**Friday, December 2, 6:53 PM**

☺

Good Evening, Texas Southern University Police Department:

I trust this email will find you in good health. Effective immediately, Friday, December 2, 2022, Deputy Segreant Bobby Brown will serve as the Acting Executive Director of Public Safety and Acting Chief of Police. Thank you all for your leadership, service, and protection.

Sincerely,
*Devi Bala, CPA*
*VP Business & Finanace/CFO*
*Texas Southern University*
*devi.bala@tsu.edu*

# EXHIBIT 3

Saturday 10:01 AM

Hao: Update on emergency hrg: hrg must be in assigned court-not ancillary...working on date and time now...standby

Read Saturday

Today 8:00 AM

Hao, Chief Young is coming to work, but her emails are not working.  Please advise your client to obey the court order and turn on her emails.  She needs to conduct her business

Delivered

# EXHIBIT 4

12/3/2022 1:19 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 70673512
By: SASHA PRINCE
Filed: 12/5/2022 12:00 AM

**CAUSE NO. 2022-77744**

| | | |
|---|---|---|
| **MARY YOUNG** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Petitioner,* | § | |
| | § | |
| | § | |
| | § | |
| **v** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **TEXAS SOUTHERN UNIVERSITY,** | § | |
| **AND RESPONSIBLE TSU AGENTS** | § | |
| | § | |
| *Respondent.* | § | **127th JUDICIAL DISTRICT** |

**<u>PETITIONER MARY YOUNG'S EMERGENCY MOTION FOR CONTEMPT AND TO
ENFORCE EMERGENCY TEMPORARY RESTRAINING ORDER</u>**

**To the Honorable Ancillary Judge:**

Petitioner, TSU Police Chief Mary Young, files this emergency motion for the following

reasons:

**I.**
**Short History of Proceedings**

1.1    This is a mandamus action.  Petitioner is seeking a mandamus to compel Texas

Southern University ("TSU") to comply with non-discretionary Texas statutory law.

1.2    Within the last 48 hours, two different sitting Harris County district judges

(Engelhart and Morris) have recognized the need for emergency relief in this case because of

TSU's blatant disregard of mandatory state law governing how complaints against licensed peace

officers are required to be conducted.  *Cf.* Section 614,022 and 614.023, Texas Government Code.

Judge Morris issued the TRO enjoining TSU's *ultra vires* and illegal acts.  See **Exhibit 1.**  Judge

Engelhart granted Petitioner's emergency motion for expedited discovery to prepare for the

temporary injunction hearing. See **Exhibit 2.**  Both judge's listened to TSU's arguments and rejected them.

      1.3    Given that two prior judges have already heard and rejected TSU's protestations to the TRO, this motion is not an opportunity to revisit why the TRO was needed.   Rather, the motion is filed to seek redress for TSU's intentional and deliberate violation of the TRO and to request enforcement of the order.

      1.4    The TRO in this case, dated December 1, 2022, found that Respondent TSU was "threatening to terminate or discipline or engage in an unlawful employment action against Petitioner in clear violation of Texas law."[1]  This court further found that TSU's unlawful conduct against Petitioner  was "based on [an] invalid complaint and  [that disciplinary action] would violate the legal requirements mandated by Texas law."[2]  To prevent TSU's unlawful *ultra vires* actions against Petitioner, the court found that "[a]n immediate temporary restraining order/mandamus [was] required to maintain the *status quo ante* until …a temporary injunction hearing" could be conducted. See **Exhibit 1** at 1-2.  The TRO also found that TSU's unlawful actions would cause Petitioner irreparable harm and would deprive her of "*guaranteed statutory rights under Texas law*" which "money damages cannot redress."  *Id.* at "e," paragraph "b."  And, the evidence showed that TSU had to be enjoined because it had been knowingly violating the statutory rights of Petitioner for months.  *Id.*

      1.5    Because of TSU's repetitious and knowing violations of Petitioner's legal rights, the judges recognized a temporary restraining order and expedited discovery were needed.   The TRO expressly enjoined TSU from doing any of the following acts:

---

[1] Petitioner is a licensed Texas peace officer employed as the Chief of Police at Texas Southern University.
[2] Sections 614.022 and 614.023, Tex. Gov't Code, provides mandatory requirements that govern investigations of police officers based on a complaint.  TSU ignored and disregarded all of those requirements based an unsigned, anonymous complaint.

a. threatening to, attempting to, purporting to, or taking any adverse employment or disciplinary action against Petitioner until the court can conduct a hearing on Petitioner's request for a temporary injunction,

…

c. taking any further actions, of failing to take necessary actions, that would damage, impair, frustrate, put at risk, jeopardize, and/or delay in any way the completion of the items addressed in (a)…

The above clearly informed TSU that it was not to engage in any action, or even attempt to engage in any action, or take "*any adverse employment or disciplinary action* against Petitioner until the court can conduct a hearing on Petitioner's request for a temporary injunction." And the temporary injunction hearing was scheduled to occur on December 13, 2022 at 11:00 a.m.

      1.6    In further support of the TRO, Judge Engelhart conducted an emergency hearing one day later to authorize expedited discovery to be conducted to prepare for the temporary injunction hearing. He ordered TSU to present its President for deposition, as well as the investigator who engaged in some of the unlawful conduct alleged in this case. Finally, Judge Engelhart ordered TSU to produce within 3 business days all of the investigative files TSU had compiled relating to Petitioner based on the anonymous and unsigned complaint. *See* attached **Exhibit 2,** Judge Engelhart's signed discovery order.

      1.7    Less than 24 hours after the TRO had been signed, issued and bond paid, and less than 1 ½ hours after the expedited discovery order was signed, TSU, represented and advised by the same lawyers who attended both hearings, ignored the TRO and instructed Petitioner to leave campus, removed her from her position as chief of police, instructed her not to return to her office, not to wear her officer uniform, and not to perform her duties. TSU further violated the TRO by

replacing Petitioner with an "acting chief of police" who was one of her subordinates.  *See* Group Exhibit 3, TSU emails and records provided to Petitioner and her counsel in direct violation of the TRO.

1.8     TSU's violations of the TRO is flagrant, intentional, knowing and is an affront to this court's orders.   This court must act immediately to enforce the temporary restraining order, restore the parties to the *status quo ante* that existed prior to TSU's violations, set a hearing to assess sanctions and penalties for TSU's knowing and intentional violations of the TRO, require TSU to pay Petitioner's attorney's fees and costs for having to prepare, file and argue this motion, and reinstate Petitioner to the position from which she was unlawfully removed until the court can conduct the temporary injunction hearing in this case.

1.9     Petitioner asks the court to immediately approve and enter the attached supplied order, and grant Petitioner any further relief to which she may be entitled.

Respectfully submitted,

**THE HALL LAW GROUP, PLLC**

*/s/ Benjamin L. Hall, III*
**Benjamin L. Hall, III**
State Bar No. 08743745
**Ryan Finnegan**
State Bar No. 24119322
530 Lovett Boulevard
Houston, Texas 77006
Telephone: (713) 942-9600
Facsimile:  (713) 942-9566
Email: bhall@thlf.us
Email: rfinnegan@thlf.us

**ATTORNEYS FOR PETITIONER**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that all counsel of record were served with the foregoing document on December 3, 2022.

*/s/ Benjamin L. Hall, III*
**Benjamin L. Hall, II**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Ryan Finnegan on behalf of Benjamin Hall, III
Bar No. 08743745
rfinnegan@bhalllawfirm.com
Envelope ID: 70673512
Status as of 12/3/2022 9:05 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rosalinda Luna | | Rosalinda.Luna@oag.texas.gov | 12/3/2022 1:19:00 AM | SENT |
| Benjamin S.Lyles | | benjamin.lyles@oag.texas.gov | 12/3/2022 1:19:00 AM | SENT |
| Ryan Finnegan | | rfinnegan@thlf.us | 12/3/2022 1:19:00 AM | SENT |
| Hall Law | | myteam@thlf.us | 12/3/2022 1:19:00 AM | SENT |
| Benjamin Hall | | bhall@thlf.us | 12/3/2022 1:19:00 AM | SENT |

# EXHIBIT 5

From: Benjamin Hall penman13@aol.com
Subject: Compliance with Court-Issued TRO
Date: Dec 3, 2022 at 11:13:57 AM
To: Le, Hao Hao.Le@tsu.edu
Cc: Benjamin Hall bhall@thlf.us, myteam@thlf.us

Hao:

I am in receipt of your email below which is in direct violation of the December 1, 2022 temporary restraining order issued in Cause No. 202277744, styled Young, Mary v. Texas Southern University. ("TRO")

As Chief Young's attorney, I have advised her to disregard all instructions by you or any other TSU official that abridges the protections granted to her in the court-issued TRO.  Unless and until that TRO expires, Chief Young will continue to carry out her employment duties as the Chief of Police of Texas Southern University.  She will continue in all ways to perform her duties as the TSU Chief of Police and any actions by TSU to interfere with, abridge or frustrate the protections granted her in the court-issued TRO will not be honored or tolerated.

Please advise if TSU intends to arrest Chief Young for continuing to do her duties as the TSU Chief of Police under the protections of the court-issued TRO.  If so, I will make arrangements to be present when that occurs and will have necessary parties standing by to ensure she can be bailed out of jail.   Neither Chief Young nor I will indulge or tolerate TSU's roguish behavior and complete disregard for the rule of law.

Please be sure to forward this email to all necessary parties at TSU, including the Regents, President, HR personnel and police personnel.

I am copying all known

**Benjamin L. "Ben" Hall, III, Ph.D., J.D.**
**The Hall Law Group, PLLC**
530 Lovett Blvd.
Houston, Tx. 77006

713.942.9600 (o)
713.942.9566 (f)
bhall@thlf.us
**Board Certified: Personal Injury Trial Law (Texas)**
**Board Certified: Civil Trial Law (Texas)**
**TOP 10 BEST OF THE BEST LAWYERS (Texas)**
**TOP 10 BEST OF THE BEST PERSONAL INJURY LAW FIRMS (Texas)**
**TOP 100 TRIAL ATTORNEYS (NBA)**
**TOP 100 PERSONAL INJURY TRIAL LAWYERS  (Texas)**
**TEXAS SUPER LAWYER (*Since 2004*)**
**AV-RATED, *MARTINDALE-HUBBELL* (*Since 1998*)**
**MEMBER: ABOTA, TTLA, ABA, NBA, TLA**
**BOARD MEMBER: Texas Board of Legal Specialization (2008-2014)**


On Dec 2, 2022, at 6:44 PM, Le, Hao <Hao.Le@tsu.edu> wrote:


Dear Ben:

I sent you correspondence yesterday on behalf of our VP of Business & Finance/CFO regarding your client being placed on immediate administrative leave with pay.  I have been apprised that your client showed up today on the University campus in complete disregard of her administrative leave.  I would ask that you advise your client and remind her regarding the conditions of her administrative leave, which is to refrain from:

1. Being on campus grounds,
2. Attending University-sanctioned events,
3. Utilizing any University-owned items (e.g., vehicle, uniform, keys, computer, mobile telephone, etc.), and
4. Retaliation.

**Hao Le**
*Chief Compliance Officer & General Counsel*



Office: 713-313-7470 | Fax: 713-313-1906
Hannah Hall, 340
3100 Cleburne Street, Houston, TX 77004
www.tsu.edu

This e-mail is confidential.  Please do not forward.  If this e-mail is delivered to an unintended recipient, please delete immediately without storing any of the content.  Thank you.

# EXHIBIT 6





# THE HALL LAW GROUP, PLLC

530 Lovett Boulevard   •   Houston, Texas 77006
Telephone:  (713) 942-9600   •   Facsimile: (713) 942-9566

December 5, 2022

<u>*Via E-filing*</u>

Honorable Judge Ravi K. Sandill
C/o Clerk of Court
127th Judicial District Clerk
201 Caroline St., 10th Floor
Houston, TX 77002

Re: Cause No. 2022-777446; *Young v. TSU*; 127th District Court of Harris County, Texas

Dear Honorable Judge Ravi K. Sandill:

Petitioner, Police Chief Mary Young, respectfully requests an emergency hearing on the attached document: Petitioner's First Notice of Respondent TSU's Deliberate Violations of Temporary Restraining Order.

Very truly yours,

/s/ William L. Van Fleet II
William L. Van Fleet II

Cc: All Counsel of Record








12/5/2022 5:04 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 70716729
By: CAROL WILLIAMS
Filed: 12/5/2022 5:04 PM

## CAUSE NO. 2022-77744

| | | |
|---|---|---|
| **MARY YOUNG** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Petitioner,* | § | |
| | § | |
| | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **TEXAS SOUTHERN UNIVERSITY,** | § | |
| **AND RESPONSIBLE TSU AGENTS** | § | |
| | § | |
| | § | |
| *Respondent.* | § | **127TH JUDICIAL DISTRICT** |

---

### PETITIONER'S SECOND NOTICE OF RESPONDENT TSU'S DELIBERATE VIOLATIONS OF TEMPORARY RESTRAINING ORDER

---

To the Honorable District Court Judge:

Petitioner, TSU Police Chief Mary Young ("Petitioner"), files this Second Notice of Respondent TSU's Deliberate Violations of Temporary Restraining Order shows the following:

### Short History of Proceedings

1.     This is a mandamus action. Petitioner is seeking a mandamus to compel Texas Southern University ("TSU") to comply with non-discretionary Texas law.

2.     Two Harris County district judges (Engelhardt and Morris) have already recognized the need for emergency relief in this case because of TSU's disregard of mandatory state law governing how complaints against licensed peace officers are to be conducted. *Cf.* Section 614.022 and 614.023, Texas Government Code.   On December 1, 2022, Judge Morris

issued the TRO to stop TSU's *ultra vires*[1] and illegal acts.   On December 2, 2022, Judge Engelhardt granted Petitioner's emergency motion for expedited discovery to prepare for the upcoming temporary injunction hearing.   Both judges listened to TSU's protests against the need for a TRO and rejected them.

### Second Notice of Violations

3.     **Violation No. 8:**     Petitioner has learned that TSU, acting in direct violation of the court's TRO, actually "pinned" Bobby Brown, police chief, with four (4) stars to present him as TSU police chief while the court's TRO was in place.   Attached as **Exhibit 8**[2] is a photograph of Sergeant Bobby Brown (right side of photo) with the four stars of the TSU police chief.   Also present in the photograph is TSU Sergeant Darren Barnett (left side of photo).   The photo was taken after the pinning had occurred in violation of the TRO.

4.     **Violation No. 9:**     Petitioner has also learned that Mr. Brown was offered a police chief salary of over $100,000 to take the police chief position.   Again, such was a direct violation of the TRO.

### Requested Relief

5.     Petitioner asks the court to take into consideration the repetitive and deliberate violations of the court's order and enter the relief previous requested.   Petitioner asks for such other and further relief to which she may be entitled.

---

[1] Texas Supreme Court has held that *ultra vires* acts of a governmental official are not protected by sovereign immunity.   See *The City of El Paso v. Heinrich*, 284 S.W.3d 366 (2009)

[2] Exhibits are number seriatim with prior evidence of violations in included with Petitioner's First Notice of Notice of Respondent TSU's Deliberate Violations of Temporary Restraining Order

Respectfully submitted,

**THE HALL LAW GROUP, PLLC**

*/s/ Benjamin L. Hall, III*
**Benjamin L. Hall, III**
State Bar No. 08743745
**Ryan Finnegan**
State Bar No. 24119322
530 Lovett Boulevard
Houston, Texas 77006
Telephone: (713) 942-9600
Facsimile: (713) 942-9566
Email: bhall@thlf.us
Email: rfinnegan@thlf.us

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was served via the Court's electronic filing system on counsel for Respondent on December 5, 2022.

*/s/ Benjamin L. Hall, III*
Benjamin L. Hall, III

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Kimberly Bobb on behalf of Benjamin Hall, III
Bar No. 08743745
kbobb@bhalllawfirm.com
Envelope ID: 70716729
Status as of 12/6/2022 6:59 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rosalinda Luna | | Rosalinda.Luna@oag.texas.gov | 12/5/2022 5:04:41 PM | SENT |
| Benjamin S.Lyles | | benjamin.lyles@oag.texas.gov | 12/5/2022 5:04:41 PM | SENT |
| John DanielCoolidge | | daniel.coolidge@oag.texas.gov | 12/5/2022 5:04:41 PM | SENT |
| Nicole Myette | | nicole.myette@oag.texas.gov | 12/5/2022 5:04:41 PM | SENT |
| Ryan Finnegan | | rfinnegan@thlf.us | 12/5/2022 5:04:41 PM | SENT |
| Hall Law | | myteam@thlf.us | 12/5/2022 5:04:41 PM | SENT |
| Benjamin Hall | | bhall@thlf.us | 12/5/2022 5:04:41 PM | SENT |



12/6/2022 1:40 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 70742713
By: CAROL WILLIAMS
Filed: 12/6/2022 1:40 PM

## CAUSE NO. 2022-77744

| | | |
|---|---|---|
| **MARY YOUNG** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Petitioner,* | § | |
| | § | |
| | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **TEXAS SOUTHERN UNIVERSITY,** | § | |
| **AND RESPONSIBLE TSU AGENTS** | § | |
| | § | |
| | § | |
| *Respondent.* | § | **127TH JUDICIAL DISTRICT** |

---

### PETITIONER'S THIRD NOTICE OF TSU'S CONTINUING AND DELIBERATE VIOLATIONS OF TEMPORARY RESTRAINING ORDER

---

To the Honorable District Judge Ravi Sandill:

Petitioner, TSU Police Chief Mary Young, files this **THIRD** Notice of TSU's Continuing and Deliberate Violations of Temporary Restraining Order and shows the following:

### Nature of Case

1.      This is a mandamus action.  Petitioner is seeking a mandamus to compel Texas Southern University ("TSU") to comply with non-discretionary Texas law.  The brief procedural history of this case has been previously detailed in prior notices filed by Petitioner and will not be repeated here.

### THIRD Notice of Continuing Violations

2.      TSU is continuing to flagrantly violate this court's December 1, 2022 temporary restraining order ("TRO").  The repetitive nature of the violations shows the conduct is not accidental or the result of mere negligence.  They are purposeful!

3.      Each day since the TRO has been in place, TSU has violated and ignored the order.  Today, 12/6/22, five days after the TRO has been in place, TSU again disabled Petitioner's office computer.  TSU is intent on frustrating and denying Petitioner the ability to perform her duties as police chief. Petitioner attempted to send the following email to TSU's General Counsel, Hao Le, without receiving any response:

> I am still unable to use my desktop and its features. The network is not allowing me to connect to the internet to check emails, send emails, or conduct daily business. I am also not able to confirm meetings on my calendar with those on my Executive Assistant calendar.  She is showing a lock symbol and unable to access. This is the second email I have attempted to send this morning to rectify this problem.

See **Exhibit 9**.  Petitioner is also attaching other screenshots taken on 12/6/22 that capture her disabled TSU computer.  See **Group Exhibit 10**.

## Requested Relief—"Death Penalty Sanctions"

4.      Because of TSU's complete disregard for the TRO, Petitioner asks the court to impose death-penalty sanctions and to strike TSU's answer, defenses and pleas.  TSU has acted with complete impunity and in complete disregard for this court's orders—even threatening now to ignore the court's expedited discovery order.   The court should act swiftly and send a clear message that TSU's misconduct will not be tolerated.  Mere monetary sanctions, while also being requested, will not be sufficient to remedy the irreparable harm TSU has done, and is doing, to Petitioner.  See **Exhibit 11**, photo taken of Petitioner at the Texans' football game on Sunday, 12/4/22, and posted online accusing her of being suspended by TSU with a copy of the TSU email in the post.

5.      Petitioner asks that TSU be found to be in contempt of court, that its defenses and pleas be struck, and for all other relief to which she may be entitled. A suggested order will be supplied at or before the hearing on this matter.

Respectfully submitted,

**THE HALL LAW GROUP, PLLC**

*/s/ Benjamin L. Hall, III*
**Benjamin L. Hall, III**
State Bar No. 08743745
**Ryan Finnegan**
State Bar No. 24119322
530 Lovett Boulevard
Houston, Texas 77006
Telephone: (713) 942-9600
Facsimile: (713) 942-9566
Email: bhall@thlf.us
Email: rfinnegan@thlf.us

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document was served via the Court's electronic filing system on counsel for Respondent on December 6, 2022.

/s/ *Benjamin L. Hall, III*
Benjamin L. Hall, III

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kimberly Bobb on behalf of Benjamin Hall, III
Bar No. 08743745
kbobb@bhalllawfirm.com
Envelope ID: 70742713
Status as of 12/6/2022 2:06 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rosalinda Luna | | Rosalinda.Luna@oag.texas.gov | 12/6/2022 1:40:15 PM | SENT |
| Benjamin S.Lyles | | benjamin.lyles@oag.texas.gov | 12/6/2022 1:40:15 PM | SENT |
| John DanielCoolidge | | daniel.coolidge@oag.texas.gov | 12/6/2022 1:40:15 PM | SENT |
| Nicole Myette | | nicole.myette@oag.texas.gov | 12/6/2022 1:40:15 PM | SENT |
| Ryan Finnegan | | rfinnegan@thlf.us | 12/6/2022 1:40:15 PM | SENT |
| Hall Law | | myteam@thlf.us | 12/6/2022 1:40:15 PM | SENT |
| Benjamin Hall | | bhall@thlf.us | 12/6/2022 1:40:15 PM | SENT |

# EXHIBIT 9



Good morning All,
I am still unable to use my desktop and its features.
The network is not allowing me to connect to the internet to check emails, send emails or conduct daily business..
I am also not able to confirm meetings on my calendar with those on my Executive Assistant calendar.. She is showing a lock symbol and unable to access.
This is the second email I have attempted to send this morning to rectify this problem.

Is there something needed on my end to address this issue?
Thanks for your time this morning.
Regards,

**Mary L. Young**
**Chief of Police & Executive Director**
**Emergency Management**

**TSU** TEXAS SOUTHERN UNIVERSITY
Department of Public Safety

Office: 713-313-7733 | Fax: 713-313-4425
General Service Building, Suite 201
3100 Cleburne Street, Houston, TX 77004
www.tsu.edu

# EXHIBIT GROUP 10

EXHIBIT 10-1



**EXHIBIT 10-2**



**EXHIBIT 10-3**



**EXHIBIT 10-4**



# EXHIBIT 11

# Working in TSU uniform and on suspension.... unlawful. Sick. Smdh Houston Texans game smdh





8:03    ◦ıl 5G ▯

**Photo** ⌄    **Done**

## FW: Appointment of Acting DPS Leadership

**From:** Devi Bala <devi.bala@tsu.edu>
**Sent:** Friday, December 2, 2022 6:54 PM
**To:** TSU DPS <TSUDPS@TSU.EDU>
**Cc:** Edmond, Yolanda N.
<Yolanda.Edmond@tsu.edu>; Rashid, Arman
<Arman.Rashid@tsu.edu>; Le, Hao
<Hao.Le@tsu.edu>; Doman, Dakota J
<dakota.doman@tsu.edu>; Brown, Bobby A
<bobby.abrown@tsu.edu>
**Subject:** Appointment of Acting DPS Leadership

Good Evening, Texas Southern University Police
Department:

I trust this email will find you in good health. Effective
immediately, Friday, December 2, 2022, Deputy
Segreant Bobby Brown will serve as the Acting
Executive Director of Public Safety and Acting Chief of
Police. Thank you all for your leadership, service, and
protection.

Sincerely,
*Devi Bala, CPA*
*VP Business & Finance/CFO*
*Texas Southern University*
devi.bala@tsu.edu



**FILED**
Marilyn Burgess
District Clerk

DEC 7 2022

Time:_____
Harris County, Texas
By_____
Deputy

P-3

TRORX
STBNX
CASO

CAUSE NO. 2022-77744

MARY YOUNG                              §        IN THE DISTRICT COURT OF
                                        §
        *Petitioner,*                   §
                                        §
                                        §
                                        §
v                                       §        HARRIS COUNTY, TEXAS
                                        §
TEXAS SOUTHERN UNIVERSITY,              §
RESPONSIBLE TSU AGENTS,                 §
PRESIDENT LESIA CRUMPTON-               §
YOUNG, GENERAL COUNSEL HAO              §
LE, AND/OR THEIR DESIGNEES              §
                                        §
        *Respondent.*                   §        127th JUDICIAL DISTRICT

## TEMPORARY RESTRAINING ORDER

On this day, the Court considered Petitioner's Mary Young's Verified First Amended

Petition, Request for Mandamus Relief, Declaratory Judgment Relief, Application for Temporary

Restraining Order and For Temporary/Permanent Injunctions.

Based upon facts set forth in the application the Court enters the following orders:

The Court **GRANTS** Petitioner's Application for TRO.

The court finds that in order to maintain and preserve the status quo, and to prevent further

immediate and irreparable harm to Petitioner, Petitioner is entitled to a temporary restraining order

because they have suffered and continue to suffer injury.

a. **This injury is imminent**. Despite repeated requests by Petitioner to have Respondents

TSU President Crumpton-Young and General Counsel Hao Le to comply with Texas law,

Respondents are threatening to terminate or discipline or engage in an unlawful employment action

against Petitioner in clear violation of Texas law.  Petitioner has been told that she is subject to

immediate disciplinary action based on the invalid complaint and such action would violate all of

1

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging.

the legal requirements mandated by Texas law. Thus, the immediate loss or taking of Petitioner's property rights and denial of her procedural due process rights mandated by Texas law are not only imminent but a very present danger. An immediate temporary restraining order/mandamus is required to maintain the *status quo ante* until Petitioner can put on evidence at a temporary injunction hearing to enjoin Respondent's unlawful conduct.

b. **The injury is irreparable.** A denial of Petitioner's guaranteed statutory rights under Texas law is irreparable. This court cannot restore them after they are lost and damages will not replace those rights. Abridgement of Petitioner's statutory rights is an irreparable injury that money damages cannot redress. When a Texas statute delineates the actions a governmental body or official must perform nothing is left to the exercise of discretion.

The purpose of an injunction is to maintain and preserve the status quo. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)(emphasis added); *see also GL Logistics Co. v. Flores*, No. 04-21-00125-CV, 9 (Tex. App. Aug. 31, 2021). Given the Respondents' previous failure to ameliorate this situation, there is no doubt that this Court must intervene and order and enjoin the Respondents, and any other individuals, from further conduct in violation of Petitioner's statutory rights. Petitioner is entitled to a temporary restraining order and probable injunctive relief.

It is therefor **ORDERED, ADJUDGED, AND DECREED** that **TEXAS SOUTHERN UNIVERSITY, RESPONSIBLE TSU AGENT, PRESIDENT LESIA CRUMPTON-YOUNG, GENERAL COUNSEL HAO LE, AND THEIR DESIGNEES** ("Respondents") as well as all any TSU officers, agents, servants, employees, attorneys, and any other persons acting in concert or participation with them, are enjoined and restrained from:

2

a. threatening to, attempting to, purporting to, or taking any adverse employment or disciplinary action against Petitioner until the court can conduct a hearing on Petitioner's request for a temporary injunction and/or permanent injunction in this case;

b. utilizing the unsigned, untimely, and anonymous complaint against Petitioner for any adverse employment or disciplinary action; and

c. taking any further actions, or failing to take necessary actions, that would damage, impair, frustrate, put at risk, jeopardize, and/or delay in any way the completion of the items addressed in sections (a) and (b) above.

It is further **ORDERED, ADJUDGED AND DECREED** that the Petitioner execute and file with the Clerk a bond in the amount of $ 100.00          . Any amount previously posted shall suffice to satisfy the same.

The Clerk of the above and entitled court shall forthwith, on the filing by Petitioner of the bond hereinafter required, and on approving same according to law, issue a writ of injunction in conformity with the law and the terms of this order.

This order shall expire on  December 21                    , 2022.

This matter is set for a temporary injunction hearing in the   127th     Judicial District Court of Harris County, Texas at  10:00   a.m./~~p.m.~~ on the  20th   day of  December            , 2022.

**SO ORDERED.**

**SIGNED** on this the 7th day of December 2022, at 4:05 o'clock P.M.

_____
**Ancillary Judge Presiding**

* The Temporary Restraining Order, dated December 1, 2022, was determined to be void and of no effect.

3

11/30/2022 10:49:47 AM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 70557209
By: CHAMBERS, WANDA R
Filed: 11/30/2022 10:49:47 AM

**2022-77744 / Court: 127**

Pgs-3

TRORX
STBNX
CASO

CAUSE NO. _____

| | | |
|---|---|---|
| **MARY YOUNG** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Petitioner,* | § | |
| | § | |
| | § | |
| **v** | § | **HARRIS COUNTY, TEXAS** |
| **TEXAS SOUTHERN UNIVERSITY,** | § | |
| | § | |
| **AND RESPONSIBLE TSU AGENTS** | § | |
| *Respondent.* | § | **_____ JUDICIAL DISTRICT** |

## TEMPORARY RESTRAINING ORDER

On this day, the Court considered Petitioner's Verified Original Petition, Request for Mandamus Relief, Declaratory Judgment Relief, Application for Temporary Restraining Order and For Temporary/Permanent Injunctions.

Based upon facts set forth in the application the Court enters the following orders:

The Court **GRANTS** Petitioner's Application for TRO.

The court finds that in order to maintain and preserve the status quo, and to prevent further immediate and irreparable harm to Petitioner, Petitioner is entitled to a temporary restraining order because they have suffered and continue to suffer injury.

a. **This injury is imminent**. Despite repeated requests by Petitioner to have Respondent comply with Texas law, Respondent is threatening to terminate or discipline or engage in an unlawful employment action against Petitioner in clear violation of Texas law. Petitioner has been told that she is subject to immediate disciplinary action based on the invalid complaint and such action would violate all of the legal requirements mandated by Texas law. Thus, the immediate

1

loss or taking of Petitioner's property rights and denial of her procedural due process rights mandated by Texas law are not only imminent but a very present danger.  An immediate temporary restraining order/mandamus is required to maintain the *status quo ante* until Petitioner can put on evidence at a temporary injunction hearing to enjoin Respondent's unlawful conduct.

      b. **The injury is irreparable.** A denial of Petitioner's guaranteed statutory rights under Texas law is irreparable.  This court cannot restore them after they are lost and damages will not replace those rights.  Abridgement of Petitioner's statutory rights is an irreparable injury that money damages cannot redress.  When a Texas statute delineates the actions a governmental body or official must perform nothing is left to the exercise of discretion.

      The purpose of an injunction is to maintain and preserve the status quo. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)(emphasis added); *see also GL Logistics Co. v. Flores*, No. 04-21-00125-CV, 9 (Tex. App. Aug. 31, 2021).  Given the Respondent's previous failure to ameliorate this situation, there is no doubt that this Court must intervene and order and enjoin the Respondents, and any other individuals, from further conduct in violation of Petitioner's statutory rights.  Petitioner is entitled to a temporary restraining order and probable injunctive relief.

      It is thereby **ORDERED, ADJUDGED, AND DECREED** that **TEXAS SOUTHERN UNIVERSITY, AND RESPONSIBLE TSU AGENTS** ("Respondents") as well as all of its officers, agents, servants, employees, attorneys, and any other persons acting in concert or participation with them, are enjoined and restrained from:

      a.  threatening to, attempting to, purporting to, or taking any adverse employment or disciplinary action against Petitioner until the court can conduct a hearing on Petitioner's request for a temporary injunction and/or permanent injunction in this case;

b. utilizing the unsigned, untimely, and anonymous complaint against Petitioner for any adverse employment or disciplinary action; and

c. taking any further actions, or failing to take necessary actions, that would damage, impair, frustrate, put at risk, jeopardize, and/or delay in any way the completion of the items addressed in sections (a) and (b) above.

It is further **ORDERED, ADJUDGED AND DECREED** that the Petitioner execute and file with the Clerk a bond in the amount of $ ___100.00___.

The Clerk of the above and entitled court shall forthwith, on the filing by Petitioner of the bond hereinafter required, and on approving same according to law, issue a writ of injunction in conformity with the law and the terms of this order.

This order shall expire on ___December 14___, 2022.

This matter is set for a temporary injunction hearing in the ___127th___ Judicial District Court of Harris County, Texas at _11:00_ a.m./p.m. on the _13_ day of ___December___, 2022.

**SO ORDERED.**

**SIGNED** on this the _____ day of November 2022, at _____ o'clock ___.M.

Signed: *Brittanye Morris*
12/1/2022
_____
**Ancillary Judge Presiding**

3

12/21/2022 1:42 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 71217812
By: Tasha Fraser
Filed: 12/21/2022 1:42 PM

## CAUSE NO. 2022-77744

| | | |
|---|---|---|
| **MARY YOUNG,** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Petitioner* | § | |
| | § | |
| **VS.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **TEXAS SOUTHERN UNIVERSITY AND** | § | |
| **RESPONSIBLE TSU AGENTS,** | § | |
| | § | |
| *Respondents* | § | **127TH JUDICIAL DISTRICT** |

---

### NOTICE OF TSU'S JUDICIAL ADMISSIONS ON APPEAL REGARDING PETITIONER'S TEMPORARY RESTRAINING ORDER

---

To The Honorable District Judge Ravi Sandill:

On appeal, Respondent TSU made a binding judicial admission in response to Petitioner Mary Young's request for the court of appeals to enter an order continuing the district court temporary restraining order in place during the pendency of Respondents' interlocutory appeal. Specifically, in their opposition to Petitioner's request for an appellate order to continue the temporary restraining order, Respondents represented to the appeals court that the stay provisions of Tex. Civ. Prac. & Rem Code § 51.014(b) "operates to keep [the TRO] in force pending resolution of this appeal." Additionally, Respondents stated that only the court of appeals had jurisdiction to dissolve the TRO—not the trial court. Respondents then concluded their position that stating Petitioner Young's request for emergency temporary relief was "irrelevant." *See* Exhibit 1 (p. 7, sect. II). Thereafter the appeals court denied Petitioner's request for alternative relief. Thus, having prevailed on these arguments, Respondents are now judicially estopped from taking a contrary position in this court.

Petitioner provides this court with notice of Respondents' judicial admissions which have been made in the court of appeals regarding the status of the temporary restraining order.

**THE HALL LAW GROUP, PLLC**

*/s/ Benjamin L. Hall, III*
**Benjamin L. Hall, III**
State Bar No. 08743745
**Ryan Finnegan**
State Bar No. 24119322
530 Lovett Boulevard
Houston, Texas 77006
Telephone: (713) 942-9600
Facsimile:  (713) 942-9566
Email: bhall@thlf.us
Email: rfinnegan@thlf.us

**ATTORNEYS FOR PETITIONER**

**CERTIFICATE OF SERVICE**

The undersigned certifies that the above and foregoing Motion for Continuance has been served upon all parties and counsel of record via eService on December 21, 2022.

*/s/ Benjamin L. Hall, III*
Benjamin L. Hall, III

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Kimberly Bobb on behalf of Benjamin Hall, III
Bar No. 08743745
kbobb@bhalllawfirm.com
Envelope ID: 71217812
Status as of 12/21/2022 2:13 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Rosalinda Luna | | Rosalinda.Luna@oag.texas.gov | 12/21/2022 1:42:02 PM | SENT |
| Benjamin S.Lyles | | benjamin.lyles@oag.texas.gov | 12/21/2022 1:42:02 PM | SENT |
| John DanielCoolidge | | daniel.coolidge@oag.texas.gov | 12/21/2022 1:42:02 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 12/21/2022 1:42:02 PM | SENT |
| Ryan Finnegan | | rfinnegan@thlf.us | 12/21/2022 1:42:02 PM | SENT |
| Hall Law | | myteam@thlf.us | 12/21/2022 1:42:02 PM | SENT |
| Benjamin Hall | | bhall@thlf.us | 12/21/2022 1:42:02 PM | SENT |

# Exhibit 1

ACCEPTED
01-22-00913-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/13/2022 4:20 PM
CHRISTOPHER PRINE
CLERK

00913-CV

No. 01-22-00940-CV

In the Court of Appeals
for the First Judicial District
Houston, Texas

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
12/13/2022 4:20:17 PM
CHRISTOPHER A. PRINE
Clerk

———————————————

TEXAS SOUTHERN UNIVERSITY, PRESIDENT LESIA CRUMPTON-YOUNG,
TSU GENERAL COUNSEL HAO LE,

*Appellant-Plaintiff,*

v.

MARY YOUNG,

*Appellees-Defendants.*

———————————————

On Appeal from the
127th District Court of Harris County, Texas
No. 2022-77744

———————————————

**RESPONSE IN OPPOSITION TO APPELLEE MARY YOUNG'S
EMERGENCY MOTION TO DISMISS APPEAL FOR LACK OF
JURISDICTION OR, ALTERNATIVELY, FOR TEMPORARY RELIEF**

———————————————

TO THE HONORABLE COURT OF APPEALS:

Appellants-Defendants Texas Southern University, President Lesia Crumpton-Young, and General Counsel Hao Le ("TSU") file this Response in Opposition to Appellee-Plaintiff Mary Young's ("Young") Emergency Motion to Dismiss Appeal for Lack of Jurisdiction or, Alternatively, for Temporary Relief, and would respectfully show the Court as follows:

**NATURE AND STAGE OF THE PROCEEDINGS**

- 1 -

This appeal is about whether a trial court may subject a governmental unit to its jurisdiction despite the governmental unit's assertion of sovereign immunity and request to stay all discovery until resolution of the jurisdictional defenses.

On Friday, December 2, 2022, an ancillary judge granted—pursuant to a hearing in which TSU had little notice—Young's motion to conduct expedited discovery in preparation for a temporary injunction hearing. The expedited discovery order required TSU to produce documents on Wednesday, December 7, produce the relevant investigator, Darlene Brown, for a deposition on Friday, December 9, and produce TSU President Leisa Crumpton-Young for a deposition on Monday, December 12. The hearing on the temporary injunction was initially set for December 14, but is now set for December 20.

On Monday, December 5, 2022, the Appellants filed a Plea to the Jurisdiction ("Plea"), arguing that sovereign immunity bars all of Young's claims, and also filed a Motion for Reconsideration and Motion for Protective Order to Stay Discovery ("Motion to Stay"), requesting the trial court to reconsider the expedited discovery order in light of the jurisdictional defenses and stay all discovery until the Court resolves the Plea. Both the Plea and Motion to Stay were set for a hearing on Thursday, December 8. On Wednesday, December 7, Young filed an amended petition, and TSU responded by filing an Amended Plea to the Jurisdiction. A temporary restraining order

against TSU was also issued on December 7, again, despite TSU's jurisdictional defenses.

The trial court, both in a December 7 telephone conference and at the December 8 hearing, refused to consider either versions of the Plea or the Motion to Stay, wanting to give Young an adequate opportunity to respond to the jurisdictional arguments, and stated that the trial court will see the Parties at the temporary injunction hearing. By refusing to consider TSU's jurisdictional arguments, reconsider the expedited discovery order, or stay discovery until it resolved the jurisdictional issues, and proceeding to a temporary injunction hearing, the trial court subjected TSU to its jurisdiction, forcing TSU to produce documents, defend depositions, and appear at a temporary injunction hearing despite the assertion of sovereign immunity.

TSU brings this accelerated interlocutory appeal pursuant to Texas Civil Practices & Remedies Code § 51.014 to resolve its jurisdictional defenses. TSU respectfully requests the Court retain this appeal.

**RESPONSE IN OPPOSITION TO EMERGENCY MOTION TO DISMISS
APPEAL FOR LACK OF JURISDICTION OR, ALTERNATIVELY, FOR
TEMPORARY RELIEF**

## I.   This Court has jurisdiction over TSU's appeal.

### A. The Court may consider an appeal based on an implicit denial of a Plea to the Jurisdiction.

Texas Civil Practice and Remedies Code § 51.014(a)(8) states that a governmental entity may appeal from an interlocutory order of a district court that denies a Plea to the Jurisdiction. Tex. Civ. Prac. & Rem. Code § 51.014(a)(8). The Texas Supreme Court held that a governmental unit may take such an interlocutory appeal when the trial court implicitly—as opposed to explicitly—denies a Plea to the Jurisdiction. *Thomas v. Long*, 207 S.W.3d 334, 340 (Tex. 2006); *see also San Jacinto County v. Nunn*, 203 S.W.3d 905, 907 (Tex. App.—Beaumont 2006, pet. denied) (appellate court had jurisdiction over trial court's implicit denial of Plea); *Tex. Dep't of Family & Prot. Servs. v. ASI Gymnastics, Inc.*, No. 05-09-01469-CV, 2010 WL 2764793, at *1 n.2 (Tex. App.—Dallas Jul. 14, 2010, no pet.) (holding that the grant of injunctive relief served as an implicit denial of the government's Plea).

Young argues that this Court should dismiss TSU's appeal because the trial court has not entered a written order. However, a valid, signed order *does* exist in this case— the expedited discovery order. Not only does this order *alone* implicitly deny TSU's Plea to the Jurisdiction by subjecting it to the Court's jurisdiction, but by forcing TSU to comply with the order, the trial court also implicitly denies the Plea.

- 4 -

The case that Young relies on to support her contention is also distinguishable. *See Tex. Dept. of Pub. Safety v. Salazar*, No. 03-11-00206-CV, 2011 WL 1469429, at *1 (Tex. App.—Austin Apr. 19, 2011, no pet.) (mem. op.). In that case, the Third Court of Appeals held that the Court's grant of a motion for continuance on a hearing on a plea to the jurisdiction, while allowing additional discovery, did not "implicitly deny" the government's Plea, and thus the Court lacked jurisdiction. *Id.* First, discovery in *Salazar* was on-going and delved into non-jurisdictional issues, as the case was remanded to the trial court initially after the court determined that two of the plaintiffs' statutory challenges were not barred by sovereign immunity, and the subsequent accelerated appeal after remand occurred almost a year and a half later. *See Tex. Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 910 (Tex. App.—Austin 2009, no pet.); *Salazar*, 2011 WL 1469429, at *1. Here, discovery has not yet commenced, but the trial court intends to subject TSU to discovery that is unrelated to jurisdiction, which is not proper. *See In re Hao Hao Buddhist Congregational Church Tex. Chapter*, No. 01-14-00059-CV, 2014 WL 7335188, at *6 (Tex. App.—Houston [1st Dist.] Dec. 23, 2014, orig. proceeding) (mem. op.) ("We conclude that the trial court abused its discretion in requiring relators to comply fully with Huynh's discovery demands before determining the jurisdiction question raised in relater's motion for protective order and plea to the jurisdiction."); *In re Kimberly-Clark Corp.*, 228 S.W.3d 480, 490 (Tex. App.—Dallas 2007, orig. proceeding) (citing *In re Dyer Custom Installation, Inc.*, 133 S.W.3d 878, 883 (Tex. App.—Dallas 2004,

orig. proceeding)) ("Allowing discovery that provides a party the relief sought in the main suit severely compromises or vitiates the other party's ability to present her claim or defense during a trial because the issue would be moot."). Second, the trial court did not rule on Young's motion for continuance, but instead intended for TSU to be subjected to its jurisdiction by requiring it to participate in depositions and attend the temporary injunction hearing.

### B. The expedited discovery order did not permit "limited" jurisdictional discovery; rather, it ordered unnecessary discovery into the merits of the lawsuit.

Young claims the expedited discovery order allows for "limited and targeted discovery." However, the expedited discovery order required TSU to engage in discovery related to the actual merits of the lawsuit—and thus was not limited to the jurisdictional issues. Specifically, the order required TSU to produce Darlene Brown for a deposition to be "examined and questioned about her audit and work relating to Petitioner and the complaint(s) she investigated." *See* December 2, 2022 Order Granting Expedited Discovery. Similarly, the order required TSU to produce President Crumpton-Young to be questioned "on the matters asserted in this case." *See* December 2, 2022 Order Granting Expedited Discovery.

It is improper for a trial court to permit discovery that delves into the merits of a case after a governmental unit asserts jurisdictional bars—unless discovery is jurisdictionally related. *See, e.g., In re Astrotech Corp.*, No. 03-13-00624-CV, 2014 WL

711018, at *2 (Tex. App.—Austin Feb. 12, 2014, orig. proceeding) (mem. op.). ("If the trial court does not have jurisdiction to enter a judgment, it does not have jurisdiction to allow plaintiffs to conduct discovery."); *In re CMM Const. Co., Inc.*, No. 09-05-096-CV, 2005 WL 913438, at *2 (Tex. App.—Beaumont Apr. 21, 2005, orig. proceeding) (mem. op.) (holding that the trial court should not permit discovery on matters unrelated to determination of jurisdictional issues, prior to conducting a hearing or ruling on the merits of a motion to abate); *but see Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000) ("When reviewing a plea to the jurisdiction, a court should limit itself to the jurisdictional issue and avoid considering the merits of the claims."). Because the discovery required by the expedited discovery order concerned the actual merits of the case, forcing TSU to engage in discovery despite its jurisdictional defenses is improper.

## II.   Young's request for this Court to continue the temporary restraining order is irrelevant because the underlying lawsuit is stayed.

Texas Civil Practices and Remedies Code § 51.014(b) states that an appeal based on a denial of a governmental unit's Plea to the Jurisdiction "stays *all other proceedings in the trial court pending resolution of that appeal.*" Tex. Civ. Prac. and Rem. Code § 51.014(b). Because a temporary restraining order is a form of injunctive relief, this automatic stay operates to keep it in force pending resolution of this appeal. During this appeal, this Court holds exclusive jurisdiction over the case, meaning it has sole jurisdiction to dissolve the temporary restraining order. *See* Tex. R. App. P. 29.5 (the appellate court

retains jurisdiction of the case during this interlocutory because the trial court's jurisdiction is prohibited by Tex. Civ. Prac. & Rem. Code § 51.014). Therefore, Young's request for this Court to continue the temporary restraining order is irrelevant.

## III.   TSU seeks this appeal not for purposes of delay.

Finally, Young accuses TSU of "gamesmanship" and argues that TSU filed this appeal "solely for the purpose of running out the clock on the temporary restraining order" and "preventing the trial court from conducting the temporary injunction hearing." Not so. The law is clear that a "trial court *must* determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing litigation to proceed." *See Tex. Parks & Wildlife Dep't v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004) (emphasis added) (citing *Austin N.W.R. Co. v. Cluck*, 97 Tex. 403, 405 (1903)). "Before a court may address the merits of any case, the court *must* have jurisdiction over the party or the property subject to suit, jurisdiction over the subject matter, jurisdiction to enter a particular judgment, and capacity to act as a court." *St. Bar of Tex. v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994) (emphasis added).

The doctrine of sovereign immunity is the bedrock of governmental operation— it preserves the separation of powers, "protects the public treasury," and "prevent[s] potential disruptions of key government services that could occur when government funds are unexpectedly and substantially diverted by litigation." *Univ. of Incarnate Word v. Redus*, 602 S.W.3d 398, 404 (Tex. 2020) (quoting *Wasson Interests, Ltd. v. City of*

*Jacksonville*, 489 S.W.3d 427, 429, 431 (Tex. 2016)). Sovereign immunity is both

"'inherent' in Texas statehood and 'developed without any legislative or constitutional

enactment.'" *Id.* at 404. Forcing TSU to engage in discovery and appear at a temporary

injunction hearing *before* the court rules on the jurisdictional issues is not only improper

based on case law, but it would also render TSU's immunity completely useless. *Harris*

*County Flood Control Dist. v. PG & E Tex. Pipeline, L.P.*, 35 S.W.3d 772, 773–74 (Tex.

App.—Houston [1st Dist.] 2000, pet. dism'd w.o.j.)) ("The policy reasons for providing

an interlocutory appeal from an order granting or denying a plea to the jurisdiction is

the State should not have to expend resources in trying a case on the merits if it is

immune from suit.").

TSU has every right to challenge the trial court's jurisdiction before the court has

the opportunity to render any judgment in this case. *See Univ. of Tex. MD Anderson Cancer*

*Ctr. v. Contreras*, 576 S.W.3d 439, 443 (Tex. App.—Houston [1st Dist.] 2019, no pet.)

("We thus must consider the sovereign-immunity arguments made by a governmental

unit on appeal regardless of whether it made these arguments or how it framed them in

the trial court.").

## CONCLUSION

Not only does sovereign immunity bar Young's lawsuit, but TSU should not be

subjected to the trial court's jurisdiction without the trial court first ruling on whether

sovereign immunity bars subject matter jurisdiction. Appellants respectfully request that

the Court retain this appeal to address TSU's jurisdictional defenses.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

CHRISTOPHER HILTON
Chief, General Litigation Division

/s/ *Daniel Coolidge*
DANIEL COOLIDGE
Attorney-in-Charge
Texas Bar No. 24113693
Assistant Attorney General
daniel.coolidge@oag.texas.gov

General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone (512) 475-4072
Facsimile: (512) 320-0667

***ATTORNEYS FOR APPELLANTS-
DEFENDANTS***

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been served electronically through the electronic filing manager in accordance with Tex. R. App. P. 9.5(b)(1) on the 13th day of December, 2022, to:

Benjamin L. Hall, III  *Via electronic mail through File and*
William L. Van Fleet, II  *Serve Texas*
Ryan Finnegan
The Hall Law Group, PLLC
530 Lovett Blvd.
Houston, Texas 77006

*Counsel for Plaintiff*

/s/ *Daniel Coolidge*
DANIEL COOLIDGE
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes.  This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains less than 15,000 words, excluding any parts exempted by Tex. R. App. P. 9.4.(i)(1).

/s/ *Daniel Coolidge*
DANIEL COOLIDGE
Assistant Attorney General

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of Daniel Coolidge
Bar No. 24113693
nicole.myette@oag.texas.gov
Envelope ID: 70981245
Status as of 12/13/2022 4:45 PM CST

Associated Case Party: Mary Young

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Benjamin L. Hall, III | | bhall@thlf.us | 12/13/2022 4:20:17 PM | SENT |
| William L.Van Fleet, II | | bvfleet@comcast.net | 12/13/2022 4:20:17 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ryan Finnegan | | rfinnegan@thlf.us | 12/13/2022 4:20:17 PM | SENT |
| Kimberly Bobb | | kbobb@thlf.us | 12/13/2022 4:20:17 PM | SENT |
| Nicole Myette | | nicole.myette@oag.texas.gov | 12/13/2022 4:20:17 PM | SENT |

Associated Case Party: Texas Southern University

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 12/13/2022 4:20:17 PM | SENT |
| Daniel Coolidge | | daniel.coolidge@oag.texas.gov | 12/13/2022 4:20:17 PM | SENT |
| Benjamin S.Lyles | | benjamin.lyles@oag.texas.gov | 12/13/2022 4:20:17 PM | SENT |

*Cause No. 2022-77911*

*Young*

*v.*

*TSU*

*P-2*

*127th Dist Ct.*

*XDISX*

FILED
DEC 02 2022
Time:
By:
Marilyn Burgess
District Clerk
Harris County, Texas

the subpoena on Ms. Brown.  *See* Exhibit 2, December 1, 2022 email from Mr. Lyles.  Such gamesmanship should not be tolerated—he either is her attorney or he is not!

**REQUEST #1:**  That Ms. Darlene Brown and her company, McConnell & Jones immediately turnover complete and exact copies to Petitioner's counsel all documents, recordings, electronic communications, drafts of reports and findings, and communications with any TSU employee or representative and that such documents be immediately produced and delivered to Petitioner counsel's office *before* end of business on ~~Monday, December 5, 2022. All information and records requested in Petitioner's attached Instanter Subpoena, see Exhibit 3 to this motion. TSU's attorney, Mr. Lyles, is be **ORDERED** to accept service of Petitioner's instanter subpoena via e service in this case.~~

*related to the investigation made the basis of this lawsuit*

X GRANTED *as modified*  _____ DENIED

→ *Wednesday, December 7, 2022*

**REQUEST #2:**  Deposition of Ms. Darlene Brown to be conducted in-person and examined and questioned about her audit and work relating to Petitioner and the complaint(s) she investigated.  Ms. Darlene Brown is to be presented for deposition to commence not later than Friday, December 9, 2022 at 9:00 a.m. in the law offices of The Hall Law Group, PLLC, located at 530 Lovett Blvd, Houston, Tx. 77006 or a mutually agreeable location.

X GRANTED *as modified*  _____ DENIED

**REQUEST #3:** Deposition of TSU President Lesia L. Crumpton-Young to be commenced in-person not later than ~~Thursday, December 8, 2022~~ at 9:00 a.m. on the matters asserted in this case, including but not limited to her personal conversations with Petitioner[3] and Ms. Darlene Brown regarding the latter's work product and conclusions.  This deposition is to be conducted in Houston, Tx at a mutually agreeable location before the deadline.

*than Monday, December 12, 2022*

X GRANTED *as modified*  _____ DENIED

**III.**
**ARGUMENT AND AUTHORITIES**

**A.**   **The Court May Grant Expedited Discovery**

*Page 1*

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging.

---

[3] President Crumpton is the executive officer who told Petitioner that the Board of Regents had voted to terminate her (Petitioner).  This was later discovered not to be true.  Why she made these statements is directly probative on the issue that an adverse employment decision had been made without complying with the requirements of Section 614.022 and 614.023, Texas Government Code which mandates how complaints against a licensed Texas peace officer are to be handled.

*It is further ordered that documents produced will be considered "attorney eyes only" and not disclosed beyond that without further order or agreement in writing.*

## ~~CONCLUSION~~

For the reasons set forth herein, Petitioner respectfully requests that the Court, as soon as is practicable, take up and rule on the above emergency and expedited discovery requests.

Dated:  December 1, 2022

Respectfully submitted,

/s/ *Benjamin L. Hall, III*
**Benjamin L. Hall, III**
TBN: 08743745
Ryan Finnegan
TBN: 24119322
The Hall Law Group, PLLC
530 Lovett Blvd.
Houston, Tx 77006
713.942.9600 (o)
713.942.9566 (f)
Bhall@thlf.us

*Attorneys for Petitioner*

Page 2

### ORDER

The Court grants the request for expedited discovery and to shorten the time for this motion to be considered.  The court's rulings on Petitioner's expedited discovery requests are denoted by check marks (X)  above indicating whether the request has been **GRANTED** or **DENIED**.

**IT IS SO ORDERED this date:** _____.

Presiding Judge ~~Ravi Sandill~~

Mike Engelhart

12/2/2022

5



## TEXAS SOUTHERN UNIVERSITY
### Department of Internal Audit & Assurance Services
*Experience • Collaboration • Results*

3100 Cleburne Street • Houston, TX 77004 • (713) 313-7454

**Date:** August 15, 2022

**From:** Darlene Brown, Acting Chief Audit Executive

**To:** Texas Southern University Board of Regents

**Cc:**
President Crumpton-Young
Ms. Lisa McBride, TSU Board Counsel

**Re:** Internal Audit Investigation Report, TSU Department of Public Safety Time Recording Practices

Our conclusion to the allegation is stated on page six of this report. Applicable policy violation discussions begin on page six of this report. Examples of Weekly Time Reports related to this investigation are included in Appendix C on pages 15 and 16 of this report.

## <u>Allegation</u>

An anonymous report was submitted to Texas Southern University's Ethics Line on March 24, 2022. This report alleged:

- The Chief of Police (Mary Young) verbally gave a directive at a supervisor's meeting in January 2022 that she would raise pay for "Lead Officers".
- The "Lead Officer" pay is two (2) hours a day for up to five (5) days a week for field training pay. (Note: The "Lead Officer" designation was created internally by the Chief of Police and is not an official job classification or pay category. Through this investigation we determined that there were two distinct types of pay that the Chief of Police authorized; "Lead Officer" and Field Officer Training.)
- These pay types were not approved by the President or Board of Regents.
- Seven individuals were named in the anonymous report as receiving the "Lead Officer" pay:
  - <u>McAfee, Gaynell</u>
    - Officer McAfee received the $25/hr. additional pay for "Lead Officer" when filling-in for her supervisor.
    - Investigation Interview Summary: Officer McAfee stated that the Chief of Police did tell her that she will be compensated for the hours worked as a "Lead Officer". The DPS timekeeper instructed Officer McAfee to record the hours either before or after the actual shift times worked. Officer McAfee still serves as "Lead Officer" but was told by Lt. J. Starks on behalf of Deputy Chief Brown and Captain Etheridge after this Internal Audit investigation started that they can no longer use the special code provided to receive additional compensation.

RESTRICTED (Access Limited to Authorized Personnel)

- o Ward, James
  - Officer Ward received the $25/hr. additional pay for "Lead Officer" when filling-in for his supervisor.
  - Investigation Interview Summary: Officer Ward stated that he was told by Chief of Police (Mary Young) after a supervisor's meeting for himself and Officer McAfee to stay behind. It was then that the Chief of Police told them she would compensate them for doing a good job and that they should see the DPS timekeeper, to use the special code when acting as supervisor, and where to place the special work code on the Weekly Time Report. The DPS timekeeper told Officer Ward to record the hours for different days or time periods for when he did not actually work. Additionally, Officer Ward was told that a Compensation Request Form was not completed for these hours. Instead, the DPS timekeeper prepared a Supplemental Salary Form for him to sign and return each Monday morning. The DPS timekeeper also told Officer Ward to provide his Weekly Time Report to Lt. Bridges for approval instead of his direct supervisor.

    Officer Ward stated that the Chief of Police met with Officers Ward, McAfee, and Holiday after the weekly supervisors meeting during the week of July 4, 2022 and questioned them on who told them to record their time in the manner of which they were recording it. The Chief of Police then proceeded to tell them that going forward they have to work the additional four hours but that they can't put it on their Weekly Time Sheets until August 1st and that they would be only allowed four hours per pay period.
- o Holiday, John
  - Officer Holiday received the $25/hr. additional pay for "Lead Officer" when filling-in for his supervisor.
  - Investigation Interview Summary: Officer Holiday stated that the Chief of Police told him around May 2022 that he will be compensated for the hours worked as a "Lead Officer". The DPS timekeeper instructed Officer Holiday to record the hours for different days or time periods for when he did not actually work.

    Officer Holiday stated that his immediate supervisor (Sgt. Allison) was not aware of the reason/purpose of the special code. Sgt. Allison did ask Officer Holiday, but Officer Holiday was instructed by Chief Young not to inform his supervisor. Officer Holiday was told by Chief Young to take his timesheet to Ms. Scruggs and the Chief would sign-off.
- o Sawyer, Jujuana
  - Officer Sawyer received the two hours per day Field Training Officer pay for completing paperwork.
  - Investigation Interview Summary: Officer Sawyer stated that she was told by either the Sargent or Deputy Chief Brown that field training officers were allowed to record two additional hours a day to complete paperwork. Officer Sawyer stated that the hours she recorded were not always the same day that she had an officer assigned to her.
- o Jones , Chevron
  - Officer Jones received the two hours per day Field Training Officer pay for completing paperwork.
  - Investigation Interview Summary: Officer Jones stated that he was told by Lt. Bridges that an additional two hours a day could be recorded for Field Officer Training to complete paperwork.
- o Jones, Tyronne
  - Officer Jones received the two hours per day Field Training Officer pay for completing paperwork.
  - Investigation Interview Summary: Officer Jones stated that he was told by Lt. Bridges that an additional two hours a day could be recorded for Field Officer Training to complete paperwork. The two hours were recorded on the same day that an officer was

assigned to him for training, regardless of if it took the two hours to complete the paperwork.

- o Cantu, Bethany
  - ▪ Officer Cantu received the two hours per day Field Training Officer pay for completing paperwork.
  - ▪ Investigation Interview Summary: Officer Cantu stated that she was told by Lt. Bridges that an additional two hours a day could be recorded for Field Officer Training to complete paperwork as a pay incentive. The two hours were recorded on the same day that an officer was assigned to her for training, regardless of if it took the two hours to complete the paperwork.

- Six individuals were named in the anonymous report as authorized to sign the time sheets:
  - o Lieutenant Bridges, James
    - ▪ Lt. Bridges separated from TSU.
  - o Lieutenant Jones, Ivan
    - ▪ Investigation Interview Summary: Lt. Jones stated that he was not aware of the "Lead Officer" additional compensation or code used. Lt. Jones stated that Deputy Chief Brown and Lt. Bridges verbally communicated that Field Training Officers were allowed to record two additional hours a day to complete paperwork.
  - o Sergeant McCray, Brian
    - ▪ Did not interview as his assigned staff did not receive Field Training Officer extra pay or "Lead Officer Pay".
  - o Sergeant Barnett, Darren
    - ▪ Investigation Interview Summary:
      Sergeant Barnett stated that he is aware that the Chief of Police announced that Officers Ward and Holiday would be compensated for filling in for supervisors on their respective supervisor's days off.
      Sergeant Barnett stated that he is aware that Field Training Officers were told by the Chief of Police that they could add two hours a day to their time sheets for completing paperwork.
      After this investigation commenced, Sergeant Barnett informed TSU's Acting Chief Audit Executive that he received a telephone call from one of the TSU DPS officers that certain officers were being questioned about their time recording practices.
  - o Lieutenant Starks, Jamal
    - ▪ Investigation Interview Summary:
      Lt. Starks stated that he is aware that the Chief of Police announced Officers Ward and Holiday would be compensated for filling in for supervisors on their respective supervisor's days off.
      Lt. Starks stated that he is aware that Field Training Officers were told by the Chief of Police that they could add two hours a day to their time sheets for completing paperwork.
  - o Sergeant John-Miller, Curtis
    - ▪ Did not interview as his assigned staff did not receive Field Training Officer extra pay or "Lead Officer Pay".

## Additional Interview Summaries

*Chief of Police Young Investigation Interview Summary:*

The Chief of Police stated that she would not tell officers to record time that was not worked and that according to policies they must have worked the time in order to record it.

The Chief of Police stated that there has been instances where supervisors (senior officers) have similar off days so others have had to cover their shifts. In these instances, the officers would work the shift but since they can't have a promotion they would receive compensation – it was not to be a daily or weekly thing. The Chief of Police authorized Officers Ward, McAfee, and Holiday that they can pick-up 8 hours bi-monthly not the 2 hours a day.

The Chief of Police stated that she did not direct Lieutenant Bridges, Lieutenant Jones, Sergeant Barnett, Lieutenant Starks, Sergeant McCray, Sergeant Brown, and Sergeant John-Miller to sign the timesheets for individuals to receive an additional two (2) hours per day field training pay.

The Chief of Police stated that all supervisor's meetings are recorded and that she would provide the Acting Chief Audit Executive with the recordings. She later called the Acting Chief Audit Executive to say that there were no supervisor meetings held in January 2022 (the time when the alleged verbal authorization for additional "Lead Officer" compensation occurred).

The Chief of Police asked if she should speak with the individuals that recorded overtime and I told her she should not.

*DPS Timekeeper (Ms. Chandra Scruggs) Investigation Interview Summary:*

Ms. Chandra Scruggs works in the Building & Grounds department but has also been serving as the DPS timekeeper since the end of October 2020 or November of 2020.

Ms. Scruggs stated that she was not told what the FTO paperwork/FTO Documentation acronym was for but that she did not question it when processing Weekly Time Reports because they were signed by the respective supervisors.

Ms. Scruggs stated that the Chief of Police told Ms. Scruggs to create a code for individuals to use if they are acting in a supervisor role and that they are to receive $25/hr on top of their regular hourly rate for the role. The Chief of Police told Ms. Scruggs that she can't promote them but wanted to compensate them. According to Ms. Scruggs, nobody was present for this conversation. Later, when the Dispatch Supervisor questioned the code on a Weekly Time Report the Chief's verbal answer to Ms. Scruggs was that they were to be paid the additional $25/hr.

Ms. Scruggs stated that the code HRSTLDR is used to identify the hours worked as a "Lead Officer"/shift supervisor and that she prepares a separate sign-in sheet each pay period for this. When preparing the payroll, she includes this along with the Weekly Time Reports to Command for signature and then she delivers the signed pay packages to Human Resources (Payroll). Ms. Scruggs stated that she did tell Officers Ward, McAfee, and Holiday that they have to record the HRSTLDR hours as different times than the times they recorded for their shift.

*Deputy Chief of Police Brown Investigation Interview Summary:*

The Deputy Chief of Police stated that he has been present when the Chief of Police verbally gave approval for Field Training Officers (FTO) to add two hours to their time each day. The Deputy Chief of Police stated that he may have repeated that Field Training Officers could record two hours for paperwork. It was supposed to be up to 2 hours, and he was not aware that this is a practice of recording time not worked but that they have to physically work the time.

The Deputy Chief of Police stated that Chief of Police Young advised leads (Lead Officers) that if they came in and were acting as a lead they could get compensated. He stated that the maximum allowed by the Chief of Police was a total of 16 hours a month.

The Deputy Chief of Police stated that he was present in a meeting the week of July 4, 2022 with Officers Ward, McAfee, and Ms. Scruggs when the Chief of Police asked who told them how to record their time.

RESTRICTED (Access Limited to Authorized Personnel)

*Dispatch Supervisor (Officer Tina Dorsey) Investigation Interview Summary:*

The Dispatch Supervisor stated that Chief Young held Officers McAfee and Ward over after a supervisors meeting in February 2022 and told them that for two of the five days working as a supervisor/"Lead Officer" they would receive "special event" pay but she did not provide instruction on how to do this and told them to see the DPS timekeeper (Ms. Scruggs).

The Dispatch Supervisor stated that when saw Officer McAfee's Weekly Timesheet with the special code she called Ms. Scruggs and was told that Chief Young authorized the code. Since then, the Dispatch Supervisor has stopped signing Officer McAfee's Weekly Time Report area where the special event code is located.

The Dispatch Supervisor stated that on Wednesday July 6, 2022, the Chief of Police held a meeting with Sgt. Jones, Officer McCray, and Officer Dorsey and told them that an investigation was coming up and instructed for Officer Holiday to join the meeting.

*Corporal Brian Auzenne Investigation Interview Summary:*

Corporal Brian Auzenne has assumed the Field Training Officer (FTO) coordinator role with the departure of Lieutenant Bridges.  Corporal Auzenne stated that the former FTO coordinator stated that two additional hours could be recorded by Field Training Officers as part of training someone – either before or after the shift.  Corporal Auzenne stated that it has not been directly communicated and that it was just understood that you can record two hours a day that you are with an officer.

Corporal Auzenne stated that Compensation Request Forms were not required to be completed for the two hours a day FTO paperwork completion but this has recently been mandated.

*Note: Prior to assuming the FTO coordinator role, Corporal Auzenne also submitted two hours a day for FTO paperwork completion.*


## Policies Applicable to this Allegation

Texas Southern University (TSU) approved four (4) Manual of Administrative Policies and Procedures (MAPP) that apply to time reporting, pay, fraud, and ethics.  Applicable sections of these MAPPS are summarized below and were used to apply the investigation facts learned.

- 02.02.01 Pay Guidelines for Staff Employees
  Merit adjustments, equity adjustments, and reward-based increases must be part of the budget cycle and must meet approval of the Associate Vice President of Human Resources.  All pay adjustments are subject to review, approval, and recommendation through established channels, including the Office of Human Resources.
  Interim assignments. A temporary pay increase may be granted for assuming additional responsibilities on an interim basis for a specified period of time or until the vacant job is filled. The employee may receive a temporary pay increase of up to 25% of salary for the duration of the assignment, as recommended by the hiring manager and approved by Human Resources.

- 02.02.03 Overtime / Compensatory Time
  All overtime and extra hours must be authorized in writing and in advance by the dean/director of the department.
  Supervisors are responsible for monitoring the work hours of employees under their supervision and for ensuring that information reported on timesheets is complete and accurate.

- 02.05.05 Ethics and Conflict of Interest Policy
  Employees shall avoid any actions that violate or would create the appearance that they are violating the law or ethical standards of Texas Southern University.

- 02.05.06 Fraud Policy
  Fraudulent or related dishonest activities include but are not limited to fraud;
  Forgery or alteration of documents (checks, promissory notes, time sheets, independent contractor agreements, purchase orders, budgets, etc.)
  Authorizing or receiving payments for hours not worked.
  Management should not attempt to conduct individual investigations, interviews, or interrogations to determine if a suspected activity is fraudulent, dishonest, or improper.
  Do not contact the suspected individual to determine facts or demand restitution. Under no circumstances should there be any reference to "what you did," "the crime", "the fraud", "the forgery," "the misappropriation," etc.

## Conclusion

Based upon the internal audit investigation procedures performed, the allegation received is substantiated and related to two (2) distinct types of additional compensation that Chief of Police Mary Young authorized verbally and when she signed the weekly time reporting packages provided by the DPS timekeeper. These compensation types are described below. Neither of these compensation types were discussed or approved by TSU Human Resources, the President, or the Board of Regents. MAPP 02.02.01 Pay Guidelines for Staff Employees requires review of pay adjustments by Human Resources.

*Compensation Types Involved in this Internal Audit Investigation:*

- "Lead Officer" compensation – This compensation is a flat $25/hour of additional compensation for security officers and dispatchers that were designated as the Lead Officer for a shift where their immediate supervisor was absent. Officers were instructed by the DPS Timekeeper (Ms. Chandra Scruggs) and/or Chief Young to use code HRSTLDR in the special events section of the weekly time report and record the actual number of hours worked as "Lead Officer" but to record it for different hours; either before their shift worked, after their shift worked, or on their day off.
- Field Training Officer compensation – This is an additional two (2) hours pay at the respective officer's overtime hourly rate, for each day that they were training an officer. This additional compensation was to complete paperwork associated with assessing an officer's performance during training.

Texas Southern University (TSU) Manual of Administrative Policies and Procedures (MAPP) 02.05.06 Fraud Policy defines fraud as:

*Fraudulent or related dishonest activities include, but are not limited to:*
*a. Theft of funds, securities, supplies or any other asset (including furniture, fixtures, or equipment);*
*b. Fraud;*
*c. Embezzlement;*
*d. Bribery/rebate/kickback;*
*e. Misapplication, destruction, removal or concealment of property, or conflicts of interest;*
*f. Illegal or fraudulent handling or reporting of money transactions;*
*g. Forgery or alteration of documents (checks, promissory notes, time sheets, independent contractor agreements, purchase orders, budgets, etc.);*
*h. Forgery or alteration by employees, of student related items such as grades, transcripts, loans, fee or tuition documents, etc.;*
*i. Acceptance or solicitation of any gift, favor or service that might reasonably tend to influence the employee in the discharge of his or her official duties;*
*j. Destruction or disappearance of records, furniture, fixtures, or equipment where theft is suspected;*
*k. Authorizing or receiving payments for hours not worked;*
*l. Authorizing or receiving payments for goods not received or services not performed;*
*m. Disclosing confidential information the employee is routinely privy to at the University;*
*n. Any apparent violation of Federal, State, or local laws related to dishonest activities or fraud, and;*
*o. Any similar or related activity.*

RESTRICTED (Access Limited to Authorized Personnel)

In applying the TSU MAPP 02.05.06 definition of fraud, Chief of Police Mary Young committed fraud against TSU through authorizing payments for hours not worked when she authorized two (2) hours of overtime to Field Training Officers each day that they had an officer assigned to them, even if it did not take the full two hours each day to complete the paperwork.

The police officers that recorded time for Field Officer Training paperwork when they did not actually work the two hours constitutes fraudulent reporting.  Officers stated that they did complete the required paperwork, but it did not always take the full two hours.  An example of the Weekly Time Sheet is included in Appendix C.

The Chief of Police told the "Lead Officers" that they were to record their actual hours worked in the top section of the Weekly Time Report and then use the special code and record their same hours in the bottom section of the Weekly Time Report.

The DPS timekeeper instructed individuals that served as "Lead Officers" that they were to record the actual hours worked as normal hours on the top section of the Weekly Time Report.  They then were to record the same number of hours on a different time period, or a different day than actually worked using a specially created code on the bottom section of the Weekly Time Report.  This code identified that they were acting as the supervisor for the respective number of hours and should receive the flat $25/hour for those hours.  The result is that for each day the respective officer filled in for the supervisor, they worked an eight-hour shift but recorded 16 hours; eight of the hours were paid at the standard hourly rate and eight hours were paid at the $25/hour rate.  This constitutes fraudulent reporting because it gives the appearance that the individual worked additional hours when they did not.  An example of the Weekly Time Sheet is included in Appendix C.

Individuals that recorded time for "Lead Officers" as instructed by the DPS timekeeper documented their time worked incorrectly.

RESTRICTED (Access Limited to Authorized Personnel)

00007

## Policy Violations

The tables below describe the policy violations that occurred.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.05.06 | Fraud Policy | **III. Management's Responsibilities**<br>E. Management should not attempt to conduct individual investigations, interviews, or interrogations to determine if a suspected activity is fraudulent, dishonest or improper. The Office of Internal Audit & Fraud will conduct an investigation working in conjunction with internal or external departments, such as the University Office of General Counsel and law enforcement agencies.<br>F. Management is responsible for taking appropriate corrective actions to ensure adequate controls exist to prevent the occurrence of fraud or dishonest or improper activities.<br>I. Management's responsibilities in handling fraud or dishonest or improper activities include the following:<br>1. Do not contact the suspected individual to determine facts or demand restitution. Under no circumstances should there be any reference to "what you did," "the crime," "the fraud," "the forgery," "the misappropriation," etc.<br>ii. Take appropriate disciplinary action after consulting with the Office of Human Resources and the Office of General Counsel.<br>iii. Do not discuss the case, facts, suspicions or allegations with anyone outside the University unless specifically directed to do so by Internal Audit & Fraud or General Counsel.<br>iv. Do not discuss the case with anyone inside the University other than employees who have a "need to know," Internal Audit & Fraud or General Counsel.<br>v. Direct all inquiries from the suspected individual, his or her representative or his or her attorney to General Counsel.<br>VI. Direct all inquiries from the media to the Office of University Advancement. A proper response to such an inquiry should be, "I'm not at liberty to discuss this matter." |

**Violation(s) to this Policy**
1. The Chief of Police questioned certain officers about their time recording after interview with the Acting Chief Audit Executive and was told by the Acting Chief Audit Executive that she should not speak to the officers about this matter.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.05.05 | Ethics & Conflict of Interest | **III. Standards of Ethical Conduct**<br>G. Employees shall avoid any actions that violate or would create the appearance that they are violating the law or ethical standards of Texas Southern University. |

**Violation(s) to this Policy**
1. The Chief of Police took intentional actions to establish time recording practices that were not in compliance with TSU policies. These actions included authorizing two hours a day for Field Officer Training paperwork, instructing the DPS timekeeper to create a method for paying a flat rate of $25/hour additional compensation for "Lead Officers", and showing "Lead Officers" how to record their time worked in the supervisor role.
2. Police officers recording time as Field Officer Training paperwork for hours not worked violates TSU policies.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.01 | Pay Guidelines for Staff Employees | **V. Policy and Procedures Provisions – Employee Pay Adjustments**<br>Decisions to grant merit or equity or reward-based increases must be part of the budget cycle plan and can be initiated at the division level, if funds are available. Division initiated merit increases must meet the approval of the Associate Vice President of Human Resources/Chief Human Resource Officer to ensure that compliance and equity across the university are preserved.<br>**VII. Policy Provisions – General**<br>D. All pay adjustments are subject to review, approval, and recommendation through established channels, including the Office of Human Resources. |

**Violation(s) to this Policy**
While the "Lead Officer" additional hourly rate is not technically a merit or equity-based increases by definition, Section VII was violated because this additional $25/hour rate was not reviewed, approved, or recommended through the established channels, including the Office of Human Resources.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.01 | Pay Guidelines for Staff Employees | **VI. Types of Pay Adjustments**<br>I. Interim Assignment: A temporary pay increase may be granted for assuming additional responsibilities on an interim basis for a specified period of time or until the vacant job is filled. Normally interim assignments will not result in changes to exemption status as defined in FLSA regulations.<br><br>1. Interim Assignments: Nominations of employees to fill positions on an interim basis may be approved by the President and forwarded to Human Resources. Nominations may also be made by the employee's management in order to fill vacated positions where the work must continue until a permanent replacement is hired. Interim appointments must have the final approval of the President and/or Human Resources.<br><br>2. Interim Salary Increase Employees appointed to an interim position must perform the duties of the higher level job for at least 6 weeks before an interim personnel action is processed. The interim assignment should not exceed one (1) year. Within this timeframe the employee can be placed on the payroll with the interim title by means of a personnel action form. The employee may receive a temporary pay increase of up to 25% of salary for the duration of the assignment, as recommended by the hiring manager and approved by Human Resources. The interim salary should not exceed the salary of the previous incumbent or the budgeted amount for the position. The interim salary should not fall below the minimum, nor exceed the maximum of the pay grade established for the position, when applicable. |

**Violation(s) to this Policy**
While the "Lead Officer" was not an interim assignment to fill a vacancy, the officers assumed additional responsibilities to cover their respective supervisor's shift in their absence. This practice has been in effect for longer than six (6) weeks.  Additionally, the $25/hour flat rate on top of their normal hourly rate represents more than 25% of their normal hourly rate.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.03 | Overtime / Compensatory Time | **IV. General Provisions**<br>B. All overtime and extra hours must be authorized in writing and in advance by the dean/director of the department. Employees may not make unauthorized decisions to work overtime or extra hours. Working |

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| | | unauthorized time may subject the employee to disciplinary action, up to and including termination. Similarly, compensation, whether in the form of compensatory time off or pay for overtime or extra hours, may not be waived by the non-exempt employee.<br>**IV. General Provisions**<br>C. Supervisors are responsible for monitoring the work hours of employees under their supervision and for ensuring that information reported on timesheets is complete and accurate. |

**Violation(s) to this Policy**

1. The Chief of Police verbally authorized the additional compensation of $25/hour for "Lead Officers" and two hours overtime for Field Training Officers. This was not documented in writing and was not recorded as part of the normal supervisor meeting recordings. However, the Chief of Police did sign each payroll submission which included the completed timesheets.
2. The Chief of Police and the DPS Timekeeper collaborated to establish a special pay code and showed "Lead Officer" on how to complete their timesheet. The code that was created is for paper tracking only and was not setup in the Banner payroll system.
3. The Chief of Police did not inform the respective officer's supervisor that "Lead Officer" compensation had been authorized.
4. The DPS Timekeeper setup a time reporting and authorization process for "Lead Officers" that was outside of the customary way of processing overtime which is to record the actual day and time worked in the overtime section of the weekly time report and requires a Compensation Request form to be completed and submitted to the DPS Executive Assistant.
5. The Field Training Officer authorization that the Chief of Police implemented has been perpetuated through verbal communications from the Deputy Chief of Police and the Field Training Officer coordinator to Field Training Officers.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.03 | Overtime / Compensatory Time | **VI. Compensation for Overtime – Non-Exempt Employees**<br>A.　Compensation for non-exempt employees for overtime shall consist of either of the following methods:<br>　　1.　Compensatory time off (leave) at the rate of one and one-half hours for each overtime hour worked; or<br>　　2. Cash payment at the rate of one and one-half time the employee's regular hourly rate of pay for all hours worked in excess of forty (40) in the work week, in addition to the regular pay for the pay period during which it was earned.<br>　　a. Cash payments may only be paid if the employee is not able to take the compensatory time within twelve (12) months of the time being earned, as noted in § V, B above; or if the employee has worked a campus event or special event job doing the same type of work as their primary job, and with the prior approval of both managers.<br>b. If the employee has worked a campus event or special event job doing different work than the primary job, payment can be based on approved event flat rates. Approval is subject to review by the compensation unit of the Department of Human Resources.<br>**IX. Reporting Additional Work and Compensatory Leave**<br>A.　Non-exempt employees shall report all additional work beyond the standard forty (40) hour work week on the appropriate dates, on the Time |

RESTRICTED (Access Limited to Authorized Personnel)

000010

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| | | and Effort Report, using the correct time reporting category. Shift differential and overtime codes shall be reported, where appropriate. |
| | | B. Overtime pay will be added to the employee's pay for the time period in which it was accrued and reported. The hourly rate for overtime pay will reflect the hourly pay rate recorded in the payroll/personnel system; State contributions for social security, retirement, and insurance benefits are not included in the calculation for the overtime rate. |

**Violation(s) to this Policy**
1. The "Lead Officer" does not qualify for a special event job doing different work than the primary job.
2. The $25/hour flat rate was not reviewed and approved by the compensation unit of the Department of Human Resources.
3. "Lead Officers" were instructed by the DPS Timekeeper to record the hours actually worked as normal on the Weekly Time Report and to record the hours that they were to receive the $25/hour flat rate for filling in the supervisor role in a separate section of the Weekly Time Report using different hours and/or dates than the day that they worked.
4. Field Officer Training paperwork hours were recorded on the Weekly Time Report for after a normal shift even if the hours were not worked.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.03 | Overtime / Compensatory Time | **X. Additional Compensation for Additional University Assignments** B. All requests for payment of event pay or authorized overtime pay must be submitted on the appropriate Texas Southern University forms, in accordance with applicable policy and in accordance with published payroll deadlines. Failure to meet all documentation requirements and deadlines can result in delayed payment or denial of the request for payment. D. All requests for payment of event pay or authorized overtime pay must be submitted on the appropriate Texas Southern University forms, with required support documentation, and in accordance with this policy (Sections V & VI). Failure to meet all documentation requirements and deadlines can result in delayed payment or denial of the request for payment. |

**Violation(s) to this Policy**
1. Overtime for Field Training Officers were completed on the required Application for Special Event or Overtime Pay Form but the Compensation Request Form is not completed.
2. Special hourly rate for "Lead Officers" did not complete the Compensation Request Form or the Application for Special Event or Overtime Pay Form.

**Fiscal Impact:**

The total amount paid for Field Training Officer paperwork and "Lead Officer" between September 1, 2021 and June 20, 2022 was $27,960.82.

Field Officer Training summary – September 1, 2021 – June 20, 2022. The respective officers did not keep track of the hours that they were completing the paperwork. Instead of recording the actual hours, they recorded two each day. As a result, we are not able to determine how much of this time is valid.

RESTRICTED (Access Limited to Authorized Personnel)

000011

| Last Name | First Name | Total Paid | Total OT 1.5 Hrs | Total OT 1.0 Hrs | Total Hours |
|---|---|---|---|---|---|
| Auzenne | Brian | $3,155.99 | 78 | 18 | 96 |
| Cantu | Bethany | $2,460.89 | 63 | 11 | 74 |
| Howard | James | $2,545.36 | 57 | 17 | 74 |
| John-Miller | Curtis | $1,400.28 | 28 | 8 | 36 |
| Jones | Chevon | $988.33 | 28 | | 28 |
| | Ivan | $251.58 | 6 | | 6 |
| | Tyrone | $911.89 | 26 | | 26 |
| McCray | Brian | $642.90 | 10 | 8 | 18 |
| Sawyer | Jujuana | $3,803.60 | 96 | 18 | 114 |
| Grand Total | | $16,160.82 | 392 | 80 | 472 |

"Lead Officer" summary – September 1, 2021 – June 20, 2022. These are the hours that the respective individual used the designated code to identify hours they worked in the supervisor role. These hours were recorded on different dates or times than they actually worked.

| Last Name | First Name | Total Paid | Total Hours |
|---|---|---|---|
| Holiday | John | $2,200.00 | 88 |
| McAfee | Gaynell | $5,200.00 | 208 |
| Ward | James | $4,400.00 | 176 |
| Grand Total | | $11,800.00 | 472 |

000012

## Time Reporting Overview

The graphic below provides an overview of time recording practices for Field Training Officers (FTO) and "Lead Officers".



## Appendix A: EthicsLine Report Received

| | |
|---|---|
| **From:** | Nwankwo, DeAnna M |
| **Sent:** | Thursday, April 14, 2022 6:56 PM |
| **To:** | Parker-Thompson, Charla |
| **Subject:** | Confidential - EthicsPoint Hotline Matter |

*[handwritten: - OT, Prior period to current Payroll period
FY 2020-21
FY 21-22]*

Chief Audit Executive,

The following matter was received via the EthicsPoint Hotline on 3/24/2022. I apologize for the delay in forwarding the matter to your attention, but I was not alerted by the system that a report had been received. Please advise how you would like to proceed.

**Assigned to**
None entered

*[handwritten: Data dump payroll, per payroll name - Employee ID, pay period, st hours recorded by work code, don't need pay rate]*

**Synopsis Notes**
None entered

**Case Details**
Since January 2022, while at a weekly ~~supervisor meeting~~, Mary gave all the officers (names withheld) in the police department a directive that she would raise the pay for special officers (names withheld). Mary categorized the special officers as the lead officers (names unknown) and (first name unknown) McCefee, telecommunications officer, for security and telecommunications. Those officers were (first name unknown) Ward, security officer, McCefee, (first name unknown) Sawyer, police officer, (first name unknown) Holiday, security officer, (first name unknown) Jones, police officer, Tyrone Jones, police officer, and (first name unknown) Cantu, police officer.

Mary approved field training pay for the lead officers and McCefee so that the lead officers and McCefee would have higher pay that included the sum equivalent of two overtime hours per day, up to five days a week. The persons who were authorized by Mary to sign-off on the timesheets were (first name unknown) Bridges, lieutenant, (first name unknown) Jones, sergeant, (first name unknown) Barnett, sergeant, (first name unknown) Stark, lieutenant, (first name unknown) McCray, sergeant, (first name unknown) Brown, sergeant, and (first name unknown) John-Miller, police officer. Bridges, Jones, Barnett, Stark, McCray, Brown, and John-Miller signed the time sheets because they were told by Mary that Ward, McCefee, Sawyer, Holiday, Jones, Tyrone, and Cantu were entitled to those funds for the work that they did.

The president (name unknown) and the board of regents did not authorize these pay increases. This act appears to be illegal and unethical. The supervisors (names unknown) were operating according to Mary's directive, believing that Mary had the authority to do this. The supervisors that were present at the weekly supervisors' meeting were witnesses to this directive. There were no cameras that captured this incident. This matter may have been reported to management.

**Case Summary**
None entered

*[handwritten: Requested DMN
Follow email sent to Maria White 6/10/2022
6/13/2022 Victor Thezukson will provide the spreadsheet (email from M. White)]*

DeAnna M. Nwankwo MJur., CCEP, MBEC
VP, Chief Compliance Officer

**Exhibit 1: EthicsLine Report.**
*Note:  The yellow highlight and handwritten notes were made by VP, Chief Compliance Officer, DeAnna Nwankwo prior to providing the hardcopy to Acting Chief Audit Executive, Darlene Brown through Sr. Associate Vice President of HR and Payroll Services, Yolanda Edwards.  Both Ms. Nwankwo and Ms. Parker-Thompson were separated from TSU prior to this internal audit investigation being assumed by Acting Chief Audit Executive, Darlene Brown.*

## Appendix B: Internal Audit Investigation Procedures Performed

The following procedures were performed for this internal audit investigation:

- Conducted interviews via Microsoft Teams, cell phone, and in-person.
- Analyzed the time report file provided for period of September 1, 2021, through June 20, 2022.
- Reviewed a sample weekly time reports (WPR) completed by DPS staff and initially gathered by VP, Chief Compliance Officer, DeAnna Nwankwo.
- Reviewed a sample Application for Special Event or Overtime Pay for Non Exempt forms completed by DPS Timekeeper initially gathered by VP, Chief Compliance Officer, DeAnna Nwankwo.
- Reviewed a sample Department of Event Services Supplemental Salary Sign-In Sheet forms completed by DPS Staff and Timekeeper initially gathered by VP, Chief Compliance Officer, DeAnna Nwankwo.
- Reviewed a sample of Compensation Request forms completed by DPS staff initially gathered by VP, Chief Compliance Officer, DeAnna Nwankwo.
- Confirmed with Human Resources that the additional compensation request had not been requested, discussed, or granted by and to Chief of Police Mary Young.
- Reviewed the Texas Southern University Department of Public Safety Policies and Procedures, March, 2020, for overtime and special event time recording policies.  Section 200.33 discusses overtime in detail. The procedures do not grant additional compensation for "Lead Officer" or "Field Training Officers".
- Reviewed applicable TSU MAPPS to determine compliance.

## Appendix C: Weekly Time Sheet Examples

*"Lead Officer" Weekly Timesheet Example*

Below is an example of the "Lead Officer" Weekly Timesheet showing eight (8) hours worked each day for March 13, 2022, and March 14, 2022, at regular hours from 11pm to 7am (top portion of the document) and then the special code to indicate that they served as supervisor and should receive the additional $25/hour compensation on the bottom section of the document.  These hours were recorded on March 13,2022 and March 14, 2022, from 3:00pm to 11:00pm although the individual only worked 11:00pm to 7am.

**TEXAS SOUTHERN UNIVERSITY DEPARTMENT OF PUBLIC SAFETY**
*Weekly Payroll Report (WPR)*

NAME: *James W. Ward* _____  ID. #: ▆▆▆▆▆▆

**PAYROLL PERIOD: *Mar. 13, 2022 thru Mar. 19, 2022 SHIFT 11pm to 7am***

| | | REGULAR HOURS WORKED | | | | | |
|---|---|---|---|---|---|---|---|
| DATE | | Start Shift | End Shift | Hours Worked | LEAVE | NOTE | APPROVAL |
| Sun. | 03/13/2022 | 11pm | 7am | 8 | | Reg. Shift | |
| Mon. | 03/14/2022 | 11am | 7am | 8 | | Reg. Shift | |
| Tue. | 03/15/2022 | 11pm | 7am | 8 | | Reg. Shift | |
| Wed. | 03/16/2022 | 11pm | 7am | 8 | | Reg. Shift | |
| Thu. | 03/17/2022 | 11pm | 7am | 8 | | Reg. Shift | |
| Fri. | 03/18/2022 | | | | | Off Day | |
| Sat. | 03/19/2022 | | | | | Off Day | |
| | TOTAL HOURS | | | 40 | | TOTAL HOURS LEAVE | |

| | | | | | | | PAID | | COMP TIME | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | | REGULAR OVERTIME/COMP HOURS | | | REASONS/ NOTES | | OTP (1.0) | OT (1.5) | OTP (1.0) | OT (1.5) | APPROVAL |
| | | Start | End | Total Hours | | | | | | | |
| Sun. | | | | | | | | | | | |
| Mon | | | | | | | | | | | |
| Tue. | | | | | | | | | | | |
| Wed | | | | | | | | | | | |
| Thu. | | | | | | | | | | | |
| Fri. | 03/18/2022 | 11pm | 7am | 8 | Spring Break | | X | | | | 926A |
| Fri. | 03/18/2022 | 7am | 11am | 4 | Relays | | | X | | | 926A |
| Sat. | 03/19/2022 | 6am | 6pm | 12 | Relays | | | X | | | 926A |

| | PAID CAMPUS EVENT HOURS | | | | | | PAID | | |
|---|---|---|---|---|---|---|---|---|---|
| DATE | Begin Event | End Event | Total Hours | EVENT NAME | EVENT LOCATION | | OTP (1.0) | OT (1.5) | APPROVAL |
| Sun. | | | | | | | | | |
| Mon. | | | | | | | | | |

| | SPECIAL EVENT WORK HOURS | | | | | |
|---|---|---|---|---|---|---|
| DATE | Begin Event | End Event | Total Hours | EVENT NAME | EVENT LOCATION | APPROVAL |
| Sun. | 03/13/2022 | 3pm | 11pm | 8 | HRSTLDR | | 926A |
| Mon. | 03/14/2022 | 3pm | 11pm | 8 | HRSTLDR | | 926A |
| Tue. | | | | | | |
| Wed. | | | | | | |
| Thu. | | | | | | |
| Fri. | | | | | | |
| Sat. | | | | | | |

*Training Officer Weekly Timesheet Example*

Below is an example of a Field Training Officer's Weekly Timesheet showing eight (8) hours worked each day for January 2, 2022 through January 8, 2022 at regular hours from 3pm to 11pm (top portion of the document) and then the overtime of FTO Paperwork for two hours on four of these days. These hours were recorded on the Timesheet from 1:00pm to 3:00pm. It is uncertain if the officer actually worked two hours prior to starting their normal shift.

RESTRICTED (Access Limited to Authorized Personnel)

000016

## TEXAS SOUTHERN UNIVERSITY DEPARTMENT OF PUBLIC SAFETY
### Weekly Payroll Report (WPR)



RECEIVED
JAN 25 2022

**NAME:** Cantu, Bethany        **ID. #:** ███████

**PAYROLL PERIOD:** Jan 2,2021- Jan 8, 2022        **SHIFT:** 3:00pm-11:00pm

| | | REGULAR HOURS WORKED | | LEAVE | NOTE | APPROVAL |
|---|---|---|---|---|---|---|
| | | Start Shift | End Shift | Hours Worked | | | |
| Sun | 01-02-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Mon | 01-03-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Tue | 01-04-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Wed | 01-05-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Thu | 01-06-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Fri | 01-07-2022 | · | · | · | | OFF DAY | |
| Sat | 01-08-2022 | - | · | · | | OFF DAY | |
| | | | | 40 | | | |

| | | REGULAR OVERTIME/COMP HOURS | | | REASONS/ NOTES | PAID | | COMP TIME | | APPROVAL |
|---|---|---|---|---|---|---|---|---|---|---|
| | DATE | Start | End | Total Hours | | OTP (1.0) | OT (1.5) | OTP (1.0) | OT (1.5) | |
| Sun | 01-02-2022 | 1:00 PM | 3:00 PM | 2 | FTO Paperwork | | X | | | |
| Mon | 01-03-2022 | 1:00 PM | 3:00 PM | 2 | FTO Paperwork | | X | | | |
| Tue | 01-04-2022 | 1:00 PM | 3:00 PM | 2 | FTO Paperwork | | X | | | |
| Wed | 01-05-2022 | | | | | | | | | |
| Thu | 01-06-2022 | 1:00 PM | 3:00 PM | 2 | FTO Paperwork | | X | | | |
| Fri | | | | | | | | | | |
| Sat | | | | | | | | | | |

| | | PAID CAMPUS EVENT HOURS | | | | | PAID | | |
|---|---|---|---|---|---|---|---|---|---|
| | DATE | Begin Event | End Event | Total Hours | EVENT NAME | EVENT LOCATION | OTP (1.0) | OT (1.5) | APPROVAL |
| Sun | | | | | | | | | |
| Mon | | | | | | | | | |
| Tues | | | | | | | | | |
| Wed | | | | | | | | | |
| Thu | | | | | | | | | |
| Fri | | | | | | | | | |
| Sat | | | | | | | | | |

| | | SPECIAL EVENT WORK HOURS | | | | | |
|---|---|---|---|---|---|---|---|
| | DATE | Begin Event | End Event | Total Hours | EVENT NAME | EVENT LOCATION | APPROVAL |
| Sun | | | | | | | |
| Mon | | | | | | | |
| Tues | | | | | | | |
| Wed | | | | | | | |

RESTRICTED (Access Limited to Authorized Personnel)

000017

**Affidavit of TSU Police Chief Mary Young**

**Fort Bend County, Texas**

Before me, the undersigned authority, appeared TSU Police Chief Mary Young, and after being sworn on her oath stated the following:

My name is Mary Young.  I am over 21 years of age, have never been convicted of any crime and I have personal knowledge of all facts and information provided in this affidavit.  All of the following information is based on my personal knowledge of the facts and events and are true and correct.

I have had the honor of working as the TSU Chief of Police since 2017. Prior to coming to TSU, I worked for more than 20 years as a police officer with the Houston Police Department.  I received multiple honors for exemplary police work with that department. I accepted employment at TSU to assist with setting a standard of excellence in the police department.  When I arrived, officers were being paid monthly which caused them financial hardship.  We were able to change that so that they are now paid bi-weekly. Also, there were no approved Police Department General Orders that governed the duties, procedures, and operations of the department.  I was successful in creating and approving the first comprehensive General Orders for the department which are still being used to this day.  The property room was also being operated without any approved procedures.  With the help of outside consultants, I was able to create and put in place needed written procedures for the property room that are consistent with generally-recognized police practice.  Also, when I arrived, TSU officers did not have their own police uniforms or body armor.  With the administration's cooperation at the time, we successfully got uniforms and equipment for all officers.  I did not do these things alone; rather, all officers and staff working together helped bring about these improvements. And while there is much more to do, I celebrate the achievements my officers and staff have helped us achieve to provide better police service to the university and community.

I have reviewed the foregoing response prepared by my attorney addressing errors in the Brown Report, and all factual statements in that response are based are true and correct.

The Brown Report, authored by Ms. Darlene Brown, is factually wrong when it contends I created the lead officer position to pay certain officers extra money.  This is not true.  In fact, serving as a lead officer comes with no extra compensation or pay at all. A lead officer can be any officer selected by a supervisor to assist with managing a shift, the roll call, and ultimately the end-of-the-day activities. Such a person, regardless of rank, can be selected by any supervisor. However, in most instances, seniority plays a major factor in the selection of who becomes the lead officer.  Again, no extra pay or compensation comes with being designated or chosen to serve as a lead officer.

As the TSU Police Chief, I am also responsible for ensuring that proper police training and operational tactics are provided to Probationary Police Officers ("PPOs")

once they are hired as police officers at Texas Southern University. To accomplish this goal, officers selected as Field Training Officers ("FTOs") must also go through proper training to be certified and train PPOs. A Field Training Supervisor is also assigned to monitor the Field Training Program and the Assistant Chief of Police oversees the progress and process until probationary police officers are deemed to be ready to meet with me, the Chief, for evaluation and questioning regarding proper police tactics and operational laws. The assignments, shifts, and overtime training compensation are approved by the supervisor.  Field Training Officers who are training PPOs can be paid *up to (2) hours* of compensation to complete paperwork, field training meetings, documented counseling, and any other required duties of the field training program.  Only time actually worked in the FTO program—up to a maximum of 2 hours— can be submitted for payment.  FTOs are chosen by the Field Training Supervisor, Lieutenant of Police and/or the Assistant Chief of Police.  The Brown Report is wrong in suggesting that 2 hours of pay is automatically approved irrespective of whether an FTO works the time or not.  That is not true.

Special event pay relates to pay officers receive to provide police services at special events.  Special events are identified by The Office of Special Events ("OSE"). OSE personnel meet with the police department's special event supervisor to identify a series of events that will require extra police/security presence and services. Such services can include parking, building openings, traffic control, escorts, etc. The list of special events is then placed in the common area of the police roll call room, on the bulletin board, and is announced in police roll call.  Thereafter, officers can decide what special events they may wish to cover and can sign up for any event that they wish to work. Importantly, the rate of pay for the officer's services at such events are already established in the initial meeting between the OSE representatives and the DPS department's special events supervisor.  As such, pricing for the police officer's time at the special event is already determined before the posting is even put on the police bulletin board. Therefore, at the time officers choose a special event to work they already know the reporting time, location, and rate of pay for the event they will cover.  The special event rate schedule was already approved in 2017 and has been correctly identified in my attorney's foregoing response.

I was not provided a copy of the unsigned anonymous complaint against me until after my lawyer filed suit.  Ms. Darlene Brown did not provide me with a copy of either the anonymous complaint or her report before my lawsuit was filed.  With her knowledge and permission, I recorded my August 15, 2022, meeting with her, at which time I can clearly be heard asking her for a copy of these records at that meeting. Ms. Brown did not give me a copy of these documents.  The audio recording is supplied with my attorney's response.

I have been consistently clear with all my police officers that overtime, FTO, and special event pay will not be approved unless the time has actually been worked and verified by immediate supervisors.

This concludes my affidavit.

_____
Mary Young, TSU Police Chief



NOTARY PUBLIC

**SWORN AND SUBSCRIBED** before me this _____ day of December 2022.

ROSALIE A CEDILLO
Notary ID #12333343
My Commission Expires
September 16, 2025

# EXHIBIT 2

**Texas Southern University**

**FY 2021 Restricted Budget**

| | FY2020 Approved Budget | --------------Change-------------- | | FY2021 Approved Budget |
|---|---|---|---|---|
| | | Dollars | Percent | |
| **Source of Funds** | | | | |
| **Research Grants/Contracts Budget** | $      10,500,000 | $             - | 0% | $      10,500,000 |
| Financial Aid: | | - | | |
| Pell Grants | 28,626,856 | (3,380,815) | -12% | **25,246,041** |
| Texas Grants Scholarship | 7,972,723 | 200,160 | 3% | **8,172,883** |
| Texas Grant GEER Allocation | - | 1,168,261 | 0% | **1,168,261** |
| Texas Grant Emergency Allocation | - | 1,130,255 | 0% | **1,130,255** |
| TPEG | 2,723,964 | (258,355) | -9% | **2,465,609** |
| Title III Federal Grants | | | | |
| Historically Black Colleges and Universities | 6,235,192 | 1,767,152 | 28% | 8,002,344 |
| Historically Black Graduate Institutions | 4,449,800 | 689,539 | 15% | 5,139,339 |
| Student Aid and Fiscal Responsibility Act | 1,404,010 | 120,695 | 9% | 1,524,705 |
| **Subtotal** | $      12,089,002 | $   2,577,386 | 21% | $      14,666,388 |
| | | | | |
| Endowment Interest Income | 1,065,625 | 300,436 | 28% | 1,366,061 |
| Gifts and Other Operating Revenue | 6,022,110 | (1,027,166) | -17% | 4,994,944 |
| **Total Restricted Funds** | $      69,000,280 | $      710,162 | 1% | $      69,710,442 |
| | | | | |
| Use of Funds by Object - Operating | | | | |
| Salaries and Wages | 12,826,700 | 1,048,933 | 8% | 13,875,633 |
| Benefits | 2,634,076 | 287,496 | 11% | 2,921,572 |
| M&O | 9,690,083 | (160,398) | -2% | 9,529,685 |
| Capital | 777,644 | 609,000 | 78% | 1,386,644 |
| Scholarships | 43,071,777 | (1,074,869) | -2% | 41,996,908 |
| **Total Uses** | $      69,000,280 | $      710,162 | 1% | $      69,710,442 |

30

## Texas Southern University
### FY 2020 Restricted Budget

| | FY2019 Approved Budget | --------------Change-------------- | | FY2020 Approved Budget |
|---|---|---|---|---|
| | | Dollars | Percent | |
| **Source of Funds** | | | | |
| Research Grants/ Contracts Budget | $ 10,500,000 | $ - | 0% | $ 10,500,000 |
| Financial Aid: | | - | | |
| Pell Grants | 24,529,315 | 4,097,541 | 17% | 28,626,856 |
| Texas Grants Scholarship | 6,772,246 | 1,200,477 | 18% | 7,972,723 |
| TPEG | 2,665,975 | 57,989 | 2% | 2,723,964 |
| Title III Federal Grants | | | | |
| Historically Black Colleges and Universities | 6,235,192 | - | 0% | 6,235,192 |
| Historically Black Graduate Institutions | 3,874,211 | 575,589 | 15% | 4,449,800 |
| Student Aid and Fiscal Responsibility Act | 1,356,389 | 47,621 | 4% | 1,404,010 |
| Subtotal | $ 11,465,792 | $ 623,210 | 5% | $ 12,089,002 |
| | | | | |
| Endowment Interest Income | 1,545,679 | (480,054) | -31% | 1,065,625 |
| Gifts and Other operating revenue | 5,590,000 | 432,110 | 8% | 6,022,110 |
| **Total Restricted Funds** | $ 63,069,007 | $ 5,931,273 | 9% | $ 69,000,280 |
| | | | | |
| Use of Funds by Object - Operating | | | | |
| Salaries and Wages | 10,936,643 | 1,890,057 | 17% | 12,826,700 |
| Benefits | 2,320,594 | 313,482 | 14% | 2,634,076 |
| M&O | 10,112,998 | (422,915) | -4% | 9,690,083 |
| Capital | 2,083,163 | (1,305,519) | -63% | 777,644 |
| Scholarships | 37,615,609 | 5,456,168 | 15% | 43,071,777 |
| **Total Uses** | $ 63,069,007 | $ 5,931,273 | 9% | $ 69,000,280 |

# TEXAS SOUTHERN UNIVERSITY

**(An Agency of the State of Texas)**
*MANAGEMENT'S DISCUSSION AND ANALYSIS, Continues*
**For the Year Ended August 31, 2021**

## CAPITAL ASSETS

At year end, TSU had capital assets net of $287,506,536.27 in a variety of capital assets and infrastructure (net of accumulated depreciation). This represents a net decrease of $4,222,526.76.

Major capital asset events during the current year include the following:

- Building improvements completed at a cost of $11,578,398.09.

- Various equipment and other capital assets increase for a total of $4,902,875.51.

More detailed information about TSU's capital assets is presented in note 2 to the financial statements.

## LONG-TERM DEBT

TSU's revenue bonds carry the rating of "Baa3" with Moody's Investors Service. At year end, TSU had $77,123,762.34 in revenue bonds outstanding versus $88,041,717.33 last year. Also, loans that were financed through the U.S. Department of Education's Historical Black Colleges and Universities program were forgiven.

More detailed information about TSU's long-term liabilities is presented in note 5 to the financial statements.

## ECONOMIC FACTORS

Texas Southern University is a vibrant and progressive HBCU located in the Third Ward Community of the Houston Metropolitan Area. Its rich history and unwavering connection to the community have led to the successful bridging of the gap for many first-generation college students. As a public 4-year institution offering professional programs in Pharmacy, Business, and Law, the University's financial position is closely tied to the State of Texas and the health of the state's economy.

During fiscal year 2021, the institution responded to the State's request for a budget reduction of approximately 5%. With the economic downfall spurned by the COVID-19 pandemic, there was a significant amount of pressure on the institution's budget. The receipt of CARES ACT, HBCU, and HEERF funding has relieved a significant amount of the financial pressure from the institutions budget. Most, if not all, revenue generation resources such as enrollment, residential housing, campus/sporting events were covered by these sources. Additionally, direct costs associated with reducing the spread of COVID-19 and maintaining a healthy campus were supported by the Federal funding.

With the unpredictability of state appropriations, enrollment and campus-generated revenue, the University implemented measures to ensure prudent fiscal management efforts while supporting the institution's priority of the health and safety of its faculty, staff, and students. The University expanded its virtual learning capabilities and course offerings. The University continued to heavily invest in its existing online e-learning and conference platforms, software upgrades and installations, and revamped online security. Classes continued to be offered in three formats: face-to-face, hybrid (face-to-face and

# Texas Southern University

**(An Agency of the State of Texas)**
*STATEMENT OF REVENUES, EXPENSES, AND CHANGES IN NET POSITION*
**For the Year Ended August 31, 2021**

|  |  | 2021 |
|---|---|---|
| **OPERATING REVENUES** |  |  |
| Tuition and Fees-Pledged | $ | 78,232,310.78 |
| Discount on Tuition and Fees |  | (24,582,417.44) |
| Auxiliary Enterprises-Pledged |  | 7,508,283.86 |
| Other Sales of Goods and Services-Pledged |  | 59,381.88 |
| Federal Revenue |  | 19,841,669.36 |
| Federal  Pass-Through Revenue |  | 2,881,601.22 |
| State Revenue |  | 290,743.17 |
| State Pass-Through Revenue |  | 5,511,131.79 |
| Other Contracts and Grants-Pledged |  | 1,893,888.35 |
| Other Operating Revenue |  | 5,352,936.78 |
| **Total Operating Revenues** |  | **96,989,529.75** |
|  |  |  |
| **OPERATING EXPENSES** |  |  |
| Salaries and Wages |  | 94,566,668.12 |
| Payroll Related Costs |  | 47,631,196.04 |
| Professional Fees and Services |  | 10,896,255.41 |
| Travel |  | 832,338.17 |
| Materials and Supplies |  | 7,756,989.77 |
| Communication and Utilities |  | 6,579,530.08 |
| Repairs and Maintenance |  | 6,291,981.43 |
| Rental and Leases |  | 1,155,554.53 |
| Printing and Reproduction |  | 363,917.74 |
| Federal Pass-Through Expense |  | 408,897.89 |
| Bad Debt Expense |  | 2,203,500.96 |
| Scholarships |  | 36,471,782.80 |
| Other Operating Expenses |  | 8,075,011.93 |
| Depreciation and Amortization |  | 22,977,507.35 |
| **Total Operating Expenses** |  | **246,211,132.22** |
|  |  |  |
| **Operating (Loss)** | $ | **(149,221,602.47)** |

See Notes to Financial Statements.

# Texas Southern University

**(An Agency of the State of Texas)**
*SCHEDULE 1A - SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS*
**For the Year Ended August 31, 2021**

| Federal Grantor/ Pass-through Grantor/ Program Title | Assistance Listing No. | NSE Name/ *Id. No.* | Agy/ Univ No | Pass-through From — Pass-Through From Agencies or Universities Amount | Pass-Through From Non-State Entities Amount | Direct Program Amount | Total Amount PT From and Direct Program |
|---|---|---|---|---|---|---|---|
| **U.S. Department of Defense** | | | | | | | |
| Basic, Applied, and Advanced Research in Science and Engineering | 12.630 | Virginia Tech University/ | | | 41,561.48 | | 41,561.48 |
| | | *UNITE 2016-2021* | | | | | |
| Totals - U.S. Department of Defense | | | | -- | 41,561.48 | -- | 41,561.48 |
| **U.S. Department of Education** | | | | | | | |
| Direct Programs: | | | | | | | |
| Title III Part B Strengthening Historically Black Colleges and Universities Program | 84.031B | | | | | 11,284,435.16 | 11,284,435.16 |
| Minority Science and Engineering Improvement | 84.120A | | | | | 67,035.87 | 67,035.87 |
| COVID-19 - Higher Education Emergency Relief Fund (HEERF) Student Aid Portion | 84.425E | | | | | 10,549,600.00 | 10,549,600.00 |
| COVID-19 - Higher Education Emergency Relief Fund (HEERF) Institutional Portion | 84.425F | | | | | 7,528,607.67 | 7,528,607.67 |
| COVID-19 - HEERF Historically Black Colleges and Universities (HBCUs) | 84.425J | | | | | 27,820,595.36 | 27,820,595.36 |
| Pass-Through From: | | | | | | | |
| Governors Emergency Education Relief (GEER) Fund | 84.425C | | | | | | 2,422,998.99 |
| *Pass-Through From:* | | | | | | | |
| Texas Higher Education Coordinating Board | | | 781 | 2,422,998.99 | | | |
| Totals - U.S. Department of Education | | | | 2,422,998.99 | -- | 57,250,274.06 | 59,673,273.05 |
| **U.S. Department of Energy** | | | | | | | |
| Pass-Through From: | | | | | | | |
| Minority Economic Impact | 81.137 | | | | | | 40,366.45 |
| *Pass-Through From:* | | | | | | | |
| University of Houston | | | 730 | 40,366.45 | | | |
| Totals - U.S. Department of Energy | | | | 40,366.45 | -- | -- | 40,366.45 |
| **U.S. Department of Health and Human Services** | | | | | | | |
| Direct Programs: | | | | | | | |
| NIEHS Hazardous Waste Worker Health and Safety Training | 93.142 | | | | | 347,713.68 | 347,713.68 |
| Substance Abuse and Mental Health Services Projects of Regional and National Significance | 93.243 | | | | | 594,143.48 | 594,143.48 |
| PPHF Geriatric Education Centers | 93.969 | | | | | 20,661.14 | 20,661.14 |
| Totals - U.S. Department of Health and Human Services | | | | -- | -- | 962,518.30 | 962,518.30 |
| **U.S. Department of Homeland Security** | | | | | | | |
| Pass-Through From: | | | | | | | |
| Disaster Grants - Public Assistance (Presidentially Declared Disasters) | 97.036 | | | | | | 233,409.32 |
| *Pass-Through From:* | | | | | | | |
| Texas Division of Emergency Management | | | 575 | 233,409.32 | | | |
| Totals - U.S. Department of Homeland Security | | | | 233,409.32 | -- | -- | 233,409.32 |
| **U.S. Department of Justice** | | | | | | | |
| Public Safety Partnership and Community Policing Grants | 16.710 | Harris County - Texas/ | | | 65,491.36 | | 65,491.36 |

# Texas Southern University

**(An Agency of the State of Texas)**

*SCHEDULE 1A - SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS*

**For the Year Ended August 31, 2021**

| Federal Grantor/ Pass-through Grantor/ Program Title | Assistance Listing No. | NSE Name/ *Id. No.* | Agy/ Univ No | Pass-Through From Agencies or Universities Amount | Pass-Through From Non-State Entities Amount | Direct Program Amount | Total Amount PT From and Direct Program |
|---|---|---|---|---|---|---|---|
| | | *2020CKWX0029* | | | | | |
| Totals - U.S. Department of Justice | | | | -- | 65,491.36 | -- | 65,491.36 |
| **U.S. Department of Transportation** | | | | | | | |
| Direct Programs: | | | | | | | |
| Highway Training and Education | 20.215 | | | | | 40,665.00 | 40,665.00 |
| Totals - U.S. Department of Transportation | | | | -- | -- | 40,665.00 | 40,665.00 |
| **Research & Development Cluster** | | | | | | | |
| Direct Programs: | | | | | | | |
| **National Aeronautics and Space Administration** | | | | | | | |
| Space Operations | 43.007 | | | | | 11,595.36 | 11,595.36 |
| Totals - National Aeronautics and Space Administration | | | | -- | -- | 11,595.36 | 11,595.36 |
| **National Science Foundation** | | | | | | | |
| Computer and Information Science and Engineering | 47.070 | US Ignite, Inc./ | | 3,920.00 | | | 3,920.00 |
| | | *CNS-1719547* | | | | | |
| Direct Programs: | | | | | | | |
| Mathematical and Physical Sciences | 47.049 | | | | | 5,930.24 | 5,930.24 |
| Computer and Information Science and Engineering | 47.070 | | | | | 145,767.30 | 145,767.30 |
| Education and Human Resources | 47.076 | | | | | 804,293.02 | 804,293.02 |
| Education and Human Resources | 47.076 | | | | | 143,231.85 | 143,231.85 |
| *Pass-Through To:* | | | | | | | |
| *University of Houston* | | | | | | | |
| Education and Human Resources | 47.076 | | | | | 100,507.28 | 100,507.28 |
| *Pass-Through To:* | | | | | | | |
| *Texas State University* | | | | | | | |
| Education and Human Resources | 47.076 | | | | | 69,186.08 | 69,186.08 |
| *Pass-Through To:* | | | | | | | |
| *University of Houston - Clear Lake* | | | | | | | |
| Education and Human Resources | 47.076 | | | | | 68,050.00 | 68,050.00 |
| *Pass-Through To:* | | | | | | | |
| *University of Houston - Downtown* | | | | | | | |
| Totals - National Science Foundation | | | | -- | 3,920.00 | 1,336,965.77 | 1,340,885.77 |
| **U.S. Department of Defense** | | | | | | | |
| Basic, Applied, and Advanced Research in Science and Engineering | 12.630 | Academy of Applied Science/ *W911NF10200 76;601608* | | 2,784.35 | | | 2,784.35 |
| Totals - U.S. Department of Defense | | | | -- | 2,784.35 | -- | 2,784.35 |
| **U.S. Department of Energy** | | | | | | | |
| Direct Programs: | | | | | | | |
| Minority Economic Impact | 81.137 | | | | | 20,000.00 | 20,000.00 |
| Totals - U.S. Department of Energy | | | | -- | -- | 20,000.00 | 20,000.00 |
| **U.S. Department of Health and Human Services** | | | | | | | |

# Texas Southern University

**(An Agency of the State of Texas)**

*SCHEDULE 1A - SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS*

**For the Year Ended August 31, 2021**

| Federal Grantor/ Pass-through Grantor/ Program Title | Assistance Listing No. | NSE Name/ *Id. No.* | Agy/ Univ No | Pass-Through From Agencies or Universities Amount | Pass-Through From Non-State Entities Amount | Direct Program Amount | Total Amount PT From and Direct Program |
|---|---|---|---|---|---|---|---|
| Maternal and Child Health Federal Consolidated Programs | 93.110 | Baylor University/ *5* | | | 54,044.47 | | 54,044.47 |
| | | *T16MC29831-04-00* | | | | | |
| Direct Programs: | | | | | | | |
| Minority Health and Health Disparities Research | 93.307 | | | | | 1,249,698.02 | 1,249,698.02 |
| Centers for Medicare and Medicaid Services (CMS) Research, Demonstrations and Evaluations | 93.779 | | | | | 71,681.75 | 71,681.75 |
| Biomedical Research and Research Training | 93.859 | | | | | 89,026.34 | 89,026.34 |
| Biomedical Research and Research Training | 93.859 | | | | | 27,922.68 | 27,922.68 |
| *Pass-Through To:* | | | | | | | |
| *University of Houston* | | | | | | | |
| Totals - U.S. Department of Health and Human Services | | | | -- | 54,044.47 | 1,438,328.79 | 1,492,373.26 |
| U.S. Department of Justice | | | | | | | |
| Direct Programs: | | | | | | | |
| Postconviction Testing of DNA Evidence | 16.820 | | | | | 102,717.66 | 102,717.66 |
| Totals - U.S. Department of Justice | | | | -- | -- | 102,717.66 | 102,717.66 |
| U.S. Department of Transportation | | | | | | | |
| University Transportation Centers Program | 20.701 | University of North Carolina - Chapel Hill/ | | | | 190,229.47 | 190,229.47 |
| | | *69A3551747133* | | | | | |
| Direct Programs: | | | | | | | |
| University Transportation Centers Program | 20.701 | | | | | 62,203.09 | 62,203.09 |
| Pass-Through From: | | | | | | | |
| Highway Research and Development Program | 20.200 | | | | | | 2,506.97 |
| *Pass-Through From:* | | | | | | | |
| *University of Houston* | | | 730 | 2,506.97 | | | |
| University Transportation Centers Program | 20.701 | | | | | | 88,777.46 |
| *Pass-Through From:* | | | | | | | |
| *University of Texas at Austin* | | | 721 | 88,777.46 | | | |
| Totals - U.S. Department of Transportation | | | | 91,284.43 | 190,229.47 | 62,203.09 | 343,716.99 |
| **Highway Planning and Construction Cluster** | | | | | | | |
| U.S. Department of Transportation | | | | | | | |
| Direct Programs: | | | | | | | |
| Highway Planning and Construction | 20.205 | | | | | 3,854.32 | 3,854.32 |
| Pass-Through From: | | | | | | | |
| Highway Planning and Construction | 20.205 | | | | | | 93,542.03 |
| *Pass-Through From:* | | | | | | | |
| *Texas Department of Transportation* | | | 601 | 93,542.03 | | | |

75

# Texas Southern University

**(An Agency of the State of Texas)**
*SCHEDULE 1A - SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS*
**For the Year Ended August 31, 2022**

| Federal Grantor/ Pass-through Grantor/ Program Title | ALN Number | NSE Name/ Id. No. | Agy/ Univ No | Pass-Through From Agencies or Universities Amount | Pass-Through From Non- State Entities Amount | Direct Program Amount |
|---|---|---|---|---|---|---|
| **U.S. Department of Education** | | | | | | |
| Minority Science and Engineering Improvement | 84.120A | Howard University/ | | | 58,853.47 | |
| | | P120A190033 | | | | |
| Direct Programs: | | | | | | |
| Higher Education Institutional Aid | 84.031 | | | | | 11,201,059.43 |
| COVID-19 - Higher Education Emergency Relief Fund (HEERF) Student Aid Portion | 84.425E | | | | | 13,579,125.00 |
| COVID-19 - Higher Education Emergency Relief Fund (HEERF) Institutional Portion | 84.425F | | | | | 3,251,165.26 |
| COVID-19 - HEERF Historically Black Colleges and Universities (HBCUs) | 84.425J | | | | | 41,058,582.81 |
| Pass-Through From: | | | | | | |
| Governors Emergency Education Relief (GEER) Fund | 84.425C | | | | | |
| Pass-Through From: | | | | | | |
| Texas Higher Education Coordinating Board | | | 781 | 928,436.68 | | |
| Totals - U.S. Department of Education | | | | 928,436.68 | 58,853.47 | 69,089,932.50 |
| **U.S. Department of Health and Human Services** | | | | | | |
| NIEHS Hazardous Waste Worker Health and Safety Training | 93.142 | Deep South Center for Environmental Justice, Inc./ | | | 241,736.57 | |
| | | 2U45ES010664-22 | | | | |
| Direct Programs: | | | | | | |
| Substance Abuse and Mental Health Services Projects of Regional and National Significance | 93.243 | | | | | 695,645.56 |
| Totals - U.S. Department of Health and Human Services | | | | 0 | 241,736.57 | 695,645.56 |
| **U.S. Department of Justice** | | | | | | |
| Direct Programs: | | | | | | |
| Public Safety Partnership and Community Policing Grants | 16.710 | | | | | 66,578.07 |
| Totals - U.S. Department of Justice | | | | 0 | 0 | 66,578.07 |
| **U.S. Department of Transportation** | | | | | | |
| Direct Programs: | | | | | | |
| Highway Training and Education | 20.215 | | | | | 19,776.50 |
| Totals - U.S. Department of Transportation | | | | 0 | 0 | 19,776.50 |
| **Research & Development Cluster** | | | | | | |
| **National Aeronautics and Space Administration** | | | | | | |
| Direct Programs: | | | | | | |
| Space Operations | 43.007 | | | | | 494.3 |
| Totals - National Aeronautics and Space Administration | | | | 0 | 0 | 494.3 |
| **National Science Foundation** | | | | | | |
| Computer and Information Science and Engineering | 47.070 | Platforms for Advanced Wireless Research (PAWR)/ CNS-1719547 | | | 18,942.45 | |
| Education and Human Resources | 47.076 | Howard University/ 1901420 | | | 20,828.11 | |
| Education and Human Resources | | Platforms for Advanced Wireless Research (PAWR)/ R76522 | | | 18,740.31 | |
| Education and Human Resources | | University of California - San Diego/ KR 705026/DUE-1821521 | | | 8,906.72 | |

# Texas Southern University

**(An Agency of the State of Texas)**
*SCHEDULE 1A - SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS*
**For the Year Ended August 31, 2022**

| Federal Grantor/ Pass-through Grantor/ Program Title | ALN Number | NSE Name/ Id. No. | Agy/ Univ No | Pass-Through From Agencies or Universities Amount | Pass-Through From Non- State Entities Amount | Direct Program Amount |
|---|---|---|---|---|---|---|
| **Direct Programs:** | | | | | | |
| Engineering | 47.041 | | | | | 19,923.96 |
| Mathematical and Physical Sciences | 47.049 | | | | | 11,812.97 |
| Computer and Information Science and Engineering | 47.070 | | | | | 56,675.57 |
| Education and Human Resources | 47.076 | | | | | 790,261.43 |
| Education and Human Resources | 47.076 | | | | | 156,895.87 |
| *Pass-Through To:* | | | | | | |
| *University of Houston* | | | | | | |
| Education and Human Resources | 47.076 | | | | | 82,372.83 |
| *Pass-Through To:* | | | | | | |
| *Texas State University* | | | | | | |
| Education and Human Resources | 47.076 | | | | | 60,834.05 |
| *Pass-Through To:* | | | | | | |
| *University of Houston - Clear Lake* | | | | | | |
| Totals - National Science Foundation | | | | 0 | 67,417.59 | 1,178,776.68 |
| **U.S. Department of Defense** | | | | | | |
| Basic, Applied, and Advanced Research in Science and Engineering | 12.630 | Academy of Applied Science/ | | | 6,629.83 | |
| | | *W911NF1020076;601 608 FY21* | | | | |
| Air Force Defense Research Sciences Program | 12.800 | Clarkson Aerospace Corporation/ | | | 73,978.98 | |
| | | *FA9550-21-1-0460;TSU-21-1-0460* | | | | |
| **Pass-Through From:** | | | | | | |
| Basic and Applied Scientific Research | 12.300 | | | | | |
| *Pass-Through From:* | | | | | | |
| *University of Houston* | | | 730 | 8,630.19 | | |
| Totals - U.S. Department of Defense | | | | 8,630.19 | 80,608.81 | 0 |
| **U.S. Department of Health and Human Services** | | | | | | |
| Maternal and Child Health Federal Consolidated Programs | 93.110 | Baylor University/ | | | 4,500.02 | |
| | | *5T16MC29831-04-00* | | | | |
| Trans-NIH Research Support | 93.310 | Duke University/ | | | 59,244.23 | |
| | | *IU24MD16258-01/303000432* | | | | |
| **Direct Programs:** | | | | | | |
| Minority Health and Health Disparities Research | 93.307 | | | | | 1,857,812.45 |
| Minority Health and Health Disparities Research | 93.307 | | | | | 19,866.81 |
| *Pass-Through To:* | | | | | | |
| *University of Texas at El Paso* | | | | | | |
| Centers for Medicare and Medicaid Services (CMS) Research, Demonstrations and Evaluations | 93.779 | | | | | 123,378.79 |
| Biomedical Research and Research Training | 93.859 | | | | | 158,149.43 |
| Biomedical Research and Research Training | 93.859 | | | | | 26,777.05 |
| *Pass-Through To:* | | | | | | |

# Texas Southern University
### (An Agency of the State of Texas)
### *SCHEDULE 1A - SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS*
#### For the Year Ended August 31, 2022

| Federal Grantor/ Pass-through Grantor/ Program Title | ALN Number | NSE Name/ Id. No. | Agy/ Univ No | Pass-Through From Agencies or Universities Amount | Pass-Through From Non-State Entities Amount | Direct Program Amount |
|---|---|---|---|---|---|---|
| *University of Houston* | | | | | | |
| | | | | | | |
| Vision Research | 93.867 | | | | | 81,491.17 |
| Scholarships for Health Professions Students from Disadvantaged Backgrounds | 93.925 | | | | | 571,939.97 |
| Pass-Through From: | | | | | | |
| Cancer Treatment Research | 93.395 | | | | | |
| *Pass-Through From:* | | | | | | |
| *University of Houston* | | | 730 | 42,125.22 | | |
| | | | | | | |
| Totals - U.S. Department of Health and Human Services | | | | 42,125.22 | 63,744.25 | 2,839,415.67 |
| **U.S. Department of Housing and Urban Development** | | | | | | |
| Direct Programs: | | | | | | |
| General Research and Technology Activity | 14.506 | | | | | 33,160.09 |
| Totals - U.S. Department of Housing and Urban Development | | | | 0 | 0 | 33,160.09 |
| **U.S. Department of Justice** | | | | | | |
| Direct Programs: | | | | | | |
| Postconviction Testing of DNA Evidence | 16.820 | | | | | 9,870.40 |
| Totals - U.S. Department of Justice | | | | 0 | 0 | 9,870.40 |
| **U.S. Department of Transportation** | | | | | | |
| University Transportation Centers Program | 20.701 | University of North Carolina - Chapel Hill/ | | 140,116.60 | | |
| | | 69A3551747133/2016 0688-01-TSU | | | | |
| Direct Programs: | | | | | | |
| Highway Planning and Construction | 20.205 | | | | | 78,539.59 |
| University Transportation Centers Program | 20.701 | | | | | 19,924.30 |
| Pass-Through To: | | | | | | |
| *University of Texas at Arlington* | | | | | | |
| | | | | | | |
| Pass-Through From: | | | | | | |
| Highway Planning and Construction | 20.205 | | | | | |
| *Pass-Through From:* | | | | | | |
| *Texas Department of Transportation* | | | 601 | 89,591.70 | | |
| | | | | | | |
| University Transportation Centers Program | 20.701 | | | | | |
| *Pass-Through From:* | | | | | | |
| *University of Texas at Austin* | | | 721 | 123,904.36 | | |
| | | | | | | |
| Totals - U.S. Department of Transportation | | | | 213,496.06 | 140,116.60 | 98,463.89 |
| **Student Financial Assistance Programs Cluster** | | | | | | |
| **U.S. Department of Education** | | | | | | |
| Direct Programs: | | | | | | |
| Federal Supplemental Educational Opportunity Grants | 84.007 | | | | | 370,446.80 |
| Federal Work-Study Program | 84.033 | | | | | 533,151.48 |
| Federal Pell Grant Program | 84.063 | | | | | 24,543,459.69 |
| Federal Direct Student Loans | 84.268 | | | | | 72,972,110.00 |
| Teacher Education Assistance for College and Higher Education Grants (TEACH Grants) | 84.379 | | | | | 87,489.50 |
| Totals - U.S. Department of Education | | | | 0 | 0 | 98,506,657.47 |
| **U.S. Department of Health and Human Services** | | | | | | |

| Texas Southern University | | | | |
|---|---|---|---|---|
| **FY 2022 Restricted Budget** | | | | |

| | FY2021 Approved Budget | --------------Change-------------- | | FY2022 Approved Budget |
|---|---|---|---|---|
| | | Dollars | Percent | |
| **Source of Funds** | | | | |
| **Research Grants/Other Contracts** | $   10,500,000 | $   1,050,000 | 10.0% | $   11,550,000 |
| **Financial Aid** | | | | |
| Pell Grants | $   25,246,041 | $ (14,648,969) | -58.0% | $   10,597,072 |
| Texas Grants Scholarship | 8,172,883 | (376,975) | -4.6% | 7,795,908 |
| Texas Grant GEER Allocation | 1,168,261 | (996,046) | -85.3% | 172,215 |
| Texas Grant Emergency Allocation | 1,130,255 | (1,130,255) | -100.0% | - |
| TPEG | 2,465,609 | (10,789) | -0.4% | 2,454,820 |
| **Subtotal Grants/Scholarship** | $   48,683,049 | $ (16,113,034) | -33.1% | $   32,570,015 |
| **Title III Federal Grants** | | | | |
| Historically Black Colleges and Universities | $   8,002,344 | $   247,892 | 3.1% | $   8,250,236 |
| Historically Black Graduate Institutions | 5,139,339 | 114,881 | 2.2% | 5,254,220 |
| Student Aid and Fiscal Responsibility Act | 1,524,705 | (10,907) | -0.7% | 1,513,798 |
| **Subtotal Title III Federal Grants** | $   14,666,388 | $   351,866 | 2.4% | $   15,018,254 |
| **Other Restricted Funds** | | | | |
| Endowment Interest Income | $   1,366,061 | $   (174,933) | -12.8% | $   1,191,127 |
| Gifts and Other Operating Revenue | 4,994,944 | (352,081) | -7.0% | 4,642,863 |
| **Subtotal Other Restricted Funds** | $   6,361,004 | $   (527,014) | -8.3% | $   5,833,991 |
| **Total Restricted Funds** | $   69,710,442 | $ (16,288,182) | -23.4% | $   53,422,260 |
| | | | | |
| **Use of Funds by Object-of-Expense** | | | | |
| Salaries and Wages | $   13,875,633 | $   (100,757) | -0.7% | $   13,774,876 |
| Benefits | 2,921,572 | (141,507) | -4.8% | 2,780,065 |
| General Operating | 10,916,329 | 2,821,856 | 25.8% | 13,738,185 |
| Scholarships | 41,996,908 | (18,867,774) | -44.9% | 23,129,134 |
| **Total Uses of Funds by Object-of-Expense** | $   69,710,442 | $ (16,288,182) | -23.4% | $   53,422,260 |

# EXHIBIT 3



# THE HALL LAW GROUP, PLLC

530 Lovett Boulevard   •   Houston, Texas 77006
Telephone: (713) 942-9600  •  Facsimile: (713) 942-9566

Benjamin L. Hall, III, Ph.D., J.D.
Board Certified Personal Injury Trial Law
Board Certified Civil Trial Law
Texas Board of Legal Specialization

December 27, 2022

**DELIVERED VIA HAND-DELIVERY AND EMAIL**

Chairman Albert H. Myres
Regent Marc C. Carter
Regent Pamela A. Medina
Regent James M. Benham
Regent Caroline Baker-Hurley
Regent Stephanie D. Nellons-Paige
Regent Ron J. Price
Regent Marilyn A. Rose
Regent Mary Evans Sias
Student Regent Keonne McClain
c/o Attorney Philip Fraissinet, Board Counsel
Thompson & Horton Law Firm
3200 Southwest Freeway, Ste. 2000
Houston, TX 77027

**Re:  Police Chief Mary Young's Response to August 15, 2022 Memo of Darlene Brown**

Dear Chairman Myres and TSU Regents:

Thank you for an opportunity to respond on behalf of TSU Police Chief Mary Young ("Chief Young") to claims of wrongdoing contained in the August 15, 2022 memo of Ms. Darlene Brown, Acting Chief Audit Executive, sent to the Texas Southern Board of Regents (hereinafter "the Brown Report"). The Brown Report is legally and factually wrong and this response is tasked with addressing fatal errors in that report. Chief Young has done nothing wrong.








This response is divided into three sections: 1) Why Ms. Brown's Conclusions are Legally and Factually Wrong; 2) Why Chief Young Was Targeted; and 3) Chief Young's Suggested Settlement Proposal To End The Dispute.

## I. The Brown Report Is Legally and Factually Wrong

**1)      The Brown Report Violates Texas Law**

Because police officers are often falsely accused of wrongdoing because of the nature of their profession, the Texas legislature in 1994 enacted specific laws to protect them from being disciplined based on anonymous complaints.  Specifically, Sections 614.022 and 614.023, Tex. Gov't Code Ann. (Vernon 1994), sets forth *mandatory* procedures that must be followed before any disciplinary action[1] may be taken against a police officer accused of wrongdoing.   The pertinent requirements are:

> 1) The complaint must be in writing and *signed*;
>
> 2) A copy of the signed complaint "*shall be given to the officer…within a reasonable time after the complaint is filed;*" and
>
> 3) No disciplinary action may be taken against the police officer if these procedures have not been followed.

The Texas Supreme Court and all Texas courts of appeal interpreting these statutes have held that the procedural safeguards in the law are to be strictly complied with before any disciplinary action may be taken against a covered police officer.   See *Colorado County v. Staff,* 510 S.W.ed 435, 443 (Tex. 2017) (the law "provide[s] covered employees with procedural safeguards to reduce the risk that adverse employment actions would be based on unsubstantiated complaints"); *Guthery v. Taylor,* 112 S.W.3d 715 (same, as modified by *Colorado County v. Staff*); *Buck et al. v. Kozlowski,*

---

[1] These laws prohibit any "disciplinary action" from being taken—not merely adverse employment actions.  Section 614.023(b) reads: "Disciplinary action may not be taken against the officer or employee unless a copy of the *signed complaint* is given to the officer or employee.*"  Emphasis added throughout unless otherwise indicated.

*et al*, No. 13-21-00123-CV (Tex. App—Corpus, May 26, 2022 (failure to comply with Chapter 614, Tex. Gov't Code, prevents disciplinary action being taken against covered employee); *Turner v. Perry,* 278 S.W.3d 806, 823 (Tex. App.—Houston [14th Dist.] 2009, pet. denied.). See **Tabs 1 and 2**, copies of the *Guthery* and *Colorado County* opinions.

The Brown Report does not comply with Texas law.  It makes findings of alleged wrongdoing against Chief Young even though there is no signed complaint.  And, TSU has taken drastic disciplinary action against Chief Young based on that erroneous Brown Report generated by an *unsigned and anonymous* complaint.  The authors of the Brown Report freely admit the anonymous complaint is the genesis of their engagement.  See **Tab 54**.  TSU disciplinary actions against Chief Young include the following:  banned her from coming on campus, prohibited her from attending any TSU-sponsored events, denied her permission to wear her TSU police uniform, blocked her card pass to get into buildings, expressly prohibited her from doing any act as police chief, tried to remove her name as police chief from the graduation brochure, filled her position with one of her subordinates, disconnected her access to job emails as well as restricted access to her office computer,  instructed officers to ignore any orders she issued, and had a locksmith change the locks on her office door to lock her out.  See **Tab 49**, TSU General Counsel Hao Le's 12/2/22 email purporting to ban Chief Young from the campus, etc. See also **Tab 50**, various shots of other disciplinary actions taken against her.

Because of TSU's unlawful disciplinary actions, suit had to be filed to protect Chief Young's legal rights.  In less than ten (10) days of Chief Young filing her lawsuit, two (2) Harris County district court judges agreed that TSU had probably violated Texas law.  See **Tab 51,** signed temporary restraining orders ("TROs").  The TROs variously enjoined TSU and its President and General Counsel from taking any further actions to terminate or interfere with Chief Young's job

as the police chief.  TSU's administrators disregarded the court orders and continued to enforce disciplinary actions against the chief.  A third Harris County district judge, Michael Engelhardt, also entered an emergency order compelling TSU to produce its entire investigative file relating to the Brown Report and to produce the investigator, Ms. Darlene Brown, and TSU President Lesia Crumpton-Young for expedited depositions.[2]  TSU opposed the discovery orders and filed an interlocutory appeal to stop the litigation and discovery.  TSU's attorneys represented to the Houston First Court of Appeals that Chief Young's TRO against TSU will remain in place until the interlocutory appeal is concluded.  See **Tab 52**.

To this day, TSU is still imposing the above unlawful disciplinary actions and restrictions on Chief Young in spite of the clear violations of Texas law.

### 2)     The Brown Report Is Factually Wrong

In addition to the Brown Report being based on an unsigned complaint, it is also plagued with incorrect facts, missing evidence, and flawed reasoning.  Following is a discussion of the more glaring factual errors in the report:[3]

#### a) There Was No January 2022 Supervisor Meeting

The unsigned complaint states "[s]ince January 2022 while at a weekly supervisor meeting, [Chief Young] gave all the officers …in the police department a directive that she would raise the pay for special officers….[Chief Young] categorized the special officers as the lead officers…."[4] This claim is provably false.

There were no supervisor meetings with Chief Young in January 2022.  In fact, there were no January 2022 supervisor meetings at all.  To prove this point, we provide the sworn affidavit of

---

[2] See **Tab 53,** December 2, 2022 discovery order signed by Judge Engelhardt.
[3] The author is personally familiar with the high-quality work of the McConnell Jones firm.  Unfortunately, Ms. Darlene Brown's work product in this instance is not consistent with the high caliber work that firm is known for.
[4] See Brown Report, Tab 54.

the minutes-keeper for all police supervisor meetings, Ms. Ada Rattiff.  See **Tab 3**.  Ms. Rattiff was asked to collect and review all recorded minutes of the police supervisor meetings dating back to September 2021.  All of those minutes are supplied with this response.  See **Tabs 25** through **34**.  After performing her review, Ms. Rattiff confirms that no police supervisor meetings occurred in January 2022 and no meeting minutes exists for any such meetings.  See Tab 3.  Further, Ms. Rattiff was asked to review the official minutes to determine if there is mention in any of the minutes of Chief Young suggesting that extra pay would be paid to lead officers.  Again, no such directive is found in any of the minutes.  *Id.* The reason no such minutes exists is because Chief Young never gave any such directive.[5]   Whenever the subject of lead officers and overtime pay are recorded as a subject discussed in the supervisor meetings, Chief Young stressed that overtime pay will only be approved for time that is actually worked (i.e., time worked over 40 hrs/wk).  See highlighted supervisor minute in **Tab 30**.

### b) The Brown Report Contradicts The Unsigned Complaint

Even though the unsigned complaint contends Chief Young gave her lead officer directive in January 2022 the Brown Report contends—wrongly—that such lead officer pay was already in place as of September 2021—4 months earlier.  See **Tab 54 at 12**.  If the lead officer pay directive was already occurring as of September 2021 the anonymous complaint's claim that Chief Young gave the directive in January 2022 makes no sense.   However, even though the complaint is wrong about a non-existent January 2022 directive, and the Brown investigators contend lead officer pay was being made before that directive was supposedly given, the authors of the Brown Report blindly ignore these inconsistencies.   The authors of the Brown Report act as though they wanted

---

[5] See discussion of "lead officers," "overtime pay," and "special event" pay addressed in Chief Young's accompanying affidavit, **Tab 55.**

to reach a pre-determined conclusion against Chief Young irrespective of what the facts were otherwise showing.

### c) "Lead Officer," "Overtime Pay," And "Special Event Pay"

The Brown Report fundamentally misunderstands the differences between "lead officer," "overtime pay" and "special event pay."  Contrary to the claim made in the unsigned anonymous complaint, "lead officers" receive no extra pay simply for serving as a lead officer.  This designation is simply functional to identify the person in charge when a supervisor is otherwise not present.  No extra compensation is paid for assuming or being assigned this designation.

"Overtime pay" is controlled by federal and state laws that govern pay to non-exempt police staff. The Fair Labor Standards Act ("FLSA") contains strict rules about non-exempt employees being paid time and a half for all time they work above 40 hours a week.  As such, TSU's non-exempt police officers earn and are required to be paid 1.5 times their regular hourly rate of pay for each hour over 40 they work in any given week.  This is a non-discretionary rate dictated by both federal and state law.

Finally, "special event pay" and "lead officer" have nothing to do with each other.  Special event pay are amounts paid to officers pursuant to the duly authorized rate schedule approved by TSU administrators back in 2017.  Specifically, in a memo dated October 24, 2017, at 1:54 p.m., Shannon Broussard, Director of Facilities and Special Events, circulated to Chief Young and other department heads the "New Approve[d] Personnel Fee Sheet" that was to be used on "all time sheets submitted to the Budget and/or HR office" relating to special events.  See **Tab 14**.  Ms. Broussard copied all of the following TSU administrators on the email:  TSU Chief Financial Officer Kenneth R. Huewitt, Ashlee McClelland, Raphael Moffett, Chief Young and others.  The approved "fee sheet" clearly reflects the hourly charges to be assessed and paid to police officers,

supervisors, dispatchers and other law enforcement personnel that might be needed to cover a special event.   A copy of the pertinent section of the approved fee sheet is provided below in **Fig**. 1.1:

| | |
|---|---|
| **First Aid or Nurse (Event Cost)** | $100.00/Day |
| **Ticket Seller** | $15.50 |
| **Ticket Taker** | $15.50 |
| **Ushers** | $15.50 |
| **Safety Officer** | $25.00 |
| **Security & Traffic Control** | |
| **Police Officer** | $40.00 |
| **Police Special Occasion** | $50.00 |
| **Police Commander / Supervisor** | $50.00 |
| **Police Commander / Supervisor** | $60.00 |
| **Police Dispatcher** | $25.00 |
| **Traffic / Security Officer** | $25.00 |
| **Traffic / Security Officer Special Occasion** | $30.00 |
| **Building and Grounds Support Services** | |
| **Custodian** | $15.50 |
| **Custodian (Food Event)** | $18.50 |
| **Custodial Supervisor** | $21.50 |
| **Grounds Keeper** | $18.50 |
| **Tiger Labor Force** | $18.50 |
| **Bus / Tram Driver** | $20.00 |
| **Clock Operator** | $15.50 |

**Fig. 1.1**

See also **Tab 14**.[6]   The Brown Report shows no knowledge of these approved special event rates. Accordingly, the report draws the inaccurate conclusion that special event pay was not authorized. As a consequence, the Brown Report wrongly claims such payments were not approved by the TSU Human Resources department.[7]

---

[6] The older rates were replaced by the October 24, 2017 rate sheet.
[7] Additional evidence of the Brown Report's error about special event pay can be found in its discussion of a Weekly Time Sheet in Appendix C of its Report at 16.   That form actually identifies requested time for "Special Event Work Hours" but the Brown Report misidentifies the time as "lead officer" time.   This is wrong.   The requested $25.00/hr

To charge Chief Young with fraud for following TSU's approved 2017 fee sheet is reckless and unsupported by any credible evidence.  The Brown Report makes this charge because it did not do the hard work of thoroughly researching TSU payroll and HR records.  The fact that a special code was adopted by the bookkeeper to distinguish special event pay from regular or overtime pay is merely a bookkeeping convenience—not a violation of TSU policy.

### d)  Witness Statements Refute The Complaint's And Brown Report's Conclusions

None of the information relied on in the Brown Report is sworn.  On the other hand, Chief Young has required all witnesses testifying on her behalf in this response to swear under oath to the truthfulness of their supplied facts.  Following are material excerpts from the sworn affidavits of TSU police officers (current and former) attesting to Chief Young's steadfast integrity and honesty in her handling of officer pay:

### i.  Excerpts from Affidavit of Former TSU Deputy Chief Fred Brown
### Tab 6

"…I have been a licensed Texas peace officer for 34 years.  I am still a licensed peace officer in this state.  During the last three plus decades as a police officer, I have served in multiple law enforcement positions.  Presently, I serve as a Lieutenant with the Harris County Precinct #1 Commissioner's Office.  I also previously served as a Deputy Chief of Police in the Texas Southern University Police Department where I had the opportunity to work directly with and under the leadership of TSU Chief of Police Mary Young.  I also have worked as a law enforcement officer for numerous years with the Harris County Sheriff's Department.  In these various positions I have observed and been involved in managing practically every aspect of law enforcement, including administrative operations of the various law enforcement agencies.  I have also [] personally written and implemented police policies in these agencies, including overtime pay policies.

During my work with the TSU police department I personally worked with Chief Young on a regular basis.  I observed and implemented her orders to TSU police officers regarding overtime pay.  She was clear that officers were required to keep track of and document their overtime.  I never heard her tell anyone or any officer they could get paid overtime pay even if they did not work.  To the contrary, she repeatedly instructed officers that they would not be paid overtime if they did not perform the work.  If anyone is claiming Chief Young in any way tolerated officers or police personnel being paid overtime pay without working that would be contrary to everything I know about her and observed when dealing with Chief Young.  Chief Young is one

---

pay for the special event the officer worked is specifically authorized by the October 24, 2017 approved personnel time sheet.

of the most professional police officers I have ever had the honor of working with.  She is competent, honest and professional…."

### ii. Excerpts From The Affidavit of Peace Officer Dereka Lawton
### Tab 4

"…    I am a licensed Texas peace officer and have held such license in this state for 4 years.  I previously worked several years at TSU as a police officer.   I left TSU in October 2022 for a different job with the University of Houston police department….

During the time I worked at TSU, Chief Mary Young lead the police department.  I found her to be the type of police officer I hope to be one day.  She was professional with all her officers and required all of us to carry out our duties in conformity with respect and the highest ethics.  I observed her provide clear orders and instructions to officers about being honest, serving with integrity and respect for others.  She stressed to us that we were servants of the people and not their lords.

Regarding overtime pay, Chief Young was clear that if you did not work overtime you were not to be paid for overtime.  And, to make sure overtime was properly accounted for Chief Young required officers to obtain approval for overtime, submit their request for overtime pay to their direct supervisors for verification and sign off, and only then would the pay request be forwarded up the chain of command.  I thought this was a very good system and is the same type of system I presently work under at the University of Houston…."

### iii. Excerpts From The Affidavit of TSU Peace Officer Bethany Cantu
### Tab 10

"…    I have never seen TSU Chief Mary Young do anything I would regard as dishonorable, under-handed, or dishonest.  To the contrary, she demands the best from all of us.  Regarding overtime pay, she follows the regulations of the Department and requires sign off on overtime pay requests to be approved by the requisite supervisors before being submitted up the chain of command.  I am honored to serve the community with her…"

### iv. Excerpts From The Affidavit of TSU Sergeant Ivan Jones
### Tab 9

"…    I have known Chief Young for over 40 years.  She is a quality person.  She leads the department honorably, with integrity and respect for others, and is unquestionably competent as a law enforcement officer.  TSU is lucky to have her as its police chief.

I personally have heard Chief Young instruct officers and supervisors about paid overtime.  Because of personnel shortages in the department she offered officers extra time before and/or after their shifts to work to make sure we had enough police coverage to keep the campus and community safe.  Because such time was over and above the time officers were assigned to cover their shifts they necessarily would qualify for time and a half pay if they worked extra hours. Had there been more officers to cover normal shifts this practice would not have been needed.  Chief

Young is to be commended for holding things together with the limited officers she has to protect the university community.

Chief Young is a compassionate, caring and competent police chief.  Anyone accusing her of wrongdoing is not speaking truthfully about this great professional…."

### v. Excerpts From The Affidavit of TSU Sergeant Brian McCray
### Tab 7

"…I personally observed Chief Young ordering her officers to properly account for all their overtime.  No one was paid or to be paid if they did not work overtime.  And, Chief Young followed accepted protocol to ensure that the direct supervisor of each officer applying for overtime pay verify and sign off on any request for overtime pay.  Her overtime policies and practices are the same as are used in all well-run police departments—i.e., officers working overtime had to perform the work, have their immediate supervisors verify and sign off on the work having been performed, and only then sending the pay request up to command staff for final sign off.   I have never known Chief Young to deviate from this recognized practice.

I am also impressed with Chief Young's work ethic.  She usually outworks everyone else in the department and stays later than others to ensure all needed work is done.  Most impressive is her practice of not requesting anyone to do anything she would not do herself.  I have seen her "get her hands dirty" even though she is the Chief.  Nothing is beneath her to do if she thought it needed to be done.

If anyone is complaining about Chief Young or her police and administrative practices then it is either because they do not understand policing, have a personal agenda, or have not paid attention to how hard this competent police chief works everyday to improve the TSU police department.  Chief Young only wants the best for TSU and I have seen in real time how she works to try to make that happen.

I am proud to be a TSU sergeant because of Chief Mary Young."

### vi. Excerpts From The Affidavit of TSU Police Officer Bea Philips
### Tab 8

"…   I am a licensed Texas peace officer working in the TSU Police Department.  I have worked as an officer with TSU since 2018.  During that period I have worked closely with TSU Police Chief Mary Young and have had many opportunities to work with her.   I have been lucky to learn from Chief Young and to watch how she handles her business as a police officer and chief.  I have seen her use her own money to pay for items and services that should have been paid for by TSU.  I have asked her why she was using her own money to pay for items for TSU and she would just respond that the items/services were needed and it did not hurt her too much to help out by using her own funds.

…

I have never heard Chief Young tell anyone that they could be paid for overtime without working.  To the contrary, she insisted that supervisors monitor and verify overtime pay requests

before sending them up the chain of command for payment.  I like working in the TSU police department under Chief Young's leadership.  I am not aware of any hostile work environment or favoritism being present or practiced in the department.

…

Chief Young is a great police chief and is well-respected by officers, students, staff, administrators, local officials and in the community.  It is great to have her as our police chief…."

### vii. Excerpts From The Affidavit of TSU Corporal Brian Auzenne
### Tab 5

"…    I have been a licensed Texas peace officer for the last twenty (20) years to the present…..[I] began working for TSU in the Department of Public Safety 2 years ago.  I presently hold the rank of Corporal in the Department.

…

I have never seen TSU Chief Mary Young do anything I would regard as dishonorable, under-handed, or dishonest.  To the contrary, she demands the best from all of us.  She stresses the importance of police officers being servants of the people and honest in all our dealings.  If anyone is claiming she has done anything dishonest or dishonorable that would be completely contrary to everything I have heard and seen her do throughout our department for over the last two years.  And, regarding overtime pay, she follows the regulations of the Department and requires sign off on overtime pay requests to be approved by the requisite supervisors before being submitted up the chain of command…"

In addition to the above sworn testimonials, the recorded supervisor meeting minutes

confirm Chief Young's steadfast insistence that officers would only be paid overtime for work

they actually worked:

**December 15, 2021 Supervisor Meeting Minute:**

**19) b. Question: Is there two different pays (sic) for special events, like the voting event?**
    **i.  Voting event is $25 per hour (B.Brown)**
    **ii. Basket ball(sic) games are regular OT.  *There are only special rate events and OT rate events (Chief)***
    **iii. Please keep in mind you must do your 40 hours before your overtime rate kicks in.  If not, then special event is just your regular pay rate. (C. Scruggs)**
          **1. *If the employee has called in sick, they cannot do special event, overtime or extra jobs. (Captain/Chief)***

See **Tab 30.**  Thus, both sworn eye-witness testimony and the official recorded supervisor meeting minutes refute the unsigned complaint against Chief Young.  There was never any lead officer pay.

### e) The Brown Report Misrepresents Chief Brown's Overtime Pay Procedures

Chief Young implemented the same overtime payment process approved and used by all well-run law enforcement agencies in the area: i.e., the Houston Police Department, Harris County Sheriff's Office, Humble ISD, METRO, and various other local constable offices.  Specifically, the payment process operates as follows: officers requesting overtime pay must certify in writing that they actually performed the work, then submit the written pay request to their immediate supervisors to verify and approve, once the supervisors sign-off and certify that the work was performed, they must sign off on the pay request before sending it upstream to their immediate supervisors for approval. This is a tried-and-true checks and balances system intended to minimize the risk of officers being paid overtime pay for work   they did not perform or for which they did not qualify.[8]   The below flowchart accurately shows Chief Young's approved overtime payment procedures   which   track   similar   procedures   used   by   other   law   enforcement   agencies:

---

[8] Police department  Records show that Chief Young has rejected overtime requests even when subordinate supervisors had signed off on the payment.   See **Tab 22.**

**OVERTIME SEQUENCE PURSUANT TO TIMEKEEPER**

**Fig. 1.2**

The above flowchart positions Chief Young in the *seventh* spot to sign off on overtime pay requests —-not the first.  However, the Brown Report appears to place the police chief in the first approval position.   See **Tab 54**, Brown Report at 13.  Whether intended or not, the report's diagram is misleading.[9]

In addition to the above multi-layered approval process, Chief Young insisted that all overtime requests be in writing.   See **Tab 17,** TSU DPS Compensation Request Form.  Additionally, she implemented a color-coded chart to keep track of when officers were absent, out sick, or working on weekends or holidays so she could also check to see if any officer was requesting overtime pay on days when they were claiming to be sick or when they should have been working their regular shift at regular pay.  See **Tabs 18, 20, and 21.**  In the Patrol Division she used an additional document to keep track of the 8-hour shifts worked by her patrol officers.

---

[9] It is also curious that the Brown Report wrongly claims the Human Resources Department did not sign off on DPS overtime pay requests.  This also is not true.  As previously addressed, the HR office approved the special event rates in 2017 and is also included in the pay approval process.   See **Fig. 1.2** at Step 8.

See **Tab 20.** Chief Young was so dedicated to determining whether overtime pay was costing the university more money than the DPS Special Rate pay she had her department participate in an official study of the issue.   That study revealed that the DPS Special Rate resulted in a better fiscal outcome for the university and, therefore, Chief Young had payments comply with that method. See **Tabs 15 and 16.**

Finally, the Brown Report fails to address the issue as to how overtime opportunities are made possible outside of the regular shift hours officers work.   Specifically, why is overtime necessary in the department?   The answer to this question is more complicated than it may first appear.   Generally, there are always special events happening on TSU's vibrant campus.   These events are created by students, staff, faculty, community members, guests, etc. and are coordinated and calendared in the Office of Special Events ("OSE").   Once the events are calendared, the police department is asked to supply needed security officers or traffic control personnel for  the events. **Tab 19 -** is a 24-page list of various special events the police department received notice of security/police-related needs.   Officer's pay for these events is generally supplied by the group/person/organizer sponsoring the special event.   Officers may volunteer to provide police services at the events and be paid the authorized pay rate that was approved by the university back in 2017.[10] Special event opportunities are generally supplemental work to an officer's regular shift duties.   Chief Young provides an affidavit detailing how security services for special events are scheduled, staffed and paid for.   See **Tab 55.**   In short, special event police services are paid in conformity with TSU's approved 2017 personnel pay scale attached as **Tab 14.**  The Brown Report fails to show any knowledge of this approved pay schedule.

     **f)  FTO Pay Requests**

---

[10] The approved special event personnel pay sheet is being provided in **Tab 14.**

The Brown Report's discussion of Field Training Officer ("FTO") pay is also wrong.   See Brown Report at 6.[11]  Even though the report states it has no provable evidence of  any monetary loss to the university caused by the department's FTO pay practices, it calls into question whether payments to FTOs were handled properly.  As such, a response on behalf of Chief Young is needed.

The Texas Commission of Law Enforcement ("TCOLE"), a state agency, governs the licensure, certification and recertification of peace officers in Texas.   There are numerous requirements TCOLE requires a person to satisfy to become and remain a licensed peace officer in this state.  After completing Basic Academy Training, a probationary peace officer ("PPO") must successfully complete an additional minimum number of hours in real world training under the supervision of a qualified FTO.  However, every FTO must also be trained on what she must know and do to train a PPO.  To comply with these state mandates, Chief Young authored and implemented a dedicated Field Training Manual for her department to ensure uniform compliance with what state law requires.  See **Tab 47**, TSU DPS Field Training Manual.

No TSU officer is required to be a FTO.  However, those who wish to be FTOs are required not only to have the new recruits "shadow" them during their eight-hour shifts, but they also are required to complete specialized training for themselves, as well as paperwork and documentation relating to the PPO's progress, growth, needs for improvements, training etc.  Because such tasks require FTOs to work hours beyond their regular shifts, Chief Young— just as other law enforcement agencies—authorizes "*up to two hours of overtime"* to complete these extra duties. Two hours is a *cap* to discourage officers from asking for more time to be paid than is reasonably needed to complete FTO duties.   The two-hour limit is not intended to be an automatic pay

---

[11] The report states "Field Training Officer compensation—This is an additional two (2) hours pay at the respective officer's overtime hourly rate, for each day that they were training an officer.  This additional compensation was to complete paperwork associated with assessing an officer's performance during training."

increase.  If an officer's FTO duties can be completed in less than 2 hours they are required to

submit a pay request for only the time they spent completing the tasks.  Former TSU Deputy Chief

of Police Fred Brown is recorded in the Brown Report as having correctly explained this limiting

instruction when he spoke with the investigators.  See Brown Report at bottom of 4.  The "up to"

language was not permission to falsely claim time that had not been worked.   The Brown Report's

suggestion to the contrary is not accurate.  And, the report supplies no credible evidence of this

instruction being misused by any FTO police officer.

Finally, there also is no supervisor meeting minute where Chief Young made any type of

statement that endorsed an automatic two hour pay increase for FTOs.  See **Tabs 25 through 34**.

Chief Young makes clear in her affidavit that was never allowed. She writes:

> As the TSU Police Chief, I am also responsible for ensuring that proper police training and
> operational tactics are provided to Probationary Police Officers ("PPOs") once they are
> hired as police officers at Texas Southern University. To accomplish this goal, officers who
> are selected as Field Training Officers ("FTOs") must also go through proper training to
> be certified and able to train PPOs. A Field Training Supervisor is also assigned to monitor
> the Field Training Program and the Assistant Chief of Police oversees the progress and
> process until probationary police officers are deemed to be ready to meet with me, the
> Chief, for evaluation and questioning regarding proper police tactics and operational laws.
> The assignments, shifts and overtime training compensation is approved by the
> supervisor.  Field Training Officers who are training PPOs can be paid *up to (2) hours* of
> compensation to complete paperwork, field training meetings, documented counseling, and
> any other required duties of the field training program.  Only time actually worked in the
> FTO program—up to a maximum of 2 hours— can be submitted for payment.  FTOs are
> chosen by the Field Training Supervisor, Lieutenant of Police and/or the Assistant Chief
> of Police.  The Brown Report is wrong in suggesting that 2 hours of pay [are] automatically
> approved irrespective of whether an FTO works the time or not.  That is not true.

See **Tab 55**, Police Chief Young's affidavit. If there is evidence that some FTOs were misusing

the system, their immediate supervisors should have detected their misconduct before approving

the pay requests.  Chief Young cannot, and should not, be charged with fraud when she never

authorized anyone to misrepresent their FTO overtime.

## II. Why Was Chief Young Targeted?[12]

Why would Chief Young come under attack by an anonymous complainant if she did nothing wrong?  This question needs an answer.  Perhaps the following details supply that answer:

**a)   Anonymous Complaint Follows Chief Young's Correction of TSU President's Detail**

For over five (5) years, Chief Young steadily upgraded her police department without incident.   President Lesia Crumpton-Young was installed as the new TSU president in July 2021, and Chief Young assigned a police detail to provide security for the new president.

Within months of the officers being assigned, Chief Young received several complaints from university leaders complaining that one or more of the officers appeared to be acting too personally with the president—such as helping her with her wardrobe, carrying her purse, sitting side by side in restaurants having lunch and dinner, holding personal items and umbrellas for her, carrying her personal bags/groceries, and performing non-security related errands.  Such acts between a particular officer (Sergeant Darren Barnett) and the president gave the appearance of a more inappropriate personal relationship between the two.

Chief Young confronted all officers—including Sergeant Barnett—about the complaints she was receiving.  Her corrections were not well-received by Sergeant Barnett.  In fact, after repeated conversations regarding the security detail, and officers were still showing some inappropriate activities with the president, Chief Young reached out to other agencies that provided similar security detail services to help and assist with training her officers.  Due to scheduling conflicts and manpower shortages, the needed training never occurred. After months of regular travel and last-minute security requests, Chief Young had to use additional officers to fill-in and help with security detail duties regarding the president's pick-up/drop off and other requests from

---

[12] Most of the following Information was learned after Chief Young filed her lawsuit.

the office of the president. This was becoming a rigorous daily task for the already short-staffed police department. Chief young then suggested that the civilian driver assigned to the Board of Regents and president's office (Mr. Calvin Dumas) assist more than usual to help with the president's in-state travel and around the city for pick-up/drop-off services, luncheons, and informal functions.  Barnett, and the office of the president, reluctantly accepted this change. However, soon thereafter, Barnett offered to resign—an offer Chief Young would have been willing to accept.  However, Sergeant Barnett then shared with other TSU officers that at the same time of his proffered resignation he received a call from President Crumpton's executive director, Ms. Harper, stating that the president could not live without him and asked him not to resign.  **See Tab 4.**  Barnett confided that the president's office tried to hire him to work in Hannah Hall where the president offices instead of in the police department.  Following is an account of what Sergeant Barnett shared with TSU officer Dereka Lawton:

> Another peculiar interaction between Sergeant Barnett and President Crumpton's office occurred just after Chief Young warned Sergeant Barnett that he was "in too deep" with the president.  Chief Young instructed Barnett to create more distance from the president in order to ensure both he and the president were kept in the best light and professionalism. Barnett threatened to resign his position because of Chief Young's admonition, but according to Barnett, he received a call from President Crumpton's chief of staff, Eddy Harper (sp?), who told him President Crumpton "needed him" and that they would create a job for him in Hannah Hall.  Such a position would have had Barnett work[] closer with the president.  However, because Barnett was not qualified for the position he did not accept the position.  After Chief Young tried to correct Barnett's conduct with President Crumpton is the first time I heard Barnett gripping about Chief Young and stating he "couldn't stand the chief."  He only made this statement to me after Chief Young tried to correct his interactions with President Crumpton.

See **Tab 4.**

Not long afterwards—i.e., less than two weeks later—the anonymous unsigned complaint surfaced against Chief Young.  And, throughout the time Ms. Darlene Brown performed her work, Sergeant Barnett was heard participating in her interviews and informing police staff members

about what was coming next in the investigation.  In fact, Sergeant Barnett forecasted to police staff that Chief Young was going to be placed on leave of absence before any formal action on that matter had been taken or communicated to Chief Young.   Sergeant Barnett also told police staff that his friend, TSU Sergeant Bobby Brown, was going to be installed by the administration to replace Chief Young—before any such announcement had been made.[13] It is now clear that Sergeant Barnett was privy to inside information about the investigation before anything was officially shared with Chief Young.

The undersigned attorney served Chief Young's open records request on TSU to obtain all communications between Sergeant Barnett, President Crumpton-Young, and Darlene Brown. TSU is opposing production of the requested public records and has refused to produce any of the court-ordered witnesses (Crumpton-Young and Brown) for deposition as ordered by Judge Engelhardt.  So far, TSU administrators have succeeded in frustrating production of the ordered discovery.

### b)  Sergeant Barnett's Curious Relationship With President Crumpton-Young

Chief Young has been supplied evidence revealing a more personal relationship between Sergeant Barnett and the TSU president than was previously known.  Following are some of the newly discovered details:

- Barnett personally bought and gifted a handgun to President Crumpton-Young and paid another TSU police officer to "bling it out" with rhinestones for "his girl."  See **Tab 41**, picture of the president's rhinestone-decorated pistol, and **Tab 10**, Affidavit of TSU Officer Bethany Cantu.
- President Crumpton-Young reciprocated by purchasing and giving Sergeant Barnett an expensive cowboy hat, expensive leather boots, and an expensive leather belt that Barnett brags about to other TSU police officers and has posted online in front of a TSU marked vehicle.  See **Tab 43**, Photos Barnett posted online of the President's gifts; and **Tab 4**, affidavit of Officer Dereka Lawton.

---

[13] See **Tab 40 and Tab 50, Exhibit 2.** TSU ultimately announced what Barnett had forecasted and circulated an email appointing Barnett's close friend, Bobby Brown, to serve as an interim police chief in direct violation of the court-issued TRO.

- Barnett refers to President Crumpton as "that girl is my heart."   See **Tab 4,** Dereka Lawton affidavit.
- President Crumpton told another TSU police officer who rescued her from a certain fall that **"Barnett would have killed you if anything had happened to me."  Tab 4.**
- Sergeant Barnett also traveled out of town with President Crumpton on a trip that originally identified the President's husband as the person traveling with her—but her husband did not go on the trip, Sergeant Barnett was the male who traveled with the president on the trip.  When Chief Young inquired about the sudden last-minute travel change, Ms. Krystina Reed (former President's Department Business Administrator) informed the Chief the request for the change was made by the President herself.
- The President's office tried to get Barnett moved to Hannah Hall where the president's office is situated after Chief Young confronted him about his inappropriate conduct with the president.  **Tab 4.**
- Barnett was also allowed to order alcohol on the President's university pay card while traveling with her.  The charges were subsequently reversed after reimbursement forms were sent back for explanation by university personnel.  See **Tabs 44 and 45.**
- Very late one night, President Crumpton-Young called Sergeant Barnett personally—not through the police department dispatch—and asked for him to meet her to help find her missing daughter.  The call was made even though President Crumpton-Young's husband was there with her. She told the chief, "I (the president) am used to calling on him (Sergeant Barnett) in a lot of ways."

Removing Chief Young from her position as police chief based on trumped up charges made it convenient for Barnett's close friend, Sergeant Bobby Brown, to be put in her position.  See **Tab 50, Exhibit 2.**   However, putting Bobby Brown over the police department has caused numerous female officers to come forward with disturbing claims of sexual misconduct perpetrated by him— one of the women has sought legal representation to file for a TRO against Brown because she fears his sexual misconduct.  Bobby Brown, however, if left in the interim police chief position, will permit Sergeant Barnett to do whatever he wishes with President Crumpton-Young given the facts that have only recently been documented and shared with Chief Young.

Chief Young has only recently learned that Sergeant Bobby Brown has engaged in a number of sexual misdeeds as a police officer, including the following: 1)  forwarding a picture of a dildo to female  officers at a prior place of employment for which he was relieved of duty, 2) he has been asking male TSU officers about a current female TSU officer and  requesting information

about "who's hitting [that] P‑ ‑ sy," and 3) disturbingly, circulating a text message to TSU officers, including female officers, that contains a shot of his naked penis in the shot.  See **Tab 42**, copy of Brown's penis shot.   At least one female TSU officer is prepared to sign and swear out a complaint against Sergeant Brown because of his sexual harassment in the department.  See Tex. Educ. Code, Section 51.252, et seq. which subjects an officer to termination for sexual harassment.

Regrettably, in the administration's haste to remove Chief Young in order to keep Sergeant Barnett close to the President, it has now placed a wolf over the hen house.  This is an unsustainable condition in the police department that poses a substantial legal risk to the university—all because of personal agendas, a legally defective incompetent complaint, and poorly researched investigation.  The situation should be immediately corrected by returning Chief Young to her position as police chief.  A substantial percentage of the department would warmly welcome her return.

### III.  Chief Young's Settlement Proposal To Resolve The Dispute

Chief Young has been tremendously damaged by all the negative press and untrue allegations leveled against her.  Her 25+ years of superlative police work and public service now lay tattered in the eyes of the public.  Her college-age daughter wakes up daily in tears because of all the negative stories and comments about her mom that populate social media and online searches.  "A person's good name is more valuable than gold" and Chief Young seeks to have her good name restored.

Chief Young makes the following modest settlement proposal to quickly resolve the present dispute and restore her good name: 1) the Board of Regents vote to immediately reinstate her to her position as TSU police chief; 2) immediately issue a mutually-approved joint press release announcing that additional facts have been uncovered  that disprove claims made against

Chief Young and commend reinstatement of her to her position as TSU police chief, with an apology to the Chief; 3) all litigation between the parties will be immediately ended; and 4) Chief Young's attorney's fees  and costs, as well as a reasonable public relations budget to help rehabilitate her public image will be paid by TSU.

I stand ready to answer any questions you may have regarding these matters.

Sincerely,

Benjamin L. Hall, III, Ph.D., J.D.
530 Lovett Blvd.
Houston Texas, 77006
713.942.9600
Trial Counsel for TSU Police Chief Mary Young

# EXHIBIT 4

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 460-2023-04689 |

Texas Workforce Commission and EEOC

*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Mary Young | 281-773-5966 | 03-12-1969 |

| Street Address | City, State and ZIP Code |
|---|---|
| 2818 Sedona Creek Dr | Missouri City TX 77459 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two are named, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| Texas Southern University | 500+ | (713) 313-7011 |

| Street Address | City, State and ZIP Code |
|---|---|
| 3100 Cleburne St, Houston, TX 77004 | |

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

RECEIVED 21 APR 2023 Houston District Office US EEOC

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest        Latest

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

See Exhibit A.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State or Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 4/20/2023                *[signature]* Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

# EXHIBIT 5

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Houston District Office**
1919 Smith Street, 6th Floor
Houston, TX 77002
(346) 327-7700
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 07/14/2023

**To:** Mary Young
2818 Sedona Creek Dr
Missouri City, TX 77459

Charge No: 460-2023-04689

EEOC Representative and email:    CHRISTOPHER FUENTES
Federal Investigator
christopher.fuentes@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 460-2023-04689.

On behalf of the Commission,

Digitally Signed By: Rayford O. Irvin
07/14/2023
Rayford O. Irvin
District Director

**Cc:**

Deborah Curry
TEXAS SOUTHERN UNIVERSITY - OGC / LEGAL
3100 CLEBURNE ST # 340
Houston, TX 77004

Hao Le
TEXAS SOUTHERN UNIVERSITY - OGC / LEGAL
3100 CLEBURNE STREET  # 340
HOUSTON, TX 77004

Brian T Bagley
Akerman, LLP
1300 POST OAK BLVD STE 2300
Houston, TX 77056

Scott D Marrs
Akerman, LLP
1300 POST OAK BLVD STE 2300
Houston, TX 77056

Alexandra Ledyard
Akerman, LLP
1300 POST OAK BLVD STE 2300
Houston, TX 77056

Ryan Finnegan
HALL LAW FIRM
530 LOVETT BLVD
HOUSTON, TX 77006

Kimberley L Bobb
HALL LAW FIRM
530 LOVETT BLVD
HOUSTON, TX 77006

Benjamin L Hall
HALL LAW FIRM
530 LOVETT BLVD
HOUSTON, TX 77006

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

#### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

#### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

#### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 460-2023-04689 to the District Director at Rayford O. Irvin, 1919 Smith Street 6th Floor

Houston, TX 77002.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Houston District Office**
1919 Smith Street, 6th Floor
Houston, TX 77002
(346) 327-7700
Website: www.eeoc.gov

## <u>DETERMINATION AND NOTICE OF RIGHTS</u>
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 07/14/2023

**To:** Byron Charles
1626 Rev Dr. Random Howard St.
Port Arthur, TX 77640
Charge No: 460-2023-04032

EEOC Representative and email:     CHRISTOPHER FUENTES
Federal Investigator
christopher.fuentes@eeoc.gov

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 460-2023-04032.

On behalf of the Commission,

Digitally Signed By: Rayford O. Irvin
07/14/2023

Rayford O. Irvin
District Director

**Cc:**

Danielle Dailey
Walmart c/o Littler Mendelson, P.C.
2301 MCGEE ST STE 800
Kansas City, MO 64108

Scott A Forman
Walmart c/o Littler Mendelson
2301 McGee St STE 800
Kansas City, MO 64108

Sara McNeil
SPIELBERGER LAW GROUP
4890 W KENNEDY BLVD # 950
TAMPA, FL 33609

Eric D Rogers
SPIELBERGER LAW GROUP
4890 W KENNEDY BLVD # 950
TAMPA, FL 33609


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 460-2023-04032 to the District Director at Rayford O. Irvin, 1919 Smith Street 6th Floor

Houston, TX 77002.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "**in remission**" (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# EXHIBIT 6

**Affidavit of TSU Police Officer Bea Philips**

**Harris County, Texas**

Before me, the undersigned authority, appeared TSU Police Officer Bea Philips and after being sworn on her oath stated the following:

My name is Bea Philips. I am over 21 years of age, have never been convicted of any crime and I have personal knowledge of all the facts and information provided in this affidavit. All of the following information was personally observed and/or learned by me while serving as a licensed Texas peace officer and/or during my work as a licensed police officer in this state. All of the following facts and information are true and correct.

I am a licensed Texas peace officer working in the TSU Police Department. I have worked as an officer with TSU since 2018. During that period I have worked closely with TSU Police Chief Mary Young and have had many opportunities to work with her. I have been lucky to learn from Chief Young and to watch how she handles her business as a police officer and chief. I have seen her use her own money to pay for items and services that should have been paid for by TSU. I have asked her why she was using her own money to pay for items for TSU and she would just respond that the items/services were needed and it did not hurt her too much to help out by using her own funds.

I work on the security detail that accompanies TSU President Crumpton and have observed some actions of a member of the detail that seemed irregular to me. Chief Young stressed that we remain professional when working on the detail and advised us that our conduct had been seen by others who were not pleased with some of the actions they observed. She was clear that we were there to provide security services and not to run personal errands, hold umbrellas, or carry purses. I remember another member of our detail, Sergeant Barnett, commenting he was going to resign from the police department after Chief Young instructed our detail to maintain a professional relationship when handling our security duties. Barnett later withdrew his resignation.

I have never heard Chief Young tell anyone that they could be paid for overtime without working. To the contrary, she insisted that supervisors monitor and verify overtime pay requests before sending them up the chain of command for payment. I like working in the TSU police department under Chief Young's leadership. I am not aware of any hostile work environment or favoritism being present or practiced in the department.

I learned there was some type of investigation into Chief Young and that a number of officers were asked to attend a meeting(s) relating to that investigation. I was confused when no one asked me to be interviewed even though I was one who worked very closely with the Chief. Also, I have learned that there are several other officers and sergeants who were not questioned for the investigation. Whatever the reason was for not including us in the interview process it is hard to imagine how a complete "investigation" could have been performed when so many police officers with knowledge of how the department runs were not interviewed or questioned.

Chief Young is a great police chief and is well-respected by officers, students, staff, administrators, local officials and in the community. It is great to have her as our police chief.

Further Affiant Sayeth Not.

_____

**TSU Peace Officer Bea Philips**

SWORN AND SUBCRIBED this _22nd_ day of November 2022.

NOTARY SEAL

ROSALIE A CEDILLO
Notary ID #12333343
My Commission Expires
September 16, 2025

# EXHIBIT 7

4

**Affidavit of Texas Peace Officer Dereka Lawton**

**Harris County, Texas**

Before me, the undersigned authority, appeared Texas Peace Officer Dereka Lawton and after being sworn on her oath stated the following:

My name is Dereka Lawton.  I am over 21 years of age, have never been convicted of any crime and I have personal knowledge of all the facts and information provided in this affidavit.  All of the following information was personally observed and/or learned by me while serving as a licensed Texas peace officer and/or during my work as a licensed police officer in this state.  All of the following facts and information are true and correct.

I am a licensed Texas peace officer and have held such license in this state for 4 years. I previously worked several years at TSU as a police officer.   I left TSU in October 2022  for a different job with the University of Houston police department.  I have provided police services in the areas of investigations and patrol.

During the time I worked at TSU, Chief Mary Young lead the police department.  I found her to be the type of police officer I hope to be one day.  She was professional with all her officers and required all of us to carry out our duties in conformity with respect and the highest ethics.  I observed her provide clear orders and instructions to officers about being honest, serving with integrity and respect for others.  She stressed to us that we were servants of the people and not their lords.

Regarding overtime pay, Chief Young was clear that if you did not work overtime you were not to be paid for overtime.  And, to make sure overtime was properly accounted for Chief Young required officers to obtain approval for overtime, submit their request for overtime pay to their direct supervisors for verification and sign off, and only then would the pay request be forwarded up the chain of command.  I thought this was a very good system and is the same type of system I presently work under at the University of Houston.

Sometime earlier in 2022, was contacted by Ms. Yolanda Edmonds in the TSU HR department to answer questions about how the police department was being run.  Another person was on the call but I do not presently remember that person's name.  Ms. Edmonds asked me about whether I observed a hostile work environment, favoritism, and how was the morale in the police department.  I truthfully answered that I had not experienced any hostile work environment, favoritism or low morale in the department.  Instead, I was pleased with the way things were being handled in the department.  I told her I would give my experience an 8 out of 10 score in terms of satisfaction. It seemed to me, however, that Ms. Edmonds was not interested in learning about the positive things occurring in the department but was more interested in trying to "dig up dirt" on Chief Young. Because I had nothing negative to say, it seemed Ms. Edmonds lost interest and the conversation ended.  As a police officer, I can say that Ms. Edmonds' questioning was more result-oriented as opposed to trying to learn true facts. And, the result she appeared to trying to get was some negative statements or information against Chief Young.  If this is the way she conducted other interviews, I would discredit anything Ms. Edmonds reports about Chief Young.

It is curious to me that Chief Young is coming under attack at or about the same time she corrected TSU Sergeant Barnett for getting too close to TSU President Lesia Crumpton.  It is no

secret in the police department that Sergeant Barnett was President Crumpton's favorite officer to be with. In fact, their relationship was so cozy Sergeant Barnett often bragged about President Crumpton giving him expensive personal gifts. On one occasion, he bragged about President Crumpton buying him a pair of expensive leather boots, along with an expensive leather belt. Barnett was wearing these items at the time he was bragging about them and was showing them off to me and others. He also bragged about buying and giving President Crumpton an expensive gun that he had customized with rhinestones for her. He also talked about how she relied on him for personal errands in the middle of the night and would call to have him drive her around. Barnett referred to President Crumpton as "that girl is my heart" and once when President Crumpton almost slipped and hurt herself—only to have been rescued from certain injury by another TSU officer—President Crumpton remarked **"If I had hurt myself Sergeant Barnett would have killed you!"** I don't know the extent of the relationship between Sergeant Barnett and President Crumpton but as a police officer the interactions between these two was too close and intimate at times.

Another peculiar interaction between Sergeant Barnett and President Crumpton's office occurred just after Chief Young warned Sergeant Barnett that he was "in too deep" with the president. Chief Young instructed Barnett to create more distance from the president in order to ensure both he and the president were kept in the best light and professionalism. Barnett threatened to resign his position because of Chief Young's admonition, but according to Barnett, he received a call from President Crumpton's chief of staff, Eddy Harper (sp?), who told him President Crumpton "needed him" and that they would create a job for him in Hanna Hall. Such a position would have had Barnett worker closer with the president. However, because Barnett was not qualified for the position he did not accept the position. After Chief Young tried to correct Barnett's conduct with President Crumpton is the first time I heard Barnett gripping about Chief Young and stating he "couldn't stand the chief." He only made this statement to me after Chief Young tried to correct his interactions with President Crumpton.

Chief Young is a very good police chief! If anyone is complaining about her I would strongly recommend looking at the relationship between Sergeant Barnett and the president's office as being a probable source of those complaints.

Further Affiant Sayeth Not.

**Officer Dereka Lawton, Texas Peace Officer**

NOTARY SEAL

SWORN AND SCRIBED this 7th day of ~~November 2022.~~
December 2022

ROSALIE A CEDILLO
Notary ID #12333343
My Commission Expires
September 16, 2025

# EXHIBIT 8

No. 14-02-00743-CV

Court of Appeals of Texas, Fourteenth District, Houston

# Guthery v. Taylor

112 S.W.3d 715 (Tex. App. 2003)

Decided Jul 17, 2003

No. 14-02-00743-CV.

Opinion filed July 17, 2003.

Appeal from the 268th District Court, Fort Bend County, Texas, Trial Court Cause No. 115,869.

> Reversed and Rendered.

716 *716

Gregory B. Cagle, League City, for appellants.

Meredith Rene Riede, Sugar Land, for appellees.

Panel consists of Justices ANDERSON, SEYMORE, and GUZMAN.

717 *717

## OPINION

JOHN S. ANDERSON, Justice.

This police disciplinary case requires the court to construe Texas Government Code sections 614.022 and 614.023, which apply only to those police officers who are not covered by a civil service statute. Tex. Gov't Code Ann. § 614.021(3) (Vernon 1994). Section 614.022 provides: "To be considered by the head of a . . . police department, the complaint must be: (1) in writing; and (2) signed by the person making the complaint." Tex. Gov't Code Ann. § 614.022 (Vernon 1994). Section 614.023 provides:

(a) A copy of a signed complaint against a law enforcement officer, fire fighter, or police officer shall be given to the officer or employee within a reasonable time after the complaint is filed.

(b) Disciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee.

Tex. Gov't Code Ann. § 614.023 (Vernon 1994).

The case arises because appellant, Kerry Guthery, received a disciplinary suspension based on an investigation stemming from a citizen's complaint. Guthery subsequently filed suit in the trial court, seeking a declaratory judgment delineating his rights under sections 614.022 and 614.023. Guthery also sought injunctive relief, or, alternatively, a writ of mandamus to compel Sugar Land Police Chief Earnest B. Taylor, in his capacity of Chief of Police, and the City of Sugar Land, appellees, to withdraw the disciplinary action taken against him and to restore his back pay and benefits.

The parties filed cross-motions for summary judgment, urging competing interpretations of the statutes at issue. The trial court granted appellees' motion and denied Guthery's motion, ordering that he take nothing.

We reverse the summary judgment in favor of appellees and render judgment in favor of Guthery (1) declaring appellees' actions violated sections

614.022 and 614.023, and (2) ordering appellees to withdraw the disciplinary action and restore Guthery's back pay and benefits.

## FACTUAL AND PROCEDURAL BACKGROUND [1] *718

718

[1] We derive the factual background not only from the summary judgment proof presented, but also from the pleadings. We recognize facts asserted in the pleadings are not competent summary judgment evidence . *See Laidlaw Waste Sys., Inc. v. City of Wilmer*, 904 S.W.2d 656, 661 (Tex. 1995). Nevlerthess, both parties concede the facts are undisputed and refer to factual assertions alleged in the pleadings.

On January 29, 2000, Guthery, a police officer, decided to disperse a party at 55 Ashbury Park. He knocked on the front door with his flashlight, damaging the door. On February 2, 2000, Mrs. Scraper, a citizen, telephoned the Sugar Land Police Department ("SLPD"), complaining an officer had damaged her door on January 29, 2000.

SLPD determined Guthery was the only officer at Scraper's house that night. After reviewing the incident report, Guthery's supervisor made notes on the report and returned it to Guthery to obtain more information about how the damage might have occurred.[2] Guthery responded to the questions that day in an email.[3] After receiving Guthery's answers, the SLPD's Professional Standards Division investigated the incident to determine whether any state laws or city policies had been violated. The investigation included meeting with Mrs. Scraper at her residence and photographing the damage. Additionally, Guthery supplied a written statement of the incident and was asked to provide a copy of the audio tape from that night. Guthery, however, was unable to provide an audio tape from that night because he failed to record this particular event.

[2] The note read as follows: "Homeowner claims her front door was damaged. Kids claim Officer Guthery beat on the front door, but they wouldn't answer. Inference is being made that the Officer damaged the door. Lt. Lund wants the following answered." Lund wanted to know how Guthery knew the defendant's cup contained beer, why Guthery was at the residence, how the defendant was identified, and what happened when Guthery went to the front door. When Officer Webster presented the report to Guthery, Guthery was told there was no complaint, but the questions needed to be answered for clarification purposes.

[3] Prior to answering the questions, Guthery asserted his *Garrity* rights against compelled self-incrimination. *See Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620 (1967) (holding Fourteenth Amendment protection against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office and prohibition extends to all, regardless of whether they are policemen or members of body politic).

The SLPD Professional Standards Division investigated the complaint as possible violations of state criminal law and city policies. During the investigation, there were multiple allegations against Guthery. The investigators ultimately concluded Guthery caused damage to Scraper's front door when he struck it several times with his flashlight, denting the wood surface and causing a panel of glass to break. The investigators also determined that Guthery failed to activate his tape recorder during the incident.

Police Chief Taylor reviewed the investigation report, and Guthery received a "Notice of Proposed Disciplinary Action" ("Notice") on April 7, 2000. Chief Taylor's proposal to suspend Guthery for three days was included in the Notice, and Taylor requested Guthery to appear at a

meeting on April 13, 2000, in order to respond.[4]

719 *719 The Notice was signed by Chief Taylor. After meeting with Guthery on April 13, 2000, Chief Taylor approved the suspension. Guthery appealed the disciplinary action to the City's Employees Board of Appeals, and after a hearing, the board reduced the suspension to one day.

> [4] The suspension was to run from April 27, 2000, through April 29, 2000. The rules Guthery was accused of violating were "SLPD Rule #1 Conduct Unbecoming to a Police Employee" and "Chapter 30, Directive 2 — Recording Devices." Guthery was to be suspended for causing damage to Mrs. Scraper's front door and for failing to tape record the incident on January 29, 2000.

Guthery then filed a petition for writ of mandamus, asking the trial court to direct Chief Taylor to withdraw the disciplinary action because it was imposed in violation of Texas Government Code section 614.023(b), and to award Guthery full back pay and benefits lost as a result of the disciplinary action. Additionally, Guthery sought to recover all attorney's fees incurred. Guthery subsequently amended his original petition and added the City of Sugar Land as a defendant. Further, he sought relief under the Uniform Declaratory Judgments Act, asking the court to declare the acts of the defendants to be in violation of the Texas Government Code.[5]

> [5] See Tex. Civ. Prac. Rem. Code Ann. '§ 37.001-.011 (Vernon 1997 Supp. 2003).

Guthery and appellees filed cross-motions for summary judgment, setting forth competing constructions of Texas Government Code sections 614.022 and 614.023. Guthery argued appellees' actions violated section 614.022 because there was no written and signed complaint from Mrs. Scraper, the owner of the residence where the damage occurred. Guthery also argued appellees could not rely on the Notice because it included the discipline to be imposed, was delivered after

conclusion of the investigation and was not signed by Scraper. Guthery noted, "at the conclusion of the investigation would not be 'within a reasonable time after the complaint is filed' as required by [section 614.023(a)]."

Appellees' motion for summary judgment was based on the following: (1) compliance with sections 614.022 and 614.023 is not mandatory; and, in the alternative, (2) the procedures taken by appellees did comply with these sections. Appellees urged the court to find that Mrs. Scraper's signature was not statutorily required on the complaint, and that Chief Taylor's signature was sufficient because he was the officer who charged Guthery and proposed disciplinary action. Appellees also argued the Notice given to Guthery at the completion of the investigation and before any disciplinary actions were taken was proper.

Following a hearing, the trial court granted appellees' motion and denied Guthery's motion. The trial court ordered Guthery take nothing on his claims and causes of action against appellees.

## ISSUES PRESENTED

Guthery raises two issues on appeal. In issue one, he argues, "A copy of the signed complaint was not given to [Guthery] within a reasonable time after it was filed and before disciplinary action was taken and the determination of 'reasonable' is for the fact finder." In issue two, he argues, Chief Taylor "considered a complaint against a police officer . . . which was not in writing and signed by the complainant as required by [Texas Government Code section 614.022]." As part of issue two, Guthery reiterates his argument that Chief Taylor did not provide him with a copy of the signed complaint within a reasonable time.

In response to issue one, appellees argue that determination of "reasonable time" is a question of law. In response to issue two, they argue the "complaint" that must be signed in the present case was the "Notice of Proposed Disciplinary Action," not Scraper's complaint. They also argue the complaint was given to Guthery "within *720 a

720 reasonable time" because it was given to him before Chief Taylor took disciplinary action against Guthery.

Thus, the controlling issue is one of statutory construction: under the facts of this case, does the Notice suffice as the "complaint" which must be signed and in writing, and given to the officer "within a reasonable time," under Texas Government Code sections 614.022 and 614.023? Only if we determine the Notice suffices as the "complaint" must we decide whether the Notice was given to Guthery "within a reasonable time." Accordingly, after setting forth the standard of review, we begin by addressing Guthery's issue two.

## STANDARD OF REVIEW AND NATURE OF JUDGMENT SOUGHT

The parties do not dispute the relevant facts. Therefore, this is a proper case for summary judgment. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000). When, as here, parties file cross-motions for summary judgment, each party bears the burden of establishing it is entitled to judgment as a matter of law. *Id.* When the trial court grants one party's motion for summary judgment and denies the other, we review both motions; and, if we find the trial court erred, we will reverse and render the judgment the trial court should have rendered. *Id.*; *Bradley v. State ex rel. White*, 990 S.W.2d 245, 247 (Tex. 1999). Generally, matters of statutory construction are legal questions, subject to de novo review. *See State Dep't of Highways Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002).

An original proceeding for a writ of mandamus initiated in the trial court is a civil action subject to trial and appeal on substantive law issues and rules of procedure as any other civil suit. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 792 n. 1 (Tex. 1991). A writ of mandamus will issue to compel a public official to perform a ministerial

act. *Id.* at 793. An act is ministerial when the law clearly delineates the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion. *Id.* A writ of mandamus will not issue to compel a public official to perform an act which involves an exercise of discretion. *Id.* There is one exception: a writ of mandamus may issue in a proper case to correct a clear abuse of discretion by a public official. *Id.* When a statute delineates the act an official is to perform with sufficient certainty so nothing is left to the exercise of discretion, the case involves only performance of a ministerial act, and is subject to mandamus. *See id.*

Under the Uniform Declaratory Judgments Act, a person whose rights are affected by a statute may have a court determine any question of construction arising under the statute and may obtain a declaration of his rights under the same. *See* Tex. Civ. Prac. Rem. Code Ann. '§ 37.002, .004 (Vernon 1997). We review declaratory judgments under the same standards as other judgments and decrees. *See* Tex. Civ. Prac. Rem. Code Ann. § 37.010 (Vernon 1997); *City of Galveston v. Giles*, 902 S.W.2d 167, 170 (Tex.App.-Houston [1st Dist.] 1995, no writ). We look to the procedure used to resolve the issue at trial to determine the standard of review on appeal. *Giles*, 902 S.W.2d at 170. Here, because the trial court resolved the case on competing motions for summary judgment in the face of undisputed facts, we review the propriety of the trial court's denial of the declaratory judgment under the same standards we apply to the summary judgment. *See Unauthorized Practice of Law Comm. v. Jansen*, 816 S.W.2d 813, 814 721 (Tex.App.-Houston *721 [14th Dist.] 1991, writ denied) (case submitted on agreed stipulation of facts and motion for summary judgment).

## DISCUSSION

Texas Government Code section 614.022 provides, "To be considered by the head of a . . . police department, the complaint must be: (1) in writing; and (2) signed by the person making the

complaint." Tex. Gov't Code Ann. § 614.022 (Vernon 1994). It is undisputed that Chief Taylor is the head of the SLPD. It is undisputed that the investigation of Guthery arose from an incident brought to the attention of the Sugar Land Police when a citizen called to report damage to her door. It is also undisputed that the citizen never provided SLPD or Chief Taylor with a written and signed complaint. Finally, it is undisputed that Chief Taylor signed the "Notice of Proposed Discipline," which Guthery received on April 7, 2000, six days before he met with Chief Taylor. We must therefore decide whether, as appellees argue, the Notice suffices as the written and signed complaint required by section 614.022.

A court's objective in construing a statute is to determine and give effect to the legislature's intent. *Tex-Air Helicopters, Inc. v. Galveston County Appraisal Review Bd.*, 76 S.W.3d 575, 581 (Tex.App.-Houston [14th Dist.] 2002, pet. denied). We presume the legislature intended the plain meaning of the words it used. *Id.* If possible, we must ascertain the legislature's intent from the language of the statute and not resort to extraneous matters for an intent not stated in the statute. *Id.* When interpreting a statute, we consider the entire act, its nature and object, and the consequence that would follow from each construction. *Id.* We must reject any statutory interpretation that defeats the legislative purpose. *Id.* In interpreting the provisions of the Government Code in question, we may look to the Code Construction Act for assistance. *See* Tex. Gov't Code Ann. § 1.002 (Vernon 1988) (stating Code Construction Act applies to construction of each provision of the Code, except as otherwise provided); Tex. Gov't Code Ann. § 311.002 (Vernon 1998) (stating chapter applies to each code enacted by 60th or subsequent legislature as part of state's continuing statutory revision program).

In interpreting the statute, we may consider the title or caption. *See* Tex. Gov't Code Ann. § 311.023(7) (Vernon 1998); *Southwestern Bell Tel. Co. v. Houston Indep. Sch. Dist.*, 397 S.W.2d 419,

421-22 (Tex. 1965). Section 614.022 is captioned: "Complaint to be in Writing and Signed by Complainant." Tex. Gov't Code Ann. § 614.022 (Vernon 1994).[6] Neither complaint nor complainant is defined in sections 614.022 and 614.023.

> [6] This caption was added when the statute was codified in the Government Code. *See* Act of May 4, 1993, 73rd Leg., R.S., ch. 268, § 1, sec. 614.022, 1993 Tex. Gen. Laws 583, 679.

Nevertheless, "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." Tex. Gov't Code Ann. § 311.011(b) (Vernon 1998); *see Deltenre v. State*, 808 S.W.2d 97, 101 (Tex.Crim.App. 1991) (concluding the term "peace officer" has acquired technical meaning by legislative definition). Moreover, when construing a statutory word or phrase, a court may take into consideration the meaning of the same or similar language used elsewhere in the act or in another act of similar nature. *L. M.-Surco Mfg., Inc. v. Winn Tile Co.*, 580 S.W.2d 920, 926 (Tex.Civ.App.-Tyler 1979, writ dism'd). When the same or a similar term is used in *722 the same connection in different statutes, the term will be given the same meaning in one as in the other, unless there is something to indicate that a different meaning was intended. *Id.*[7]

> [7] The court continued, "This rule applies with particular force where the meaning of a word as used in one act is clear or has been judicially determined, and the same word is subsequently used in another act pertaining to the same subject." *L. M.-Surco Mfg., Inc. v. Winn Tile Co.*, 580 S.W.2d 920, 926 (Tex.Civ.App.-Tyler 1979, writ dism'd). As discussed below, we find the definition of "complainant" in a subsequently enacted statute. Nevertheless,

Guthery v. Taylor     112 S.W.3d 715 (Tex. App. 2003)

given the relationship between the two statutes, we apply the rule stated in *L. M.-Surco*.

"Complainant" is defined in Local Government Code Section 143.123, as "a person claiming to be the victim of misconduct by a fire fighter or police officer." Tex. Loc. Gov't Code Ann. § 143.123(a)(1) (Vernon 1999).[8] Section 143.123(f) also provides in relevant part:

[8] Texas Local Government Code section 143.312(b)(1) also contains the identical definition of "complainant." Tex. Loc. Gov't Code Ann. § 143.312(b)(1) (Vernon 1999). The subchapter of which the section is a part applies to municipalities with populations of 460,000 or more that operate under a city manager form of government. Tex. Loc. Gov't Code Ann. § 143.301 (Vernon 1999).

*An investigator may not conduct an interrogation of a fire fighter or police officer based on a complaint by a complainant who is not a peace officer unless the complainant verifies the complaint in writing before a public officer who is authorized by law to take statements under oath.* In an investigation authorized under this subsection, an investigator may interrogate a fire fighter or police officer about events or conduct reported by a witness who is not a complainant without disclosing the name of the witness. Not later than the 48th hour before the hour on which an investigator begins to interrogate a fire fighter or police officer regarding an allegation based on a complaint, affidavit, or statement, the investigator shall give the fire fighter or police officer a copy of the affidavit, complaint, or statement. An interrogation may be based on a complaint from an anonymous complainant if the departmental employee receiving the anonymous complaint certifies in writing, under oath, that the complaint was anonymous. This subsection does not apply to an on-the-scene investigation that occurs immediately after an incident being investigated if the limitations of this subsection would unreasonably hinder the essential purpose of the investigation or interrogation. If the limitation would hinder the investigation or interrogation, the fire fighter or police officer under investigation must be furnished, as soon as practicable, a written statement of the nature of the investigation, the name of each complaining party, and the complaint, affidavit, or statement.

Tex. Loc. Gov't Code Ann. § 143.123(f) (Vernon 1999) (emphasis added).[9]

9   Texas Local Government Code section 143.312(g) contains a similar provision prohibiting interrogation "based on a complaint by a complainant who is not a fire fighter or a police officer unless the complainant verifies the complaint in writing before a public officer who is authorized by law to take statements under oath." Tex. Loc. Gov't Code Ann. § 143.312(g) (Vernon 1999).

Thus, like Government Code section 614.022, Local Government Code section 143.123(f) contains a requirement that the complaint be in writing. A signature is implicitly required because the complaint must be verified. The two sections appear to be of similar nature. *723

Section 143.123 is part of the Fire Fighter and Police Officer Civil Service Act ("CSA"). See Klinger v. City of San Angelo, 902 S.W.2d 669, 671 (Tex.App.-Austin 1995, writ denied). The purpose of the CSA is to "secure efficient fire and police departments composed of capable personnel who are free from political influence and who have permanent employment tenure as public servants." Tex. Loc. Gov't Code Ann. § 143.001(a) (Vernon 1999); Klinger, 902 S.W.2d at 671. The purpose underlying Local Government Code section 142.123 is not inconsistent with the apparent purpose of Government Code section 614.022.

Finally, the legislative history of section 614.022 suggests the similar nature of the two sections. Section 614.022 was created in 1969, and originated as Senate Bill 148. See Act of May 16, 1969, 61st Leg., R.S., ch. 407, § 1, 1969 Tex. Gen. Laws 1333. As originally drafted, Senate Bill 148 was intended to amend Texas Revised Civil Statutes Article 1269m, the Firemen's and Policemen's Civil Service Act, i.e., the precursor of present Local Government Code section 142.123. See House Comm. on Urban Affairs, Bill Analysis, Tex. S.B. 148, 61st Leg., R.S. (1969); see also original bill draft in Bill File, Tex. S.B. 148, 61st Leg., R.S. (1969).[10] The Senate

Committee on Jurisprudence, however, reported the bill adversely and substituted its own version, which did not contain any reference to Article 1269m or the Firemen's and Policemen's Civil Service Act. See "Committee Substitute for Senate Bill 148" in Bill File, Tex. S.B. 148. The Committee Substitute version was passed and ultimately became Texas Revised Civil Statute Article 6252-20, which was subsequently codified in Texas Government Code sections 614.021-614.023. See Act of May 4, 1993, 73rd Leg., R.S., ch. 268, § 1, secs. 614.021-.023, 1993 Tex. Gen. Laws 583, 678-79.

10   The Bill File is available from the Texas State Library and Archives Commission.

Given what appears to be the similar nature of sections 141.123 and 614.022, and considering the definition of "complainant" in section 141.123(a)(1) as the "victim of misconduct," we construe the "complaint" that must be signed and in writing to be the victim's complaint, in this case Mrs. Scraper's. Thus, the "Notice of Proposed Disciplinary Action" provided by Chief Taylor to Guthery does not suffice as the "complaint" which must be signed and in writing, and given to the officer "within a reasonable time," as required by Texas Government Code sections 614.022 and 614.023.[11]

11   We also note that adopting appellees' interpretation would result in an officer's being disciplined based on another officer's hearsay characterization of a citizen's complaint, as opposed to the actual content of the complaint itself.

In support of their position the Notice fulfilled the requirements of sections 614.022 and 614.023., appellees direct our attention to Fudge v. Haggar, 621 S.W.2d 196 (Tex.Civ.App.-Texarkana 1981, writ ref'd n.r.e.). In Fudge, the appellate court concluded a letter of complaint provided to a police officer at the conclusion of an internal affairs investigation satisfied the requirements of

former Texas Revised Civil Statute 6252-20 even though the investigation was prompted by a call from outside the police department. *Id.* at 198.

*Fudge*, however, is distinguishable. In *Fudge*, a member of the Dallas County Sheriff's Department called a Dallas Police Department internal affairs investigator to complain that Fudge, a patrolman with the Dallas Police Department, had engaged in improper conduct in obtaining the release of a prisoner. *Id.* at 197. James, the *724 internal affairs investigator, took affidavits from two pretrial release employees and made a special written report to the chief of police concerning the improper conduct. *Id.* James also wrote an official letter of complaint, presented it to Fudge, and showed Fudge the affidavits. *Id.* Fudge then complied with an instruction to prepare a written response to the complaint. *Id.* Subsequently, the chief of police discharged Fudge for the conduct that was the subject of the letter of complaint. *Id.*

The appellate court reasoned:

In this case we deal with an internally generated complaint. Even though the initial information received by the police department was external, coming from the Dallas County Sheriff's Office, the entire investigation began within the police department. Officer James testified that on October 19, 1979, he gave Fudge his letter of complaint and affidavits concerning all three incidents. He directed Fudge to respond to the specific acts of misconduct and Fudge did so on that day. The appellees argue that Fudge was aware of, understood, and replied to each of the charges of misconduct for which he was discharged and that the complaint against him was valid. We agree. The complaint was in writing, signed by the person making the complaint, and presented to the affected officer, Robert Fudge, prior to the taking of disciplinary action. It was in compliance with Tex. Rev. Civ. Stat. Ann. art. 6252-20. . . .

*Id.* at 198.

Thus, the *Fudge* court addressed a situation in which an internal investigation produced a complaint supported by signed affidavits, and the court held such a complaint complied with the precursor statute to sections 614.022 and 614.023. In the present case, however, we only have Chief Taylor's Notice to Guthery, charging Guthery with the violations. Guthery was not presented with an affidavit from Mrs. Scraper or anything signed by her. There is nothing to indicate Guthery was presented with affidavits from any other witnesses or presented with the internal affairs report. On the facts before us, we conclude the procedure in the present case was not in compliance with Texas Government Code sections 614.022 and 614.023. We now turn to the appropriate remedy.

Section 614.023(b) provides that "[d]isciplinary action *may not* be taken against the officer . . . unless a copy of the signed complaint is given to

the officer or employee." Tex. Gov't Code Ann. § 614.023(b) (Vernon 1994) (emphasis added). "'May not' imposes a prohibition and is synonymous with 'shall not.'" Tex. Gov't Code Ann. § 311.016(5) (Vernon 1998). Under the undisputed facts of this case, we hold Chief Taylor had a clear duty to refrain from taking disciplinary action against Guthery when the only "complaint" offered to satisfy sections 614.022 and 614.023 was the Chief's "Notice of Proposed Disciplinary Action."

We sustain Guthery's issue two. Because we sustain Guthery's issue two, it is not necessary to address issue one, by which he argues he did not receive the "complaint" within a reasonable time.

## CONCLUSION

We reverse the summary judgment in favor of appellees and render judgment in favor of Guthery (1) declaring appellees' actions violated Texas Government Code sections 614.022 and 614.023, and (2) ordering appellees withdraw the disciplinary action and restore Guthery's back pay and benefits.

725   *725

 casetext

# EXHIBIT 9

# Tex. Gov't Code § 614.023

Section 614.023 - Copy of Complaint to Be Given to Officer or Employee

**(a)** A copy of a signed complaint against a law enforcement officer of this state or a fire fighter, detention officer, county jailer, or peace officer appointed or employed by a political subdivision of this state shall be given to the officer or employee within a reasonable time after the complaint is filed.

**(b)** Disciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee.

**(c)** In addition to the requirement of Subsection (b), the officer or employee may not be indefinitely suspended or terminated from employment based on the subject matter of the complaint unless:

  **(1)** the complaint is investigated; and

  **(2)** there is evidence to prove the allegation of misconduct.

  *Tex. Gov't. Code § 614.023*

Amended By Acts 2005, 79th Leg., Ch. 507, Sec. 1, eff. 9/1/2005.

 casetext

# EXHIBIT 10

FILED
Marilyn Burgess
District Clerk

DEC 7 2022

Time:_____
Harris County, Texas
By_____
Deputy

Case 4:23-cv-03888   Document 1-7   Filed on 10/12/23 in TXSD   Page 169 of 176

P-3

TRORX
STBNX
CASO

CAUSE NO. 2022-77744

MARY YOUNG                          §        IN THE DISTRICT COURT OF

    *Petitioner,*                   §
                                    §
                                    §
                                    §
                                    §

    v                               §        HARRIS COUNTY, TEXAS

TEXAS SOUTHERN UNIVERSITY,          §
RESPONSIBLE TSU AGENTS,             §
PRESIDENT LESIA CRUMPTON-           §
YOUNG, GENERAL COUNSEL HAO          §
LE, AND/OR THEIR DESIGNEES          §

    *Respondent.*                   §        127th JUDICIAL DISTRICT

## TEMPORARY RESTRAINING ORDER

On this day, the Court considered Petitioner's Mary Young's Verified First Amended Petition, Request for Mandamus Relief, Declaratory Judgment Relief, Application for Temporary Restraining Order and For Temporary/Permanent Injunctions.

Based upon facts set forth in the application the Court enters the following orders:

The Court **GRANTS** Petitioner's Application for TRO.

The court finds that in order to maintain and preserve the status quo, and to prevent further immediate and irreparable harm to Petitioner, Petitioner is entitled to a temporary restraining order because they have suffered and continue to suffer injury.

a. **This injury is imminent**. Despite repeated requests by Petitioner to have Respondents TSU President Crumpton-Young and General Counsel Hao Le to comply with Texas law, Respondents are threatening to terminate or discipline or engage in an unlawful employment action against Petitioner in clear violation of Texas law. Petitioner has been told that she is subject to immediate disciplinary action based on the invalid complaint and such action would violate all of

1

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging.

the legal requirements mandated by Texas law.  Thus, the immediate loss or taking of Petitioner's property rights and denial of her procedural due process rights mandated by Texas law are not only imminent but a very present danger.  An immediate temporary restraining order/mandamus is required to maintain the *status quo ante* until Petitioner can put on evidence at a temporary injunction hearing to enjoin Respondent's unlawful conduct.

b. **The injury is irreparable.** A denial of Petitioner's guaranteed statutory rights under Texas law is irreparable.  This court cannot restore them after they are lost and damages will not replace those rights.  Abridgement of Petitioner's statutory rights is an irreparable injury that money damages cannot redress.  When a Texas statute delineates the actions a governmental body or official must perform nothing is left to the exercise of discretion.

The purpose of an injunction is to maintain and preserve the status quo. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)(emphasis added); *see also GL Logistics Co. v. Flores*, No. 04-21-00125-CV, 9 (Tex. App. Aug. 31, 2021).  Given the Respondents' previous failure to ameliorate this situation, there is no doubt that this Court must intervene and order and enjoin the Respondents, and any other individuals, from further conduct in violation of Petitioner's statutory rights.  Petitioner is entitled to a temporary restraining order and probable injunctive relief.

It is therefor **ORDERED, ADJUDGED, AND DECREED** that **TEXAS SOUTHERN UNIVERSITY, RESPONSIBLE TSU AGENT, PRESIDENT LESIA CRUMPTON-YOUNG, GENERAL COUNSEL HAO LE, AND THEIR DESIGNEES** ("Respondents") as well as all any TSU officers, agents, servants, employees, attorneys, and any other persons acting in concert or participation with them, are enjoined and restrained from:

2

a. threatening to, attempting to, purporting to, or taking any adverse employment or disciplinary action against Petitioner until the court can conduct a hearing on Petitioner's request for a temporary injunction and/or permanent injunction in this case;

b. utilizing the unsigned, untimely, and anonymous complaint against Petitioner for any adverse employment or disciplinary action; and

c. taking any further actions, or failing to take necessary actions, that would damage, impair, frustrate, put at risk, jeopardize, and/or delay in any way the completion of the items addressed in sections (a) and (b) above.

It is further **ORDERED, ADJUDGED AND DECREED** that the Petitioner execute and file with the Clerk a bond in the amount of $ 100.00 . Any amount previously posted shall suffice to satisfy the same.

The Clerk of the above and entitled court shall forthwith, on the filing by Petitioner of the bond hereinafter required, and on approving same according to law, issue a writ of injunction in conformity with the law and the terms of this order.

This order shall expire on December 21 , 2022.

This matter is set for a temporary injunction hearing in the 127th Judicial District Court of Harris County, Texas at 10:00 a.m./p.m. on the 20th day of December , 2022.

**SO ORDERED.**

**SIGNED** on this the 7th day of December 2022, at 4:05 o'clock P.M.

_____
**Ancillary Judge Presiding**

* The Temporary Restraining Order, dated December 1, 2022, was determined to be void and of no effect.

3

# EXHIBIT 11

CONFIDENTIAL

Exhibit 42
Photo of
Indecency

**42**

CONFIDENTIAL

Need Officer 10Am-

FRi
Brown 10a-2p

1) 2p-10pm _____
2) 10Am-10p _____
3) 10AM-10p _____
4) 10Am-10p _____

SAt

1) 10Am -10 pm _____
2) 10Am - 10 pm _____
3) 10AM-10pm _____
4) 10Am -10pm _____

Sun

1) 10Am- 10pm  Brown _____

2) 10Am- 10pm _____

3) 10Am- 10pm _____

4) 10Am- 10 pm _____



CONFIDENTIAL

To: Sgt. Brown , Officer Lawton & 4 more...

Sgt. Brown



Gallery Furniture
45.00hr cash

 M Rob

Get me Sunday too

 Sgt. Brown

K

    



PET MYOUNG_000332

CONFIDENTIAL

Sgt. Brown



**This is not everyone business**

C. JONES

**Huh ?**

Sgt. Brown



**Gallery Furniture
45.00hr cash**

M Rob

**Get me Sunday too**

PET MYOUNG_000333

