# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MARY YOUNG, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-03888 |
| | § | |
| TEXAS SOUTHERN UNIVERSITY, | § | |
| *Defendant.* | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## DECLARATION OF DARLENE BROWN

I, Darlene Brown, have personal knowledge or knowledge based on my review of business records of Texas Southern University ("TSU"), of all statements below. I hereby make the following declaration under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  My name is Darlene Brown. I am at least 18 years old, of sound mind, and competent to make this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2.  At all relevant times in 2022, I served as the Acting Chief Audit Executive for TSU. TSU's internal audit function is responsible for assessing business risks and performing internal audits across university functions to ensure compliance with applicable regulations and internal policies.  McConnell Jones had been working under a Master Services Contract to provide various professional audit and consulting services to TSU.  Their Chief Audit Executive resigned in May 2022, and we were asked to manage their internal audit function until the University could transition to a permanent solution. I was assigned as MJ's partner in charge of this engagement and served as acting Chief Audit Executive.  In this capacity, I was responsible for managing TSU's internal audit staff and internal audit activities. TSU issued a Request For Qualifications to provide fully outsourced internal audit services with a response deadline of September 8, 2022. McConnell Jones was then selected to be the sole provider of TSU's internal audit services. Thompson Horton serves as TSU's Board of Regent outside counsel.  TSU's Internal Audit interacts with Thompson Horton when requested by the Board of Regents.

3.  In or around April 14, 2022, an anonymous complaint was received on TSU's hotline.  TSU's VP, Chief Compliance Officer at the time, DeAnna Nwankwo, reviewed the complaint and forwarded it to the Chief Audit Executive at the time, Charla Parker-Thompson, for discussion and direction on how to proceed. Ms. Nwankwo began the investigation by interviewing

TSU police officers and obtaining payroll files. In or around June 14, 2022, Ms. Nwanko forwarded me copies of the information she had gathered. Between June 15, 2022 and July 2022, I obtained and analyzed additional payroll files. In or around July 10, 2022, I was asked by the TSU Board of Regents President, to perform an investigation based on the anonymous complaint that had alleged that Mary Young had authorized pay increases for certain officers without Board authorization. I signed the complaint as directed by TSU staff. True and correct copies of the complaint are attached hereto as Exhibit 1.

4.      President Crumpton-Young did not assist in my investigation of Mary Young. My investigation was independent from the Office of the President, and President Crumpton-Young did not influence, nor attempt to influence, the outcome of my investigation in any way whatsoever. A true and correct copy of my report is attached hereto as Exhibit 2.

5.      In or around July 18, 2022, I provided a copy of my preliminary draft report to Ms. Lisa McBride, TSU's outside counsel, for review.  In or around August 15, 2022, I provided a final draft report to the Board of Regents with a copy to President Crumpton-Young and TSU Board Counsel, Lisa McBride. I did not participate in any decision-making regarding placing Mary Young on leave or terminating her employment.

My name is Darlene Brown. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas on April 17, 2025.


Darlene Brown, Declarant

Exhibit 1

The following matter was received via the EthicsPoint Hotline on 3/24/2022.

**Assigned to**
None entered

**Synopsis Notes**
None entered

**Case Details**
Since January 2022, while at a weekly supervisor meeting, Mary gave all the officers (names withheld) in the police department a directive that she would raise the pay for special officers (names withheld). Mary categorized the special officers as the lead officers (names unknown) and (first name unknown) McCefee, telecommunications officer, for security and telecommunications. Those officers were (first name unknown) Ward, security officer, McCefee, (first name unknown) Sawyer, police officer, (first name unknown) Holiday, security officer, (first name unknown) Jones, police officer, Tyrone Jones, police officer, and (first name unknown) Cantu, police officer.

Mary approved field training pay for the lead officers and McCefee so that the lead officers and McCefee would have higher pay that included the sum equivalent of two overtime hours per day, up to five days a week. The persons who were authorized by Mary to sign-off on the timesheets were (first name unknown) Bridges, lieutenant, (first name unknown) Jones, sergeant, (first name unknown) Barnett, sergeant, (first name unknown) Stark, lieutenant, (first name unknown) McCray, sergeant, (first name unknown) Brown, sergeant, and (first name unknown) John-Miller, police officer. Bridges, Jones, Barnett, Stark, McCray, Brown, and John-Miller signed the time sheets because they were told by Mary that Ward, McCefee, Sawyer, Holiday, Jones, Tyrone, and Cantu were entitled to those funds for the work that they did.

The president (name unknown) and the board of regents did not authorize these pay increases. This act appears to be illegal and unethical. The supervisors (names unknown) were operating according to Mary's directive, believing that Mary had the authority to do this. The supervisors that were present at the weekly supervisors' meeting were witnesses to this directive. There were no cameras that captured this incident. This matter may have been reported to management.

**Case Summary**
None entered

The following matter was received via the EthicsPoint Hotline on 3/24/2022.

**Assigned to**
None entered

**Synopsis Notes**
None entered

**Case Details**
Since January 2022, while at a weekly supervisor meeting, Mary gave all the officers (names withheld) in the police department a directive that she would raise the pay for special officers (names withheld). Mary categorized the special officers as the lead officers (names unknown) and (first name unknown) McCefee, telecommunications officer, for security and telecommunications. Those officers were (first name unknown) Ward, security officer, McCefee, (first name unknown) Sawyer, police officer, (first name unknown) Holiday, security officer, (first name unknown) Jones, police officer, Tyrone Jones, police officer, and (first name unknown) Cantu, police officer.

Mary approved field training pay for the lead officers and McCefee so that the lead officers and McCefee would have higher pay that included the sum equivalent of two overtime hours per day, up to five days a week. The persons who were authorized by Mary to sign-off on the timesheets were (first name unknown) Bridges, lieutenant, (first name unknown) Jones, sergeant, (first name unknown) Barnett, sergeant, (first name unknown) Stark, lieutenant, (first name unknown) McCray, sergeant, (first name unknown) Brown, sergeant, and (first name unknown) John-Miller, police officer. Bridges, Jones, Barnett, Stark, McCray, Brown, and John-Miller signed the time sheets because they were told by Mary that Ward, McCefee, Sawyer, Holiday, Jones, Tyrone, and Cantu were entitled to those funds for the work that they did.

The president (name unknown) and the board of regents did not authorize these pay increases. This act appears to be illegal and unethical. The supervisors (names unknown) were operating according to Mary's directive, believing that Mary had the authority to do this. The supervisors that were present at the weekly supervisors' meeting were witnesses to this directive. There were no cameras that captured this incident. This matter may have been reported to management.

**Case Summary**
None entered

Received:  May 25, 2028 via email

Darlene Brown

Darlene Brown
*Acting Chief Audit Executive*

# TSU

## TEXAS SOUTHERN UNIVERSITY
### Department of Internal Audit & Assurance Services
*Experience • Collaboration • Results*
3100 Cleburne Street • Houston, TX 77004 • (713) 313-7454

**Date:**   August 15, 2022

**From:**   Darlene Brown, Acting Chief Audit Executive

**To:** Texas Southern University Board of Regents

**Cc:**
President Crumpton-Young
Ms. Lisa McBride, TSU Board Counsel

**Re:** Internal Audit Investigation Report, TSU Department of Public Safety Time Recording Practices

Our conclusion to the allegation is stated on page six of this report.  Applicable policy violation discussions begin on page six of this report.  Examples of Weekly Time Reports related to this investigation are included in Appendix C on pages 15 and 16 of this report.

## <u>Allegation</u>

An anonymous report was submitted to Texas Southern University's Ethics Line on March 24, 2022.  This report alleged:

- The Chief of Police (Mary Young) verbally gave a directive at a supervisor's meeting in January 2022 that she would raise pay for "Lead Officers".
- The "Lead Officer" pay is two (2) hours a day for up to five (5) days a week for field training pay. (Note: The "Lead Officer" designation was created internally by the Chief of Police and is not an official job classification or pay category.  Through this investigation we determined that there were two distinct types of pay that the Chief of Police authorized; "Lead Officer" and Field Officer Training.)
- These pay types were not approved by the President or Board of Regents.
- Seven individuals were named in the anonymous report as receiving the "Lead Officer" pay:
  - <u>McAfee, Gaynell</u>
    - Officer McAfee received the $25/hr. additional pay for "Lead Officer" when filling-in for her supervisor.
    - Investigation Interview Summary: Officer McAfee stated that the Chief of Police did tell her that she will be compensated for the hours worked as a "Lead Officer".  The DPS timekeeper instructed Officer McAfee to record the hours either before or after the actual shift times worked. Officer McAfee still serves as "Lead Officer" but was told by Lt. J. Starks on behalf of Deputy Chief Brown and Captain Etheridge after this Internal Audit investigation started that they can no longer use the special code provided to receive additional compensation.

RESTRICTED (Access Limited to Authorized Personnel)

- o Ward, James
  - Officer Ward received the $25/hr. additional pay for "Lead Officer" when filling-in for his supervisor.
  - Investigation Interview Summary: Officer Ward stated that he was told by Chief of Police (Mary Young) after a supervisor's meeting for himself and Officer McAfee to stay behind.  It was then that the Chief of Police told them she would compensate them for doing a good job and that they should see the DPS timekeeper, to use the special code when acting as supervisor, and where to place the special work code on the Weekly Time Report.  The DPS timekeeper told Officer Ward to record the hours for different days or time periods for when he did not actually work.   Additionally, Officer Ward was told that a  Compensation Request Form was not completed for these hours.  Instead, the DPS timekeeper prepared a Supplemental Salary Form for him to sign and return each Monday morning.  The DPS timekeeper also told Officer Ward to provide his Weekly Time Report to Lt. Bridges for approval instead of his direct supervisor.

    Officer Ward stated that the Chief of Police met with Officers Ward, McAfee, and Holiday after the weekly supervisors meeting during the week of July 4, 2022 and questioned them on who told them to record their time in the manner of which they were recording it.  The Chief of Police then proceeded to tell them that going forward they have to work the additional four hours but that they can't put it on their Weekly Time Sheets until August 1st and that they would be only allowed four hours per pay period.
- o Holiday, John
  - Officer Holiday received the $25/hr. additional pay for "Lead Officer" when filling-in for his supervisor.
  - Investigation Interview Summary: Officer Holiday stated that the Chief of Police told him around May 2022 that he will be compensated for the hours worked as a "Lead Officer".  The DPS timekeeper instructed Officer Holiday to record the hours for different days or time periods for when he did not actually work.

    Officer Holiday stated that his immediate supervisor (Sgt. Allison) was not aware of the reason/purpose of the special code.  Sgt. Allison did ask Officer Holiday, but Officer Holiday was instructed by Chief Young not to inform his supervisor.  Officer Holiday was told by Chief Young to take his timesheet to Ms. Scruggs and the Chief would sign-off.
- o Sawyer, Jujuana
  - Officer Sawyer received the two hours per day Field Training Officer pay for completing paperwork.
  - Investigation Interview Summary: Officer Sawyer stated that she was told by either the Sargent or Deputy Chief Brown that field training officers were allowed to record two additional hours a day to complete paperwork.  Officer Sawyer stated that the hours she recorded were not always the same day that she had an officer assigned to her.
- o Jones , Chevron
  - Officer Jones received the two hours per day Field Training Officer pay for completing paperwork.
  - Investigation Interview Summary: Officer Jones stated that he was told by Lt. Bridges that an additional two hours a day could be recorded for Field Officer Training to complete paperwork.
- o Jones, Tyronne
  - Officer Jones received the two hours per day Field Training Officer pay for completing paperwork.
  - Investigation Interview Summary: Officer Jones stated that he was told by Lt. Bridges that an additional two hours a day could be recorded for Field Officer Training to complete paperwork.  The two hours were recorded on the same day that an officer was

assigned to him for training, regardless of if it took the two hours to complete the paperwork.
- o Cantu, Bethany
  - ▪ Officer Cantu received the two hours per day Field Training Officer pay for completing paperwork.
  - ▪ Investigation Interview Summary: Officer Cantu stated that she was told by Lt. Bridges that an additional two hours a day could be recorded for Field Officer Training to complete paperwork as a pay incentive.  The two hours were recorded on the same day that an officer was assigned to her for training, regardless of if it took the two hours to complete the paperwork.


- Six individuals were named in the anonymous report as authorized to sign the time sheets:
  - o Lieutenant Bridges, James
    - ▪ Lt. Bridges separated from TSU.
  - o Lieutenant Jones, Ivan
    - ▪ Investigation Interview Summary: Lt. Jones stated that he was not aware of the "Lead Officer" additional compensation or code used.  Lt. Jones stated that Deputy Chief Brown and Lt. Bridges verbally communicated that Field Training Officers were allowed to record two additional hours a day to complete paperwork.
  - o Sergeant McCray, Brian
    - ▪ Did not interview as his assigned staff did not receive Field Training Officer extra pay or "Lead Officer Pay".
  - o Sergeant Barnett, Darren
    - ▪ Investigation Interview Summary:
      Sergeant Barnett stated that he is aware that the Chief of Police announced that Officers Ward and Holiday would be compensated for filling in for supervisors on their respective supervisor's days off.
      Sergeant Barnett stated that he is aware that Field Training Officers were told by the Chief of Police that they could add two hours a day to their time sheets for completing paperwork.
      After this investigation commenced, Sergeant Barnett informed TSU's Acting Chief Audit Executive that he received a telephone call from one of the TSU DPS officers that certain officers were being questioned about their time recording practices.
  - o Lieutenant Starks, Jamal
    - ▪ Investigation Interview Summary:
      Lt. Starks stated that he is aware that the Chief of Police announced Officers Ward and Holiday would be compensated for filling in for supervisors on their respective supervisor's days off.
      Lt. Starks stated that he is aware that Field Training Officers were told by the Chief of Police that they could add two hours a day to their time sheets for completing paperwork.
  - o Sergeant John-Miller, Curtis
    - ▪ Did not interview as his assigned staff did not receive Field Training Officer extra pay or "Lead Officer Pay".

## Additional Interview Summaries

*Chief of Police Young Investigation Interview Summary:*

The Chief of Police stated that she would not tell officers to record time that was not worked and that according to policies they must have worked the time in order to record it.

The Chief of Police stated that there has been instances where supervisors (senior officers) have similar off days so others have had to cover their shifts.  In these instances, the officers would work the shift but since they can't have a promotion they would receive compensation – it was not to be a daily or weekly thing.  The Chief of Police authorized Officers Ward, McAfee, and Holiday that they can pick-up 8 hours bi-monthly not the 2 hours a day.

The Chief of Police stated that she did not direct Lieutenant Bridges, Lieutenant Jones, Sergeant Barnett, Lieutenant Starks, Sergeant McCray, Sergeant Brown, and Sergeant John-Miller to sign the timesheets for individuals to receive an additional two (2) hours per day field training pay.

The Chief of Police stated that all supervisor's meetings are recorded and that she would provide the Acting Chief Audit Executive with the recordings.  She later called the Acting Chief Audit Executive to say that there were no supervisor meetings held in January 2022 (the time when the alleged verbal authorization for additional "Lead Officer" compensation occurred).

The Chief of Police asked if she should speak with the individuals that recorded overtime and I told her she should not.

*DPS Timekeeper (Ms. Chandra Scruggs) Investigation Interview Summary:*

Ms. Chandra Scruggs works in the Building & Grounds department but has also been serving as the DPS timekeeper since the end of October 2020 or November of 2020.

Ms. Scruggs stated that she was not told what the FTO paperwork/FTO Documentation acronym was for but that she did not question it when processing Weekly Time Reports because they were signed by the respective supervisors.

Ms. Scruggs stated that the Chief of Police told Ms. Scruggs to create a code for individuals to use if they are acting in a supervisor role and that they are to receive $25/hr on top of their regular hourly rate for the role.  The Chief of Police told Ms. Scruggs that she can't promote them but wanted to compensate them.  According to Ms. Scruggs, nobody was present for this conversation.  Later, when the Dispatch Supervisor questioned the code on a Weekly Time Report the Chief's verbal answer to Ms. Scruggs was that they were to be paid the additional $25/hr.

Ms. Scruggs stated that the code HRSTLDR is used to identify the hours worked as a "Lead Officer"/shift supervisor and that she prepares a separate sign-in sheet each pay period for this.  When preparing the payroll, she includes this along with the Weekly Time Reports to Command for signature and then she delivers the signed pay packages to Human Resources (Payroll).  Ms. Scruggs stated that she did tell Officers Ward, McAfee, and Holiday that they have to record the HRSTLDR hours as different times than the times they recorded for their shift.

*Deputy Chief of Police Brown Investigation Interview Summary:*

The Deputy Chief of Police stated that he has been present when the Chief of Police verbally gave approval for Field Training Officers (FTO) to add two hours to their time each day.  The Deputy Chief of Police stated that he may have repeated that Field Training Officers could record two hours for paperwork.  It was supposed to be up to 2 hours, and he was not aware that this is a practice of recording time not worked but that they have to physically work the time.

The Deputy Chief of Police stated that Chief of Police Young advised leads (Lead Officers) that if they came in and were acting as a lead they could get compensated.  He stated that the maximum allowed by the Chief of Police was a total of 16 hours a month.

The Deputy Chief of Police stated that he was present in a meeting the week of July 4, 2022 with Officers Ward, McAfee, and Ms. Scruggs when the Chief of Police asked who told them how to record their time.

*Dispatch Supervisor (Officer Tina Dorsey) Investigation Interview Summary:*

The Dispatch Supervisor stated that Chief Young held Officers McAfee and Ward over after a supervisors meeting in February 2022 and told them that for two of the five days working as a supervisor/"Lead Officer" they would receive "special event" pay but she did not provide instruction on how to do this and told them to see the DPS timekeeper (Ms. Scruggs).

The Dispatch Supervisor stated that when saw Officer McAfee's Weekly Timesheet with the special code she called Ms. Scruggs and was told that Chief Young authorized the code. Since then, the Dispatch Supervisor has stopped signing Officer McAfee's Weekly Time Report area where the special event code is located.

The Dispatch Supervisor stated that on Wednesday July 6, 2022, the Chief of Police held a meeting with Sgt. Jones, Officer McCray, and Officer Dorsey and told them that an investigation was coming up and instructed for Officer Holiday to join the meeting.

*Corporal Brian Auzenne Investigation Interview Summary:*

Corporal Brian Auzenne has assumed the Field Training Officer (FTO) coordinator role with the departure of Lieutenant Bridges.  Corporal Auzenne stated that the former FTO coordinator stated that two additional hours could be recorded by Field Training Officers as part of training someone – either before or after the shift.  Corporal Auzenne stated that it has not been directly communicated and that it was just understood that you can record two hours a day that you are with an officer.

Corporal Auzenne stated that Compensation Request Forms were not required to be completed for the two hours a day FTO paperwork completion but this has recently been mandated.

*Note: Prior to assuming the FTO coordinator role, Corporal Auzenne also submitted two hours a day for FTO paperwork completion.*


## Policies Applicable to this Allegation

Texas Southern University (TSU) approved four (4) Manual of Administrative Policies and Procedures (MAPP) that apply to time reporting, pay, fraud, and ethics.  Applicable sections of these MAPPS are summarized below and were used to apply the investigation facts learned.

- 02.02.01 Pay Guidelines for Staff Employees
  Merit adjustments, equity adjustments, and reward-based increases must be part of the budget cycle and must meet approval of the Associate Vice President of Human Resources.  All pay adjustments are subject to review, approval, and recommendation through established channels, including the Office of Human Resources.
  Interim assignments. A temporary pay increase may be granted for assuming additional responsibilities on an interim basis for a specified period of time or until the vacant job is filled. The employee may receive a temporary pay increase of up to 25% of salary for the duration of the assignment, as recommended by the hiring manager and approved by Human Resources.

- 02.02.03 Overtime / Compensatory Time
  All overtime and extra hours must be authorized in writing and in advance by the dean/director of the department.
  Supervisors are responsible for monitoring the work hours of employees under their supervision and for ensuring that information reported on timesheets is complete and accurate.

- 02.05.05 Ethics and Conflict of Interest Policy
  Employees shall avoid any actions that violate or would create the appearance that they are violating the law or ethical standards of Texas Southern University.

- 02.05.06 Fraud Policy
  Fraudulent or related dishonest activities include but are not limited to fraud;
  Forgery or alteration of documents (checks, promissory notes, time sheets, independent contractor agreements, purchase orders, budgets, etc.)
  Authorizing or receiving payments for hours not worked.
  Management should not attempt to conduct individual investigations, interviews, or interrogations to determine if a suspected activity is fraudulent, dishonest, or improper.
  Do not contact the suspected individual to determine facts or demand restitution. Under no circumstances should there be any reference to "what you did," "the crime", "the fraud," "the forgery," "the misappropriation," etc.

## Conclusion

Based upon the internal audit investigation procedures performed, the allegation received is substantiated and related to two (2) distinct types of additional compensation that Chief of Police Mary Young authorized verbally and when she signed the weekly time reporting packages provided by the DPS timekeeper.  These compensation types are described below.  Neither of these compensation types were discussed or approved by TSU Human Resources, the President, or the Board of Regents.  MAPP 02.02.01 Pay Guidelines for Staff Employees requires review of pay adjustments by Human Resources.

*Compensation Types Involved in this Internal Audit Investigation:*

- "Lead Officer" compensation – This compensation is a flat $25/hour of additional compensation for security officers and dispatchers that were designated as the Lead Officer for a shift where their immediate supervisor was absent.  Officers were instructed by the DPS Timekeeper (Ms. Chandra Scruggs) and/or Chief Young to use code HRSTLDR in the special events section of the weekly time report and record the actual number of hours worked as "Lead Officer" but to record it for different hours; either before their shift worked, after their shift worked, or on their day off.
- Field Training Officer compensation – This is an additional two (2) hours pay at the respective officer's overtime hourly rate, for each day that they were training an officer.  This additional compensation was to complete paperwork associated with assessing an officer's performance during training.

Texas Southern University (TSU) Manual of Administrative Policies and Procedures (MAPP) 02.05.06 Fraud Policy defines fraud as:

*Fraudulent or related dishonest activities include, but are not limited to:*
*a. Theft of funds, securities, supplies or any other asset (including furniture, fixtures, or equipment);*
*b. Fraud;*
*c. Embezzlement;*
*d. Bribery/rebate/kickback;*
*e. Misapplication, destruction, removal or concealment of property, or conflicts of interest;*
*f. Illegal or fraudulent handling or reporting of money transactions;*
*g. Forgery or alteration of documents (checks, promissory notes, time sheets, independent contractor agreements, purchase orders, budgets, etc.);*
*h. Forgery or alteration by employees, of student related items such as grades, transcripts, loans, fee or tuition documents, etc.;*
*i. Acceptance or solicitation of any gift, favor or service that might reasonably tend to influence the employee in the discharge of his or her official duties;*
*j. Destruction or disappearance of records, furniture, fixtures, or equipment where theft is suspected;*
*k. Authorizing or receiving payments for hours not worked;*
*l. Authorizing or receiving payments for goods not received or services not performed;*
*m. Disclosing confidential information the employee is routinely privy to at the University;*
*n. Any apparent violation of Federal, State, or local laws related to dishonest activities or fraud, and;*
*o. Any similar or related activity.*

RESTRICTED (Access Limited to Authorized Personnel)

In applying the TSU MAPP 02.05.06 definition of fraud, Chief of Police Mary Young committed fraud against TSU through authorizing payments for hours not worked when she authorized two (2) hours of overtime to Field Training Officers each day that they had an officer assigned to them, even if it did not take the full two hours each day to complete the paperwork.

The police officers that recorded time for Field Officer Training paperwork when they did not actually work the two hours constitutes fraudulent reporting.  Officers stated that they did complete the required paperwork, but it did not always take the full two hours.  An example of the Weekly Time Sheet is included in Appendix C.

The Chief of Police told the "Lead Officers" that they were to record their actual hours worked in the top section of the Weekly Time Report and then use the special code and record their same hours in the bottom section of the Weekly Time Report.

The DPS timekeeper instructed individuals that served as "Lead Officers" that they were to record the actual hours worked as normal hours on the top section of the Weekly Time Report.  They then were to record the same number of hours on a different time period, or a different day than actually worked using a specially created code on the bottom section of the Weekly Time Report.  This code identified that they were acting as the supervisor for the respective number of hours and should receive the flat $25/hour for those hours.  The result is that for each day the respective officer filled in for the supervisor, they worked an eight-hour shift but recorded 16 hours; eight of the hours were paid at the standard hourly rate and eight hours were paid at the $25/hour rate.  This constitutes fraudulent reporting because it gives the appearance that the individual worked additional hours when they did not.  An example of the Weekly Time Sheet is included in Appendix C.

Individuals that recorded time for "Lead Officers" as instructed by the DPS timekeeper documented their time worked incorrectly.

## Policy Violations

The tables below describe the policy violations that occurred.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.05.06 | Fraud Policy | **III. Management's Responsibilities**<br>E. Management should not attempt to conduct individual investigations, interviews, or interrogations to determine if a suspected activity is fraudulent, dishonest or improper. The Office of Internal Audit & Fraud will conduct an investigation working in conjunction with internal or external departments, such as the University Office of General Counsel and law enforcement agencies.<br>F. Management is responsible for taking appropriate corrective actions to ensure adequate controls exist to prevent the occurrence of fraud or dishonest or improper activities.<br>I. Management's responsibilities in handling fraud or dishonest or improper activities include the following:<br>1. Do not contact the suspected individual to determine facts or demand restitution. Under no circumstances should there be any reference to "what you did," "the crime," "the fraud," "the forgery," "the misappropriation," etc.<br>ii. Take appropriate disciplinary action after consulting with the Office of Human Resources and the Office of General Counsel.<br>iii. Do not discuss the case, facts, suspicions or allegations with anyone outside the University unless specifically directed to do so by Internal Audit & Fraud or General Counsel.<br>iv. Do not discuss the case with anyone inside the University other than employees who have a "need to know," Internal Audit & Fraud or General Counsel.<br>v. Direct all inquiries from the suspected individual, his or her representative or his or her attorney to General Counsel.<br>VI. Direct all inquiries from the media to the Office of University Advancement. A proper response to such an inquiry should be, "I'm not at liberty to discuss this matter." |

**Violation(s) to this Policy**

1. The Chief of Police questioned certain officers about their time recording after interview with the Acting Chief Audit Executive and was told by the Acting Chief Audit Executive that she should not speak to the officers about this matter.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.05.05 | Ethics & Conflict of Interest | **III. Standards of Ethical Conduct**<br>G. Employees shall avoid any actions that violate or would create the appearance that they are violating the law or ethical standards of Texas Southern University. |

**Violation(s) to this Policy**

1. The Chief of Police took intentional actions to establish time recording practices that were not in compliance with TSU policies. These actions included authorizing two hours a day for Field Officer Training paperwork, instructing the DPS timekeeper to create a method for paying a flat rate of $25/hour additional compensation for "Lead Officers", and showing "Lead Officers" how to record their time worked in the supervisor role.
2. Police officers recording time as Field Officer Training paperwork for hours not worked violates TSU policies.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.01 | Pay Guidelines for Staff Employees | **V. Policy and Procedures Provisions – Employee Pay Adjustments**<br>Decisions to grant merit or equity or reward-based increases must be part of the budget cycle plan and can be initiated at the division level, if funds are available. Division initiated merit increases must meet the approval of the Associate Vice President of Human Resources/Chief Human Resource Officer to ensure that compliance and equity across the university are preserved.<br>**VII. Policy Provisions – General**<br>D. All pay adjustments are subject to review, approval, and recommendation through established channels, including the Office of Human Resources. |

**Violation(s) to this Policy**
While the "Lead Officer" additional hourly rate is not technically a merit or equity-based increases by definition, Section VII was violated because this additional $25/hour rate was not reviewed, approved, or recommended through the established channels, including the Office of Human Resources.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.01 | Pay Guidelines for Staff Employees | **VI. Types of Pay Adjustments**<br>I. Interim Assignment: A temporary pay increase may be granted for assuming additional responsibilities on an interim basis for a specified period of time or until the vacant job is filled. Normally interim assignments will not result in changes to exemption status as defined in FLSA regulations.<br><br>1. Interim Assignments: Nominations of employees to fill positions on an interim basis may be approved by the President and forwarded to Human Resources. Nominations may also be made by the employee's management in order to fill vacated positions where the work must continue until a permanent replacement is hired. Interim appointments must have the final approval of the President and/or Human Resources.<br><br>2. Interim Salary Increase Employees appointed to an interim position must perform the duties of the higher level job for at least 6 weeks before an interim personnel action is processed. The interim assignment should not exceed one (1) year. Within this timeframe the employee can be placed on the payroll with the interim title by means of a personnel action form. The employee may receive a temporary pay increase of up to 25% of salary for the duration of the assignment, as recommended by the hiring manager and approved by Human Resources. The interim salary should not exceed the salary of the previous incumbent or the budgeted amount for the position. The interim salary should not fall below the minimum, nor exceed the maximum of the pay grade established for the position, when applicable. |

**Violation(s) to this Policy**
While the "Lead Officer" was not an interim assignment to fill a vacancy, the officers assumed additional responsibilities to cover their respective supervisor's shift in their absence. This practice has been in effect for longer than six (6) weeks.  Additionally, the $25/hour flat rate on top of their normal hourly rate represents more than 25% of their normal hourly rate.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.03 | Overtime / Compensatory Time | **IV. General Provisions**<br>B. All overtime and extra hours must be authorized in writing and in advance by the dean/director of the department. Employees may not make unauthorized decisions to work overtime or extra hours. Working |

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| | | unauthorized time may subject the employee to disciplinary action, up to and including termination. Similarly, compensation, whether in the form of compensatory time off or pay for overtime or extra hours, may not be waived by the non-exempt employee.<br>**IV. General Provisions**<br>C. Supervisors are responsible for monitoring the work hours of employees under their supervision and for ensuring that information reported on timesheets is complete and accurate. |

**Violation(s) to this Policy**

1. The Chief of Police verbally authorized the additional compensation of $25/hour for "Lead Officers" and two hours overtime for Field Training Officers. This was not documented in writing and was not recorded as part of the normal supervisor meeting recordings. However, the Chief of Police did sign each payroll submission which included the completed timesheets.
2. The Chief of Police and the DPS Timekeeper collaborated to establish a special pay code and showed "Lead Officer" on how to complete their timesheet. The code that was created is for paper tracking only and was not setup in the Banner payroll system.
3. The Chief of Police did not inform the respective officer's supervisor that "Lead Officer" compensation had been authorized.
4. The DPS Timekeeper setup a time reporting and authorization process for "Lead Officers" that was outside of the customary way of processing overtime which is to record the actual day and time worked in the overtime section of the weekly time report and requires a Compensation Request form to be completed and submitted to the DPS Executive Assistant.
5. The Field Training Officer authorization that the Chief of Police implemented has been perpetuated through verbal communications from the Deputy Chief of Police and the Field Training Officer coordinator to Field Training Officers.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.03 | Overtime / Compensatory Time | **VI. Compensation for Overtime – Non-Exempt Employees**<br>A.  Compensation for non-exempt employees for overtime shall consist of either of the following methods:<br>    1.  Compensatory time off (leave) at the rate of one and one-half hours for each overtime hour worked; or<br>    2. Cash payment at the rate of one and one-half time the employee's regular hourly rate of pay for all hours worked in excess of forty (40) in the work week, in addition to the regular pay for the pay period during which it was earned.<br>    a. Cash payments may only be paid if the employee is not able to take the compensatory time within twelve (12) months of the time being earned, as noted in § V, B above; or if the employee has worked a campus event or special event job doing the same type of work as their primary job, and with the prior approval of both managers.<br>b. If the employee has worked a campus event or special event job doing different work than the primary job, payment can be based on approved event flat rates. Approval is subject to review by the compensation unit of the Department of Human Resources.<br>**IX. Reporting Additional Work and Compensatory Leave**<br>A.  Non-exempt employees shall report all additional work beyond the standard forty (40) hour work week on the appropriate dates, on the Time |

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| | | and Effort Report, using the correct time reporting category. Shift differential and overtime codes shall be reported, where appropriate. |
| | | B.   Overtime pay will be added to the employee's pay for the time period in which it was accrued and reported. The hourly rate for overtime pay will reflect the hourly pay rate recorded in the payroll/personnel system; State contributions for social security, retirement, and insurance benefits are not included in the calculation for the overtime rate. |

**Violation(s) to this Policy**

1.   The "Lead Officer" does not qualify for a special event job doing different work than the primary job.
2.   The $25/hour flat rate was not reviewed and approved by the compensation unit of the Department of Human Resources.
3.   "Lead Officers" were instructed by the DPS Timekeeper to record the hours actually worked as normal on the Weekly Time Report and to record the hours that they were to receive the $25/hour flat rate for filling in the supervisor role in a separate section of the Weekly Time Report using different hours and/or dates than the day that they worked.
4.   Field Officer Training paperwork hours were recorded on the Weekly Time Report for after a normal shift even if the hours were not worked.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.03 | Overtime / Compensatory Time | **X. Additional Compensation for Additional University Assignments** <br> B. All requests for payment of event pay or authorized overtime pay must be submitted on the appropriate Texas Southern University forms, in accordance with applicable policy and in accordance with published payroll deadlines. Failure to meet all documentation requirements and deadlines can result in delayed payment or denial of the request for payment. <br> D. All requests for payment of event pay or authorized overtime pay must be submitted on the appropriate Texas Southern University forms, with required support documentation, and in accordance with this policy (Sections V & VI). Failure to meet all documentation requirements and deadlines can result in delayed payment or denial of the request for payment. |

**Violation(s) to this Policy**

1.   Overtime for Field Training Officers were completed on the required Application for Special Event or Overtime Pay Form but the Compensation Request Form is not completed.
2.   Special hourly rate for "Lead Officers" did not complete the Compensation Request Form or the Application for Special Event or Overtime Pay Form.

## Fiscal Impact:

The total amount paid for Field Training Officer paperwork and "Lead Officer" between September 1, 2021 and June 20, 2022 was $27,960.82.

Field Officer Training summary – September 1, 2021 – June 20, 2022.  The respective officers did not keep track of the hours that they were completing the paperwork.  Instead of recording the actual hours, they recorded two each day. As a result, we are not able to determine how much of this time is valid.

RESTRICTED (Access Limited to Authorized Personnel)

| Last Name | First Name | Total Paid | Total OT 1.5 Hrs | Total OT 1.0 Hrs | Total Hours |
|---|---|---|---|---|---|
| ⊟ Auzenne | Brian | $3,155.99 | 78 | 18 | 96 |
| ⊟ Cantu | Bethany | $2,460.89 | 63 | 11 | 74 |
| ⊟ Howard | James | $2,545.36 | 57 | 17 | 74 |
| ⊟ John-Miller | Curtis | $1,400.28 | 28 | 8 | 36 |
| ⊟ Jones | Chevon | $988.33 | 28 | | 28 |
| | Ivan | $251.58 | 6 | | 6 |
| | Tyrone | $911.89 | 26 | | 26 |
| ⊟ McCray | Brian | $642.90 | 10 | 8 | 18 |
| ⊟ Sawyer | Jujuana | $3,803.60 | 96 | 18 | 114 |
| **Grand Total** | | **$16,160.82** | **392** | **80** | **472** |

"Lead Officer" summary – September 1, 2021 – June 20, 2022.  These are the hours that the respective individual used the designated code to identify hours they worked in the supervisor role.  These hours were recorded on different dates or times than they actually worked.

| Last Name | First Name | Total Paid | Total Hours |
|---|---|---|---|
| ⊟ Holiday | John | $2,200.00 | 88 |
| ⊟ McAfee | Gaynell | $5,200.00 | 208 |
| ⊟ Ward | James | $4,400.00 | 176 |
| **Grand Total** | | **$11,800.00** | **472** |

RESTRICTED (Access Limited to Authorized Personnel)

## Time Reporting Overview

The graphic below provides an overview of time recording practices for Field Training Officers (FTO) and "Lead Officers".



**Appendix A: EthicsLine Report Received**

| | |
|---|---|
| From: | Nwankwo, DeAnna M |
| Sent: | Thursday, April 14, 2022 6:56 PM |
| To: | Parker-Thompson, Charla |
| Subject: | Confidential - EthicsPoint Hotline Matter |

*[handwritten note: OT, Prior period to current Payroll period FY 2020-21 FY 21-22]*

Chief Audit Executive,
The following matter was received via the EthicsPoint Hotline on 3/24/2022. I apologize for the delay in forwarding the matter to your attention, but I was not alerted by the system that a report had been received. Please advise how you would like to proceed.

*[handwritten note: Data dump payroll, per payroll name - Employee T# pay period, # hours recorded by work code, don't need pay rate.]*

**Assigned to**
None entered

**Synopsis Notes**
None entered

**Case Details**
Since January 2022, while at a weekly supervisor meeting, Mary gave all the officers (names withheld) in the police department a directive that she would raise the pay for special officers (names withheld). Mary categorized the special officers as the lead officers (names unknown) and (first name unknown) McCefee, telecommunications officer, for security and telecommunications. Those officers were (first name unknown) Ward, security officer, McCefee, (first name unknown) Sawyer, police officer, (first name unknown) Holiday, security officer, (first name unknown) Jones, police officer, Tyrone Jones, police officer, and (first name unknown) Cantu, police officer.

Mary approved field training pay for the lead officers and McCefee so that the lead officers and McCefee would have higher pay that included the sum equivalent of two overtime hours per day, up to five days a week. The persons who were authorized by Mary to sign-off on the timesheets were (first name unknown) Bridges, lieutenant, (first name unknown) Jones, sergeant, (first name unknown) Barnett, sergeant, (first name unknown) Stark, lieutenant, (first name unknown) McCray, sergeant, (first name unknown) Brown, sergeant, and (first name unknown) John-Miller, police officer. Bridges, Jones, Barnett, Stark, McCray, Brown, and John-Miller signed the time sheets because they were told by Mary that Ward, McCefee, Sawyer, Holiday, Jones, Tyrone, and Cantu were entitled to those funds for the work that they did.

The president (name unknown) and the board of regents did not authorize these pay increases. This act appears to be illegal and unethical. The supervisors (names unknown) were operating according to Mary's directive, believing that Mary had the authority to do this. The supervisors that were present at the weekly supervisors' meeting were witnesses to this directive. There were no cameras that captured this incident. This matter may have been reported to management.

**Case Summary**
None entered

*[handwritten note: Requested DMN Follow email sent to Maria White 6/10/2022 6/13/2022 Victor Ihezukwu will provide (in spreadsheet (email from M. White)]*

DeAnna M. Nwankwo MJur., CCEP, MBEC
VP, Chief Compliance Officer

**Exhibit 1: EthicsLine Report.**
*Note:  The yellow highlight and handwritten notes were made by VP, Chief Compliance Officer, DeAnna Nwankwo prior to providing the hardcopy to Acting Chief Audit Executive, Darlene Brown through Sr. Associate Vice President of HR and Payroll Services, Yolanda Edwards.  Both Ms. Nwankwo and Ms. Parker-Thompson were separated from TSU prior to this internal audit investigation being assumed by Acting Chief Audit Executive, Darlene Brown.*

**Appendix B: Internal Audit Investigation Procedures Performed**

The following procedures were performed for this internal audit investigation:

- Conducted interviews via Microsoft Teams, cell phone, and in-person.
- Analyzed the time report file provided for period of September 1, 2021, through June 20, 2022.
- Reviewed a sample weekly time reports (WPR) completed by DPS staff and initially gathered by VP, Chief Compliance Officer, DeAnna Nwankwo.
- Reviewed a sample Application for Special Event or Overtime Pay for Non Exempt forms completed by DPS Timekeeper initially gathered by VP, Chief Compliance Officer, DeAnna Nwankwo.
- Reviewed a sample Department of Event Services Supplemental Salary Sign-In Sheet forms completed by DPS Staff and Timekeeper initially gathered by VP, Chief Compliance Officer, DeAnna Nwankwo.
- Reviewed a sample of Compensation Request forms completed by DPS staff initially gathered by VP, Chief Compliance Officer, DeAnna Nwankwo.
- Confirmed with Human Resources that the additional compensation request had not been requested, discussed, or granted by and to Chief of Police Mary Young.
- Reviewed the Texas Southern University Department of Public Safety Policies and Procedures, March, 2020, for overtime and special event time recording policies. Section 200.33 discusses overtime in detail. The procedures do not grant additional compensation for "Lead Officer" or "Field Training Officers".
- Reviewed applicable TSU MAPPS to determine compliance.

## Appendix C: Weekly Time Sheet Examples

*"Lead Officer" Weekly Timesheet Example*

Below is an example of the "Lead Officer" Weekly Timesheet showing eight (8) hours worked each day for March 13, 2022, and March 14, 2022, at regular hours from 11pm to 7am (top portion of the document) and then the special code to indicate that they served as supervisor and should receive the additional $25/hour compensation on the bottom section of the document. These hours were recorded on March 13,2022 and March 14, 2022, from 3:00pm to 11:00pm although the individual only worked 11:00pm to 7am.

**TEXAS SOUTHERN UNIVERSITY◊DEPARTMENT OF PUBLIC SAFETY**
**Weekly Payroll Report (WPR)**
NAME: _James W. Ward_ _____ ID. #: _T00592392_

**PAYROLL PERIOD:** _Mar. 13, 2022 thru Mar. 19, 2022 SHIFT 11pm to 7am_

| | DATE | REGULAR HOURS WORKED | | | LEAVE | NOTE | APPROVAL |
|---|---|---|---|---|---|---|---|
| | | Start Shift | End Shift | Hours Worked | | | |
| Sun. | 03/13/2022 | 11pm | 7am | 8 | | Reg. Shift | |
| Mon. | 03/14/2022 | 11am | 7am | 8 | | Reg. Shift | |
| Tue. | 03/15/2022 | 11pm | 7am | 8 | | Reg. Shift | |
| Wed. | 03/16/2022 | 11pm | 7am | 8 | | Reg. Shift | |
| Thu. | 03/17/2022 | 11pm | 7am | 8 | | Reg. Shift | |
| Fri. | 03/18/2022 | | | | | Off Day | |
| Sat. | 03/19/2022 | | | | | Off Day | |
| | | TOTAL HOURS | | 40 | | TOTAL HOURS LEAVE | |

| DATE | REGULAR OVERTIME/COMP HOURS | | | REASONS/ NOTES | PAID | | COMP TIME | | APPROVAL |
|---|---|---|---|---|---|---|---|---|---|
| | Start | End | Total Hours | | OTP (1.0) | OT (1.5) | OTP (1.0) | OT (1.5) | |
| Sun. | | | | | | | | | |
| Mon | | | | | | | | | |
| Tue. | | | | | | | | | |
| Wed | | | | | | | | | |
| Thu. | | | | | | | | | |
| Fri. 03/18/2022 | 11pm | 7am | 8 | Spring Break | X | | | | *JWa* |
| Fri. 03/18/2022 | 7am | 11am | 4 | Relays | | X | | | *JWa* |
| Sat. 03/19/2022 | 6am | 6pm | 12 | Relays | | X | | | *JWa* |

| DATE | PAID CAMPUS EVENT HOURS | | | EVENT NAME | EVENT LOCATION | PAID | | APPROVAL |
|---|---|---|---|---|---|---|---|---|
| | Begin Event | End Event | Total Hours | | | OTP (1.0) | OT (1.5) | |
| Sun. | | | | | | | | |
| Mon. | | | | | | | | |

| DATE | SPECIAL EVENT WORK HOURS | | | EVENT NAME | EVENT LOCATION | APPROVAL |
|---|---|---|---|---|---|---|
| | Begin Event | End Event | Total Hours | | | |
| Sun. 03/13/2022 | 3pm | 11pm | 8 | HRSTLDR | | *JWa* |
| Mon. 03/14/2022 | 3pm | 11pm | 8 | HRSTLDR | | *JWa* |
| Tue. | | | | | | |
| Wed. | | | | | | |
| Thu. | | | | | | |
| Fri. | | | | | | |
| Sat. | | | | | | |

*Training Officer Weekly Timesheet Example*

Below is an example of a Field Training Officer's Weekly Timesheet showing eight (8) hours worked each day for January 2, 2022 through January 8, 2022 at regular hours from 3pm to 11pm (top portion of the document) and then the overtime of FTO Paperwork for two hours on four of these days. These hours were recorded on the Timesheet from 1:00pm to 3:00pm. It is uncertain if the officer actually worked two hours prior to starting their normal shift.

RESTRICTED (Access Limited to Authorized Personnel)

# TEXAS SOUTHERN UNIVERSITY◊DEPARTMENT OF PUBLIC SAFETY
## *Weekly Payroll Report (WPR)*

RECEIVED
JAN 25 2022

**NAME:** *Cantu, Bethany*      **ID. #:** *T00689339*

**PAYROLL PERIOD:** *Jan 2,2021- Jan 8, 2022*      **SHIFT:** *3:00pm-11:00pm*

| | | REGULAR HOURS WORKED | | | LEAVE | NOTE | APPROVAL |
|---|---|---|---|---|---|---|---|
| | | Start Shift | End Shift | Hours Worked | | | |
| Sun | 01-02-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Mon | 01-03-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Tue | 01-04-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Wed | 01-05-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Thu | 01-06-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Fri | 01-07-2022 | - | - | - | | OFF DAY | |
| Sat | 01-08-2022 | - | - | - | | OFF DAY | |
| | | | | 40 | | | |

| | DATE | REGULAR OVERTIME/COMP HOURS | | | REASONS/ NOTES | PAID | | COMP TIME | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Start | End | Total Hours | | OTP (1.0) | OT (1.5) | OTP (1.0) | OT (1.5) | APPROVAL |
| Sun | 01-02-2022 | 1:00 PM | 3:00 PM | 2 | FTO Paperwork | | X | | | |
| Mon | 01-03-2022 | 1:00 PM | 3:00 PM | 2 | FTO Paperwork | | X | | | |
| Tue | 01-04-2022 | 1:00 PM | 3:00 PM | 2 | FTO Paperwork | | X | | | |
| Wed | 01-05-2022 | | | | | | | | | |
| Thu | 01-06-2022 | 1:00 PM | 3:00 PM | 2 | FTO Paperwork | | X | | | |
| Fri | | | | | | | | | | |
| Sat | | | | | | | | | | |

| | DATE | PAID CAMPUS EVENT HOURS | | | EVENT NAME | EVENT LOCATION | PAID | | APPROVAL |
|---|---|---|---|---|---|---|---|---|---|
| | | Begin Event | End Event | Total Hours | | | OTP (1.0) | OT (1.5) | |
| Sun | | | | | | | | | |
| Mon | | | | | | | | | |
| Tues | | | | | | | | | |
| Wed | | | | | | | | | |
| Thu | | | | | | | | | |
| Fri | | | | | | | | | |
| Sat | | | | | | | | | |

| | DATE | SPECIAL EVENT WORK HOURS | | | EVENT NAME | EVENT LOCATION | APPROVAL |
|---|---|---|---|---|---|---|---|
| | | Begin Event | End Event | Total Hours | | | |
| Sun | | | | | | | |
| Mon | | | | | | | |
| Tues | | | | | | | |
| Wed | | | | | | | |

RESTRICTED (Access Limited to Authorized Personnel)