# EXHIBIT F

1              CAUSE NO. 2022-77744

2

MARY YOUNG                    ) IN THE DISTRICT COURT OF

3                             )
                              )
4  VS.                        ) HARRIS COUNTY, TEXAS
                              )
5  TEXAS SOUTHERN UNIVERSITY, )
   TEXAS SOUTHERN UNIVERSITY  )
6  PRESIDENT TSU GENERAL COUNSEL )
   HAO LE AND THEIR DESIGNEES ) 127th JUDICIAL DISTRICT

7

8

9

10

11         ORAL and VIDEOTAPED DEPOSITION OF

12              LESIA CRUMPTON-YOUNG

13              February 16th, 2024

14

15      ORAL DEPOSITION of LESIA CRUMPTON-YOUNG, produced

16  as a witness at the instance of the Plaintiff, and duly

17  sworn, was taken in the above-styled and numbered cause

18  on the 16th day of February, 2024, from 1:14 p.m. to

19  4:24 p.m. before BRENDA A. FOSTER, CSR in and for the

20  State of Texas, reported by machine shorthand, at The

21  Hall Law Group, 530 Lovett Boulevard, Houston, Texas,

22  pursuant to the Texas Rules of Civil Procedure and the

23  provisions stated on the record or attached hereto.

24

25



Lesia Crumpton-Young

February 16, 2024
Pages 2 to 5

---

Page 2

```
 1  APPEARANCES
 2       For the Plaintiff:
 3          MR. BENJAMIN L. HALL, III
            THE HALL LAW GROUP, PLLC
 4          530 LOVETT BOULEVARD
            HOUSTON, TEXAS  77006
 5          (713) 942-9600
            (713) 942-9566 fax
 6          bhall@thlf.us
 7
 8       For the Defendant:
 9          MS. YVONNE DENISE POWELL BENNETT
            OFFICE OF ATTORNEY GENERAL
10          P.O. BOX 12548
            AUSTIN, TEXAS  78711-2548
11          yvonne.bennett@oag.texas.gov
12
13
    Also Present:
14          Ricky Brandham, BWF videographer
15
                    *-*-*-*-*
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1              I N D E X
 2                                        Page
    LESIA CRUMPTON-YOUNG
 3       Examination
         By Mr. Hall . . . . . . . . . . . . . . . .  4
 4
 5  Signature. . . . . . . . . . . . . . . . . 118
    Reporter's Certificate . . . . . . . . . . 119
 6
                    EXHIBITS
 7  NO.         DESCRIPTION              PAGE
 8  Exhibit No. 55   Deposition Notice           12
    Exhibit No. 56   Presidential Search pgs.     13
 9  Exhibit No. 57   President Leadership profile 14
    Exhibit No. 58   Article                      14
10  Exhibit No. 59   EthicsPoint complaint        15
    Exhibit No. 60   Case details, tab 2, tab 3   26
11  Exhibit No. 61   Temporary Restraining Order  56
    Exhibit No. 62   Notice of temporary
12                   relief of duties             58
    Exhibit No. 63   email/admin leave with pay   68
13  Exhibit No. 64   Text Messages                 -
    Exhibit No. 65   Draft of order                -
14  Exhibit No. 66   Letter/Compliance with TRO
    Exhibit No. 67   Temporary Restraining Order  63
15  Exhibit No. 68   Letter/Response to Memo of
                     Darlene Brown                96
16  Exhibit No. 69   Notice of employment
                     separation                    9
17  Exhibit No. 70   Board of Regents letter      81
    Exhibit No. 71   Board policies              114
18  Exhibit No. 72   Personnel Fee Sheet          99
19
                    *-*-*-*-*
20
21
22
23
24
25
```

---

Page 4

```
 1           P R O C E E D I N G S
 2           THE VIDEOGRAPHER:  We're on the record.
 3  Today's date is February 16th, 2024.  The time is
 4  1:14 p.m., beginning the deposition of Dr. Lesia
 5  Crumpton-Young.  Counsel has appeared here today, along
 6  with the witness.  Will counsel now identify themselves
 7  for the record, starting with counsel for the
 8  plaintiff.
 9           MR. HALL:  I'm Benjamin Hall.  I
10  represent the petitioner, Mary Young.
11           MS. BENNETT:  Yvonne Bennett with the
12  Office of the Attorney General, representing Dr. Lesia
13  Crumpton-Young.
14           THE VIDEOGRAPHER:  Will the court
15  reporter please swear in the witness.
16           LESIA CRUMPTON-YOUNG,
17  having been first duly sworn, testified as follows:
18           EXAMINATION
19  QUESTIONS BY MR. HALL:
20      Q.  Dr. Crumpton-Young, my name is Benjamin Hall,
21  and I represent petitioner, Mary Young.  Do you
22  understand that?
23      A.  Yes.
24      Q.  Okay; and you understand that we have brought
25  a lawsuit against TSU relating to the employment
```

---

Page 5

```
 1  relationship between the petitioner and that
 2  institution.  Do you understand that?
 3      A.  Yes.
 4      Q.  Have you ever given a deposition before?
 5      A.  Yes.
 6      Q.  Today I'm going to be asking you a few
 7  questions, and should you not understand my questions
 8  at any time, please do not answer them.  Make me do the
 9  hard work of asking you a question that you understand
10  before you answer it.  Can we have that agreement?
11      A.  Yes.
12      Q.  What do you understand the nature of this
13  lawsuit to be?
14      A.  I understand that there's a allegation that a
15  signed complaint was not given to Mary Young.
16      Q.  Did you ever give Chief Young -- and when I
17  say "Chief Young," I'm talking about Chief Mary Young.
18  Did you ever give a signed complaint to Chief Young?
19      A.  Not personally.
20      Q.  I jumped ahead of myself a little.  In 2 --
21  when did you become the chief executive officer of TSU?
22      A.  That wasn't my title.
23      Q.  When did you become the president of TSU?
24      A.  July of 2021.
25      Q.  And when did you last serve as president of
```



Lesia Crumpton-Young

February 16, 2024
Pages 6 to 9

Page 6

1 TSU?
2    A.   June of 2023.
3    Q.   During your tenure as the president of TSU,
4 was petitioner Mary Young serving at any time as the
5 chief of police of TSU?
6    A.   Yes.
7    Q.   As I understand it, you did not hire Mary
8 Young as the chief of police, she was already the chief
9 of police when you arrived; is that correct?
10    A.   Yes.
11    Q.   Did you have the authority as president of
12 TSU to terminate Mary Young from her position as chief
13 of police?
14    A.   Yes, it's my understanding.
15    Q.   And did you authorize the termination of Mary
16 Young's employment from TSU?
17    A.   No.
18    Q.   Was that authorized by someone that was
19 higher than you or beneath you in terms of the org
20 chart, or the organizational chart?
21    A.   I wouldn't say the authorization is
22 consistent with higher education.
23    Q.   Okay.  So my choice of authorization is not a
24 convenient term for educational, the educational
25 context.  Is that what you're saying?

Page 7

1    A.   That's, that's not a term we use.  That's not
2 a --
3    Q.   Okay.
4    A.   That's not -- we don't.
5    Q.   So what term would you -- what term is used
6 in the educational context when you're terminating an
7 employee?
8    A.   Termination.
9    Q.   Did you terminate Mary Young's employment?
10    A.   No.
11    Q.   Who did?
12    A.   The letter of termination should have a
13 signature on it.
14    Q.   And that person who signed that termination
15 letter would be the person who terminated Mary Young?
16    A.   Yes.
17    Q.   Were you aware of that termination being
18 communicated to Mary Young prior to it being provided
19 to Ms. Young?
20    A.   I don't understand the question.
21    Q.   Did you have any participation in approving
22 the termination letter being provided to Chief Young?
23    A.   Participation is not typically a term used
24 related to terminations in higher education, so I don't
25 understand the question.

Page 8

1    Q.   Okay.  I can ask it a different way.
2    A.   Okay.
3    Q.   What role, if any, did you play in the
4 termination of Mary Young as police chief?
5    A.   Advisory.
6    Q.   Okay; and did you advise that she be
7 terminated?
8    A.   No.
9    Q.   Did you disapprove of the termination?
10    A.   No.
11    Q.   Did you approve of the termination?
12    A.   It did not require an approval.
13         MR. HALL:  Objection, nonresponsive.
14    Q.   Did you approve of the termination?  I'm not
15 asking whether it required your approval, just simply
16 did you approve of it?
17    A.   No.
18    Q.   Do you recall the -- I may have asked you
19 this -- do you recall the name of the person who signed
20 the termination letter?
21    A.   The termination letter should have a
22 signature on it.
23    Q.   Yes, ma'am.  Do you recall who signed it --
24    A.   I --
25    Q.   The name of that person?

Page 9

1    A.   I do not recall who signed it.
2    Q.   Okay, no worries.  Would you take a moment
3 and look in this binder at Exhibit 69.
4         MR. HALL:  For the court reporter, we have
5 already numbered these exhibits, and I will give this
6 binder to you with those numbers.
7    A.   Okay.
8    Q.   Is Exhibit 69 the letter of termination?
9    A.   Yes.  We usually use the term "employment
10 separation."
11    Q.   Okay; and then the second page, which is --
12 this is Exhibit 69 to your deposition, is that the
13 signature that you've been referring to as a person who
14 would have terminated the employment of Chief Young?
15    A.   Yes.
16    Q.   And did -- was this person -- and how do you
17 say this person's name?
18    A.   Devi, Devi, Devi.
19    Q.   Last name?
20    A.   Bala.
21    Q.   And was Devi Bala someone who was superior to
22 you in terms of the organizational chart, or was she
23 under you as the president?
24    A.   Devi Bala reported directly to me as
25 president.



Lesia Crumpton-Young

February 16, 2024
Pages 10 to 13

---

Page 10

1    Q.   Okay.  Did Devi Bala advise you or inform you
2  in any way that she intended to send this employment
3  separation letter dated January 9th, 2023?
4    A.   She discussed her concerns about the
5  violation of the administrative leave and said that it
6  was appropriate that we separate.
7    Q.   Okay.  So she did discuss the intended
8  separation of Chief Young as communicated in Exhibit
9  69?
10    A.   She discussed it with me.
11    Q.   Now, you understand that -- well, do you
12  understand that Chief Young was a police officer at the
13  time that she worked as the police chief at TSU?
14    A.   I'm aware that Mary Young was the chief of
15  police at Texas Southern University.
16    Q.   And in that position as the chief of police,
17  did you understand she herself was, in fact, a peace
18  officer or police officer in the state of Texas?
19    A.   I, I don't -- I can't say that I know that.
20    Q.   Okay.  Did you at that time understand that
21  the chief of police of TSU required a peace officer's
22  license to hold that position?
23    A.   No, I was not aware of that.
24    Q.   In terms of the police officers at TSU when
25  you were the president, did you understand those peace

---

Page 11

1  officers, those police officers to be peace officers in
2  the state of Texas?
3    A.   No, I can't say that I understood that
4  specifically.
5    Q.   Today are you aware that Mary Young was a
6  licensed peace officer in the state of Texas when she
7  served as the chief of police?
8    A.   I'm not aware of that today.
9    Q.   At the time that you were the president of
10  TSU, did you know what the qualifications were or what
11  the university required for a person to be even
12  eligible for consideration to be the police chief?
13    A.   I can't say that I spent time on that.  I
14  didn't hire a chief of police.  So, no, I, I can't say
15  that I specifically knew those nuances.
16          MR. HALL:  Okay.  So I'm going to object
17  to the nonresponsive portion.
18    Q.   Did you have any understanding that the
19  police chief of TSU had to be a licensed peace officer
20  in the state of Texas?
21    A.   I did not know that, did not have that
22  understanding.
23    Q.   And today as you sit here in the deposition,
24  are you aware of that requirement on the -- in order to
25  serve as a chief of police of TSU?

---

Page 12

1    A.   I do not -- I am not aware of that
2  requirement.
3    Q.   Did the chief of police of TSU report
4  directly to you?
5    A.   No.
6    Q.   To whom did that person report?
7  Specifically, Mary Young, to whom did she report?  Who
8  was her direct report?
9    A.   So initially you asked who did Mary Young
10  report to, but then at the end of your sentence you
11  said who were her direct reports, so which question
12  would you like me to answer?
13    Q.   Thank you.  To whom did Mary Young report as
14  the chief of police?
15    A.   On January -- prior to January 9th, she
16  reported to Devi Bala, according to what I'm reading
17  here in the book.
18    Q.   Okay.  I want to walk through some of the
19  exhibits in the binder before you.  If you will turn to
20  Exhibit 55.  It will be the first exhibit.
21    A.   Okay, thank you.
22    Q.   Do you recognize -- and I don't know if
23  you've been provided this, but this is the deposition
24  notice.  This is essentially our invitation asking you
25  to be here today.  Have you had an opportunity to -- to

---

Page 13

1  review this?
2    A.   Yes.
3    Q.   And you understand it is pursuant to this
4  deposition notice that you are now here in this
5  deposition, correct?
6    A.   Yes.
7    Q.   Okay.  If you'll turn to Exhibit 56.  If
8  you'll flip through those pages, my question to you is,
9  do you recognize any of those pages and, if so, could
10  you tell me which one?
11    A.   I'm supposed to flip through Section 55?
12    Q.   Yeah, just, just 56.
13    Q.   56.
14    Q.   56.
15    A.   I don't recognize any of those pages.
16    Q.   Okay.
17    A.   Prior to today.
18    Q.   If you'll look at just the second physical
19  page in 56.
20    A.   Okay.
21    Q.   Under "Leadership Profile," do you see that
22  section?
23    A.   Yes.
24    Q.   It says, "As the chief executive officer of
25  TSU, the president leads the development and



Lesia Crumpton-Young

February 16, 2024
Pages 14 to 17

Page 14

1 implementation of goals and strategies to achieve the
2 University's mission." Do you see that?
3    A.  Uh-huh.
4    Q.  Is that a "yes"?
5    A.  Yes, I see it.
6    Q.  Okay; and as so, at the time that you were
7 the president of TSU, you did not understand yourself
8 to be the chief executive officer?
9    A.  So what I'm currently reading refers to the
10 presidential profile for the search of 2024.
11    Q.  Okay.  Do you think that -- I mean, are you
12 not aware that the president was considered the chief
13 executive officer when you were hired?
14    A.  When I was hired, I was -- my title was
15 president.
16    Q.  Okay.  Did you understand your function as
17 president to be the chief executive officer?
18    A.  I really -- I understood my role to be
19 president for sure.
20    Q.  Okay, okay.  No, we won't quabble too much
21 about that.  Let's go to skip 57.  I'm going to skip
22 over 57 and go to 58.  Do you recognize the document
23 which has been identified as Exhibit 58?
24    A.  I mean, I don't -- I can read it if you would
25 like for me to.

Page 15

1    Q.  Well, would you please take a moment.
2    A.  Okay.
3    Q.  Do you recognize that to have a picture of
4 you?  Is that a picture of you to the right?
5    A.  Yes.
6    Q.  Is anything that's in this statement or this
7 article anything that you supplied?
8    A.  No.
9    Q.  Okay.  Let's go to Exhibit 59.  Would you
10 take a moment and look at Exhibit 59.  Have you had an
11 opportunity to complete it?
12    A.  Yes.
13    Q.  Do you recognize that document?
14    A.  No.
15    Q.  Have you ever seen it?
16    A.  I don't recall seeing it.
17    Q.  Okay.  Do you -- there was an anonymous
18 complaint that was alleged to have been filed against
19 Chief Young.  Did you ever see that anonymous,
20 anonymous complaint?
21    A.  I can't -- I cannot recall if I ever saw a
22 printed copy of the complaint.
23    Q.  I didn't ask you about printed copy.  I asked
24 you had you ever seen the complaint.  Whether it was on
25 your computer, laptop, electronic, otherwise, had you

Page 16

1 ever seen the complaint?
2    A.  I cannot recall if I have seen the complaint
3 or seen this document.
4    Q.  Prior to January 9th, 2023, the date of
5 Bala's separation letter, had anyone told you about an
6 anonymous complaint against Chief Young?
7    A.  Yes.
8    Q.  Can you tell the Court what you, what you
9 recall was told to you about that anonymous complaint?
10    A.  I was told that there was a complaint that
11 Chief Young had authorized fraudulent use of overtime
12 pay.
13    Q.  Anything else?
14    A.  That's the essence of what I remember from
15 the conversation.
16    Q.  And can you -- do you recall who first told
17 you that?
18    A.  No, I cannot recall who first told me that.
19    Q.  Can you tell me the names of anyone who told
20 you that?
21    A.  So it may have been compliance officer or HR
22 or possibly the first COO.  He was quite concerned
23 about overtime pay in the police department.
24        MR. HALL:  So I'm going to object to that
25 as nonresponsive.

Page 17

1    Q.  I didn't ask you for the titles that the
2 people held.  I asked you could you tell us the names
3 of the persons who told you or discussed with you this
4 anonymous complaint.  Do you know any names?
5    A.  And, and is the question still the name of
6 the first person who told me?  Is that still the
7 question?
8    Q.  No, ma'am.
9    A.  Okay.
10    Q.  We're, we're two questions away from that
11 one.
12    A.  Okay, okay.
13    Q.  When you told me that you did not remember
14 the name, I asked you do you remember the name of
15 anyone who discussed the anonymous complaint.  In
16 response you gave me titles.  I'm now back at that
17 second question, and that is can you recall the names
18 of anyone who discussed the anonymous complaint against
19 Mary Young with you?
20    A.  And the question is not still the first
21 person?
22    Q.  Correct.
23    A.  Okay.  So just to make sure I'm clear,
24 because I want to answer your specific questions, would
25 you mind repeating the question that you're asking me



Lesia Crumpton-Young

Page 18

1 right now?
2    Q.   Absolutely.  Do you recall the names of
3 anyone who discussed the anonymous complaint with you
4 prior to the term -- the separation letter?
5    A.   Yes.
6    Q.   Okay.  Please give me those names.
7    A.   I'm sure at, at some point I discussed it
8 with the chairman of the Board of Regents.
9    Q.   Is that Albert Myres?
10    A.   Yes, Albert Myres.  At that time the
11 personnel, chairman -- chairperson of the personnel
12 committee, which was Caroline Baker Hurley.
13    Q.   Is that Judge Baker Hurley?
14    A.   Yes, yes, Regent Caroline Baker Hurley.  Hao
15 Le, general counsel, and at the time -- and also at one
16 time acting vice-president for administration.  But
17 you're not asking me that; you're asking me names.
18    Q.   Right.  I'm not asking you about titles.
19    A.   I'm a, I'm a person who has always associated
20 individuals with their titles, so I'm trying to
21 remember their names because I'm accustomed to calling
22 them by their titles.
23    Q.   You --
24    A.   So just give me a minute to just walk through
25 it in my head for you.  Mr. Ken Huewitt at one time

Page 19

1 talked to me about concerns with overtime.
2         MR. HALL:  Objection, nonresponsive.
3    Q.   I asked you about the anonymous complaint.
4    A.   The anonymous complaint, okay.  Darlene
5 Brown.  Hao Le.  Yolanda, I can't remember the last
6 name.  She was in charge of HR.
7    Q.   Is it Edmonds?
8    A.   Yes, thank you for your assistance.  Devi
9 Bala.  Those are the names I can recall at this
10 point --
11    Q.   Okay.
12    A.   -- at this time.
13    Q.   Fine.  So I want to -- the ones that you can
14 comfortably recall right now that discussed the
15 anonymous complaint against Chief Young were, as you
16 just outlined, Albert Myres, Caroline Baker Hurley, Hao
17 Le, Darlene Brown, Yolanda Edmonds, and Devi Bala.  Is
18 that, is that all you can comfortably recall now?
19    A.   That discussed the -- the question is
20 discussed the anonymous complaint?
21    Q.   Yes.
22    A.   And what are the names again?
23    Q.   Albert Myres, Caroline Baker Hurley, Hao Le,
24 Darlene Brown, Yolanda Edmonds, and Devi, Devi Bala.
25    A.   Those are the ones I can remember comfortably

Page 20

1 right now.
2    Q.   Okay.  When you say they -- these individuals
3 discussed with you the anonymous complaint, you're
4 talking about the complaint against Chief Young
5 concerning misuse of overtime pay?
6    A.   Yes.
7    Q.   And is it correct to tell the Court that when
8 you discussed the matter with Albert Myres, you knew
9 that it was an anonymous complaint?
10    A.   I was told that it was an anonymous
11 complaint.
12    Q.   And did you understand "anonymous" to mean
13 that the complainant or whoever it was that was
14 sponsoring the complaint had not identified him or
15 herself, correct?
16    A.   I was, let me, let's be clear because we, I
17 want to make sure I'm answering your question.  You're
18 using the term "anonymous complaint."  We usually use
19 the concern -- we usually use the phrase that it is an
20 "EthicsPoint complaint," or it came through the Ethics,
21 EthicsPoint hotline.  So I want to make sure that I'm
22 making clear to you I'm responding to the -- being told
23 about the EthicsPoint hotline complaint.
24    Q.   Right.
25    A.   Okay.

Page 21

1    Q.   And so that's what I understand --
2    A.   Okay.
3    Q.   -- to be the anonymous complaint, which is
4 now Exhibit 59 before you.  You see that?
5    A.   Yes.
6    Q.   And that is the anonymous complaint that,
7 that came through the EthicsPoint hotline on March
8 24th, 2022, correct?
9    A.   That's what's written here, and that's what
10 I'm reading.
11    Q.   That's in Exhibit 59.
12    A.   Okay.
13    Q.   Is that right?
14    A.   That's what I'm reading.
15    Q.   I understand that what you're saying is, hey,
16 I don't have any personal knowledge, all I have is this
17 exhibit before me, and that Exhibit 59 says -- has a
18 date on it, and you understand the content to be the
19 anonymous complaint; is that correct?  I'm not trying
20 to, I'm not trying to trick you on this at all.  I just
21 want to make sure that we're talking about the same
22 thing.  When we've been talking about "anonymous
23 complaint," do you understand that to be what's, what
24 is contained in Exhibit 59?
25    A.   Yes.  This describes the concern about

Lesia Crumpton-Young

February 16, 2024
Pages 22 to 25

Page 22

1 overtime misuse.
2    Q.   Right; and -- but at the time that you
3 discussed exhibit, or the contents of Exhibit 59 with
4 Albert Myres, did you have a name of anyone who was
5 making the complaint?
6    A.   No.
7    Q.   Okay.  At the time that you discussed the
8 anonymous complaint with Albert Myres, did you know who
9 the complainant was?
10    A.   I simply knew that there was a complaint that
11 was reported through the EthicsPoint hotline.
12        MR. HALL:  Okay.  Objection,
13 nonresponsive.
14    Q.   My question is, at the time that you
15 discussed the anonymous complaint with Albert Myres,
16 the chairman of the Board of Regents at TSU, did you
17 know the name of the complainant who had filed that
18 anonymous complaint?
19    A.   No.
20    Q.   To this day, do you know who the name of the
21 complainant was?
22    A.   No.
23    Q.   Also, when you spoke with Judge Caroline
24 Baker Hurley about the anonymous complaint, did you
25 know the name of the complainant who had sponsored or

Page 23

1 authored this EthicsPoint hotline complaint?
2    A.   That was not the essence of the conversation.
3        MR. HALL:  Objection, nonresponsive.
4    Q.   I'm asking you specific questions, and you've
5 been very helpful because you've been very careful in
6 the, in the way that you're answering.  So let me make
7 sure you're answering the question I'm asking.
8        At the time that you discussed the anonymous
9 complaint with Caroline Baker Hurley, did you know, did
10 you know the name of the complainant who sponsored this
11 EthicsPoint hotline complaint?
12    A.   No.
13    Q.   Okay.  Anytime that you discussed this
14 anonymous complaint with Hao Le, did you know the name
15 of the complainant of this Exhibit 59 that came through
16 the EthicsPoint hotline?
17    A.   No.
18    Q.   Would the answer be the same to that question
19 as to Darlene Brown specifically?  Did you ever know
20 the name of the complainant who filed this EthicsPoint
21 hotline complaint, which is Exhibit 59, when you spoke
22 with Darlene Brown?
23    A.   No.
24    Q.   Similarly, when you spoke to the HR person,
25 Yolanda Edmonds -- I think we've agreed that that's

Page 24

1 probably the name -- did you know the name of the
2 complainant who had authored or sponsored the contents
3 of this EthicsPoint hotline complaint?
4    A.   No.
5    Q.   And finally, Devi or Deva --
6    A.   Devi, Devi.
7    Q.   Devi, Devi, thank you.  Did you know when you
8 spoke with Devi Bala the name of the complainant who
9 had sponsored this EthicsPoint hotline report dated
10 3/24/2022, which is Exhibit 59?
11    A.   No.
12    Q.   Okay.  Now, I kind of combined some questions
13 there at one time, and I want to make sure I have it as
14 well.  Have you come to know who authored Exhibit 59?
15    A.   No.
16    Q.   Has anyone ever suggested to you that they
17 actually sponsored or were responsible for the filing
18 of the anonymous complaint?
19    A.   No.
20    Q.   Would it be correct for me to tell the Court
21 that throughout the entire period of time that you were
22 the president of TSU you never knew the name of the
23 person who sponsored or authored or filed this
24 EthicsPoint hotline anonymous complaint, which is
25 Exhibit 59?  Throughout the entire time when you were

Page 25

1 president, you did not know that person's identity?
2    A.   Yes.
3    Q.   Okay.  Thank you.  Prior to today, had you
4 ever seen Exhibit 59?
5    A.   Yeah, you asked me that earlier.  I don't
6 recall whether I have seen this, this in this form.  I
7 don't recall.
8    Q.   Okay.  Did Devi Bala ever tell you that she,
9 is it a female?
10    A.   Uh-huh, female.
11    Q.   Did Devi Bala ever tell you that she knew the
12 name of the complainant who filed this anonymous
13 complaint?
14    A.   No.
15    Q.   At any of the times that you talked with
16 Regent Myres, Baker Hurley, general counsel Hao Le,
17 Darlene Brown, Yolanda Edmonds, Devi Bala, at any of
18 those times that you spoke with them, did any of them
19 ever tell you that they know who sponsored the
20 anonymous complaint?
21    A.   Would you mind repeating that question?
22    Q.   Absolutely.
23        MR. HALL:  Would you please read that
24 back to her.
25        (Reporter read the requested



MAGNA
LEGAL SERVICES

Lesia Crumpton-Young

February 16, 2024
Pages 26 to 29

Page 26

1          portion of testimony)
2    A.  No, not that I can recall.
3    Q.  Okay.  To this day, are you aware of anyone
4 telling you that they knew who sponsored or authored
5 this anonymous complaint?
6    A.  No, I'm not aware of that today.
7    Q.  Would it be correct to tell the Court then
8 that at the time of the letter of separation that Devi
9 Bala signed to Chief Young, she had never revealed to
10 you she knew who the named complainant was for the
11 anonymous complaint?
12    A.  Would you mind repeating that back?
13    Q.  Oh, absolutely.  In fact, I thank you for the
14 opportunity because I thought it was a little confusing
15 myself.
16          Prior to January 9th, 2023, did Devi Bala
17 ever tell you she knew the name of the person who filed
18 this anonymous complaint, which is Exhibit 59?
19    A.  No.
20    Q.  Okay.  Thank you.  If you look at Exhibit 60,
21 please.
22    A.  I just want, I just want to make sure I'm
23 answering what you're asking.  I mean, it is the policy
24 of the EthicsPoint hotline for the, for there to be
25 anonymity.  So it is, we have -- it is frequent, it is

Page 27

1 common when things are put into the EthicsPoint hotline
2 that there is no name because there is anonymity that
3 protects that process.  So just want to make sure I
4 answered your questions because you -- it is, it is a
5 process that frequently has no names associated with
6 it.
7    Q.  Right.
8    A.  Okay.
9    Q.  So I appreciate that information.
10          MR. HALL:  I'm going to object to it as
11 nonresponsive because it's not responsive to any
12 question that I asked, but now I will give you a
13 question that that would be responsive to so that you
14 can answer it.
15    Q.  Was the intent and the practice of the
16 EthicsPoint hotline to try to encourage anonymity upon
17 the persons filing the complaints?
18          MS. BENNETT:  Objection, form.
19    A.  Yeah, yeah, now.  No.
20    Q.  Did the EthicsPoint hotline generally receive
21 anonymous complaints?
22          MS. BENNETT:  Objection, form.
23    A.  Yeah.
24    Q.  You can answer.
25    A.  No, I won't say it generally did.

Page 28

1    Q.  Okay.  Was this, was it unusual then to have
2 this Exhibit 59 arrive as an unsigned anonymous
3 complaint across the EthicsPoint hotline?
4          MS. BENNETT:  Objection, form.
5    A.  You said is it unusual?
6    Q.  Right.
7    A.  No, it's not unusual.
8    Q.  Okay.  Were most of the complaints that were
9 received on the EthicsPoint hotline, say in March of
10 2022, if you know, generally unsigned and anonymous?
11    A.  I have no knowledge of these at this -- well,
12 of the, of what came in in March to the EthicsPoint
13 hotline.
14    Q.  But what we do know is that the complaint
15 that came against Chief Mary Young was unsigned and
16 anonymous, correct?
17          MS. BENNETT:  Objection, form.
18    A.  And I, I don't know any of that.  I can't
19 speak to that.  I don't, I don't get the direct
20 information out of the EthicsPoint hotline --
21    Q.  Okay.
22    A.  -- in my role as president.
23    Q.  All right.  Look at Exhibit 60.  Oh, by the
24 way, this instance, did you actually have the written
25 complaint, this anonymous complaint, 59, with you when

Page 29

1 you discussed it with Albert Myres, Caroline Baker
2 Hurley, or any of the individuals you named?
3    A.  No.
4    Q.  Did they know the contents of the anonymous
5 complaint when you spoke to them or were you the person
6 giving them information about what it contained?
7          MS. BENNETT:  Objection, form.
8    A.  I'm not sure how to answer that question.
9    Q.  So when you went to Albert Myres to discuss
10 and, and you discussed the anonymous complaint with
11 him, did he already know about it or were you telling
12 him about it?
13          MS. BENNETT:  Objection, form.
14    Q.  You can answer.
15    A.  You said when I went.  I, I didn't go.
16    Q.  When you spoke to Albert Myres about the
17 anonymous complaint, did he already know about it or
18 were you first introducing him to it?
19          MS. BENNETT:  Objection, form.
20    Q.  You can answer.
21    A.  He, he, he told me about --
22    Q.  Okay.
23    A.  -- the conversation.  He initiated the
24 conversation.
25    Q.  So Albert Myres already knew about the



Lesia Crumpton-Young

February 16, 2024
Pages 30 to 33

Page 30

1 anonymous complaint, Exhibit 59, before you spoke to
2 him about it?
3    A.  Correct.
4    Q.  Did you know about the anonymous complaint
5 before he told you about it?
6    A.  No.
7    Q.  Okay.  Do you know approximately when that
8 occurred?
9    A.  I just remembered that I was actually on
10 vacation.
11    Q.  Okay.  And where were you vacationing?
12    A.  Mexico.
13    Q.  Do you know generally when that would have
14 been?
15    A.  I don't recall exactly, but usually -- what
16 is it I was doing in 2022.  I'm sorry.  I just don't
17 recall exactly when it was in 2022.
18    Q.  Okay.  What do you recall Albert Myres saying
19 to you about this anonymous complaint?
20    A.  He informed me that they had received a
21 complaint and that the internal auditor was handling
22 the complaint and that they would keep me apprised.
23    Q.  And are you telling the Court that when
24 Albert Myres told you about the anonymous complaint he
25 suggested to you that the internal auditor was already

Page 31

1 investigating it?
2    A.  He --
3        MS. BENNETT:  Objection, form.
4    A.  No, he, he explained to me that she would be
5 handling it.  He did not give me any specifics about
6 what that was at that time, in that call.
7    Q.  Okay.  Do you know how Albert Myres came in
8 possession of the anonymous complaint?
9    A.  I do not.
10    Q.  But as I understand your testimony so far,
11 the head of the Board of Regents of TSU had knowledge
12 of the anonymous complaint and told you about it,
13 correct?
14    A.  Correct.
15    Q.  That's the first time you knew about it?
16    A.  That's the first time I knew about it.
17    Q.  And what did he tell you the complaint
18 alleged?
19    A.  Fraudulent use of overtime pay.  That was my
20 understanding.
21    Q.  And do you recall Albert Myres saying that
22 the chief of police herself was fraudulently getting
23 paid overtime pay or that -- or did he give you any
24 more --
25    A.  He --

Page 32

1    Q.  -- characterization that he used?
2    A.  He, he said to me it was fraudulent use of
3 overtime pay.  I mean, that's the term I recall.
4    Q.  Once Albert Myres, the head of the Board of
5 Regents at TSU, told you that, what did you do with
6 that knowledge?
7    A.  Asked him, you know, asked him what is the
8 specific plan.  I mean, as I said, I was on vacation so
9 I was out of the country.  He, he assured me that they
10 were going to discuss it and -- with the internal
11 auditor and that they were going to investigate, I
12 think he did use that word, but they were going to
13 discuss investigating something of that sort.
14    Q.  Who is the "they"?
15    A.  The internal auditor.  The internal auditor
16 and the board.
17    Q.  Okay.
18    A.  Because the internal auditor reports to the
19 board.
20    Q.  Got it.  So he told you that they were going
21 to investigate it, and that meant the internal auditor
22 and the board itself would be investigating.  That was
23 your understanding?
24    A.  Well, I mean, I want to make sure we're
25 clear.  My understanding is that the internal auditor

Page 33

1 was going to do the work, and naturally because she
2 reports to the board and the audit committee, that
3 they, they as a collective, a team, would work on what
4 needed to be done, and that was a very general
5 conversation.
6    Q.  I am correct, though, that the Board of
7 Regents is the top policy-making body of TSU, correct?
8        MS. BENNETT:  Objection, form.
9    A.  Yeah, I wouldn't, I wouldn't describe it that
10 way.
11    Q.  You wouldn't?
12    A.  Uh-uh.
13    Q.  Okay.  How would you describe the role of the
14 Board of Regents?
15    A.  They're the governing body for the
16 university.
17    Q.  Okay.  When you heard Albert Myres says --
18 say that they were going to be working with the
19 internal auditor on the investigation, did you
20 understand that to be an investigation at the governing
21 body level, that is the Board of Regent level?
22    A.  I want to clarify.  I did not say that he
23 said they would be working with the internal auditor.
24 He said they will look into the matter and they will
25 get back to me.  I did not -- I don't want to imply



Lesia Crumpton-Young

February 16, 2024
Pages 34 to 37

Page 34

1 that or nor state -- I don't want it to sound that I
2 said the Board of Regents, that they were actively
3 engaged in an investigation, no.  He was simply
4 conveying to me that they were going to look into the
5 matter.  They -- and they would be informing me of the
6 outcome.
7    Q.  Okay.
8    A.  That was the initial conversation.  Very
9 brief conversation.
10    Q.  And you're talking about the "they" being the
11 Board of Regents would be looking into the matter?
12    A.  It was my understanding as it was going to be
13 the internal auditor who would be looking into the
14 matter and the audit committee, et cetera, would be
15 working with her to inform me of their findings about
16 the complaint.
17    Q.  Okay; and Albert Myres did not give you a
18 copy of the complaint.  Is that correct?
19    A.  I was in Mexico on a cell phone during that
20 conversation.
21    Q.  Did Albert Myres ever give you a copy of the
22 complaint?
23    A.  No, Albert Myres never gave me a copy of the
24 complaint that I can remember.
25    Q.  Did anyone give you a copy, either electronic

Page 35

1 or hard copy, of the anonymous complaint?
2    A.  I, I know we said this earlier.  I do not
3 recall getting a hard copy of the complaint.  I don't
4 recall that.
5    Q.  Right, and I'm not limiting it now to hard
6 copies.  I'm asking did they ever supply you with a
7 copy of it, whether it was electronic, computerized,
8 text, or a hard physical copy of the complaint?
9    A.  I don't recall that.  I don't --
10    Q.  Okay.
11    A.  -- I don't know.
12    Q.  Okay.  Did you have any subsequent
13 discussions after that initial discussion with Albert
14 Myres about this anonymous complaint?
15    A.  Conversations about the anonymous complaint
16 or conversations about the fraudulent use of overtime?
17    Q.  The complaint.
18    A.  No, I don't -- I, I didn't have any specific
19 conversations about the complaint.  I mean, that's not,
20 that's not what -- that's not -- no.
21    Q.  Okay.
22    A.  I had no specific conversations about the
23 document that came in over EthicsPoint.
24    Q.  Okay.  Did you gain any knowledge as to
25 whether Albert Myres had seen the actual complaint, the

Page 36

1 anonymous complaint?
2    A.  It's not customary for individuals to see at
3 this point hotline printouts, so I would -- I don't
4 know.  Albert Myres would have to answer that question
5 but...
6    Q.  Are you finished?
7    A.  I don't know how to answer that question.  I
8 mean, I think Albert Myres will have to answer that
9 question.
10    Q.  Okay.
11    A.  But it's not if, you know, I --
12        MR. HALL:  So I'm going to object to the
13 nonresponsive portion.
14    Q.  And ask you, are you aware of any of the
15 Board of Regent members having seen, read, been
16 provided a copy of the anonymous complaint before Mary
17 Young was terminated?
18    A.  I don't know.
19    Q.  Okay.  Are you aware of anyone at TSU
20 providing Mary Young with a copy of a signed copy of
21 the anonymous complaint before she was terminated?
22    A.  Yes.
23    Q.  Who?
24    A.  Darlene Brown.
25    Q.  We took Darlene Brown's deposition in this

Page 37

1 case.  Have you had an opportunity to read it?
2    A.  No.
3    Q.  Darlene Brown admits that she never provided
4 a signed copy of the anonymous complaint to Mary Young.
5 What's the source of your information that she, that
6 she did, in fact, give a signed copy to Mary Young?
7    A.  I was told that she gave a signed copy to
8 her.
9    Q.  Who told you that?
10    A.  I think Darlene Brown.
11    Q.  Okay.  So if Darlene Brown has admitted that
12 she never gave a signed complaint to Mary Young, you
13 don't have anything to contradict that, do you?
14    A.  What was the question again?
15    Q.  Sure.  If Darlene Brown in this lawsuit has
16 already admitted she never provided a signed copy of
17 the anonymous complaint to Mary Young, do you have any
18 evidence to contradict that?
19        MS. BENNETT:  Objection, form.
20    A.  Well, I just happen in the section you asked
21 me to look at, in 59, I see a page that says on, that
22 on May 25th that there's a signature here.
23    Q.  Yeah, but do you see it only says it was
24 received.  She's acknowledging when she received the
25 complaint, not that she made the complaint.  You



Lesia Crumpton-Young

February 16, 2024
Pages 38 to 41

Page 38

1 understand the distinction there?
2    A.   No.
3    Q.   Okay.  Read what's above her signature.
4    A.   She received the complaint on May 25th, 2028,
5 via email; and it's signed Darlene Brown.
6    Q.   Right; but you don't understand that that
7 means that Darlene Brown actually was the complainant,
8 do you?
9    A.   Let me make sure I'm clear.  This is a signed
10 copy of the complaint that I'm looking at.  It's a
11 signed copy of the complaint.
12    Q.   Okay.  That --
13    A.   And it is my understanding, it was my
14 understanding that this signed copy of the complaint
15 was presented to Mary Young.  That's what I was told.
16        MR. HALL:  Okay.  So object,
17 nonresponsive.
18    Q.   My question to you is, do you understand
19 Darlene Brown to have been the complainant, the
20 complainant, the person who actually authored that
21 ethics complaint?
22    A.   The EthicsPoint hotline on our campus had,
23 when individuals process it, et cetera, et cetera,
24 they, if they're, if they're given a copy of it, they
25 sign it.  Is that what we're saying?

Page 39

1        MR. HALL:  Objection, nonresponsive.
2    Q.   My question to you is, do you understand
3 Darlene Brown to have filed that ethics complaint, that
4 she was, in fact, the complainant?
5    A.   No, Darlene Brown is not the complainant.
6    Q.   Okay, okay.  Are you aware of Darlene Brown
7 -- oh, no, I'm sorry.  Are you aware of any Board of
8 Regent, Hao Le, Devi Bala, Yolanda Edmonds, Caroline
9 Baker Hurley, Albert Myres, ever having a signed copy
10 of the anonymous complaint that was signed by the
11 complainant?
12        MS. BENNETT:  Objection, form.
13    A.   Yeah.  This is, this is the customary
14 process.  There's a signed copy of the complaint, and
15 the signed copy of the complaint, I was told, was given
16 to Mary Young.  That is our process, and I was told
17 that it was followed.
18        MR. HALL:  Objection, nonresponsive.
19    Q.   I'm asking you a different question.  I
20 promise you we're going to get to what you want to
21 answer, but my, my question is different.  Are you
22 aware of any of those people you talked to, Albert
23 Myres, Caroline Baker Hurley, Hao Le, Darlene Brown,
24 Yolanda Edmonds, a Devi Bala, any of them having a
25 signed copy of the EthicsPoint complaint that was

Page 40

1 signed by the complainant, the actual person who filed
2 the complaint, and giving it to Mary Young?
3    A.   I don't know.
4    Q.   Okay, good deal.  At the very least we can
5 tell the Judge, you, as the president of TSU, have
6 never seen a signed copy of the complaint, the
7 anonymous complaint that was, that was signed by the
8 complainant who actually filed that complaint, correct?
9        MS. BENNETT:  Objection, form.
10    A.   Yeah, I have seen -- I have been told that
11 the signed copy that you have in the folder was, by
12 Darlene Brown was given to Mary Young.
13        MR. HALL:  Okay.  Objection,
14 nonresponsive.
15    Q.   You know who the -- you know what I mean when
16 I say "complainant."  The complainant is the person who
17 actually authored the anonymous complaint.  You
18 understand that, that definition?
19    A.   That, that's not consistent with, with our
20 definitions in higher education.
21    Q.   Okay.  I'm about to show --
22    A.   So, for example, if we receive an anonymous
23 complaint, in Title IX, we do an investigation, and
24 that, that complaint becomes the Title IX
25 investigator's complaint once he's done his

Page 41

1 investigation.
2        MR. HALL:  Okay.  Objection,
3 nonresponsive.
4    A.   I mean that's just the system.
5    Q.   I'm asking you specifically as to this
6 complaint, this anonymous complaint, which is
7 Exhibit 59, have you ever seen a document or been
8 provided a document that was signed by the complainant,
9 the author of the ethics complaint?
10        MS. BENNETT:  Objection, form.
11    Q.   Have you ever seen that?
12    A.   I -- what is the question again?
13    Q.   Sure.  Have you ever seen a signed copy of
14 the EthicsPoint complaint, this anonymous complaint,
15 and the signature was that of the complainant, the
16 actual person who filed the complaint?
17        MS. BENNETT:  Objection, form.
18    A.   Yeah, I, I can't answer that question.
19    Q.   Well, have you seen it or not?
20        MS. BENNETT:  Objection, form.
21    A.   Yeah, I have already answered the question to
22 the best of my ability that I was informed that the
23 complaint was signed by Darlene Brown and that that
24 signed complaint was given to Mary Young.
25    Q.   Okay.



Page 42

1   A.  Here in the binder you asked me to look at
2  the signed complaint.  It looks, it looks to be what I
3  was told happened.
4   Q.  Right.  That Darlene Brown, you're relying
5  upon Darlene Brown's signature to be the signed
6  complaint; is that right?
7   A.  Yeah, she's the -- in this instance she's the
8  compliance officer who handled the complaint.  So, so
9  when she handled it and she investigated it, then she
10  signed it to say that it, to authenticate it.
11      MR. HALL:  Objection, nonresponsive.
12   A.  Well, that's our, that's the university
13  process, and so I'm being responsive to --
14   Q.  I'm not, I'm not --
15   A.  -- describing what is the process.
16   Q.  I'm not here to debate.  I'm here to ask you
17  questions --
18   A.  Okay.
19   Q.  -- and you're here to answer.
20   A.  I'm doing my best, I'm doing my best.
21   Q.  Are you -- is it your contention in this case
22  that Darlene Brown is the complainant, the person who
23  authored the anonymous complaint?
24   A.  My position is that Darlene Brown is acting
25  in the role of the compliance officer through her being

Page 43

1  the internal auditor who investigated the allegations
2  and therefore signed the complaint on behalf of the
3  university because the investigation showed this to be
4  true.
5   Q.  Okay.
6   A.  That fraudulent activity, fraudulent misuse
7  of overtime was happening in the police department, and
8  it was being, it was being directed to the officers by
9  Mary Young.
10      MR. HALL:  Okay.  Now I have your
11  explanation, I have to object as nonresponsive.
12   Q.  Let me show you why I'm, I'm pressing you on
13  this issue.  Would you turn to Exhibit 62 -- no, 60.2.
14  It's going to be that little subpart there.  This is
15  Texas law about filing a complaint against a police
16  officer.
17      Did you know before today that Texas had a
18  specific law about what you have to have before you
19  file a complaint against a police officer?  And my
20  question is simply, did you know that?
21   A.  No, I didn't know that.
22   Q.  Okay.  So this is Texas law, Texas Government
23  Code 614.022.  It says, "To be considered by the head
24  of a state agency or by the head of a fire department,
25  a local law enforcement agency, the complaint" -- and

Page 44

1  we're talking about a complaint against a police
2  officer -- "must be in writing and it must be signed by
3  the person making the complaint."  Do you see that?
4   A.  Yes.
5   Q.  Darlene Brown says she did not make this
6  complaint.  She did not sign the complaint as a
7  complainant.  She simply acknowledged when she received
8  this anonymous complaint.  That's her, her testimony.
9      Assuming that is correct, did you as the
10  president or Albert Myres or any of these people that
11  you talked to ever have the complaint signed by the
12  person making the complaint?
13      MS. BENNETT:  Objection, form.
14   A.  I am going to answer because I believe this
15  has been satisfied because the person who is bringing
16  the complaint, substantiating the complaint through the
17  EthicsPoint hotline, was Darlene Brown through the
18  investigation.
19      MR. HALL:  Objection, nonresponsive.
20   Q.  You believe Darlene Brown is the complainant?
21   A.  I believe Darlene Brown is the person who
22  investigated it and who authenticated the complaint.
23   Q.  Okay.  I'll ask it a different way.  Are you
24  aware of anybody else who signed the anonymous
25  complaint, other than Darlene Brown?

Page 45

1   A.  I'm just aware that Darlene Brown signed it.
2   Q.  Okay.  Thank you.  If you will then turn to
3  subpart 3, take a moment and read this.  Have you had
4  an opportunity to read Texas Government Code 614.023?
5   A.  Yes.
6   Q.  All right.  During the time that you talk
7  with Albert Myres, Caroline Baker, Hao Le, Darlene
8  Brown, Yolanda Edmonds, and Devi Bala, did you know
9  that this Texas law existed?
10   A.  I can't say that I def -- that I did.
11   Q.  Let's -- you want to read this?
12   A.  It's the same one we just looked at.  This is
13  the same one we just looked at.
14   Q.  No, ma'am, this is the next section of the
15  law.
16   A.  6.14022, 6.14023 (sic).
17   Q.  Right.
18   A.  Okay.
19   Q.  This is the -- first you have to have a
20  signed complaint signed by the complainant.  Then the
21  next is this section that we're reading.
22   A.  Uh-huh.
23   Q.  And that's 614.023 of the Texas Government
24  Code that says:  "A copy of the signed complaint
25  against a law enforcement officer of this state or a



Lesia Crumpton-Young

February 16, 2024
Pages 46 to 49

Page 46

1 fire fighter, detention officer, county jailer, a peace
2 officer appointed or employed by a political
3 subdivision of this state shall be given to the officer
4 or employee within a reasonable time after the
5 complaint is filed."
6        As I understand from the document 59, Exhibit
7 59, this complaint was filed in March, on March 24th,
8 2022. My question to you is, do you know whether
9 Darlene Brown ever provided a signed copy of a
10 complaint by the complainant reasonably, within a
11 reasonable time after that anonymous complaint was
12 filed with TSU?
13     A. What's the question again?
14     Q. Sure. Do you know whether Darlene Brown ever
15 provided a signed copy of the anonymous complaint that
16 was signed by the complainant within a reasonable time
17 after January 24th, 2022?
18     A. January 4th, 2022?
19     Q. January 24th, 2022 is when the ethics, this
20 anonymous complaint came in.
21     A. No, that's not true. Are you trying to trick
22 me?
23     Q. No, ma'am.
24     A. Okay. I think you made me read March of 20
25 --

Page 47

1     Q. What did I say?
2     A. You said January.
3     Q. I'm sorry, March. March 24th, 2022.
4     A. Okay.
5     Q. Okay. Let me -- thank you for helping me on
6 that. I promise you I'm going to beat you not by
7 tricking you. I'm going to beat you because I'm right.
8        MS. BENNETT: Objection.
9     Q. So let me just rephrase. Do you have any
10 evidence that Darlene Brown served or provided Mary
11 Young with a signed complaint by the complainant within
12 a reasonable time after January -- I mean, sorry, after
13 March 24th, 2022?
14     A. So let me just make sure because you've had
15 me read these. This Government Code 6.14023 (sic) as
16 read here speaks about termination and those issues
17 associated with complaints. Mary Young according to,
18 if I, if I recall her termination letter appropriately,
19 she was not terminated for any of these factors
20 associated with this signed complaint.
21     Q. Okay.
22     A. So this, does this apply to what we're
23 talking about today or am I confused?
24        MR. HALL: Objection, nonresponsive, but
25 I'll answer your question. You're both confused and

Page 48

1 wrong.
2     A. So Mary Young's termination letter was for
3 violating her administrative leave policy. That is
4 my --
5     Q. Say that, say that one more time.
6     A. She -- it's my understanding --
7     Q. No, no, say what you just said.
8     A. It's my understanding that she violated her
9 administrative leave by causing dissension and
10 harassing officers on campus.
11     Q. And why was she on administrative leave?
12     A. She was on administrative leave during the
13 investigation of all of these things.
14     Q. Of the anonymous complaint?
15     A. During, during the investigation of her
16 behavior.
17     Q. Of the anonymous complaint?
18     A. No, it was during the -- we were looking at
19 the -- the investigation had already found that she had
20 committed fraud.
21     Q. That was the investigation of the anonymous
22 complaint, is that what you're talking about?
23     A. Yes.
24     Q. Okay.
25     A. That's my understanding, was the

Page 49

1 investigation of the complaint that she -- fraudulent
2 use of overtime.
3     Q. Right.
4     A. Okay.
5     Q. What we've been talking about, Exhibit 59,
6 the investigation of that anonymous complaint, correct?
7     A. Yes. It was the investigation of the
8 fraudulent use of overtime, yes.
9     Q. Which was communicated in the anonymous
10 complaint, which is Exhibit 59, correct?
11     A. Yes.
12     Q. Thank you.
13     A. 59, yes.
14     Q. Okay. Now we're going to come to that
15 because I want you to read further here.
16     A. Okay.
17     Q. In this text Government Code 614.023 it says,
18 "Disciplinary action may not be taken against the
19 officer or employee unless a copy of the signed
20 complaint is given to the officer or employee." Do you
21 understand that this means that if you did not provide
22 the signed complaint by the complainant to Mary Young
23 you couldn't put her on leave of absence?
24     A. Well, this --
25        MS. BENNETT: Objection.



Lesia Crumpton-Young

February 16, 2024
Pages 50 to 53

Page 50

1   A.  -- this says --
2         MS. BENNETT:  Objection, form.
3   Q.  You can answer.
4   A.  Well, this says that it simply needs to be a
5   copy of the signed complaint.  She was given a copy of
6   the signed complaint.
7   Q.  No, ma'am, Darlene Brown says she never was.
8   A.  Part --
9         MS. BENNETT:  Object.
10  A.  Part --
11        MR. HALL:  I understand you're objecting.
12  I got you.  It's not as to form.  You just disagree
13  with my question.
14        MS. BENNETT:  You didn't ask a question.
15  You made a statement.
16        MR. HALL:  Well --
17        MS. BENNETT:  My objection is to your
18  statement.
19  Q.  If Darlene Brown says she never provided the
20  signed complaint to Mary Young, would you agree Mary
21  Young should never have been placed on leave of
22  absence?
23        MS. BENNETT:  Objection, form.  Calls for
24  a legal conclusion.
25  A.  I, when I read this, it says, it says,

Page 51

1   "unless a copy of the signed complaint is given to the
2   officer," and I was told that a signed complaint was
3   given to the officer.
4   Q.  And who told you that?
5   A.  Darlene Brown.
6   Q.  Okay.  Thank you.  And if the, if the signed
7   complaint was not provided to her, to Mary Young, no
8   disciplinary action should have been taken, correct?
9         MS. BENNETT:  Objection, form.  Calls for
10  a legal conclusion.
11  Q.  So let me ask you your understanding of this
12  language when it says "Disciplinary action may only be
13  taken against the officer or employee unless a copy of
14  the signed complaint is given to the officer or
15  employee."  Do you understand, you, your personal
16  understanding, that you could not have placed Mary
17  Young on leave of absence if you did not provide her
18  with a signed complaint?
19  A.  Mary Young was provided with a signed
20  complaint.
21  Q.  Right.  And if she was not provided with a
22  signed complaint, according to your understanding of
23  this language, she should never -- she could not be
24  placed on leave of absence, correct?
25  A.  Mary Young was provided with a signed

Page 52

1   complaint.
2         MR. HALL:  Objection, nonresponsive.
3   Q.  If she was not provided with the signed
4   complaint, according to this language, would you agree
5   Mary Young should not have been placed on leave of
6   absence?
7         MS. BENNETT:  Objection, form.  Asked and
8   answered.
9   Q.  Answer my question, ma'am.
10  A.  What is --
11  Q.  She's only, she's only saying that she thinks
12  my question is improper, but you have to answer it.
13  A.  What is the question?
14  Q.  If Mary Young was never provided a signed
15  complaint, according to your understanding of this
16  language, Mary Young should never have been placed on
17  leave of absence, correct?
18        MS. BENNETT:  Objection, form.
19  A.  That's not correct.  I mean, there are a
20  number of reasons why someone could be placed on leave
21  of absence, so -- and Mary Young was given a copy of
22  the signed complaint.  So it's a hypothesis or a
23  rhetorical question, and I've answered it.
24  Q.  Okay.
25  A.  She, she did receive it, and there are a

Page 53

1   number of instances where she could have been placed on
2   administrative leave outside of the scope of even what
3   we're discussing today.
4         MR. HALL:  Okay.  Objection,
5   nonresponsive.
6   Q.  Let's move further.
7   A.  Okay.
8   Q.  Subpart C.  No, no.
9   A.  Oh.
10  Q.  Same law.
11  A.  Okay.  Okay.
12  Q.  Same law, subpart C.  In addition, this is in
13  addition to no disciplinary action being taken to the
14  requirement of Subsection B, the officer or employee
15  may not be indefinitely suspended or terminated from
16  employment based on the subject matter of the complaint
17  unless the complaint is investigated and there is
18  evidence to prove the allegation of misconduct.
19        First part, in addition to Subsection B,
20  meaning you have to first have had a signed complaint.
21  I understand you say Darlene Brown signed it when she
22  -- acknowledging her receipt of it, but do you
23  understand that Mary Young, if for some reason we can
24  prove that Mary Young was never provided a signed
25  complaint, if we can prove that, you-all would have



Lesia Crumpton-Young

Page 54

1  violated state law if you terminated a -- terminated
2  her based on that allegation or you disciplined her
3  based on that allegation, do you agree?
4      A.  But that's not --
5          MS. BENNETT:  Object.
6      Q.  Do you agree with that?
7          MS. BENNETT:  Objection.
8          MR. HALL:  Form.
9          MS. BENNETT:  Objection, form.
10         MR. HALL:  Okay.
11     A.  No, I don't agree with that.
12     Q.  Okay.  Good deal.  So let's move further.
13  You understand that we filed a lawsuit against you-all,
14  against TSU because you violated this law.  Do you
15  understand that?
16         MS. BENNETT:  Objection.
17     A.  We did not --
18         MS. BENNETT:  Objection, form.
19     Q.  Do you understand we alleged you violated
20  that law?  The laws that we just went over.  Do you
21  understand that I as the lawyer for Mary Young sued TSU
22  and you for violating that law?
23     A.  No --
24         MS. BENNETT:  Objection.  Objection,
25  form.  You have just got to give me a moment to get my

Page 55

1  objection on the record.  Otherwise, we are talking
2  over each other so...
3      Q.  And --
4      A.  No, I do not understand that because Part B
5  says the officer or employee may not be indefinitely
6  suspended.  We did not indefinitely suspend Mary Young.
7  "Or terminated from employment based on the subject
8  matter of the complaint."  She was not terminated from
9  employment based on the subject matter of the
10  complaint.
11     Q.  Okay.
12     A.  And she was not indefinitely suspended.
13         MR. HALL:  Okay.  Objection,
14  nonresponsive.
15     Q.  All I'm asking you now is do you understand
16  we alleged in our lawsuit against you and TSU that you
17  broke that law?  You understand that was our
18  allegation?
19     A.  I do not understand that --
20     Q.  Okay.
21     A.  -- because we did not break the law.  I think
22  it is a faulty allegation.
23     Q.  Right.  In other words, we made the
24  allegation, but you think it's faulty, correct?
25     A.  Well, I, I think it's inconsistent with the

Page 56

1  law that you have asked me to read.
2      Q.  Okay.
3      A.  It's inconsistent.  It doesn't apply.
4      Q.  Okay.  So why don't we go to 61, Exhibit 61.
5  Ma'am, do you understand that a judge agreed with us
6  and said that you probably violated that law?
7          MS. BENNETT:  Objection, form.
8  Objection.
9      Q.  Are you aware a judge signed an order saying
10  that?
11         MS. BENNETT:  Objection, objection.
12     A.  No.
13     Q.  Okay.  Look at -- in Exhibit 61, on Page 1,
14  the subsection at the bottom that says, "The injury is
15  imminent."  Do you see that, that paragraph?
16     A.  Yes.
17     Q.  "Despite repeated requests by Petitioner to
18  have Respondent comply with Texas law..."
19         Respondent is you-all at TSU, that, that's
20  who the respondent is.  If you look up at the top,
21  you'll see TSU and responsible TSU agents.  Y'all are
22  identified as the Respondent.
23         "Respondent is threatening to terminate or
24  discipline or engage in an unlawful employment action
25  against Petitioner in clear violation of Texas law."

Page 57

1  You understand that a judge found this against you-all?
2          MS. BENNETT:  Objection, form.
3      Q.  Did you know that?
4          MS. BENNETT:  Objection, form.
5          MR. HALL:  What's the -- what's the
6  objection?
7          MS. BENNETT:  That you are
8  mischaracterizing the Judge's decision here.
9          MR. HALL:  I'm just reading the Judge's
10  --
11         MS. BENNETT:  You are reading a section
12  that I am certain that you authored.
13         MR. HALL:  No.  The Judge authored it
14  because she signed it.  But anyway, you and I are not
15  going to debate this.
16         MS. BENNETT:  Right, we're not.  I'm
17  objecting to your question.
18     Q.  At least in the Judge's order, it says
19  "Respondent" -- that's TSU and you -- "are threatening
20  to terminate or discipline or engage in an unlawful
21  employment action against the petitioner, Mary Young,
22  in clear violation of Texas law."
23     A.  That is an inaccurate statement.
24     Q.  Okay.  All right.  So you disagree with the
25  Judge on that?



Lesia Crumpton-Young

Page 58

1           MS. BENNETT: Objection. Objection,
2 form.
3      Q.   Correct, you disagree?
4      A.   I disagree.
5      Q.   Okay.
6      A.   We never threatened.
7      Q.   Let's --
8      A.   We never threatened to terminate or
9 discipline Mary Young.
10     Q.   Okay. Go to Exhibit 62.
11     A.   To my knowledge, no one did that.
12     Q.   Yes, ma'am. Go to Exhibit 62. Are you
13 there?
14     A.   Uh-huh.
15     Q.   Is that a "yes"?
16     A.   Yes, yes, I'm here.
17     Q.   Ma'am, you just said that you never
18 threatened Mary Young.
19     A.   Uh-huh.
20     Q.   This is your document from TSU that's
21 authored by Devi Bala. Do you see that?
22     A.   Yeah, just as I've said.
23     Q.   What?
24     A.   Paragraph 2 says that, "We are temporarily
25 relieving you of your duty with pay until notice." It

Page 59

1 says, "The university will make an ultimate decision."
2 There was no threat of termination. There was no
3 threat of -- I want to use the exact phrase now that I
4 --
5           So there was no threat of indefinitely
6 suspending or terminating them based on the subject
7 matter of the complaint. That was not what's in this
8 letter.
9      Q.   Look at subpart B of that, what you just
10 read. No, no, what you just read, the law. What does
11 subpart B say, no disciplinary action shall be taken?
12     A.   Yes, this is not a disciplinary action.
13     Q.   Okay.
14     A.   She was, she was provided her pay, and it
15 said we are temporarily relieving you, and that the
16 university is going to make an ultimate decision.
17     Q.   Okay.
18     A.   That is in compliance with the law.
19     Q.   Okay.
20     A.   And we were -- we had never threatened nor
21 done anything to violate this law against Mary Young.
22 This is simply a letter letting her know that they are
23 temporarily relieving her of duties, never changed her
24 pay until there's some type of decision made.
25           MR. HALL: Okay. Objection,

Page 60

1 nonresponsive.
2      Q.   What would be a disciplinary action as you
3 understand it?
4      A.   Well, according to this code, if she had been
5 indefinitely suspended or if she had been terminated --
6      Q.   How about --
7      A.   -- and that didn't happen.
8      Q.   How about if she had been taken, her duties
9 had been taken away?
10     A.   This --
11     Q.   No, I'm asking you.
12           MS. BENNETT: Objection.
13     Q.   Would that be a disciplinary action?
14     A.   That's not a disciplinary action.
15     Q.   How about if she had been told "don't come
16 back on campus" for any reason, would that be a
17 disciplinary action?
18           MS. BENNETT: Objection, form.
19     A.   Yeah, she was not told that. She was --
20     Q.   No, no, I'm asking you, would that have been
21 a disciplinary action --
22           MS. BENNETT: Objection, form.
23     Q.   If she, if she had been told "don't come back
24 on campus"?
25           MS. BENNETT: Objection, form.

Page 61

1      A.   That wouldn't have been told to her. That
2 was not told to her.
3      Q.   I'm, I'm asking you a different question,
4 Ms. Young, Crumpton-Young. I'm asking you, would that
5 be considered a disciplinary action if you told an
6 employee "don't come back on campus"?
7           MS. BENNETT: Objection, form.
8      A.   Yeah, that's such a broad statement, so I, I,
9 I cannot answer that question as posed.
10     Q.   Okay. How about if you, if a, you told an
11 employee "I'm not going to allow you to get back on
12 your computer at work" and blocked the employee from
13 getting back on the computer. Would that be a
14 disciplinary action?
15     A.   No, that's not a disciplinary action.
16     Q.   How about -- how about --
17     A.   We do that at, that's that, we do that in
18 higher education frequently.
19     Q.   How about, how about if you locked the
20 employee out of their office, would that be a
21 disciplinary action?
22           MS. BENNETT: Objection, form.
23     A.   That is not a disciplinary action. This
24 person has been -- when we, when we have someone on
25 paid administrative leave, there are rules associated




Lesia Crumpton-Young

February 16, 2024
Pages 62 to 65

Page 62

1  with being on paid administrative leave. The
2  expectation is that the employee will have the
3  appropriate behavior to comply with that administrative
4  leave period.
5          MR. HALL: Okay. Object to the
6  nonresponsive portion.
7      Q.  And am I correct then that Exhibit 2 also had
8  attached to it the anonymous unsigned complaint?
9      A.  I, I have not seen this.
10     Q.  But you see it now?
11     A.  Well, I see it in this book, but I also see a
12  copy of the signed complaint a few sections earlier.
13     Q.  Ma'am.
14     A.  So I, I was told -- I want to just be clear
15  -- I was told as president that Mary Young had a signed
16  copy of the complaint, and what I see here signed by
17  Darlene Brown is an example of a signed complaint.
18     Q.  Okay. I understand.
19         MR. HALL: So object to the nonresponsive
20  portion of your answer.
21     Q.  I want to move now to Exhibit 6 --
22     A.  I thought my answer was good.
23         MR. HALL: Okay. Object to that as well.
24     Q.  Because if you turn over to Exhibit 67.
25     A.  Okay. That's --

Page 63

1      Q.  I'm going to come back to the other ones.
2  67.
3      A.  67.
4      Q.  Are you aware that after that letter that we
5  just went over another district court judge found that
6  you-all had broken the law?
7          MS. BENNETT: Objection, form.
8      Q.  Did you know that?
9      A.  I'm not aware of that.
10     Q.  Okay. Well, let me read to you at the
11  bottom. In fact, the judge finds that you specifically
12  broke the law, and if you look there on the first page
13  of Exhibit 67, at the bottom, the entry --
14         THE WITNESS: Is it possible for me to use
15  the ladies' room?
16         MR. HALL: Of course it is. Hold on.
17  He's going to go off and then you're going to take your
18  mic off.
19         THE VIDEOGRAPHER: Going off the record.
20  The time is 2:43.
21         (Break taken)
22         THE VIDEOGRAPHER: We're on the record.
23  The time is 2:56.
24     Q.  Would you please turn again to Exhibit 67.
25  This is a court order, what's known as a temporary

Page 64

1  restraining order. And if you look at the third page
2  of this document, do you see the date on that document?
3  Down at the bottom?
4      A.  Yes.
5      Q.  This order was signed December 7th, 2022. Do
6  you see that?
7      A.  Yes.
8      Q.  Okay. If you go back to the first page, you
9  do understand that I as Police Chief Mary Young's
10  lawyer have sued you in your official capacity as the
11  former president of TSU. Did you know that?
12     A.  Yes.
13     Q.  Okay; and we told the Court, we filed our
14  petition with the Judge and complained that you-all
15  were taking action against Chief Young contrary to the
16  law. That's our allegation. And then at the bottom of
17  the first page of this Exhibit 67, I want to read this
18  to you. "This injury is imminent." Do you see that,
19  that paragraph, "This injury is imminent," which is the
20  bottom paragraph? Do you see it?
21     A.  Yes.
22     Q.  "Despite repeated requests by Petitioner to
23  have Respondent's TSU President Crumpton-Young and
24  general counsel Hao Le to comply with Texas law,
25  Respondents are threatening to terminate or

Page 65

1  discharge" -- I mean "terminate or discipline or engage
2  in an unlawful employment action against Petitioner in
3  clear violation of Texas law. Petitioner has been told
4  that she is subject to immediate disciplinary action
5  based on the invalid complaint and such action would
6  violate all of the legal requirements mandated by Texas
7  law. Thus, the immediate loss or taking a Petitioner's
8  property rights and denial of her procedural due
9  process rights mandated by Texas law are not only
10  imminent but a very present danger."
11         First, did I read that correctly?
12     A.  That's what I see printed here on this
13  document.
14     Q.  And then it continues, "An immediate
15  temporary restraining order mandamus is required to
16  maintain the status quo ante until Petitioner can put
17  on evidence at a temporary injunction hearing to enjoin
18  Respondent's unlawful conduct."
19         I, I did read that correctly as well,
20  correct?
21     A.  Yes.
22     Q.  Okay. Did you know that the Court had
23  entered such an order and a finding against you like
24  this?
25     A.  No, I was not aware.



Lesia Crumpton-Young

February 16, 2024
Pages 66 to 69

Page 66

1   Q.  Okay.  Would you go back then to Exhibit 62.
2 This is the letter from Devi Bala to Chief Young,
3 telling her she's placed on leave of absence, correct?
4          MS. BENNETT:  Objection, form.
5   Q.  I'm asking you, is this the letter that
6 placed Chief Young on leave of absence?
7          MS. BENNETT:  Objection, form.
8   A.  The, yes, the paragraph says throughout the
9 duration of this paid administrative leave.
10   Q.  Okay.  Did you understand also that right
11 above that paragraph -- and we're talking about, you're
12 talking about the second paragraph in Exhibit 62 on the
13 first page that says, "Effective immediately you are
14 temporarily relieved of your duties as chief of police
15 with pay until further notice.  The university will
16 make an ultimate decision on your employment status.
17 Throughout the duration of this paid administrative
18 leave, we request that you refrain from being on campus
19 grounds, attending university-sanctioned events, and
20 utilizing any university-owned items such as vehicle,
21 uniform, keys, computer, mobile telephone, et cetera,
22 until such a time as you are otherwise notified."
23          First, did I read that correctly?
24   A.  That's the way it's printed in this document,
25 uh-huh.

Page 67

1   Q.  Okay.  And do you understand that that letter
2 was what you said is not disciplinary action against
3 Chief Young, correct?
4          MS. BENNETT:  Objection, form.
5   A.  No.
6   Q.  Is this discipline -- I mean, was this
7 placing her on temporary leave of absence and all of
8 these restrictions, does that constitute disciplinary
9 action against Chief Young?
10   A.  No.
11   Q.  Okay.  Good.  And then if you look above
12 that -- and when I say "good," I'm talking about I
13 understand that I've gotten an answer from you on that.
14 Would you look above that, and where it says 02.02.03
15 overtime comp, compensatory time, do you see that?
16   A.  Yes, I see that --
17   Q.  Okay.
18   A.  -- written here.
19   Q.  Right.  And that was one of the items in the
20 anonymous complaint against Chief Young, correct,
21 regarding misuse of overtime pay?
22   A.  The ethics hotline document?
23   Q.  Yeah, yes.
24   A.  Yes.
25   Q.  Okay; and then you understand that the order,

Page 68

1 the court order that I read to you, which is Exhibit
2 67, the Judge found as part of his findings to enter
3 this temporary restraining order that this leave of
4 absence violated the police chief's due process rights.
5 Do you understand that?
6          MS. BENNETT:  Objection, form.
7   A.  No.
8   Q.  Okay.  That's fine.  Let's go back to
9 Exhibit 63 and ask you, have you ever seen these two
10 pages from Deva -- Devi Bala to Chief Young?
11   A.  I'm not certain if I have seen these pages.
12   Q.  Okay.  Look at the second page, dated
13 December 6th, at 6:53 p.m.  Do you see that time at the
14 top?
15   A.  Yes, I see Friday, December 2nd, 6:53 p.m.
16   Q.  Okay; and that's a day after the temporary
17 restraining order had been issued against TSU, which is
18 Exhibit 61, correct?  If you look on the last page of
19 Exhibit 61, you'll see the date.  What's the date of
20 that order?
21   A.  I'm not sure which date I'm reading.  I see
22 multiple dates.
23   Q.  It's, it's the date signed by the Court.
24   A.  Okay.  Okay.
25   Q.  What's the date?

Page 69

1   A.  Signed 12/1/2022.
2   Q.  Okay; and the day, the following day after
3 the Judge told you-all not to take any further
4 disciplinary action against Chief Young, if you look at
5 Exhibit 62, that's the letter where Davi, yeah, Davi --
6 Devi Bala is telling Chief Young "don't come back on
7 campus," correct?
8          No, in fact, on the same day, on the same day
9 of the temporary restraining order, you-all were
10 telling Chief Young don't come back on campus, correct?
11          MS. BENNETT:  Objection.  Objection,
12 form.
13   Q.  Well, are they the same dates?
14   A.  That was not the intent of this letter.
15          MR. HALL:  I didn't ask about the intent,
16 so I'm going to object as nonresponsive.
17   Q.  Is the date of December 1st telling Chief
18 Young don't come back on campus the same date of the
19 temporary restraining order, December 1, 2022?
20          MS. BENNETT:  Objection, form.
21   Q.  Is it the same day?
22   A.  I'm not even sure I understand the question
23 at this point.
24   Q.  Okay.  When -- what's the date that the
25 temporary restraining order was entered, which is



Lesia Crumpton-Young

February 16, 2024
Pages 70 to 73

Page 70

1 Exhibit 61?
2    A.  So this -- it says, "So ordered" and "signed
3 on this day of November," but it's blank.
4    Q.  Right, because the Judge substituted and
5 provided the date that she actually signed it.  And
6 what date did she sign it?
7    A.  According to what I'm reading, it looks like
8 she signed it on 12/1.
9    Q.  That's December 1st, 2022, correct?
10    A.  Yes, 12/1/2022 is what's printed here.
11    Q.  And what's the date of Exhibit 62?
12    A.  December 1, 2022 is what's printed on the
13 letter under, under Section 62.
14    Q.  Got it.  And then if you will now turn to
15 Exhibit 63, if you look at the second page of
16 Exhibit 63, and would you tell us what's the date
17 that's provided at the top of that, of that exhibit?
18    A.  December 2nd.
19    Q.  And it says, "Good evening, Texas Southern
20 University Police Department:  I trust this email will
21 find you in good health.  Effective immediately,
22 Friday, December 2nd, 2022, Deputy Sergeant Bobby Brown
23 will serve as the Acting Executive Director of Public
24 Safety and Acting Chief of Police.  Thank you all for
25 your leadership, service, and protection."

Page 71

1        Did I read that correctly?
2    A.  That's, that's what's included in the book,
3 yes.
4    Q.  Okay.  And Devi Bala would have been,
5 according to you, the person to whom Chief Young would
6 have reported to, correct?
7    A.  Correct.
8    Q.  All right; and in this document, this
9 Exhibit 63, Devi Bala is now putting a new chief of
10 police in place as the acting chief of police, and
11 that's Bobby Brown, correct?
12    A.  Acting, correct.
13    Q.  And that is the very next day after the Judge
14 had enjoined you-all from taking any further action
15 against Chief Young, correct?
16        MS. BENNETT:  Objection, form.
17    A.  This letter isn't actually against Chief
18 Young.
19    Q.  Right, because you had already told Chief
20 Young don't come back on campus in the prior, in the
21 prior exhibit, correct?
22        MS. BENNETT:  Objection, form.
23    A.  That was not the intent of the prior exhibit.
24        MR. HALL:  Objection, nonresponsive.
25    Q.  The prior letter, which is Exhibit 62, told

Page 72

1 Chief Young, don't come back on campus, and you're on
2 leave of absence with pay, correct?
3    A.  The prior letter informed her that she was on
4 administrative leave with pay, and then simply
5 articulated the policy of the administrative leave.
6 Was not specifically written or targeted at Chief
7 Young.  It simply articulates the policies of
8 administrative leave.  That's what is in that letter.
9    Q.  Right.
10    A.  That's a standard, standard language about
11 administrative leave with pay.
12        MR. HALL:  Objection, nonresponsive.
13    Q.  The only thing I was asking you was, she was
14 put on leave with all of those restrictions on the very
15 day the temporary restraining order was entered, and
16 the very next day, December 2nd, you-all put a new
17 acting chief of police in place.  Is that, is that just
18 correct in terms of chronology?
19    A.  It's consistent with practices.
20    Q.  And is it correct the way I stated it in
21 terms of chronology?
22    A.  Well, it from looking at the documents and
23 the dates --
24    Q.  Yes.
25    A.  -- I'm not sure when these things were

Page 73

1 received, I'm not sure.  So you're asking me to speak
2 to something I can't speak to.
3    Q.  Well, you can --
4    A.  Because this is signed on the 1st, but does
5 that mean that my team received that on the 1st?  I
6 can't speak to that.  I don't know that to be true
7 because I didn't receive these personally.
8    Q.  I understand that's what you're saying.  I'm
9 just asking now not about when you received it.
10    A.  Okay.
11    Q.  I'm just asking when they were authored and
12 dated.  One is dated December 1st.  That's telling her
13 you're on leave.  The next is dated December 2nd, and
14 that is we've got a new acting police chief.  That's
15 all I'm trying to nail down now is the chronology.  Is
16 that chronology correct based upon the doc -- the dates
17 on the documents?
18    A.  Based on what is written in this book on
19 these documents, one happened on the 1st, one happened
20 on the 2nd.
21    Q.  Okay.  Now, according to the December 1st
22 letter --
23    A.  Okay.
24    Q.  -- which is Exhibit 62, Chief Young was put
25 on leave of absence, according to the words of the



Page 74

1 letter, and I'm going here on the first paragraph: "On
2 August 25th, 2022, our Acting Chief Audit Executive,
3 Ms. Darlene Brown, presented you with a signed
4 complaint, signed written complaint.  The complaint
5 relates to your actions as the university chief of
6 police.  Resulting from the investigation, there is
7 evidence to prove the allegations of your misconduct,
8 which violates the following policies."  Did I read
9 that correctly?
10      A.  Yes, that's what's stated there.
11      Q.  And, therefore, according to this letter,
12 it's Darlene Brown's work product, and the evidence she
13 gathered based upon the anonymous complaint that
14 generated this leave of absence that was issued against
15 Chief Young, correct?
16          MS. BENNETT:  Objection, form.
17      A.  No.
18      Q.  Okay.  I'll let the Judge read it then as
19 opposed to you.  Let me show you Darlene Brown's
20 deposition.  You're going to hold that.
21      A.  Okay.
22      Q.  Okay.  Let me give this to you.  And so that
23 you will know, we took Darlene Brown's deposition in
24 this lawsuit.  I don't want to push your drink off.
25      A.  Okay.

Page 75

1      Q.  Do you see the name of Darlene Brown here on
2 the first page of this document?  I just want you to
3 get comfortable that that's her deposition.  Do you see
4 her name there?
5      A.  Yes.
6          MR. HALL:  Okay.  Yvonne, do you want to
7 look along on this?
8          MS. BENNETT:  Oh, I will love to.  I'm
9 not able to access anything on the depos.
10      Q.  What's the date of that deposition?  Do you
11 see it?
12      A.  Where it says "Oral Deposition of Darlene
13 Brown," is that the date of it, following it?
14      Q.  Yes.
15      A.  February 9th, 2024.
16      Q.  Okay.  Would you turn to page 17.  Each of
17 the pages is numbered up here at the top.  Do you have
18 Page 17, do you have it?
19      A.  Yes.
20      Q.  And, and I don't have it in front of me, but
21 I hope that I have this correct.  Would you read Lines
22 22 through 25 out loud?
23      A.  Okay.  Q, period.
24      Q.  That's question, so that's me asking the
25 question.

Page 76

1      A.  Open parentheses.
2      Q.  Uh-huh.
3      A.  By Mr., period, Hall, closed parentheses.
4      Q.  Uh-huh.
5      A.  You can still answer.
6      Q.  It should have been something before that.
7      A.  Okay.
8      Q.  So it -- we're going to start here at Page
9 17, starting at Line 7.  Would you read from Page 17,
10 Line 7, until I ask you to stop.
11      A.  Q, period, That's okay, period.  We all do
12 it, comma, but as you sit here today under oath you now
13 know that Texas law requires the complaint not only to
14 be signed but to be signed by the complainant making
15 the complaint.  Is that what you want me to --
16      Q.  Keep reading.
17      A.  Mr. Kinney, colon, objection, period, form,
18 period.
19      Q.  Next.
20      A.  Question.  Well, Q, period, open parentheses,
21 By Mr. Hall, closed parentheses.  Do you now -- do you
22 now know that now, do you know that now?
23          A, period, I would say I do not know that
24 because I'm not in the legal field.
25          Q, period, but have you learned that in this

Page 77

1 process, question mark.
2          A, period, I have learned that, yes.
3      Q.  Okay.  Now, I want to ask you to turn to
4 Page 19.
5      A.  Okay.
6      Q.  Starting at Line 4.  And would you read until
7 I ask you to stop.
8      A.  Q, period, and that anonymous complaint was
9 not signed at all, comma, correct, question mark.  A,
10 period, not by the complainant.  Q, period, thank you.
11 And it is also correct that throughout the entire
12 investigation, period.  From the time that you, that
13 you first asked to investigate until the time you
14 finished your written report, you never had a signed
15 complaint by the complainant that you were
16 investigating, correct?
17      Q.  Okay.  Did you know that Darlene Brown in her
18 sworn testimony just a few days ago admitted she never
19 had a signed complaint by the complainant that complied
20 with that statutory requirement of 614.022?
21          MS. BENNETT:  Objection, form.
22      Q.  Did you know that before you just read that?
23      A.  What was the question?
24      Q.  Sure.  Did you know before you just read
25 those two parts of her sworn testimony that Darlene



Lesia Crumpton-Young

February 16, 2024
Pages 78 to 81

Page 78

1 Brown admits she never had a copy of the
2 complaint by the complainant that complied with Section
3 614.022?
4        MS. BENNETT: Objection, form.
5    A.   There is a signed complaint. It was signed
6 by Darlene Brown.
7        MR. HALL: Objection, nonresponsive.
8    Q.   My only question now is, did you know that
9 Darlene Brown has admitted that throughout her entire
10 investigation of Chief Young she never had a signed
11 complaint by the complainant that complied with Texas
12 law 614.022 of the Government Code?
13        MS. BENNETT: Objection, form.
14    Q.   Did you know that before reading this?
15    A.   No, I don't know that; and, no, I still don't
16 know that.
17    Q.   Okay. Thank you. Are you aware that Darlene
18 Brown actually has admitted in this case that she broke
19 Texas law by investigating this unsigned complaint?
20        MS. BENNETT: Objection, form.
21    Q.   No?
22    A.   No.
23    Q.   Okay. Let's keep going. Do you have any
24 text messages with anyone relating to the anonymous
25 complaint against Chief Young?

Page 79

1    A.   No.
2    Q.   Do you have any emails with anyone, either
3 receiving them or sending them out, relating to the
4 anonymous complaint against Chief Young?
5    A.   Not at this time.
6    Q.   Did you destroy any such documents?
7    A.   No.
8    Q.   Okay. Did you ever have any such documents?
9    A.   The specific question again.
10    Q.   Yeah, the specific question, did you have any
11 documents, either text messages, emails, memos,
12 letters, audio recordings, relating to the anonymous
13 complaint against Chief Young? Did you ever have any
14 such records?
15    A.   Not relating to the anonymous complaint, no.
16    Q.   How about again relating to the allegations
17 against Chief Young?
18    A.   Yes, I'm sure at some point.
19    Q.   Okay. Where are those?
20    A.   I'm retired from TSU, so they would -- if I
21 had them in my email, they would be in my email
22 account.
23    Q.   Okay; and what's your email address that you
24 used then?
25    A.   Lesia.young --

Page 80

1    Q.   At?
2    A.   -- @tsu.edu.
3    Q.   Okay. Have you deleted or intentionally
4 destroyed any of those communications?
5    A.   No, I don't have access to those.
6    Q.   Okay; and did you ever, when you had access,
7 intentionally delete or destroy any of those records?
8    A.   No, not to my knowledge.
9    Q.   Okay. Are you aware that my law firm on
10 behalf of Chief Young filed an appeal with the Board of
11 Regents relating to Darlene Brown's report?
12    A.   No.
13    Q.   Have you ever read the appeal that was filed
14 on behalf of Chief Young with the TSU Board of Regents?
15    A.   No, not to my knowledge.
16    Q.   And am I correct that within five months of
17 our appealing Darlene Brown's report, you were asked to
18 leave TSU as the president?
19        MS. BENNETT: Objection, form.
20    A.   No.
21        MR. HALL: What, what's wrong with that?
22        MS. BENNETT: She already testified she
23 wasn't aware of the appeal, so to ask her a question
24 about the, the timing between the appeal.
25        MR. HALL: Okay. Okay. That, that's a

Page 81

1 worthy objection.
2    Q.   Between December --
3        MR. HALL: I wasn't trying to be...
4        MS. BENNETT: I know.
5        MR. HALL: Between --
6    Q.   Between December 27th and 2022 -- of 2022,
7 within five months of that, that date, you were asked
8 to either resign your position as president of TSU or
9 be let go; is that true?
10    A.   No.
11    Q.   Were you ever asked to -- or provided with an
12 option to resign or retire versus being involuntarily
13 let go from TSU?
14    A.   No.
15    Q.   Okay. So anyone saying that in this case
16 would not be telling the truth?
17    A.   Correct.
18    Q.   All right; and so if you'll turn to Exhibit
19 70, do you recognize that document?
20    A.   Yes.
21    Q.   Okay. How do you recognize -- I mean, how
22 did you come to learn of this document?
23    A.   I received a copy.
24    Q.   All right. Did you author this?
25    A.   No.



Lesia Crumpton-Young

February 16, 2024
Pages 82 to 85

Page 82

1    Q.   I mean, you didn't supply the language or
2  anything?
3    A.   No.
4    Q.   And this is dated May 26th, 2023.  That says,
5  "In a collegial manner, Dr. Lesia Crumpton-Young
6  approached me as chairman of the Texas Southern
7  University Board of Regents with her retirement
8  request.  The board agreed with the request and the
9  mutually beneficial timing that will ultimately lead to
10  the best outcome for Texas Southern University."  Did I
11  read that correctly?  Did I read that correctly?
12    A.   I'm not sure.  I was --
13    Q.   You weren't paying attention to that?
14    A.   I was trying to follow the letter.
15    Q.   Okay.
16    A.   Trying to read the letter.
17    Q.   I see.  Why don't you take a moment and just
18  read it.  Are you finished?
19    A.   Yes.
20    Q.   Okay.  Thank you.  I'm going to ask you a
21  slightly different question, see if I can get some
22  better understanding.
23    A.   Uh-huh.
24    Q.   If, if anyone swears under oath in this case
25  that you were encouraged to retire or resign from TSU

Page 83

1  by members of the Board of Regents, would that be a
2  true statement or not?
3    A.   Not true.
4    Q.   Okay; and are you aware of any investigations
5  of your, of you by the Board of Regents regarding
6  alleged wrongdoing on your part prior to your
7  resignation?
8    A.   I don't understand that question.
9    Q.   Are you aware of, did you -- well, strike
10  that.
11          Have you learned that the Board of Regents
12  was investigating you for possible termination prior to
13  May of 2023?
14    A.   No, I have not learned that.
15    Q.   Okay.  Have you ever heard that?
16    A.   No.
17    Q.   I'm not trying to be accusatory.  I'm just
18  saying, you know, we have anonymous complaints too that
19  come to us about you, and I'm just trying to figure out
20  if there is any validity there.  I appreciate your
21  answer.
22          Now, the next subject matter I'm going to ask
23  you about is more personal in nature, and I'm, I'm
24  close to being finished with you.  How did you consider
25  your work relationship with Chief Mary Young?  Did you

Page 84

1  think that you-all were compatible in terms of your
2  respective duties, duties at TSU?
3    A.   I thought that Mary, that Chief Young and I
4  had a good working relationship.
5    Q.   And did you think that she was a good police
6  chief?
7    A.   In general, I thought that Mary Young did a
8  good job as police chief.
9    Q.   And if I understand correctly, you-all never
10  had words with one another; is that right?
11    A.   I don't recall ever having words.
12    Q.   And it's also correct that you actually
13  volunteered and told Mary Young, hey, the Board of
14  Regents are considering terminating you, and the two of
15  you went to some eating establishment to talk about
16  that.  Do you remember that?
17    A.   I did not tell Mary Young that the board was
18  considering terminating her.
19    Q.   What did you tell Mary Young about that?
20    A.   I told her that the preliminary information
21  from the investigation indicated that she had committed
22  fraud, that she and deputy chief and her DBA.
23    Q.   And what?
24    A.   And her DBA.
25    Q.   Okay.  And did you say anything about the

Page 85

1  Board of Regents?
2    A.   I said that I was just informed.
3    Q.   By whom?
4    A.   The board.
5    Q.   Okay; and was that based upon the work of
6  Darlene Brown?
7    A.   I'm not sure what in totality it was based
8  upon.  I certainly, I was informed by the board in the,
9  in the board meeting.
10    Q.   And was it related to the work that Darlene
11  Brown was doing or the subject matter that Darlene
12  Brown was working on?
13    A.   It was related to the allegations of, of
14  fraud.
15    Q.   And that's the --
16    A.   Over -- a misuse of overtime, yes.
17    Q.   In other words, it was related to the subject
18  matter that was in the anonymous complaint?
19    A.   It was related to the subject matter of
20  overuse of, overuse and abuse of overtime, yes.
21    Q.   Which was the subject matter of the anonymous
22  complaint, correct?
23    A.   Yes.
24    Q.   Okay; and you communicated that to Chief
25  Young before the final complaint had even come out,



Page 86

1 correct?  I, mean the final report of Darlene -- strike
2 that.
3          You communicated to Chief Young that
4 information about the board considering matters
5 relating to this anonymous complaint, you communicated
6 that to Chief Young before Darlene Brown had finalized
7 her report?
8     A.  No, I did not, I did not communicate anything
9 about the board's intentions to Mary Young.
10    Q.  Okay.  So in our lawsuit, we have alleged
11 that you told Mary Young, either as a courtesy or
12 whatever, you mentioned to her, hey, you know, the
13 board is considering terminating you, you're saying
14 that that's not true?
15    A.  I did -- I never said the board is
16 considering terminating Mary Young.
17    Q.  Did you say any, any board member or any
18 regent was considering that?
19    A.  I did not.
20    Q.  Okay.  This conversation that you had with
21 Mary Young, was it had -- and I'm talking about this
22 conversation y'all had -- was it at an eatery, some
23 kind of eating place that y'all were talking?
24    A.  Which conversation are you referring to?
25    Q.  The one where you as a professional courtesy

Page 87

1 or otherwise were trying to share with Mary Young that
2 there was some consideration ongoing about overtime,
3 fraud, or misuse.
4     A.  I never had a conversation with Mary Young
5 about any considerations of any type of ongoing, you
6 know, as you said in your question.
7     Q.  Okay.  Tell me what you'd characterize the
8 conversation you had with Mary Young.
9     A.  Yeah, I had a conversation with Mary Young to
10 inform her that the preliminary report is showing that
11 there was abuse of the overtime system by herself, her
12 deputy chief, and her DBA.
13    Q.  And that, and the DBA is what?  What does
14 that mean?
15    A.  Departmental business administrator, I
16 believe is what it stands for.
17    Q.  Okay.
18    A.  We just use the acronym DBA on campus.
19    Q.  Okay; and that preliminary report was from
20 whom?
21    A.  Was from, my understanding it was from the
22 investigation done by Darlene Brown and maybe others.
23    Q.  Okay; and that preliminary investigation or
24 conclusion was provided to whom?
25         MS. BENNETT:  Objection, form.

Page 88

1     Q.  Was it provided to you?
2     A.  No, no.  This was a discussion that was
3 shared with me in a board meeting.
4     Q.  Okay.  Were you present when Darlene Brown
5 was discussing her findings with the Board of Regents?
6     A.  No.
7     Q.  At the time that you were told about this
8 preliminary report, where were you?  Were you in a
9 board meeting, were you in the president's house, where
10 were you?
11    A.  I, I went into executive board meeting.
12    Q.  Okay; and the Board of Regents was discussing
13 this preliminary report?
14    A.  Well, yes.
15    Q.  Okay.
16    A.  They were sharing with me, yes.
17    Q.  And did you have any input or any information
18 to share with them regarding the allegation or the
19 findings in the report?
20    A.  No, I didn't.
21    Q.  You had no, no information personally to
22 support the findings in the report.  Would that be a
23 fair statement?
24    A.  Correct.
25    Q.  And would it be also a fair statement that

Page 89

1 the individual Board of Regent members had no personal
2 knowledge of any facts to support the preliminary
3 findings in the report?
4         MS. BENNETT:  I'm sorry.  Objection,
5 form.
6     A.  Yeah, it's very difficult for me to speak for
7 individual members of the board.
8     Q.  Let me ask it a different way.  Are you aware
9 of any regent having any personal information of
10 wrongdoing by Mary Young?
11    A.  Personal information, I'm not sure what that
12 means.
13    Q.  Are you aware of any of the regents saying,
14 hey, I have personal knowledge or I have gained
15 knowledge of personal wrongdoing by Mary Young as it
16 relates to overtime in the police department?
17    A.  I don't think that has been shard with me.
18    Q.  Okay.
19    A.  I don't recall that being shared with me from
20 a personal vantage point.
21    Q.  From your standpoint, the sole source of this
22 claim of wrongdoing against Chief Young as it relates
23 to overtime pay would be the anonymous complaint and
24 the subsequent investigation done by Darlene Brown; is
25 that correct?



Page 90

1          MS. BENNETT:  Objection, form.
2     A.   What, I don't, what was -- would you mind
3  repeating the question.
4          MR. HALL:  Please read that back.
5          (Reporter read the requested
6          portion of testimony)
7     A.   I don't think that's the sole source, so no.
8     Q.   Okay.  Would that be the primary source?
9     A.   No.
10    Q.   Okay.  Tell me what the primary source would
11  be.
12    A.   The HR payroll system that showed that it did
13  occur.
14    Q.   No, no.  Well, I see what you're saying.
15          MR. HALL:  Object, nonresponsive.
16    Q.   My question is, in terms of what was being
17  discussed at the Board of Regents, the information that
18  they were discussing was the preliminary report and
19  findings by Darlene Brown based upon her investigation
20  of the anonymous complaint that appeared on the ethics
21  hotline; is that correct?
22    A.   No.
23    Q.   Did the Board of Regents have anyone other
24  than Darlene Brown investigating the anonymous
25  complaint --

Page 91

1          MS. BENNETT:  Objection, form.
2     Q.   -- against Chief Young?
3          MS. BENNETT:  Sorry.  Objection, form.
4     A.   I can't speak for the Board of Regents.
5     Q.   Okay.  Are you aware of anyone other than
6  Darlene Brown investigating the anonymous complaint
7  against Chief Young?
8     A.   Would you mind repeating that, please?
9     Q.   Sure.  Are you aware of anyone else other
10  than Darlene Brown who investigated the anonymous
11  overtime allegation against Chief Young?
12    A.   I'm aware that facts related to the HR
13  payroll system were, were ascertained about the payment
14  and the amount of money.  So I -- so, yes, my thought
15  is others had to provide factual information.
16    Q.   Okay.  Can you tell us the names of those
17  people?
18    A.   I would, they would certainly be probably
19  someone in HR and payroll, someone in our business and
20  finance office.
21    Q.   Okay.  Anyone else?
22    A.   Not to my knowledge.
23    Q.   Okay.
24    A.   In addition to, of course, Darlene Brown that
25  I'm aware of, that I'm aware of.

Page 92

1     Q.   All right.
2     A.   That's what comes to mind.
3     Q.   Okay.  Can you give us any specific names
4  other than Darlene Brown as being in the investigation?
5  You gave me some titles of some divisions or
6  departments, but can you give me some names that you
7  know actually were engaged in corroborating or
8  supporting this allegation against Chief Young?
9     A.   Well, collecting, maybe collecting payroll
10  data, I would just point to the head of HR at that
11  time.
12    Q.   You're giving me titles again.  I want names.
13  I want specific names so I can take the deposition.
14  Can you give me specific names, or is the better
15  answer, no, you can't give me specific names?
16    A.   I have given you functions on campus.  That's
17  the best I can recall at this time.
18    Q.   Okay.  Got it.  You have now named three
19  people that you say Darlene Brown found to have been
20  engaging in wrongdoing regarding this overtime:  Chief
21  Young, a deputy chief, and a DBA; is that correct?
22    A.   That's my understanding.
23    Q.   Okay.  Do you know the name of the DBA?
24    A.   I do not.
25    Q.   Okay.  Do you know the name of the deputy

Page 93

1  chief?
2     A.   Not at this moment.  I always use titles,
3  deputy chief.
4     Q.   Okay.
5     A.   Sorry.
6     Q.   And we know the chief is Mary Young, correct?
7     A.   She's chief.
8     Q.   Tell me exactly what you understand that they
9  did wrong as it relates to overtime.
10    A.   My understanding, that they gave the order
11  for individuals to charge overtime pay for hours that
12  they didn't work and that the DBA created some type of
13  coding system that masked, for lack of a better term,
14  masked the charges of overtime on their time sheets.
15    Q.   And when, when supposedly did the chief
16  authorize that?
17          MS. BENNETT:  Objection, form.
18    A.   I don't know the dates of when the chief
19  authorized it.
20    Q.   Would you turn to Exhibit 59 again.  And in
21  this anonymous complaint, which is Exhibit 59, do you
22  see at the top where it says "case details"?  Do you
23  see that?
24    A.   Yes.
25    Q.   And it says, "Since January 2022, while at a



Lesia Crumpton-Young

February 16, 2024
Pages 94 to 97

Page 94

1 weekly supervisor meeting, Mary gave all the officers
2 (names withheld) in the police department a directive
3 that she would raise the pay for special officers
4 (names withheld). Mary characterized the special
5 officers as the lead officers." Do you see that?
6    A.  Yes, I, I see that on the page here.
7    Q.  At least as it relates to this anonymous
8 complaint, whoever filed this is saying that this
9 behavior started in January of 2022. Do you see that?
10    A.  Yes.
11    Q.  And that there was a weekly supervisor
12 meeting that occurred in January of 2022. Do you see
13 that?
14    A.  Yes.
15    Q.  Are you aware that factually there were no
16 supervisor meetings or meetings at all with Mary Young
17 during January of 2022?
18    A.  No, I'm not aware.
19    Q.  Are you aware also that Darlene Brown has
20 admitted in her deposition that there were no
21 irregularities for lead officer pay?
22    A.  No, I'm not aware.
23    Q.  And are you further aware that, in fact,
24 there was a 2017 authorization for pay, for special
25 event pay by officers that Darlene Brown did not

Page 95

1 include in her report?
2    A.  No, I'm not aware.
3    Q.  Okay. Who, who was responsible for knowing
4 that -- strike that.
5       Would you have expected that Darlene Brown
6 would have at least found out that the very pay that
7 she criticized Chief Young about was approved in 2017,
8 by the prior administration and that Judge -- and that
9 Chief Young was simply following it?
10       MS. BENNETT: Object.
11    Q.  Would you, would you have expected her to
12 know that?
13       MS. BENNETT: Objection, form.
14    A.  No.
15    Q.  Assuming that what I just told you is true,
16 and I know that that's a -- that's going to be a
17 challenge there, but assuming that I can prove that,
18 that there was, in fact, an authorization for exactly
19 what Chief Young was doing, and that authorization was
20 2017, in the prior administration, approving exactly
21 what Chief Young did, would you agree that at least
22 Darlene Brown should have found that before she accused
23 the chief of fraud for following such policy?
24       MS. BENNETT: Objection, form.
25    A.  No.

Page 96

1       MR. HALL: Would you please put Cinderella
2 there for me. Just put the word "Cinderella." That's
3 an important answer.
4    Q.  I would like for you to turn to Exhibit 68.
5 Would you turn to page -- oh, I know you don't -- you
6 said you've never seen Exhibit 68, right?
7    A.  I have not.
8    Q.  This is my --
9    A.  To my knowledge, I haven't.
10    Q.  That's okay. This is my letter that I wrote
11 to the Board of Regents on December 27th of 2022, on
12 behalf of Chief Young. If you'll turn to Page 7 of 21.
13 And I'm just going to go to the prior page if you can.
14 Just --
15    A.  6 or 7?
16    Q.  Page 6, yes. Down at the bottom it says,
17 "Finally" -- the last paragraph, "Finally, special
18 event pay and lead officer pay" -- "lead officer have
19 nothing to do with each other. Special event pay are
20 amounts paid to officers pursuant to the duly
21 authorized rate schedule approved by TSU administrators
22 back in 2017. Specifically, in a memo dated October
23 24, 2017, at 1:54 p.m., Shannon Broussard, director of
24 facilities and special events, circulated to Chief
25 Young and other department heads the new approved

Page 97

1 personnel fee sheet that was to be used on all time
2 sheets submitted to the budget and/or HR office
3 relating to special events."
4       We actually included that in the appeal to
5 the Board of Regents as Tab 14. And then it goes on to
6 say who the other people were copied on it. If you
7 want to see Exhibit 14, I have it.
8    A.  I, I would like to see it.
9    Q.  Okay. One moment.
10       MR. HALL: Let's go off record, please.
11       THE VIDEOGRAPHER: Off the record. The
12 time is 3:50.
13       (Break taken)
14       THE VIDEOGRAPHER: On the record. The
15 time is 3:51.
16    Q.  I'm going to bring you the entire document,
17 but I'll just ask you if you knew this. As of 2017,
18 there was actually a special rate that was implemented
19 for officers of $25, if they were security officers,
20 that increased their pay for special events. Did you
21 know that? I assume not, you had so much on your
22 plate, but did you know that there was a special
23 authorization in 2017, authorizing that pay increase?
24    A.  Yeah, certainly, I was not here in 2017.
25 But, you know, as I read this, I mean, it says, it



1 reads -- and this is my first time seeing this -- it
2 reads as if Shannon Broussard circulated that.
3     Q.   Right.  Ken Huewitt actually approved it.
4     A.   Well, I'm look -- I want to make sure I look
5 at it then.  Because the way this reads, it reads as if
6 Shannon Broussard approved it.
7     Q.   No, no, it went to the necessary channels.
8 I'll bring it down because we actually have the cover
9 memo as well with it.
10    A.   Okay.
11    Q.   But the point that I'm asking you, subject
12 to, you know, I having to show you that document in
13 just a second, did you know that this increase of $25
14 for security officers actually existed well before
15 Chief Young's alleged 2022 directive, according to the
16 anonymous complaint?
17    A.   And this question is about special event
18 rate?
19    Q.   Correct, because that's what Darlene Brown is
20 complaining about in her report.  All of the time that
21 she said was a misuse of overtime was actually
22 authorized and listed as special event pay, not lead
23 officer pay.  And so my sole question to you is, did
24 you even know there was this special rate that these --
25 and the only officers that got it were the security

1 officers for special event pay, nothing for lead
2 officer pay?  Did you know that?  Well --
3     A.   I want to make sure I understand what you're
4 explaining to me because the two are somewhat
5 inconsistent --
6     Q.   Okay.
7     A.   -- from my understanding, and so I just --
8 that's why I'm quiet because I'm listening to you,
9 Mr. Hall.
10    Q.   Yeah, I understand.  So -- thank you.  So
11 here is, the last exhibit is going to be Exhibit 72.
12         MR. HALL:  Yvonne, this is Exhibit 72.
13    Q.   And for the record, this is -- the tab's
14 that we were previously talking about, about the rate
15 increase that was given to TSU security officers back
16 in 2017, for special event pay.
17         MR. HALL:  And the witness is having an
18 opportunity to review that document now.
19    A.   So is there a, is there an approval page --
20    Q.   That's all we have.
21    A.   -- like with a signature, or -- you just
22 mentioned that you thought Ken Huewitt approved this.
23    Q.   Yes.
24    A.   You mentioned that and, and I'm just looking
25 for that page, Mr. Hall.

1     Q.   He's right there.  He's on the copied list.
2     A.   Yeah, he, he's copied.  So that's a -- you
3 know, in higher education that's, copy and approve is
4 not the same thing for us.
5     Q.   Okay.
6     A.   So I'm just wondering, since you mentioned
7 that Ken Huewitt approved it, is there a page.  I'm
8 sure there are other pages.  I'm just asking so I can
9 answer your question.
10    Q.   There may be other pages, but this is the
11 extent of everything I have.
12    A.   This is the extent of what you have.
13    Q.   Exactly.
14    A.   Okay.
15    Q.   And let me say further that all of the other
16 rates on that page have been utilized since 2017 to
17 even today, without any complaint, as authorized pay.
18         MS. BENNETT:  I'm objecting to counsel's
19 testifying.
20         MR. HALL:  Well, she was asking me did I
21 have any additional documents.  I agree that I
22 shouldn't have even answered her question, but as a
23 courtesy to her I wanted her to know that these rates
24 are still being implemented and used.
25         MS. BENNETT:  And I'm still objecting to

1 counsel testifying on the record.
2     A.   So I'm not sure what we are discussing here,
3 but I'm happy to answer a question.
4     Q.   Okay.  The question is, were you aware of
5 these rates being approved that are in Exhibit 72?
6     A.   At this point I would have to say that it
7 does not appear that you've put anything in front of me
8 to say the rates have been approved.
9     Q.   Okay.  That's fine.
10    A.   Okay.  Because here it does say requires
11 approval from the vice-president, in the note there,
12 and I don't see anything with a vice-president's
13 signature.
14         I was not here in 2017, but from my knowledge
15 Shannon Broussard is not and was, is not or was not --
16 well, she certainly was not a vice-president when I met
17 Shannon Broussard.
18    Q.   No worries.
19    A.   Okay.
20    Q.   We'll be able to prove it was authorized.
21 My, my question to you is, did you even know these
22 rates existed, whether authorized or unauthorized, as
23 of 2017?
24    A.   As of 2017, I was not at Texas Southern.
25    Q.   How about at the, how about did you ever gain



Lesia Crumpton-Young                                              February 16, 2024
                                                                 Pages 102 to 105

Page 102

1 any knowledge prior to today that these rates were, in
2 fact, even being discussed even if they weren't
3 authorized prior to this alleged anonymous complaint
4 against Chief Young?
5    A.  That was a very broad question.
6    Q.  Did you, do you --
7    A.  I mean, there's --
8    Q.  Well, let me rephrase.
9    A.  Okay.  Okay.
10   Q.  Prior to today, did you even know this
11 document existed, 72?
12   A.  I, I know that we have rates that we charge
13 when there are outside events or special events.  And
14 like, for example, where it says "a special occasion,"
15 there's an event of, such as a major event held in the
16 city.  I am aware that we had rates for that type of
17 activity.
18   Q.  Okay; but were you aware of this specific
19 rate chart or rate schedule in Exhibit 72?
20   A.  I am not aware of the specific amount in the
21 rate schedule from 2017 or...
22   Q.  So if I were to ask you questions about the
23 actual billings that Darlene Brown was critical of
24 about overtime and they conform to this rate chart, you
25 can't help us one way or the other as to whether she's

Page 103

1 right or wrong.  Would that be correct?
2    A.  Not without seeing the context and the
3 specific thing that we're referring to.
4    Q.  Okay.  Good deal.
5    A.  I like to --
6    Q.  Good deal.
7    A.  -- work in specifics.
8    Q.  If Ken Huewitt, if we can prove that Ken
9 Huewitt or the appropriate executive at TSU approved
10 these rates for special event pay at $25 an hour for
11 security officers, and we can further prove that what
12 Darlene Brown is incorrectly criticizing about in terms
13 of overtime pay as it relates to these security
14 officers, would you agree that Chief Young was well
15 within her authority to comply with these rates for
16 special event pay for security officers?
17        MS. BENNETT:  Objection, form.
18   Q.  Assuming that we can prove the first two
19 things?
20        MS. BENNETT:  Objection, form.
21   A.  No.
22   Q.  Okay.  Why not?
23   A.  Because the way that you posed the question,
24 Mr. Hall, it assumes that these are interchangeable and
25 they are not.

Page 104

1    Q.  What's interchangeable?  What's --
2    A.  Maybe you should read his question to him
3 because I want to make sure that I'm answering your
4 question.
5    Q.  Right.  I'm, I'm talking about special event
6 pay for security officers at $25 an hour.
7    A.  That wasn't the question.  You talked about
8 special event pay and overtime pay in the same
9 question, and they are not interchangeable, and that's
10 why my answer is no.
11   Q.  Ma'am, are you aware that Darlene Brown's
12 overtime allegation is only related to over -- to
13 special event pay?  Are you, I mean --
14   A.  That is not my understanding.
15   Q.  Did you read her report?  I'm not being, I'm
16 not being condescending here.  I'm asking you, did you
17 read it?  Because that's what it talks about.
18   A.  I read it.
19   Q.  Okay; and do you recall that the only thing
20 she talks about is lead officer pay and special event
21 pay?
22   A.  That's not the only thing.  That was, that's
23 not the only thing.
24   Q.  Okay.  Well, in her deposition she agrees
25 that that's the only thing.  You read something

Page 105

1 different?  You read something different?
2    A.  I read, I read her report.
3    Q.  And what, what do you understand she said
4 about overtime pay?
5    A.  That it was fraudulent misuse of overtime
6 pay, that individuals were documenting that they were
7 working overtime for hours they were not working.
8    Q.  Okay.  Let me talk to -- well, I know that
9 we -- we go to this final subject.
10       MR. HALL:  Let me see the note that you
11 gave me.
12   Q.  And do you recall how many officers Darlene
13 Brown supposedly said had misused or were charging this
14 overtime pay that they didn't actually work?
15   A.  The specific number of officers?
16   Q.  Yes.
17   A.  Not at this time.  I don't recall that.
18   Q.  I mean, do you remember it being several
19 officers, more than five or less than five?
20   A.  I don't recall.
21   Q.  Did you ever talk with the DBA, or that do
22 you know anybody who talked to the DB -- let me ask one
23 question.  Do you recall anyone talking to the DBA that
24 allegedly was participating in this scheme?
25   A.  I was told that the DBA was part of the



Page 106

1 investigation.
2    Q.   Right.  Other than Darlene Brown, are you
3 aware of anyone talking to the DBA?
4    A.   It's my understanding that I think HR also
5 checked those records, and, and I think the office of
6 the vice-president for business and finance.
7    Q.   Okay; and was only one DBA?
8    A.   According to what I read in the report, it,
9 it pointed to a specific DBA, and there was only one.
10    Q.   And was that Chandra Scruggs?  Chandra,
11 C-H-A-N-D-R-A.
12    A.   I am, I use titles and not typically names.
13    Q.   Okay.  That's okay.  Are you aware that
14 Chandra Scruggs is my client?
15    A.   No, I'm not aware.
16    Q.   Okay; and then who is this deputy chief that
17 you -- you said you don't know his name or her name?
18    A.   It's a, it was, he's male.
19    Q.   Okay.  Is he still with TSU, do you know?
20    A.   It's my understanding that he resigned.
21    Q.   Okay.  All right.  The next series of
22 questions is not intended to be offensive at all, but
23 it's going to come across as somewhat offensive.  We
24 have made an allegation that Chief Young was instructed
25 by Albert Myres, the president, the Board Chair of

Page 107

1 Regents to intervene because of what appeared to be a
2 too personal relationship between you and one of the
3 male officers.  Are you aware of any facts to support
4 that allegation?
5    A.   No.
6    Q.   Were you having a personal relationship with
7 one of Chief Young's police officers?
8        MS. BENNETT:  Objection, form.
9    A.   No.
10    Q.   We've also alleged that Chief Young or her
11 staff intervened and found a travel voucher or charge
12 that alleged to have a male traveling with you out of
13 town for an overnight trip in the name of your husband
14 but, in fact, it was a TSU police officer that was
15 alleged to be in a personal relationship with you.  Do
16 you have any facts to support that allegation?
17        MS. BENNETT:  Objection, form.
18    A.   No.
19    Q.   Okay.  We also have alleged in the case that
20 you purchased some personal clothing items for that
21 same male police officer, specifically including a hat,
22 a belt, and some boots.  Do you know any facts to
23 support that allegation?
24        MS. BENNETT:  Objection, form.
25    A.   No.

Page 108

1    Q.   Did you ever purchase any clothing items for
2 a TSU police officer while you were president?
3        MS. BENNETT:  Objection, form.
4    A.   What was the question?
5    Q.   Did you ever purchase any gifts for a TSU
6 police officer while you were president?
7    A.   Yes.
8    Q.   For whom?
9    A.   Isaac.
10    Q.   What's the name?
11    A.   Officer Isaac, Officer Barnett, I think.
12 Probably purchased a gift at the retreat for Chief
13 Young.  I gave -- when we had retreats, I gave gifts,
14 you know, welcome kind of gifts and baskets.  I
15 probably had one for Chief Young.  Let me see who else
16 maybe.  I can't recall anyone else at this point.
17    Q.   Okay.  What did you -- is Isaac a male or
18 female?
19    A.   He's male.
20    Q.   What did you purchase for him?
21    A.   Definitely a tie because the, when the
22 officers had to wear plainclothes I didn't think, they
23 didn't, he didn't own a, own a tie.  So definitely a
24 tie.  I remember my husband taking care of the tie when
25 they were assigned to accompany me at the rodeo.  I

Page 109

1 believe we bought my husband -- I don't know if he
2 purchased it or gave it to him, but ties and a cowboy
3 hat.
4    Q.   This is Isaac?
5    A.   And, and Barnett; they were both on my detail
6 at the rodeo.
7    Q.   Okay.  I'm asking now did you buy -- I'm only
8 on Isaac now.  Did you buy him a hat?
9    A.   I don't recall if he has a -- if he had a hat
10 at the rodeo but a tie and maybe a shirt.  I, I'd have
11 to, I don't recall but I --
12    Q.   Just tell --
13    A.   -- I'm trying in my mind, looking at, trying
14 to see pictures of us at the rodeo but...
15    Q.   Tell me only what you recall.
16    A.   I would say definitely a tie --
17    Q.   Okay.
18    A.   -- and definitely a hat.
19    Q.   What kind?
20    A.   And I'm not sure for which officer.  I want
21 to be clear because it's been a while, but definitely a
22 tie, definitely ties and definitely hats.  I can
23 remember those for sure.
24        MR. HALL:  Okay.  I'm going to object to
25 that as nonresponsive.



Lesia Crumpton-Young                                       February 16, 2024
                                                          Pages 110 to 113

Page 110

1    Q.  I'm asking you specifically as to Officer
2  Isaac.
3    A.  Okay.  I don't remember specifically as to
4  any individual officer.
5    Q.  Okay.  As to Barnett, did you buy any
6  clothing for him as a gift?
7    A.  I bought a hat for sure to attend the rodeo,
8  as part of his uniform, yes.
9    Q.  Anything else?
10    A.  For, as part of my Christmas gifts, I believe
11  that he would have received one of them, as well as the
12  other members of the cabinet.  That would have been in
13  20 -- Christmas of 2021 probably, when I gave gifts for
14  Christmas.
15    MR. HALL:  Objection, nonresponsive.
16    Q.  I'm still on Sergeant Barnett.
17    A.  Okay.
18    Q.  I'm asking you specifically, do you recall
19  any other clothing you purchased for him as a gift?
20    A.  No other, I do not recall any other clothing
21  beyond possibly a hat and a tie.
22    Q.  Okay.  Did you ever purchase any boots for
23  any TSU police officer?
24    A.  I am not, no, I am not aware of purchasing
25  boots.

Page 111

1    Q.  Okay; and then do you recall purchasing a
2  leather belt for any TSU police officer?
3    A.  No.
4    Q.  All right.  Have you ever traveled out of
5  town for an overnight trip with any TSU male police
6  officer?
7    MS. BENNETT:  Objection, form.
8    A.  What was the question?
9    Q.  Sure.  Have you ever traveled out of town
10  overnight with a male TSU police officer?
11    A.  When they have --
12    MS. BENNETT:  Object.
13    A.  No, go ahead.
14    MS. BENNETT:  Objection, form.
15    A.  When Chief Young has assigned them as my
16  detail, yes.
17    Q.  For an out, out-of-town trip?
18    A.  Yes.
19    Q.  Okay.  Have you ever had a male TSU police
20  officer give you a gift?
21    MS. BENNETT:  Objection, form.
22  Relevance.  This has no relevance to the --
23    MR. HALL:  It does.
24    MS. BENNETT:  -- the facts made the basis
25  of this case.

Page 112

1    Q.  Yeah, you can answer my question.
2    A.  Not to my specific knowledge.  I mean,
3  they've given me pie, cake.  They've given -- you know,
4  as a president I receive a lot of things, so not to,
5  not -- if you're asking about apparel, then no.
6    Q.  No, I'm asking about a gun.
7    A.  A gun?
8    Q.  Did a TSU police officer give you a gun?
9    A.  No.
10    Q.  Okay.  As I understand, after Mary Young was
11  terminated you recommended Bobby Brown to become the
12  acting chief.  Is that correct or not?
13    A.  No.
14    Q.  Okay.  Who recommended Bobby Brown?
15    A.  His supervisor.
16    Q.  Who was that?
17    A.  I believe Devi Bala.
18    Q.  Did you have any discussion with her about
19  that appointment?
20    A.  Yes.
21    Q.  And did you approve that appointment?
22    A.  She didn't need my approval.
23    MR. HALL:  That's not answering my
24  question, so objection, nonresponsive.
25    Q.  Did you approve it?

Page 113

1    A.  No.
2    Q.  What were your discussions about Bobby Brown
3  and with Devi, Devi Bala?
4    A.  My discussions with Devi Bala is that we
5  needed someone to act, needed someone to act as chief
6  of police because we didn't have a chief of police.
7    Q.  Got it.  And are you aware, was Bobby Brown a
8  close friend of Sergeant Barnett?
9    MS. BENNETT:  Objection, form.
10    A.  I can't speak to their friendships.
11    Q.  Okay.  No worries.
12    MR. HALL:  I'm going to step out and speak
13  with Chief Young for a moment.
14    THE WITNESS:  Sure.
15    MR. HALL:  And then I'll be back.  I hope
16  I'm finished with you, but I may not be if she gives me
17  a lot, but I think I'm finished with you.  Okay.  You
18  want to step out for a minute.
19    THE VIDEOGRAPHER:  Going off the record.
20  The time is 4:16.
21    (Break taken)
22    THE VIDEOGRAPHER:  We are on the record.
23  The time is 4:19.
24    Q.  Do you know what Exhibit 71 is?
25    A.  Yes.



Lesia Crumpton-Young

February 16, 2024
Pages 114 to 117

Page 114

1    Q.   Okay.  What is it?
2    A.   It looks like it may be a --
3    Q.   No, only if you, if you recognize it.  If you
4  don't recognize it, that's fine.  We have other
5  witnesses who can prove it up.
6    A.   Okay.
7    Q.   You don't recognize it?
8    A.   I don't recognize it.
9    Q.   Okay.  Thank you.  I think that, I think that
10 concludes my examination of you in these, with regard
11 to these exhibits, and that's exhibits that go through
12 72.  It's going to be Exhibits 55 through 72.
13       Do you recognize this org chart?  And tell me
14 if you can, was this correct when you were president?
15    A.   At first glance it looks like it may have
16 been one of our org structures, yes.
17    Q.   Okay.  You gave me too many mays and
18 possiblys.
19    A.   We had, we had a reorganization.
20    Q.   Okay.
21    A.   Two reorganizations during, during my
22 presidency so...
23    Q.   Do you feel comfortable telling us under oath
24 whether this accurately reflects your org chart before
25 Mary Young, Chief Young was terminated?

Page 116

1       MS. BENNETT:  Can I have this copy?
2       MR. HALL:  You can have that copy.
3       MS. BENNETT:  Okay.  Excellent.  Are you
4  passing the witness?
5       MR. HALL:  I did.
6       MS. BENNETT:  Okay.  Sorry, I didn't hear
7  you.  I reserve all questions for trial.  I don't have
8  any questions for you at this time.  Thank you.
9       THE VIDEOGRAPHER:  Going off the record.
10 The time is 4:24.  Ending the deposition of Dr. Lesia
11 Crumpton-Young.
12       (Deposition concluded at 4:24 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 115

1    A.   I can't say for certain --
2    Q.   Good.
3    A.   -- that that is true.
4    Q.   Then I will not have -- I will not prove it
5  up through you.  Okay.  Thank you so much, ma'am.  Did
6  you answer my questions truthfully?
7    A.   Yes, yes.
8    Q.   Okay; and consistent with the oath to tell me
9  the truth, the whole truth, and nothing but the truth?
10    A.   Yes.
11    Q.   You told me the whole truth in response to my
12 questions, right?
13    A.   From what I can remember sitting here today,
14 yes.
15    Q.   Have you knowingly lied to me today?
16    A.   No, not to my knowledge.
17    Q.   Okay.  Thank you, ma'am.  I'm finished with
18 you.
19       MS. BENNETT:  I just have one question.
20 Is that a marked exhibit?
21       MR. HALL:  It is not since she couldn't
22 prove it up.
23       MS. BENNETT:  Oh, okay.  Can I at least
24 get a copy of it, though?
25       MR. HALL:  Absolutely.

Page 117

1               CHANGES AND SIGNATURE
2  WITNESS:  LESIA CRUMPTON-YOUNG
3  DATE OF DEPO: February 16th, 2024
4       Please indicate changes on this sheet of paper,
   giving the page and line number, the change and the
5  reason for the changes.  Reason for changes are: (1) To
   clarify the record; (2) To conform to the facts; (3) To
6  correct transcription errors.
7     PAGE/LINE        CHANGE                 REASON
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____



Lesia Crumpton-Young

February 16, 2024
Pages 118 to 121

Page 118

1        I, LESIA CRUMPTON-YOUNG, have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4

5                          _____
                          LESIA CRUMPTON-YOUNG
6    THE STATE OF _____)
7    COUNTY OF _____)
8        Before me, _____, on this
9    day personally appeared LESIA CRUMPTON-YOUNG, known to
10   me (or proved to me under oath of through
11   _____) (description of identity card or
12   other document) to be the person whose name is
13   subscribed to the foregoing instrument and acknowledged
14   to me that he/she executed the same for the purpose and
15   consideration therein expressed.
16       Given under my hand and seal of office this _____
17   day of _____, _____.
18
                          _____
19                        NOTARY PUBLIC IN AND FOR
                          THE STATE OF _____
20
21   My Commission Expires: _____
22
23
24
25

Page 119

1                    CAUSE NO. 2022-77744
2
     MARY YOUNG                  )  IN THE DISTRICT COURT OF
3                                )
                                 )
4    VS.                         )  HARRIS COUNTY, TEXAS
                                 )
5    TEXAS SOUTHERN UNIVERSITY,  )
     TEXAS SOUTHERN UNIVERSITY   )
6    PRESIDENT TSU GENERAL COUNSEL )
     HAO LE AND THEIR DESIGNEES  )  127th JUDICIAL DISTRICT
7
8             REPORTER'S CERTIFICATION
         TO THE DEPOSITION OF LESIA CRUMPTON-YOUNG
9                February 16th, 2024
10       I, Brenda A. Foster, Certified Shorthand
     Reporter in and for the State of Texas, hereby
11   certify to the following:
              That the witness, LESIA CRUMPTON-YOUNG, was
12   duly sworn by the officer and that the transcript
     was correctly reported in machine shorthand by me
13   at the time and place set forth in said caption
     and that said transcript contains a true record of
14   the proceedings had at said time and place;
              That the deposition transcript was submitted
15   on_____2024 to the witness or to the attorney
     for the witness for examination, signature and
16   return to me by _____2024;
              That the amount of time used by each party
17   at the deposition is as follows:
         MR. BENJAMIN L. HALL, III - (    )
18       MS. YVONNE DENISE POWELL BENNETT - (00)
              That pursuant to information given to the
19   deposition officer at the time said testimony was
     taken, the following includes counsel for all
20   parties of record:
              For the Plaintiff(s):
21
22       MR. BENJAMIN L. HALL, III
         THE HALL LAW GROUP, PLLC
23       530 LOVETT BOULEVARD
         HOUSTON, TEXAS  77006
24       (713) 942-9600
         (713) 942-9566 fax
25       bhall@thlf.us

Page 120

1    For the Defendant:
2    MS. YVONNE DENISE POWELL BENNETT
     OFFICE OF ATTORNEY GENERAL
3    P.O. BOX 12548
     AUSTIN, TEXAS  78711-2548
4    Yvonne.bennett@oag.texas.gov
5        I further certify that I am neither attorney
     nor counsel for, related to, nor employed by any
6    of the parties or attorneys in the action in which
     this proceeding was taken, and further that I am
7    not financially or otherwise interested in the
     outcome of the action.
8        Further certification requirements pursuant
     to Rule 203 of TRCP will be certified to after
9    they have occurred.
10       Certified to by me on this _____ day of
     _____2024.
11
12
         _____
13       BRENDA A. FOSTER, Texas CSR #2470
14       Expiration 01/31/2025
         Magna Legal Services
15       Firm Registration No. 633
         16414 San Pedro, Suite 900
16       San Antonio, Texas  78232
         866.672.7880
17
18
19
20
21
22
23
24
25

Page 121

1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
2        The original deposition was/was not returned
     to the deposition officer;
3        If returned, the attached Changes and
     Signature page contains any changes and the
4    reasons therefor;
         If returned, the original deposition was
5    delivered by regular mail/certified
     mail/hand-delivery to Benjamin Hall, Custodial
     Attorney;
6        That $_____is the deposition officer's
7    charges to the Plaintiff for preparing the
     original deposition transcript and any copies of
8    exhibits;
         That the deposition was delivered in
9    accordance with Rules 203.3, and that a copy of
     this certificate was served on all parties herein
10   on and filed with the Clerk.
11       Witness my hand this_____day of
     _____ 2024.
12
13
         _____
14       BRENDA A. FOSTER, Texas CSR #2470
15       Expiration 01/31/2025
         Magna Legal Services
16       Firm Registration No. 633
         16414 San Pedro, Suite 900
17       San Antonio, Texas  78232
         866.672.7880
18
19
20
21
22
23
24
25



Lesia Crumpton-Young

February 16, 2024
Index: $25..account

**$**

**$25**  97:19 98:13 103:10 104:6

**0**

**02.02.03**  67:14

**1**

**1**  56:13 69:19 70:12

**12/1**  70:8

**12/1/2022**  69:1 70:10

**14**  97:5,7 99:13

**16th**  4:3

**17**  75:16,18 76:9

**19**  77:4

**1:14**  4:4

**1:54**  96:23

**1st**  69:17 70:9 73:4,5,12,19,21

**2**

**2**  5:20 58:24 62:7

**20**  46:24 110:13

**2017**  94:24 95:7,20 96:22,23 97:17, 23,24 99:16 100:16 101:14,23,24 102:21

**2021**  5:24 110:13

**2022**  21:8 28:10 30:16,17 46:8,17, 18,19 47:3,13 64:5 69:19 70:9,12,22 74:2 81:6 93:25 94:9,12,17 96:11 98:15

**2023**  6:2 10:3 16:4 26:16 82:4 83:13

**2024**  4:3 14:10 75:15

**2028**  38:4

**21**  96:12

**22**  75:22

**24**  96:23

**24th**  21:8 46:7,17,19 47:3,13

**25**  75:22

**25th**  37:22 38:4 74:2

**26th**  82:4

**27th**  81:6 96:11

**2:43**  63:20

**2:56**  63:23

**2nd**  68:15 70:18,22 72:16 73:13,20

**3**

**3**  45:3

**3/24/2022**  24:10

**3:50**  97:12

**3:51**  97:15

**4**

**4**  77:6

**4:16**  113:20

**4:19**  113:23

**4:24**  116:10,12

**4th**  46:18

**5**

**55**  12:20 13:11 114:12

**56**  13:7,12,13,14,19

**57**  14:21,22

**58**  14:22,23

**59**  15:9,10 21:4,11,17,24 22:3 23:15, 21 24:10,14,25 25:4 26:18 28:2,25 30:1 37:21 41:7 46:6,7 49:5,10,13 93:20,21

**6**

**6**  62:21 96:15,16

**6.14022**  45:16

**6.14023**  45:16 47:15

**60**  26:20 28:23

**60.2**  43:13

**61**  56:4,13 68:18,19 70:1

**614.022**  43:23 77:20 78:3,12

**614.023**  45:4,23 49:17

**62**  43:13 58:10,12 66:1,12 69:5 70:11,13 71:25 73:24

**63**  68:9 70:15,16 71:9

**67**  62:24 63:2,3,13,24 64:17 68:2

**68**  96:4,6

**69**  9:3,8,12 10:9

**6:53**  68:13,15

**6th**  68:13

**7**

**7**  76:9,10 96:12,15

**70**  81:19

**71**  113:24

**72**  99:11,12 101:5 102:11,19 114:12

**7th**  64:5

**9**

**9th**  10:3 12:15 16:4 26:16 75:15

**@**

**@tsu.edu**  80:2

**A**

**ability**  41:22

**absence**  49:23 50:22 51:17,24 52:6, 17,21 66:3,6 67:7 68:4 72:2 73:25 74:14

**absolutely**  18:2 25:22 26:13 115:25

**abuse**  85:20 87:11

**access**  75:9 80:5,6

**accompany**  108:25

**account**  79:22



**accurately** 114:24

**accusatory** 83:17

**accused** 95:22

**accustomed** 18:21

**achieve** 14:1

**acknowledged** 44:7

**acknowledging** 37:24 53:22

**acronym** 87:18

**act** 113:5

**acting** 18:16 42:24 70:23,24 71:10, 12 72:17 73:14 74:2 112:12

**action** 49:18 51:8,12 53:13 56:24 57:21 59:11,12 60:2,13,14,17,21 61:5,14,15,21,23 64:15 65:2,4,5 67:2,9 69:4 71:14

**actions** 74:5

**actively** 34:2

**activity** 43:6 102:17

**actual** 35:25 40:1 41:16 102:23

**addition** 53:12,13,19 91:24

**additional** 100:21

**address** 79:23

**administration** 18:16 95:8,20

**administrative** 10:5 48:3,9,11,12 53:2 61:25 62:1,3 66:9,17 72:4,5,8, 11

**administrator** 87:15

**administrators** 96:21

**admits** 37:3 78:1

**admitted** 37:11,16 77:18 78:9,18 94:20

**advise** 8:6 10:1

**Advisory** 8:5

**agency** 43:24,25

**agents** 56:21

**agree** 50:20 52:4 54:3,6,11 95:21 100:21 103:14

**agreed** 23:25 56:5 82:8

**agreement** 5:10

**agrees** 104:24

**ahead** 5:20 111:13

**Albert** 18:9,10 19:16,23 20:8 22:4,8, 15 29:1,9,16,25 30:18,24 31:7,21 32:4 33:17 34:17,21,23 35:13,25 36:4,8 39:9,22 44:10 45:7 106:25

**allegation** 5:14 53:18 54:2,3 55:18, 22,24 64:16 88:18 91:11 92:8 104:12 106:24 107:4,16,23

**allegations** 43:1 74:7 79:16 85:13

**alleged** 15:18 31:18 54:19 55:16 83:6 86:10 98:15 102:3 107:10,12, 15,19

**allegedly** 105:24

**amount** 91:14 102:20

**amounts** 96:20

**and/or** 97:2

**anonymity** 26:25 27:2,16

**anonymous** 15:17,19,20 16:6,9 17:4,15,18 18:3 19:3,4,15,20 20:3,9, 10,12,18 21:3,6,19,22 22:8,15,18,24 23:8,14 24:18,24 25:12,20 26:5,11, 18 27:21 28:2,10,16,25 29:4,10,17 30:1,4,19,24 31:8,12 35:1,14,15 36:1,16,21 37:4,17 39:10 40:7,17,22 41:6,14 42:23 44:8,24 46:11,15,20 48:14,17,21 49:6,9 62:8 67:20 74:13 77:8 78:24 79:4,12,15 83:18 85:18, 21 86:5 89:23 90:20,24 91:6,10 93:21 94:7 98:16 102:3

**answering** 20:17 23:6,7 26:23 104:3 112:23

**ante** 65:16

**Anytime** 23:13

**apparel** 112:5

**appeal** 80:10,13,23,24 97:4

**appealing** 80:17

**appeared** 4:5 90:20 107:1

**apply** 47:22 56:3

**appointed** 46:2

**appointment** 112:19,21

**apprised** 30:22

**approached** 82:6

**appropriately** 47:18

**approval** 8:12,15 99:19 101:11 112:22

**approve** 8:11,14,16 100:3 112:21, 25

**approved** 95:7 96:21,25 98:3,6 99:22 100:7 101:5,8 103:9

**approving** 7:21 95:20

**approximately** 30:7

**arrive** 28:2

**arrived** 6:9

**article** 15:7

**articulated** 72:5

**articulates** 72:7

**ascertained** 91:13

**assigned** 108:25 111:15

**assistance** 19:8

**assume** 97:21

**assumes** 103:24

**assuming** 44:9 95:15,17 103:18

**assured** 32:9

**attached** 62:8

**attend** 110:7

**attending** 66:19

**attention** 82:13

**Attorney** 4:12

**audio** 79:12

**audit** 33:2 34:14 74:2

**auditor** 30:21,25 32:11,15,18,21,25 33:19,23 34:13 43:1

**August** 74:2

**authenticate** 42:10

**authenticated** 44:22

**author** 41:9 81:24

**authored** 23:1 24:2,14,23 26:4 38:20 40:17 42:23 57:12,13 58:21 73:11



Lesia Crumpton-Young

February 16, 2024
Index: authority..characterize

**authority** 6:11 103:15

**authorization** 6:21,23 94:24 95:18, 19 97:23

**authorize** 6:15 93:16

**authorized** 6:18 16:11 93:19 96:21 98:22 100:17 101:20,22 102:3

**authorizing** 97:23

**aware** 7:17 10:14,23 11:5,8,24 12:1 14:12 26:3,6 36:14,19 39:6,7,22 44:24 45:1 56:9 63:4,9 65:25 78:17 80:9,23 83:4,9 89:8,13 91:5,9,12,25 94:15,18,19,22,23 95:2 101:4 102:16,18,20 104:11 106:3,13,15 107:3 110:24 113:7

### B

**back** 17:16 25:24 26:12 33:25 60:16, 23 61:6,11,13 63:1 64:8 66:1 68:8 69:6,10,18 71:20 72:1 90:4 96:22 99:15 113:15

**Baker** 18:12,13,14 19:16,23 22:24 23:9 25:16 29:1 39:9,23 45:7

**Bala** 9:20,21,24 10:1 12:16 19:9,17, 24 24:8 25:8,11,17 26:9,16 39:8,24 45:8 58:21 66:2 68:10 69:6 71:4,9 112:17 113:3,4

**Bala's** 16:5

**Barnett** 108:11 109:5 110:5,16 113:8

**based** 53:16 54:2,3 55:7,9 59:6 65:5 73:16,18 74:13 85:5,7 90:19

**basis** 111:24

**baskets** 108:14

**beat** 47:6,7

**beginning** 4:4

**behalf** 43:2 80:10,14 96:12

**behavior** 48:16 62:3 94:9

**belt** 107:22 111:2

**beneath** 6:19

**beneficial** 82:9

**Benjamin** 4:9,20

**Bennett** 4:11 27:18,22 28:4,17 29:7, 13,19 31:3 33:8 37:19 39:12 40:9 41:10,17,20 44:13 47:8 49:25 50:2, 9,14,17,23 51:9 52:7,18 54:5,7,9,16, 18,24 56:7,11 57:2,4,7,11,16 58:1 60:12,18,22,25 61:7,22 63:7 66:4,7 67:4 68:6 69:11,20 71:16,22 74:16 75:8 77:21 78:4,13,20 80:19,22 81:4 87:25 89:4 90:1 91:1,3 93:17 95:10, 13,24 100:18,25 103:17,20 107:8, 17,24 108:3 111:7,12,14,21,24 113:9 115:19,23 116:1,3,6

**billings** 102:23

**binder** 9:3,6 12:19 42:1

**blank** 70:3

**blocked** 61:12

**board** 18:8 22:16 31:11 32:4,16,19, 22 33:2,6,14,21 34:2,11 36:15 39:7 80:10,14 82:7,8 83:1,5,11 84:13,17 85:1,4,8,9 86:4,13,15,17 88:3,5,9, 11,12 89:1,7 90:17,23 91:4 96:11 97:5 106:25

**board's** 86:9

**Bobby** 70:22 71:11 112:11,14 113:2,7

**body** 33:7,15,21

**book** 12:17 62:11 71:2 73:18

**boots** 107:22 110:22,25

**bottom** 56:14 63:11,13 64:3,16,20 96:16

**bought** 109:1 110:7

**break** 55:21 63:21 97:13 113:21

**bring** 97:16 98:8

**bringing** 44:15

**broad** 61:8 102:5

**broke** 55:17 63:12 78:18

**broken** 63:6

**brought** 4:24

**Broussard** 96:23 98:2,6 101:15,17

**Brown** 19:5,17,24 23:19,22 25:17 36:24 37:3,10,11,15 38:5,7,19 39:3, 5,6,23 40:12 41:23 42:4,22,24 44:5, 17,20,21,25 45:1,8 46:9,14 47:10 50:7,19 51:5 53:21 62:17 70:22 71:11 74:3 75:1,13 77:17 78:1,6,9, 18 85:6,11,12 86:6 87:22 88:4 89:24 90:19,24 91:6,10,24 92:4,19 94:19, 25 95:5,22 98:19 102:23 103:12 105:13 106:2 112:11,14 113:2,7

**Brown's** 36:25 42:5 74:12,19,23 80:11,17 104:11

**budget** 97:2

**business** 87:15 91:19 106:6

**buy** 109:7,8 110:5

### C

**C-H-A-N-D-R-A** 106:11

**cabinet** 110:12

**cake** 112:3

**call** 31:6

**calling** 18:21

**Calls** 50:23 51:9

**campus** 38:22 48:10 60:16,24 61:6 66:18 69:7,10,18 71:20 72:1 87:18 92:16

**capacity** 64:10

**care** 108:24

**careful** 23:5

**Caroline** 18:12,14 19:16,23 22:23 23:9 29:1 39:8,23 45:7

**case** 37:1 42:21 78:18 81:15 82:24 93:22 107:19 111:25

**causing** 48:9

**cell** 34:19

**cetera** 34:14 38:23 66:21

**Chair** 106:25

**chairman** 18:8,11 22:16 82:6

**chairperson** 18:11

**challenge** 95:17

**Chandra** 106:10,14

**changed** 59:23

**channels** 98:7

**characterization** 32:1

**characterize** 87:7



Lesia Crumpton-Young

February 16, 2024
Index: characterized..conveying

characterized 94:4

charge 19:6 93:11 102:12 107:11

charges 93:14

charging 105:13

chart 6:20 9:22 102:19,24 114:13,24

checked 106:5

chief 5:16,17,18,21 6:5,8,12 7:22
8:4 9:14 10:8,12,13,14,16,21 11:7,
12,14,19,25 12:3,14 13:24 14:8,12,
17 15:19 16:6,11 19:15 20:4 26:9
28:15 31:22 64:9,15 66:2,6,14 67:3,
9,20 68:10 69:4,6,10,17 70:24 71:5,
9,10,15,17,19 72:1,6,17 73:14,24
74:2,5,15 78:10,25 79:4,13,17
80:10,14 83:25 84:3,6,8,22 85:24
86:3,6 87:12 89:22 91:2,7,11 92:8,
20,21 93:1,3,6,7,15,18 95:7,9,19,21,
23 96:12,24 98:15 102:4 103:14
106:16,24 107:7,10 108:12,15
111:15 112:12 113:5,6,13 114:25

chief's 68:4

choice 6:23

Christmas 110:10,13,14

chronology 72:18,21 73:15,16

Cinderella 96:1,2

circulated 96:24 98:2

city 102:16

claim 89:22

clarify 33:22

clear 17:23 20:16,22 32:25 38:9
56:25 57:22 62:14 65:3 109:21

client 106:14

close 83:24 113:8

closed 76:3,21

clothing 107:20 108:1 110:6,19,20

code 43:23 45:4,24 47:15 49:17
60:4 78:12

coding 93:13

collecting 92:9

collective 33:3

collegial 82:5

colon 76:17

combined 24:12

comfortable 75:3 114:23

comfortably 19:14,18,25

comma 76:12 77:9

committed 48:20 84:21

committee 18:12 33:2 34:14

common 27:1

communicate 86:8

communicated 7:18 10:8 49:9
85:24 86:3,5

communications 80:4

comp 67:15

compatible 84:1

compensatory 67:15

complainant 20:13 22:9,17,21,25
23:10,15,20 24:2,8 25:12 26:10
38:7,19,20 39:4,5,11 40:1,8,16 41:8,
15 42:22 44:7,20 45:20 46:10,16
47:11 49:22 76:14 77:10,15,19 78:2,
11

complained 64:14

complaining 98:20

complaint 5:15,18 15:18,20,22,24
16:1,2,6,9,10 17:4,15,18 18:3 19:3,
4,15,20 20:3,4,9,11,14,18,20,23
21:3,6,19,23 22:5,8,10,15,18,24
23:1,9,11,14,21 24:3,18,24 25:13,20
26:5,11,18 28:3,14,25 29:5,10,17
30:1,4,19,21,22,24 31:8,12,17
34:16,18,22,24 35:1,3,8,14,15,17,
19,25 36:1,16,21 37:4,12,17,25
38:4,10,11,14,21 39:3,10,14,15,25
40:2,6,7,8,17,23,24,25 41:6,9,14,16,
23,24 42:2,6,8,23 43:2,15,19,25
44:1,3,6,8,11,12,16,22,25 45:20,24
46:5,7,10,11,15,20 47:11,20 48:14,
17,22 49:1,6,10,20,22 50:5,6,20
51:1,2,7,14,18,20,22 52:1,4,15,22
53:16,17,20,25 55:8,10 59:7 62:8,
12,16,17 65:5 67:20 74:4,13 76:13,
15 77:8,15,19 78:2,5,11,19,25 79:4,
13,15 85:18,22,25 86:5 89:23 90:20,
25 91:6 93:21 94:8 98:16 100:17
102:3

complaints 27:17,21 28:8 47:17
83:18

complete 15:11

compliance 16:21 42:8,25 59:18

complied 77:19 78:2,11

comply 56:18 62:3 64:24 103:15

computer 15:25 61:12,13 66:21

computerized 35:7

concern 20:19 21:25

concerned 16:22

concerns 10:4 19:1

concluded 116:12

concludes 114:10

conclusion 50:24 51:10 87:24

condescending 104:16

conduct 65:18

conform 102:24

confused 47:23,25

confusing 26:14

consideration 11:12 87:2

considerations 87:5

considered 14:12 43:23 61:5

consistent 6:22 40:19 72:19 115:8

constitute 67:8

contained 21:24 29:6

content 21:18

contention 42:21

contents 22:3 24:2 29:4

context 6:25 7:6 103:2

continues 65:14

contradict 37:13,18

contrary 64:15

convenient 6:24

conversation 16:15 23:2 29:23,24
33:5 34:8,9,20 86:20,22,24 87:4,8,9

conversations 35:15,16,19,22

conveying 34:4



**COO** 16:22

**copied** 97:6 100:1,2

**copies** 35:6

**copy** 15:22,23 34:18,21,23,25 35:1, 3,7,8 36:16,20 37:4,6,7,16 38:10,11, 14,24 39:9,14,15,25 40:6,11 41:13 45:24 46:9,15 49:19 50:5 51:1,13 52:21 62:12,16 78:1 81:23 100:3 115:24 116:1,2

**correct** 6:9 13:5 17:22 20:7,15 21:8, 19 24:20 26:7 28:16 30:3 31:13,14 33:6,7 34:18 40:8 44:9 49:6,10 51:8, 24 52:17,19 55:24 58:3 62:7 65:20 66:3 67:3,20 68:18 69:7,10 70:9 71:6,7,11,12,15,21 72:2,18,20 73:16 74:15 75:21 77:9,11,16 80:16 81:17 84:12 85:22 86:1 88:24 89:25 90:21 92:21 93:6 98:19 103:1 112:12 114:14

**correctly** 65:11,19 66:23 71:1 74:9 82:11 84:9

**corroborating** 92:7

**counsel** 4:5,6,7 18:15 25:16 64:24 101:1

**counsel's** 100:18

**country** 32:9

**county** 46:1

**court** 4:14 9:4 16:8 20:7 24:20 26:7 30:23 63:5,25 64:13 65:22 68:1,23

**courtesy** 86:11,25 100:23

**cover** 98:8

**cowboy** 109:2

**created** 93:12

**critical** 102:23

**criticized** 95:7

**criticizing** 103:12

**Crumpton-young** 4:5,13,16,20 61:4 64:23 82:5 116:11

**customary** 36:2 39:13

---

**D**

**danger** 65:10

**Darlene** 19:4,17,24 23:19,22 25:17 36:24,25 37:3,10,11,15 38:5,7,19 39:3,5,6,23 40:12 41:23 42:4,5,22, 24 44:5,17,20,21,25 45:1,7 46:9,14 47:10 50:7,19 51:5 53:21 62:17 74:3,12,19,23 75:1,12 77:17,25 78:6,9,17 80:11,17 85:6,10,11 86:1, 6 87:22 88:4 89:24 90:19,24 91:6, 10,24 92:4,19 94:19,25 95:5,22 98:19 102:23 103:12 104:11 105:12 106:2

**data** 92:10

**date** 4:3 16:4 21:18 64:2 68:19,21, 23,25 69:17,18,24 70:5,6,11,16 75:10,13 81:7

**dated** 10:3 24:9 68:12 73:12,13 82:4 96:22

**dates** 68:22 69:13 72:23 73:16 93:18

**Davi** 69:5

**day** 22:20 26:3 68:16 69:2,8,21 70:3 71:13 72:15,16

**days** 77:18

**DB** 105:22

**DBA** 84:22,24 87:12,13,18 92:21,23 93:12 105:21,23,25 106:3,7,9

**deal** 40:4 54:12 103:4,6

**debate** 42:16 57:15

**December** 64:5 68:13,15 69:17,19 70:9,12,18,22 72:16 73:12,13,21 81:2,6 96:11

**decision** 57:8 59:1,16,24 66:16

**def** 45:10

**definition** 40:18

**definitions** 40:20

**delete** 80:7

**deleted** 80:3

**denial** 65:8

**department** 16:23 43:7,24 70:20 89:16 94:2 96:25

**Departmental** 87:15

**departments** 92:6

**depos** 75:9

**deposition** 4:4 5:4 9:12 11:23 12:23 13:4,5 36:25 74:20,23 75:3,10,12 92:13 94:20 104:24 116:10,12

**deputy** 70:22 84:22 87:12 92:21,25 93:3 106:16

**describe** 33:9,13

**describes** 21:25

**describing** 42:15

**destroy** 79:6 80:7

**destroyed** 80:4

**detail** 109:5 111:16

**details** 93:22

**detention** 46:1

**Deva** 24:5 68:10

**development** 13:25

**Devi** 9:18,21,24 10:1 12:16 19:8,17, 24 24:5,6,7,8 25:8,11,17 26:8,16 39:8,24 45:8 58:21 66:2 68:10 69:6 71:4,9 112:17 113:3,4

**difficult** 89:6

**direct** 12:8,11 28:19

**directed** 43:8

**directive** 94:2 98:15

**directly** 9:24 12:4

**director** 70:23 96:23

**disagree** 50:12 57:24 58:3,4

**disapprove** 8:9

**discharge** 65:1

**disciplinary** 49:18 51:8,12 53:13 59:11,12 60:2,13,14,17,21 61:5,14, 15,21,23 65:4 67:2,8 69:4

**discipline** 56:24 57:20 58:9 65:1 67:6

**disciplined** 54:2

**discuss** 10:7 29:9 32:10,13

**discussed** 10:4,10 17:3,15,18 18:3, 7 19:14,19,20 20:3,8 22:3,7,15 23:8, 13 29:1,10 90:17 102:2

**discussing** 53:3 88:5,12 90:18



101:2

**discussion**  35:13 88:2 112:18

**discussions**  35:13 113:2,4

**dissension**  48:9

**distinction**  38:1

**district**  63:5

**divisions**  92:5

**doc**  73:16

**document**  14:22 15:13 16:3 35:23 41:7,8 46:6 58:20 64:2 65:13 66:24 67:22 71:8 75:2 81:19,22 97:16 98:12 99:18 102:11

**documenting**  105:6

**documents**  72:22 73:17,19 79:6,8, 11 100:21

**drink**  74:24

**due**  65:8 68:4

**duly**  4:17 96:20

**duration**  66:9,17

**duties**  59:23 60:8 66:14 84:2

**duty**  58:25

E

**earlier**  25:5 35:2 62:12

**eatery**  86:22

**eating**  84:15 86:23

**Edmonds**  19:7,17,24 23:25 25:17 39:8,24 45:8

**education**  6:22 7:24 40:20 61:18 100:3

**educational**  6:24 7:6

**Effective**  66:13 70:21

**electronic**  15:25 34:25 35:7

**eligible**  11:12

**email**  38:5 70:20 79:21,23

**emails**  79:2,11

**employed**  46:2

**employee**  7:7 46:4 49:19,20 51:13, 15 53:14 55:5 61:6,11,12,20 62:2

**employment**  4:25 6:16 7:9 9:9,14 10:2 53:16 55:7,9 56:24 57:21 65:2 66:16

**encourage**  27:16

**encouraged**  82:25

**end**  12:10

**Ending**  116:10

**enforcement**  43:25 45:25

**engage**  56:24 57:20 65:1

**engaged**  34:3 92:7

**engaging**  92:20

**enjoin**  65:17

**enjoined**  71:14

**enter**  68:2

**entered**  65:23 69:25 72:15

**entire**  24:21,25 77:11 78:9 97:16

**entry**  63:13

**essence**  16:14 23:2

**essentially**  12:24

**establishment**  84:15

**ethics**  20:20 38:21 39:3 41:9 46:19 67:22 90:20

**Ethicspoint**  20:20,21,23 21:7 22:11 23:1,11,16,20 24:3,9,24 26:24 27:1, 16,20 28:3,9,12,20 35:23 38:22 39:25 41:14 44:17

**evening**  70:19

**event**  94:25 96:18,19 98:17,22 99:1, 16 102:15 103:10,16 104:5,8,13,20

**events**  66:19 96:24 97:3,20 102:13

**evidence**  37:18 47:10 53:18 65:17 74:7,12

**exact**  59:3

**examination**  4:18 114:10

**Excellent**  116:3

**executive**  5:21 13:24 14:8,13,17 70:23 74:2 88:11 103:9

**exhibit**  9:3,8,12 10:8 12:20 13:7 14:21,23 15:9,10 21:4,11,17,24 22:3 23:15,21 24:10,14,25 25:4 26:18,20

28:2,23 30:1 41:7 43:13 46:6 49:5, 10 56:4,13 58:10,12 62:7,21,24 63:13,24 64:17 66:1,12 68:1,9,18,19 69:5 70:1,11,15,16,17 71:9,21,23,25 73:24 81:18 93:20,21 96:4,6 97:7 99:11,12 101:5 102:19 113:24 115:20

**exhibits**  9:5 12:19 114:11,12

**existed**  45:9 98:14 101:22 102:11

**expectation**  62:2

**expected**  95:5,11

**explained**  31:4

**explaining**  99:4

**explanation**  43:11

**extent**  100:11,12

F

**facilities**  96:24

**fact**  10:17 26:13 37:6 39:4 63:11 69:8 94:23 95:18 102:2 107:14

**factors**  47:19

**facts**  89:2 91:12 107:3,16,22 111:24

**factual**  91:15

**factually**  94:15

**fair**  88:23,25

**faulty**  55:22,24

**February**  4:3 75:15

**fee**  97:1

**feel**  114:23

**female**  25:9,10 108:18

**field**  76:24

**fighter**  46:1

**figure**  83:19

**file**  43:19

**filed**  15:18 22:17 23:20 24:23 25:12 26:17 39:3 40:1,8 41:16 46:5,7,12 54:13 64:13 80:10,13 94:8

**filing**  24:17 27:17 43:15

**final**  85:25 86:1 105:9


MAGNA
LEGAL SERVICES

**finalized** 86:6

**finally** 24:5 96:17

**finance** 91:20 106:6

**find** 70:21

**finding** 65:23

**findings** 34:15 68:2 88:5,19,22 89:3 90:19

**finds** 63:11

**fine** 19:13 68:8 101:9 114:4

**finished** 36:6 77:14 82:18 83:24 113:16,17 115:17

**fire** 43:24 46:1

**firm** 80:9

**flip** 13:8,11

**folder** 40:11

**follow** 82:14

**form** 25:6 27:18,22 28:4,17 29:7,13, 19 31:3 33:8 37:19 39:12 40:9 41:10,17,20 44:13 50:2,12,23 51:9 52:7,18 54:8,9,18,25 56:7 57:2,4 58:2 60:18,22,25 61:7,22 63:7 66:4, 7 67:4 68:6 69:12,20 71:16,22 74:16 76:17 77:21 78:4,13,20 80:19 87:25 89:5 90:1 91:1,3 93:17 95:13,24 103:17,20 107:8,17,24 108:3 111:7, 14,21 113:9

**found** 48:19 57:1 63:5 68:2 92:19 95:6,22 107:11

**fraud** 48:20 84:22 85:14 87:3 95:23

**fraudulent** 16:11 31:19 32:2 35:16 43:6 49:1,8 105:5

**fraudulently** 31:22

**frequent** 26:25

**frequently** 27:5 61:18

**Friday** 68:15 70:22

**friend** 113:8

**friendships** 113:10

**front** 75:20 101:7

**function** 14:16

**functions** 92:16

---

## G

**gain** 35:24 101:25

**gained** 89:14

**gathered** 74:13

**gave** 17:16 34:23 37:7,12 92:5 93:10 94:1 105:11 108:13 109:2 110:13 114:17

**general** 4:12 18:15 25:16 33:4 64:24 84:7

**generally** 27:20,25 28:10 30:13

**generated** 74:14

**gift** 108:12 110:6,19 111:20

**gifts** 108:5,13,14 110:10,13

**give** 5:16,18 9:5 18:6,24 27:12 31:5, 23 34:17,21,25 37:6 54:25 74:22 92:3,6,14,15 111:20 112:8

**giving** 29:6 40:2 92:12

**glance** 114:15

**goals** 14:1

**good** 40:4 54:12 62:22 67:11,12 70:19,21 84:4,5,8 103:4,6 115:2

**governing** 33:15,20

**Government** 43:22 45:4,23 47:15 49:17 78:12

**grounds** 66:19

**gun** 112:6,7,8

---

## H

**Hall** 4:9,19,20 8:13 9:4 11:16 16:24 19:2 22:12 23:3 25:23 27:10 36:12 38:16 39:1,18 40:13 41:2 42:11 43:10 44:19 47:24 50:11,16 52:2 53:4 54:8,10 55:13 57:5,9,13 59:25 62:5,19,23 63:16 69:15 71:24 72:12 75:6 76:3,21 78:7 80:21,25 81:3,5 90:4,15 96:1 97:10 99:9,12,17,25 100:20 103:24 105:10 109:24 110:15 111:23 112:23 113:12,15 115:21,25 116:2,5

**handled** 42:8,9

**handling** 30:21 31:5

**Hao** 18:14 19:5,16,23 23:14 25:16 39:8,23 45:7 64:24

**happen** 37:20 60:7

**happened** 42:3 73:19

**happening** 43:7

**happy** 101:3

**harassing** 48:10

**hard** 5:9 35:1,3,5,8

**hat** 107:21 109:3,8,9,18 110:7,21

**hats** 109:22

**head** 18:25 31:11 32:4 43:23,24 92:10

**heads** 96:25

**health** 70:21

**hear** 116:6

**heard** 33:17 83:15

**hearing** 65:17

**held** 17:2 102:15

**helpful** 23:5

**helping** 47:5

**hey** 21:15 84:13 86:12 89:14

**higher** 6:19,22 7:24 40:20 61:18 100:3

**hire** 6:7 11:14

**hired** 14:13,14

**hold** 10:22 63:16 74:20

**hope** 75:21 113:15

**hotline** 20:21,23 21:7 22:11 23:1,11, 16,21 24:3,9,24 26:24 27:1,16,20 28:3,9,13,20 36:3 38:22 44:17 67:22 90:21

**hour** 103:10 104:6

**hours** 93:11 105:7

**house** 88:9

**HR** 16:21 19:6 23:24 90:12 91:12,19 92:10 97:2 106:4

**Huewitt** 18:25 98:3 99:22 100:7 103:8,9

**Hurley** 18:12,13,14 19:16,23 22:24



23:9 25:16 29:2 39:9,23

**husband** 107:13 108:24 109:1

**hypothesis** 52:22

### I

**identified** 14:23 20:14 56:22

**identify** 4:6

**identity** 25:1

**immediately** 66:13 70:21

**imminent** 56:15 64:18,19 65:10

**implementation** 14:1

**implemented** 97:18 100:24

**imply** 33:25

**important** 96:3

**improper** 52:12

**inaccurate** 57:23

**include** 95:1

**included** 71:2 97:4

**including** 107:21

**inconsistent** 55:25 56:3 99:5

**incorrectly** 103:12

**increase** 97:23 98:13 99:15

**increased** 97:20

**indefinitely** 53:15 55:5,6,12 59:5 60:5

**individual** 89:1,7 110:4

**individuals** 18:20 20:2 29:2 36:2 38:23 93:11 105:6

**inform** 10:1 34:15 87:10

**information** 27:9 28:20 29:6 37:5 84:20 86:4 88:17,21 89:9,11 90:17 91:15

**informed** 30:20 41:22 72:3 85:2,8

**informing** 34:5

**initial** 34:8 35:13

**initially** 12:9

**initiated** 29:23

**injunction** 65:17

**injury** 56:14 64:18,19

**input** 88:17

**instance** 28:24 42:7

**instances** 53:1

**institution** 5:2

**instructed** 106:24

**intended** 10:2,7 106:22

**intent** 27:15 69:14,15 71:23

**intentionally** 80:3,7

**intentions** 86:9

**interchangeable** 103:24 104:1,9

**internal** 30:21,25 32:10,15,18,21,25 33:19,23 34:13 43:1

**intervene** 107:1

**intervened** 107:11

**introducing** 29:18

**invalid** 65:5

**investigate** 32:11,21 77:13

**investigated** 42:9 43:1 44:22 53:17 91:10

**investigating** 31:1 32:13,22 77:16 78:19 83:12 90:24 91:6

**investigation** 33:19,20 34:3 40:23 41:1 43:3 44:18 48:13,15,19,21 49:1,6,7 74:6 77:12 78:10 84:21 87:22,23 89:24 90:19 92:4 106:1

**investigations** 83:4

**investigator's** 40:25

**invitation** 12:24

**involuntarily** 81:12

**irregularities** 94:21

**Isaac** 108:9,11,17 109:4,8 110:2

**issue** 43:13

**issued** 68:17 74:14

**issues** 47:16

**items** 66:20 67:19 107:20 108:1

**IX** 40:23,24

### J

**jailer** 46:1

**January** 10:3 12:15 16:4 26:16 46:17,18,19 47:2,12 93:25 94:9,12, 17

**job** 84:8

**judge** 18:13 22:23 40:5 56:5,9 57:1, 13,25 63:5,11 64:14 68:2 69:3 70:4 71:13 74:18 95:8

**Judge's** 57:8,9,18

**July** 5:24

**jumped** 5:20

**June** 6:2

### K

**Ken** 18:25 98:3 99:22 100:7 103:8

**keys** 66:21

**kind** 24:12 86:23 108:14 109:19

**Kinney** 76:17

**knew** 11:15 20:8 22:10 24:22 25:11 26:4,10,17 29:25 31:15,16 97:17

**knowing** 95:3

**knowingly** 115:15

**knowledge** 21:16 28:11 31:11 32:6 35:24 58:11 80:8,15 89:2,14,15 91:22 96:9 101:14 102:1 112:2 115:16

### L

**lack** 93:13

**ladies'** 63:15

**language** 51:12,23 52:4,16 72:10 82:1

**laptop** 15:25

**law** 43:15,18,22,25 45:9,15,25 53:10,12 54:1,14,20,22 55:17,21 56:1,6,18,25 57:22 59:10,18,21 63:6,12 64:16,24 65:3,7,9 76:13 78:12,19 80:9



Lesia Crumpton-Young

February 16, 2024
Index: laws..names

laws 54:20

lawsuit 4:25 5:13 37:15 54:13 55:16 74:24 86:10

lawyer 54:21 64:10

Le 18:15 19:5,17,23 23:14 25:16 39:8,23 45:7 64:24

lead 82:9 94:5,21 96:18 98:22 99:1 104:20

leadership 13:21 70:25

leads 13:25

learn 81:22

learned 76:25 77:2 83:11,14

leather 111:2

leave 10:5 48:3,9,11,12 49:23 50:21 51:17,24 52:5,17,20 53:2 61:25 62:1,4 66:3,6,9,18 67:7 68:3 72:2,4, 5,8,11,14 73:13,25 74:14 80:18

legal 50:24 51:10 65:6 76:24

Lesia 4:4,12,16 82:5 116:10

Lesia.young 79:25

letter 7:12,15,22 8:20,21 9:8 10:3 16:5 18:4 26:8 47:18 48:2 59:8,22 63:4 66:2,5 67:1 69:5,14 70:13 71:17,25 72:3,8 73:22 74:1,11 82:14,16 96:10

letters 79:12

letting 59:22

level 33:21

license 10:22

licensed 11:6,19

lied 115:15

limiting 35:5

Lines 75:21

list 100:1

listed 98:22

listening 99:8

local 43:25

locked 61:19

looked 45:12,13

loss 65:7

lot 112:4 113:17

loud 75:22

love 75:8

## M

made 37:25 46:24 50:15 55:23 59:24 106:24 111:24

maintain 65:16

major 102:15

make 5:8 17:23 20:17,21 21:21 23:6 24:13 26:22 27:3 32:24 38:9 44:5 47:14 59:1,16 66:16 98:4 99:3 104:3

making 20:22 22:5 44:3,12 76:14

male 106:18 107:3,12,21 108:17,19 111:5,10,19

mandamus 65:15

mandated 65:6,9

manner 82:5

March 21:7 28:9,12 46:7,24 47:3,13

mark 77:1,9

marked 115:20

Mary 4:10,21 5:15,17 6:4,7,12,15 7:9,15,18 8:4 10:14 11:5 12:7,9,13 17:19 28:15 36:16,20 37:4,6,12,17 38:15 39:16 40:2,12 41:24 43:9 47:10,17 48:2 49:22 50:20 51:7,16, 19,25 52:5,14,16,21 53:23,24 54:21 55:6 57:21 58:9,18 59:21 62:15 64:9 83:25 84:3,7,13,17,19 86:9,11,16,21 87:1,4,8,9 89:10,15 93:6 94:1,4,16 112:10 114:25

masked 93:13,14

matter 20:8 33:24 34:5,11,14 53:16 55:8,9 59:7 83:22 85:11,18,19,21

matters 86:4

mays 114:17

meaning 53:20

means 38:7 49:21 89:12

meant 32:21

meeting 85:9 88:3,9,11 94:1,12

meetings 94:16

member 86:17

members 36:15 83:1 89:1,7 110:12

memo 96:22 98:9

memos 79:11

mentioned 86:12 99:22,24 100:6

messages 78:24 79:11

met 101:16

Mexico 30:12 34:19

mic 63:18

mind 17:25 25:21 26:12 90:2 91:8 92:2 109:13

minute 18:24 113:18

mischaracterizing 57:8

misconduct 53:18 74:7

mission 14:2

misuse 20:5 22:1 43:6 67:21 85:16 87:3 98:21 105:5

misused 105:13

mobile 66:21

moment 9:2 15:1,10 45:3 54:25 82:17 93:2 97:9 113:13

money 91:14

months 80:16 81:7

move 53:6 54:12 62:21

multiple 68:22

mutually 82:9

Myres 18:9,10 19:16,23 20:8 22:4,8, 15 25:16 29:1,9,16,25 30:18,24 31:7,21 32:4 33:17 34:17,21,23 35:14,25 36:4,8 39:9,23 44:10 45:7 106:25

## N

nail 73:15

named 26:10 29:2 92:18

names 16:19 17:2,4,17 18:2,6,17,21 19:9,22 27:5 91:16 92:3,6,12,13,14, 15 94:2,4 106:12



**naturally** 33:1

**nature** 5:12 83:23

**needed** 33:4 113:5

**nonresponsive** 8:13 11:17 16:25
19:2 22:13 23:3 27:11 36:13 38:17
39:1,18 40:14 41:3 42:11 43:11
44:19 47:24 52:2 53:5 55:14 60:1
62:6,19 69:16 71:24 72:12 78:7
90:15 109:25 110:15 112:24

**note** 101:11 105:10

**notice** 12:24 13:4 58:25 66:15

**notified** 66:22

**November** 70:3

**nuances** 11:15

**number** 52:20 53:1 105:15

**numbered** 9:5 75:17

**numbers** 9:6

---

**O**

**oath** 76:12 82:24 114:23 115:8

**object** 11:16 16:24 27:10 36:12
38:16 43:11 50:9 54:5 62:5,19,23
69:16 90:15 95:10 109:24 111:12

**objecting** 50:11 57:17 100:18,25

**objection** 8:13 19:2 22:12 23:3
27:18,22 28:4,17 29:7,13,19 31:3
33:8 37:19 39:1,12,18 40:9,13 41:2,
10,17,20 42:11 44:13,19 47:8,24
49:25 50:2,17,23 51:9 52:2,7,18
53:4 54:7,9,16,18,24 55:1,13 56:7,8,
11 57:2,4,6 58:1 59:25 60:12,18,22,
25 61:7,22 63:7 66:4,7 67:4 68:6
69:11,20 71:16,22,24 72:12 74:16
76:17 77:21 78:4,7,13,20 80:19 81:1
87:25 89:4 90:1 91:1,3 93:17 95:13,
24 103:17,20 107:8,17,24 108:3
110:15 111:7,14,21 112:24 113:9

**occasion** 102:14

**occur** 90:13

**occurred** 30:8 94:12

**October** 96:22

**offensive** 106:22,23

**office** 4:12 61:20 91:20 97:2 106:5

**officer** 5:21 10:12,18 11:6,19 13:24
14:8,13,17 16:21 42:8,25 43:16,19
44:2 45:25 46:1,2,3 49:19,20 51:2,3,
13,14 53:14 55:5 94:21 96:18 98:23
99:2 104:20 107:14,21 108:2,6,11
109:20 110:1,4,23 111:2,6,10,20
112:8

**officer's** 10:21

**officers** 10:24 11:1 43:8 48:10 94:1,
3,5,25 96:20 97:19 98:14,25 99:1,15
103:11,14,16 104:6 105:12,15,19
107:3,7 108:22

**official** 64:10

**ongoing** 87:2,5

**open** 76:1,20

**opportunity** 12:25 15:11 26:14 37:1
45:4 99:18

**opposed** 74:19

**option** 81:12

**Oral** 75:12

**order** 11:24 56:9 57:18 63:25 64:1,5
65:15,23 67:25 68:1,3,17,20 69:9,
19,25 72:15 93:10

**ordered** 70:2

**org** 6:19 114:13,16,24

**organizational** 6:20 9:22

**out-of-town** 111:17

**outcome** 34:6 82:10

**outlined** 19:16

**overnight** 107:13 111:5,10

**overtime** 16:11,23 19:1 20:5 22:1
31:19,23 32:3 35:16 43:7 49:2,8
67:15,21 85:16,20 87:2,11 89:16,23
91:11 92:20 93:9,11,14 98:21
102:24 103:13 104:8,12 105:4,5,7,
14

**overuse** 85:20

---

**P**

**p.m.** 4:4 68:13,15 96:23 116:12

**pages** 13:8,9,15 68:10,11 75:17

100:8,10

**paid** 31:23 61:25 62:1 66:9,17 96:20

**paragraph** 56:15 58:24 64:19,20
66:8,11,12 74:1 96:17

**parentheses** 76:1,3,20,21

**part** 50:8,10 53:19 55:4 68:2 83:6
105:25 110:8,10

**participating** 105:24

**participation** 7:21,23

**parts** 77:25

**passing** 116:4

**pay** 16:12,23 20:5 31:19,23 32:3
58:25 59:14,24 66:15 67:21 72:2,4,
11 89:23 93:11 94:3,21,24,25 95:6
96:18,19 97:20,23 98:22,23 99:1,2,
16 100:17 103:10,13,16 104:6,8,13,
20,21 105:4,6,14

**paying** 82:13

**payment** 91:13

**payroll** 90:12 91:13,19 92:9

**peace** 10:17,21,25 11:1,6,19 46:1

**people** 17:2 39:22 44:10 91:17
92:19 97:6

**period** 24:21 62:4 75:23 76:3,11,17,
18,20,23,25 77:2,8,10,12

**person** 7:14,15 8:19,25 9:13,16
11:11 12:6 17:6,21 18:19 23:24
24:23 26:17 29:5 38:20 40:1,16
41:16 42:22 44:3,12,15,21 61:24
71:5

**person's** 9:17 25:1

**personal** 21:16 51:15 83:23 89:1,9,
11,14,15,20 107:2,6,15,20

**personally** 5:19 73:7 88:21

**personnel** 18:11 97:1

**persons** 17:3 27:17

**petition** 64:14

**petitioner** 4:10,21 5:1 6:4 56:17,25
57:21 64:22 65:2,3,16

**Petitioner's** 65:7

**phone** 34:19



Lesia Crumpton-Young

February 16, 2024
Index: phrase..reason

**phrase** 20:19 59:3

**physical** 13:18 35:8

**picture** 15:3,4

**pictures** 109:14

**pie** 112:3

**place** 71:10 72:17 86:23

**placing** 67:7

**plainclothes** 108:22

**plaintiff** 4:8

**plan** 32:8

**plate** 97:22

**play** 8:3

**point** 18:7 19:10 36:3 69:23 79:18 89:20 92:10 98:11 101:6 108:16

**pointed** 106:9

**police** 6:5,8,9,13 8:4 10:12,13,15, 16,18,21,24 11:1,7,12,14,19,25 12:3,14 16:23 31:22 43:7,15,19 44:1 64:9 66:14 68:4 70:20,24 71:10 72:17 73:14 74:6 84:5,8 89:16 94:2 107:7,14,21 108:2,6 110:23 111:2,5, 10,19 112:8 113:6

**policies** 72:7 74:8

**policy** 26:23 48:3 72:5 95:23

**policy-making** 33:7

**political** 46:2

**portion** 11:17 26:1 36:13 62:6,20 90:6

**posed** 61:9 103:23

**position** 6:12 10:16,22 42:24 81:8

**possession** 31:8

**possibly** 16:22 110:21

**possiblys** 114:18

**practice** 27:15

**practices** 72:19

**preliminary** 84:20 87:10,19,23 88:8,13 89:2 90:18

**present** 65:10 88:4

**presented** 38:15 74:3

**presidency** 114:22

**president** 5:23,25 6:3,11 9:23,25 10:25 11:9 13:25 14:7,12,15,17,19 24:22 25:1 28:22 40:5 44:10 62:15 64:11,23 80:18 81:8 106:25 108:2,6 112:4 114:14

**president's** 88:9

**presidential** 14:10

**pressing** 43:12

**previously** 99:14

**primary** 90:8,10

**printed** 15:22,23 65:12 66:24 70:10, 12

**printouts** 36:3

**prior** 7:18 12:15 13:17 16:4 18:4 25:3 26:16 71:20,21,23,25 72:3 83:6,12 95:8,20 96:13 102:1,3,10

**procedural** 65:8

**process** 27:3,5 38:23 39:14,16 42:13,15 65:9 68:4 77:1

**product** 74:12

**professional** 86:25

**profile** 13:21 14:10

**promise** 39:20 47:6

**property** 65:8

**protection** 70:25

**protects** 27:3

**prove** 53:18,24,25 74:7 95:17 101:20 103:8,11,18 114:5 115:4,22

**provide** 49:21 51:17 91:15

**provided** 7:18,22 12:23 36:16 37:3, 16 41:8 46:9,15 47:10 50:19 51:7, 19,21,25 52:3,14 53:24 59:14 70:5, 17 81:11 87:24 88:1

**providing** 36:20

**Public** 70:23

**purchase** 108:1,5,20 110:22

**purchased** 107:20 108:12 109:2 110:19

**purchasing** 110:24 111:1

**pursuant** 13:3 96:20

**push** 74:24

**put** 27:1 49:23 65:16 72:14,16 73:24 96:1,2 101:7

**putting** 71:9

**Q**

**quabble** 14:20

**qualifications** 11:10

**question** 5:9 7:20,25 12:11 13:8 17:5,7,17,20,25 19:19 20:17 22:14 23:7,18 25:21 27:12,13 29:8 36:4,7, 9 37:14 38:18 39:2,19,21 41:12,18, 21 43:20 46:8,13 47:25 50:13,14 52:9,12,13,23 57:17 61:3,9 69:22 75:24,25 76:20 77:1,9,23 78:8 79:9, 10 80:23 82:21 83:8 87:6 90:3,16 98:17,23 100:9,22 101:3,4,21 102:5 103:23 104:2,4,7,9 105:23 108:4 111:8 112:1,24 115:19

**questions** 4:19 5:7 17:10,24 23:4 24:12 27:4 42:17 102:22 106:22 115:6,12 116:7,8

**quiet** 99:8

**quo** 65:16

**R**

**raise** 94:3

**rate** 96:21 97:18 98:18,24 99:14 102:19,21,24

**rates** 100:16,23 101:5,8,22 102:1, 12,16 103:10,15

**read** 14:24 25:23,25 36:15 37:1 38:3 45:3,4,11 46:24 47:15,16 49:15 50:25 56:1 59:10 63:10 64:17 65:11, 19 66:23 68:1 71:1 74:8,18 75:21 76:9 77:6,22,24 80:13 82:11,16,18 90:4,5 97:25 104:2,15,17,18,25 105:1,2 106:8

**reading** 12:16 14:9 21:10,14 45:21 57:9,11 68:21 70:7 76:16 78:14

**reads** 98:1,2,5

**reason** 53:23 60:16



Lesia Crumpton-Young

February 16, 2024
Index: reasonable..sending

**reasonable** 46:4,11,16 47:12

**reasons** 52:20

**recall** 8:18,19,23 9:1 15:16,21 16:2,
9,16,18 17:17 18:2 19:9,14,18 25:6,
7 26:2 30:15,17,18 31:21 32:3 35:3,
4,9 47:18 84:11 89:19 92:17 104:19
105:12,17,20,23 108:16 109:9,11,15
110:18,20 111:1

**receipt** 53:22

**receive** 27:20 40:22 52:25 73:7
112:4

**received** 28:9 30:20 37:24 38:4 44:7
73:1,5,9 81:23 110:11

**receiving** 79:3

**recognize** 12:22 13:9,15 14:22
15:3,13 81:19,21 114:3,4,7,8,13

**recommended** 112:11,14

**record** 4:2,7 55:1 63:19,22 97:10,
11,14 99:13 101:1 113:19,22 116:9

**recordings** 79:12

**records** 79:14 80:7 106:5

**referring** 9:13 86:24 103:3

**refers** 14:9

**reflects** 114:24

**refrain** 66:18

**regard** 114:10

**regent** 18:14 25:16 33:21 36:15 39:8
86:18 89:1,9

**regents** 18:8 22:16 31:11 32:5 33:7,
14 34:2,11 80:11,14 82:7 83:1,5,11
84:14 85:1 88:5,12 89:13 90:17,23
91:4 96:11 97:5 107:1

**related** 7:24 85:10,13,17,19 91:12
104:12

**relates** 74:5 89:16,22 93:9 94:7
103:13

**relating** 4:25 78:24 79:3,12,15,16
80:11 86:5 97:3

**relationship** 5:1 83:25 84:4 107:2,
6,15

**relevance** 111:22

**relieved** 66:14

**relieving** 58:25 59:15,23

**relying** 42:4

**remember** 16:14 17:13,14 18:21
19:5,25 34:24 84:16 105:18 108:24
109:23 110:3 115:13

**remembered** 30:9

**reorganization** 114:19

**reorganizations** 114:21

**repeated** 56:17 64:22

**repeating** 17:25 25:21 26:12 90:3
91:8

**rephrase** 47:9 102:8

**report** 12:3,6,7,8,10,13 24:9 77:14
80:11,17 86:1,7 87:10,19 88:8,13,
19,22 89:3 90:18 95:1 98:20 104:15
105:2 106:8

**reported** 9:24 12:16 22:11 71:6

**reporter** 4:15 9:4 25:25 90:5

**reports** 12:11 32:18 33:2

**represent** 4:10,21

**representing** 4:12

**request** 66:18 82:8

**requested** 25:25 90:5

**requests** 56:17 64:22

**require** 8:12

**required** 8:15 10:21 11:11 65:15

**requirement** 11:24 12:2 53:14
77:20

**requirements** 65:6

**requires** 76:13 101:10

**reserve** 116:7

**resign** 81:8,12 82:25

**resignation** 83:7

**resigned** 106:20

**respective** 84:2

**respondent** 56:18,19,20,22,23
57:19

**Respondent's** 64:23 65:18

**Respondents** 64:25

**responding** 20:22

**response** 17:16 115:11

**responsible** 24:17 56:21 95:3

**responsive** 27:11,13 42:13

**restraining** 64:1 65:15 68:3,17
69:9,19,25 72:15

**restrictions** 67:8 72:14

**Resulting** 74:6

**retire** 81:12 82:25

**retired** 79:20

**retirement** 82:7

**retreat** 108:12

**retreats** 108:13

**revealed** 26:9

**review** 13:1 99:18

**rhetorical** 52:23

**rights** 65:8,9 68:4

**rodeo** 108:25 109:6,10,14 110:7

**role** 8:3 14:18 28:22 33:13 42:25

**room** 63:15

**rules** 61:25

---

**S**

**Safety** 70:24

**satisfied** 44:15

**schedule** 96:21 102:19,21

**scheme** 105:24

**scope** 53:2

**Scruggs** 106:10,14

**search** 14:10

**section** 13:11,22 37:20 45:14,21
57:11 70:13 78:2

**sections** 62:12

**security** 97:19 98:14,25 99:15
103:11,13,16 104:6

**send** 10:2

**sending** 79:3



**sentence** 12:10

**separate** 10:6

**separation** 9:10 10:3,8 16:5 18:4 26:8

**Sergeant** 70:22 110:16 113:8

**series** 106:21

**serve** 5:25 11:25 70:23

**served** 11:7 47:10

**service** 70:25

**serving** 6:4

**Shannon** 96:23 98:2,6 101:15,17

**shard** 89:17

**share** 87:1 88:18

**shared** 88:3 89:19

**sharing** 88:16

**sheet** 97:1

**sheets** 93:14 97:2

**shirt** 109:10

**show** 40:21 43:12 74:19 98:12

**showed** 43:3 90:12

**showing** 87:10

**sic** 45:16 47:15

**sign** 38:25 44:6 70:6

**signature** 7:13 8:22 9:13 37:22 38:3 41:15 42:5 99:21 101:13

**signed** 5:15,18 7:14 8:19,23 9:1 26:9 36:20 37:4,6,7,12,16 38:5,9,11, 14 39:9,10,14,15,25 40:1,6,7,11 41:8,13,23,24 42:2,5,10 43:2 44:2, 11,24 45:1,20,24 46:9,15,16 47:11, 20 49:19,22 50:5,6,20 51:1,2,6,14, 18,19,22,25 52:3,14,22 53:20,21,24 56:9 57:14 62:12,15,16,17 64:5 68:23 69:1 70:2,5,8 73:4 74:3,4 76:14 77:9,14,19 78:1,5,10

**Similarly** 23:24

**simply** 8:15 22:10 34:3 43:20 44:7 50:4 59:22 72:4,7 95:9

**sit** 11:23 76:12

**sitting** 115:13

**skip** 14:21

**slightly** 82:21

**sole** 89:21 90:7 98:23

**sort** 32:13

**sound** 34:1

**source** 37:5 89:21 90:7,8,10

**Southern** 10:15 70:19 82:6,10 101:24

**speak** 28:19 73:1,2,6 89:6 91:4 113:10,12

**speaks** 47:16

**special** 94:3,4,24 96:17,19,24 97:3, 18,20,22 98:17,22,24 99:1,16 102:13,14 103:10,16 104:5,8,13,20

**specific** 17:24 23:4 32:8 35:18,22 43:18 79:9,10 92:3,13,14,15 102:18, 20 103:3 105:15 106:9 112:2

**specifically** 11:4,15 12:7 23:19 41:5 63:11 72:6 96:22 107:21 110:1, 3,18

**specifics** 31:5 103:7

**spent** 11:13

**spoke** 22:23 23:21,24 24:8 25:18 29:5,16 30:1

**sponsored** 22:25 23:10 24:2,9,17, 23 25:19 26:4

**sponsoring** 20:14

**staff** 107:11

**standard** 72:10

**standpoint** 89:21

**stands** 87:16

**start** 76:8

**started** 94:9

**starting** 4:7 76:9 77:6

**state** 10:18 11:2,6,20 34:1 43:24 45:25 46:3 54:1

**stated** 72:20 74:10

**statement** 15:6 50:15,18 57:23 61:8 83:2 88:23,25

**status** 65:16 66:16

**statutory** 77:20

**step** 113:12,18

**stop** 76:10 77:7

**strategies** 14:1

**strike** 83:9 86:1 95:4

**structures** 114:16

**subdivision** 46:3

**subject** 53:16 55:7,9 59:6 65:4 83:22 85:11,17,19,21 98:11 105:9

**submitted** 97:2

**subpart** 43:14 45:3 53:8,12 59:9,11

**subsection** 53:14,19 56:14

**subsequent** 35:12 89:24

**substantiating** 44:16

**substituted** 70:4

**sued** 54:21 64:10

**suggested** 24:16 30:25

**superior** 9:21

**supervisor** 94:1,11,16 112:15

**supplied** 15:7

**supply** 35:6 82:1

**support** 88:22 89:2 107:3,16,23

**supporting** 92:8

**supposed** 13:11

**supposedly** 93:15 105:13

**suspend** 55:6

**suspended** 53:15 55:6,12 60:5

**suspending** 59:6

**swear** 4:15

**swears** 82:24

**sworn** 4:17 77:18,25

**system** 41:4 87:11 90:12 91:13 93:13

---

**T**

---

**Tab** 97:5



Lesia Crumpton-Young

February 16, 2024
Index: tab's..understanding

**tab's** 99:13

**taking** 64:15 65:7 71:14 108:24

**talk** 45:6 84:15 105:8,21

**talked** 19:1 25:15 39:22 44:11 104:7 105:22

**talking** 5:17 20:4 21:21,22 34:10 44:1 47:23 48:22 49:5 55:1 66:11,12 67:12 86:21,23 99:14 104:5 105:23 106:3

**talks** 104:17,20

**targeted** 72:6

**team** 33:3 73:5

**telephone** 66:21

**telling** 26:4 29:11 30:23 66:3 69:6, 10,17 73:12 81:16 114:23

**temporarily** 58:24 59:15,23 66:14

**temporary** 63:25 65:15,17 67:7 68:3,16 69:9,19,25 72:15

**tenure** 6:3

**term** 6:24 7:1,5,23 9:9 18:4 20:18 32:3 93:13

**terminate** 6:12 7:9 56:23 57:20 58:8 64:25 65:1

**terminated** 7:15 8:7 9:14 36:17,21 47:19 53:15 54:1 55:7,8 60:5 112:11 114:25

**terminating** 7:6 59:6 84:14,18 86:13,16

**termination** 6:15 7:8,12,14,17,22 8:4,9,11,14,20,21 9:8 47:16,18 48:2 59:2 83:12

**terminations** 7:24

**terms** 6:19 9:22 10:24 72:18,21 84:1 90:16 103:12

**testified** 4:17 80:22

**testifying** 100:19 101:1

**testimony** 26:1 31:10 44:8 77:18,25 90:6

**Texas** 10:15,18 11:2,6,20 43:15,17, 22 45:4,9,23 56:18,25 57:22 64:24 65:3,6,9 70:19 76:13 78:11,19 82:6, 10 101:24

**text** 35:8 49:17 78:24 79:11

**thing** 21:22 72:13 100:4 103:3 104:19,22,23,25

**things** 27:1 48:13 72:25 103:19 112:4

**thinks** 52:11

**thought** 26:14 62:22 84:3,7 91:14 99:22

**threat** 59:2,3,5

**threatened** 58:6,8,18 59:20

**threatening** 56:23 57:19 64:25

**tie** 108:21,23,24 109:10,16,22 110:21

**ties** 109:2,22

**time** 4:3 5:8 6:4 10:13,20 11:9,13 14:6 18:10,15,16,25 19:12 22:2,7,14 23:8 24:13,21,25 26:8 31:6,15,16 45:6 46:4,11,16 47:12 48:5 63:20,23 66:22 67:15 68:13 77:12,13 79:5 88:7 92:11,17 93:14 97:1,12,15 98:1,20 105:17 113:20,23 116:8,10

**times** 25:15,18

**timing** 80:24 82:9

**title** 5:22 14:14 40:23,24

**titles** 17:1,16 18:18,20,22 92:5,12 93:2 106:12

**today** 4:5 5:6 11:5,8,23 12:25 13:17 25:3 26:6 43:17 47:23 53:3 76:12 100:17 102:1,10 115:13,15

**Today's** 4:3

**told** 16:5,9,10,16,18,19 17:3,6,13 20:10,22 29:21 30:5,24 31:12 32:5, 20 37:7,9 38:15 39:15,16 40:10 42:3 51:2,4 60:15,19,23 61:1,2,5,10 62:14,15 64:13 65:3 69:3 71:19,25 84:13,20 86:11 88:7 95:15 105:25 115:11

**top** 33:7 56:20 68:14 70:17 75:17 93:22

**totality** 85:7

**town** 107:13 111:5,9

**travel** 107:11

**traveled** 111:4,9

**traveling** 107:12

**trial** 116:7

**trick** 21:20 46:21

**tricking** 47:7

**trip** 107:13 111:5,17

**true** 43:4 46:21 73:6 81:9 83:2,3 86:14 95:15 115:3

**trust** 70:20

**truth** 81:16 115:9,11

**truthfully** 115:6

**TSU** 4:25 5:21,23 6:1,3,5,12,16 10:13,21,24 11:10,19,25 12:3 13:25 14:7 22:16 24:22 31:11 32:5 33:7 36:19 40:5 46:12 54:14,21 55:16 56:19,21 57:19 58:20 64:11,23 68:17 79:20 80:14,18 81:8,13 82:25 84:2 96:21 99:15 103:9 106:19 107:14 108:2,5 110:23 111:2,5,10, 19 112:8

**turn** 12:19 13:7 43:13 45:2 62:24 63:24 70:14 75:16 77:3 81:18 93:20 96:4,5,12

**type** 59:24 87:5 93:12 102:16

**typically** 7:23 106:12

**U**

**uh-huh** 14:3 25:10 45:22 58:14,19 66:25 76:2,4 82:23

**Uh-uh** 33:12

**ultimate** 59:1,16 66:16

**ultimately** 82:9

**unauthorized** 101:22

**understand** 4:22,24 5:2,7,9,12,14 6:7 7:20,25 10:11,12,17,20,25 13:3 14:7,16 20:12 21:1,15,18,23 31:10 33:20 38:1,6,18 39:2 40:18 46:6 49:21 50:11 51:15 53:21,23 54:13, 15,19,21 55:4,15,17,19 56:5 57:1 60:3 62:18 64:9 66:10 67:1,13,25 68:5 69:22 73:8 83:8 84:9 93:8 99:3, 10 105:3 112:10

**understanding** 6:14 11:18,22 31:20 32:23,25 34:12 38:13,14 48:6, 8,25 51:11,16,22 52:15 82:22 87:21



MAGNA ▶
LEGAL SERVICES

Lesia Crumpton-Young

92:22 93:10 99:7 104:14 106:4,20

**understood** 11:3 14:18

**uniform** 66:21 110:8

**university** 10:15 11:11 33:16 42:12 43:3 59:1,16 66:15 70:20 74:5 82:7, 10

**University's** 14:2

**university-owned** 66:20

**university-sanctioned** 66:19

**unlawful** 56:24 57:20 65:2,18

**unsigned** 28:1,10,15 62:8 78:19

**unusual** 28:1,5,7

**utilized** 100:16

**utilizing** 66:20

---

**V**

**vacation** 30:10 32:8

**vacationing** 30:11

**validity** 83:20

**vantage** 89:20

**vehicle** 66:20

**versus** 81:12

**vice-president** 18:16 101:11,16 106:6

**vice-president's** 101:12

**violate** 59:21 65:6

**violated** 48:8 54:1,14,19 56:6 68:4

**violates** 74:8

**violating** 48:3 54:22

**violation** 10:5 56:25 57:22 65:3

**volunteered** 84:13

**voucher** 107:11

---

**W**

**walk** 12:18 18:24

**wanted** 100:23

**wear** 108:22

**weekly** 94:1,11

**withheld** 94:2,4

**witnesses** 114:5

**wondering** 100:6

**word** 32:12 96:2

**words** 55:23 73:25 84:10,11 85:17

**work** 5:9 33:1,3 61:12 74:12 83:25 85:5,10 93:12 103:7 105:14

**worked** 10:13

**working** 33:18,23 34:15 84:4 85:12 105:7

**worries** 9:2 101:18 113:11

**worthy** 81:1

**writing** 44:2

**written** 21:9 28:24 67:18 72:6 73:18 74:4 77:14

**wrong** 48:1 80:21 93:9 103:1

**wrongdoing** 83:6 89:10,15,22 92:20

**wrote** 96:10

---

**Y**

**y'all** 56:21 86:22,23

**Yolanda** 19:5,17,24 23:25 25:17 39:8,24 45:8

**you-all** 53:25 54:13 56:19 57:1 63:6 64:14 69:3,9 71:14 72:16 84:1,9

**Young** 4:10,21 5:15,16,17,18 6:4,8, 12 7:15,18,19,22 8:4 9:14 10:8,12, 14 11:5 12:7,9,13 15:19 16:6,11 17:19 19:15 20:4 26:9 28:15 36:17, 20 37:4,6,12,17 38:15 39:16 40:2,12 41:24 43:9 47:11,17 49:22 50:20,21 51:7,17,19,25 52:5,14,16,21 53:23, 24 54:21 55:6 57:21 58:9,18 59:21 61:4 62:15 64:15 66:2,6 67:3,9,20 68:10 69:4,6,10,18 71:5,15,18,20 72:1,7 73:24 74:15 78:10,25 79:4, 13,17 80:10,14 83:25 84:3,7,13,17, 19 85:25 86:3,6,9,11,16,21 87:1,4,8, 9 89:10,15,22 91:2,7,11 92:8,21 93:6 94:16 95:7,9,19,21 96:12,25 102:4 103:14 106:24 107:10 108:13, 15 111:15 112:10 113:13 114:25

**Young's** 6:16 7:9 48:2 64:9 98:15 107:7

**Yvonne** 4:11 75:6 99:12

MAGNA ▶
LEGAL SERVICES