# EXHIBIT G

```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
                 HOUSTON DIVISION


MARY YOUNG,                      )
                                 )
              Plaintiff,         )
                                 )
VS.                              ) CIVIL ACTION
                                 )
TEXAS SOUTHERN UNIVERSITY,       ) NO.: 4:23-cv-03888
                                 )
              Defendant.         )
                                 )
                                 )


         -----------------------------------

            REMOTE ORAL DEPOSITION OF

                   MARY YOUNG

              FEBRUARY 27, 2025

         -----------------------------------
```

REMOTE ORAL DEPOSITION OF MARY YOUNG, produced as
a witness at the instance of the DEFENDANT, and duly
sworn, was taken in the above-styled and numbered
cause on February 27, 2025, from 9:59 a.m. to
4:12 p.m., via Zoom teleconference, before Vanessa J.
Theisen, CSR in and for the State of Texas, and RPR,
reported by machine shorthand, pursuant to the
Federal Rules of Civil Procedure and any provisions
stated on the record or attached hereto.

2

```
1        A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4     Ms. Taren Marsaw
      THE HALL LAW GROUP, PLLC
5     530 Lovett Boulevard
      Houston, Texas 77006
6     (713) 942-9600
      Tmarsaw@thlf.us
7
8   FOR THE DEFENDANT TEXAS SOUTHERN UNIVERSITY:
9     Mr. Joseph Keeney
      Assistant Attorney General
10    OFFICE OF THE ATTORNEY GENERAL
      General Litigation Division
11    P.O. Box 12548, Capitol Station
      Austin, Texas 78711-2548
12    (512) 475-4090
      Joseph.Keeney@oag.texas.gov
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
1            INDEX
                      PAGE
2   Appearances............................  2
3   MARY YOUNG
4     EXAMINATION BY MR. KEENEY..................  4
      EXAMINATION BY MS. MARSAW.................. 171
5     FURTHER EXAMINATION BY MR. KEENEY......... 201
6
    Changes and Signature............................ 206
7   Reporter's Certificate............................ 208
8
            EXHIBITS
9
    NO.   DESCRIPTION            PAGE
10
11  1     December 1, 2022, Notice of
          Temporary Relief of Duties
12        Young_001102 - 1106.................  8
13  2     December 2, 2022, Le/Hall Email,
          Subject: Administrative Leave
14        With Pay
          Young_1011............................. 13
15
16  3     Notice of Employment Separation
          Young_001107 - 1109.................. 27
17  4     August 15, 2022, Investigation Report
          000001 - 000017....................... 43
18
    5     October 24, 2017 Broussard Email,
19        Subject:  New Event Personnel
          Fee Sheet
20        Young_000095 - 0097.................. 75
21
22
23
    REPORTER'S NOTE
24  Quotation marks are used for clarity and do not
    necessarily reflect a direct quote.
25
```

4

```
1               MARY YOUNG,
2   having been first duly sworn, testified as follows:
3               EXAMINATION
4   BY MR. KEENEY:
5       Q.  Good morning.  My name is Joseph Keeney, and
6   I represent Texas Southern University.
7               Can you please state your full name for
8   the record?
9       A.  My name is Mary young.
10      Q.  All right.
11      A.  Common spelling, Y-O-U-N-G.
12      Q.  Okay.  Thank you.  Have you ever gone by any
13  other names?
14      A.  Any other names at Texas Southern
15  University, or just period?
16      Q.  Just period.
17      A.  Young is my married name, so Mary Miller --
18      Q.  Okay.
19      A.  -- is my maiden name.
20      Q.  All right.  Have you ever given a deposition
21  before?
22      A.  Yes.
23      Q.  And can you tell me how many times you have
24  had your deposition taken?
25      A.  Maybe three times, possibly.
```

5

```
1       Q.  What were -- what were the nature of those
2   depositions?
3       A.  One, I was a witness -- well, I think all
4   three I was witnesses -- I was a witness to all
5   three, yes.
6       Q.  And were those cases for which you had your
7   deposition taken, were they in connection with your
8   police enforcement -- I'm sorry, law enforcement
9   duties?
10      A.  Yes.
11      Q.  Okay.  Have you ever testified in court?
12      A.  Yes.
13      Q.  Okay.  Well, it sounds like you'll know how
14  this is supposed to work, but I'm just going to go
15  over some of the basic expectations and ground rules,
16  so bear with me.
17              I'll be asking you a series of questions
18  concerning the facts relevant to this case.  And just
19  to confirm, you understand that this deposition is
20  taking -- being taken in connection with your lawsuit
21  against Texas Southern University, correct?
22      A.  Yes.
23      Q.  Okay.  Just let me know if any question is
24  not clear or if you need any clarification.  I'm
25  going to speak as clearly as I can, but just let me
```

6

1  know if you can't hear.
2          I know that we're on a remote
3  videoconference software, so it can get spotty at
4  times.  Just let me know if you need me to repeat the
5  question or restate it.
6      A.  Okay.
7      Q.  Let's also, please, agree to wait until each
8  other is finished talking.  That will help the court
9  reporter make sure -- ensure the transcript is clear,
10  and ensure that you and I can hear each other as
11  well.
12         Do you understand that your testimony
13  today could be used as evidence in this case?
14      A.  Yes, sir.
15      Q.  And you understand, I'm sure, that you're
16  under an obligation to testify completely and
17  honestly in this deposition as if you were in court,
18  correct?
19      A.  Yes, sir.
20      Q.  All right.  Are you aware of any reason why
21  you might not be able to testify completely and
22  honestly today?
23      A.  No, sir.
24      Q.  Are you currently on any medications?
25      A.  No, sir.

7

1      Q.  Okay.  Apart from speaking with your
2  attorneys, did you do anything to prepare for this
3  deposition?
4      A.  Just reviewed my notes.  This has been two
5  years, so I had a lot of reviewing.
6      Q.  It can be the nature of litigation that it
7  is drawn out, so...
8          So you looked at some notes.  Were those
9  notes that have been turned over in discovery, or
10  were those just your internal notes?
11      A.  Oh, just my internal notes, yes, sir.
12      Q.  Okay.  Do you have any of those notes with
13  you?
14      A.  Yes.
15      Q.  Okay.  All right.  Well, if I could ask you
16  to just please refrain from looking at them while
17  we're taking this deposition, just speak from your
18  memory.  Perhaps I will ask for those notes later on,
19  but -- or show you some documents, and we can
20  introduce those as exhibits.  But today I'll just ask
21  you to testify from your memory to the best of your
22  recollection.
23      A.  Yes, sir.
24      Q.  Okay.  Are you currently employed?
25      A.  No, sir.

8

1      Q.  All right.  And where do you currently
2  reside?
3      A.  In Missouri City, Texas.
4      Q.  Okay.  All right.  Now, I'm going to show
5  you one of these documents that I have.  I'm going to
6  drop this in the chat.  Just let me know when you see
7  it.
8          Okay.  It should be arriving now.  I've
9  premarked this as Exhibit 1.  Just let me know if you
10  have any trouble opening that.
11          (Exhibit 1 marked.)
12      A.  I'm not able to open just yet.
13      Q.  Okay.
14      A.  Okay.
15      Q.  All right.  Are you able to see that?
16      A.  Yes.
17      Q.  Okay.  Do you recognize this document?
18      A.  Yes.
19      Q.  Okay.  Did you receive this document on or
20  around December 1st, 2022?
21      A.  If that's the date that's on there, I
22  believe so.
23      Q.  Okay.  And can you describe what are we
24  looking at?  What is this document?
25      A.  So this appears to be the document -- so let

9

1  me.  Let me -- let me look at it.  Hold, please.
2  Yes, administrative leave document.
3      Q.  Okay.  So was this document a letter from
4  Texas Southern University placing you on
5  investigative [sic] leave?
6      A.  On administrative leave?
7      Q.  Administrative leave.
8      A.  Yes.
9      Q.  That's right.  Okay.  You were placed on
10  administrative leave.
11          And do you agree that as part of the
12  administrative leave, or because of the
13  administrative leave, you were temporarily relieved
14  of your duties as chief of police with pay?
15      A.  You're saying do I believe that?
16      Q.  Is that what happened?  Were you temporarily
17  relieved by TSU of your duties as chief of police
18  with pay?
19      A.  So that letter that you just put up, there
20  is another letter I -- I received a temporary
21  restraining order for that same date.
22      Q.  Uh-huh.
23      A.  So that superseded that letter.
24      Q.  Okay.  So you're saying that there was
25  another letter from TSU?

10

1    A. Yes, correct.
2    Q. It was a temporary restraining order?
3    A. No, I'm sorry. Let me make certain that I'm
4 clear.
5         The December 1st letter, that you put in
6 the chat --
7    Q. Uh-huh.
8    A. -- you should have in your notes. There's a
9 temporary restraining order with that same date on
10 there that I received, and that should have
11 superseded that December 1st letter that you just put
12 in the chat.
13        So, no, I was not on administrative
14 leave when the temporary restraining order was
15 administered.
16    Q. Okay. A temporary restraining order from
17 TSU or from a court?
18    A. From a court.
19    Q. I see, okay. So the temporary restraining
20 order did not come from TSU; it came from a court?
21    A. Correct.
22    Q. Okay. On the same day, December 1st, 2022?
23    A. If I'm not mistaken, it was the same day. I
24 had filed my lawsuit in November.
25    Q. Uh-huh.

11

1    A. In November, when I originally filed the
2 lawsuit --
3    Q. Uh-huh.
4    A. -- that is when the judge granted me the
5 temporary restraining order. And, I believe, it was
6 toward the end of November, which would have been
7 like the 28th, the 30th, or so, to get a December
8 restraining order.
9    Q. I see, okay. Well, I understand your point
10 about the temporary restraining order, but is it true
11 that TSU -- notwithstanding that temporary
12 restraining order, TSU, with this letter, did at
13 least initially place you on administrative leave
14 with pay?
15    A. Yes.
16    Q. Okay. And as it states in this letter, do
17 you agree that because you were placed on
18 administrative leave, TSU had requested that you
19 refrain from being on campus grounds?
20        MS. MARSAW: Objection. Form.
21    A. No.
22    Q. (BY MR. KEENEY) Okay. So where it says
23 here, "we request that you refrain from being on
24 campus grounds," you disagree with that statement?
25    A. You said did I understand that that's what

12

1 that meant. Was that not your question, or am I not
2 hearing your question? I'm sorry.
3    Q. Well, I'm asking, did TSU request that you
4 refrain from being on campus grounds?
5    A. In the letter that you put in the chat, yes.
6    Q. Okay. And did TSU request that you refrain
7 from attending university-sanctioned events?
8    A. In that letter, yes.
9    Q. Okay. Same question for the next phrase.
10 Did TSU request that you refrain from utilizing
11 university-owned items?
12    A. In that letter, yes.
13    Q. Yes. Okay. Same question for the next
14 sentence. I'm sorry, this is tedious.
15        Did TSU request that -- or direct you,
16 I'm sorry. Did TSU direct you not to attempt to
17 contact anyone concerning the investigation that is
18 referenced in this letter?
19    A. If that's what's in that letter, yes.
20    Q. Okay. Same question for the next sentence.
21        Did TSU request -- or direct, I'm sorry.
22 Did TSU direct you not to retaliate in any shape,
23 form, or fashion, against anyone who has made
24 allegations, who is a witness to the allegations, or
25 providing information to the investigation or

13

1 complaint?
2        MS. MARSAW: Objection. Form.
3    Q. (BY MR. KEENEY) You can answer.
4    A. In that letter, yes.
5    Q. All right. I'm going to show another
6 document. I have marked this as Exhibit 2. If you
7 could just let me know when you have that open.
8        (Exhibit 2 marked.)
9    A. Is this the one that says -- this is my
10 letter. Is it not the same letter?
11    Q. This should be an email from Hao Le to
12 Benjamin Hall. If you're unable to open it, I can
13 share my screen.
14    A. Yes, I apologize. Can you please share your
15 screen?
16    Q. All right. Okay. Are you able to see that
17 PDF?
18    A. I am.
19    Q. Okay, great. Have you ever seen this
20 document?
21    A. I don't think so.
22    Q. You do not recognize this document?
23    A. I'm looking at -- it doesn't come to my
24 knowledge that I've seen this is what I'm saying.
25    Q. Okay. So you were never forwarded this

Mary Young - 2/27/2025

14

1  email?
2       A.  This document doesn't come to my -- to my
3  knowledge at all.  But --
4            MS. MARSAW:  You guys, I don't know if
5  you can hear, but I'm not able to hear what's being
6  said right now.
7            MR. KEENEY:  I'm able to hear.
8            THE REPORTER:  Yes, I am too.  Can you
9  hear me, Ms. Marsaw?
10           MS. MARSAW:  I can hear you.
11           THE REPORTER:  Okay.  Ms. Young, can you
12 say something?
13           THE WITNESS:  (No response.)
14           THE REPORTER:  Oh, I think she froze.
15           MR. KEENEY:  Ms. Young, are you there?
16           THE WITNESS:  Yes, I'm here.
17           MR. KEENEY:  Ms. Marsaw, are you able to
18 hear now?
19           MS. MARSAW:  I can hear.
20      Q.  (BY MR. KEENEY)  Okay.  So just to confirm,
21 Ms. Young, you've never seen this document before?
22      A.  This document doesn't come to my
23 recollection.
24      Q.  Okay.  That's fine.
25           All right.  I'm going to stop sharing.

15

1            All right.  Did you ever travel to TSU
2  and come to the TSU campus grounds on Friday
3  December 2nd, 2022?
4       A.  For work?
5       Q.  I'm just asking if you were on TSU campus
6  grounds on December 2nd, 2022.
7       A.  If that's a workday, I'm sure I was.
8       Q.  Okay.  Do you remember coming to TSU campus
9  grounds any other day in December 2022?
10      A.  To come to work, yes.
11      Q.  Okay.  So did you come to work every workday
12 in December 2022?
13      A.  I came every day that I was scheduled to
14 work in 2022, yes.
15      Q.  All right.  So if we were to just look at
16 the December 22 calendar, just looking at the
17 workdays, so that would have been December 5th
18 through the 9th.  Those are the standard weekdays.
19 Are those -- were those your workdays?
20           MS. MARSAW:  Objection.  Form.
21      A.  If those were the days.  Again, I want --
22 because I think you're asking me questions based on
23 the first administrative leave, but I don't think
24 you're asking me questions based on the restraining
25 order that I received from the judge, and that's what

16

1  I'm going on.  So --
2       Q.  (BY MR. KEENEY)  Well, I'm not --
3       A.  -- what I received from the judge is "work."
4  So I guess, that's what I'm trying to make certain,
5  that we're on the same --
6       Q.  Uh-huh.
7       A.  -- page when you're asking me did I come to
8  work.  And I did come to work, because I was told by
9  the judge that I could come to work.
10      Q.  Okay.  No.  I think -- I think we are on the
11 same page.
12      A.  Okay.
13      Q.  I'm just -- I want to make sure --
14      A.  Okay.
15      Q.  Yeah, we are on the same page.
16      A.  Okay, perfect.
17      Q.  Yeah.  So you came to work -- your workdays
18 in December.
19           Did you take any holidays in December
20 for the Christmas holiday?
21      A.  Yes, the Christmas break.  I think that
22 was -- and I don't have a December calendar in front
23 of me --
24      Q.  Uh-huh.
25      A.  -- but whenever the Christmas holidays were,

17

1  yeah, I --
2       Q.  Okay.
3       A.  -- I did not come to work those days.
4       Q.  Okay.  But other days in December, you did
5  come to work -- you did come to TSU?
6       A.  The days that I was scheduled, yes.
7       Q.  All right.  Okay.  So I assume -- did you go
8  to your office at TSU in December?
9       A.  I did.
10      Q.  Okay.  Did you speak to TSU police officers
11 in December 2022?
12      A.  Did I speak cordially, like I normally
13 speak, or --
14      Q.  Just did you have -- yeah, in the course of
15 your -- in the course of your job, I imagine you
16 interact with other employees.  So did you interact
17 with other employees and speak to other officers?
18           MS. MARSAW:  Objection --
19      A.  Like I always do.
20      Q.  (BY MR. KEENEY)  Okay.  Did you make any
21 announcements over the police radio?
22           MS. MARSAW:  Objection.  Form.
23      Q.  (BY MR. KEENEY)  Did you make any
24 announcements in December 2022 over the police radio?
25      A.  Can you be specific?

18

1      Q.  Just in general.  It doesn't matter the
2  subject.  I'm just asking if you made any police
3  announcements on the police radio.
4      A.  I'm not certain if I did.  "Good morning,"
5  could have been an announcement on the police radio.
6      Q.  Right, right.  Okay.  Did you give any
7  directives to subordinate officers in December 2022?
8      A.  Again, I'm not -- I'm not following what
9  you're asking, but everything that I did was in
10  purview of my job.  And --
11      Q.  Uh-huh.
12      A.  -- again, I'm only going by the temporary
13  restraining order that was provided for me.
14          So if you're asking me if I spoke to
15  officers during that time I had a temporary
16  restraining order, yes.
17          If you're asking me, did I come to work
18  during that time the temporary restraining order was
19  on file, yes.
20          If you're asking me, did I go to my
21  office during that time I had a temporary restraining
22  order, yes.  I did every thing within this temporary
23  restraining at TSU.
24      Q.  Okay.  And, again, I'm just making sure that
25  we have the facts.

19

1      A.  Okay.
2      Q.  So I --
3      A.  Okay.
4      Q.  I understand, and you've represented that
5  there was a temporary restraining order.
6      A.  Yes.
7      Q.  But I'm asking what you did while that
8  temporary restraining order was in effect, according
9  to your testimony.
10      A.  Right.
11      Q.  Right.
12      A.  All of the same police duties that I have
13  done before a temporary restraining order was in
14  place.  So I've not changed what I had done --
15      Q.  Okay.
16      A.  -- since I've been there, yes, sir.
17      Q.  Did you attend any TSU-sanctioned events in
18  December 2022?
19          MS. MARSAW:  Objection.  Form.
20      A.  TSU-sanctioned events?  I'm assuming you're
21  speaking about commencement services or a basketball
22  game.  I'm just --
23      Q.  (BY MR. KEENEY) Any kind of --
24      A.  -- trying to remember what happened in
25  December.

20

1      Q.  Right.  Any kind of TSU events.  So
2  graduation, commencement, basketball games, other
3  sports events?
4      A.  I'm certain.  I'm certain.
5      Q.  Okay.  So did you use any university-owned
6  items while you were -- well, in December 2022?
7      A.  Repeat that question.  What did I do what?
8      Q.  Did you use any university-owned items when
9  you were working in December 2022?
10          MS. MARSAW:  Objection.  Form.
11      A.  Such as the police radio --
12      Q.  (BY MR. KEENEY)  Radio --
13      A.  Pen, paper --
14      Q.  -- keys, badge, phone?
15      A.  I'm the police chief, and I'm certain that I
16  would have used my badge for entry and keys to unlock
17  or lock a door.  I'm certain of that.
18      Q.  Okay.  And I assume that is the same with
19  your police uniform.  Did you wear your police
20  uniform in December 2022?
21          MS. MARSAW:  Objection.  Form.
22      A.  I'm certain I did for commencement,
23  absolutely.
24      Q.  (BY MR. KEENEY)  Okay.
25      A.  Absolutely.

21

1      Q.  As TSU police chief, were you assigned a
2  police vehicle?
3      A.  Yes.
4      Q.  All right.  And when TSU placed you on
5  leave, did you leave your police vehicle at TSU?
6          MS. MARSAW:  Objection.  Form.
7      A.  I was -- I was only placed on leave through
8  that paper.  It was superceded with the restraining
9  order -- and so unless --
10      Q.  Okay.
11      A.  -- I'm not understanding the leave --
12      Q.  No, I understand --
13      A.  -- that you're speaking about.
14      Q.  No, I understand.  I'm just getting -- I'm
15  just getting facts.  I'm not making any value
16  judgments.
17      A.  Okay.
18      Q.  I'm asking, did you -- did you place -- did
19  you surrender your police vehicle, turn over the keys
20  when -- well, in December 2022?
21          MS. MARSAW:  Objection.  Form.
22      A.  I had a take-home vehicle.
23      Q.  (BY MR. KEENEY)  Yeah.  You had a take-home
24  vehicle, so you continued to use your take-home
25  vehicle in December 2022?

22

1    A. When I went to work in the take-home
2 vehicle.
3    Q. Yes.
4    A. That was the answer: When I went to work.
5    Q. Okay. So you answered in the affirmative,
6 that you continued to use your police vehicle in
7 December?
8    A. When I went to work, I used the vehicle.
9    Q. Okay. Do you still have that vehicle in
10 your possession?
11    A. No.
12    Q. Okay. And why do you no longer have that
13 vehicle in your possession?
14    A. Why don't I have the vehicle?
15    Q. Yes. Did you -- did you turn it over to
16 TSU?
17    A. No. The vehicle was not used after
18 commencement. It's -- it was just placed at my
19 house.
20    Q. Okay. Is it still at your house?
21    A. No, I answered that one. I don't have the
22 vehicle.
23    Q. Do you know where it is now?
24    A. I do not.
25    Q. Was that vehicle towed from your house?

23

1    A. You asking me, or are you telling me,
2 because I don't know what happened to the vehicle.
3    Q. You don't know what happened, okay.
4        Do you currently have in your possession
5 your badge from TSU?
6    A. Yes.
7    Q. Okay. Do you still have your TSU keys?
8    A. I believe the keys were in the vehicle, but
9 if not, possibly some keys.
10    Q. Okay. Do you still have any TSU-issued
11 mobile telephone?
12    A. Yes.
13    Q. Did you go to any public events in
14 December 2022, in your police uniform?
15        MS. MARSAW: Objection. Form.
16    A. Public event? Commencement?
17    Q. (BY MR. KEENEY) I'll be more specific, did
18 you attend the Houston Rodeo in December 2022?
19    A. No, the rodeo.
20    Q. No? Okay. Did you attend the rodeo any
21 other time in 2022 or '3?
22    A. February?
23    Q. Oh, it was February 2023?
24    A. Yes.
25    Q. Oh, okay. Do you remember wearing a police

24

1 uniform to the Houston Rodeo?
2    A. I did not have a police uniform on.
3    Q. Oh, okay. Was it any other type of clothing
4 with a police logo on it?
5    A. In 2024? Is that what you just said?
6    Q. I thought we were talking about 2023.
7    A. Okay. It doesn't come to mind that I had a
8 police uniform on in 2023.
9    Q. Okay. So you never went to the Houston
10 Rodeo wearing a police T-shirt or any other type
11 of --
12        MS. MARSAW: Objection. Form.
13    Q. (BY MR. KEENEY) -- clothing wearing --
14 clothing displaying the word "police"?
15    A. So I didn't work the rodeo in 2023. There
16 was a barbecue cook-off where am I -- I am the
17 coordinator for police officers, so I would have worn
18 maybe a police shirt there.
19    Q. Uh-huh.
20    A. Just a basic police shirt, like I would have
21 always worn.
22    Q. Okay. When did that barbecue cook-off
23 occur?
24    A. They're always in February.
25    Q. Okay. So February 2023, we're talking

25

1 about.
2    A. Okay.
3    Q. Okay. At any point in December 2022, did
4 you visit the TSU campus with your attorney?
5    A. In December, yes.
6    Q. Okay. Was that on one occasion or more than
7 one occasion?
8    A. I believe, one.
9    Q. Do you remember what day?
10    A. I do not.
11    Q. Okay. Do you remember it -- what -- can you
12 -- can you say whether or not it was December 1st or
13 2nd?
14        MS. MARSAW: Objection.
15    A. I don't remember the date.
16    Q. (BY MR. KEENEY) Okay. Do you remember what
17 you and your attorney did on that day at the TSU
18 campus?
19    A. I believe my attorney just met me in my
20 office.
21    Q. Uh-huh.
22    A. With the restraining order that I had in
23 place.
24    Q. Did you and your attorney speak with other
25 officers on that day?

26

1   A. I don't recall my attorney speaking for me
2 on that day. I think my attorney was just at the
3 office. I think I did the salutations and the
4 pleasantries with officers.
5   Q. Okay. So you're -- you never witnessed your
6 attorney speaking to other police officers at the TSU
7 campus?
8   A. Speaking with a hello or speaking like how?
9 Like having a meeting or something? So no, no.
10   Q. Just having any kind of conversation.
11   A. Speaking?
12   Q. Yes.
13   A. Speaking?
14   Q. I'm not sure I understand? So did you
15 witness your attorney talking to other TSU officers
16 at TSU?
17   A. Speaking and saying hello and introducing
18 himself, I believe I've seen that, yes.
19   Q. Okay. We were talking about December 2022.
20 I forgot to ask. Did that ever occur? Did you ever
21 visit TSU with your attorney in January of 2023?
22   A. January 2023?
23   Q. Yes.
24   A. It doesn't come to my mind that I went on
25 campus in 2023.

27

1   Q. Okay. When was the last time that you were
2 on the TSU campus?
3   A. I believe December 2022.
4   Q. Okay. I'm going to show another document,
5 and if you have trouble opening it, again, I can
6 share my screen.
7   A. Can you just -- can you just share it?
8   Q. I can do that. That's fine, that's fine.
9 I'd like to make this as quick and easy as I can.
10       (Exhibit 3 marked.)
11       All right. Are you able to see that?
12   A. Yes.
13   Q. All right. Great. All right. You just see
14 the PDF, correct? Is there anything else visible?
15       Ms. Young, are you able to see --
16   A. I just see --
17   Q. -- only the PDF, or --
18   A. Yes.
19   Q. Okay. All right. Do you recognize this
20 document?
21   A. So, yes, this document was taped on my front
22 door when I got home.
23   Q. Your front door of your --
24   A. Of my residence.
25   Q. -- your residence? And do you remember what

28

1 day you received it?
2   A. I do not remember the day I received it.
3   Q. Okay. The date there is listed January 9th,
4 2023. Do you believe that it was on or around
5 January 9th, 2023?
6   A. I couldn't agree or disagree if that was the
7 correct date that it was on my door.
8   Q. Okay. All right. And can you just describe
9 -- tell me, what is this document?
10   A. The separation document?
11   Q. Yes.
12   A. Yes, that's what it says, "Notice of
13 Employment Separation."
14   Q. Okay. All right. Let's just go through
15 some of the statements here.
16       It starts out, "As you know, Texas
17 Southern University ("TSU") is committed to the
18 safety of its students, faculty, and staff. That
19 commitment is reflected in the creation" --
20       THE REPORTER: Can you slow down --
21       MR. KEENEY: -- "and operation of the
22 University's" --
23       THE REPORTER: Excuse me --
24       MR. KEENEY: -- "Department" -- I'm
25 sorry.

29

1       THE REPORTER: I need you --
2       MR. KEENEY: Am I talking too quickly?
3       THE REPORTER: Yes. I need you to slow
4 down reading that, please.
5       MR. KEENEY: I will slow down.
6       THE REPORTER: Thank you.
7       MR. KEENEY: Thank you for checking me.
8       MR. KEENEY: I'm not sure exactly where I left off,
9 but, "the operation at the University's Department of
10 Public Safety," I think may have been the last thing
11 I said.
12       THE REPORTER: Okay.
13       MR. KEENEY: Just let me know, Vanessa,
14 when I should continue.
15       THE REPORTER: Oh, yes, you can
16 continue.
17       MR. KEENEY: Oh, okay. Great.
18   Q. (BY MR. KEENEY) The next line reads, "Such
19 effective and efficient operation require a focus on
20 safety. It has come to TSU's attention that there is
21 confusion, divisiveness, dissension and acrimony
22 throughout TSU DPS -- all caused by your actions
23 despite repeated requests to cease."
24       To the best of your knowledge, what is
25 this statement referring to?

Mary Young - 2/27/2025

30

1    A. I have no idea, because none of what's in
2  this statement is true or accurate.
3    Q. Okay. Did TSU ever ask you to cease causing
4  confusion, divisiveness, dissension, or acrimony?
5    A. No.
6    Q. No? Do you have any idea what TSU requested
7  you to cease doing, prior to January 9th, 2023?
8    A. I do not.
9    Q. No? Okay. All right. "This has distressed
10  TSU DPS's members, resulting in contemplated
11  resignations and sick leave usage."
12       Are you aware of any TSU employee who,
13  around this time, contemplated a resignation?
14    A. I have no idea.
15    Q. Do you have any knowledge of any TSU
16  employee who contemplated using sick leave around
17  this time?
18    A. No.
19    Q. All right. I'm going to skip to the next
20  paragraph. "TSU no longer has the confidence that
21  you can continue to be a contributing member of the
22  TSU DPS with our ongoing focus on safety. You have
23  intentionally violated the terms of your paid
24  administrative leave communicated on December 1st,
25  2022."

31

1       Do you agree that you violated the terms
2  of your paid administrative leave?
3    A. No.
4    Q. "In fact, multiple TSU DPS officers have
5  testified via affidavit -- which is on file in the
6  spurious lawsuit you filed -- that you and your
7  counsel have gone so far as threatening them
8  individually and in-person on TSU's campus."
9       Did you ever threaten any TSU employee
10  individually?
11    A. No.
12    Q. Did you ever witness your counsel, your
13  attorney, threaten any TSU employee?
14    A. No.
15    Q. To the best of your knowledge, what do you
16  believe these statements are referring to?
17    A. To the best of my knowledge, none of these
18  statements are true referring to me. I have no idea
19  where these statements came from.
20    Q. At any point after you were placed on
21  administrative leave, did TSU block your card pass to
22  get into TSU buildings?
23    A. And when the temporary restraining order was
24  in effect, they unlocked my computer and the doors.
25  But my doors were never locked -- I'm sorry, because

32

1  I had the keys to get in.
2    Q. Okay. I'm confused. So did they -- are you
3  saying that TSU initially blocked your access to TSU
4  buildings but that they later reactivated or
5  reauthorized you to have access?
6    A. On my computer, yes.
7    Q. Okay. Did you ever -- were you ever -- did
8  you -- did you have a badge or a card to get access
9  to TSU buildings?
10    A. Did I -- do I have a badge or card to get
11  access to TSU buildings?
12    Q. So I -- for example, I'm a state employee.
13  I have a badge. Do you have or did you have a
14  similar type of card or badge whenever you were at
15  TSU?
16    A. Yes, yes.
17    Q. Okay. And did that badge give you access to
18  buildings at TSU?
19    A. If the -- if the doors were locked and it
20  had an access code card on it, yes.
21    Q. Okay. Did TSU remove your ability to use
22  that card to get access to buildings?
23    A. Yes.
24    Q. Do you remember when that occurred?
25    A. I do not. I remember they reinstated and

33

1  put it back. Every time it did not work, a phone
2  call was made to the general counsel, and it was
3  suddenly -- my access was back allowed. I'm aware of
4  that.
5    Q. Okay.
6    A. And it went on a couple of days, yes.
7    Q. Okay. Now, you mentioned your computer.
8  Did TSU restrict access to your office computer?
9    A. The sign-on part, yes.
10    Q. And did TSU similarly reauthorize you or
11  reactivate your ability to access your computer?
12    A. Yes.
13    Q. Okay. Did TSU instruct TSU officers to
14  ignore any orders that you issued after you were
15  placed on administrative leave?
16       MS. MARSAW: Objection. Form.
17    A. I don't know what TSU would have said to
18  officers.
19    Q. (BY MR. KEENEY) Okay. Are you aware of --
20  did anyone ever inform you that they had been
21  instructed to ignore your orders after you were
22  placed on administrative leave?
23    A. I wasn't placed on administrative leave.
24  That leave was completely gone once the temporary
25  restraining order was in place.

34

1      Q.  I understand that position, but I'm simply
2  asking, did TSU or did anyone ever inform you -- did
3  any TSU employee ever inform you that they had been
4  instructed to disregard or ignore your orders after
5  you were -- after you received that letter on
6  December 1st, 2022?
7           MS. MARSAW:  Objection.  Form.
8      A.  I'm not sure.
9      Q.  (BY MR. KEENEY)  Okay.  Did TSU change the
10  locks on your office door?
11     A.  I'm not sure if the locks were changed, but
12  I no longer had access to get in my door.
13     Q.  Okay.  And when did you attempt -- do you
14  remember -- when do you -- when did you attempt but
15  were not able to get in through the door, as you --
16  as you said?
17     A.  I don't remember the date, but it was in
18  December.
19     Q.  Of 2022?
20     A.  Yes.
21     Q.  Okay.  Do you -- forgive me if I asked this,
22  but did you issue any official directives or orders
23  to TSU officers in December 2022 or January 2023?
24           MS. MARSAW:  Objection.  Form.
25     A.  I don't recall issuing any orders.

35

1      Q.  (BY MR. KEENEY) Did you give any
2  instructions as a supervisor at that time?
3           MS. MARSAW:  Objection.  Form.
4      A.  If I did, it would have been the same that I
5  normally give as a chief of police.
6      Q.  (BY MR. KEENEY)  Okay.  Did you receive pay
7  from TSU while you were on administrative leave?
8      A.  I received my regular salary, because I was
9  not on administrative leave.
10     Q.  All right.  Okay.  I'll rephrase.
11          Did you receive your regular rate of pay
12  in December 2022?
13     A.  Yes.
14     Q.  Okay.  And at what point did you stop
15  receiving pay from TSU?
16     A.  I believe it was January 2023.
17     Q.  All right.
18     A.  Or February.
19     Q.  Okay.  So you were paid for your time where
20  it's -- for at least some time worked in January.
21          Do you remember the last day that you
22  received pay for?
23     A.  No.
24     Q.  All right.  Do you have any reason to
25  believe it would not have been up to January 9th,

36

1  2023?
2      A.  No.
3      Q.  Okay.  I'm going to stop sharing.
4          One other question.  Did you ever -- do
5  you remember ever riding in a golf cart on TSU campus
6  grounds in December 2022?
7      A.  Riding in a golf cart?
8      Q.  Yes.
9           MS. MARSAW:  Objection.  Form.
10     A.  Possibly for commencement?
11     Q.  (BY MR. KEENEY)  Okay.  Commencement.
12          Did you -- do you remember at any point
13  handing out copies of a temporary restraining order
14  to TSU officers?
15     A.  Yes.
16     Q.  Okay.  And when did that occur?
17     A.  I want to say the very next day that the
18  restraining order, which, I believe, is the same day
19  of the administrative leave form you put in the chat.
20     Q.  So either December 1st or 2nd?
21     A.  It was in December.
22     Q.  Okay.  Apart from handing copies of the
23  court orders to TSU officers, did you place any of
24  these court orders on the tops of people's computers?
25           MS. MARSAW:  Objection.  Form.

37

1      A.  I could have to all of the supervisors, so
2  that they'll know that the restraining order was in
3  effect.
4      Q.  Uh-huh.  Okay.  Okay.
5          Are you familiar with the term "special
6  event pay," as it was used at TSU while you were the
7  police chief?
8           MS. MARSAW:  Objection.  Form.
9      A.  Yes.
10     Q.  (BY MR. KEENEY)  Okay.  Can you define
11  special event pay?
12     A.  Well, special event pay was already in place
13  prior to me becoming the police chief, and so I just
14  followed what was already in place, and that is a
15  special rate that's given to officers for a special
16  event.
17     Q.  Okay.  Well, what constitutes a special
18  event?
19     A.  It could be defined many ways.  It could
20  be -- commencement is a special event -- something
21  that doesn't quite often happen on campus regularly.
22     Q.  Okay.  Commencement.  Would a basketball
23  game be considered a special event?
24     A.  Possibly, if that basketball game would have
25  drawn more visitors to come on campus, like the NAAC

38

1    -- I mean, NCAA or something of that sort.
2    Q. Uh-huh. Did that ever happen? Did the NCAA
3    host a basketball game at TSU?
4    A. They did.
5    Q. That's pretty cool.
6        Can you think of any other events that
7    qualify as a special event?
8    A. Maybe voting. It's -- there's a length of
9    events, and I really don't have any in front of me
10   to --
11   Q. Uh-huh.
12   A. -- share. But there are -- are a long list
13   of events that qualifies for special event pay.
14   Q. Okay. If an officer receives special event
15   pay and worked -- let's say the event was from
16   5:00 p.m. to 10:00 p.m., how would that be reported
17   on the officer's time sheet?
18   A. I'm certain that officers have to record all
19   of their overtime pay or special event pay or special
20   rate pay on their own individual time sheets, and
21   they give them to their supervisors.
22   Q. Uh-huh. Would the officer indicate that he
23   worked from 5:00 p.m. to 10 p.m., or would he or she
24   indicate -- would it be permissible to indicate that
25   the officer worked from 10:00 p.m. to 3:00 a.m.?

39

1        MS. MARSAW: Objection. Form.
2    A. The time would reflect what the hours were
3    that they worked.
4    Q. (BY MR. KEENEY) Okay. And is there a
5    special code that is used for special event pay?
6    A. I don't handle the rates and the paperwork
7    on events. I just sign off on the officers'
8    paperwork once it's been viewed up through their
9    chain of command and the other supervisors. I'm the
10   very last person that sees those forms.
11   Q. Thank you for that, but my question is: Are
12   you aware of a special code that is used for special
13   event pay?
14   A. Again, if there is a code that's used, I
15   don't create the code. I just sign off on the form.
16   So if you're telling me that there is a special code,
17   then I'll agree with you. I don't know about a
18   special code, because I don't create a code.
19   Q. Okay. So you're unfamiliar with any code
20   that was ever used for special event pay?
21   A. I don't know what code is used.
22   Q. Okay. What rate of pay would an officer
23   receive for special events -- for special event pay?
24   A. The rates vary from officer to security to
25   supervisor, so I don't know. I don't know what

40

1    particular event you're speaking of, so I don't -- I
2    don't know. Again --
3    Q. Uh-huh.
4    A. -- I just sign off on the -- on the form.
5    The rates are already there. I don't make the rates.
6    The rates are already there.
7    Q. To the best of your knowledge, do you know
8    what a TSU sergeant would receive for working a
9    special event?
10   A. I don't. To the best of my knowledge, if I
11   could possibly say $40, $50, or $60 an hour, and I
12   don't know what event.
13   Q. Uh-huh.
14   A. But it could range between those three.
15   Q. Does the event -- does the type of event
16   affect how much the rate of pay would be?
17   A. Yes.
18   Q. Can you give me an example of two different
19   types of events that would have different rates of
20   pay?
21   A. Yes. So like the special events for -- so
22   there is a special event, and then there is a
23   special-special event.
24        So the special-special is something that
25   probably would only happen once on the campus. Like,

41

1    we had the Democratic National Convention, and they
2    received that special-special rate. Therefore, the
3    CFO and the president, along with myself, would have
4    signed off on that rate.
5        And that probably would have been, for a
6    supervisor, maybe 60 an hour. But like a special
7    event that happens regularly on campus, such as
8    Homecoming or student events, those supervisors
9    probably are at 50 an hour or something like that.
10   Q. I see.
11   A. Or the law school--
12   Q. Okay.
13   A. -- school or something, yes.
14   Q. Were there any special events where the
15   officer would receive $25 an hour?
16   A. Well, security. Security would probably
17   receive that amount.
18   Q. Okay. So officers who are working security
19   at a special event would receive 24 -- I'm sorry, $25
20   an hour?
21   A. Security officers, not certified police
22   officers.
23        So TSU has a hybrid organization. There
24   are certified police officers, and then there are
25   security officers. So security officers would

42

1  probably make $25 an hour, whereas certified police
2  officer would probably make $40 an hour.
3      Q.  I see.  Okay.  Can you help me understand
4  what is the difference between a security officer,
5  and a -- you said it was a certified police officer?
6      A.  Certified state licensed --
7      Q.  State --
8      A.  -- police officer.  That's the difference
9  between a security officer.  A security officer is
10  just an officer that works in a capacity of security;
11  not certified, not licensed, or anything of that
12  nature.
13      Q.  I see.  So the security officer would not
14  have a license from the Texas Commission on Law
15  Enforcement?
16      A.  That is correct.
17      Q.  I see.  And if I understood you correctly,
18  the security officers would receive $25 an hour for
19  special events.  Licensed police officers, would they
20  ever receive $25 an hour for a special event?
21      A.  The certified police officers, $25 an hour?
22      Q.  Yes, excuse me.  The certified police
23  officer, is there any special event that they would
24  have worked and received $25 an hour?
25      A.  I can't recall one.

43

1      Q.  Okay.
2          MR. KEENEY:  All right.  We're close
3  enough to 11:00.  I like to take breaks approximately
4  every hour.  Would it be all right if we come back at
5  11:00?
6          MS. MARSAW:  That's fine.
7          MR. KEENEY:  Great.  Thank you.
8          THE REPORTER:  Off the record at 10:55.
9          (Recess 10:55 a.m. to 11:02 a.m.)
10          THE REPORTER:  Okay.  Back on the record
11  at 11:02.
12      Q.  (BY MR. KEENEY)  All right.  I'm going to
13  send and share what I've marked as Exhibit 4.
14          (Exhibit 4 marked.)
15      Q.  Ms. Young, if you could please let me know
16  if you're able to see the next exhibit?
17      A.  Yes, I can see it.
18      Q.  All right.  Do you recognize this document?
19      A.  Yes.
20      Q.  Okay.  So you've seen this document before?
21      A.  I've seen this document when my attorney
22  gave it to me.
23      Q.  Okay.  And can you describe the document for
24  me?
25      A.  It appears to be from Darlene Brown, what

44

1  she concluded on her finding.
2      Q.  All right.  So who is Darlene Brown?
3      A.  It says up there that she's the acting chief
4  audit.
5      Q.  Acting chief audit executive, right?
6      A.  That's what it says.  I don't -- I don't --
7  I've never heard that term used before, and I've
8  worked there since 2017.  But that's what that --
9  that's what that says.
10      Q.  Okay.  Are you aware that TSU hired
11  Ms. Brown to conduct an audit?
12      A.  No.
13      Q.  Okay.  All right.  Did you ever meet with
14  Darlene Brown when you were at TSU?
15      A.  So Darlene Brown was the acting chief
16  because the actual chief audit resigned in May,
17  because she was not certified.  And so Darlene Brown
18  came in at that moment as the acting chief audit.
19      Q.  What is the name of that individual you said
20  was not certified?
21      A.  Her name is -- give me a second.  Charla
22  Parker-Thompson.  So she was the auditor up until May
23  when Darlene Brown came in.
24      Q.  Okay.  Thank you.
25      A.  You're welcome.

45

1      Q.  So did you meet with Darlene Brown at some
2  point in 2022?
3      A.  Darlene Brown sent me a Zoom request.  I
4  think it was Teams in 2022, yes.
5      Q.  All right.  So you met with Darlene Brown
6  over Teams?
7      A.  In July of 2022, correct.
8      Q.  Okay, great.  All right.  So I'm just going
9  to scroll down to Page 4.  All right.  So this is a
10  summary of Darlene Brown's interview with you.
11          Can you confirm that's what we're
12  looking at?
13      A.  Yeah, you put up Page 4.
14      Q.  Yes, okay.  So you confirmed that you met
15  with Darlene Brown in July 2022.  All right.
16          Do you remember making this first
17  statement, Darlene Brown says, "The Chief of Police
18  stated that she would not tell officers to record
19  time that was not worked."  I'll stop there.
20          Did you -- do you recall making that
21  statement to Darlene Brown?
22      A.  Yes, but can we go back?  When you asked,
23  have I met with Darlene in July over Teams?
24  Completely different from what you've shown me now.
25          This is August, and she only met with me

46

1 in August after the board of regents had advised her
2 to meet with me. So that -- the very first meeting
3 in July --
4    Q. Uh-huh.
5    A. -- is not what this is.
6    Q. Oh, I --
7    A. I just want to make certain that we're clear
8 on that.
9    Q. So you met with Darlene Brown on more than
10 one occasion?
11    A. I met with her in July because that was the
12 first time -- she came in June. The June board
13 meeting, and they introduced her as the new auditor
14 now, because the other lady had resigned in May.
15       And then in July, a Teams call -- she
16 sent me a Teams call, talking about my officers with
17 field training.
18    Q. Okay. And were there any other times you
19 met with Darlene Brown?
20    A. And then in August.
21    Q. And then in August. All right. So this
22 investigation interview summary, is it your testimony
23 that this refers to the meeting in August?
24    A. Yes.
25    Q. All right. Thank you for that

47

1 clarification.
2       So do you remember in August informing
3 Darlene Brown -- and we'll start with the first line
4 -- that you "would not tell officers to record time
5 that was not worked"?
6    A. I don't remember if it was actually August,
7 but I do remember saying that I would not have
8 officers record time if they had not worked it. That
9 sounds like something I would say, yes.
10    Q. Uh-huh. Okay. And then next line, "and
11 then according to policies they must have worked the
12 time in order to record it," correct?
13    A. That's correct.
14    Q. All right. "The Chief of Police stated that
15 there has been instances where supervisors (senior
16 officers) have similar off days so others have had to
17 cover their shifts."
18       Is this a true statement?
19    A. I believe supervisors have had other
20 officers cover their shift. I believe that's true.
21    Q. "In these instances, the officers would work
22 the shift but since they can't have a promotion they
23 would receive compensation -- it was not to be a
24 daily or weekly thing."
25       Do you agree with that statement?

48

1    A. That -- I don't agree with that. I don't
2 know where that came from. You don't get paid just
3 because you're covering someone's assignment.
4    Q. Okay. "The Chief of Police authorized
5 Officers Ward, McAfee, and Holiday that they can
6 pick-up 8 hours bi-monthly not the 2 hours a day."
7    A. I don't -- I don't know what that means.
8    Q. Okay. So you never stated that?
9    A. No. And to clarify, again, I only saw
10 this -- this entire packet that you're showing me, is
11 when I filed my lawsuit and my attorney brought it to
12 my attention after the TRO. I had never seen this
13 prior to that, and that was in 2023, so I had never
14 seen any of this until 2023.
15    Q. So the first time you saw this report was
16 2023?
17    A. That is correct.
18    Q. So do you -- so you disagree with this
19 statement that you told Darlene Brown that officers
20 would receive compensation for covering the shifts of
21 their supervisors?
22    A. Yes. I've not known officers to get
23 compensated just for covering a shift. I have known
24 officers, senior officers, to take the role as --
25 over that shift when their supervisors are on another

49

1 assignment or doing something, but I've never known
2 anyone to get paid for covering a shift.
3    Q. So if an officer is acting as lead
4 officer -- are you familiar with the term "lead
5 officer"?
6    A. So that term -- lead officer is just a term
7 that means you are taking the lead for that day.
8 Nothing else. There is nothing significant about the
9 term other than you're taking the lead for that day.
10 There is no compensatory time that you receive for
11 it, no money that you get out of it. It's just the
12 title that you receive -- I mean, that you're using
13 that day. So I am familiar with that word, "lead."
14    Q. All right. So if an officer -- if an
15 officer's supervisor is not working and the officer
16 fills in as the lead officer, did you authorize that
17 officer to receive any additional compensation?
18    A. No. And once again, oftentimes I don't know
19 who's filling in, who's taking leave. That's through
20 their own chain of command. So I wouldn't know who
21 took the lead for that day or what supervisor is off
22 that day. There is no compensation to receive for
23 lead officer, so no.
24    Q. Okay. All right. "The Chief of Police
25 stated that she did not direct Lieutenant Bridges,

50

1  Lieutenant Jones, Sergeant Barnett, Lieutenant
2  Starks, Sergeant McCray, Sergeant Brown, and Sergeant
3  John-Miller to sign the time sheets for individuals
4  to receive an additional two (2) hours a day field
5  training pay."
6      A. Yes.
7      Q. Did you with agree with that estimate?
8      A. That is correct. I did authorize that.
9      Q. All right. "The Chief of Police stated that
10  all supervisor's meetings are recorded." Did you --
11      A. That is correct.
12      Q. -- make that statement? Okay. "And that
13  she would provide the Acting Chief Audit Executive
14  with the recordings."
15          Did you make that statement?
16      A. Yes. And I believe she listened to all the
17  recordings of the meetings.
18      Q. All right. So you state that there was no
19  supervisor meeting in January 2022?
20          Do you remember that -- making that
21  statement?
22      A. So, again, I -- the way this is written, she
23  and I did not have that conversation like that, so I
24  did not see this entire package until 2023.
25          The anonymous complaint that was filed

51

1  had January 2022 on there, and so she asked if I had
2  any recordings from January 2022. And so that's
3  where this conversation is coming from, the
4  recordings from January 2022 supervisors' meeting.
5  And so that's -- I'm believing that that's why that
6  question is answered like it is --
7      Q. Okay.
8      A. -- because she went back to the 2022
9  recording in January.
10      Q. All right. So were there any supervisor
11  meetings in January 2022?
12          MS. MARSAW: Objection. Form.
13      A. Again, if there were any meetings, they're
14  all recorded. All of my meetings are recorded.
15      Q. (BY MR. KEENEY) Okay. Do you remember if
16  there were supervisor meetings after January 2022?
17      A. All of the meetings are recorded. I try to
18  have a supervisors' meeting once a month or once
19  every two months. At any rate, every meeting that I
20  would have had with supervisors would have been
21  recorded.
22      Q. Okay. All right. Let's skip ahead, and I'm
23  going to read some statements from the interview with
24  Ms. Chandra Scruggs. Who is Ms. Chandra Scruggs?
25      A. Now, Chandra Scruggs was -- she worked in

52

1  another division. She did not work in my division.
2  We were using her services because we did not have a
3  timekeeper for our department, and so she was working
4  our department as a timekeeper as well as her own
5  department as a timekeeper.
6      Q. I see. So she had "been serving as the DPS
7  timekeeper since the end of October 2020 or
8  November 2020." That's what it states here.
9          Do you agree with that?
10      A. I disagree. She wasn't the DPS timekeeper.
11      Q. She wasn't -- okay. So your testimony is
12  she wasn't the DPS timekeeper, but she was providing
13  services?
14      A. Correct.
15      Q. I see, okay. So is it more accurate, then,
16  to say that she was providing timekeeping services
17  since October or November 2020?
18      A. She was assisting us in timekeeping
19  services, yes.
20      Q. All right. I'm going to skip ahead to the
21  next -- I'm going to skip to the third paragraph.
22      A. Okay.
23      Q. "Ms. Scruggs stated that the Chief of Police
24  told Ms. Scruggs to create a code for individuals to
25  use if they are acting in a supervisor role." I'll

53

1  stop there.
2          Did you tell Ms. Scruggs to create a
3  code for individuals to use if they are acting in a
4  supervisor role?
5      A. No, sir.
6      Q. All right. And same question. Did you
7  inform Ms. Scruggs that these officers acting in a
8  supervisor role are to receive $25 an hour on top of
9  their regular hourly rate?
10      A. No, sir.
11      Q. You never said that the chief of -- I'm
12  sorry. You never said that you can't promote them,
13  but you wanted to compensate them?
14      A. No, sir.
15      Q. All right. Apart from receiving pay for
16  filling in as a supervisor, did you ever authorize
17  officers to receive an additional $25 an hour for any
18  other reason?
19      A. Repeat your question. You said, "aside from
20  filling in as a supervisor"?
21      Q. So you -- your testimony is that you never
22  authorized an additional 25 an hour for the purpose
23  of filling in as a supervisor. Did I understand you
24  correctly?
25      A. That's correct. You don't get paid just

Mary Young - 2/27/2025

54

1  because you filled in for a supervisor.
2      Q. Did you ever authorize an additional $25 an
3  hour for any other purpose or reason?
4      A. No.
5      Q. Ms. Scruggs stated -- I'm looking at the
6  last paragraph of that section. "Ms. Scruggs stated
7  that the code HRSTLDR is used to identify the hours
8  worked as a 'lead officer'/shift supervisor, and that
9  she prepares a separate sign-in sheet each pay period
10  for this."
11         Are you familiar with the code HRSTLDR?
12      A. No.
13      Q. You have never heard this code?
14      A. I'm not familiar with that code.
15      Q. Okay. So you never heard of anyone using
16  this code?
17         MS. MARSAW: Objection.
18      A. I'm not familiar with that code.
19      Q. (BY MR. KEENEY) Have you ever seen this
20  code used on a time sheet?
21      A. I am not familiar with that code.
22      Q. All right. So this is the first time that
23  you have ever seen this code. Is that your
24  testimony?
25      A. I saw this document for the first time in

55

1  2023, so I've seen this document. As far as that
2  code, I am not familiar with that code.
3      Q. When you read this document, was that the
4  first time that you ever saw or heard of this code?
5      A. Yes.
6      Q. Okay. "When preparing the payroll, she
7  includes this along with the Weekly Time Reports to
8  Command for signature and then she delivers the
9  signed pay packages to Human Resources (Payroll)."
10         Do you have any knowledge of this
11  statement, whether this statement is accurate or not?
12      A. That she sends the weekly time reports to
13  the command for their signatures? Absolutely.
14      Q. That's the correct process?
15      A. The process is the officers fill in their
16  time sheets. There -- they give it to their
17  supervisors.
18      Q. Uh-huh.
19      A. From that supervisor, it goes to that
20  lieutenant. From that lieutenant, it goes to that
21  captain. From the captain, it goes to the deputy
22  chief, and I'm the very last person that signs off on
23  that.
24      Q. Okay. "Ms. Scruggs stated that she did tell
25  Officers Ward, McAfee, and Holiday that they have to

56

1  record the HRSTLDR hours as different times than the
2  times they recorded for their shift."
3         Are you aware of whether or not
4  Ms. Scruggs informed these officers --
5      A. No.
6      Q. -- they would be recording hours as
7  different times than the times they recorded for
8  their shift?
9      A. No.
10      Q. All right. Moving on to the next section.
11  "The Deputy Chief of Police," and is that Bobby
12  Brown?
13      A. The Deputy Chief of Police at the time was
14  Frederick Brown.
15      Q. Frederick Brown. "The Deputy Chief of
16  Police stated that he has been present when the Chief
17  of Police verbally gave approval for Field Training
18  Officers (FTO) to add two hours to their time each
19  day."
20         Did you verbally give approval for field
21  training officers to add two hours to their time?
22      A. So there is a field training manual that
23  officers have, and when they are training someone,
24  the field training supervisor is allowed to give the
25  field training officer that's training the incoming

57

1  officer overtime. And they can get up to two hours
2  that time per day if they're -- when they're
3  training.
4      Q. Okay.
5      A. So I think that's what she tried to say in
6  that, but she didn't word it correctly.
7      Q. I see. "The Deputy Chief of Police stated
8  that he may have repeated that Field Training
9  Officers could record two hours for paperwork."
10         Do you recall whether or not the Deputy
11  Chief of Police made that statement?
12      A. I am not aware of that.
13      Q. Okay. Skipping to the next paragraph. "The
14  Deputy Chief of Police stated that Chief of Police
15  Young advised leads (Lead Officers) that if they came
16  in and were acting as a lead, they could get
17  compensated."
18         Is that a true statement?
19      A. No. And can I just add something? All of
20  this that's written is written from one person.
21         Normally, when an investigation of this
22  manner takes place, the person writes in their own
23  words and sign it so that it's accurate that that's
24  what they said.
25         This is hearsay, or me just listening to

58

1  what she interpreted. And sometimes interpretation
2  can be wrong, and I think this entire investigation
3  is wrong, based on her interpretation.
4          And so that's why it's hard for me to
5  understand how you're asking and presenting the
6  questions, because I think it's hard to follow along
7  with how she interpreted the answers. Her responses
8  are not conducive to what police officers would say,
9  and so that's why this investigation is inaccurate.
10  Q. Okay.
11          MR. KEENEY: I'll just object to the
12  nonresponsive portion of that answer, but thank you.
13  A. Okay.
14  Q. (BY MR. KEENEY) All right. So is it -- is
15  it true that you -- I'll strike that.
16          Did you allow officers to receive a
17  total of 16 hours a month of additional compensation?
18  A. No. I don't understand the question.
19  Q. So it -- it states here, "He stated that the
20  maximum allowed by the Chief of Police was a total of
21  16 hours a month."
22          Perhaps I phrased that confusingly. Did
23  you authorize officers to receive a total of 16
24  hours' worth of additional compensation for any
25  reason?

59

1          MS. MARSAW: Objection. Form.
2  A. No.
3  Q. (BY MR. KEENEY) "The Deputy Chief of Police
4  stated he was present in a meeting the week of
5  July 4, 2022 with Officers Ward, McAfee, and
6  Ms. Scruggs when the Chief of Police asked who told
7  them how to report their time."
8          Do you recall a meeting on July 4th --
9  or the week of July 4th, 2022?
10  A. I believe that was the first time I met with
11  Darlene over Teams about field training, and it was
12  in July.
13  Q. Did you meet with Officers Ward, McAfee, and
14  Ms. Scruggs during the week of July 4th, 2022?
15  A. I don't know the actual date. I remember
16  talking to Darlene Brown for the very first time in
17  July. That conversation dealt with field training
18  officers and pay, and she mentioned those names, the
19  names that you just mentioned, which are not field
20  training officers.
21  Q. I'm just asking if you met with these
22  individuals and asked them how -- and asked them who
23  told them how to record their time?
24  A. I remember meeting with those individuals.
25  I'm not sure the depth of the conversation.

60

1  Q. I just scrolled up to the end of the
2  investigation interview summary for you. It states,
3  "The Chief of Police asked if she should speak with
4  the individuals that recorded overtime."
5          Did you ask Darlene Brown if you could
6  or should speak with the individuals about the
7  substance of the investigation?
8          MS. MARSAW: Objection. Form.
9  A. The conversation that I had with her in July
10  via Teams, it was in with field training, and she has
11  it recorded because the Teams were recorded. That
12  meeting is recorded. And I asked her, "Should I
13  speak with those officers?" And she said, "Yes."
14          So that Teams meeting is recorded, so
15  you can go back and hear that.
16  Q. (BY MR. KEENEY) Darlene Brown states here,
17  "I told her she should not."
18          Did Darlene Brown tell you you should
19  not talk to the other officers?
20  A. That Teams meeting is recorded.
21  Q. I understand, but I'm just asking you: Did
22  Darlene Brown state that you should not talk to other
23  officers?
24  A. I asked her, "Should I speak with the
25  officers about field training?" And she said, "Yes."

61

1  Q. Did you ask Darlene Brown if you could speak
2  with any individuals on any topic relating to her
3  investigation?
4  A. In --
5          MS. MARSAW: Objection. Form.
6  A. In July, I didn't know it was an
7  investigation. When she called a Teams meeting in
8  July, she asked for information.
9  Q. (BY MR. KEENEY) Uh-huh. Then did you ask
10  if you could speak with individuals -- I'm not asking
11  about overtime, I'm asking did you ask if you could
12  speak with individuals about lead officer pay?
13          MS. MARSAW: Objection. Form.
14  A. I don't even know what lead officer pay is.
15  There is no such thing.
16  Q. (BY MR. KEENEY) Then is your answer no?
17  A. That is correct.
18  Q. Okay. Did Darlene Brown tell you that you
19  should not talk to other officers about any other
20  topic?
21          MS. MARSAW: Objection. Form.
22  A. When I spoke with her via Teams, I asked her
23  could I speak to officers regarding the field
24  training, because that's what she called me about,
25  was the field training, and she said yes.

62

1    Q. (BY MR. KEENEY) And I -- and I understand
2  that. But I'm asking about other topics. Were there
3  any other topics that you asked if you could speak to
4  officers about and --
5    A. I think the only --
6    Q. -- that Darlene Brown said no.
7    A. Sorry about that overtalk.
8        MS. MARSAW: Objection. Form.
9    A. The only topic that was talked about was the
10 field training, so I'm going to say, no, still.
11   Q. (BY MR. KEENEY) Okay. Let's talk about the
12 August meeting.
13       Did Darlene Brown tell you that you
14 should not talk to other officers about any topic in
15 the August meeting that you had with Darlene Brown?
16   A. August? I don't remember her having that
17 conversation with me in August.
18   Q. All right. Let's go to the next interview
19 summary. This says for Dispatch Supervisor (Officer
20 Tina Dorsey).
21       "The Dispatch Supervisor stated that
22 Chief Young held Officers McAfee and Ward over after
23 a supervisors meeting in February 2022."
24       Do you remember holding these officers
25 back after a supervisors' meeting in February 2022?

63

1    A. I do not remember holding anyone back.
2  There just always officers that stay around once the
3  meeting has adjourned, and so if the topic was about
4  these officers doing a great job, then I can see that
5  those officers were held back.
6    Q. I see. So are you -- is it your testimony
7  that you spoke with -- maybe you didn't hold them
8  back, but is it your testimony that you spoke with
9  these officers, McAfee and Ward, after a supervisors'
10 meeting in February 2022?
11   A. All supervisors' meetings are recorded, so
12 it's on the recording if I spoke with them.
13       At this moment, I'm not certain if it
14 was February that I spoke with them or what was said,
15 but if they are saying that we had a meeting, then,
16 yes.
17   Q. Okay. Well, the -- this is talking about
18 what happened after the meeting. So presumably the
19 meeting would not be recorded.
20       So I'm asking, do you recall speaking
21 after the supervisors' meeting with Officers McAfee
22 and Ward?
23   A. All the meetings are recorded, even
24 afterwards the recordings are still going on.
25   Q. Well, thank you for that information. But

64

1  I'm asking do you recall speaking -- I understand
2  there is a recording, but I'm asking to your best --
3  the best of your knowledge and memory, did you speak
4  with Officers McAfee and Ward after a supervisors'
5  meeting in February of 2022?
6    A. I don't want to say yes and I did not, and I
7  don't want to say no. So I just can't recall that
8  right now. It's not coming to my mind that there was
9  a meeting after the meeting.
10   Q. Uh-huh. It may not have been an official
11 meeting. I'm just asking if you spoke with them. Do
12 you remember speaking with them?
13       MS. MARSAW: Objection.
14   A. I could have, if they had a question after
15 the meeting. I really can't answer that to say yes
16 or no, because there are always people behind the
17 meetings that want to talk. So I wouldn't say I
18 didn't speak to them and they were there.
19   Q. (BY MR. KEENEY) All right. Do you recall
20 telling Officers McAfee and Ward that for two of the
21 five days working as a supervisor/lead officer they
22 could receive special event pay?
23   A. No.
24   Q. Okay. Do you know what this statement may
25 be referring to?

65

1    A. Is that a statement that I made?
2    Q. I'm just asking -- so this is a summary of
3  Tina Dorsey's investigation interview.
4    A. Oh, no.
5    Q. Do you recall or do you know what
6  Tina Dorsey is referring to with this statement?
7    A. No, sir.
8    Q. So it's your testimony that you never
9  instructed or informed these officers, McAfee and
10 Ward, that they could receive special event pay for
11 working as a supervisor/lead officer for two of the
12 five days that they did so?
13   A. It is my testimony.
14   Q. The next sentence, "She did not provide
15 instruction on how to do this and told them to see
16 the DPS timekeeper Ms. Scruggs."
17       Do you recall informing Officers McAfee
18 and Ward to see the DPS timekeeper for --
19   A. No.
20   Q. -- instructions on how to fill out their
21 time sheets?
22   A. No.
23   Q. "The Dispatch Supervisor stated that when
24 she saw Officer McAfee's Weekly Timesheet with the
25 special code she called Ms. Scruggs and was told that

66

1  Chief Young authorized the code."
2       So again we have another statement that
3  you authorized the use of a special code, and I'm
4  just trying to understand where -- what this -- if
5  you're denying this, where is this testimony coming
6  from?
7       MS. MARSAW:  Objection.
8       A.  And, again, this is her interpretation from
9  who she spoke with.
10      I don't know anything about a special
11  code.  I did not authorize a special code.  And so,
12  again, reading this, you're telling me this is what
13  the dispatch supervisor said to Ms. Brown.
14      That's their interpretation, and this is
15  what we're looking at, so I'm not -- I'm not certain
16  on what's being said.  I didn't authorize a special
17  code.  I didn't know anything about a special code.
18      Q.  (BY MR. KEENEY)  Okay.
19      A.  And I think you'll see that inside
20  Ms. Scruggs' testimony.  I think she did an affidavit
21  to confirm that I knew nothing about a special
22  code --
23      Q.  Okay.
24      A.  -- nor did I authorize a special code.
25      Q.  All right.  "The Dispatch Supervisor stated

67

1  that on Wednesday, July 6th, 2022, the Chief of
2  Police held a meeting with Sergeant Jones, Officer
3  McCray, and Officer Dorsey."
4       Do you remember a meeting on or around
5  July 6th, 2022, with these officers?
6       A.  I do not, but all those meetings are
7  recorded, and if they -- if that's the correct date
8  and time, then whatever was said would be in that --
9  on the recording.
10      Q.  Are these officers supervisors, or were
11  they --
12      A.  Yes.
13      Q.  -- I guess, at the time?
14      A.  Yes.  The Sergeant -- Sergeant James was --
15  Sergeant McCray, I think you said Officer.  Dorsey is
16  not an officer.
17      I don't understand the statement.  So
18  that's -- all of that's inaccurate.  I have no idea
19  what that even mean.
20      Q.  Okay.  So you never held -- you don't
21  remember, at least, having a meeting just with these
22  officers?
23      A.  No.  I did not have a meeting with just
24  these officers to instruct them about a meeting, no.
25      Q.  Did you ever -- perhaps it wasn't an

68

1  official meeting or formal meeting, but did you ever
2  tell these officers on or around July 6th, 2022, that
3  an investigation was coming up?
4       A.  No.
5       Q.  And I'm just trying to be comprehensive, so
6  I thank you for your patience.
7       A.  Uh-huh.
8       Q.  Did you instruct Officer Holiday to join the
9  meeting, any meeting, that this might be referring
10  to?
11      A.  I do not recall having a separate meeting in
12  July with just four people.  My supervisor meeting
13  incorporates everyone, encompasses everyone.  So to
14  have a meeting with four people, that's not -- that's
15  not normal.
16      Q.  Okay.  All right.  I'm just going to go down
17  to -- let's see.
18      All right.  I think we can skip ahead,
19  save us some time.  I'm just going to show Appendix C
20  of the Darlene Brown investigation report.
21      This appears to be a sample time sheet.
22      A.  Okay.
23      Q.  For an Officer James Ward.  Would this be a
24  time sheet that you, in your capacity as police chief
25  at TSU, would have approved?

69

1       A.  If the -- if the times are accurate and the
2  time sheets have been sent up via the chain of
3  command and then given to me, then, yes, we would
4  have approved that.
5       Q.  Okay.  I can't read the signatures here, but
6  do you recognize any of the notations on this page to
7  be your signature?
8       A.  No, that's not my signature.
9       Q.  Okay.  So none of these --
10      A.  No.
11      Q.  None of these -- I'm sorry.  I need to move,
12  because my light went out.
13      A.  Okay.
14      Q.  All right.  So your signature is nowhere
15  listed on -- or nowhere indicated on this page,
16  correct?
17      A.  That is correct.
18      Q.  All right.  So I wanted to ask about what is
19  listed or indicated under Special Event Work Hours.
20      It says or it indicates here that this
21  officer worked from 3:00 p.m. to 11:00 p.m. on
22  March 13th, 2022; the officer worked from 11:00 p.m.
23  to 7:00 a.m. on March 13th, 2022 -- I presume that
24  that carries over to the next day, the 14th -- and
25  that the officer worked from, going back down to

70

1 special events, 3:00 p.m. through 11:00 p.m. on
2 March 14th.
3         And then I assume that this is a typo
4 because the others say 11:00 p.m., but it says
5 11:00 a.m. on March 14th, 2022, to 7:00 a.m.  So I
6 presume that should be 11:00 p.m. to 7:00 a.m. the
7 next day.
8         So there is a special event section.
9 Are you aware of what special event Officer Ward
10 could have been working to receive the special
11 event -- or to prompt him to note on his time sheet
12 that he was working a special event?
13         MS. MARSAW:  Objection.  And I also want
14 to just point out that she's already made it clear
15 that she doesn't have personal knowledge of this
16 particular document, and her signature is not on it.
17         MR. KEENEY:  Thank you.
18     Q. (BY MR. KEENEY)  You can answer the
19 question, Ms. Young.
20     A. No.
21     Q. All right.
22     A. I don't know what event he would have
23 worked, no.
24     Q. Okay.  Is it typical for officers to work
25 eight-hour events before or after their shift?

71

1     A. Is it likely that officers can work events
2 before their shifts or after their shifts, yes.
3     Q. No, my question is:  Is it typical to work
4 an eight-hour shift -- an eight-hour -- I'm sorry.
5         Is it typical to work an eight-hour
6 event immediately before or after a regular shift?
7     A. Again, it's likely that an officer can work
8 an event before or after their shift.  If it is an
9 eight -- if it's an eight-hour or a four-hour event,
10 it's likely that can happen.
11     Q. Is it typical is my question.
12     A. Does it happen --
13     Q. Not whether or not it could.
14     A. -- regularly?
15     Q. I'm not asking if it could happen.  I'm
16 asking how likely is it?  How -- sorry.  How typical
17 is it?
18         MS. MARSAW:  Objection.  Form.
19     A. It's very likely, and if you want to use the
20 word "typical," can it occur?  Typically, it can.
21 So, yes, it happens.
22     Q. (BY MR. KEENEY)  Give me some examples of
23 special events that would run from 3:00 p.m. to
24 11:00 p.m. at TSU.
25     A. Homecoming, voter registration.  It could

72

1 have been the TSU Relays, a number of things happen.
2 I believe this particular officer worked the
3 nightshift, which was 11:00 p.m. to 7:00 a.m.
4         So he would have to work anything before
5 his shift started at 11:00 p.m.  So anything that he
6 worked prior -- before 11:00 p.m. could have resulted
7 in an eight-hour or four-hour event that took place.
8         Like I said, Homecoming, that's an
9 entire week of something.  TSU Relays is a couple of
10 weekends, so, yes.
11     Q. Okay.  So it's your testimony that James
12 Ward would have only been authorized to receive the
13 special event pay for these two periods of -- through
14 -- on March 13th and 14th, between 3:00 and
15 11:00 p.m., if he was working a special event on
16 those days?
17     A. So I don't know what event this is and what
18 he worked.  I'm only answering the question is it
19 likely that that can happen before their shift.  So I
20 don't know --
21     Q. My question is:  Is it authorized?  Now,
22 I've moved on.
23         I'm asking is it authorized to receive
24 special event pay regardless of whether or not,
25 Ward -- in other words, for this time sheet and for

73

1 the pay to have been authorized, would Officer
2 Ward -- would Officer Ward have had to be -- would
3 have had -- would Officer Ward have had to be working
4 a special event from 3:00 p.m. to 11:00 p.m., on both
5 March 13th and 14th --
6         MS. MARSAW:  Objection.  Form.
7     Q. (BY MR. KEENEY)  -- to be authorized by you?
8         MS. MARSAW:  Objection.
9     A. So someone approved it.  Whomever those
10 signatures are approved that he worked that event.
11 What that event was, I'm not certain.  But whoever
12 approved it, approved that he worked that event.
13     Q. (BY MR. KEENEY)  Now, earlier you testified
14 that you ultimately give the last approval after --
15     A. No.
16     Q. Did I misunderstand?
17     A. Yes, I'm sorry.  I don't give the last
18 approval because, again, I don't even know what these
19 officers are working.
20         What I do give is my last signature on
21 the forms once they have been reviewed by their
22 supervisors.
23     Q. Okay.  So last signature?
24     A. Uh-huh.
25     Q. My question is what is authorized now.  My

74

1 question is:  For you to sign off on an officer to
2 receive pay for a special event, would James Ward or
3 any officer have needed to work a special event for
4 those hours for which he was receiving pay for a
5 special event?
6         MS. MARSAW:  Objection.  Form.
7     A.  If any officer receives pay for an event,
8 that means they would have worked that event.  I
9 strictly prohibit dishonesty on events.  No one is
10 going to not work an event or not -- or get paid for
11 an event not worked.  I'm very vigilant about that.
12 They know that we have integrity when it comes to
13 working events.
14         And so our motto was -- TSU, you know,
15 they're going to be tired of seeing us, because we
16 are going to always be vigilant.
17         So if an officer said they worked this
18 particular event that you're saying and a supervisor
19 had signed off on that, then I expected honesty to go
20 up the chain of command that by the time it gets to
21 me for my signature that they've already approved
22 everything, and it just needs my signature so that
23 the officer can get paid for what they worked.
24     Q.  (BY MR. KEENEY)  All right.  In other words,
25 if you had knowledge that Officer Ward had not

75

1 actually worked a special event, you would not have
2 approved it?
3     A.  Absolutely.
4     Q.  Okay.
5     A.  Nor would any other officer.
6     Q.  All right.  All right.  I'm going to share
7 one more document.  All right.  Oh, there we go.
8         MR. KEENEY:  Bear with me, I'm sorry.
9         THE WITNESS:  No, you're fine.
10     Q.  (BY MR. KEENEY)  Okay.  Are you familiar
11 with the document that I've marked as Exhibit 5 and
12 that is displayed on the screen now?
13         (Exhibit 5 marked.)
14     A.  I'm attached to that document, yes.  2017,
15 yes.
16     Q.  Okay.  And do you remember receiving this
17 email?
18     A.  It shows that I received it.
19     Q.  I can't remember every email in my inbox, so
20 your memory is -- must be better than mine.
21         So you remember this email?
22     A.  It shows that I received it.  Now, if I
23 remember it or not, but that -- I see where it says
24 "To," and I see my name highlighted, so it shows that
25 I received it.

76

1     Q.  Okay.  Do you recall receiving -- or do you
2 recall the New Approved Personnel Fee Sheet?
3     A.  Yes.
4     Q.  Okay.  I'm just going to scroll to the
5 attachment, or at least I assume that it -- this was
6 attached to that email.
7     A.  Okay.
8     Q.  Do you recall receiving the personnel fee
9 sheet in 2017?
10     A.  I do.
11     Q.  From Shannon Broussard?
12     A.  Yes.
13     Q.  All right.  So Shannon Broussard sent a
14 personnel fee sheet to you, and it looks like a
15 number of other individuals.
16         Do you know who these individuals are
17 that also received it -- the email?
18     A.  From the names on there --
19     Q.  Yes, do you --
20     A.  -- yes.  It seems like it was --
21     Q.  -- know who these people are?
22     A.  I'm sorry, go ahead.
23     Q.  I'm sorry too.  Do you know these
24 individuals listed here?
25     A.  When you say "do I know them," are you

77

1 asking so do I know the positions that they held, or
2 do I just recognize the name?
3     Q.  I guess the positions.  Do you know their
4 positions?
5     A.  Yes.  So it was the special event
6 coordinator for the university, the CFO of the
7 university, my assistant chief, my timekeeper, my
8 department business administrator.
9         The -- again, those three names, the
10 Shaw, Ellis, Sims, they all worked in student events.
11 And then Dr. Moffett is the -- he was over the vice
12 president of student services, and then
13 Kenneth Huewitt was the CFO.  And then Ashlee
14 McClelland was his DBA.
15     Q.  Okay.  So this list includes people that
16 were in the TSU police department as well as outside
17 the police department?
18     A.  Yes, sir.
19     Q.  Okay.  So both members of the police
20 department and outside the police department are
21 listed here?
22     A.  Yes, sir.  The personnel that would be the
23 deciding factor on the fees.
24     Q.  I see.
25     A.  When the new fees came about.  Because, I

Mary Young - 2/27/2025

78

1   think, when I got there they were in the process of
2   recreating fee sheets, because, as you know, police
3   services are not free.
4       Q. Uh-huh.
5       A. And so they wanted to come up with a new fee
6   service for the police department, and this is what
7   you're seeing.
8       Q. All right. So the fee sheet that I'm
9   looking at here, it lists -- it lists police
10  officers, but it also lists a number of other
11  positions.
12      So is it fair to say that this personnel
13  fee sheet governs not just police officers' pay, but
14  non-police officers' pay as well?
15      MS. MARSAW: Objection. Form.
16      A. So those names that you saw on that email,
17  the "To," someone in that area represented each of
18  these technical, security, or building and grounds
19  support. So there was a supervisor of someone in
20  that email.
21      Q. (BY MR. KEENEY) All right. So I'm just
22  asking, so there's admin, technical support, security
23  and traffic control, building and ground support
24  services. This fee relates to the pay that police
25  officers would receive, as well as the pay that

79

1   non-police officers would receive.
2       Do you agree -- am I interpreting this
3   correctly?
4       A. Yes. But I just wanted to caution you that
5   there are administrative positions in the police
6   department that can also work those technical support
7   services positions. So, yeah. So although they are
8   assigned to the police department, they can still
9   qualify to work those things, such as an usher, a
10  ticket taker, and things of that sort. But they were
11  assigned to the police department.
12      Q. So is it your testimony that the personnel
13  fee sheet is the one that is used only by the police
14  department, or is this same sheet, to your knowledge,
15  used by other departments at TSU as well?
16      MS. MARSAW: Objection. Form.
17      A. I think that the sheet says that it is for
18  Texas Southern University Event Services. So any
19  event that requires the uses of any of those
20  particular personnel that you see down there, this
21  fee is for that.
22      Q. (BY MR. KEENEY) I see. So this is a TSU
23  event services personnel fee sheet --
24      A. Yes.
25      Q. -- that dictates what event services will

80

1   pay to any individual who works these positions,
2   regardless of whether or not that person is a police
3   officer or a non-police officer?
4       A. Within the scope of what they do and what --
5   who they are. So you can't be an electrician and
6   then want to get police officers' pay.
7       Q. I understand that.
8       A. Okay.
9       Q. So if an electrician wanted to work an event
10  at TSU, this is the fee sheet that they would look to
11  see how much they would get paid?
12      A. The electrician, that says 25 an hour, yes.
13      Q. Okay, thank you.
14      A. Uh-huh.
15      Q. Is there any other purpose that this fee
16  sheet serves?
17      A. So this is the fee sheet that's used when
18  they are working special events, when they are
19  working events at TSU. So this the a special event
20  sheet.
21      Q. Okay. Was Shannon Broussard in your chain
22  of command at the TSU Police Department?
23      A. No, Shannon Broussard was over event
24  services.
25      Q. All right. Wherever a TSU police officer

81

1   submits their time sheets for internal review to
2   their supervisors, their weekly -- what we saw in
3   Appendix C -- their weekly payroll sheets, do they
4   have to include a copy of this personnel fee sheet?
5       A. No. Typically, the timekeeper knows what
6   the fees are.
7       Q. So they -- okay. So they do not submit the
8   personnel fee sheet to the timekeeper, and, I believe
9   we said earlier, that was Ms. Scruggs at the time.
10  So they -- they do not --
11      A. No. Ms. Scruggs wasn't my timekeeper at the
12  time. Angelle Whitfield, the name that you see, the
13  two -- remember Ms. Scruggs never worked in my
14  department.
15      Q. Uh-huh.
16      A. She just assisted us because we didn't have
17  a timekeeper.
18      Q. Okay. Well, let's talk about just the time
19  period where --
20      A. Okay.
21      Q. -- Ms. Scruggs was timekeeper.
22      A. Okay.
23      Q. So in 2022, if an officer is submitting to
24  their supervisor their weekly payroll sheet, is there
25  any requirement that they attach a copy of this

82

1  personnel fee sheet to the supervisor or to the
2  timekeeper?
3      A.  No.
4      Q.  And I'm just getting that from this email
5  here, it says, "Please attach a copy to all time
6  sheets submitted to the Budget and/or HR office."
7          So when she's referring to time sheets
8  submitted to the budget and/or HR office, do you
9  know, is she referring to the weekly payroll sheets,
10 or is she referring to something else?
11     A.  So Shannon Broussard he, is referring to
12 when the timekeeper submits all the paperwork and
13 everything has been signed off by that particular
14 department, then the fee sheet goes with that, so
15 that they -- so that HR can see what event was worked
16 and how they can make certain that it matches the
17 time that that person put in for.
18     Q.  I see.  So do all of those weekly payroll
19 sheets need to be submitted to budget or HR?
20         MS. MARSAW:  Objection.  Form.
21     A.  I don't know how the timekeeper submits the
22 reports to HR or budget.  All I know is that it's
23 submitted by our timekeeper.
24     Q.  (BY MR. KEENEY)  I see.  So after it goes
25 through the supervisors and it goes through the TPS

83

1  -- I'm sorry, TSU Police Department's review process
2  and approval process, after that -- after you sign
3  it, is that when it goes to the budget or HR office?
4      A.  After I sign it, it goes back to the
5  timekeeper, and the timekeeper puts a folder together
6  with the attachments that -- whatever that
7  probably -- if you sent us a special event or
8  whatever for that time period, and then it goes to
9  the HR office or budget office.
10     Q.  Okay.  Thank you.  I'm thankful that we
11 could clarify that process.  I was confused where
12 this personnel fee sheet came into play.
13     A.  Okay.
14     Q.  All right.
15         MR. KEENEY:  Well, it is 12:00 or almost
16 12:00.  Would y'all like to --
17         THE WITNESS:  Can I -- can I just add
18 something to that on your fee sheet?  I'm sorry.  So
19 for clarity for you, for the fee sheets so that you
20 understand --
21     Q.  (BY MR. KEENEY)  Sure.
22     A.  -- properly why that's in that packet?
23         So the fee sheet, if you can scroll back
24 down, if you see that they don't have 2017, it was
25 issued in October of 2017.  Those amounts were

84

1  already predestined, and these are the amounts that
2  we are to use for any event.
3          And so that's helping you, if you
4  understand why that sheet was in there, because it's
5  letting you know that that's why.
6      Q.  Uh-huh.
7      A.  It's only for a special occasion, as we see
8  with the asterisk.  In order to get a special
9  occasion fee, that has to be approved by -- normally,
10 it's the vice president or the CFO.
11     Q.  Okay.  I -- that's what you were referring
12 to earlier when you said there were special and
13 special-specials?
14     A.  Yes, sir.  Yes, sir.
15     Q.  Okay.
16     A.  Uh-huh, okay.
17     Q.  And did inflation have any impact 2017 to
18 2022, or were these the same rates?
19         MS. MARSAW:  Objection.  Form.
20     A.  These are the same rates.
21     Q.  Okay.
22         MR. KEENEY:  All right.  Well, with
23 that, let's take 30 minutes and come back after
24 lunch.
25         THE WITNESS:  Okay.

85

1          MS. MARSAW:  All right.  So we'll see
2  12:31, 12:32.
3          MR. KEENEY:  That sounds good.
4          MS. MARSAW:  Okay.
5          THE REPORTER:  Okay.  Off the record at
6  12:01.
7          (Recess 12:01 p.m. to 12:33 p.m.)
8          THE REPORTER:  Back on at 12:33.
9      Q.  (BY MR. KEENEY)  All right.  Ms. Young, are
10 you familiar with Ms. Crumpton-Young?
11     A.  Yes.
12     Q.  Okay.  And who is Ms. Crumpton-Young?
13     A.  The former president of Texas Southern
14 University.
15     Q.  Okay.  And did you work with Ms. Crumpton-Young
16 while you were TSU's police chief?
17     A.  Yes, she was my supervisor.
18     Q.  Did Ms. Crumpton-Young ever tell you that
19 she favored male police officers over female police
20 officers?
21     A.  Yes.
22     Q.  Did she make that exact statement to you?
23     A.  Her exact statement was she preferred male
24 police officers over female police officers because
25 she's never worked for a female police officer

Mary Young - 2/27/2025

86

1  before, yes.
2      Q.  And when did she make that statement?
3      A.  When I first had a conversation with her,
4  our first outing.  She invited me to a lunch.  It was
5  on a Sunday, and her first comment to me was she just
6  wanted to kind of get to know who I was, because
7  she's never worked with female police officers
8  before, especially a female police chief.  And she
9  preferred working for a male police chief than a
10  female police chief.
11          She's had like six institutions, and I
12  was the first that had a female police chief.
13      Q.  Were there any other individuals present
14  when she made that statement?
15      A.  No.  It was just she and I at lunch.
16      Q.  Did she say anything else after she made
17  that statement?
18      A.  There were several topics being discussed.
19  She talked about, again, her previous institutions.
20  This was like the icebreaker for us, because she and
21  I had never had a one-on-one conversation.
22          When she got there in July of 2022 --
23  2021, I'm sorry -- 2021, it was immediately on the
24  ground for her.  You know, we had just gotten over
25  COVID, and so she was trying to put together this

87

1  university that had been broken through COVID and all
2  the other things.  So it wasn't until that particular
3  luncheon on a Sunday that she and I had a
4  conversation.  That was our first conversation.
5      Q.  Okay.  And this, you said, was July 2021?
6      A.  No.  That's when she arrived at TSU, in July
7  of 2021.  I'm not certain when our luncheon was.  It
8  could have been September or so.
9      Q.  Okay.  Did she ever tell you why she
10  preferred or favored male police officers in that
11  meeting?
12      A.  The very first meeting we had, her exact
13  words to me was, she has never worked with a female
14  police chief before.  She prefers to work with male
15  police chiefs and male officers.  She never said why.
16  She just said she preferred to work with male police
17  chiefs and male officers.
18      Q.  Okay.  And did she give you any other
19  context for that statement?
20          MS. MARSAW:  Objection.
21      A.  When you mean "any other context"...
22      Q.  (BY MR. KEENEY)  You said she didn't give
23  you any reason, but did she ever -- apart from
24  explicitly saying why she had that belief, did she
25  ever give you any examples or other information in

88

1  that meeting that, in your understanding, explained
2  why she felt that way?
3      A.  No.  I've been a police officer long enough
4  to know how females are discriminated against.  I
5  hear that so often, that people prefer males over
6  females.  So I hear that often.
7          She just kind of said it, and I was in
8  shock because, here I am; this is my supervisor, my
9  first time in a true encounter with her, for her to
10  say it like that.  And, again, that's -- that
11  happens.  That happens.  And when she said it, it
12  bothered me.  But, I mean, I have a job to do, and
13  she has a job to do.
14      Q.  Apart from that meeting, did she ever say
15  that to you any other time, that she favored or
16  preferred male police officers?
17      A.  I think from that meeting her actions showed
18  it, and what I mean by her actions showing it, I
19  think she undermined my authority.  I don't think; I
20  know she undermined my authority a lot.
21          She would ask my male counterparts, male
22  police chiefs from other states, male police chiefs
23  in the state and in the city, she would ask them
24  questions on answers on what I've already given her.
25  And so I felt at that moment that she undermined my

89

1  authority and didn't take what I said as a female
2  police chief with any seriousness to it because she
3  wanted to hear from the male police chief.
4      Q.  Okay.
5          MR. KEENEY:  I'll just -- I'm trying to
6  be very narrow, so I'll object to the nonresponsive
7  portion of that.
8      Q.  (BY MR. KEENEY)  But I'm specifically asking,
9  did she ever say, at any other point, that she
10  favored male police officers or favored -- or
11  preferred male police officers?
12      A.  The very first meeting we ever had one on
13  one, she said she preferred male police chiefs and
14  male police officers over female police chiefs and
15  female police officers.
16      Q.  Apart from that meeting, was there any other
17  time that she made that statement or a similar
18  statement?
19      A.  Aside from that meeting, there were other
20  small innuendos that resulted to her statement by her
21  actions.  I remember one time we were on -- I don't
22  know if you have ever been on the campus of Texas
23  Southern University, but there is a Tiger Walk.  And
24  she made the statement that, "There is only going to
25  be one powerful Young that works on this campus."

90

1    Q. When did she make that statement?
2    A. This is after our first meeting in whatever
3  month that was and maybe toward the end of 2021.  I
4  don't have an exact date, but she made that statement
5  to me.
6    Q. Was any other individual present when she
7  made that statement?
8    A. I'm certain there were other people around
9  when she made the statement.  I don't have the exact
10  names of who was around when she made that statement,
11  but there were clearly other people around.
12    Q. So this was in public, are you saying?
13    A. Yeah, it's the thoroughfare of the
14  university that's called the Tiger Walk.
15    Q. Do you know if anyone heard her make that
16  statement?
17    A. There were others around.  I just don't have
18  the names, and it's -- again, this has been two and a
19  half years for me.
20    Q. Right.  That's okay.
21    A. Okay.  And so, yeah, no.
22    Q. Okay.  You said that she asked others about
23  your policing recommendations or policing advice.  Is
24  that correct?
25    A. No.  What I said was, she would call my

91

1  counterparts that are male police chiefs and male
2  police officers and ask them questions based on the
3  answer I had already given her to the question that
4  she asked.
5         So she wanted their response as opposed
6  to the response I had given, which was, in turn, the
7  same response.
8    Q. Did she tell you that she had called other
9  police chiefs to ask about their recommendations?
10    A. Not only did she tell me, I had two of the
11  police chiefs call me to ask me what was going on.
12    Q. And what were the names of those police
13  chiefs who called you?
14    A. From the Houston Police Department, it was
15  Chief Troy Finner, and at Tennessee State University,
16  he's -- he's deceased now, but it was the emergency
17  management, Mr. Williams.
18         Now, I also held the position as
19  emergency manager at Texas Southern University, aside
20  from chief of police.
21    Q. Okay.  Are you aware of any other male
22  officer that she called to ask for their
23  recommendations?
24    A. Absolutely.  My assistant chief,
25  Frederick Brown; Sergeant Barnett, Darren Barnett;

92

1  Officer Norris Isaac, and I'm trying to see if there
2  were any other male officers and police chiefs that
3  she called.
4         But those were the ones -- the main ones
5  that she called and would ask for their opinions
6  about certain things, as opposed to what I would say
7  or suggest.
8    Q. Do you recall any specific recommendations
9  that you made that she called another officer to get
10  their opinion on?
11    A. I recall a very specific recommendation
12  where she called another chief, which is Chief
13  Finner, but that's not the first time she's called
14  Chief Finner.  I'm just giving you one that I clearly
15  remember, because this was a very difficult time on
16  campus.
17         We had a student that accidentally shot
18  another student, playing with a gun.  And as the
19  investigation was unfolding, the best thing at that
20  time was to allow the district attorney's office to
21  take over the case, as opposed to any agency putting
22  any of the kids in jail, because we needed the
23  district attorney's office to really make that
24  judgment, because one student was saying this
25  happened, and another student was saying that was

93

1  happening.
2         So I agreed with district attorney's
3  office to let it go through the DA's office as
4  opposed to an agency handling it, and she didn't like
5  my suggestion on that.
6         And because she did not like my
7  suggestion on that, she contacted the Houston Police
8  Department's Chief of Police, asked him should an
9  agency take over this case or should the district
10  attorney's office take over this case?
11         And the chief told her, the male chief
12  told her, "No, the district attorney's office should
13  take over this case, based on what you all are saying
14  that happened and based on what the student is saying
15  happened."
16         And the police chief, the male police
17  chief, that works for the Houston Police Department,
18  the same agency I came from under, told her the exact
19  same words in the exact same way, and she said, "Oh,
20  that's great news to hear."  But I had just told her
21  the same exact thing in the same exact way, but she
22  relied on him, and preferred the way he said it and
23  preferred -- because he said it, it was okay.
24         And she didn't tell me she had contacted
25  him.  He called me.  And when he told her that he was

94

1 going to contact me, she then approached me and said,
2 "Oh, Chief Young, I spoke with Chief Finner." I
3 said, "Yes, I know. He told me." And so she said,
4 "Oh, he told you?" I said, "Yes, ma'am."
5     Q. Okay. So how often would you say this
6 occurred where Ms. Crumpton-Young would call a male
7 officer or male chief and ask their opinion?
8     A. This was a continuous -- this was a
9 continuous thing, a continuous conversation.
10     I can recall the time -- my assistant
11 chief is a male. Frederick Brown is a male. I
12 remember being in a meeting with her, and I would say
13 something -- it can be on any topic -- and she would
14 ignore it, the information that I had given her.
15     I would then tell Fred Brown, "Hey, you
16 repeat it to her." He repeated exactly what I said,
17 and she said, "Oh, Deputy Chief, that's a great
18 idea." He would look at me, I would look at him, and
19 I would just shake my head. This happened all the
20 time when I was in the room with the deputy chief and
21 the president.
22     Q. Did Ms. Crumpton-Young ever expressly tell
23 you that she would reject your recommendations unless
24 it had approval for the endorsement of a male
25 officer?

95

1     MS. MARSAW: Objection. Form.
2     A. Repeat that question.
3     Q. (BY MR. KEENEY) Did Ms. Crumpton-Young ever
4 tell you that she would reject your recommendations
5 unless they were endorsed or approved by a male?
6     A. I think it was obvious, based on her
7 actions, that she preferred male opinions over female
8 opinions. In that same setting, I remember -- I have
9 a female captain. She specifically said that she did
10 not like my female captain. Had never had a
11 conversation with her, had never done anything with
12 her, but she specifically said she did not like my
13 female captain.
14     So I tried to protect my female captain
15 at all costs, that she wouldn't have any interaction
16 with her. If she had any questions, any concerns,
17 send them to me, and I'll bring them to her
18 attention.
19     So it was obvious. It -- she didn't
20 have to directly keep saying, "Chief Young, I prefer
21 a male chief." Her actions showed me, because every
22 time I gave her something, as a female chief, she
23 relied on the male chief for the answer.
24     Q. Did she tell you why she did not like your
25 female captain?

96

1     A. She did not. She mentioned it to
2 Sergeant Barnett why she did not like the female
3 captain, and he related the message and said, "The
4 president does not like the captain."
5     Q. Okay. Did Ms. Crumpton-Young instruct you
6 to tell her whether or not a male officer had
7 approved your proposals?
8     A. Say that again.
9     Q. Did Ms. Crumpton-Young instruct you to tell
10 her, to advise her, whether or not a male officer had
11 approved your proposals? When you were giving her
12 proposals, did she instruct you to tell her whether
13 or not that proposal was approved by a male?
14     MS. MARSAW: Objection. Form.
15     A. No.
16     Q. (BY MR. KEENEY) Okay. And you -- you've
17 mentioned a few names. Can you just list for me the
18 names of the out-of-state male police officials that
19 you're aware of or that you believe Ms. Crumpton-Young
20 called in order to ask for their opinion on your
21 recommendations or advice?
22     A. So I don't have the exact name, but all the
23 dispatch calls are recorded. So you can -- I don't
24 remember. It was in 2021, when she got there.
25     So Tennessee State University Police

97

1 Department, all of those calls are recorded. So that
2 conversation is recorded, and that police chief's
3 name is there. I can't recall his name at this
4 moment.
5     Aside from the Tennessee State Police
6 Chief, it was the emergency manager at Tennessee
7 State.
8     Again, I can't recall their names right
9 now, but all of that still is in place, and it's a
10 recorded call. Just like all 911 calls and all
11 police calls are recorded, those calls are recorded.
12 And then the university person that she called,
13 again, was Chief Finner.
14     Q. Are there any other individuals that she
15 called that you're aware of?
16     A. As far as out of the state and outside of
17 TSU, I believe it was just the Tennessee State
18 University officials that I named, as well as Chief
19 Finner with the Houston Police Department.
20     Q. Okay.
21     A. If there are others, I'm not aware. She
22 could have called others, but those are the ones that
23 I specifically know.
24     Q. All right. So as far as Chief Finner, do
25 you know how many times she called Chief Finner to

98

1 ask for his opinion on recommendations you had made?
2    A. I don't know how many times, but each time
3 it was a crucial moment; one time the Homecoming, the
4 shooting. I can recall when she first got there and
5 she and the chairman of the board of regents at the
6 time, Chairman Myres, set a meeting up for me to meet
7 Chief Finner.
8        Needless did they know, Chief Finner and
9 I had known each other for quite some time, and we
10 worked in the same department. And so there was no
11 need to introduce me to him nor him to be introduced
12 to me, because we knew each other, and we knew how
13 professional development and things were with inside
14 our agencies.
15       So to have that meeting, I thought, was
16 very peculiar. He called me afterwards and said he
17 didn't understand why we had to meet, but, according
18 to the chairman, and this is the chairman's words to
19 me, the president wanted us to meet, myself and Chief
20 Finner, so that I can see what the Houston Police
21 Department was doing and if I can implement some of
22 those things -- if some of those things can be
23 implemented at Texas Southern.
24    Q. Okay. You mentioned these were some crucial
25 moments that you're aware of where she asked for

99

1 Chief Finner's opinion. Do you have an approximate
2 number of times?
3    A. I don't know the number of times. I just
4 remember some of the moments that stand out. Like I
5 said, Homecoming, the death of one of the students,
6 the luncheon, and I'm certain there were other times.
7 These are the ones that I just recall now.
8    Q. Okay. And for the Tennessee State official,
9 did Ms. Crumpton-Young call both of them for the same
10 events or issues, or are you aware?
11    A. I'm not aware if they both were called for
12 the same event or the same issue. I just know both
13 of them were contacted by her.
14    Q. Okay. And if you had to approximate, do you
15 know about how many times or how frequently this
16 would have occurred?
17    A. I don't have that number. I remember when I
18 approached her about Tennessee State, her response to
19 me was -- in her phone she has the word, "TSU
20 Police," and so she thought she was contacting me,
21 but she was contacting the TSU police chief.
22    Q. Okay. So there was one -- at least one
23 instance where she called the TSU official.
24       Are you aware of more than one instance
25 where she called the TSU official?

100

1    A. I am. I remember -- like I said, I remember
2 that time particularly because I said, "Madam
3 President," because that was another thing, she
4 wanted to be called "Madam President." "Madam
5 President, you may want to remove that Tennessee
6 State number and put in the TSU number in case of a
7 true emergency."
8       Because I don't remember what the
9 emergency was, why she called the chief, but whatever
10 it was, when she realized that it was not me, and
11 then when I called to confirm that she was trying to
12 contact the police -- because Tennessee State Police
13 Department actually called our department because of
14 a recorded conversation, and that's how I realized
15 that she was trying to contact -- that she had
16 contacted TSU.
17       And so she says, "Oh, oh, again, I'm
18 just so used to talking to the men. I keep
19 forgetting I have a female police chief."
20    Q. Did she say that to you?
21    A. Her words were, "Oh, I keep forgetting that
22 I have a female police chief."
23    Q. Okay. Now, if you could just give me an
24 approximate number, use your best guess, how many
25 times she called other police officers outside of

101

1 TSU.
2    A. I don't know the approximate number. I just
3 know the ones, the Tennessee State Police Department,
4 Tennessee State Emergency Manager, and Houston
5 Police. If there were others, I'm not aware. And I
6 don't remember the number of times she may have
7 contacted each of those individuals that I just
8 named.
9    Q. Okay. Just -- I'm just asking about the
10 ones you're aware of, though.
11    A. If you could tell me about how many
12 you're aware of. If you could count the number that
13 you're aware of.
14    A. Count the number of individuals or the
15 number of times?
16    Q. No, the number of times she called an
17 individual outside of TSU.
18    A. I really don't know the number because I can
19 say she contacted the Houston Police Chief at least
20 on three or four occasions, but it could have been
21 ten. So I don't -- I don't want to just give a
22 number because I'm not accurate on how many times. I
23 just know it was more than once, and I know it was
24 because they were male police chiefs, and she wanted
25 to value their opinion over mine.

102

1    Q. Okay.
2        MR. KEENEY: Well, I'm just asking for
3    the numbers, so I'll object to the nonresponsive
4    portion of that response.
5    Q. (BY MR. KEENEY) But just the ones you're
6    aware of, three or four you're aware of. Are there
7    more than three or four that you're aware of?
8    A. Are there more than three or four times that
9    she contacted the Houston Police Chief?
10    Q. The Houston Chief or the TSU -- Tennessee
11    State University Official and --
12    A. I don't want to --
13    Q. -- you can finish that --
14    A. I don't want to make up a number and just
15    make a -- and throw a number out there. I don't have
16    an exact number of times. I know it was more than
17    once, and I know it was strictly and primarily
18    because she wanted to know what their opinion was
19    based on something.
20    Q. Okay.
21        MR. KEENEY: Objection. Nonresponsive.
22    Q. (BY MR. KEENEY) But -- I think we can move
23    on, but I'm not asking you how many actually, just
24    how many you're aware of. So I think I have your
25    answer now. So that's okay, we can --

103

1    A. Okay.
2    Q. Are you aware of any instance where
3    President Crumpton-Young called a TSU male officer to
4    ask for that officer's opinion on policing matters?
5    A. Yes.
6    Q. Can you tell me who Ms. Crumpton-Young
7    called?
8    A. She would -- she often called Sergeant
9    Barnett.
10    Q. Are there any other individuals you're aware
11    of that Ms. Crumpton-Young called to ask for their
12    opinion at TSU?
13    A. I'm pretty sure Sergeant Brown,
14    Officer Norris Isaac, Officer -- Sergeant Ivan Jones,
15    and my Assistant Chief Frederick Brown.
16    Q. And how did you become aware that she had
17    called each of these individuals?
18    A. Because they would tell me. They would say,
19    "Madam President asked me this. Madam President
20    called to say this. Madam President asked me this."
21    Q. Okay. And can you tell me approximately how
22    many times or how frequently that occurred?
23    A. That was very frequent. Those guys -- the
24    names that I gave you of those males that I gave
25    you -- were all doing executive detail work with the

104

1    president.
2        So those were -- those officers that --
3    would have to drive her to various locations to or
4    from home, to an event or something of that sort, a
5    luncheon, a dinner or something. So all of those
6    male names that I gave you all had contact with her,
7    whether it was driving a golf cart, driving a
8    vehicle, walking on the campus, or something of that.
9    Q. Okay. For -- we'll start with
10    Sergeant Barnett.
11        For Sergeant Barnett, what matters did
12    Sergeant Barnett tell you that President Crumpton-Young
13    had asked for his opinion on?
14    A. So with Sergeant Barnett, it is -- it's very
15    lengthy with Sergeant Barnett, because he was not her
16    original driver. We had a driver for her, a male,
17    but she preferred Sergeant Barnett.
18        One of the things I remember Sergeant
19    Barnett mentioning, that when he took the president
20    to get an alteration on her dress, that she made
21    mention that this is really not the style of clothing
22    that she prefers. She's doing this because, of
23    course, she has to, based on the position that she's
24    in and that she needed to get this style of clothing.
25        She also told him that -- what was his

105

1    opinion on the dress that she had to wear and what
2    was his opinion on whether or not she should be the
3    commencement speaker for December and what was his
4    opinion on a particular individual that was in the
5    community.
6        So she relied on his opinion for several
7    things. Even she mentioned to me that she relied on
8    Sergeant Barnett for a lot of things.
9    Q. Okay. Apart from those items you mentioned,
10    are there any other issues you're aware of that
11    President Crumpton-Young asked for Darnett -- I'm
12    sorry, Darren Barnett's opinion on?
13    A. Yes. Specifically, dealing with her
14    children. She -- it was a time when she thought her
15    daughter was missing, and she contacted Sergeant
16    Barnett really late at night so he can go to help her
17    find her daughter.
18        She didn't contact 911 or the police;
19    she specifically called Sergeant Barnett and wanted
20    him to help kind of navigate through the city so she
21    can locate her daughter.
22        There were -- there were times when she
23    asked Sergeant Barnett's opinion about a particular
24    event that was happening on campus, and he gave her
25    his opinion on that.

106

1    So there were multiple things. I don't
2  have anything in front of me to outline exactly
3  everything that she relied on Sergeant Barnett for.
4  But I know when it came to our police department, she
5  asked him questions about our department, about the
6  number of officers that worked there; how many did we
7  need; what was going on in our department; the things
8  that you would think you would ask the supervisor of
9  the department, the female, but she did not. She
10 asked everyone except me.
11    Q. You said everyone except you. Are you --
12 you mentioned that these individuals were on her
13 security detail. Is that right?
14    A. Yes, that's what I meant by the "everyone,"
15 I'm sorry.
16    Q. That's okay. That's fine.
17    And you said she asked for Mr. -- or
18 Sergeant Barnett's opinion on I think it was a
19 university event. Do you know what event or what
20 opinion she was asking for?
21    A. I'm not certain. It could be anything from
22 a visitor coming on campus for Homecoming, anything.
23    You have to understand, this is the
24 president of the university, the most powerful person
25 on the campus, asking a less qualified officer his

107

1  opinion about what's going on on the campus as it
2  pertains to safety, visitors coming, any type of
3  event.
4    She's asking that officer, the male
5  officer, that information. She does not come to me,
6  the female police chief who's qualified, who's
7  educated, who understands, who's knowledgeable. She
8  does not come to me with these questions. She goes
9  to Sergeant Barnett.
10    Q. And you said "safety" specifically. Did
11 Darren Barnett tell you that she had asked --
12 Ms. Crumpton-Young, I mean, had asked for his opinion
13 on safety?
14    A. Yes. So when I -- when I talk about safety,
15 I'm talking about the overall safety of our
16 university. Where's there's cameras? Are they
17 working? The gates, are they working properly?
18 Security, are they inside the dorms? Things of that
19 sort.
20    How are the students feeling? Are they
21 safe to walk back and forth on the streets of that --
22 something like that. Do we have anything in place to
23 prevent people coming on campus? How are our thefts
24 going? Do we have any thefts? Do we have any sexual
25 assaults? Yes, she would ask Sergeant Barnett his

108

1  opinion about those things.
2    Q. Okay. Were -- you mentioned some other
3  individuals on her -- on Ms. Crumpton-Young's
4  security detail. Apart from the issues, the matters
5  that you have already mentioned that she asked for
6  Barnett's opinion on, are there any other issues that
7  you're aware of that Ms. Crumpton-Young asked for
8  these other individuals' opinions on?
9    MS. MARSAW: Objection. Form.
10    A. Again, she would -- she would rely on -- if
11 she had a question and there were two officers
12 standing in front, one male, one female, she would
13 ask the male officer, and the male officer would give
14 his opinion. She would not look at the female
15 officer.
16    The guys that I mentioned that was on
17 her detail were all males, except we had a female,
18 but she never really relied on the female.
19    So to answer your question, there were
20 other male officers who she relied on their opinion
21 for things.
22    Q. (BY MR. KEENEY) Are you aware of any
23 instance where Ms. Crumpton-Young did rely on the
24 female officer's opinion, or asked for it?
25    A. Not at all.

109

1    Q. Okay. Did you at any point start giving
2  suggested policing strategies to other male officers
3  to communicate to President Crumpton-Young?
4    A. Suggested policing strategies?
5    Q. Yes.
6    A. I'm not -- I'm not understanding your
7  question.
8    Q. Did you give any policing recommendations,
9  or suggested policies to a male officer to
10 communicate on your behalf to President
11 Crumpton-Young?
12    MS. MARSAW: Objection. Form.
13    A. Yes.
14    Q. (BY MR. KEENEY) Which policies or
15 strategies or recommendations did you give to another
16 officer to communicate to Crumpton-Young?
17    MS. MARSAW: Objection --
18    A. My assistant chief, Frederick Brown.
19    Q. (BY MR. KEENEY) Okay. Any other officer
20 that you asked to communicate your policies?
21    A. I wouldn't have officers go to the president
22 on policies and procedures. I would take care of
23 that myself, because she's my supervisor, and I would
24 talk to my assistant chief.
25    Again, we would be in meetings, and I

110

1  could have a conversation -- we would be in
2  conversation, and I could suggest something to
3  President Crumpton-Young, and it would literally go
4  over her head.
5         Deputy Chief Brown will say the same
6  exact thing, and she would say, "That's an awesome
7  idea. Thank you, Chief Brown."
8  Q.  And that's --
9  A.  -- and he and I would look at each other --
10 Q.  Uh-huh.
11 A.  -- and I would shake my head.
12 Q.  In those meetings then, did you ask
13 Deputy Chief Brown to communicate your recommendation
14 or opinion to Crumpton-Young?
15 A.  Yes. I said, "Listen, you are going to have
16 to talk, because she accepts everything that you say.
17 I'm going to tell you what to say; you repeat it."
18 Yeah, that's in his sworn statement. He will tell
19 you that himself.
20 Q.  Okay. Did you make any requests to the
21 president that she direct policing matters to you?
22 A.  I did. I -- but it's not the way you just
23 put it.
24 Q.  Okay. How would you phrase it?
25 A.  Yeah. So I asked the president, if

111

1  possible, could she allow me to give her information
2  pertaining to the department.
3  Q.  And when you made that statement -- I'm just
4  trying to understand the context of that request.
5  So when did you make it? When did you say that?
6  A.  So I'm not certain if you're familiar with
7  what university presidents do, but oftentimes they
8  are the face of the university, and they have to go
9  various places.
10        And so as she was traveling to various
11 places in the city, it would be at certain times she
12 wanted the officers to be there. So that's the time
13 that we have to make certain our officers are
14 available, because officers work on different shifts.
15 I didn't have like a particular squad where all they
16 did was presidential work. The department is not
17 made for that.
18        The police department is actually for
19 the safety of the students. It was not just
20 comprised of a presidential detail. That's just an
21 added incentive for officers to do outside work, but
22 still within the scope of their job.
23 Q.  Uh-huh.
24 A.  And so an example would be at 8:00 a.m. --
25 "Have an officer at 8:00 a.m.," and then 30 minutes

112

1  before that time, a text message would come through
2  and say, "Oh, could they come at 11:00?" And so now
3  I'm having to make some adjustments to officers'
4  schedules, trying to find if an officer is available
5  or someone available.
6         And so I asked her, along with her
7  executive -- at the time she had an executive
8  director, Ms. Harper, and I said -- and it's in text
9  messages, I believe, or emails in the president's
10 email -- "If we can respect the authority that I have
11 as the chief of police, could we please alleviate the
12 conversation to the officers and direct everything to
13 me? Therefore, I can give you the proper answer and
14 the proper notifications to make certain that
15 everything that you're requesting goes as planned."
16 So I said that on multiple occasions.
17 Q.  Multiple, okay. So you said it multiple
18 occasions with respect to this issue?
19 A.  No, period.
20 Q.  Any other issue --
21 A.  It was on everything. It was on everything.
22 Q.  All right. Did Ms. Crumpton-Young ever --
23 did she ever tell you directly that she would rely on
24 a male's advice or endorsement over your advice?
25        MS. MARSAW: Objection. Asked and

113

1  answered.
2  Q.  (BY MR. KEENEY) You can answer.
3  A.  Oh. Again, the very first meeting we had
4  one on one, her words were, she preferred male
5  officers, because she's never worked with a female
6  police chief before. So she relies and prefer male
7  police chiefs and male police officers. She said
8  that. She said that.
9  Q.  I understand, and my question was a bit more
10 narrow. I was just asking if she directly said she
11 would rely on males' advice or endorsements, over
12 your advice?
13 A.  She said she preferred a male police chief
14 and a male officer over a female police chief. I'm a
15 female.
16 Q.  Uh-huh.
17 A.  I can only give you my advice based on the
18 knowledge that I have. The only -- the only problem
19 that I have is that I -- the genders are different.
20 I'm the female that's giving you the same advice that
21 you're asking for the male advice.
22 Q.  Well, okay. Maybe I'm -- maybe I'm confused
23 with that last part, because did --
24 A.  Okay. Maybe I'm misunderstanding your
25 question, I'm sorry. Let me -- let me --

114

1    Q. No, it's, okay. No. Thank you for saying,
2  you know, for asking. If you're -- if you're
3  confused, just let me know.
4          But, no, I'm asking -- so the meeting
5  that you referred to earlier when you first met with
6  Crumpton-Young and she said that she preferred -- did
7  she use the term "male," or was she -- did she
8  explicitly say the names of other officers?
9          MS. MARSAW: I'm sorry, you guys. My
10  internet broke out. I didn't -- can you repeat the
11  question, Joseph?
12         MR. KEENEY: Vanessa, would you mind
13  reading it back?
14         THE REPORTER: Okay. So the meeting --
15  can y'all hear me okay?
16         MR. KEENEY: Yes.
17         THE REPORTER: "So the meeting that you
18  referred to earlier when you first met with
19  Crumpton-Young and she said that she preferred -- did
20  she use the term 'male,' or was she -- did she
21  explicitly say the names of other officers?"
22     A. No, she did not give any names. She
23  specifically said, "I prefer working with male police
24  chiefs, male police officers," because she has never
25  worked with a female police chief. Those were her

115

1  exact words. She didn't give a name. She had only
2  been there -- I had only met her a couple of times.
3  That was our very first meeting. She had only been
4  on the campus as the university president maybe four
5  or five months or so.
6     Q. Okay.
7     A. If not -- if not even that long.
8     Q. Okay, thank you.
9     A. Okay.
10     Q. All right. We've talked about Darren
11  Barnett.
12         Now, did you ever confront or speak with
13  Darren Barnett regarding his relationship with
14  President Crumpton-Young?
15     A. I'm trying to make certain I answer your
16  question correctly, because I met with Sergeant
17  Barnett on more than one occasion about President
18  Crumpton-Young. I kind of remember having a
19  conversation with him about the night that I told you
20  she had called him really, really late or something.
21     Q. Uh-huh.
22     A. And I wanted him to understand that, as a
23  police officer, the things that we needed to do and
24  what's not to be seen as if we're not doing those
25  things.

116

1          I saw that she consistently relied on
2  Sergeant Barnett on a lot of things. When he's --
3  when he's off of work, he would come on campus and,
4  you know, kind of be inside the suite at the
5  basketball games with her.
6          I remember him telling me that she had
7  invited him to a couple of the Rockets games and
8  things of that sort.
9          So I just needed to make certain that he
10  understood at work, that when you're at work, you're
11  at work, and so these -- this type of conduct cannot
12  be shown as such.
13         And so I just wanted to assure him that
14  he doesn't have to do these things, because to me, as
15  his supervisor, I felt like he was doing these things
16  because he was forced to do these things, and I
17  wanted to make certain to let him know that you don't
18  have to do these things.
19         Certainly, you don't have to take her to
20  the hair dresser or beauty shop and things of that
21  place. I just wanted him to know that he didn't have
22  to do those things, but I felt that he was forced to
23  do those things and that those things were making him
24  a little uncomfortable, so I wanted to kind of talk
25  to him about these things.

117

1     Q. Okay.
2     A. If that answers your question.
3     Q. Yes, I think so.
4          Did you tell him that there was
5  something inappropriate about what he was doing?
6     A. Oh, absolutely. I don't know if I used the
7  word "inappropriate" or I used the word that it was
8  things that were "not becoming of an officer," and it
9  wasn't professional. So I wanted to render back the
10  professional look of our department. So, yes, I had
11  a conversation with him on that.
12     Q. Okay. Did you believe or did you -- do you
13  have any knowledge that Darren Barnett and President
14  Crumpton-Young were engaged romantically?
15     A. I didn't know anything about the romantic
16  part of the involvement until once this investigation
17  started, when officers started saying that, "Oh, you
18  didn't know that, Chief?" or, "Yeah, this happened,"
19  or whatever, so I had no knowledge of that.
20     Q. Okay. Do you recall approximately when you
21  spoke with Darren Barnett and told him that he was
22  acting inappropriately or unbecoming of an officer?
23  Do you remember when that conversation occurred?
24     A. I addressed the entire detail at some point
25  about what I thought was not becoming of an officer,

118

1  just the actual department itself, because people
2  were on the outside looking in, and they saw some of
3  the behavior that the officers were doing, like
4  taking her to the grocery store and certain things
5  like that.
6          But particularly the one that I had a
7  conversation with Sergeant Barnett about was the next
8  day after the daughter had gone missing and that she
9  had called him really, really late at night.  And so
10  I called him, because I wanted to know where was his
11  -- where was his head space at that moment.  And I
12  asked him like, "Hey, tell me what's going on with
13  you."
14          His exact words to me were, "Chief, I
15  really care about her."  And I said, "I think that
16  you're in too deep."  And his response was, "Yes, I
17  really care about her."
18          And so at that moment, I kind of
19  figured -- again, didn't have anything concrete about
20  a romantic relationship, but just those words alone
21  made me realize that I needed to protect him and keep
22  his position as an officer.
23          And so then I told him that I was going
24  to probably take him off the detail for a while, just
25  so he could understand what his job duties really

119

1  were for the department and for the university.  And
2  within maybe a week or two later, he gave me his
3  resignation.
4          And in his resignation he expressed that
5  he wanted to be removed from the president's detail,
6  and that he wanted to resign in July because it would
7  make his year anniversary.
8          I accepted his resignation, but then
9  maybe -- and my timeline could be wrong when I say
10  maybe two or three days or a day or two, but soon
11  after that he called if I could rescind his
12  resignation because he was told that he would get a
13  better position somewhere -- or he was told by the --
14  by the higher -- his words were, he was told by the
15  higher-ups that he would have a better position or
16  something of that sort.
17      Q.  Who do you understand "the higher-ups" to
18  refer to?
19      A.  Well, Regent Price told me he was the person
20  that talked to Sergeant Barnett and told him to
21  rescind his resignation.
22          Now, Regent Price was on the board of
23  regents at that time.  So he told me that he spoke to
24  Sergeant Barnett and told Sergeant Barnett to rescind
25  his resignation.

120

1      Q.  Did Regent Price tell you why he asked
2  Darren Barnett to rescind his resignation?
3      A.  He did not tell me why, and I do not believe
4  I asked why because, again, at this moment I don't
5  know about anything going on.  I have no knowledge
6  about anything going on with this -- with this,
7  quote/unquote, and I'm using the air quote,
8  "anonymous complaint," the one that you showed me
9  from Darlene Brown earlier.
10          I have no knowledge about an anonymous
11  complaint coming in.  I also have no knowledge about
12  Sergeant Barnett or the president in a romantic
13  relationship.  I just see the inappropriate -- I see
14  the actions that are not appropriate for police
15  officers.
16          And so, again, I don't know of anything
17  that Sergeant Barnett or the president have, because
18  Sergeant Barnett was dating the basketball coach or
19  something.  So I don't know about that, and it wasn't
20  really my business.
21          I just wanted to make certain that our
22  department was not going to be depicted as a laughing
23  stock, when we worked so hard to gain the trust of
24  the campus community, the stakeholders that are
25  invested in us.  I just didn't want anybody to think

121

1  that we were not professional officers.  And so
2  that's why the conversations that I was having with
3  him was those conversations.
4      Q.  Okay.  I can understand that.
5          Do you have any -- you said "romantic,"
6  but do you have any knowledge that there was any
7  physical -- that there was any physical relationship
8  between Darren Barnett and President Crumpton-Young?
9      A.  Again, the knowledge that I had acquired
10  from all of this came through this investigation,
11  through this lawsuit.  So I guess the better question
12  would be:  Do you have any of the officers that are
13  aware, because they apparently knew more of this than
14  I did.
15      Q.  Okay.  So did Darren Barnett, as part of his
16  job on the president's security detail, travel with
17  the president whenever she traveled out of town?
18      A.  He did.
19      Q.  So was that part of his job duties?
20      A.  An assignment?  He was on an assignment.
21      Q.  Okay.  Now, I remember reading somewhere
22  that Darren Barnett traveled out of town under the --
23  under the president's husband's name.
24          Do you have any idea what I'm referring
25  to?

122

1    A. Yes, there's -- you should have it in the
2  email, if you read it from that. It should be in an
3  email that the president's husband's name was
4  originally on that ticket, but it was since changed
5  over to Sergeant Barnett's name on that same ticket.
6        And that came from, at the time, the
7  president's DBA, which we call department business
8  administrator, Christina. I can't think of her last
9  name. Again, I apologize; it's been a couple of
10 years.
11       She was the one that made those changes
12 for the president to put Sergeant Barnett on -- in
13 that spot instead of the husband.
14    Q. And when you say "spot," what are you
15 referring to? What kind of trip was this?
16    A. I'm not certain, but it was -- of course,
17 it's university -- a university trip, but I'm not
18 certain if it was a football game, a basketball game,
19 or a tournament or the president just traveling on
20 business or something. I'm not certain what type of
21 event it was, but he did go.
22    Q. Was he going as part of his responsibilities
23 as a member of her security detail?
24    A. Yes, yes. He was a --
25    Q. Was the -- this was an assignment?

123

1    A. He was a -- I'm sorry.
2    Q. I was just asking if this was an assignment.
3  I'm sorry to interrupt.
4    A. Yes, he was -- he was the person assigned at
5  that time.
6        Let me back up. The president made it
7  clear that she wanted Sergeant Barnett to be the one
8  to travel with her.
9    Q. Uh-huh.
10    A. So that's why he was always -- not always,
11 but he was the main person that was traveling,
12 because she made it clear that she wanted Sergeant
13 Barnett to travel with her.
14    Q. And I -- did other officers at times travel
15 with Ms. Crumpton-Young out of town?
16    A. Male officers did travel with her. My
17 assistant chief, Frederick Brown; Sergeant Jones;
18 Officer Norris; Sergeant Brown.
19       But I do not recall any of those
20 officers spending nights in the -- have overnight
21 stays. I think that was just like a turnaround; they
22 would go and come back. Maybe it was like to Dallas
23 or Austin or something of that sort.
24       I don't remember them -- it could have,
25 they could have. I just don't remember right now.

124

1    Q. Did the female officer on the president's
2  security detail ever travel with her on assignment
3  out of town?
4    A. No.
5        MR. KEENEY: All right. It's been about
6  an hour. I think we can take a five-minute or
7  ten-minute break.
8        MS. MARSAW: Which one do you want,
9  Joseph, ten or five?
10       MR. KEENEY: Let's do ten. Yeah, that
11 would be great.
12       MS. MARSAW: Okay. We'll be back at
13 1:42.
14       THE REPORTER: Okay. Off the record at
15 1:32.
16       (Recess 1:32 p.m. to 1:43 p.m.)
17       THE REPORTER: All right. Back on the
18 record at 1:43.
19    Q. (BY MR. KEENEY) Okay. Before you had the
20 conversation that we were discussing with Darren
21 Barnett, were you aware of any gifts the two of them
22 had exchanged with one another?
23       MS. MARSAW: Objection. Form.
24    A. When you ask before I was -- before I had
25 the conversation with him? Which conversation?

125

1    Q. (BY MR. KEENEY) The conversation we were
2  just discussing where you spoke with Mr. Barnett --
3  Sergeant Barnett regarding his conduct or
4  professionalism. I'm not sure how you would like to
5  describe it, but you had a conversation with Darren
6  Barnett. I believe, it was after he went to the
7  president's house to assist with the missing
8  daughter.
9    A. Oh, you mean --
10    Q. Unless there were other --
11    A. -- the last conversation?
12    Q. -- unless there were other conversations?
13    A. You're talking about the conversation when
14 he said that -- that I told him that she couldn't
15 call him at night because she needed to call the
16 police and get a police report, that one, about the
17 daughter?
18    Q. Is that the last -- is that the last
19 conversation that you had about his relationship with
20 President Crumpton-Young before the complaint was
21 filed?
22    A. So remember, I didn't know anything about
23 the relationship.
24    Q. Uh-huh.
25    A. I wanted to, again, protect the integrity of

126

1  how it looked, how officers were being perceived.  So
2  that's the conversation I had with Sergeant Barnett.
3      Q.  Right.
4      A.  And so your question is:  Was I aware of
5  gifts that he received from the president?
6      Q.  Uh-huh.  At that time, did you know of any
7  gifts they had exchanged?
8      A.  I did not.
9      Q.  Okay.  Did -- do you know of any instance
10  where President Crumpton-Young gave gifts to TSU
11  Police Officers?
12      A.  No.
13      Q.  Okay.  Are you aware of any gifts that --
14  well, has Darren Barnett ever given you a gift?
15      A.  No.  Did the department give me a gift for
16  my birthday, like every shift?  That would be gift --
17  individual gift from an officer or something like
18  that, other than a birthday or a Christmas?  No.
19      Q.  Other than a birthday or Christmas?  Okay.
20          Did Darren Barnett ever give you a
21  birthday or Christmas gift?
22      A.  If it was, from the shift, but I don't think
23  personally.
24      Q.  Okay.  So perhaps they -- the shift could
25  have gone in on a joint gift to you, is that what

127

1  you're saying?
2      A.  That's possible, yes.
3      Q.  Okay.  Do you recall any of these gifts from
4  your shifts?
5      A.  Cake, food, probably like some food and a
6  cake.
7      Q.  Did Darren Barnett ever give you a bottle of
8  liquor?
9      A.  No, I don't drink.
10      Q.  Okay.  Was there -- are you -- are you aware
11  of anyone giving anyone at TSU a bottle of White
12  Hennessy?
13          MS. MARSAW:  Objection.  Form.
14      A.  I do not.
15      Q.  (BY MR. KEENEY)  Okay.  Did any member of
16  the TSU Board of Regents speak with you about Darren
17  Barnett and President Crumpton-Young's relationship?
18      A.  Could you be a little more specific on that
19  question?
20      Q.  Sure.  Did they -- did the -- anyone from
21  the TSU Board of Regents come to you complaining
22  about Darren Barnett and President Crumpton-Young's
23  relationship?
24      A.  I think there were several members that
25  complained about the conduct of officers and what was

128

1  shown in the public and that I needed to at least
2  address those issues.
3          I was already aware because, like I told
4  you, I saw some things that I didn't think was
5  becoming of a police officer, and it was not looking
6  good for our department.
7          So, yes, there were -- there were some
8  complaints that came from the board of regents, but I
9  tried to address all of those things.
10      Q.  Uh-huh.  Was the board of regents
11  complaining about specifically Darren Barnett, or
12  were they complaining about more than one member of
13  the security detail?
14      A.  I think it started off with more than one
15  because of what was, again, being shown on the
16  outside, but I think when it -- when the complaints
17  really started being piled on, it may have been
18  specifically toward some of the behavior of Sergeant
19  Barnett.
20      Q.  Okay.  When did this occur?  When did the
21  TSU Board of Regents complain to you?
22      A.  So, again, the information was brought out
23  not only by the board; there were faculty and staff
24  on the campus.
25          It was a lot of people that kind of

129

1  observed some of the things that the department was
2  doing, some of the things that officers were doing.
3          People can be out in the open at a
4  restaurant and kind of saw some of the things.  So it
5  was not just the board of regents bringing it to my
6  attention; it was several people that brought it to
7  my attention.  I just wanted to correct the behavior
8  of the officers.
9      Q.  Okay.  And do you remember when this
10  occurred?
11      A.  No.
12      Q.  Was it on more than one occasion that a TSU
13  board member spoke with you about this issue?
14      A.  About what issue?
15      Q.  The issue with the security detail and
16  President Crumpton-Young.
17      A.  So, again, the -- no one particularly came
18  and said, "Hey, Chief, do this."  I think what I want
19  you to understand is that there were several
20  complaints in the community about the behavior of my
21  officers.  Everyone knew at the time that I was the
22  chief of police and I needed to speak to my officers,
23  because some conduct --
24      Q.  Uh-huh.
25      A.  -- appeared to be out of hand, and

130

1  particularly when they saw one of the officers doing
2  some things that was not becoming of an officer, like
3  holding up the president's dress or holding her purse
4  or taking her shopping.
5        Those things kind of caught the
6  attention, not just the board of regents, but people
7  in the community that have a stake in the university,
8  and they wanted to bring it to my attention.
9    Q. Do you remember specifically who spoke with
10 you about these issues that you just mentioned?
11   A. Oh, there was several people. I'm pretty
12 sure it's -- emails and things inside -- even inside
13 the original package that you have, I think there's
14 some emails that specifically say who complained
15 about the behaviors of my officers. I don't have
16 anything in front of me. Again, this has been two
17 and a half years --
18   Q. Uh-huh.
19   A. -- of constant reminding, that because I'm a
20 female, that I'm not good enough to lead a
21 department.
22       So this has been haunting me for two and
23 a half years, that because of my gender, that I'm not
24 good enough to run a department or that I'm not smart
25 enough or intelligent enough.

131

1        So forgive me if I don't have a name of
2  a person that asked me to correct the behavior of an
3  officer who I'm trying to protect, because, as a
4  female, I'm not good enough to run a department. So
5  it's been two years, and I do not have those names.
6        What I do know is that it was hard being
7  a female police chief on that campus. That's what I
8  know.
9    Q. Okay. Let's narrow it to the board of
10 regents.
11       Can you name any specific member of the
12 board of regents that came to you to complain about
13 the conduct of the members of the president's
14 security detail?
15   A. So let me see if I can help on that one.
16       When I observed this behavior and that I
17 believed and still believe that my authority was
18 being undermined as a female police chief, I wanted
19 to take it up to my supervisor. At the time my
20 supervisor was my authority.
21       And so as far as the board of regents
22 being involved, it's because I involved the board of
23 regents because I wanted to see if they could correct
24 the behavior of the president, because she didn't
25 take my authority to run my department.

132

1        She undermined my authority. She felt
2  like the male officers or male police chiefs had
3  better knowledge than me. So maybe if I take it to
4  the supervisor -- or her supervisor, maybe they can
5  possibly con -- you know, put a hold on or put a lid,
6  so to speak, on her conduct. I knew the power that
7  she had because she was the most powerful Young on
8  that campus.
9        I think that she was taking advantage of
10 my officers. They just happened to be male officers.
11       If there were female officers, those --
12 these questions that you're asking me would not even
13 have come up, because these things would not take
14 place with female officers. These things are only
15 taking place because they were male officers.
16   MR. KEENEY: Okay. I have to object to
17 nonresponsiveness.
18   Q. (BY MR. KEENEY) I understand, but I'm asking
19 specifically the names of boards -- members of the
20 board of regents.
21       Did they ever come to -- you said --
22 your testimony was that you approached the board, but
23 did the board ever approach you and ask you to
24 intervene and do something about the security detail,
25 and how they were being used by President

133

1  Crumpton-Young?
2    A. I remember having a conversation with the
3  chairman of the board. I don't remember when that
4  conversation took place. I remember having a
5  conversation with Regent Price with the board, former
6  president -- former Interim President Regent Sias and
7  Regent Nellons-Paige, Regent Rose, so I -- Regent
8  Terrell. I've had several conversations with the
9  regents before about my police department.
10   Q. Okay. And in those conversations, did they
11 ever ask you to do something about how the security
12 detail was being used or what they were doing on the
13 president's security detail?
14   MS. MARSAW: Objection. Form.
15   A. So we've always had a president's detail.
16 Let's take this back. The -- when I got there in
17 2017, there was a male president, and the president
18 that succeeded him was a president -- a male.
19       The president's detail did not come into
20 question or me having to constantly talk to them
21 about anything until President Crumpton-Young became
22 the president, and specifically because she wanted
23 those officers to do more than their jobs were.
24       So, again, I went to the board at the
25 last straw, because I needed someone to see what I

134

1  was seeing: How the president was treating me. And
2  I wanted the board to help me understand that, so I
3  went to the board.
4      Q. (BY MR. KEENEY) Okay. Now, I'm sure you
5  remember there was a complaint anonymously filed at
6  TSU. Do you have any facts? Do you have any
7  knowledge of who -- well, let me strike that.
8          The anonymous complaint. In
9  December 2022, did you have any knowledge of the
10 identity of the person who filed that anonymous
11 complaint?
12     A. This is February 2025, and there still has
13 not been an identity of the person that filed that
14 complaint.
15     Q. Okay. Do you have any knowledge that
16 Crumpton-Young knew about the complaint before it was
17 filed?
18     A. I think I have knowledge now that a lawsuit
19 has been filed. But prior to, again, I was
20 blindsided by all of this. From your very first
21 question, I had no knowledge of any of this, so, no.
22     Q. So -- okay. So just to be clear the
23 answer [sic] is: Do you know whether or not
24 Crumpton-Young knew about the complaint before it was
25 filed?

135

1          And if you don't know, that's fine. You
2  can say yes, no, or I don't know.
3      A. Because the complaint itself is bogus. It's
4  hard to answer that question because the complaint
5  doesn't even make sense, so I would say I don't know.
6      Q. Okay. When did you first learn about the
7  complaint? When did you first hear about it?
8      A. I believe that was July on the Teams meeting
9  with Darlene Brown about field training.
10     Q. Okay. That's when you first learned that a
11 complaint had been filed against you?
12     A. Yes.
13     Q. Okay. Did you ever speak with President
14 Crumpton-Young about the complaint or the allegations
15 in the complaint?
16     A. So August -- it was the board meeting after
17 the August board meeting, President Crumpton-Young
18 asked Sergeant Jones to contact me because she wanted
19 to speak with me. And that might have been August --
20 I don't know the date. Forget that. I don't know
21 the date. I just know you can look up whatever the
22 August board meeting was, 2022.
23     Q. Uh-huh.
24     A. And she asked to speak with me.
25     Q. So you had --

136

1      A. She called --
2      Q. Uh-huh.
3      A. Go ahead.
4      Q. She called you?
5      A. She did.
6      Q. Okay. And what did she say about the
7  complaint?
8      A. Well, that's -- that was the second time we
9  actually had a one-on-one, and we left the campus and
10 went to a restaurant that was down the street.
11     Q. Uh-huh.
12     A. And she said that she was in Mexico and that
13 they had called her during the summer to tell her
14 that -- about the complaint or something.
15     Q. Uh-huh. And when you went to the restaurant
16 with Crumpton-Young -- I just want the timeline to be
17 clear -- was this in August or was it after
18 August 2022?
19     A. It was after the board meeting. So the
20 board meeting was either the -- no, it was August.
21     Q. Okay.
22     A. Because the next board meeting would have
23 been October.
24     Q. Uh-huh. And what did Ms. Crumpton-Young say
25 about the complaint? Did she say anything else about

137

1  the complaint?
2      A. At that meeting, I remember that meeting
3  specifically, because she said, "Chief, I know you're
4  aware that a complaint was filed and that you and
5  your deputy chief was found" -- I don't remember the
6  exact words she used, but it was something like we
7  were found guilty of fraud. I'll just say that, and
8  you can kind of look at --
9      Q. Uh-huh.
10     A. -- what she actually said.
11     Q. Uh-huh.
12     A. Dealing with overtime. And she said,
13 because of that, she was instructed -- these are her
14 words to me. She was instructed by the board of
15 regents to terminate me. That's what she said to me.
16     Q. And this was in August of 2022 that she said
17 that the board instructed her to terminate you?
18     A. Yes.
19     Q. Okay. Did she say anything after that?
20     A. And that if I needed my assistant chief to
21 confirm what I'm telling -- because she says,
22 "Listen, don't share this with anyone but your
23 assistant chief, and if he needs to get confirmation,
24 you can have him contact me."
25         So when we got back on campus, told it

138

1  to my assistant chief, what the conversation she and
2  I just had, and that he should contact her, and he
3  attempted to contact her.
4      Q. Okay. Did she fire you? Did she terminate
5  your employment in that meeting?
6      A. Her response to me in that meeting was she
7  was instructed by the board of regents to terminate
8  me.
9      Q. Uh-huh. Did she do it? Did she tell you
10 that you were terminated as of that day?
11     A. She did not.
12     Q. Did she tell you why she was not terminating
13 you at that time?
14     A. We didn't get into that, but what I would
15 say, when I got back on campus, I ran into Regent
16 Price, and, like I always have an officer that's
17 assigned to the board of regents and the president.
18 He asked me what was wrong and how was I doing?
19         And I said, "Well, I'm not doing good."
20 And he said, "What do you mean?" I said, "I heard
21 from the president, just met with the president, and
22 she said that you-all had instructed that she fire
23 me." And he says, "What? What are you talking
24 about?"
25         And the very next day, I got a call from

139

1  the board of regents' lawyer saying that Darlene
2  Brown needed to do an investigation for me. So
3  that's probably why that date says an
4  August-something date on her paperwork to you,
5  because she had never talked to me about an
6  investigation, where she talked to all these officers
7  and got, I guess, their opinions of whatever that
8  first slide you had shown us earlier throughout this
9  morning.
10        And so that's how that paperwork has an
11 August date on it, because the board of regents'
12 lawyer -- I can't think of her name. It's a female.
13 I want to say Linda, Lisa, something with an "L" --
14 and Regent Price. And that's how Darlene Brown was
15 able to talk to me, because I was never ever afforded
16 the opportunity, through the Texas Government Code
17 614. And I know you're not familiar that government
18 code. I was never afforded the opportunity for the
19 Texas Government Code, so therefore I didn't even
20 know about an investigation. I just knew the
21 conversation she had with me in July.
22     Q. Okay. So when, ultimately, were you
23 terminated from TSU employment?
24     A. Well, according to that slide you put up, it
25 said January 2023. I don't know what the date was

140

1  because, again, that was taped on my front door.
2      Q. Uh-huh.
3      A. So I don't have that slide. If you can go
4  back to that slide, it will have that date on there.
5      Q. Do you know who made the decision to
6  terminate you from employment at TSU?
7      A. I thought the ultimate decision was the
8  president.
9      Q. Do you know if President Crumpton-Young
10 ultimately made the decision or, rather, delegated
11 that decision-making authority to someone else?
12         MS. MARSAW: Objection. Form.
13     A. No.
14     Q. (BY MR. KEENEY) After you were placed on
15 administrative leave after December 1st, did TSU
16 install an interim police chief?
17         MS. MARSAW: Objection. Form.
18     A. I wasn't on administrative leave. I had a
19 temporary restraining order. There was an email that
20 was sent out that Bobby Brown would be the interim
21 police chief.
22     Q. (BY MR. KEENEY) So Bobby Brown -- a lot of
23 -- a lot of names are similar.
24         Is Bobby Brown the same as Frederick
25 Brown? Bobby is --

141

1      A. No.
2      Q. They're different people?
3      A. Yes. Frederick was the assistant chief.
4  Bobby Brown was a sergeant equivalent to Barnett.
5      Q. Okay. Do you know if Frederick Brown is
6  still employed at TSU?
7      A. No, he's not.
8      Q. Okay. Do you believe that President
9  Crumpton-Young had sexually exploited Darren Barnett?
10     A. I believe Crumpton-Young used her power as
11 the president of the university to take advantage of
12 Sergeant Barnett. As far as sexual exploitation,
13 those are two consenting adults. What they did on
14 their own time, that had nothing to do what
15 transpired at work.
16         But I believe she used her power and
17 authority, yeah, to take advantage of him. I do.
18     Q. Okay. So, to your knowledge, President
19 Crumpton-Young took advantage of Barnett because of
20 her authority. And my question is: Did she give
21 anything of value to, to your knowledge, Darren
22 Barnett in exchange for anything sexual?
23         MS. MARSAW: Objection. Form.
24     A. I don't know what value that she gave him
25 for anything sexual. I know what benefits he

142

1  received because of his gender.
2       I know she promised him a spot in the
3  president's office because of his gender, and he's
4  not qualified.  He doesn't have a degree.  And once
5  he realized he didn't have a degree, and once she
6  realized he didn't have a degree, that's when he
7  asked me could he rescind his resignation.
8       I don't know what value she gave him
9  sexually, other than the fact that if it was a female
10 and she had asked that female to do those things that
11 Barnett was doing, we would not be having this
12 conversation.  But because he was a male, that is why
13 we're having a conversation.
14      Because I believe she took advantage of
15 him with her power of being a female in authority,
16 the highest authority.  She's the CEO of the
17 university.  I think she took advantage of him, and I
18 think that his gain out of it was that he was with
19 the powerful person on the campus.
20      And so, yes, I believe her power and
21 authority dictated my termination.
22 Q.  Okay.
23      MR. KEENEY:  Just for the record, I'll
24 object to the portion that was nonresponsive, but
25 thank you for that answer.

143

1  Q.  (BY MR. KEENEY)  All right.  I think that
2  we're going to end early.  So let me take five
3  minutes and then come back, and we can finish up,
4  hopefully.
5       THE REPORTER:  Okay.  Off the record at
6  2:13.
7       (Recess 2:13 p.m. to 2:21 p.m.)
8       THE REPORTER:  Okay.  Back on the record
9  at 2:21.
10      MR. KEENEY:  All right.  Thank you again
11 for your patience and your time.  I don't have much
12 more to go.
13 Q.  (BY MR. KEENEY)  I'm wondering, did you ever
14 tell President Crumpton-Young that what you believed
15 she was doing was gender discrimination?
16 A.  No.
17 Q.  And is the answer the same for sex
18 discrimination?  Did you ever say that she was
19 discriminating based on sex?
20 A.  I'm trying to give you the answer, but
21 there's so much more to that question on why I did
22 not go to her to express the discrimination that I
23 saw her do to me.
24 Q.  Uh-huh.
25 A.  The president was being investigated herself

144

1  by the board of regents.  They actually were trying
2  to terminate her.  So it's a little bit more to that,
3  and so that's my resolve for not going to her,
4  letting her know how discriminated I was in the
5  treatment that I was getting from her.  But it was
6  not a secret.  I assure that.  It was not a secret.
7  The president knew exactly what she was doing.
8  Q.  Okay.  Let's just talk about -- take a step
9  back and talk about what your -- some of your job
10 responsibilities were as the police chief.
11      So what does the position of police
12 chief entail?
13 A.  So the police chief, especially of a college
14 -- on a college campus is a unique position because
15 not only are you the police chief of the university,
16 but all of the surrounding area that borders that
17 university.  So your students that reside on campus,
18 the students that are in the community that don't
19 reside on campus, the faculty, the staff, the
20 stakeholders, the alumni that come on campus, all of
21 those persons that have a genuine feel, concern,
22 love, support, admiration for that campus, you're
23 responsible for their safety while they're on campus.
24      You're responsible to make certain that
25 you enforce the laws that are governed under the

145

1  federal, the state, and the local laws.
2       You are also the spokesperson for
3  your department in the case of any emergency.  You
4  are the overseer of that department, whether it's the
5  budget, whether it's the officers, staffing, hiring,
6  firing.  You delegate.  You -- there is -- there's an
7  array of different things that the police chief does.
8       And then I had another position as
9  emergency manager.  So not only was I the police
10 chief and over the safety and the security of the
11 university and the students and the staff, I am now
12 the emergency manager that, whenever there's an
13 emergency, I am the one who implements the protocols
14 for those emergencies.  Whether it's a bomb threat or
15 a hurricane or any of those things, I implement those
16 protocols and put those things in place.
17      And then we have an infor -- an
18 operation center where we all meet.  And I'm the
19 person who says, "This is how it's going to operate."
20 And then I now bring all that to the president, and
21 he or she signs off and says, "Yes, this is going to
22 be the things that we do to make certain that our
23 university is operable."
24      So there is an array of duties as a
25 police chief.  It's not just a title.  There's work.

146

1  And I take pride in that, because I came from an
2  organization where we worked.  I worked for the
3  fourth largest city in the United States, never had a
4  blemish on my record whatsoever.  So being appointed
5  as the first female police chief was not only an
6  honor, but I felt I had a duty, because now I'm
7  working on a college campus where you can have the
8  ability to shape young people's lives.
9          Throughout my entire career it was easy
10 to put people in jail, but when you're working on a
11 college campus and you're seeing that these young
12 people are truly having an opportunity to want to do
13 best, you put your first -- your foot forward.
14         And so as a police chief, we did
15 everything.  I -- again --
16     Q.  Uh-huh.
17     A.  -- it just wasn't a title.  I did the work.
18 We worked long hours.  I worked long hours.  I
19 implemented, delegated, orchestrated, just anything
20 that you believe that -- to get the continuity of
21 people together to make certain that your personal
22 safety as well as public safety was being addressed,
23 I was -- I was the person for that.
24     Q.  Uh-huh.  Can you tell me about your job
25 performance?  How would you -- how would you rate

147

1  yourself?
2     A.  Of course, I'll give myself a 10 out of 10,
3  but I let my work speak for itself.
4          In the years that I was the police chief
5  there, I was voted by my peers as the Chief of Police
6  of the Year three times.  I was selected to attend
7  the FBI leadership academy.
8          That academy is not offered to HBCU
9  Police Chiefs because HBCUs do not have the number of
10 officers.  You have to have over 150 sworn officers
11 or more.  I was selected to attend that, and so I'm
12 probably the only HBCU police chief in the history of
13 the FBI leadership that ever attended that and became
14 certified.
15         When it comes to being the liaison on
16 the federal level, again, I was selected by my peers.
17         And so rating my job performance, rating
18 my skill set, rating my ability, I'm saying 10 out of
19 10.  I don't know what your scale is.  Your scale may
20 be a hundred, so if it's a hundred, I'm a hundred out
21 of a hundred, if I have to rate myself.
22         But I -- I'm only giving you the things
23 that my peers selected me for.  Again, I allow the
24 work that I do to speak for itself.  I'm not looking
25 for a pat on the back, but I will tell you I came to

148

1  TSU in 2017 with a wonderful, wonderful pedigree, and
2  it's been tarnished.
3     Q.  So what does one look for when one is
4  selecting a police chief?  What are the credentials
5  or qualifications that is -- that are valued?
6     A.  Integrity, honesty, fairness, care, the
7  ability to do the job, transparency, strength,
8  knowledge, education.  Several, several different
9  attributes.
10         We look for those things, because those
11 are the things that every day that you're going to
12 have to exhibit.  Even when you don't want to exhibit
13 those things, those things will be displayed.
14     Q.  Tell me, how does leadership play into the
15 role?
16         MS. MARSAW:  Objection.  Form.
17     A.  I don't know how one could accept the job as
18 a police chief without understanding that it requires
19 leadership.
20         I'm a collaborative leader.  I believe
21 in including everyone.  I believe opinions matter.  I
22 believe we're better together.  I believe in all of
23 that.  I believe in connecting the dots.
24         So, for me, leadership is probably one
25 of the most important if not the important skill that

149

1  one can possess in this position.
2     Q.  (BY MR. KEENEY)  And how -- how did you
3  display collaborative leadership when you were at
4  TSU?
5     A.  Inclusion.  I included everyone.  That's why
6  I said I had supervisor meetings.  I could have just
7  had a command meeting with just my number two or my
8  number three, but I included all the supervisors
9  because I wanted them to understand the things that
10 we were discussing so they can go back and share with
11 the officers underneath them.
12         I'm always looking out for people to
13 have professional growth.  If you're somewhere and
14 you can't grow professionally, then it's kind of hard
15 to remain in that position or remain at that
16 location.
17         And so because of the college campus --
18 and the retentions are always hard for officers on a
19 college campus because a lot of times most think it's
20 boring.  It's a boring job.  Like "I don't want to
21 babysit a child.  I don't want to babysit these
22 kids," or whatever.  "I want to go out there and
23 write tickets" and, you know, "jump out of houses."
24 I don't know what they want to do.
25         But it's different on a college campus

150

1  because education is more important than writing the
2  tickets or incarcerating the students. So that's how
3  I corroborated. I made certain that everybody was
4  included. I left no one out.
5      Q. Okay. How did that impact the officers
6  under your command? How did they react to your
7  collaborative leadership?
8      A. One thing I can say as a leader, that
9  whenever change is happening, you're going to have
10  some that's for it and some that's against it. And
11  so I can only say that I believe that the majority of
12  those officers that worked under my leadership
13  appreciated what I had done for them.
14      Q. Did you ever hear any officer making any --
15  making any statement indicating that they did not
16  respect you as a leader?
17      A. I did not hear that statement.
18      Q. Anything resembling that sentiment, that
19  they're -- that they did not respect you?
20      A. No.
21      Q. Were there ever any instances where you were
22  not able to manage effectively as a leader at TSU's
23  police department?
24      A. Nope.
25      Q. Ever any instances where you lost control of

151

1  the officers under your command?
2      A. No.
3      Q. Were there ever any instances where you were
4  challenged -- your authority was challenged? I'm not
5  talking about Crumpton-Young, but the officers under
6  your command, did they ever challenge your authority?
7      A. No.
8      Q. Are there any instances where you were not
9  able to perform your job as a police chief due to --
10  well, let me strike that.
11          Were there ever any instances where you
12  feel like you made any mistakes or failures while you
13  were a police chief at TSU?
14      A. Mistakes or failures? I'm human, so, of
15  course, those things can take place.
16          I think that some of the mistakes that I
17  made is that I hired people because I wanted to give
18  people opportunities, second chances. The majority
19  of officers that I hired, they came on in 2017.
20          They came to the department -- to the
21  department at a time when no other agency was going
22  to hire them. So I pretty much gave -- the majority
23  of the officers, if not 85 percent of the officers
24  that are at TSU, I hired them, and they all came from
25  second, third, some even fourth chances with an

152

1  agency. But I wanted to give them opportunity
2  because I believe people should be afforded the
3  opportunity, especially when I heard some of the
4  reasons on why they were not at those agencies.
5          So the mistake that I made at that
6  moment was just being too freely to give opportunity
7  to everyone without truly, truly doing my due
8  diligence. I relied solely on my recruiters to bring
9  the people to me. And if they said that, "Yes, this
10  is a good fit. Please give them a opportunity,
11  Chief." I took that, and I gave opportunities. And
12  so those would -- that would be some of the things
13  that I would correct.
14          Moving forward, if I had to change it,
15  again, I would probably truly, truly sit down myself
16  and understand what I'm getting myself into with
17  hiring certain people.
18      Q. Okay. All right. Well, thank you. I'm
19  just going to switch gears and return to another
20  topic --
21      A. Okay.
22      Q. -- that I left off at earlier.
23          You mentioned that Darren Barnett had
24  threatened to resign at one point.
25      A. Threatened, or he sent me a letter of

153

1  resignation?
2      Q. So he didn't threaten it. He actually did
3  it?
4      A. He sent his letter of resignation. I still
5  have a copy of it.
6      Q. Okay. Did he ever tell you that it was
7  because you had indicated that you were planning to
8  take him off of the president's detail?
9      A. I believe I made it clear to him that his
10  behavior from getting out of bed at midnight, doing
11  certain things was not becoming of a police officer.
12  There was no reports.
13          Those -- we have protocols that you have
14  to follow. You are a police officer. You're jumping
15  out of bed at night, trying to go to a scene of a
16  crime. Yet no one knows, and there's no paperwork.
17  There's nothing in place.
18          That's not -- that's not how we're
19  trained, that's not in my policies, and that is not a
20  procedure. And so I said, "I think you're in too
21  deep. I think you need to take a step back. I'm
22  going to take you from the detail assignments." So,
23  yes, I did say that.
24      Q. Did he tell you that the reason he was
25  resigning was because of that?

154

1    A. No. He did not tell me that. What I
2 remember Sergeant Barnett saying to me -- and I don't
3 know the timeline from when he said it, if it was the
4 time that I met with him after that incident I'm
5 speaking of or his resignation. But I remember him
6 saying that he was angry with me because of a trip
7 that I did not allow him to go on.
8         I remember specifically him saying that
9 he thought that I deliberately did not want him to go
10 on this trip, and because I had told the business
11 administrator that he's not going on the trip, he
12 took it as something really, really negative.
13         But I was trying to protect him, because
14 what he didn't know was two weeks prior to that he
15 had gotten -- I had received notice from the
16 president's office that the last trip that Sergeant
17 Barnett had gone on with the president, he had bought
18 some alcohol that morning -- and it came from the
19 board of regents person. He had bought some alcohol
20 on the flight using the president's card, and that
21 was going to be a violation, and that was his second
22 violation.
23         And so I did not want him to get caught
24 up. So I said he's not going on this trip. It was
25 either in March, middle March, or the latter part of

155

1 March or something. And he told me that he was upset
2 because I wouldn't let him go on that trip. And the
3 next thing I know, I get this anonymous complaint.
4    Q. Okay. You mentioned that Sergeant Barnett
5 was called in the middle of the night.
6         So what would have been the proper
7 procedure for the president if she wished to seek
8 assistance from the TSU Police Department after
9 hours?
10    A. Oh, there is no after hours for the police
11 department because we are a 24-hour service.
12         Officers have shifts that they work,
13 eight-hour shifts. The proper thing to do with
14 anyone -- it doesn't have to be the police department
15 of TSU or the president of TSU. Most people, if they
16 believe something is wrong with their family and they
17 reside in the city, they will call that city police
18 department or they will call 911. That's the first
19 thing people would do.
20         Secondly, because she is the president
21 and she has the information on our department, she
22 could have clearly just called our dispatch number,
23 and we could have dispatched an officer there. None
24 of that took place.
25    Q. Uh-huh.

156

1    A. She didn't call 911. She didn't called HPD.
2 She didn't call TSU dispatch. She didn't call me.
3 She called Sergeant Barnett.
4    Q. Uh-huh. Would it have been -- would it have
5 been appropriate for her to call you directly?
6    A. If she had called me because she believes
7 her daughter was missing --
8    Q. Uh-huh.
9    A. -- and something possibly is happening to
10 her daughter, if she had called me, the chief of
11 police for the university that she works for, then I
12 would have instructed her what the steps are to do.
13    Q. Uh-huh. And what should Darren Barnett have
14 done in that situation? Assuming Crumpton-Young
15 should not have called him, regardless of that, what
16 should Darren Barnett have done, in your opinion?
17    A. Sergeant Barnett is a supervisor. He also
18 has a supervisor. If he felt the need to do police
19 work while he's at home -- which we never ever
20 encourage. We never encourage that.
21         We are a 24-hour operation, so there's
22 always somebody at work. He could have called a
23 supervisor that was at work, or he could have called
24 his supervisor. He could have called the captain.
25 He could have called the deputy chief, or he could

157

1 have called me.
2         When Sergeant Barnett called me, he was
3 already at the location, at the hospital with the
4 daughter and everything. That's totally
5 unacceptable. Anything could have happened.
6    Q. Okay. So Darren Barnett did not call you
7 until after the situation had been resolved?
8    A. It wasn't resolved. When Sergeant Barnett
9 called me, he said, "Chief Young" -- now he's with
10 the president and the husband. They're at the
11 hospital now. He's telling me that when they found
12 this location -- because, I guess, this Find My
13 phone. I don't have an iPhone. I'm an Android
14 person. No judging.
15         So apparently on this iPhone, you can
16 Find My iPhone or Find My phone or whatever. So with
17 that Find My phone, he went to the location where the
18 president said her daughter's vehicle was.
19         He described that when they got to the
20 vehicle, the hatchback of the door was open and the
21 daughter was laying inside. At that moment they
22 didn't know if she was dead or alive, if there were
23 anyone else around, anything like that.
24         That's a crime scene. We don't know
25 what's going on. You are police officer. You've got

158

1    to think.
2         And so he's not clearly thinking. He's
3    acting more on emotion than he is on the profession.
4    He said they then get her out of the car. Now,
5    you've removed her. You don't know what's going on.
6    Removed her out of the car, take her and put her
7    inside another vehicle, and then they're at the
8    hospital.
9         Those things are not protocol for the
10   police department. It's just not protocol. He just
11   didn't follow the protocol, and I think Sergeant
12   Barnett has been an officer long enough to know that
13   what he did was not the protocol. But I think he --
14   I think, because it was the president, right, and
15   whatever relationship or friendship or whatever it is
16   that they had, he did not follow the protocol, and he
17   just wanted to -- I just think that she used her
18   power to have him do that, because she called him.
19   Q. Okay. I understand. Do you remember who
20   President Crumpton-Young's executive assistant was?
21   A. When you say "executive assistant,"
22   executive assistant for --
23   Q. A personal -- a personal executive assistant
24   or a personal assistant?
25   A. So when she got there, she had Heidi Smith,

159

1    and I don't know what their -- because she gives --
2    the president likes to use acronyms or just one-word
3    to describe people or whatever.
4         So Kia Harper, she brought her in with
5    her from Baltimore. So I don't know if Kia was her
6    executive assistant or not. I don't know if Doman
7    was her -- if that's considered her executive
8    assistant or if that was her chief of staff. So I
9    don't know the terms that she would have used for an
10   executive assistant.
11        I don't know if Christina was her
12   executive assistant or if -- I can't think of the
13   other young lady's name that worked there. So I
14   don't know. I just know she had assistants.
15   Q. Do you know if any one of Crumpton-Young's
16   assistants reached out to Darren Barnett, asking him
17   not to resign?
18        MS. MARSAW: Objection. Form.
19   A. I don't know that to be true. Kia Harper's
20   name comes up, and I think you're probably reading
21   what I read also, that maybe Kia Harper was the
22   person that told Sergeant Barnett don't resign
23   because the president said she had a position for
24   him. I think that's probably what you're reading,
25   because I read that somewhere.

160

1    Q. (BY MR. KEENEY) Yeah. Tell me more about
2    that. So was it someone from the president's office
3    that was trying to create a position for Darren
4    Barnett?
5    A. Again, you're -- you probably -- you're
6    probably reading what I read, and I'm not even
7    certain where it was that I read it. It could be in
8    someone's sworn affidavit or something, but I
9    remember seeing that, that Sergeant Barnett was to be
10   given a position in the president's office. But,
11   because he did not meet the qualifications --
12   Sergeant Barnett did not have a degree, and he didn't
13   have the years of service, nor the skills.
14        And I believe shortly thereafter, he put
15   a social media post on that, thanks to the president,
16   he's enrolling in school to get a degree. And that's
17   on his -- that was on his social media, and I think
18   someone has a copy of that screenshot or something on
19   his social media.
20   Q. How -- do you know why he said thanks to the
21   president?
22        MS. MARSAW: Objection.
23   Q. (BY MR. KEENEY) Do you have any knowledge
24   as to how the president may be helping Darren Barnett
25   get a degree?

161

1    A. I would not know. I just know the president
2    loves power, and she would use her power.
3    Q. Do you know the specific position or
4    position title they were attempting to create for --
5    allegedly for Darren Barnett?
6    A. I couldn't even begin to tell you of a title
7    without a degree, working on a college campus. You
8    have to have a master's degree to start by working on
9    a college campus. He didn't even have a community
10   college education, so I couldn't tell you what
11   position they were trying to give him.
12   Q. Is it possible that the position may have
13   not required a college degree?
14   A. It's very possible.
15        MS. MARSAW: Objection. Calls for
16   speculation.
17   A. Yes.
18        MR. KEENEY: Okay. I'm sorry, I'm just
19   gathering my notes here.
20        THE WITNESS: Sorry.
21        MR. KEENEY: It's okay.
22   Q. (BY MR. KEENEY) Are you aware of Darren
23   Barnett ever telling anyone, before the complaint was
24   filed against you, that he knew that you would be
25   fired soon?

162

1    A.  Barnett told everyone that.  Again, I'm the
2  only one that didn't know about this complaint.
3  Barnett told everyone that I was going to be fired,
4  because he had gotten that from Crumpton-Young.
5  Sergeant McCray knew.
6        Now, remember these are all the people
7  that I hired at TSU, so they're sharing this with me,
8  including Barnett.  I hired Barnett, but, because he
9  was upset that I wanted to remove him from the
10  president's detail, because I believed she was taking
11  advantage of him through her power, he in turn became
12  angry.  Upset, I'm assuming.  Mad, the word you used,
13  the -- whatever.
14        But, yes, it was no secret that Barnett
15  had shared with everyone there that the president
16  wanted to fire me.  It became such hostile, that all
17  of my authority, I felt, was literally taken from me,
18  because I would say something, and they would look
19  around like, "Well, she's not going to be here
20  anyway."  Or my authority would be undermined because
21  I could say it, but then Barnett would be like -- and
22  tell them, "Oh, that's not what's going to happen."
23        It's like every time I would say
24  something, it would be counteracted with one of the
25  male officers saying, "That's not going to

163

1  happening," or "Don't worry about it.  She's not
2  going to be here long."
3        They all knew this because of what
4  Sergeant Barnett shared with them, and he admitted
5  that he would share the things with these officers,
6  male -- male officers, the male sergeants, about my
7  tenure there at TSU.  He knew.  I didn't know.  He
8  knew.  So, yes, that is true.
9    Q.  All right.  So Darren Barnett is talking
10  about the complaint, talking with other officers.
11        Is that -- are we talking about the time
12  period after the complaint had been filed, or are we
13  talking about before the complaint was filed that he
14  was talking about it?
15    A.  I think this is a continuous thing.  I think
16  the complaint is just a facade.  I think they just
17  made up a complaint, because still, to this day, we
18  don't have a complainant.  I requested one.  I know
19  the government code requires one.
20        I think that that's been ongoing
21  conversation that Sergeant Barnett was having with
22  the department about her terminating me.  I think the
23  complaint is just a cover-up.  I think that was
24  already something that she wanted to do.
25    Q.  Do you have any knowledge regarding the date

164

1  that -- you mentioned Darren Barnett apparently said
2  that he heard from the president's office that you
3  would be terminated.  Do you know when Darren Barnett
4  received that information from President Crumpton-Young?
5    A.  No.
6    Q.  But is it -- is it true that Darren Barnett
7  did say that he received this information from the
8  president's office?
9    A.  That's inside more than one officer's sworn
10  statement, yes.
11    Q.  All right.
12        MR. KEENEY:  Okay.  Let's take one more
13  break, and then I just have a few more questions.
14  But I'll see y'all back here at 3:00.
15        THE WITNESS:  Okay.
16        THE REPORTER:  Okay.  Off the record at
17  2:55.
18        (Recess 2:55 p.m. to 3:00 p.m.)
19        THE REPORTER:  Okay.  Back on at
20  3:00 p.m.
21    Q.  (BY MR. KEENEY) All right.  Ms. Young, are
22  you currently receiving any sources of income?
23    A.  No.
24    Q.  Are you receiving any unemployment benefits?
25    A.  Oh, let me -- I'm sorry.  Let me go back.  I

165

1  misunderstood the question I was answering, because I
2  thought you were asking am I employed.
3    Q.  No --
4    A.  I'm receiving -- my apologies.
5    Q.  That's fine.
6    A.  So I did retire from the Houston Police
7  Department, so, yes, I am receiving my retirement
8  benefits.
9    Q.  Okay.  Apart from the pension payments, are
10  you receiving any other form of income?
11    A.  Unless I do some type of consultant work
12  dealing with answering a police question or
13  organizing or coordinating some police things, no.
14    Q.  Have you done any type of consulting work
15  since leaving TSU?
16    A.  Maybe once or twice, I had to sit on a
17  panel.  I have -- I'm a part of the Women's
18  Empowerment Group where we -- where we kind of
19  empower each other, because I'm not the only female
20  or the first or the last female that have gone
21  through this type of gender discrimination.
22        And so there's a group of law
23  enforcement officers, particularly black female
24  chiefs, that are part of this social circle, and so
25  we kind of empower each other.  So, yeah, we've sat

166

1  on panels.  I have sat on maybe two or three panels
2  within the last two and a half years.
3      Q.  Did you receive any income --
4      A.  No.
5      Q.  -- from being on at that panel?
6      A.  No, no income.
7      Q.  No honorarium or payments?
8      A.  No.  It's just a "that a girl" for standing
9  up.
10     Q.  Any other type of consulting work that you
11  received a payment for?
12     A.  So I -- I am a coordinator for the barbecue
13  cook-off for the rodeo, so I get a coordinator's fee
14  for hiring officers to work that particular tent.
15  That's it.
16         A consultant fee would have been
17  probably with some former athletes, giving them
18  information as they move to Houston, maybe where to
19  live, or something like that, but nothing full-time
20  and of significant monetary value, no.
21     Q.  Okay.  Since leaving TSU, have you submitted
22  any job applications at other police departments?
23     A.  Oh, yes, several, several, several.  Six, I believe,
24  to be exact.
25     Q.  Uh-huh.

167

1      A.  It's very hard to apply for a chief of
2  police job.  A lot of times those jobs don't come
3  vacant often.  Those persons tend to stay in those
4  jobs at least 10 to 12 years, although the life span
5  of the career is about five or so.
6         So I have applied for several different
7  jobs, but because of this litigation that's hanging
8  over me -- Constable Rosen's Office, that's Precinct
9  1; Fort Bend County Sheriff's Department, Fagan;
10  Precinct 2 in Waller County; Precinct 8 in Harris
11  County, Sheriff [sic] Eagleton; Precinct 7 was May
12  Walker.  I couldn't go back to the Houston Police
13  Department because I had retired from there.  I even
14  applied for Spring ISD.
15         So I have applied for several different
16  agencies -- Missouri City Police Department, Prairie
17  View A&M Univ -- I have applied for several different
18  police departments as the police chief --
19     Q.  Uh-huh.
20     A.  -- and, again, it's extremely hard to get
21  employment.  I'm over 50, Mr. Keeney.  And, listen,
22  to gain gainful employment over 50 for a job as the
23  police chief is extremely hard.  And so when this
24  happened to me two and a half years ago that I didn't
25  expect, I wasn't prepared either.

168

1         So to answer your question, yes, I've
2  applied.  No, I have not been hired anywhere.  I've
3  not had steady employment since that wrongful
4  termination.  And I used that word, you don't have
5  to.  I'll say it -- since that wrongful termination
6  in 2023.  And it's very disheartening, because my
7  reputation means a lot to me.
8      Q.  Apart from applying for police chief
9  positions, have you applied to any other type of
10  role, or any other level?
11     A.  I did not.
12     Q.  Did I understand you to say that you were
13  also receiving a pension payment from the Houston
14  Police Department?
15     A.  When you say, "also," like in conjunction
16  with something else, what do you mean by also?  I am
17  receiving my pension from Houston Police, yes.
18     Q.  Yes?  Are you receiving a pension from TSU?
19     A.  No.
20     Q.  No.  Okay.  I thought that you had retired,
21  I'm sorry -- that you retired from TSU.
22     A.  Mr. Keeney, I have not met with anyone since
23  they mailed -- since they taped a letter to my door.
24     Q.  Uh-huh.
25     A.  They taped a letter to my door.  I have not

169

1  been afforded the opportunity to get any of my
2  belongings.  When you asked me if I had their
3  belongings, I have not had an opportunity to talk
4  about any benefits that I'm afforded or anything.
5         So since that letter was taped on my
6  door in 2023, I have not had any contact with Texas
7  Southern University at all.
8      Q.  Okay.  That's fine.  I just misunderstood.
9  I thought that you had indicated that you were
10  drawing a retirement payment or a pension payment
11  from TSU, but it's from Houston Police Department?
12     A.  No.  That's the other Young, Crumpton-Young
13  is drawing her retirement.  They allowed her to
14  retire --
15         THE REPORTER:  I'm sorry, who?
16         THE WITNESS:  The president,
17  Crumpton-Young.  They allowed her to retire from TSU.
18     Q.  (BY MR. KEENEY) Okay.  I know it might be
19  difficult to answer this question, but do you know
20  when -- or when were you planning to retire from TSU?
21     A.  I was at the top of my game, I say, I say.
22  And we were doing some tremendous things.  Again, we
23  had just overcome a lot of things, from a hurricane
24  to COVID, to reimaging this new form of policing,
25  getting more students.

170

1        At least another ten years.  At least
2   ten years.  I was not trying to go anywhere soon.
3   This was going to be my retirement.  I was not trying
4   to leave TSU.  I think that that was so much that
5   needed to be done on that campus, especially with our
6   students, so I was not trying to go anywhere.
7        Q.  All right.
8        MR. KEENEY:  I believe that I'm finished
9   with my questions, so if you'll excuse me, and have
10  -- and we'll have one more five-minute break, so that
11  I can just make sure that I didn't miss anything.
12  Then we can come back, and I'll wrap up.
13       THE WITNESS:  Yes, sir.
14       MR. KEENEY:  Thank you.
15       THE REPORTER:  Back on at 3:15.
16       (Recess 3:09 p.m. to 3:15 p.m.)
17       MR. KEENEY:  All right.  Ms. Young,
18  thank you, again, for your time.  I have no further
19  questions, and I'll pass the witness.
20       THE REPORTER:  You are muted, Taren.
21       MS. MARSAW:  Thanks.  That will be
22  necessary for you to hear me.  Thank you.
23
24
25

171

1                EXAMINATION
2   BY MS. MARSAW:
3        Q.  I have quite a few questions for you.  Let's
4   start with your qualifications, because I believe
5   that you were asked earlier in the deposition what it
6   takes in order to become a chief inside of the TSU
7   department.  And I think you said something along the
8   lines of integrity, honesty, ability to do the job.
9        Can you tell me what formal requirements
10  you had to have?
11       A.  Yeah.  So the formal requirements, of
12  course, is the academia.  Secondly, would be the law
13  enforcement training.  Thirdly, would be some type of
14  leadership or supervisory skills or an academy for
15  that.  And then thir -- finally, would probably be
16  the ability to navigate through pressing times and
17  see how you're able to handle conflict resolutions.
18       Q.  Okay.  So let's take these one by one, if
19  you don't mind.
20       A.  Okay, okay.
21       Q.  Tell me about the academia piece.  What does
22  that mean?
23       A.  So generally, a bachelor's degree is
24  customary, a master's degree is preferred, and, of
25  course, a doctoral, anything higher than that is

172

1   always over the top and excessive.
2        Going through an academy, meaning that
3   you are now going through all the channels that it
4   takes to get the training, the education, topics,
5   subjects, you become a subject matter expert.
6        All those things are needed to become a
7   police chief, because not only are you speaking for
8   the things that you do yourself, but you hold
9   everyone that's under you accountable, and then they
10  have to do those same things.  And so it's necessary
11  to get that training.  It's necessary to have those
12  skills.
13       It's not freely given.  You have to earn
14  it, and there's a lot of hours in training that you
15  have to put into it.
16       Q.  How many hours in training?
17       A.  So Texas, the hours are at least 80 hours.
18  You have to go through the Bill Blackwood Law
19  Enforcement Management Institute of Texas.  That's
20  the LEMIT.  That's for any police chief in the state
21  of Texas, you have to go through that training.  You
22  cannot be a police chief unless you go through that
23  training.
24       Then there is hours of just TCOLE, which
25  is our licensing agency.  Those are hours that TCOLE

173

1   requires you to also have.  So there's an abundance
2   of education and topics and training that you must
3   have, and you must keep that standard in those
4   education and training courses accurate, if you wish
5   to remain in that position.
6        Q.  Okay.  And so you did the 80 hours?
7        A.  Yes, I did the TCOLE hours and the new
8   police chief hours, yes, in the same year because,
9   again, when I was appointed to the police chief, I
10  had already taken my hours from TCOLE with the
11  Houston Police Department.  And I came on to TSU in
12  March of 2017 to take the supervisory courses for
13  chief in, I think it was, August or so.
14       Q.  Okay.  And you did the Bill Blackwood Law
15  Enforcement --
16       A.  I did.
17       Q.  -- training?
18       A.  Yes, ma'am.
19       Q.  You say you came from a police department.
20  How long were you at the police department?
21       A.  20 years with the Houston Police Department.
22       Q.  Okay.  Is Houston Police Department one of
23  the larger police departments in the country?
24       A.  The fourth largest in the nation and the
25  largest in the state.

174

1    Q.  Okay.  And did you have any blemish on your
2  record, any write-ups for bad behavior at police --
3  at Houston Police Department?
4    A.  No.  I -- and actually, I received,
5  throughout my career, Officer of the Year, maybe
6  twice.  Now, this is out of 5,000 officers.  So
7  Officer of the Year, twice; Crisis and Prevention
8  Officer of the Year, once.
9        I received the Chief's
10  Accommodation [sic] twice.  I was -- when I retired,
11  I was the community service specialist for all of
12  Southwest Houston.  So I was a very well-known
13  officer with the Houston Police Department.  Because
14  I wanted to learn more, so I purposely put myself
15  around people that were doing great things in the
16  city, and I purposely put myself around police
17  chiefs.  So I got the knowledge of how to conduct
18  myself as a police chief as well as the education to
19  hold the position as the police chief.
20        So I had no blemishes on my record.  I
21  had a really good -- a really good performance.  In
22  fact, I really owe Houston Police Department, and I
23  give them the credit, because I know they're probably
24  wanting the credit -- I give them credit for my
25  professional career.

175

1    Q.  Okay.  Now, you said that from an academic
2  standpoint you either have a bachelor's, a master's,
3  PhD.  Do you have either of those?
4    A.  I have a master's degree.  I have hours
5  toward a PhD.  I have a certificate from Harvard in
6  their justice department.  I have completed the FBI
7  leadership school.
8        As I was telling Mr. Keeney, I'm the
9  only HBCU person in the history of the FBI LEEDS 81
10  to have an HBCU person -- because most HBCUs, the
11  personnel doesn't get to a hundred officers, and this
12  particular leadership you have to have at least a
13  hundred officers or more to even be considered.  So I
14  was one of the-- one of the ones selected for that.
15  So, yes, I had the academia.
16    Q.  Okay.  I want to kind of segue from that,
17  you having the academia.  We talked a little bit
18  about the resignation of the sergeant.
19    A.  Okay.
20    Q.  And him not having the academia to be placed
21  inside of a different department or wherever he was
22  being placed.  Is there a rank inside of the police
23  department?
24    A.  Yes.
25    Q.  Okay.  And if you could, just in about ten

176

1  seconds, just tell me the rank from bottom all the
2  way up to top, top being chief.
3    A.  So we start off as an officer, corporal,
4  sergeant, lieutenant, captain, deputy chief, and
5  chief.
6    Q.  Okay.  And so it's fair to say, based on
7  that rank, that Sergeant Barnett was -- sergeant,
8  lieutenant, captain, deputy chief, he was four people
9  in between -- or four ranks in between you and him?
10    A.  Yes.
11    Q.  Okay.  All right.  So let's do this.  I want
12  to go back to for -- administrative leave quite a
13  bit?
14        THE REPORTER:  Hang on just a second.
15  You froze for me.  I don't know if she did for you,
16  Ms. Young?
17        THE WITNESS:  Yeah, I didn't -- I didn't
18  get it.
19        THE REPORTER:  Okay.  Your whole
20  question was just gone.  So can you just --
21        MS. MARSAW:  Oh, it's okay.
22        THE REPORTER:  -- start over.
23        MS. MARSAW:  It's okay.  It's all right.
24        THE REPORTER:  Okay.
25    Q.  (BY MS. MARSAW)  So I'm switching topics

177

1  just a little bit.
2    A.  Okay.
3    Q.  When we were talking about -- you were shown
4  a letter, December 1st, 2022, letter.  And you were
5  asked had you ever seen that letter?  And on it --
6  you were asked to read it.  And it said, "Notice of
7  Temporary Relief of Duties."
8        Do you remember that early in this
9  deposition?
10    A.  So there were two letters.  Is -- one was --
11  one was to Attorney Hall with his name on it, and the
12  other one had the December 1st, I think, yes.
13    Q.  Yeah.  I'm not asking about the letter
14  between Attorney Hall and the other individual.
15    A.  Oh, okay, yes.
16    Q.  So this one is the one where you were asked
17  to read what it said, and you were asked about
18  equipment being used or items that belonged to the --
19  to TSU and being on campus; it was something along
20  that line.  Do you remember that letter?
21    A.  Yes.
22    Q.  Okay.  You made mention that there was a
23  temporary restraining order that was in place?
24    A.  Yes.
25    Q.  Did that temporary restraining order --

178

1  strike that.
2        Was that temporary restraining order for
3  your benefit?
4        MR. KEENEY: Objection. Form.
5     A. So the temporary restraining order was for
6  everything, and it specifically said that no adverse
7  employment or termination could be -- and I don't
8  know the verbiage, and I don't have it in front of
9  me, but I know I received two temporary restraining
10 orders.
11       I know they're both -- they're good for
12 at least 14 days, and I had two that would have
13 carried me or something. But I don't remember the
14 verbiage of what you're saying -- of what you're
15 asking me.
16    Q. (BY MR. KEENEY) Okay. So I'm not -- I
17 think I'm asking you a different question.
18    A. Okay.
19    Q. So I'm not asking the verbiage yet.
20    A. Okay.
21    Q. We'll get there.
22    A. Okay.
23    Q. What I'm asking was, the temporary
24 restraining order, did you seek the temporary
25 restraining order against TSU?

179

1     A. Yes.
2     Q. And what was the reason for the temporary
3  restraining order?
4     A. So the first reason was because supposedly I
5  had gotten this anonymous complaint, and I didn't
6  know anything about an anonymous complaint and an
7  investigation because -- again, I've been a police
8  officer for quite some time. I understand the
9  government code and how things work when it comes to
10 police officers being accused or alleged of
11 committing something, and so that never took place
12 with me.
13       So when I got that call in July via
14 Teams, I didn't think that to be an investigation.
15 That's just information asking me do I know anything
16 about the officers in their field training.
17       So it was to protect me because of all
18 the things that I had heard about being fired and
19 being terminated. At that moment, when I filed for a
20 temporary restraining order, it was already out there
21 that I was going to be terminated, and it was just a
22 matter of time.
23       And so I don't know if you can imagine
24 this, but imagine --
25    Q. Hold on, hold on.

180

1        MS. MARSAW: I'm going to object right
2  here to the nonresponsive part, because I want us
3  to -- I want you to answer just the question that I'm
4  asking.
5     A. Okay.
6     Q. (BY MS. MARSAW) So I asked you what was the
7  purpose of the temporary restraining order, and you
8  said to protect you. Is that correct?
9     A. Yes.
10    Q. Okay. And so you said there were two
11 temporary restraining orders, correct?
12    A. Yes.
13    Q. And so you had a temporary restraining order
14 to protect you. Now, I'm going to get into the
15 content.
16       Did the temporary restraining order
17 prevent Texas Southern University from firing you?
18       MR. KEENEY: Objection. Form.
19    A. Yes.
20    Q. (BY MS. MARSAW) Did the temporary
21 restraining order prevent Texas Southern University
22 from taking any adverse action against you?
23       MR. KEENEY: Objection. Form. Calls
24 for a legal conclusion.
25    A. Yes.

181

1        MS. MARSAW: My computer is going -- I
2  don't know if you can hear this, but my computer is
3  doing an alarm. That was very strange, give me one
4  second. Let me put my computer on do not disturb.
5     Q. (BY MS. MARSAW) The temporary
6  restraining order that was granted for you against
7  TSU prevent Texas Southern University from putting
8  you on administrative leave?
9     Q. Yes.
10       MR. KEENEY: Objection. Form.
11    A. Yes.
12    Q. (BY MS. MARSAW) Did the temporary
13 restraining order that you were granted by -- from
14 TSU allow to you go back to work?
15       MR. KEENEY: Objection. Form.
16    A. Yes.
17    Q. (BY MS. MARSAW) Did the temporary
18 restraining order that you received -- that you were
19 granted by the judge and the court, did that
20 temporary restraining order give you permission to go
21 back to work?
22       MR. KEENEY: Objection. Form.
23    A. Yes.
24       MS. MARSAW: Hold on a second. What's
25 the objection to?

182

1      MR. KEENEY:  Calls for -- all of these
2   call for a legal conclusion.
3      MS. MARSAW:  It calls for a legal
4   conclusion for her to know what she's allowed to do
5   under a temporary restraining order?
6      MR. KEENEY:  Correct.  It requires the
7   interpretation of a court order; calls for a legal
8   conclusion.
9      MS. MARSAW:  Okay.
10      Q.  (BY MS. MARSAW)  Did your attorney interpret
11   the court order for you?
12      A.  Yes.
13      Q.  Okay.  And not to get into the actual
14   conversation that took place between you and your
15   attorney, okay?
16      A.  Yes.
17      Q.  This is a simple yes-or-no question.
18          Under that interpretation, were you
19   instructed to return back to work?
20      A.  Yes.
21      Q.  Okay.  And you had the first temporary
22   restraining order granted on December 1st, correct?
23      A.  Yes.
24      Q.  And you said that it extended for 14 days.
25   So we know that from December 1st through

183

1   December 14th that temporary restraining order is in
2   place, correct?
3      A.  Yes.
4      Q.  Did you have a second temporary restraining
5   order?
6      A.  Yes.
7      Q.  And do you remember the date that that
8   second temporary restraining order was put in place?
9      A.  Okay.  Can you repeat the first one in --
10   you said it was from December the 1st to what?
11      Q.  To December 14th.
12      A.  Well --
13      Q.  Let me ask the question different.
14          Was the second -- was the second
15   temporary restraining order put in place to be
16   effective for the duration of December?
17      MR. KEENEY:  Objection.  Form.
18      A.  Yes.  I think the second one was
19   December 7th.
20      Q.  (BY MS. MARSAW)  Okay.  All right.  So you
21   made it -- you were asked a question about Christmas
22   break and going on break.
23      A.  Uh-huh.
24      Q.  You said that you did indeed go on break
25   when school went on break, correct?

184

1      A.  Correct.
2      Q.  Okay.  So is it fair to say that during the
3   month of December you were returning to work and
4   going to work because you were instructed that that
5   was permissible through the temporary restraining
6   order?
7      A.  Yes.
8      Q.  Okay.  The other document that you were
9   shown was a January 9th document.  And in that
10   document at the bottom -- if we could pull that
11   document up?  I don't know if we have -- it's still
12   available?
13      MR. KEENEY:  It's in the chat if you
14   would like to pull it up.
15      MS. MARSAW:  Can you see this
16   January 9th letter?
17      MR. KEENEY:  No.
18      MS. MARSAW:  You cannot?  What do you
19   see?
20      MR. KEENEY:  It looks like a menu.  It
21   looks like a toolbar.
22      MS. MARSAW:  Okay.  Give me one second.
23      MR. KEENEY:  Vanessa, is that what you
24   see?
25      THE REPORTER:  Yes.

185

1      MS. MARSAW:  Uh-huh.  Okay.  Hold on one
2   second.  Let me try it another way.  How about now?
3      MR. KEENEY:  Now, I can.
4      MS. MARSAW:  Okay.  My apologies.
5      MR. KEENEY:  That's okay.
6      Q.  (BY MS. MARSAW)  All right.  I'm going to
7   zoom into this for a moment, and then I'm going to
8   highlight this section down here, okay?
9      A.  Okay.
10      Q.  Chief Young, if you will see the second
11   sentence that started with "through counsel"?
12      A.  Yes.
13      Q.  Do you mind reading that sentence for me?
14      A.  "Through counsel, we will work to coordinate
15   the return of all TSU property in your possession,
16   including the vehicle, keys, computer, access card,
17   mobile telephone, credit and/or procurement cards."
18      Q.  All right.  Chief Young, did TSU ever make
19   good on this comment?
20      MR. KEENEY:  Objection.  Form.
21      MS. MARSAW:  Yeah, that's a bad
22   question.  Let me ask you a different way.
23      Q.  (BY MS. MARSAW)  Chief Young, did TSU ever
24   initiate this coordination of return of your items?
25      A.  No.

186

1    Q.  So you have these -- I'm backing up.  So
2    we're no longer in January 9th.  I'm going back to
3    where the temporary restraining order -- the
4    temporary restraining orders -- make it plural --
5    that you were granted were making it permissible for
6    you to return to work.  That's where we are now,
7    okay?
8    A.  Okay.
9    Q.  So when you went to work and you showed up
10   in compliance with these orders, did you have issues
11   with accessing your computer?
12          MR. KEENEY:  Objection.  Form.
13   A.  Yes.
14          MS. MARSAW:  What's the objection?
15          MR. KEENEY:  So you made a legal
16   statement, a legal proposition, and I'm objecting to
17   the legal proposition that is being made in the
18   course of that question.
19   Q.  (BY MS. MARSAW)  When you returned to work,
20   Chief Young, did you have issues -- in December, when
21   you returned to work, did you have issues with
22   accessing your computer?
23   A.  Yes.
24   Q.  And when you had those issues come up, did
25   you have your attorney reach out to general counsel

187

1    of Texas Southern University?
2    A.  Yes.
3    Q.  And after those communications between your
4    counsel and the counsel for Texas Southern
5    University, what was their response?
6    A.  My computer would come back on; my access
7    card would work.  It was just like that.
8    Q.  Okay.  And so is it fair to say that while
9    this restraining order was in place that was in your
10   favor -- is it fair to say that anytime your counsel
11   reached out to the school, they reauthorized your
12   access and gave -- and granted you permission to do
13   your work?
14   A.  Yes.
15   Q.  So then when we talk about this
16   investigation that took place with Darlene Brown, we
17   were shown a few documents on the screen.  And I know
18   that you did not create these documents.  And we can
19   pull them back up if needed.
20          Did you see -- did you notice with your
21   own eyes, that Darlene Brown made any of these
22   statements under oath?
23   A.  No.
24   Q.  Did you see with your own eyes on any of
25   these documents that anything she wrote was under the

188

1    penalty of perjury?
2    A.  Yes.
3    Q.  Did she, Darlene Brown, say, "I'm making all
4    these statements under penalty of perjury"?
5    A.  Oh, I misunderstood your question.  No.
6    Q.  Okay.  Did you see where any of the
7    testimony that was read to you today was made under
8    the penalty of perjury?
9    A.  No.
10   Q.  Did you see where any of the testimony that
11   you had to read out into the record today was made in
12   first person, meaning this person typed it themself?
13   A.  No.
14   Q.  Did you see in any of the things that you
15   were asked to read today that anyone signed saying
16   that they in fact did say those things?
17   A.  No.
18   Q.  So is it fair to say that none of the record
19   that you read today about testimony was verified?
20   A.  That's correct.
21          MR. KEENEY:  Objection.  Form.
22   Q.  (BY MS. MARSAW)  So we went over
23   academia.  We went over credentialing for you to
24   become the police chief.  I want to go over something
25   else I'm trying to figure out.  This is where I want

189

1    to go.
2          So you talked about the array of duties
3    for the police chief?
4    A.  Uh-huh.
5    Q.  Under the array of duties, you said that you
6    oversee all emergencies, correct?
7    A.  Yes.
8    Q.  That you are the emergency manager?
9    A.  Yes.
10   Q.  That you implement protocol?
11   A.  Yes.
12   Q.  And that you put things in place and
13   determine strategy for moving forward?
14   A.  Yes.
15   Q.  Okay.  Is that the lion's share of police
16   chief work, as opposed to officer work?
17   A.  Oh, definitely police chief work.
18   Q.  Okay.  So at one point during this
19   conversation that you were having with TSU in this
20   deposition, you were asked about crucial moments.
21   A.  Uh-huh.
22   Q.  Okay.  And it was a conversation about how
23   former President Crumpton-Young would call on these
24   male opinions during crucial moments.
25          Can you tell me what a crucial moment

190

```
1  is?
2      A. So let me make certain that I clarify that.
3  I don't mean she would just call the male chiefs
4  during crucial moments. I was saying I remember
5  particularly these moments because they were so
6  crucial at nature of how they occurred. With the
7  student being shot, that's not an everyday thing. So
8  I partic -- I remember that as if it happened
9  yesterday.
10         President Crumpton-Young would call
11  males regardless. Me, having the ability to do my
12  job in any capacity, whether it's a crucial moment or
13  an everyday occurrence, I was just particularly
14  pointing that out because he asked me do I remember a
15  particular moment, but it was all the time.
16         As the police chief, I'm required to do
17  these jobs every day, so it's not just a crucial
18  moment. I just remember a particular incident, and I
19  wanted to answer his question.
20     Q. Yeah.
21     A. I don't know if I answered your question.
22     Q. I think so.
23     A. Okay.
24     Q. So if this was an everyday occurrence, then
25  I kind of want to -- I want to ask you a question
```

191

```
1  about something that you made mention of.
2         You said that sometimes you would make
3  these suggestions as the female chief, and then --
4  your deputy chief, or was it your assistant chief?
5      A. It's both. It's -- a deputy chief is the
6  same as an assistant chief; it just depends on what
7  agency.
8      Q. Okay. Understood. And so you would give
9  these --
10     A. Can you give me a second? My pen dropped.
11     Q. Sure.
12     A. Okay. I didn't want to fall off the chair,
13  so -- it's too embarrassing on camera, so...okay.
14  Sorry.
15     Q. All right. You would give them the words to
16  say, correct?
17     A. Yes.
18     Q. Okay. So when you would suggest things,
19  they would go over President Crumpton-Young's head?
20     A. So not so much that it went over her head.
21  She knew exactly what I was saying. She just ignored
22  me. She just preferred to hear from the male.
23         My assistant chief -- my deputy chief is
24  a male, and it was the exact same thing that I had
25  said. And so it wasn't that a figure of speech I
```

192

```
1  used went over her head; she just ignored me. She
2  ignored -- she completely ignored what I said, and he
3  said the exact same thing.
4      Q. Do you know -- I think that -- I have the
5  interpretation of some things. One of the questions
6  that you were asked is: Did you ever tell former
7  President Crumpton-Young that you were being
8  discriminated against? Do you remember that
9  question?
10     A. Yes.
11     Q. Okay. I'm going to ask you a different
12  question.
13     A. Okay.
14     Q. Did former President Crumpton-Young say to
15  you that she was discriminating -- strike that. Let
16  me -- let me ask a different question.
17     A. Okay.
18     Q. Did Crumpton-Young, through her conversation
19  with you, intimate that she was discriminating?
20     MR. KEENEY: Objection. Form.
21     A. Can you repeat that one?
22     Q. (BY MS. MARSAW) Sure. Did Crumpton-Young,
23  through her conversations that you -- you had
24  personally with Crumpton-Young --
25     A. Uh-huh.
```

193

```
1      Q. -- did she imply to you that she was
2  discriminating?
3      MR. KEENEY: Objection. Form.
4      A. I remember -- I remember the conversation
5  she and I had, and she told me that she was going to
6  be the only powerful Young on campus. I remember
7  specifically Crumpton-Young saying that she
8  prefers -- and it sticks out to me, because it's like
9  she said it and I'm hearing her say it. She prefers
10  male police -- male police chiefs over female police
11  chiefs because she's never worked with a female
12  police chief before.
13     Q. (BY MS. MARSAW) Okay. And so on that
14  preference of wanting a male police chief, do you
15  feel that that preference motivated her actions
16  towards you?
17     MR. KEENEY: Objection. Form.
18     A. I think --
19     MS. MARSAW: Hold on a second. What's
20  the objection?
21     MR. KEENEY: I'll withdraw the
22  objection. You said "do you feel," so...
23     MS. MARSAW: Vanessa, do you mind
24  reading that question back?
25     THE REPORTER: "And so on that
```

194

1  preference of wanting a male police chief, do you
2  feel that that preference motivated her actions
3  towards you??
4        MR. KEENEY:  I was making the objection
5  based on speculation, but you said "do you feel," so
6  I'll allow it.
7        A.  Yes.
8        Q.  (BY MS. MARSAW)  Okay.  So as you sit here
9  today, do you know if President Crumpton-Young knew
10  of the anonymous complaint?
11       A.  Sergeant Barnett said he received
12  information that I was going to be terminated and
13  that he had gotten it from President Young, so, yes.
14       MR. KEENEY:  Can I interrupt?  I'm so
15  sorry, my computer is telling me that I need to
16  restart my computer or it will restart automatically
17  for me in five minutes.  Can I do that really quickly
18  and then come back?
19       MS. MARSAW:  Absolutely.  We can take a
20  five-minute break.
21       MR. KEENEY:  So, so sorry.  Thank you.
22       THE REPORTER:  Off the record at
23  11:49 [sic].
24       (Recess 3:49 to 3:57 p.m.)
25       MR. KEENEY:  Sorry, again.

195

1        MS. MARSAW:  That's all right.  Vanessa,
2  can you read the last question that I asked?
3        (Brief pause.)
4        THE REPORTER:  (Muted.)
5        THE WITNESS:  I'm sorry. I can't hear
6  anything. I'm sorry.
7        THE REPORTER:  (Unmuted.)  Can you hear
8  me?
9        THE WITNESS:  Yes.
10       THE REPORTER:  I did such a good read
11  back.  I'm sorry you missed it.
12       "Okay.  So as you sit here today, do you
13  know if President Crumpton-Young knew of the
14  anonymous complaint?
15       Answer:  Sergeant Barnett said he
16  received information that I was going to be
17  terminated and that he had gotten it from President
18  Young, so, yes."
19       And then Mr. Kenney said, "Can I
20  interrupt?"
21       MS. MARSAW:  All right.  So we are right
22  where we need to be.
23       Q.  (BY MS. MARSAW)  Okay.  Chief Young, I want
24  to make sure that the record is clear.
25       As you sit here today, is it your

196

1  understanding that former President Crumpton-Young
2  knew of the anonymous complaint before it was filed?
3        A.  It is my understanding that this anonymous
4  complaint only came about -- yes, yes, yes.
5        Q.  Was the conversation that you heard from
6  Sergeant Barnett telling folks that you were possibly
7  going to be terminated, was that conversation before
8  the anonymous complaint surfaced?
9        A.  And the answer is yes, because I didn't know
10  anything about an anonymous complaint until July,
11  when I got a Teams call.  But throughout the year, I
12  was hearing that I was going to be terminated.
13       That started as early as March or April,
14  and then this anonymous complaint supposedly had
15  taken place, dated back in January.
16       Q.  Okay.  I want to go back to a line of
17  questioning that was asked, and it appeared to me
18  that you were asked about leadership roles and your
19  capacity to work collaboratively.
20       And then you were asked did you ever
21  have difficulty managing effectively.  Tell me how
22  you perceive that question.
23       A.  The question that I -- the way I perceive
24  the question was did I have a problem with knowing my
25  job, like was I not qualified to do the job.

197

1        Q.  Okay.  So when you were asked did you ever
2  have issues managing effectively or did you ever lose
3  control over your officers, tell me how you perceived
4  those questions as a collective.
5        A.  I perceived those questions, again, as if I
6  had any knowledge on the job itself, like do I know
7  how to lead?  Do I know how to manage?  Do I know how
8  to handle stressful situations.
9        Q.  Okay.  Well, I'm going to pose a different
10  question then.
11       A.  Okay.
12       Q.  In reality of your day-to-day while you were
13  at Texas Southern University, did you have issues
14  managing your officers effectively because of
15  external things?
16       MR. KEENEY:  Objection.  Form.
17       A.  When I got to Texas Southern in 2017, there
18  were no issues on how I handled anything, supervised
19  or whatever.  In 2021 and towards 2022, or all of
20  2022, my authority, in my opinion, how I felt, and
21  even still to this day, because of the wrongful
22  termination, I felt, as a female police chief, my
23  authority was undermined.  I will stick to it.  I
24  believe that it was a power play.
25       I believe the president had a goal that

198

1  she wanted to accomplish. I believe my officers,
2  specifically Sergeant Barnett, was targeted. I
3  believe he was somewhat coerced to do some things.
4  And so it made it extremely difficult. Because I
5  know my job. I know my worth. I know what I can do.
6  I've done it.
7          This wasn't my first time. I had been
8  on a campus four years prior to her coming, almost
9  five years prior to her coming. So I knew my job.
10         I said it early in my testimony, I was
11  nominated, voted, and awarded the Chief of Police for
12  105 HBCUs. My peers selected me based on what I did.
13  I didn't do it by myself. Collectively,
14  collaboratively, like I told him, I'm that type of
15  leader. We all did it, and Texas Southern University
16  got that award.
17         When Crumpton-Young came and she
18  preference that she preferred a male chief and a
19  female -- over a female chief, everything that I had
20  worked for, that I stood for, went down because she
21  did not see me as a person who was equipped to do the
22  job.
23         I don't know if I was inferior to her or
24  what, but she preferred the gender of a male to give
25  her the instructions and the directions for the

199

1  department that I was leading. Okay.
2      Q. (BY MS. MARSAW) And so is it fair to
3  say that you struggled to perform your job as a
4  police chief because of her behavior?
5      A. Yes.
6      Q. Okay.
7      A. It is fair to say that, yes.
8      Q. Okay. And is it fair to say that your
9  authority was constantly challenged because of her
10  behavior?
11     A. Yes, definitely fair to stay that.
12     Q. Okay. And then I'm going to touch on just
13  probably one more thing, and then I'll probably be
14  wrapped up. You said that because of the litigation
15  you haven't been hired?
16         Is it because you went to the court and
17  filed paperwork that they won't hire you?
18     A. No. There are certain standards in all
19  professions. Government is no different, especially
20  on a police department. When you're overqualified,
21  you are going -- you're going to be denied on certain
22  job positions.
23         And so I wanted to apply for a job that
24  was conducive to my skills, conducive to the time I
25  put in for the position, my worth. And there were no

200

1  jobs available to match those skill sets. And I
2  applied with several different agencies.
3      Q. Okay. And is it your feeling that one of
4  the reasons you have not been gainfully employed has
5  to do with the noise that has accompanied this
6  wrongful termination?
7      A. Lots of noise. I have had social media
8  posts where people stated that I was terminated
9  because I stole money from the students. I have
10  people, walking down -- if I'm walking down the
11  street or just in common area asking me what happened
12  to me at TSU. I have people saying that -- "TSU is
13  always TSU."
14         I have had so many negative things
15  associated with me throughout this whole ordeal than
16  I've ever had my entire life over something that I
17  did nothing.
18     Q. Uh-huh.
19         MS. MARSAW: Well, I think that that's
20  my final question for you. So I'll pass the witness.
21         MR. KEENEY: Okay. Just really quickly.
22  I just wanted to confirm something, or clarify one
23  thing.
24
25

201

1          FURTHER EXAMINATION
2  BY MR. KEENEY:
3      Q. Ms. Young, if you remember, I asked you if
4  you knew whether or not Ms. Crumpton-Young was aware
5  of the complaint before it was filed. And, if I
6  remember correctly, you said you did not know.
7          Ms. Marsaw asked if you had an
8  understanding that Ms. Crumpton-Young knew of the
9  complaint before it was filed, and you said that it
10  was your understanding.
11         Did I describe both of those questions
12  and your corresponding answers correctly?
13     A. Yeah. So let me go back to both answers.
14  And, so the way you worded, again, the complaint that
15  I'm speaking of, I knew nothing about that complaint
16  until July.
17         When I met with Crumpton-Young in
18  August, she said she found out about the complaint.
19  I don't know when she found out about the complaint.
20         As far as her knowledge of the
21  complaint, I believe she knew because Sergeant
22  Barnett, before this anonymous complaint or before
23  this call to me in July -- so I'm talking about the
24  call that I had in July, that was the first I knew
25  about an anonymous complaint.

202

1    Apparently, this anonymous complaint had
2 already been surfacing, because Sergeant Barnett had
3 already expressed to the department that the
4 president was going to get rid of me. Get rid of me
5 because of what?
6    So if he's saying that -- and this is
7 before July, and I only hear about a complaint in
8 July, one would think he's talking about this
9 anonymous complaint that only he and the president
10 knows about. I don't know anything about it.
11    I don't meet with the president until
12 August. I don't hear anything about a complaint
13 until July, but yet and still from January to August
14 that's all I heard, that I was going to get
15 terminated.
16    Q. Okay. Well, I thank you. I think that
17 clears it up. I'm wondering, do you know if
18 Ms. Crumpton-Young was aware of the complaint before
19 January 2022, before it was filed with the
20 EthicsPoint hotline or EthicsPoint system?
21    MS. MARSAW: Objection. Form.
22    A. I would still like to see the EthicsPoint
23 hotline. I had worked there since 2017 and never
24 knew about an ethics hotline that existed, and they
25 have yet to provide that for me. So if you have

203

1 that, I would like to see that, because that would
2 let me know who was the anonymous complainant.
3    I have yet to see a complainant. I have
4 yet to see this hotline, so I have reason to believe
5 -- yes, I was targeted. This was -- I'm being overly
6 expressive right now, because this is my livelihood.
7 This is my livelihood. I have been without
8 employment for two and a half years, waiting on Texas
9 Southern University to take accountability on what
10 they did.
11    They allowed the president to retire and
12 leave and go to another state and still reap her
13 benefits with her name not being smeared or scarred.
14    Me, I have to walk every day. I have to
15 try and stay strong for my child, who constantly has
16 to hear the things that her mother supposedly had
17 done, who had never done anything. My friends who
18 have known me all of my life, questioning, like what
19 is going on, and now my colleagues and coworkers.
20    And so, yes, that is damaging. My
21 reputation is damaged, and I have yet to find
22 employment because of what Texas Southern University
23 refuses to accept, when they know I did nothing
24 wrong.
25    And so I apologize for going off and

204

1 carrying on, but this is my livelihood. This is my
2 livelihood. I am over 50 years old. I can't go back
3 to my 20s. And so, yes, to your question, but I
4 wanted to point that out.
5    Q. Sorry, what were you saying yes to?
6    A. To the question that you asked me. Do I
7 believe that this affected me? Did you not ask that
8 question --
9    Q. I --
10    A. -- or I did make up that question?
11    Q. I don't think I did.
12    A. Okay.
13    Q. But --
14    A. Well, if you wanted to ask that question,
15 that was my answer.
16    Q. Okay. I'm not sure if I asked it exactly
17 this way, but my question was simply, do you have any
18 facts or is there any evidence or information in your
19 possession showing to you that Ms. Crumpton-Young
20 knew of the complaint before it was filed with the
21 EthicsPoint hotline?
22    A. I need to see the EthicsPoint hotline. I
23 requested it, and I have nothing.
24    Q. Okay.
25    A. So there was nothing presented to me from

205

1 the ethics hotline, no.
2    Q. All right.
3    MR. KEENEY: Well, thank you, again. I
4 am finished with my questions, then. And Ms. Young,
5 thank you. I hope you have a great afternoon.
6    THE WITNESS: Thank you. Likewise.
7 Thank you so much.
8    MS. MARSAW: Thank you, everyone.
9    THE WITNESS: Thank you.
10    THE REPORTER: Hang on just a second.
11 I'm sure -- do we want to do read and sign?
12    MS. MARSAW: Yes.
13    THE REPORTER: Okay. And do you -- do
14 you want a copy of the transcript, Ms. Marsaw?
15    MS. MARSAW: Yes.
16    THE REPORTER: Okay. That is it, and we
17 will go off the record at 4:12.
18    (Deposition concluded at 4:12 p.m.)
19
20
21
22
23
24
25

206

1        CHANGES AND SIGNATURE
2  WITNESS NAME:  MARY YOUNG
3  DATE OF DEPOSITION:  FEBRUARY 25, 2025
4  PAGE      LINE      CHANGE       REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

207

1          I, MARY YOUNG, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5          _____
                      MARY YOUNG
6
7  THE STATE OF _____ )
8  COUNTY OF _____ )
9          Before me, _____, on this day
10 personally appeared MARY YOUNG, known to me (or
11 proved to me under oath or through _____)
12 (description of identity card or other document) to
13 be the person whose name is subscribed to the
14 foregoing instrument and acknowledged to me that he
15 executed the same for the purposes and consideration
16 therein expressed.
17
18          Given under my hand and seal of office, this
19 _____ day of _____, _____.
20 _____
                 NOTARY PUBLIC IN AND FOR
21
22              THE STATE OF _____
23 My commission expires: _____
24 _____ No Changes Made _____ Amendment Sheet(s) Attached
25

208

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                  HOUSTON DIVISION
3
   MARY YOUNG,              )
4                           )
         Plaintiff,  )
5                           )
   VS.                      ) CIVIL ACTION
6                           )
   TEXAS SOUTHERN UNIVERSITY,   ) NO.: 4:23-cv-03888
7                           )
         Defendant.   )
8
9
         REPORTER'S CERTIFICATION OF THE ORAL
10          DEPOSITION OF MARY YOUNG,
               FEBRUARY 25, 2025
11
12       I, Vanessa J. Theisen, a Certified
13 Shorthand Reporter in and for the State of Texas,
14 hereby certify to the following:
15
16       That the witness, MARY YOUNG, was duly
17 sworn by the officer and that the transcript of the
18 oral deposition is a true record of the testimony
19 given by the witness;
20
21       That the original deposition was delivered
22 Mr. Joseph Kenney.
23
24       That a copy of this certificate was served
25 on all parties and/or the witness shown herein on

209

1  March 12, 2025.
2
3          I further certify that pursuant to FRCP
4  Rule 30(3) that the signature of the deponent:
5
6          _XX_ was requested by the deponent or a
7  party before the completion of the deposition and
8  that the signature is to be before any notary public
9  and returned within 30 days from date of receipt of
10 the transcript.
11
12          If returned, the attached Changes and
13 Signature Page contains any changes and the reasons
14 therefore:
15
16          _____ was not requested by the deponent or
17 a party before the completion of the deposition.
18
19          I further certify that I am neither
20 counsel for, related to, nor employed by any of the
21 parties or attorneys in the action in which this
22 proceeding was taken, and further that I am not
23 financially or otherwise interested in the outcome of
24 the action.
25          Certified to by me on this, the 12th day

210

1  of March, 2025.
2
3
4
5
6
7
8  _____
         VANESSA J. THEISEN, Texas CSR, RPR
9        Texas Cert No. 3238
         Expiration Date:  10/31/25
10       Integrity Legal Support Solutions
         Firm Registration No. 528
11       9901 Brodie Ln., Ste. 160-400
         Austin, Texas 78748
12       (512) 320-8690
         www.integritylegal.support
13
14
15
16
17
18
19
20
21
22
23
24
25

## Numbers

**105** 198:12
**10:00** 38:16,25
**10:55** 43:8,9
**11:00** 43:3,5 69:21,
    22 70:1,4,5,6
    71:24 72:3,5,6,15
    73:4 112:2
**11:02** 43:9,11
**11:49** 194:23
**12:00** 83:15,16
**12:01** 85:6,7
**12:31** 85:2
**12:32** 85:2
**12:33** 85:7,8
**13th** 69:22,23 72:14
    73:5
**14th** 69:24 70:2,5
    72:14 73:5 183:1,
    11
**150** 147:10
**1:32** 124:15,16
**1:42** 124:13
**1:43** 124:16,18
**1st** 8:20 10:5,11,22
    25:12 30:24 34:6
    36:20 140:15 177:4,
    12 182:22,25
    183:10
**2017** 44:8 75:14 76:9
    83:24,25 84:17
    133:17 148:1
    151:19 173:12
    197:17 202:23
**2020** 52:7,8,17
**2021** 86:23 86:23
    87:5,7 90:3 96:24
    197:19
**2022** 8:20 10:22 15:3,
    6,9,12,14 17:11,24
    18:7 19:18 20:6,9,
    20 21:20,25 23:14,
    18,21 25:3 26:19
    27:3 30:25 34:6,19,
    23 35:12 36:6 45:2,
    4,7,15 50:19 51:1,
    2,4,8,11,16 59:5,9,
    14 62:23,25 63:10

64:5 67:1,5 68:2
69:22,23 70:5
81:23 84:18 86:22
134:9 135:22
136:18 137:16
177:4 197:19,20
202:19
**2023** 23:23 24:6,8,15,
    25 26:21,22,25
    28:4,5 30:7 34:23
    35:16 36:1 48:13,
    14,16 50:24 55:1
    139:25 168:6 169:6
**2024** 24:5
**2025** 134:12
**20s** 204:3
**24-hour** 155:11
    156:21
**28th** 11:7
**2:13** 143:6,7
**2:21** 143:7,9
**2:55** 164:17,18
**2nd** 15:3,6 25:13
    36:20
**30th** 11:7
**3:00** 38:25 69:21
    70:1 71:23 72:14
    73:4 164:14,18,20
**3:09** 170:16
**3:15** 170:15,16
**3:49** 194:24
**3:57** 194:24
**4:12** 205:17,18
**4th** 59:8,9,14
**5,000** 174:6
**5:00** 38:16,23
**5th** 15:17
**614** 139:17
**6th** 67:1,5 68:2
**7:00** 69:23 70:5,6
    72:3
**7th** 183:19
**8:00** 111:24,25
**911** 97:10 105:18
    155:18 156:1
**9th** 15:18 28:3,5
    30:7 35:25 184:9,
    16 186:2

## $

**$25** 41:15,19 42:1,18,
    20,21,24 53:8,17
    54:2
**$40** 40:11 42:2
**$50** 40:11
**$60** 40:11

## A

**a.m** 38:25 43:9 43:9
    69:23 70:5 70:5,6
    72:3 111:24,25
**ability** 32:21 33:11
    146:8 147:18 148:7
    171:8,16 190:11
**able** 6:21 8:12,15
    13:16 14:5,7,17
    27:11,15 34:15
    43:16 139:15
    150:22 151:9
    171:17
**absolutely** 20:23,25
    55:13 75:3 91:24
    117:6 194:19
**abundance** 173:1
**academia** 171:12,21
    175:15,17,20
    188:23
**academic** 175:1
**academy** 147:7,8
    171:14 172:2
**accept** 148:17 203:23
**accepted** 119:8
**accepts** 110:16
**access** 32:3,5,8,11,
    17,20,22 33:3,8,11
    34:12 185:16 187:6,
    12
**accessing** 186:11,22
**accidentally** 92:17
**Accommodation**
    174:10
**accompanied** 200:5
**accomplish** 198:1
**according** 19:8 47:11
    98:17 139:24
**accountability**
    203:9
**accountable** 172:9

accurate 30:2 52:15
  55:11 57:23 69:1
  101:22 173:4
accused 179:10
acquired 121:9
acrimony 29:21 30:4
acronyms 159:2
acting 44:3,5,15,18
  49:3 50:13 52:25
  53:3,7 57:16
  117:22 158:3
action 180:22
actions 29:22 88:17,
  18 89:21 95:7,21
  120:14 193:15
  194:2
actual 44:16 59:15
  118:1 182:13
actually 47:6 75:1
  100:13 102:23
  111:18 136:9
  137:10 144:1 153:2
  174:4
add 56:18,21 57:19
  83:17
added 111:21
additional 49:17
  50:4 53:17,22 54:2
  58:17,24
address 128:2,9
addressed 117:24
  146:22
adjourned 63:3
adjustments 112:3
admin 78:22
administered 10:15
administrative 9:2,6,
  7,10,12,13 10:13
  11:13,18 15:23
  30:24 31:2,21
  33:15,22,23 35:7,9
  36:19 79:5 140:15,
  18 176:12 181:8
administrator 77:8
  122:8 154:11
admiration 144:22
admitted 163:4
adults 141:13
advantage 132:9
  141:11,17,19

142:14,17 162:11
adverse 178:6 180:22
advice 90:23 96:21
  112:24 112:24
  113:11,12,17,20,21
advise 96:10
advised 46:1 57:15
affect 40:16
affected 204:7
affidavit 31:5 66:20
  160:8
affirmative 22:5
afforded 139:15,18
  152:2 169:1,4
after 22:17 31:20
  33:14,21 34:4,5
  46:1 48:12 51:16
  62:22,25 63:9,18,
  21 64:4,9,14 70:25
  71:2,6,8 73:14
  82:24 83:2 83:2,4
  84:23 86:16 90:2
  118:8 119:11 125:6
  135:16 136:17,19
  137:19 140:14,15
  154:4 155:8,10
  157:7 163:12 187:3
afternoon 205:5
afterwards 63:24
  98:16
Again 15:21 18:8,12,
  24 27:5 39:14 40:2
  48:9 49:18 50:22
  51:13 66:2,8,12
  71:7 73:18 77:9
  86:19 88:10 90:18
  96:8 97:8,13
  100:17 108:10
  109:25 113:3
  118:19 120:4,16
  121:9 122:9 125:25
  128:15,22 129:17
  130:16 133:24
  134:19 140:1
  143:10 146:15
  147:16,23 152:15
  160:5 162:1 167:20
  169:22 170:18
  173:9 179:7 194:25
  197:5 201:14 205:3

against 5:21 12:23
  88:4 135:11 150:10
  161:24 178:25
  180:22 181:6 192:8
agencies 98:14 152:4
  167:16 200:2
agency 92:21 93:4,9,
  18 151:21 152:1
  172:25 191:7
ago 167:24
agree 6:7 9:11 11:17
  28:6 31:1 39:17
  47:25 48:1 50:7
  52:9 79:2
agreed 93:2
ahead 51:22 52:20
  68:18 76:22 136:3
air 120:7
alarm 181:3
alcohol 154:18,19
alive 157:22
allegations 12:24
  12:24 135:14
alleged 179:10
allegedly 161:5
alleviate 112:11
allow 58:16 92:20
  111:1 147:23 154:7
  181:14 194:6
allowed 33:3 56:24
  58:20 169:13,17
  182:4 203:11
almost 83:15 198:8
alone 118:20
along 41:3 55:7 58:6
  112:6 171:7 177:19
already 37:12,14
  40:5,6 70:14 74:21
  84:1 88:24 91:3
  108:5 128:3 157:3
  163:24 173:10
  179:20 202:2,3
also 6:7 70:13 76:17
  78:10 79:6 91:18
  104:25 120:11
  145:2 156:17
  159:21 168:13,15,
  16 173:1
alteration 104:20
although 79:7 167:4

alumni 144:20
always 17:19 24:21,
    24 63:2 64:16
    74:16 123:10
    123:10 133:15
    138:16 149:12,18
    156:22 172:1
    200:13
amount 41:17
amounts 83:25 84:1
and/or 82:6,8 185:17
Android 157:13
Angelle 81:12
angry 154:6 162:12
anniversary 119:7
announcement 18:5
announcements 17:21,
    24 18:3
anonymous 50:25
    120:8,10 134:8,10
    155:3 179:5,6
    194:10 195:14
    196:2,3,8,10,14
    201:22,25 202:1,9
    203:2
anonymously 134:5
another 9:20,25 13:5
    27:4 48:25 52:1
    66:2 92:9,12,18,25
    100:3 109:15
    124:22 145:8
    152:19 158:7 170:1
    185:2 203:12
answer 13:3 22:4
    58:12 61:16 64:15
    70:18 91:3 95:23
    102:25 108:19
    112:13 113:2
    115:15 134:23
    135:4 142:25
    143:17,20 168:1
    169:19 180:3
    190:19 195:15
    196:9 204:15
answered 22:5,21
    51:6 113:1 190:21
answering 72:18
    165:1,12
answers 58:7 88:24
    117:2 201:12,13

anybody 120:25
anyone 12:17,23
    33:20 34:2 49:2
    54:15 63:1 90:15
    127:11 127:11,20
    137:22 155:14
    157:23 161:23
    168:22 188:15
anything 7:2 27:14
    42:11 66:10,17
    72:4,5 86:16 95:11
    106:2,21,22 107:22
    117:15 118:19
    120:5,6,16 125:22
    130:16 133:21
    136:25 137:19
    141:21,22,25
    146:19 150:18
    157:5,23 169:4
    170:11 171:25
    179:6,15 187:25
    195:6 196:10
    197:18 202:10,12
    203:17
anytime 187:10
anyway 162:20
anywhere 168:2 170:2,
    6
Apart 7:1 36:22
    53:15 87:23 88:14
    89:16 105:9 108:4
    165:9 168:8
apologies 165:4
    185:4
apologize 13:14
    122:9 203:25
apparently 121:13
    157:15 164:1 202:1
appeared 129:25
    196:17
appears 8:25 43:25
    68:21
Appendix 68:19 81:3
applications 166:22
applied 167:6,14,15,
    17 168:2,9 200:2
apply 167:1 199:23
applying 168:8
appointed 146:4
    173:9

appreciated 150:13
approach 132:23
approached 94:1
    99:18 132:22
appropriate 120:14
    156:5
approval 56:17,20
    73:14,18 83:2
    94:24
approved 68:25 69:4
    73:9,10,12,12
    74:21 75:2 76:2
    84:9 95:5 96:7,11,
    13
approximate 99:1,14
    100:24 101:2
approximately 43:3
    103:21 117:20
April 196:13
area 78:17 144:16
    200:11
around 8:20 28:4
    30:13,16 63:2 67:4
    68:2 90:8,10,11,17
    157:23 162:19
    174:15,16
array 145:7,24 189:2,
    5
arrived 87:6
arriving 8:8
Ashlee 77:13
aside 53:19 89:19
    91:19 97:5
ask 7:15,18,20 26:20
    30:3 60:5 61:1,9,
    11 69:18 88:21,23
    91:2,9,11,22 92:5
    94:7 96:20 98:1
    103:4,11 106:8
    107:25 108:13
    110:12 124:24
    132:23 133:11
    183:13 185:22
    190:25 192:11,16
    204:7,14
asked 34:21 45:22
    51:1 59:6,22,22
    60:3,12,24 61:8,22
    62:3 90:22 91:4
    93:8 98:25 103:19,

20 104:13 105:11,
23 106:5,10,17
107:11,12 108:5,7,
24 109:20 110:25
112:6,25 118:12
119:11 120:1,4
131:2 135:18,24
138:18 142:7,10
169:2 171:5 177:5,
6,16,17 180:6
183:21 188:15
189:20 190:14
192:6 195:2 196:17,
18,20 197:1 201:3,
7 204:6,16
**asking** 5:17 12:3
15:5,22,24 16:7
18:2,9,14,17,20
19:7 21:18 23:1
34:2 58:5 59:21
60:21 61:10,11
62:2 63:20 64:1,2,
11 65:2 71:15,16
72:23 77:1 78:22
89:8 101:9 102:2,
23 106:20,25 107:4
113:10,21 114:2,4
123:2 132:12,18
159:16 165:2
177:13 178:15,17,
19,23 179:15 180:4
200:11
**assaults** 107:25
**assigned** 21:1 79:8,
11 123:4 138:17
**assignment** 48:3 49:1
121:20 121:20
122:25 123:2 124:2
**assignments** 153:22
**assist** 125:7
**assistance** 155:8
**assistant** 77:7 91:24
94:10 103:15
109:18,24 123:17
137:20,23 138:1
141:3 158:20,21,22,
23,24 159:6,8,10,
12 191:4,6,23
**assistants** 159:14,16
**assisted** 81:16

**assisting** 52:18
**associated** 200:15
**assume** 17:7 20:18
70:3 76:5
**assuming** 19:20
156:14 162:12
**assure** 116:13 144:6
**asterisk** 84:8
**athletes** 166:17
**attach** 81:25 82:5
**attached** 75:14 76:6
**attachment** 76:5
**attachments** 83:6
**attempt** 12:16 34:13,
14
**attempted** 138:3
**attempting** 161:4
**attend** 19:17 23:18,
20 147:6,11
**attended** 147:13
**attending** 12:7
**attention** 29:20
48:12 95:18 129:6,
7 130:6,8
**attorney** 25:4,17,19,
24 26:1,2,6,15,21
31:13 43:21 48:11
177:11,14 182:10,
15 186:25
**attorneys** 7:2
**attorney's** 92:20,23
93:2,10,12
**attributes** 148:9
**audit** 44:4,5,11,16,
18 50:13
**auditor** 44:22 46:13
**August** 45:25 46:1,20,
21,23 47:2,6 62:12,
15,16,17 135:16,17,
19,22 136:17,18,20
137:16 139:11
173:13 201:18
202:12,13
**August-something**
139:4
**Austin** 123:23
**authority** 88:19,20
89:1 112:10 131:17,
25 132:1 140:11
141:17,20 142:15,

16,21 151:4,6
162:17,20 197:20,
23 199:9
**authorize** 49:16 50:8
53:16 54:2 58:23
66:11,16,24
**authorized** 48:4
53:22 66:1,3 72:12,
21,23 73:1,7,25
**automatically**
194:16
**available** 111:14
112:4,5 184:12
200:1
**award** 198:16
**awarded** 198:11
**aware** 6:20 30:12
33:3,19 39:12
44:10 56:3 57:12
70:9 91:21 96:19
97:15,21 98:25
99:10,11,24 101:5,
10,12,13 102:6
102:6,7,24 103:2,
10,16 105:10 108:7,
22 121:13 124:21
126:4,13 127:10
128:3 137:4 161:22
201:4 202:18
**awesome** 110:6

---

**B**

**babysit** 149:21
149:21
**bachelor's** 171:23
175:2
**back** 33:1,3 43:4,10
45:22 51:8 60:15
62:25 63:1,5,8
69:25 83:4,23
84:23 85:8 107:21
114:13 117:9 123:6,
22 124:12,17
133:16 137:25
138:15 140:4 143:3,
8 144:9 147:25
149:10 153:21
164:14,19,25
167:12 170:12,15

176:12 181:14,21
182:19 186:2 187:6,
19 193:24 194:18
195:11 196:15,16
201:13 204:2
**backing** 186:1
**bad** 174:2 185:21
**badge** 20:14,16 23:5
32:8,10,13,14,17
**Baltimore** 159:5
**barbecue** 24:16,22
166:12
**Barnett** 50:1 91:25
91:25 96:2 103:9
104:10,11,12,14,15,
17,19 105:8,16,19
106:3 107:9,11,25
115:11,13,17 116:2
117:13,21 118:7
119:20,24,24 120:2,
12,17,18 121:8,15,
22 122:12 123:7,13
124:21 125:2,3,6
126:2,14,20 127:7,
17,22 128:11,19
141:4,9,12,19,22
142:11 152:23
154:2,17 155:4
156:3,13,16,17
157:2,6,8 158:12
159:16,22 160:4,9,
12,24 161:5,23
162:1,3,8,8,14,21
163:4,9,21 164:1,3,
6 176:7 194:11
195:15 196:6 198:2
201:22 202:2
**Barnett's** 105:12,23
106:18 108:6 122:5
**based** 15:22,24 58:3
91:2 93:13,14 95:6
102:19 104:23
113:17 143:19
176:6 194:5 198:12
**basic** 5:15 24:20
**basketball** 19:21
20:2 37:22,24 38:3
116:5 120:18
122:18
**bear** 5:16 75:8

**beauty** 116:20
**became** 133:21 147:13
162:11,16
**become** 103:16 171:6
172:5,6 188:24
**becoming** 37:13 117:8,
25 128:5 130:2
153:11
**bed** 153:10,15
**before** 4:21 14:21
19:13 43:20 44:7
70:25 71:2,6,8
72:4,6,19 86:1,8
87:14 112:1 113:6
124:19,24,24
125:20 133:9
134:16,24 161:23
163:13 193:12
196:2,7 201:5,9,22,
22 202:7,18,19
204:20
**begin** 161:6
**behalf** 109:10
**behavior** 118:3
128:18 129:7,20
131:2,16,24 153:10
174:2 199:4,10
**behaviors** 130:15
**behind** 64:16
**being** 5:20 11:19,23
12:4 14:5 66:16
86:18 94:12 126:1
128:15,17 131:6,18,
22 132:25 133:12
142:15 143:25
146:4,22 147:15
152:6 166:5 175:22
176:2 177:18,19
179:10,18,19
186:17 190:7 192:7
203:5,13
**belief** 87:24
**believe** 8:22 9:15
11:5 23:8 25:8,19
26:18 27:3 28:4
31:16 35:16,25
36:18 47:19,20
50:16 59:10 72:2
81:8 96:19 97:17
112:9 117:12 120:3

125:6 131:17 135:8
141:8,10,16 142:14,
20 146:20 148:20,
21,22,22,23 150:11
152:2 153:9 155:16
160:14 166:23
170:8 171:4 197:24,
25 198:1,3 201:21
203:4 204:7
**believed** 131:17
143:14 162:10
**believes** 156:6
**believing** 51:5
**belonged** 177:18
**belongings** 169:2,3
**Bend** 167:9
**benefit** 178:3
**benefits** 141:25
164:24 165:8 169:4
203:13
**Benjamin** 13:12
**best** 7:21 29:24
31:15,17 40:7,10
64:2,3 92:19
100:24 146:13
**better** 75:20 119:13,
15 121:11 132:3
148:22
**between** 40:14 42:4,9
72:14 121:8 176:9
176:9 177:14
182:14 187:3
**Bill** 172:18 173:14
**bi-monthly** 48:6
**birthday** 126:16,18,
19,21
**bit** 113:9 144:2
175:17 176:13
177:1
**black** 165:23
**Blackwood** 172:18
173:14
**blemish** 146:4 174:1
**blemishes** 174:20
**blindsided** 134:20
**block** 31:21
**blocked** 32:3
**board** 46:1,12 98:5
119:22 127:16,21
128:8,10,21,23

129:5,13 130:6
131:9,12,21,22
132:20,22,23 133:3,
5,24 134:2,3
135:16,17,22
136:19,20,22
137:14,17 138:7,17
139:1,11 144:1
154:19
**boards** 132:19
**Bobby** 56:11 140:20,
22,24,25 141:4
**bogus** 135:3
**bomb** 145:14
**borders** 144:16
**boring** 149:20 149:20
**both** 73:4 77:19 99:9,
11,12 178:11 191:5
201:11,13
**bothered** 88:12
**bottle** 127:7,11
**bottom** 176:1 184:10
**bought** 154:17,19
**break** 16:21 124:7
164:13 170:10
183:22 183:22,24,
25 194:20
**breaks** 43:3
**Bridges** 49:25
**Brief** 195:3
**bring** 95:17 130:8
145:20 152:8
**bringing** 129:5
**broke** 114:10
**broken** 87:1
**brought** 48:11 128:22
129:6 159:4
**Broussard** 76:11,13
80:21,23 82:11
**Brown** 43:25 44:2,11,
14,15,17,23 45:1,3,
5,15,17,21 46:9,19
47:3 48:19 50:2
56:12,14,15 59:16
60:5,16,18,22 61:1,
18 62:6,13,15
66:13 68:20 91:25
94:11,15 103:13,15
109:18 110:5,7,13
120:9 123:17,18

135:9 139:2,14
140:20,22,24,25
141:4,5 187:16,21
188:3
**Brown's** 45:10
**Budget** 82:6,8,19,22
83:3,9 145:5
**building** 78:18,23
**buildings** 31:22 32:4,
9,11,18,22
**business** 77:8 120:20
122:7,20 154:10

---

C

---

**Cake** 127:5,6
**calendar** 15:16 16:22
**call** 33:2 46:15,16
90:25 91:11 94:6
97:10 99:9 122:7
125:15 125:15
138:25 155:17,18
156:1,2,2,5 157:6
179:13 182:2
189:23 190:3,10
196:11 201:23,24
**called** 61:7,24 65:25
90:14 91:8,13,22
92:3,5,9,12,13
93:25 96:20 97:12,
15,22,25 98:16
99:11,23,25 100:4,
9,11,13,25 101:16
103:3,7,8,11,17,20
105:19 115:20
118:9,10 136:1,4,
13 155:5,22 156:1,
3,6,10,15,22,23,24,
25 157:1,2,9
158:18
**calls** 96:23 97:1,10,
11,11 161:15
180:23 182:1,3,7
**came** 10:20 15:13
16:17 31:19 44:18,
23 46:12 48:2
57:15 77:25 83:12
93:18 106:4 121:10
122:6 128:8 129:17
131:12 146:1

147:25 151:19,20,
24 154:18 173:11,
19 196:4 198:17
**camera** 191:13
**cameras** 107:16
**campus** 11:19,24 12:4
15:2,5,8 25:4,18
26:7,25 27:2 31:8
36:5 37:21,25
40:25 41:7 89:22,
25 92:16 104:8
105:24 106:22,25
107:1,23 115:4
116:3 120:24
128:24 131:7 132:8
136:9 137:25
138:15 142:19
144:14,17,19,20,22,
23 146:7,11 149:17,
19,25 161:7,9
170:5 177:19 193:6
198:8
**Can** 4:7,23 5:25 6:3,
10 7:6,19 8:23
13:3,12,14 14:5,8,
10,11,19 17:25
25:11,12 27:5,7,7,
8,9 28:8,20 29:15
30:21 37:10 38:6
40:18 42:3 43:17,
23 45:11,22 48:5
57:1,19 58:2 60:15
63:4 68:18 70:18
71:1,7,10,20,20
72:19 74:23 79:6,8
82:15,16 83:17
83:17,23 94:10,13
96:17,23 98:4,20,
21,22 101:18
102:13,22,25 103:6,
21 105:16,21
112:10,13 113:2,17
114:10,15 121:4
124:6 129:3 131:11,
15 132:4 135:2,21
137:8,24 140:3
143:3 146:7,24
149:1,10 150:8,11
151:15 157:15
170:11,12 171:9

176:20 179:23
181:2 183:9 184:15
185:3 187:18
189:25 191:10
192:21 194:14,17,
19 195:2,7,19
198:5
**cannot** 116:11 172:22
184:18
**can't** 6:1 42:25
47:22 53:12 64:7,
15 69:5 75:19 80:5
97:3,8 122:8
139:12 149:14
159:12 195:5 204:2
**capacity** 42:10 68:24
190:12 196:19
**captain** 55:21 55:21
95:9,10,13,14,25
96:3,4 156:24
176:4,8
**car** 158:4,6
**card** 31:21 32:8,10,
14,20,22 154:20
185:16 187:7
**cards** 185:17
**care** 109:22 118:15,
17 148:6
**career** 146:9 167:5
174:5,25
**carried** 178:13
**carries** 69:24
**carrying** 204:1
**cart** 36:5,7 104:7
**case** 5:18 6:13 92:21
93:9,10,13 100:6
145:3
**cases** 5:6
**caught** 130:5 154:23
**caused** 29:22
**causing** 30:3
**caution** 79:4
**cease** 29:23 30:3,7
**center** 145:18
**certain** 10:3 16:4
18:4 20:4 20:4,15,
17,22 38:18 46:7
63:13 66:15 73:11
82:16 87:7 90:8
92:6 99:6 106:21

111:6,11,13 112:14
115:15 116:9,17
118:4 120:21
122:16,18,20
144:24 145:22
146:21 150:3
152:17 153:11
160:7 190:2 199:18,
21
**Certainly** 116:19
**certificate** 175:5
**certified** 41:21,24
42:1,5,6,11,21,22
44:17,20 147:14
**chain** 39:9 49:20
69:2 74:20 80:21
**chair** 191:12
**chairman** 98:5,6,18
133:3
**chairman's** 98:18
**challenge** 151:6
**challenged** 151:4
151:4 199:9
**chances** 151:18,25
**Chandra** 51:24 51:24,
25
**change** 34:9 150:9
152:14
**changed** 19:14 34:11
122:4
**changes** 122:11
**channels** 172:3
**Charla** 44:21
**chat** 8:6 10:6,12
12:5 36:19 184:13
**checking** 29:7
**chief** 9:14,17 20:15
21:1 35:5 37:7,13
44:3,5,15,16,18
45:17 47:14 48:4
49:24 50:9,13
52:23 53:11 55:22
56:11,13,15,16
57:7,11,14,14
58:20 59:3,6 60:3
62:22 66:1 67:1
68:24 77:7 85:16
86:8,9,10,12 87:14
89:2,3 91:15,20,24
92:12 92:12,14

93:8,11,11,16,17
94:2 94:2,7,11,17,
20 95:20,21,22,23
97:6,13,18,24,25
98:7,8,19 99:1,21
100:9,19,22 101:19
102:9,10 103:15
107:6 109:18,24
110:5,7,13 112:11
113:6,13,14 114:25
117:18 118:14
123:17 129:18,22
131:7,18 137:3,5,
20,23 138:1 140:16,
21 141:3 144:10,12,
13,15 145:7,10,25
146:5,14 147:4,5,
12 148:4,18 151:9,
13 152:11 156:10,
25 157:9 159:8
167:1,18,23 168:8
171:6 172:7,20,22
173:8,9,13 174:18,
19 176:2,4,5,8
185:10,18,23
186:20 188:24
189:3,16,17 190:16
191:3,4,4,5,6,23,
23 193:12,14 194:1
195:23 197:22
198:11,18,19 199:4
**chiefs** 87:15,17
88:22 88:22 89:13,
14 91:1,9,11,13
92:2 101:24 113:7
114:24 132:2 147:9
165:24 174:17
190:3 193:10,11
**chief's** 97:2 174:9
**child** 149:21 203:15
**children** 105:14
**Christina** 122:8
159:11
**Christmas** 16:20,21,
25 126:18,19,21
183:21
**circle** 165:24
**City** 8:3 88:23
105:20 111:11
146:3 155:17

155:17 167:16
174:16
**clarification** 5:24
47:1
**clarify** 48:9 83:11
190:2 200:22
**clarity** 83:19
**clear** 5:24 6:9 10:4
46:7 70:14 123:7,
12 134:22 136:17
153:9 195:24
**clearly** 5:25 90:11
92:14 155:22 158:2
**clears** 202:17
**close** 43:2
**clothing** 24:3,13,14
104:21,24
**coach** 120:18
**code** 32:20 39:5,12,
14,15,16,18,18,19,
21 52:24 53:3 54:7,
11,13,14,16,18,20,
21,23 55:2 55:2,4
65:25 66:1,3,11,11,
17,17,22,24 139:16,
18,19 163:19 179:9
**coerced** 198:3
**collaborative**
148:20 149:3 150:7
**collaboratively**
196:19 198:14
**colleagues** 203:19
**collective** 197:4
**Collectively** 198:13
**college** 144:13,14
146:7,11 149:17,19,
25 161:7,9,10,13
**come** 10:20 13:23
14:2,22 15:2,10,11
16:7,8,9 17:3,5,5
18:17 24:7 26:24
29:20 37:25 43:4
78:5 84:23 107:5,8
112:1,2 116:3
123:22 127:21
132:13,21 133:19
143:3 144:20 167:2
170:12 186:24
187:6 194:18
**comes** 74:12 147:15

159:20 179:9
**coming** 15:8 51:3
64:8 66:5 68:3
106:22 107:2,23
120:11 198:8,9
**command** 39:9 49:20
55:8,13 69:3 74:20
80:22 149:7 150:6
151:1,6
**commencement** 19:21
20:2,22 22:18
23:16 36:10,11
37:20,22 105:3
**comment** 86:5 185:19
**Commission** 42:14
**commitment** 28:19
**committed** 28:17
**committing** 179:11
**Common** 4:11 200:11
**communicate** 109:3,10,
16,20 110:13
**communicated** 30:24
**communications**
187:3
**community** 105:5
120:24 129:20
130:7 144:18 161:9
174:11
**compensate** 53:13
**compensated** 48:23
57:17
**compensation** 47:23
48:20 49:17,22
58:17,24
**compensatory** 49:10
**complain** 128:21
131:12
**complainant** 163:18
203:2,3
**complained** 127:25
130:14
**complaining** 127:21
128:11,12
**complaint** 13:1 50:25
120:8,11 125:20
134:5,8,11,14,16,
24 135:3,4,7,11,14,
15 136:7,14,25
137:1,4 155:3
161:23 162:2

163:10,12,13,16,17,
23 179:5,6 194:10
195:14 196:2,4,8,
10,14 201:5,9,14,
15,18,19,21,22,25
202:1,7,9,12,18
204:20
**complaints** 128:8,16
129:20
**completed** 175:6
**completely** 6:16,21
33:24 45:24 192:2
**compliance** 186:10
**comprehensive** 68:5
**comprised** 111:20
**computer** 31:24 32:6
33:7,8,11 181:1,2,
4 185:16 186:11,22
187:6 194:15,16
**computers** 36:24
**con** 132:5
**concern** 144:21
**concerning** 5:18
12:17
**concerns** 95:16
**concluded** 44:1
205:18
**conclusion** 180:24
182:2,4,8
**concrete** 118:19
**conducive** 58:8
199:24 199:24
**conduct** 44:11 116:11
125:3 127:25
129:23 131:13
132:6 174:17
**confidence** 30:20
**confirm** 5:19 14:20
45:11 66:21 100:11
137:21 200:22
**confirmation** 137:23
**confirmed** 45:14
**conflict** 171:17
**confront** 115:12
**confused** 32:3 83:11
113:22 114:3
**confusingly** 58:22
**confusion** 29:21 30:4
**conjunction** 168:15
**connecting** 148:23

**connection** 5:7,20
**consenting** 141:13
**considered** 37:23
    159:7 175:13
**consistently** 116:1
**Constable** 167:8
**constant** 130:19
**constantly** 133:20
    199:9 203:15
**constitutes** 37:17
**consultant** 165:11
    166:16
**consulting** 165:14
    166:10
**contact** 12:17 94:1
    100:12,15 104:6
    105:18 135:18
    137:24 138:2,3
    169:6
**contacted** 93:7,24
    99:13 100:16 101:7,
    19 102:9 105:15
**contacting** 99:20,21
**contemplated** 30:10,
    13,16
**content** 180:15
**context** 87:19,21
    111:4
**continue** 29:14,16
    30:21
**continued** 21:24 22:6
**continuity** 146:20
**continuous** 94:8,9,9
    163:15
**contributing** 30:21
**control** 78:23 150:25
    197:3
**Convention** 41:1
**conversation** 26:10
    50:23 51:3 59:17,
    25 60:9 62:17 86:3,
    21 87:4 87:4 94:9
    95:11 97:2 100:14
    110:1,2 112:12
    115:19 117:11,23
    118:7 124:20,25,25
    125:1,5,11,13,19
    126:2 133:2,4,5
    138:1 139:21
    142:12,13 163:21

182:14 189:19,22
    192:18 193:4 196:5,
    7
**conversations** 121:2,
    3 125:12 133:8,10
    192:23
**cook-off** 24:16,22
    166:13
**cool** 38:5
**coordinate** 185:14
**coordinating** 165:13
**coordination** 185:24
**coordinator** 24:17
    77:6 166:12
**coordinator's**
    166:13
**copies** 36:13,22
**copy** 81:4,25 82:5
    153:5 160:18
    205:14
**cordially** 17:12
**corporal** 176:3
**correct** 5:21 6:18
    10:1,21 27:14 28:7
    42:16 45:7 47:12,
    13 48:17 50:8,11
    52:14 53:25 55:14
    61:17 67:7 69:16,
    17 90:24 129:7
    131:2,23 152:13
    180:8,11 182:6,22
    183:2,25 184:1
    188:20 189:6
    191:16
**correctly** 42:17
    53:24 57:6 79:3
    115:16 201:6,12
**corresponding**
    201:12
**corroborated** 150:3
**costs** 95:15
**could** 6:13 7:15 13:7
    16:9 18:5 37:1,19,
    19 40:11,14 43:15
    57:9,16 60:5 61:1,
    10,11,23 62:3
    64:14,22 65:10
    70:10 71:13,15,25
    72:6 83:11 87:8
    97:22 100:23

101:11,12,20
    106:21 110:1,2
    111:1 112:2,11
    118:25 119:9,11
    123:24,25 126:24
    127:18 131:23
    142:7 148:17 149:6
    155:22,23 156:22,
    23,24,25,25 157:5
    160:7 162:21
    175:25 178:7
    184:10
**couldn't** 28:6 125:14
    161:6,10 167:12
**counsel** 31:7,12 33:2
    185:11,14 186:25
    187:4 187:4,10
**count** 101:12,14
**counteracted** 162:24
**counterparts** 88:21
    91:1
**country** 173:23
**County** 167:9,10,11
**couple** 33:6 72:9
    115:2 116:7 122:9
**course** 17:14,15
    104:23 122:16
    147:2 151:15
    171:12,25 186:18
**courses** 173:4,12
**court** 5:11 6:8,17
    10:17,18,20 36:23,
    24 181:19 182:7,11
    199:16
**cover** 47:17,20
**covering** 48:3,20,23
    49:2
**cover-up** 163:23
**coworkers** 203:19
**create** 39:15,18
    52:24 53:2 160:3
    161:4 187:18
**creation** 28:19
**credentialing**
    188:23
**credentials** 148:4
**credit** 174:23,24,24
    185:17
**crime** 153:16 157:24
**Crisis** 174:7

**crucial** 98:3,24
  189:20,24,25 190:4,
  6,12,17
**Crumpton-Young**
  85:10,12,15,18
  94:6,22 95:3 96:5,
  9,19 99:9 103:3,6,
  11 104:12 105:11
  107:12 108:7,23
  109:3,11,16 110:3,
  14 112:22 114:6,19
  115:14,18 117:14
  121:8 123:15
  125:20 126:10
  129:16 133:1,21
  134:16,24 135:14,
  17 136:16,24 140:9
  141:9,10,19 143:14
  151:5 156:14 162:4
  164:4 169:12,17
  189:23 190:10
  192:7,14,18,22,24
  193:7 194:9 195:13
  196:1 198:17 201:4,
  8,17 202:18 204:19
**Crumpton-Young's**
  108:3 127:17,22
  158:20 159:15
  191:19
**currently** 6:24 7:24
  8:1 23:4 164:22
**customary** 171:24

**D**

**daily** 47:24
**Dallas** 123:22
**damaged** 203:21
**damaging** 203:20
**Darlene** 43:25 44:2,
  14,15,17,23 45:1,3,
  5,10,15,17,21,23
  46:9,19 47:3 48:19
  59:11,16 60:5,16,
  18,22 61:1,18 62:6,
  13,15 68:20 120:9
  135:9 139:1,14
  187:16,21 188:3
**Darnett** 105:11
**Darren** 91:25 105:12

107:11 115:10,13
117:13,21 120:2
121:8,15,22 124:20
125:5 126:14,20
127:7,16,22 128:11
141:9,21 152:23
156:13,16 157:6
159:16 160:3,24
161:5,22 163:9
164:1,3,6
**DA's** 93:3
**date** 8:21 9:21 10:9
  25:15 28:3,7 34:17
  59:15 67:7 90:4
  135:20,21 139:3,4,
  11,25 140:4 163:25
  183:7
**dated** 196:15
**dating** 120:18
**daughter** 105:15,17,
  21 118:8 125:8,17
  156:7,10 157:4,21
**daughter's** 157:18
**day** 10:22,23 15:9,13
  25:9,17,25 26:2
  28:1,2 35:21 36:17,
  18 48:6 49:7,9,13,
  21,22 50:4 56:19
  57:2 69:24 70:7
  118:8 119:10
  138:10,25 148:11
  163:17 190:17
  197:21 203:14
**days** 15:21 17:3,4,6
  33:6 47:16 64:21
  65:12 72:16 119:10
  178:12 182:24
**day-to-day** 197:12
**dead** 157:22
**dealing** 105:13
  137:12 165:12
**dealt** 59:17
**death** 99:5
**deceased** 91:16
**December** 8:20 10:5,
  11,22 11:7 15:3,6,
  9,12,16,17 16:18,
  19,22 17:4,8,11,24
  18:7 19:18,25 20:6,
  9,20 21:20,25 22:7

23:14,18 25:3,5,12
26:19 27:3 30:24
34:6,18,23 35:12
36:6,20,21 105:3
134:9 140:15 177:4,
12 182:22,25 183:1,
10,11,16,19 184:3
186:20
**deciding** 77:23
**decision** 140:5,7,10
**decision-making**
  140:11
**deep** 118:16 153:21
**define** 37:10
**defined** 37:19
**definitely** 189:17
  199:11
**degree** 142:4,5,6
  160:12,16,25 161:7,
  8,13 171:23,24
  175:4
**delegate** 145:6
**delegated** 140:10
  146:19
**deliberately** 154:9
**delivers** 55:8
**Democratic** 41:1
**denied** 199:21
**denying** 66:5
**Department** 28:24
  29:9 52:3,4,5 77:8,
  16,17,20,20 78:6
  79:6,8,11,14 80:22
  81:14 82:14 91:14
  93:17 97:1,19
  98:10,21 100:13
  100:13 101:3 106:4,
  5,7,9 111:2,16,18
  117:10 118:1 119:1
  120:22 122:7
  126:15 128:6 129:1
  130:21,24 131:4,25
  133:9 145:3,4
  150:23 151:20,21
  155:8,11,14,18,21
  158:10 163:22
  165:7 167:9,13,16
  168:14 169:11
  171:7 173:11,19,20,
  21,22 174:3,13,22

175:6,21,23 199:1,
20 202:3
**departments** 79:15
166:22 167:18
173:23
**Department's** 83:1
93:8
**depends** 191:6
**depicted** 120:22
**deposition** 4:20,24
5:7,19 6:17 7:3,17
171:5 177:9 189:20
205:18
**depositions** 5:2
**depth** 59:25
**deputy** 55:21 56:11,
13,15 57:7,10,14
59:3 94:17,20
110:5,13 137:5
156:25 176:4,8
191:4,5,23
**describe** 8:23 28:8
43:23 125:5 159:3
201:11
**described** 157:19
**despite** 29:23
**detail** 103:25 106:13
108:4,17 111:20
117:24 118:24
119:5 121:16
122:23 124:2
128:13 129:15
131:14 132:24
133:12,13,15,19
153:8,22 162:10
**determine** 189:13
**development** 98:13
**dictated** 142:21
**dictates** 79:25
**difference** 42:4,8
**different** 40:18,19
45:24 56:1,7
111:14 113:19
141:2 145:7 148:8
149:25 167:6,15,17
175:21 178:17
183:13 185:22
192:11,16 197:9
199:19 200:2
**difficult** 92:15

169:19 198:4
**difficulty** 196:21
**diligence** 152:8
**dinner** 104:5
**direct** 12:15,16,21,
22 49:25 110:21
112:12
**directions** 198:25
**directives** 18:7
34:22
**directly** 95:20
112:23 113:10
156:5
**director** 112:8
**disagree** 11:24 28:6
48:18 52:10
**discovery** 7:9
**discriminated** 88:4
144:4 192:8
**discriminating**
143:19 192:15,19
193:2
**discrimination**
143:15,18,22
165:21
**discussed** 86:18
**discussing** 124:20
125:2 149:10
**disheartening** 168:6
**dishonesty** 74:9
**Dispatch** 62:19,21
65:23 66:13,25
96:23 155:22 156:2
**dispatched** 155:23
**display** 149:3
**displayed** 75:12
148:13
**displaying** 24:14
**disregard** 34:4
**dissension** 29:21
30:4
**distressed** 30:9
**district** 92:20,23
93:2,9,12
**disturb** 181:4
**division** 52:1 52:1
**divisiveness** 29:21
30:4
**doctoral** 171:25
**document** 8:17,19,24,

25 9:2,3 13:6,20,
22 14:2,21,22 27:4,
20,21 28:9,10
43:18,20,21,23
54:25 55:1,3 70:16
75:7,11,14 184:8,9,
10,11
**documents** 7:19 8:5
187:17,18,25
**Does** 40:15 40:15
71:12 96:4 107:5,8
144:11 145:7 148:3,
14 171:21
**doesn't** 13:23 14:2,
22 18:1 24:7 26:24
37:21 70:15 116:14
135:5 142:4 155:14
175:11
**doing** 30:7 49:1 63:4
98:21 103:25
104:22 115:24
116:15 117:5 118:3
129:2 129:2 130:1
133:12 138:18,19
142:11 143:15
144:7 152:7 153:10
169:22 174:15
181:3
**Doman** 159:6
**done** 19:13,14 95:11
150:13 156:14,16
165:14 170:5 198:6
203:17 203:17
**door** 20:17 27:22,23
28:7 34:10,12,15
140:1 157:20
168:23,25 169:6
**doors** 31:24,25 32:19
**dorms** 107:18
**Dorsey** 62:20 65:6
67:3,15
**Dorsey's** 65:3
**dots** 148:23
**down** 28:20 29:4,5
45:9 68:16 69:25
79:20 83:24 136:10
152:15 185:8
198:20 200:10
200:10
**DPS's** 30:10

drawing 169:10,13
drawn 7:7 37:25
dress 104:20 105:1
    130:3
dresser 116:20
drink 127:9
drive 104:3
driver 104:16 104:16
driving 104:7 104:7
drop 8:6
dropped 191:10
due 151:9 152:7
duration 183:16
during 18:15,18,21
    59:14 136:13 184:2
    189:18,24 190:4
duties 5:9 9:14,17
    19:12 118:25
    121:19 145:24
    177:7 189:2,5
duty 146:6

**E**

each 6:7,10 54:9
    56:18 78:17 98:2,9,
    12 101:7 103:17
    110:9 165:19,25
Eagleton 167:11
earlier 73:13 81:9
    84:12 114:5,18
    120:9 139:8 152:22
    171:5
early 143:2 177:8
    196:13 198:10
earn 172:13
easy 27:9 146:9
educated 107:7
education 148:8
    150:1 161:10 172:4
    173:2,4 174:18
effect 19:8 31:24
    37:3
effective 29:19
    183:16
effectively 150:22
    196:21 197:2,14
efficient 29:19
eight 71:9
eight-hour 70:25

71:4 71:4,5,9 72:7
    155:13
either 36:20 136:20
    154:25 167:25
    175:2,3
electrician 80:5,9,
    12
Ellis 77:10
else 27:14 49:8
    82:10 86:16 136:25
    140:11 157:23
    168:16 188:25
email 13:11 14:1
    75:17,19,21 76:6,
    17 78:16,20 82:4
    112:10 122:2,3
    140:19
emails 112:9 130:12,
    14
embarrassing 191:13
emergencies 145:14
    189:6
emergency 91:16,19
    97:6 100:7,9 101:4
    145:3,9,12,13
    189:8
emotion 158:3
employed 7:24 141:6
    165:2 200:4
employee 30:12,16
    31:9,13 32:12 34:3
employees 17:16,17
Employment 28:13
    138:5 139:23 140:6
    167:21,22 168:3
    178:7 203:8,22
empower 165:19,25
Empowerment 165:18
encompasses 68:13
encounter 88:9
encourage 156:20
    156:20
end 11:6 52:7 60:1
    90:3 143:2
endorsed 95:5
endorsement 94:24
    112:24
endorsements 113:11
enforce 144:25
enforcement 5:8 5:8

42:15 165:23
    171:13 172:19
    173:15
engaged 117:14
enough 43:3 88:3
    130:20,24,25,25
    131:4 158:12
enrolling 160:16
ensure 6:9,10
entail 144:12
entire 48:10 50:24
    58:2 72:9 117:24
    146:9 200:16
entry 20:16
equipment 177:18
equipped 198:21
equivalent 141:4
especially 86:8
    144:13 152:3 170:5
    199:19
estimate 50:7
ethics 202:24 205:1
EthicsPoint 202:20
    202:20,22 204:21,
    22
even 61:14 63:23
    67:19 73:18 105:7
    115:7 130:12
    132:12 135:5
    139:19 148:12
    151:25 160:6 161:6,
    9 167:13 175:13
    197:21
event 23:16 37:6,11,
    12,16,18,20,23
    38:7,13,14,15,19
    39:5,13,20,23 40:1,
    9,12,15,15,22,23
    41:7,19 42:20,23
    64:22 65:10 69:19
    70:8,9,11,12,22
    71:6,8,9 72:7,13,
    15,17,24 73:4,10,
    11,12 74:2,3,5,7,8,
    10,11,18 75:1 77:5
    79:18,19,23,25
    80:9,19,23 82:15
    83:7 84:2 99:12
    104:4 105:24
    106:19 106:19

107:3 122:21
**events** 12:7 19:17,20
  20:1,3 23:13 38:6,
  9,13 39:7,23 40:19,
  21 41:8,14 42:19
  70:1,25 71:1,23
  74:9,13 77:10
  80:18,19 99:10
**ever** 4:12,20 5:11
  13:19 15:1 26:20
  26:20 30:3 31:9,12
  32:7 32:7 33:20
  34:2,3 36:4,5 38:2
  39:20 42:20 44:13
  53:16 54:2,19,23
  55:4 67:25 68:1
  85:18 87:9,23,25
  88:14 89:9,12,22
  94:22 95:3 112:22,
  23 115:12 124:2
  126:14,20 127:7
  132:21,23 133:11
  135:13 139:15
  143:13,18 147:13
  150:14,21,25 151:3,
  6,11 153:6 156:19
  161:23 177:5
  185:18,23 192:6
  196:20 197:1,2
  200:16
**every** 15:11,13 18:22
  33:1 43:4 51:19
  51:19 75:19 95:21
  126:16 148:11
  162:23 190:17
  203:14
**everybody** 150:3
**everyday** 190:7,13,24
**everyone** 68:13 68:13
  106:10,11,14
  129:21 148:21
  149:5 152:7 162:1,
  3,15 172:9 205:8
**everything** 18:9
  74:22 82:13 106:3
  110:16 112:12,15,
  21,21 146:15 157:4
  178:6 198:19
**evidence** 6:13 204:18
**exact** 85:22,23 87:12

90:4,9 93:18,19,21,
  21 96:22 102:16
  110:6 115:1 118:14
  137:6 166:24
  191:24 192:3
**exactly** 29:8 94:16
  106:2 144:7 191:21
  204:16
**example** 32:12 40:18
  111:24
**examples** 71:22 87:25
**except** 106:10,11
  108:17
**excessive** 172:1
**exchange** 141:22
**exchanged** 124:22
  126:7
**Excuse** 28:23 42:22
  170:9
**executive** 44:5 50:13
  103:25 112:7 112:7
  158:20,21,22,23
  159:6,7,10,12
**Exhibit** 8:9,11 13:6,
  8 27:10 43:13,14,
  16 75:11,13 148:12
  148:12
**exhibits** 7:20
**existed** 202:24
**expect** 167:25
**expectations** 5:15
**expected** 74:19
**expert** 172:5
**explained** 88:1
**explicitly** 87:24
  114:8,21
**exploitation** 141:12
**exploited** 141:9
**express** 143:22
**expressed** 119:4
  202:3
**expressive** 203:6
**expressly** 94:22
**extended** 182:24
**external** 197:15
**extremely** 167:20,23
  198:4
**eyes** 187:21,24

---

**F**

**facade** 163:16
**face** 111:8
**fact** 31:4 142:9
  174:22 188:16
**factor** 77:23
**facts** 5:18 18:25
  21:15 134:6 204:18
**faculty** 28:18 128:23
  144:19
**Fagan** 167:9
**failures** 151:12,14
**fair** 78:12 176:6
  184:2 187:8,10
  188:18 199:2,7,8,
  11
**fairness** 148:6
**fall** 191:12
**familiar** 37:5 49:4,
  13 54:11,14,18,21
  55:2 75:10 85:10
  111:6 139:17
**family** 155:16
**far** 31:7 55:1 97:16,
  24 131:21 141:12
  201:20
**fashion** 12:23
**favor** 187:10
**favored** 85:19 87:10
  88:15 89:10 89:10
**February** 23:22,23
  24:24,25 35:18
  62:23,25 63:10,14
  64:5 134:12
**federal** 145:1 147:16
**Fee** 76:2,8,14 78:2,5,
  8,13,24 79:13,21,
  23 80:10,15,17
  81:4,8 82:1,14
  83:12,18,19,23
  84:9 166:13,16
**feel** 144:21 151:12
  193:15,22 194:2,5
**feeling** 107:20 200:3
**fees** 77:23,25 81:6
**felt** 88:2,25 116:15,
  22 132:1 146:6
  156:18 162:17
  197:20,22
**female** 85:19,24,25

86:7,8,10,12 87:13
89:1,14,15 95:7,9,
10,13,14,22,25
96:2 100:19,22
106:9 107:6 108:12,
14,17,18,24 113:5,
14,15,20 114:25
124:1 130:20 131:4,
7,18 132:11,14
139:12 142:9,10,15
146:5 165:19,20,23
191:3 193:10,11
197:22 198:19
198:19
**females** 88:4,6
**few** 96:17 164:13
171:3 187:17
**field** 46:17 50:4
56:17,20,22,24,25
57:8 59:11,17,19
60:10,25 61:23,25
62:10 135:9 179:16
**figure** 188:25 191:25
**figured** 118:19
**file** 18:19 31:5
**filed** 10:24 11:1
31:6 48:11 50:25
125:21 134:5,10,13,
17,19,25 135:11
137:4 161:24
163:12,13 179:19
196:2 199:17 201:5,
9 202:19 204:20
**fill** 55:15 65:20
**filled** 54:1
**filling** 49:19 53:16,
20,23
**fills** 49:16
**final** 200:20
**finally** 171:15
**find** 105:17 112:4
157:12,16,16,17
203:21
**finding** 44:1
**fine** 14:24 27:8 27:8
43:6 75:9 106:16
135:1 165:5 169:8
**finish** 102:13 143:3
**finished** 6:8 170:8
205:4

**Finner** 91:15 92:13,
14 94:2 97:13,19,
24,25 98:7,8,20
**Finner's** 99:1
**fire** 138:4,22 162:16
**fired** 161:25 162:3
179:18
**firing** 145:6 180:17
**first** 15:23 45:16
46:2,12 47:3 48:15
54:22,25 55:4
59:10,16 86:3,4,5,
12 87:4,12 88:9
89:12 90:2 92:13
98:4 113:3 114:5,
18 115:3 134:20
135:6,7,10 139:8
146:5,13 155:18
165:20 179:4
182:21 183:9
188:12 198:7
201:24
**fit** 152:10
**five** 64:21 65:12
115:5 124:9 143:2
167:5 194:17 198:9
**five-minute** 124:6
170:10 194:20
**flight** 154:20
**focus** 29:19 30:22
**folder** 83:5
**folks** 196:6
**follow** 58:6 153:14
158:11,16
**followed** 37:14
**following** 18:8
**food** 127:5 127:5
**foot** 146:13
**football** 122:18
**forced** 116:16,22
**Forget** 135:20
**forgetting** 100:19,21
**forgive** 34:21 131:1
**forgot** 26:20
**Form** 11:20 12:23
13:2 15:20 17:22
19:19 20:10,21
21:6,21 23:15
24:12 33:16 34:7,
24 35:3 36:9,19,25

37:8 39:1,15 40:4
51:12 59:1 60:8
61:5,13,21 62:8
71:18 73:6 74:6
78:15 79:16 82:20
84:19 95:1 96:14
108:9 109:12
124:23 127:13
133:14 140:12,17
141:23 148:16
159:18 165:10
169:24 178:4
180:18,23 181:10,
15,22 183:17
185:20 186:12
188:21 192:20
193:3,17 197:16
202:21
**formal** 68:1 171:9,11
**former** 85:13 133:5,6
166:17 189:23
192:6,14 196:1
**forms** 39:10 73:21
**Fort** 167:9
**forth** 107:21
**forward** 146:13
152:14 189:13
**forwarded** 13:25
**found** 137:5,7 157:11
201:18,19
**four** 68:12,14 101:20
102:6,7,8 115:4
176:8,9 198:8
**four-hour** 71:9 72:7
**fourth** 146:3 151:25
173:24
**fraud** 137:7
**Fred** 94:15
**Frederick** 56:14,15
91:25 94:11 103:15
109:18 123:17
140:24 141:3,5
**free** 78:3
**freely** 152:6 172:13
**frequent** 103:23
**frequently** 99:15
103:22
**Friday** 15:2
**friends** 203:17
**friendship** 158:15

**from** 7:1,16,17,21
  9:3,25 10:16,17,18,
  20,20 11:19,23
  12:4,7,10 13:11
  15:25 16:3 22:25
  23:5 31:19 35:7,15
  36:22 38:15,23,25
  39:24 42:14 43:25
  45:24 48:2 51:2,3,
  4,23 53:15,19
  55:19,20,21 57:20
  66:6,8 69:21,22,25
  71:23 73:4 76:11,
  18 82:4 87:23
  88:14,17,22 89:3,
  16,19 91:14,20
  93:18 97:5 104:4
  105:9 106:21 108:4
  119:5 120:9 121:10
  122:2,6 126:5,17,
  22 127:3,20 128:8
  134:20 138:21,25
  139:23 140:6 144:5
  146:1 151:24
  153:10,22 154:3,15,
  18 155:8 159:5
  160:2 162:4,9,17
  164:2,4,7 165:6,9
  166:5 167:13 168:8,
  13,17,18,21 169:11
  169:11,17,20,23
  173:10,19 175:1,5,
  16 176:1 180:17,22
  181:7,13 182:25
  183:10 191:22
  194:13 195:17
  196:5 200:9 202:13
  204:25
**front** 16:22 27:21,23
  38:9 106:2 108:12
  130:16 140:1 178:8
**froze** 14:14 176:15
**full** 4:7
**full-time** 166:19
**further** 170:18

---

### G

**gain** 120:23 142:18
  167:22

**gainful** 167:22
**gainfully** 200:4
**game** 19:22 37:23,24
  38:3 122:18 122:18
  169:21
**games** 20:2 116:5,7
**gates** 107:17
**gathering** 161:19
**gave** 43:22 56:17
  95:22 103:24
  103:24 104:6
  105:24 119:2
  126:10 141:24
  142:8 151:22
  152:11 187:12
**gears** 152:19
**gender** 130:23 142:1,
  3 143:15 165:21
  198:24
**genders** 113:19
**general** 18:1 33:2
  186:25
**generally** 171:23
**genuine** 144:21
**get** 6:3 11:7 31:22
  32:1,8,10,22 34:12,
  15 48:2,22 49:2,11
  53:25 57:1,16
  74:10,23 80:6,11
  84:8 86:6 92:9
  104:20,24 119:12
  125:16 137:23
  138:14 146:20
  154:23 155:3 158:4
  160:16,25 166:13
  167:20 169:1 172:4,
  11 175:11 176:18
  178:21 180:14
  182:13 202:4 202:4,
  14
**gets** 74:20
**getting** 21:14,15
  82:4 144:5 152:16
  153:10 169:25
**gift** 126:14,15,16,17,
  21,25
**gifts** 124:21 126:5,7,
  10,13 127:3
**girl** 166:8
**give** 18:6 32:17 35:1,

5 38:21 40:18
  44:21 55:16 56:20,
  24 71:22 73:14,17,
  20 87:18,22,25
  100:23 101:21
  108:13 109:8,15
  111:1 112:13
  113:17 114:22
  115:1 126:15,20
  127:7 141:20
  143:20 147:2
  151:17 152:1,6,10
  161:11 174:23,24
  181:3,20 184:22
  191:8,10,15 198:24
**given** 4:20 37:15
  69:3 88:24 91:3,6
  94:14 126:14
  160:10 172:13
**gives** 159:1
**giving** 92:14 96:11
  109:1 113:20
  127:11 147:22
  166:17
**goal** 197:25
**goes** 55:19,20,21
  82:14,24,25 83:3,4,
  8 107:8 112:15
**going** 5:14,25 8:4,5
  13:5 14:25 16:1
  18:12 27:4 30:19
  36:3 43:12 45:8
  51:23 52:20,21
  62:10 63:24 68:16,
  19 69:25 74:10,15,
  16 75:6 76:4 89:24
  91:11 94:1 106:7
  107:1,24 110:15,17
  118:12,23 120:5,6,
  22 122:22 143:2
  144:3 145:19,21
  148:11 150:9
  151:21 152:19
  153:22 154:11,21,
  24 157:25 158:5
  162:3,19,22,25
  163:2 170:3 172:2,
  3 179:21 180:1,14
  181:1 183:22 184:4
  185:6,7 186:2

192:11 193:5
194:12 195:16
196:7,12 197:9
199:12,21,21 202:4,
14 203:19,25
**golf** 36:5,7 104:7
**gone** 4:12 31:7 33:24
118:8 126:25
154:17 165:20
176:20
**Good** 4:5 18:4 85:3
128:6 130:20,24
131:4 138:19
152:10 174:21
174:21 178:11
185:19 195:10
**got** 27:22 78:1 86:22
96:24 98:4 133:16
137:25 138:15,25
139:7 157:19,25
158:25 174:17
179:13 196:11
197:17 198:16
**gotten** 86:24 154:15
162:4 179:5 194:13
195:17
**governed** 144:25
**Government** 139:16,17,
19 163:19 179:9
199:19
**governs** 78:13
**graduation** 20:2
**granted** 11:4 181:6,
13,19 182:22 186:5
187:12
**great** 13:19 27:13
29:17 43:7 45:8
63:4 93:20 94:17
124:11 174:15
205:5
**grocery** 118:4
**ground** 5:15 78:23
86:24
**grounds** 11:19,24
12:4 15:2,6,9 36:6
78:18
**Group** 165:18,22
**grow** 149:14
**growth** 149:13
**guess** 16:4 67:13

77:3 100:24 121:11
139:7 157:12
**guilty** 137:7
**gun** 92:18
**guys** 14:4 103:23
108:16 114:9

---

**H**

**hair** 116:20
**half** 90:19 130:17,23
166:2 167:24 203:8
**Hall** 13:12 177:11,14
**hand** 129:25
**handing** 36:13,22
**handle** 39:6 171:17
197:8
**handled** 197:18
**handling** 93:4
**Hang** 176:14 205:10
**hanging** 167:7
**Hao** 13:11
**happen** 37:21 38:2
40:25 71:10,12,15
72:1,19 162:22
**happened** 9:16 19:24
23:2,3 63:18 92:25
93:14,15 94:19
117:18 132:10
157:5 167:24 190:8
200:11
**happening** 93:1
105:24 150:9 156:9
163:1
**happens** 41:7 71:21
88:11 88:11
**hard** 58:4,6 120:23
131:6 135:4 149:14,
18 167:1,20,23
**Harper** 112:8 159:4,
21
**Harper's** 159:19
**Harris** 167:10
**Harvard** 175:5
**has** 7:4 12:23 29:20
30:9,20 41:23
47:15 56:16 60:10
63:3 82:13 84:9
87:13 88:13 90:18
99:19 104:23

114:24 126:14
130:16,22 134:12,
19 139:10 155:21
156:18 158:12
160:18 200:4,5
203:15
**hatchback** 157:20
**haunting** 130:22
**haven't** 199:15
**having** 26:9,10 62:16
67:21 68:11 112:3
115:18 121:2 133:2,
4,20 142:11,13
146:12 163:21
175:17,20 189:19
190:11
**HBCUs** 147:9 175:10
198:12
**head** 94:19 110:4,11
118:11 191:19,20
192:1
**hear** 6:1,10 14:5
14:5,7,9,10,18,19
60:15 88:5,6 89:3
93:20 114:15 135:7
150:14,17 170:22
181:2 191:22 195:5,
7 202:7,12 203:16
**heard** 44:7 54:13,15
55:4 90:15 138:20
152:3 164:2 179:18
196:5 202:14
**hearing** 12:2 193:9
196:12
**hearsay** 57:25
**Heidi** 158:25
**held** 62:22 63:5 67:2,
20 77:1 91:18
**hello** 26:8,17
**help** 6:8 42:3 105:16,
20 131:15 134:2
**helping** 84:3 160:24
**Hennessy** 127:12
**here** 11:23 14:16
28:15 52:8 58:19
60:16 69:5,20
76:24 77:21 78:9
82:5 88:8 161:19
162:19 163:2
164:14 180:2 185:8

194:8 195:12,25
**herself** 143:25
**he's** 91:16 91:16
116:2,3 141:7
142:3 154:11,24
156:19 157:9,11
158:2 158:2 160:16
202:6,8
**Hey** 94:15 118:12
129:18
**higher** 119:14 171:25
**higher-ups** 119:15,17
**highest** 142:16
**highlight** 185:8
**highlighted** 75:24
**himself** 26:18 110:19
**hire** 151:22 199:17
**hired** 44:10 151:17,
19,24 162:7,8
168:2 199:15
**hiring** 145:5 152:17
166:14
**history** 147:12 175:9
**Hold** 9:1 63:7 132:5
172:8 174:19
179:25 179:25
181:24 185:1
193:19
**holding** 62:24 63:1
130:3 130:3
**holiday** 16:20 48:5
55:25 68:8
**holidays** 16:19,25
**home** 27:22 104:4
156:19
**Homecoming** 41:8
71:25 72:8 98:3
99:5 106:22
**honestly** 6:17,22
**honesty** 74:19 148:6
171:8
**honor** 146:6
**honorarium** 166:7
**hope** 205:5
**hopefully** 143:4
**hospital** 157:3,11
158:8
**host** 38:3
**hostile** 162:16
**hotline** 202:20,23,24

203:4 204:21,22
205:1
**hour** 40:11 41:6,9,15,
20 42:1,2,18,20,21,
24 43:4 53:8,17,22
54:3 80:12 124:6
**hourly** 53:9
**hours** 39:2 48:6 48:6
50:4 54:7 56:1,6,
18,21 57:1,9 58:17,
21,24 69:19 74:4
146:18 146:18
155:9,10 172:14,16,
17,17,24,25 173:6,
7,8,10 175:4
**house** 22:19,20,25
125:7
**houses** 149:23
**Houston** 23:18 24:1,9
91:14 93:7,17
97:19 98:20 101:4,
19 102:9,10 165:6
166:18 167:12
168:13,17 169:11
173:11,21,22 174:3,
12,13,22
**Huewitt** 77:13
**Human** 55:9 151:14
**hundred** 147:20
147:20 147:20,21
175:11,13
**hurricane** 145:15
169:23
**husband** 122:13
157:10
**husband's** 121:23
122:3
**hybrid** 41:23

---

**I**

**icebreaker** 86:20
**I'd** 27:9
**idea** 30:1,6,14 31:18
67:18 94:18 110:7
121:24
**identify** 54:7
**identity** 134:10,13
**ignore** 33:14,21 34:4
94:14

**ignored** 191:21 192:1,
2,2
**I'll** 5:17 7:20 23:17
35:10 39:17 45:19
52:25 58:11,15
89:5,6 95:17 102:3
137:7 142:23 147:2
164:14 168:5
170:12,19 193:21
194:6 199:13
200:20
**I'm** 5:8,14,24 6:15
8:4,5,12 10:3 10:3,
23 12:2,3,14,16,21
13:5,23,24 14:5,7,
16,25 15:5,7 16:1,
2,4,13 18:2,4,8,8,
12,24 19:7,20,22
20:4 20:4,15,15,17,
22 21:11,14,14,15,
18 26:14 27:4
28:24 29:8 30:19
31:25 32:2,12 33:3
34:1,8,11 36:3
38:18 39:9 41:19
43:12 45:8 51:5,22
52:20,21 53:11
54:5,14,18 55:22
59:21,25 60:21
61:10,11 62:2,10
63:13,20 64:1,2,11
65:2 66:3,15,15
68:5,16,19 69:11
71:4,15,15 72:18,
23 73:11,17 74:11
75:6,8,14 76:4,22,
23 78:8,21 82:4
83:1,10,18 86:23
87:7 89:5,8 90:8
92:1,14 97:21 99:6,
11 100:17 101:5,9,
22 102:2,23 103:13
105:11 106:15,21
107:15 109:6 109:6
110:17 111:3,6
112:3 113:14,20,22,
22,24,25 114:4,9
115:15 120:7
121:24 122:16,17,
20 123:1,3 125:4

130:11,19,20,23,24
131:3,4 132:18
134:4 137:21
138:19 143:13,20
145:18 146:6
147:11,18,20,22,24
148:20 149:12
151:4,14 152:16,18
153:21 154:4
157:13 160:6
161:18 161:18
162:1,12 164:25
165:4,17,19 167:21
168:21 169:4,15
170:8 175:8 176:25
177:13 178:16,17,
19,23 180:1,3,14
185:6,7 186:1,2,16
188:3,25 190:16
192:11 193:9
194:14 195:5,6,11
197:9 198:14
199:12 200:10
201:15,23 202:17
203:5 204:16
205:11
**imagine** 17:15 179:23,
24
**immediately** 71:6
86:23
**impact** 84:17 150:5
**implement** 98:21
145:15 189:10
**implemented** 98:23
146:19
**implements** 145:13
**imply** 193:1
**important** 148:25
148:25 150:1
**inaccurate** 58:9
67:18
**inappropriate** 117:5,
7 120:13
**inappropriately**
117:22
**inbox** 75:19
**incarcerating** 150:2
**incentive** 111:21
**incident** 154:4
190:18

**include** 81:4
**included** 149:5,8
150:4
**includes** 55:7 77:15
**including** 148:21
162:8 185:16
**Inclusion** 149:5
**income** 164:22 165:10
166:3,6
**incoming** 56:25
**incorporates** 68:13
**indeed** 183:24
**indicate** 38:22,24,24
**indicated** 69:15,19
153:7 169:9
**indicates** 69:20
**indicating** 150:15
**individual** 38:20
44:19 80:1 90:6
101:17 105:4
126:17 177:14
**individually** 31:8,10
**individuals** 50:3
52:24 53:3 59:22,
24 60:4,6 61:2,10,
12 76:15,16,24
86:13 97:14 101:7,
14 103:10,17
106:12 108:3,8
**inferior** 198:23
**inflation** 84:17
**infor** 145:17
**inform** 33:20 34:2,3
53:7
**information** 12:25
61:8 63:25 87:25
94:14 107:5 111:1
128:22 155:21
164:4,7 166:18
179:15 194:12
195:16 204:18
**informed** 56:4 65:9
**informing** 47:2 65:17
**initially** 11:13 32:3
**initiate** 185:24
**innuendos** 89:20
**in-person** 31:8
**inside** 66:19 98:13
107:18 116:4
130:12 130:12

157:21 158:7 164:9
171:6 175:21,22
**install** 140:16
**instance** 99:23,24
103:2 108:23 126:9
**instances** 47:15,21
150:21,25 151:3,8,
11
**instead** 122:13
**Institute** 172:19
**institutions** 86:11,
19
**instruct** 33:13 67:24
68:8 96:5,9,12
**instructed** 33:21
34:4 65:9 137:13,
14,17 138:7,22
156:12 182:19
184:4
**instruction** 65:15
**instructions** 35:2
65:20 198:25
**integrity** 74:12
125:25 148:6 171:8
**intelligent** 130:25
**intentionally** 30:23
**interact** 17:16 17:16
**interaction** 95:15
**Interim** 133:6 140:16,
20
**internal** 7:10,11
81:1
**internet** 114:10
**interpret** 182:10
**interpretation** 58:1,
3 66:8,14 182:7,18
192:5
**interpreted** 58:1,7
**interpreting** 79:2
**interrupt** 123:3
194:14 195:20
**intervene** 132:24
**interview** 45:10
46:22 51:23 60:2
62:18 65:3
**intimate** 192:19
**into** 31:22 83:12
133:19 138:14,15
148:14 152:16
172:15 180:14

182:13 185:7
188:11
**introduce** 7:20 98:11
**introduced** 46:13
98:11
**introducing** 26:17
**invested** 120:25
**investigated** 143:25
**investigation** 12:17,
25 46:22 57:21
58:2,9 60:2,7 61:3,
7 65:3 68:3,20
92:19 117:16
121:10 139:2,6,20
179:7,14 187:16
**investigative** 9:5
**invited** 86:4 116:7
**involved** 131:22
131:22
**involvement** 117:16
**iPhone** 157:13,15,16
**Isaac** 92:1 103:14
**issue** 34:22 99:12
112:18,20 129:13,
14,15
**issued** 33:14 83:25
**issues** 99:10 105:10
108:4,6 128:2
130:10 186:10,20,
21,24 197:2,13,18
**issuing** 34:25
**items** 12:11 20:6,8
105:9 177:18
185:24
**It's** 22:18 35:20
38:8 39:8 49:11
57:23 58:4,6 63:12
64:8 65:8 71:7,9,
10,19 72:11 82:22
84:4,7,10 90:13,18
97:9 104:14 112:20
112:8 114:1 122:9,
17 124:5 130:12
131:5,22 135:3
139:12 144:2 145:4,
5,14,19,25 147:20
148:2 149:14,19,20,
25 158:10 161:14,
21 162:23 166:8
167:1,20 168:6

169:11 172:10,11,
13 176:6,21,23,23
184:11,13 190:12,
17 191:5 191:5,13
193:8
**its** 28:18
**itself** 118:1 135:3
147:3,24 197:6
**Ivan** 103:14
**I've** 8:8 13:24 19:14,
16 26:18 43:13,21
44:7 44:7 48:22
49:1 55:1 72:22
75:11 88:3,24
133:8 168:1,2
179:7 198:6 200:16

---

### J

**jail** 92:22 146:10
**James** 67:14 68:23
72:11 74:2
**January** 26:21,22
28:3,5 30:7 34:23
35:16,20,25 50:19
51:1,2,4,9,11,16
139:25 184:9,16
186:2 196:15
202:13,19
**job** 17:15 18:10 63:4
88:12,13 111:22
118:25 121:16,19
144:9 146:24
147:17 148:7,17
149:20 151:9
166:22 167:2,22
171:8 190:12
196:25 196:25
197:6 198:5,9,22
199:3,22,23
**jobs** 133:23 167:2,4,
7 190:17 200:1
**John-Miller** 50:3
**join** 68:8
**joint** 126:25
**Jones** 50:1 67:2
103:14 123:17
135:18
**Joseph** 4:5 114:11
124:9

**judge** 11:4 15:25
16:3,9 181:19
**judging** 157:14
**judgment** 92:24
**judgments** 21:16
**July** 45:7,15,23 46:3,
11,15 59:5,8,9,12,
14,17 60:9 61:6,8
67:1,5 68:2,12
86:22 87:5,6 119:6
135:8 139:21
179:13 196:10
201:16,23,24 202:7,
8,13
**jump** 149:23
**jumping** 153:14
**June** 46:12 46:12
**just** 4:15,16 5:14,18,
23,25 6:4 7:4,10,
11,16,17,20 8:6,9,
12 9:19 10:11 13:7
14:20 15:5,15,16
16:13 17:14 18:1,2,
24 19:22 21:14,15
22:18 24:5,20
25:19 26:2,10 27:7
27:7,13,16 28:8,14
29:13 37:13 39:7,
15 40:4 42:10 45:8
46:7 48:2,23 49:6,
11 53:25 57:19,25
58:11 59:19,21
60:1,21 64:7,11
65:2 66:4 67:21,23
68:5,12,16,19
70:14 74:22 76:4
77:2 78:13,21 79:4
81:16,18 82:4
83:17 86:5,15,24
87:16 88:7 89:5
90:17 92:14 93:20
94:19 96:17 97:10,
17 99:3,7,12
100:18,23 101:2,7,
9,9,21,23 102:2,5,
14,23 110:22 111:3,
19,20 113:10 114:3
116:9,13,21 118:1,
20,24 120:13,21,25
122:19 123:2,21,25

125:2 129:5,7
130:6,10 132:10
134:22 135:21
136:16 137:7 138:2,
21 139:20 142:23
144:8 145:25
146:17,19 149:6,7
152:6,19 155:22
158:10 158:10,17,
17 159:2,14 161:1,
18 163:16 163:16,
23 164:13 166:8
169:8,23 170:11
172:24 175:25
176:1,14,20,20
177:1 179:15,21
180:3 187:7 190:3,
13,17,18 191:6,21,
22 192:1 199:12
200:11,21,22
205:10
**justice** 175:6

## K

**Keeney** 4:5 167:21
168:22 175:8
**keep** 95:20 100:18,21
118:21 173:3
**Kenneth** 77:13
**Kenney** 195:19
**keys** 20:14,16 21:19
23:7,8,9 32:1
185:16
**Kia** 159:4,5,19,21
**kids** 92:22 149:22
**kind** 19:23 20:1
26:10 86:6 88:7
105:20 115:18
116:4,24 118:18
122:15 128:25
129:4 130:5 137:8
149:14 165:18,25
175:16 190:25
**knew** 66:21 98:12
98:12 121:13
129:21 132:6
134:16,24 139:20
144:7 161:24 162:5
163:3,7,8 191:21

194:9 195:13 196:2
198:9 201:4,8,15,
21,24 202:24
204:20
**know** 5:13,23 6:1,2,4
8:6,9 13:7 14:4
22:23 23:2,3 28:16
29:13 33:17 37:2
39:17,21,25,25
40:2,7,12 43:15
48:2,7 49:18,20
59:15 61:6,14
64:24 65:5 66:10,
17 70:22 72:17,20
73:18 74:12,14
76:16,21,23,25
77:1,3 78:2 82:9,
21,22 84:5 86:6,24
88:4,20 89:22
90:15 94:3 97:23,
25 98:2,8 99:3,12,
15 101:2,3,18,23,
23 102:16,17,18
106:4,19 114:2,3
116:4,17,21 117:6,
15,18 118:10 120:5,
16,19 125:22 126:6,
9 131:6,8 132:5
134:23 135:1,2,5,
20,20,21 137:3
139:17,20,25 140:5,
9 141:5,24,25
142:2,8 144:4
147:19 148:17
149:23,24 154:3,14
155:3 157:22,24
158:5,12 159:1,5,6,
9,11,14,14,15,19
160:20 161:1 161:1,
3 162:2 163:7,18
164:3 169:18,19
174:23 176:15
178:8,9,11 179:6,
15,23 181:2 182:4,
25 184:11 187:17
190:21 192:4 194:9
195:13 196:9 197:6,
7,7 198:5 198:5
198:5,23 201:6,19
202:10,17 203:2,23

**knowing** 196:24
**knowledge** 13:24 14:3
29:24 30:15 31:15,
17 40:7,10 55:10
64:3 70:15 74:25
79:14 113:18
117:13,19 120:5,10,
11 121:6,9 132:3
134:7,9,15,18,21
141:18,21 148:8
160:23 163:25
174:17 197:6
201:20
**knowledgeable** 107:7
**known** 48:22,23 49:1
98:9 203:18
**knows** 81:5 153:16
202:10

## L

**lady** 46:14
**lady's** 159:13
**larger** 173:23
**largest** 146:3 173:24,
25
**last** 27:1 29:10
35:21 39:10 54:6
55:22 73:14,17,20,
23 113:23 122:8
125:11,18,18
133:25 154:16
165:20 166:2 195:2
**late** 105:16 115:20
118:9
**later** 7:18 32:4
119:2
**latter** 154:25
**laughing** 120:22
**law** 5:8 41:11 42:14
165:22 171:12
172:18 173:14
**laws** 144:25 145:1
**lawsuit** 5:20 10:24
11:2 31:6 48:11
121:11 134:18
**lawyer** 139:1,12
**laying** 157:21
**lead** 49:3,4,6,7,9,13,
16,21,23 54:8

57:15,16 61:12,14
130:20 197:7
**leader** 148:20 150:8,
16,22 198:15
**leadership** 147:7,13
148:14,19,24 149:3
150:7,12 171:14
175:7,12 196:18
**leading** 199:1
**leads** 57:15
**learn** 135:6 174:14
**learned** 135:10
**least** 11:13 35:20
67:21 76:5 99:22
101:19 128:1 167:4
170:1 170:1 172:17
175:12 178:12
**leave** 9:2,5,6,7,10,
12,13 10:14 11:13,
18 15:23 21:5 21:5,
7,11 30:11,16,24
31:2,21 33:15,22,
23,24 35:7,9 36:19
49:19 140:15,18
170:4 176:12 181:8
203:12
**leaving** 165:15
166:21
**left** 29:8 136:9
150:4 152:22
**legal** 180:24 182:2,3,
7 186:15,16,17
**length** 38:8
**lengthy** 104:15
**less** 106:25
**let** 5:23,25 6:4 8:6,
9,25 9:1 9:1 10:3
13:7 29:13 43:15
93:3 113:25 113:25
114:3 116:17 123:6
131:15 134:7 143:2
147:3 151:10 155:2
164:25 164:25
181:4 183:13 185:2,
22 190:2 192:15,16
201:13 203:2
**Let's** 6:7 28:14
38:15 51:22 62:11,
18 68:17 81:18
84:23 124:10 131:9

133:16 144:8
164:12 171:3,18
176:11
**letter** 9:3,19,20,23,
25 10:5,11 11:12,
16 12:5,8,12,18,19
13:4,10,10 34:5
152:25 153:4
168:23,25 169:5
177:4 177:4,5,13,
20 184:16
**letters** 177:10
**letting** 84:5 144:4
**level** 147:16 168:10
**liaison** 147:15
**license** 42:14
**licensed** 42:6,11,19
**licensing** 172:25
**lid** 132:5
**Lieutenant** 49:25
50:1 50:1 55:20
55:20 176:4,8
**life** 167:4 200:16
203:18
**light** 69:12
**like** 5:13 11:7 17:12,
19 24:20 26:8,9
27:9 37:25 40:21,
25 41:6,9 43:3
47:9 50:23 51:6
72:8 76:14,20
83:16 86:11,20
88:10 93:4,6 95:10,
12,24 96:2,4 97:10
99:4 100:1 107:22
111:15 116:15
118:3,5,12 123:21,
22 125:4 126:16,17
127:5 128:3 130:2
132:2 137:6 138:16
149:20 151:12
157:23 162:19,21,
23 166:19 168:15
184:14,20,21 187:7
193:8 196:25 197:6
198:14 202:22
203:1,18
**likely** 71:1,7,10,16,
19 72:19
**likes** 159:2

**Likewise** 205:6
**Linda** 139:13
**line** 29:18 47:3,10
177:20 196:16
**lines** 171:8
**lion's** 189:15
**liquor** 127:8
**Lisa** 139:13
**list** 38:12 77:15
96:17
**listed** 28:3 69:15,19
76:24 77:21
**Listen** 110:15 137:22
167:21
**listened** 50:16
**listening** 57:25
**lists** 78:9 78:9,10
**literally** 110:3
162:17
**litigation** 7:6 167:7
199:14
**little** 116:24 127:18
144:2 175:17 177:1
**live** 166:19
**livelihood** 203:6,7
204:1,2
**lives** 146:8
**local** 145:1
**locate** 105:21
**location** 149:16
157:3,12,17
**locations** 104:3
**lock** 20:17
**locked** 31:25 32:19
**locks** 34:10,11
**logo** 24:4
**long** 38:12 88:3
115:7 146:18
146:18 158:12
163:2 173:20
**longer** 22:12 30:20
34:12 186:2
**look** 9:1 15:15 80:10
94:18 94:18 108:14
110:9 117:10
135:21 137:8 148:3,
10 162:18
**looked** 7:8 126:1
**looking** 7:16 8:24
13:23 15:16 45:12

54:5 66:15 78:9
118:2 128:5 147:24
149:12
**looks** 76:14 184:20,
21
**lose** 197:2
**lost** 150:25
**lot** 7:5 88:20 105:8
116:2 128:25
140:22,23 149:19
167:2 168:7 169:23
172:14
**Lots** 200:7
**love** 144:22
**loves** 161:2
**lunch** 84:24 86:4,15
**luncheon** 87:3,7 99:6
104:5

---

**M**

**ma'am** 94:4 173:18
**Mad** 162:12
**Madam** 100:2,4,4
103:19 103:19,20
**made** 12:23 18:2 33:2
57:11 65:1 70:14
86:14,16 89:17,24
90:4,7,9,10 92:9
98:1 104:20 111:3,
17 118:21 122:11
123:6,12 140:5,10
150:3 151:12,17
152:5 153:9 163:17
177:22 183:21
186:15,17 187:21
188:7,11 191:1
198:4
**maiden** 4:19
**mailed** 168:23
**main** 92:4 123:11
**majority** 150:11
151:18,22
**make** 6:9 10:3 16:4,
13 17:20,23 27:9
40:5 42:1,2 46:7
50:12,15 82:16
85:22 86:2 90:1,15
92:23 102:14,15
110:20 111:5,13

112:3,14 115:15
116:9,17 119:7
120:21 135:5
144:24 145:22
146:21 170:11
185:18 186:4 190:2
191:2 195:24
204:10
**making** 18:24 21:15
45:16,20 50:20
116:23 150:14,15
186:5 188:3 194:4
**male** 85:19,23 86:9
87:10,14,15,16,17
88:16,21,21,22
89:3,10,11,13,14
91:1 91:1,21 92:2
93:11,16 94:6,7,11,
11,24 95:5,7,21,23
96:6,10,13,18
101:24 103:3 104:6,
16 107:4 108:12,13,
13,20 109:2,9
113:4,6,7,13,14,21
114:7,20,23,24
123:16 132:2 132:2,
10,15 133:17,18
142:12 162:25
163:6 163:6 163:6
189:24 190:3
191:22,24 193:10
193:10,14 194:1
198:18,24
**males** 88:5 103:24
108:17 113:11
190:11
**male's** 112:24
**manage** 150:22 197:7
**management** 91:17
172:19
**manager** 91:19 97:6
101:4 145:9,12
189:8
**managing** 196:21
197:2,14
**manner** 57:22
**manual** 56:22
**many** 4:23 37:19
97:25 98:2 99:15
100:24 101:11,22

102:23,24 103:22
106:6 172:16
200:14
**March** 69:22,23 70:2,
5 72:14 73:5
154:25 154:25
155:1 173:12
196:13
**marked** 8:11 13:6,8
27:10 43:13,14
75:11,13
**married** 4:17
**Marsaw** 14:9,17 201:7
205:14
**Mary** 4:9,17
**master's** 161:8
171:24 175:2,4
**match** 200:1
**matches** 82:16
**matter** 18:1 148:21
172:5 179:22
**matters** 103:4 104:11
108:4 110:21
**maximum** 58:20
**may** 29:10 44:16,22
46:14 57:8 64:10,
24 100:5 101:6
128:17 147:19
160:24 161:12
167:11
**Maybe** 4:25 24:18
38:8 41:6 63:7
90:3 113:22 113:22,
24 115:4 119:2,9,
10 123:22 132:3,4
159:21 165:16
166:1,18 174:5
**McAfee** 48:5 55:25
59:5,13 62:22 63:9,
21 64:4,20 65:9,17
**McAfee's** 65:24
**McClelland** 77:14
**McCray** 50:2 67:3,15
162:5
**mean** 38:1 49:12
67:19 87:21 88:12,
18 107:12 125:9
138:20 168:16
171:22 190:3
**meaning** 172:2 188:12

means 48:7 49:7 74:8
168:7
meant 12:1 106:14
media 160:15,17,19
200:7
medications 6:24
meet 44:13 45:1 46:2
59:13 98:6,17,19
145:18 160:11
202:11
meeting 26:9 46:2,13,
23 50:19 51:4,18,
19 59:4,8,24 60:12,
14,20 61:7 62:12,
15,23,25 63:3,10,
15,18,19,21 64:5,9,
9,11,15 67:2,4,21,
23,24 68:1 68:1,9,
9,11,12,14 87:11,
12 88:1,14,17
89:12,16,19 90:2
94:12 98:6,15
113:3 114:4,14,17
115:3 135:8,16,17,
22 136:19,20,22
137:2 137:2 138:5,
6 149:7
meetings 50:10,17
51:11,13,14,16,17
63:11,23 64:17
67:6 109:25 110:12
149:6
member 30:21 122:23
127:15 128:12
129:13 131:11
members 30:10 77:19
127:24 131:13
132:19
memory 7:18,21 64:3
75:20
men 100:18
mention 104:21
177:22 191:1
mentioned 33:7 59:18,
19 96:1,17 98:24
105:7,9 106:12
108:2,5,16 130:10
152:23 155:4 164:1
mentioning 104:19
menu 184:20

message 96:3 112:1
messages 112:9
met 25:19 45:5,14,23,
25 46:9,11,19
59:10,21 114:5,18
115:2,16 138:21
154:4 168:22
201:17
Mexico 136:12
middle 154:25 155:5
midnight 153:10
might 6:21 68:9
135:19 169:18
Miller 4:17
mind 24:7 26:24 64:8
114:12 171:19
185:13 193:23
mine 75:20 101:25
minutes 84:23 111:25
143:3 194:17
miss 170:11
missed 195:11
missing 105:15 118:8
125:7 156:7
Missouri 8:3 167:16
mistake 152:5
mistaken 10:23
mistakes 151:12,14,
16
misunderstand 73:16
misunderstanding
113:24
misunderstood 165:1
169:8 188:5
mobile 23:11 185:17
Moffett 77:11
moment 44:18 63:13
88:25 97:4 98:3
118:11,18 120:4
152:6 157:21
179:19 185:7
189:25 190:12,15,
18
moments 98:25 99:4
189:20,24 190:4,5
monetary 166:20
money 49:11 200:9
month 51:18 58:17,21
90:3 184:3
months 51:19 115:5

more 23:17 25:6
37:25 46:9 52:15
75:7 99:24 101:23
102:7,8,16 113:9
115:17 121:13
127:18 128:12,14
129:12 133:23
143:12,21 144:2
147:11 150:1 158:3
160:1 164:9,12,13
169:25 170:10
174:14 175:13
199:13
morning 4:5 18:4
139:9 154:18
most 106:24 132:7
148:25 149:19
155:15 175:10
mother 203:16
motivated 193:15
194:2
motto 74:14
move 69:11 102:22
166:18
moved 72:22
Moving 56:10 152:14
189:13
much 40:16 80:11
143:11,21 151:22
170:4 191:20 205:7
multiple 31:4 106:1
112:16,17,17
must 47:11 75:20
173:2,3
muted 170:20 195:4
Myres 98:6
myself 41:3 98:19
109:23 147:2,21
152:15,16 174:14,
16,18 198:13

**N**

name 4:5,7,9,17,19
44:19,21 75:24
77:2 81:12 96:22
97:3 97:3 115:1
121:23 122:3,5,9
131:1,11 139:12
159:13,20 177:11

203:13
**named** 97:18 101:8
**names** 4:13,14 59:18,
    19 76:18 77:9
    78:16 90:10,18
    91:12 96:17,18
    97:8 103:24 104:6
    114:8,21,22 131:5
    132:19 140:23
**narrow** 89:6 113:10
    131:9
**nation** 173:24
**National** 41:1
**nature** 5:1 7:6 42:12
    190:6
**navigate** 105:20
    171:16
**necessary** 170:22
    172:10,11
**need** 5:24 6:4 29:1,3
    69:11 82:19 98:11
    106:7 153:21
    156:18 194:15
    195:22 204:22
**needed** 74:3 92:22
    104:24 115:23
    116:9 118:21
    125:15 128:1
    129:22 133:25
    137:20 139:2 170:5
    172:6 187:19
**Needless** 98:8
**needs** 74:22 137:23
**negative** 154:12
    200:14
**Nellons-Paige** 133:7
**never** 13:25 14:21
    24:9 26:5 31:25
    44:7 48:8,12,13
    49:1 53:11,12,21
    54:13,15 65:8
    67:20 81:13 85:25
    86:7,21 87:13,15
    95:10,11 108:18
    113:5 114:24 139:5,
    15,18 146:3 156:19,
    20 179:11 193:11
    202:23 203:17
**new** 46:13 76:2 77:25
    78:5 169:24 173:7

**news** 93:20
**next** 12:9,13,20
    29:18 30:19 36:17
    43:16 47:10 52:21
    56:10 57:13 62:18
    65:14 69:24 70:7
    118:7 136:22
    138:25 155:3
**night** 105:16 115:19
    118:9 125:15
    153:15 155:5
**nights** 123:20
**nightshift** 72:3
**noise** 200:5,7
**nominated** 198:11
**none** 30:1 31:17 69:9,
    11 155:23 188:18
**non-police** 78:14
    79:1 80:3
**nonresponsive** 58:12
    89:6 102:3,21
    142:24 180:2
**nonresponsiveness**
    132:17
**Nope** 150:24
**nor** 66:24 75:5 98:11
    160:13
**normal** 68:15
**normally** 17:12 35:5
    57:21 84:9
**Norris** 92:1 103:14
    123:18
**notations** 69:6
**note** 70:11
**notes** 7:4,8,9,10,11,
    12,18 10:8 161:19
**Nothing** 49:8 49:8
    66:21 141:14
    153:17 166:19
    200:17 201:15
    203:23 204:23,25
**Notice** 28:12 154:15
    177:6 187:20
**notifications**
    112:14
**notwithstanding**
    11:11
**November** 10:24 11:1,
    6 52:8,17
**Now** 8:4,8 14:6,18

22:23 33:7 45:24
46:14 51:25 64:8
72:21 73:13,25
75:12,22 91:16,18
97:9 99:7 100:23
102:25 112:2
115:12 119:22
121:21 123:25
134:4,18 145:2,11,
20 146:6 157:9,11
158:4 162:6 172:3
174:6 175:1 180:14
185:2,3 186:6
203:6,19
**nowhere** 69:14,15
**number** 72:1 76:15
    78:10 99:2,3,17
    100:6 100:6,24
    101:2,6,12,14,15,
    16,18,22 102:14,15,
    16 106:6 147:9
    149:7,8 155:22
**numbers** 102:3

---

O

---

**oath** 187:22
**object** 58:11 89:6
    102:3 132:16
    142:24 180:1
**objecting** 186:16
**Objection** 11:20 13:2
    15:20 17:18,22
    19:19 20:10,21
    21:6,21 23:15
    24:12 25:14 33:16
    34:7,24 35:3 36:9,
    25 37:8 39:1 51:12
    54:17 59:1 60:8
    61:5,13,21 62:8
    64:13 66:7 70:13
    71:18 73:6,8 74:6
    78:15 79:16 82:20
    84:19 87:20 95:1
    96:14 102:21 108:9
    109:12,17 112:25
    124:23 127:13
    133:14 140:12,17
    141:23 148:16
    159:18 160:22

161:15 178:4
180:18,23 181:10,
15,22,25 183:17
185:20 186:12,14
188:21 192:20
193:3,17,20,22
194:4 197:16
202:21
**obligation** 6:16
**observed** 129:1
131:16
**obvious** 95:6,19
**occasion** 25:6,7
46:10 84:7,9
115:17 129:12
**occasions** 101:20
112:16,18
**occur** 24:23 26:20
36:16 71:20 128:20
**occurred** 32:24 94:6
99:16 103:22
117:23 129:10
190:6
**occurrence** 190:13,24
**October** 52:7,17
83:25 136:23
**off** 29:8 39:7,15
40:4 41:4 43:8
47:16 49:21 55:22
74:1,19 82:13 85:5
116:3 118:24
124:14 128:14
143:5 145:21
152:22 153:8
164:16 176:3
191:12 194:22
203:25 205:17
**offered** 147:8
**office** 17:8 18:21
25:20 26:3 33:8
34:10 82:6,8 83:3,
9,9 92:20,23 93:3
93:3,10,12 142:3
154:16 160:2,10
164:2,8 167:8
**officer** 38:14,22,25
39:22,24 41:15
42:2,4,5,8,9,9,10,
13,23 49:3,4,5,6,
14,15,16,17,23

56:25 57:1 61:12,
14 62:19 64:21
65:11,24 67:2,3,15,
16 68:8,23 69:21,
22,25 70:9 71:7
72:2 73:1,2,3 74:1,
3,7,17,23,25 75:5
80:3 80:3,25 81:23
85:25 88:3 91:22
92:1,9 94:7,25
96:6,10 103:3,14,
14 106:25 107:4,5
108:13 108:13,15
109:9,16,19 111:25
112:4 113:14
115:23 117:8,22,25
118:22 123:18
124:1 126:17 128:5
130:2 131:3 138:16
150:14 153:11,14
155:23 157:25
158:12 174:5,7,8,
13 176:3 179:8
189:16
**officer'/shift** 54:8
**officers** 17:10,17
18:7,15 24:17
25:25 26:4,6,15
31:4 33:13,18
34:23 36:14,23
37:15 38:18 39:7
41:18,21,22,24,25,
25 42:18,19,21
45:18 46:16 47:4,8,
16,20,21 48:5,19,
22,24,24 53:7,17
55:15,25 56:4,18,
21,23 57:9,15 58:8,
16,23 59:5,13,18,
20 60:13,19,23,25
61:19,23 62:4,14,
22,24 63:2,4,5,9,
21 64:4,20 65:9,17
67:5,10,22,24 68:2
70:24 71:1 73:19
78:10,13,14,25
79:1 80:6 85:19,20,
24,24 86:7 87:10,
15,17 88:16 89:10,
11,14,15 91:2 92:2

100:25 104:2 106:6
108:11,20 109:2,21
111:12,13,14,21
112:3,12 113:5,7
114:8,21,24 117:17
118:3 120:15 121:1,
12 123:14,16,20
126:1,11 127:25
129:2,8,21,22
130:1,15 132:2,10,
10,11,14,15 133:23
139:6 145:5 147:10
147:10 149:11,18
150:5,12 151:1,5,
19,23,23 155:12
162:25 163:5,6,10
165:23 166:14
174:6 175:11,13
179:10,16 197:3,14
198:1
**officer's** 38:17
49:15 103:4 108:24
164:9
**official** 34:22 64:10
68:1 99:8,23,25
102:11
**officials** 96:18
97:18
**often** 37:21 88:5,6
94:5 103:8 167:3
**oftentimes** 49:18
111:7
**old** 204:2
**once** 33:24 39:8
40:25 49:18 51:18
51:18 63:2 73:21
101:23 102:17
117:16 142:4,5
165:16 174:8
**One** 5:3 8:5 13:9
22:21 25:6,7,8
36:4 42:25 46:10
57:20 74:9 75:7
79:13 89:12,13,21,
25 92:14,24 98:3
99:5,22,22,24
104:18 108:12
108:12 113:4 113:4
115:17 118:6 120:8
122:11 123:7 124:8,

22 125:16 128:12,
14 129:12,17 130:1
131:15 145:13
148:3 148:3,17,24
149:1 150:4,8
152:24 153:16
159:15 162:2,24
163:18,19 164:9,12
170:10 171:18
171:18 173:22
175:14 175:14
177:10,11,12,16,16
181:3 183:9,18
184:22 185:1
189:18 192:5,21
199:13 200:3,22
202:8
**one-on-one** 86:21
136:9
**ones** 92:4 92:4 97:22
99:7 101:3,10
102:5 175:14
**one-word** 159:2
**ongoing** 30:22 163:20
**only** 18:12 21:7
27:17 40:25 45:25
48:9 62:5,9 72:12,
18 79:13 84:7
89:24 91:10 113:17,
18,18 115:1,2,3
128:23 132:14
144:15 145:9 146:5
147:12,22 150:11
162:2 165:19 172:7
175:9 193:6 196:4
202:7,9
**open** 8:12 13:7,12
129:3 157:20
**opening** 8:10 27:5
**operable** 145:23
**operate** 145:19
**operation** 28:21 29:9,
19 145:18 156:21
**opinion** 92:10 94:7
96:20 98:1 99:1
101:25 102:18
103:4,12 104:13
105:1,2,4,6,12,23,
25 106:18,20 107:1,
12 108:1,6,14,20,

24 110:14 156:16
197:20
**opinions** 92:5 95:7,8
108:8 139:7 148:21
189:24
**opportunities**
151:18 152:11
**opportunity** 139:16,
18 146:12 152:1,3,
6,10 169:1,3
**opposed** 91:5 92:6,21
93:4 189:16
**orchestrated** 146:19
**ordeal** 200:15
**order** 9:21 10:2,9,14,
16,20 11:5,8,10,12
15:25 18:13,16,18,
22 19:5,8,13 21:9
25:22 31:23 33:25
36:13,18 37:2
47:12 84:8 96:20
140:19 171:6
177:23,25 178:2,5,
24,25 179:3,20
180:7,13,16,21
181:6,13,18,20
182:5,7,11,22
183:1,5,8,15 184:6
186:3 187:9
**orders** 33:14,21 34:4,
22,25 36:23,24
178:10 180:11
186:4,10
**organization** 41:23
146:2
**organizing** 165:13
**original** 104:16
130:13
**originally** 11:1
122:4
**other** 4:13,14 6:8,10
15:9 17:4,16,17,17
20:2 23:21 24:3,10
25:24 26:6,15 36:4
38:6 39:9 46:14,18
47:19 49:9 53:18
54:3 60:19,22
61:19 61:19 62:2,3,
14 72:25 74:24
75:5 76:15 78:10

79:15 80:15 86:13
87:2,18,21,25
88:15,22 89:9,16,
19 90:6,8,11 91:8,
21 92:2 97:14 98:9,
12 99:6 100:25
103:10 105:10
108:2,6,8,20 109:2,
19 110:9 112:20
114:8,21 123:14
125:10,12 126:18,
19 142:9 151:21
159:13 163:10
165:10,19,25
166:10,22 168:9,10
169:12 177:12,14
184:8
**others** 47:16 70:4
90:17,22 97:21,22
101:5
**out** 7:7 28:16 36:13
49:11 65:20 69:12
70:14 97:16 99:4
102:15 114:10
121:17,22 123:15
124:3 128:22 129:3,
25 140:20 142:18
147:2,18,20 149:12,
22,23 150:4 153:10,
15 158:4,6 159:16
174:6 179:20
186:25 187:11
188:11,25 190:14
193:8 201:18,19
204:4
**outing** 86:4
**outline** 106:2
**out-of-state** 96:18
**outside** 77:16,20
97:16 100:25
101:17 111:21
118:2 128:16
**over** 5:15 7:9 17:21,
24 21:19 22:15
45:6,23 48:25
59:11 62:22 69:24
77:11 80:23 85:19,
24 86:24 88:5
89:14 92:21 93:9,
10,13 95:7 101:25

110:4 112:24
113:11,14 122:5
145:10 147:10
167:8,21,22 172:1
176:22 188:22,23,
24 191:19,20 192:1
193:10 197:3
198:19 200:16
204:2
**overall** 107:15
**overcome** 169:23
**overly** 203:5
**overnight** 123:20
**overqualified**
199:20
**oversee** 189:6
**overseer** 145:4
**overtalk** 62:7
**overtime** 38:19 57:1
60:4 61:11 137:12
**owe** 174:22
**own** 38:20 49:20 52:4
57:22 141:14
187:21,24

---

**P**

---

**p.m** 38:16 38:16,23,
23,25 69:21 69:21,
22 70:1 70:1,4,6
71:23,24 72:3,5,6,
15 73:4 73:4 85:7
85:7 124:16 124:16
143:7 143:7 164:18
164:18,20 170:16
170:16 194:24
205:18
**package** 50:24 130:13
**packages** 55:9
**packet** 48:10 83:22
**page** 16:7,11,15 45:9,
13 69:6,15
**paid** 30:23 31:2
35:19 48:2 49:2
53:25 74:10,23
80:11
**panel** 165:17 166:5
**panels** 166:1 166:1
**paper** 20:13 21:8
**paperwork** 39:6,8

57:9 82:12 139:4,
10 153:16 199:17
**paragraph** 30:20
52:21 54:6 57:13
**Parker-Thompson**
44:22
**part** 9:11 33:9
113:23 117:16
121:15,19 122:22
154:25 165:17,24
180:2
**partic** 190:8
**particular** 40:1
70:16 72:2 74:18
79:20 82:13 87:2
105:4,23 111:15
166:14 175:12
190:15,18
**particularly** 100:2
118:6 129:17 130:1
165:23 190:5,13
**pass** 31:21 170:19
200:20
**pat** 147:25
**patience** 68:6 143:11
**pause** 195:3
**pay** 9:14,18 11:14
35:6,11,15,22 37:6,
11,12 38:13,15,19,
19,20 39:5,13,20,
22,23 40:16,20
50:5 53:15 54:9
55:9 59:18 61:12,
14 64:22 65:10
72:13,24 73:1 74:2,
4,7 78:13,14,24,25
80:1,6
**payment** 166:11
168:13 169:10
169:10
**payments** 165:9 166:7
**payroll** 55:6,9 81:3,
24 82:9,18
**peculiar** 98:16
**pedigree** 148:1
**peers** 147:5,16,23
198:12
**Pen** 20:13 191:10
**penalty** 188:1,4,8
**pension** 165:9 168:13,

17,18 169:10
**people** 64:16 68:12,
14 76:21 77:15
88:5 90:8,11
107:23 118:1
128:25 129:3,6
130:6,11 141:2
146:10,12,21
149:12 151:17,18
152:2,9,17 155:15,
19 159:3 162:6
174:15 176:8 200:8,
10,12
**people's** 36:24 146:8
**per** 57:2
**perceive** 196:22,23
**perceived** 126:1
197:3,5
**percent** 151:23
**perfect** 16:16
**perform** 151:9 199:3
**performance** 146:25
147:17 174:21
**Perhaps** 7:18 58:22
67:25 126:24
**period** 4:15,16 54:9
81:19 83:8 112:19
163:12
**periods** 72:13
**perjury** 188:1,4,8
**permissible** 38:24
184:5 186:5
**permission** 181:20
187:12
**person** 39:10 55:22
57:20,22 80:2
82:17 97:12 106:24
119:19 123:4,11
131:2 134:10,13
142:19 145:19
146:23 154:19
157:14 159:22
175:9,10 188:12
188:12 198:21
**personal** 70:15
146:21 158:23
158:23,24
**personally** 126:23
192:24
**Personnel** 76:2,8,14

77:22 78:12 79:12,
20,23 81:4,8 82:1
83:12 175:11
**persons** 144:21 167:3
**pertaining** 111:2
**pertains** 107:2
**PhD** 175:3,5
**phone** 20:14 33:1
99:19 157:13,16,17
**phrase** 12:9 110:24
**phrased** 58:22
**physical** 121:7 121:7
**pick-up** 48:6
**piece** 171:21
**piled** 128:17
**place** 11:13 19:14
21:18 25:23 33:25
36:23 37:12,14
57:22 72:7 97:9
107:22 116:21
132:14,15 133:4
145:16 151:15
153:17 155:24
177:23 179:11
182:14 183:2,8,15
187:9,16 189:12
196:15
**placed** 9:9 11:17
21:4,7 22:18 31:20
33:15,22,23 140:14
175:20,22
**places** 111:9,11
**placing** 9:4
**planned** 112:15
**planning** 153:7
169:20
**play** 83:12 148:14
197:24
**playing** 92:18
**pleasantries** 26:4
**please** 4:7 6:7 7:16
9:1 13:14 29:4
43:15 82:5 112:11
152:10
**plural** 186:4
**point** 11:9 25:3
31:20 35:14 36:12
45:2 70:14 89:9
109:1 117:24
152:24 189:18

204:4
**pointing** 190:14
**police** 5:8 9:14,17
17:10,21,24 18:2,3,
5 19:12 20:11,15,
19,19 21:1,2,5,19
22:6 23:14,25 24:2,
4,8,10,14,17,18,20
26:6 35:5 37:7,13
41:21,24 42:1,5,8,
19,21,22 45:17
47:14 48:4 49:24
50:9 52:23 56:11,
13,16,17 57:7,11,
14,14 58:8,20 59:3,
6 60:3 67:2 68:24
77:16,17,19,20
78:2,6,9,13,24
79:5,8,11,13 80:2,
6,22,25 83:1 85:16,
19,19,24,24,25
86:7,8,9,10,12
87:10,14,15,16
88:3,16,22,22 89:2,
3,10,11,13,14,14,
15 91:1,2,9,11,12,
14,20 92:2 93:7,8,
16,16,17 96:18,25
97:2,5,11,19 98:20
99:20,21 100:12
100:12,19,22,25
101:3,5,19,24
102:9 105:18 106:4
107:6 111:18
112:11 113:6,7,7,
13,14 114:23,24,25
115:23 120:14
125:16 125:16
126:11 128:5
129:22 131:7,18
132:2 133:9 140:16,
21 144:10,11,13,15
145:7,9,25 146:5,
14 147:4,5,9,12
148:4,18 150:23
151:9,13 153:11,14
155:8,10,14,17
156:11,18 157:25
158:10 165:6,12,13
166:22 167:2,12,16,

18,18,23 168:8,14,
17 169:11 172:7,20,
22 173:8,9,11,19,
20,21,22,23 174:2,
3,13,16,18,19,22
175:22 179:7,10
188:24 189:3,15,17
190:16 193:10
193:10 193:10,12,
14 194:1 197:22
198:11 199:4,20
**policies** 47:11 109:9,
14,20,22 153:19
**policing** 90:23 90:23
103:4 109:2,4,8
110:21 169:24
**portion** 58:12 89:7
102:4 142:24
**pose** 197:9
**position** 34:1 91:18
104:23 118:22
119:13,15 144:11,
14 145:8 149:1,15
159:23 160:3,10
161:3,4,11,12
173:5 174:19
199:25
**positions** 77:1,3,4
78:11 79:5,7 80:1
168:9 199:22
**possess** 149:1
**possession** 22:10,13
23:4 185:15 204:19
**possible** 111:1 127:2
161:12,14
**possibly** 4:25 23:9
36:10 37:24 40:11
132:5 156:9 196:6
**post** 160:15
**posts** 200:8
**power** 132:6 141:10,
16 142:15,20
158:18 161:2 161:2
162:11 197:24
**powerful** 89:25
106:24 132:7
142:19 193:6
**Prairie** 167:16
**Precinct** 167:8,10,10,
11

**predestined** 84:1
**prefer** 88:5 95:20
  113:6 114:23
**preference** 193:14,15
  194:1,2 198:18
**preferred** 85:23 86:9
  87:10,16 88:16
  89:11,13 93:22,23
  95:7 104:17 113:4,
  13 114:6,19 171:24
  191:22 198:18,24
**prefers** 87:14 104:22
  193:8,9
**premarked** 8:9
**prepare** 7:2
**prepared** 167:25
**prepares** 54:9
**preparing** 55:6
**present** 56:16 59:4
  86:13 90:6
**presented** 204:25
**presenting** 58:5
**president** 41:3 77:12
  84:10 85:13 94:21
  96:4 98:19 100:3,4,
  5 103:3,19,19,20
  104:1,12,19 105:11
  106:24 109:3,10,21
  110:3,21,25 115:4,
  14,17 117:13
  120:12,17 121:8,17
  122:12,19 123:6
  125:20 126:5,10
  127:17,22 129:16
  131:20,24 132:25
  133:6 133:6,17,17,
  18,21,22 134:1
  135:13,17 138:17,
  21,21 140:8,9
  141:8,11,18 143:14,
  25 144:7 145:20
  154:17 155:7,15,20
  157:10,18 158:14,
  20 159:2,23 160:15,
  21,24 161:1 162:15
  164:4 169:16
  189:23 190:10
  191:19 192:7,14
  194:9,13 195:13,17
  196:1 197:25 202:4,

9,11 203:11
**presidential** 111:16,
  20
**presidents** 111:7
**president's** 112:9
  119:5 121:16,23
  122:3,7 124:1
  125:7 130:3 131:13
  133:13,15,19 142:3
  153:8 154:16,20
  160:2,10 162:10
  164:2,8
**pressing** 171:16
**presumably** 63:18
**presume** 69:23 70:6
**pretty** 38:5 103:13
  130:11 151:22
**prevent** 107:23
  180:17,21 181:7
**Prevention** 174:7
**previous** 86:19
**Price** 119:19,22
  120:1 133:5 138:16
  139:14
**pride** 146:1
**primarily** 102:17
**prior** 30:7 37:13
  48:13 72:6 134:19
  154:14 198:8,9
**probably** 40:25 41:5,
  9,16 42:1,2 83:7
  118:24 127:5 139:3
  147:12 148:24
  152:15 159:20,24
  160:5,6 166:17
  171:15 174:23
  199:13 199:13
**problem** 113:18
  196:24
**procedure** 153:20
  155:7
**procedures** 109:22
**process** 55:14,15
  78:1 83:1,2,11
**procurement** 185:17
**profession** 158:3
**professional** 98:13
  117:9,10 121:1
  149:13 174:25
**professionalism**

125:4
**professionally**
  149:14
**professions** 199:19
**prohibit** 74:9
**promised** 142:2
**promote** 53:12
**promotion** 47:22
**prompt** 70:11
**proper** 112:13,14
  155:6,13
**properly** 83:22
  107:17
**property** 185:15
**proposal** 96:13
**proposals** 96:7,11,12
**proposition** 186:16,
  17
**protect** 95:14 118:21
  125:25 131:3
  154:13 179:17
  180:8,14
**protocol** 158:9,10,11,
  13,16 189:10
**protocols** 145:13,16
  153:13
**provide** 50:13 65:14
  202:25
**provided** 18:13
**providing** 12:25
  52:12,16
**public** 23:13,16
  29:10 90:12 128:1
  146:22
**pull** 184:10,14
  187:19
**purpose** 53:22 54:3
  80:15 180:7
**purposely** 174:14,16
**purse** 130:3
**purview** 18:10
**put** 9:19 10:5,11
  12:5 33:1 36:19
  45:13 82:17 86:25
  100:6 110:23
  122:12 132:5 132:5
  139:24 145:16
  146:10,13 158:6
  160:14 172:15
  174:14,16 181:4

183:8,15 189:12
199:25
**puts** 83:5
**putting** 92:21 181:7

**Q**

**qualifications**
148:5 160:11 171:4
**qualified** 106:25
107:6 142:4 196:25
**qualifies** 38:13
**qualify** 38:7 79:9
**question** 5:23 6:5
12:1,2,9,13,20
20:7 36:4 39:11
51:6 53:6,19 58:18
64:14 70:19 71:3,
11 72:18,21 73:25
74:1 91:3 95:2
108:11,19 109:7
113:9,25 114:11
115:16 117:2
121:11 126:4
127:19 133:20
134:21 135:4
141:20 143:21
165:1,12 168:1
169:19 176:20
178:17 180:3
182:17 183:13,21
185:22 186:18
188:5 190:19,21,25
192:9,12,16 193:24
195:2 196:22,23,24
197:10 200:20
204:3,6,8,10,14,17
**questioning** 196:17
203:18
**questions** 5:17 15:22,
24 58:6 88:24 91:2
95:16 106:5 107:8
132:12 164:13
170:9,19 171:3
192:5 197:4,5
201:11 205:4
**quick** 27:9
**quickly** 29:2 194:17
200:21
**quite** 37:21 98:9

171:3 176:12 179:8
**quote** 120:7
**quote/unquote** 120:7

**R**

**radio** 17:21,24 18:3,
5 20:11,12
**ran** 138:15
**range** 40:14
**rank** 175:22 176:1,7
**ranks** 176:9
**rate** 35:11 37:15
38:20 39:22 40:16
41:2,4 51:19 53:9
146:25 147:21
**rates** 39:6,24 40:5
40:5,6,19 84:18,20
**rather** 140:10
**rating** 147:17 147:17,
18
**reach** 186:25
**reached** 159:16
187:11
**react** 150:6
**reactivate** 33:11
**reactivated** 32:4
**read** 51:23 55:3 69:5
122:2 159:21,25
160:6,7 177:6,17
188:7,11,15,19
195:2,10 205:11
**reading** 29:4 66:12
114:13 121:21
159:20,24 160:6
185:13 193:24
**reads** 29:18
**reality** 197:12
**realize** 118:21
**realized** 100:10,14
142:5,6
**really** 38:9 64:15
92:23 101:18
104:21 105:16
108:18 115:20
115:20 118:9 118:9,
15,17,25 120:20
128:17 154:12
154:12 174:21
174:21,22 194:17

200:21
**reap** 203:12
**reason** 6:20 35:24
53:18 54:3 58:25
87:23 153:24 179:2,
4 203:4
**reasons** 152:4 200:4
**reauthorize** 33:10
**reauthorized** 32:5
187:11
**recall** 26:1 34:25
42:25 45:20 57:10
59:8 63:20 64:1,7,
19 65:5,17 68:11
76:1,2,8 92:8,11
94:10 97:3,8 98:4
99:7 117:20 123:19
127:3
**receive** 8:19 35:6,11
39:23 40:8 41:15,
17,19 42:18,20
47:23 48:20 49:10,
12,17,22 50:4 53:8,
17 58:16,23 64:22
65:10 70:10 72:12,
23 74:2 78:25 79:1
166:3
**received** 9:20 10:10
15:25 16:3 28:1,2
34:5 35:8,22 41:2
42:24 75:18,22,25
76:17 126:5 142:1
154:15 164:4,7
166:11 174:4,9
178:9 181:18
194:11 195:16
**receives** 38:14 74:7
**receiving** 35:15
53:15 74:4 75:16
76:1,8 164:22,24
165:4,7,10 168:13,
17,18
**Recess** 43:9 85:7
124:16 143:7
164:18 170:16
194:24
**recognize** 8:17 13:22
27:19 43:18 69:6
77:2
**recollection** 7:22

14:23
**recommendation**
92:11 110:13
**recommendations**
90:23 91:9,23 92:8
94:23 95:4 96:21
98:1 109:8,15
**record** 4:8 38:18
43:8,10 45:18 47:4,
8,12 56:1 57:9
59:23 85:5 124:14,
18 142:23 143:5,8
146:4 164:16 174:2,
20 188:11,18
194:22 195:24
205:17
**recorded** 50:10 51:14
51:14,17,21 56:2,7
60:4,11,11,12,14,
20 63:11,19,23
67:7 96:23 97:1,2,
10,11,11 100:14
**recording** 51:9 56:6
63:12 64:2 67:9
**recordings** 50:14,17
51:2,4 63:24
**recreating** 78:2
**recruiters** 152:8
**refer** 119:18
**referenced** 12:18
**referred** 114:5,18
**referring** 29:25
31:16,18 64:25
65:6 68:9 82:7,9,
10,11 84:11 121:24
122:15
**refers** 46:23
**reflect** 39:2
**reflected** 28:19
**refrain** 7:16 11:19,
23 12:4,6,10
**refuses** 203:23
**regarding** 61:23
115:13 125:3
163:25
**regardless** 72:24
80:2 156:15 190:11
**Regent** 119:19,22
120:1 133:5,6,7,7,
7 138:15 139:14

**regents** 46:1 98:5
119:23 127:16,21
128:8,10,21 129:5
130:6 131:10,12,21,
23 132:20 133:9
137:15 138:7,17
139:1,11 144:1
154:19
**registration** 71:25
**regular** 35:8,11 53:9
71:6
**regularly** 37:21 41:7
71:14
**reimaging** 169:24
**reinstated** 32:25
**reject** 94:23 95:4
**related** 96:3
**relates** 78:24
**relating** 61:2
**relationship** 115:13
118:20 120:13
121:7 125:19,23
127:17,23 158:15
**Relays** 72:1,9
**relevant** 5:18
**relied** 93:22 95:23
105:6,7 106:3
108:18,20 116:1
152:8
**Relief** 177:7
**relies** 113:6
**relieved** 9:13,17
**rely** 108:10,23
112:23 113:11
**remain** 149:15 149:15
173:5
**remember** 15:8 19:24
23:25 25:9,11,15,
16 27:25 28:2
32:24,25 34:14,17
35:21 36:5,12
45:16 47:2,6,7
50:20 51:15 59:15,
24 62:16,24 63:1
64:12 67:4,21
75:16,19,21,23
81:13 89:21 92:15
94:12 95:8 96:24
99:4,17 100:1
100:1,8 101:6

104:18 115:18
116:6 117:23
121:21 123:24,25
125:22 129:9 130:9
133:2,3,4 134:5
137:2,5 154:2,5,8
158:19 160:9 162:6
177:8,20 178:13
183:7 190:4,8,14,
18 192:8 193:4
193:4,6 201:3,6
**reminding** 130:19
**remote** 6:2
**remove** 32:21 100:5
162:9
**removed** 119:5 158:5,
6
**render** 117:9
**repeat** 6:4 20:7
53:19 94:16 95:2
110:17 114:10
183:9 192:21
**repeated** 29:23 57:8
94:16
**rephrase** 35:10
**report** 48:15 59:7
68:20 125:16
**reported** 38:16
**reporter** 6:9
**Reports** 55:7,12
82:22 153:12
**represent** 4:6
**represented** 19:4
78:17
**reputation** 168:7
203:21
**request** 11:23 12:3,6,
10,15,21 45:3
111:4
**requested** 11:18 30:6
163:18 204:23
**requesting** 112:15
**requests** 29:23
110:20
**require** 29:19
**required** 161:13
190:16
**requirement** 81:25
**requirements** 171:9,
11

**requires** 79:19
    148:18 163:19
    173:1 182:6
**rescind** 119:11,21,24
    120:2 142:7
**resembling** 150:18
**reside** 8:2 144:17,19
    155:17
**residence** 27:24,25
**resign** 119:6 152:24
    159:17,22
**resignation** 30:13
    119:3,4,8,12,21,25
    120:2 142:7 153:1,
    4 154:5 175:18
**resignations** 30:11
**resigned** 44:16 46:14
**resigning** 153:25
**resolutions** 171:17
**resolve** 144:3
**resolved** 157:7,8
**Resources** 55:9
**respect** 112:10,18
    150:16,19
**response** 14:13 91:5,
    6,7 99:18 102:4
    118:16 138:6 187:5
**responses** 58:7
**responsibilities**
    122:22 144:10
**responsible** 144:23,
    24
**restart** 194:16
    194:16
**restate** 6:5
**restaurant** 129:4
    136:10,15
**restraining** 9:21
    10:2,9,14,16,19
    11:5,8,10,12 15:24
    18:13,16,18,21,23
    19:5,8,13 21:8
    25:22 31:23 33:25
    36:13,18 37:2
    140:19 177:23,25
    178:2,5,9,24,25
    179:3,20 180:7,11,
    13,16,21 181:6,13,
    18,20 182:5,22
    183:1,4,8,15 184:5

186:3,4 187:9
**restrict** 33:8
**resulted** 72:6 89:20
**resulting** 30:10
**retaliate** 12:22
**retentions** 149:18
**retire** 165:6 169:14,
    17,20 203:11
**retired** 167:13
    168:20,21 174:10
**retirement** 165:7
    169:10,13 170:3
**return** 152:19 182:19
    185:15,24 186:6
**returned** 186:19,21
**returning** 184:3
**review** 81:1 83:1
**reviewed** 7:4 73:21
**reviewing** 7:5
**rid** 202:4 202:4
**riding** 36:5,7
**right** 4:10,20 6:20
    7:15 8:1,4,15 9:9
    13:5,16 14:6,25
    15:1,15 17:7 18:6
    18:6 19:10,11 20:1
    21:4 27:11,13,13,
    19 28:8,14 30:9,19
    35:10,17,24 43:2,4,
    12,18 44:2,5,13
    45:5,8,9,15 46:21,
    25 47:14 49:14,24
    50:9,18 51:10,22
    52:20 53:6,15
    54:22 56:10 58:14
    62:18 64:8,19
    66:25 68:16,18
    69:14,18 70:21
    74:24 75:6 75:6,7
    76:13 78:8,21
    80:25 83:14 84:22
    85:1,9 90:20 97:8,
    24 106:13 112:22
    115:10 123:25
    124:5,17 126:3
    143:1,10 152:18
    158:14 163:9
    164:11,21 170:7,17
    176:11,23 180:1
    183:20 185:6,18

191:15 195:1,21,21
    203:6 205:2
**Rockets** 116:7
**Rodeo** 23:18,19,20
    24:1,10,15 166:13
**role** 48:24 52:25
    53:4,8 148:15
    168:10
**roles** 196:18
**romantic** 117:15
    118:20 120:12
    121:5
**romantically** 117:14
**room** 94:20
**Rose** 133:7
**Rosen's** 167:8
**rules** 5:15
**run** 71:23 130:24
    131:4,25

---

### S

**safe** 107:21
**safety** 28:18 29:10,
    20 30:22 107:2,10,
    13,14,15 111:19
    144:23 145:10
    146:22 146:22
**said** 11:25 14:6 24:5
    29:11 33:17 34:16
    42:5 44:19 53:11,
    12,19 57:24 60:13,
    25 61:25 62:6
    63:14 66:13,16
    67:8,15 72:8 74:17
    81:9 84:12 87:5,15,
    16,22 88:7,11 89:1,
    13 90:22,25 93:19,
    22,23 94:1,3,3,4,
    16,17 95:9,12 96:3
    98:16 99:5 100:1,2
    106:11,17 107:10
    110:15 112:8,16,17
    113:7,8,10,13
    114:6,19,23 118:15
    121:5 125:14
    129:18 132:21
    136:12 137:3,10,12,
    15,16 138:19,20,20,
    22 139:25 149:6

152:9 153:20 154:3,
24 157:9,18 158:4
159:23 160:20
164:1 171:7 175:1
177:6,17 178:6
180:8,10 182:24
183:10,24 189:5
191:2,25 192:2,3
193:9,22 194:5,11
195:15,19 198:10
199:14 201:6,9,18
**salary** 35:8
**salutations** 26:3
**same** 9:21 10:9,22,23
12:9,13,20 13:10
16:5,11,15 19:12
20:18 35:4 36:18
53:6 79:14 84:18,
20 91:7 93:18,19,
19,21,21 95:8
98:10 99:9,12,12
110:5 113:20 122:5
140:24 143:17
172:10 173:8 191:6,
24 192:3
**sample** 68:21
**sat** 165:25 166:1
**save** 68:19
**saw** 48:9,15 54:25
55:4 65:24 78:16
81:2 116:1 118:2
128:4 129:4 130:1
143:23
**say** 14:12 25:12
36:17 38:15 40:11
47:9 52:16 57:5
58:8 62:10 64:6,7,
15,17 70:4 76:25
78:12 86:16 88:10,
14 89:9 92:6 94:5,
12 96:8 100:20
101:19 103:18,20
110:5,6,16,17
111:5 112:2 114:8,
21 119:9 122:14
130:14 135:2,5
136:6,24,25 137:7,
19 138:15 139:13
143:18 150:8,11
153:23 158:21

162:18,21,23 164:7
168:5,12,15 169:21
169:21 173:19
176:6 184:2 187:8,
10 188:3,16,18
191:16 192:14
193:9 199:3,7,8
**saying** 9:15,24 13:24
26:17 32:3 47:7
63:15 74:18 87:24
90:12 92:24,25
93:13,14 95:20
114:1 117:17 127:1
139:1 147:18 154:2,
6,8 162:25 178:14
188:15 190:4
191:21 193:7
200:12 202:6 204:5
**says** 11:22 13:9
28:12 44:3,6,9
45:17 62:19 69:20
70:4 75:23 79:17
80:12 82:5 100:17
137:21 138:23
139:3 145:19,21
**scale** 147:19 147:19
**scarred** 203:13
**scene** 153:15 157:24
**scheduled** 15:13 17:6
**schedules** 112:4
**school** 41:11,13
160:16 175:7
183:25 187:11
**scope** 80:4 111:22
**screen** 13:13,15 27:6
75:12 187:17
**screenshot** 160:18
**scroll** 45:9 76:4
83:23
**scrolled** 60:1
**Scruggs** 51:24 51:24,
25 52:23,24 53:2,7
54:5,6 55:24 56:4
59:6,14 65:16,25
66:20 81:9,11,13,
21
**second** 44:21 136:8
151:18,25 154:21
176:14 181:4,24
183:4,8,14,14,18

184:22 185:2,10
191:10 193:19
205:10
**Secondly** 155:20
171:12
**seconds** 176:1
**secret** 144:6 144:6
162:14
**section** 54:6 56:10
70:8 185:8
**security** 39:24 41:16
41:16,18,21,25,25
42:4,9,9,10,13,18
78:18,22 106:13
107:18 108:4
121:16 122:23
124:2 128:13
129:15 131:14
132:24 133:11,13
145:10
**see** 8:6,15 10:19
11:9 13:16 27:11,
13,15,16 41:10
42:3,13,17 43:16,
17 50:24 52:6,15
57:7 63:4,6 65:15,
18 66:19 68:17
75:23,24 77:24
79:20,22 80:11
81:12 82:15,18,24
83:24 84:7 85:1
92:1 98:20 120:13
120:13 131:15,23
133:25 164:14
171:17 184:15,19,
24 185:10 187:20,
24 188:6,10,14
198:21 202:22
203:1,3,4 204:22
**seeing** 74:15 78:7
134:1 146:11 160:9
**seek** 155:7 178:24
**seems** 76:20
**seen** 13:19,24 14:21
26:18 43:20,21
48:12,14 54:19,23
55:1 115:24 177:5
**sees** 39:10
**segue** 175:16
**selected** 147:6,11,16,

23 175:14 198:12
**selecting** 148:4
**send** 43:13 95:17
**sends** 55:12
**senior** 47:15 48:24
**sense** 135:5
**sent** 45:3 46:16 69:2
    76:13 83:7 140:20
    152:25 153:4
**sentence** 12:14,20
    65:14 185:11,13
**sentiment** 150:18
**separate** 54:9 68:11
**separation** 28:10,13
**September** 87:8
**sergeant** 40:8 50:1,2,
    2,2 67:2,14,14,15
    91:25 96:2 103:8,
    13,14 104:10,11,12,
    14,15,17,18 105:8,
    15,19,23 106:3,18
    107:9,25 115:16
    116:2 118:7 119:20,
    24,24 120:12,17,18
    122:5,12 123:7,12,
    17,18 125:3 126:2
    128:18 135:18
    141:4,12 154:2,16
    155:4 156:3,17
    157:2,8 158:11
    159:22 160:9,12
    162:5 163:4,21
    175:18 176:4,7,7
    194:11 195:15
    196:6 198:2 201:21
    202:2
**sergeants** 163:6
**series** 5:17
**seriousness** 89:2
**serves** 80:16
**service** 78:6 155:11
    160:13 174:11
**services** 19:21 52:2,
    13,16,19 77:12
    78:3,24 79:7,18,23,
    25 80:24
**serving** 52:6
**set** 98:6 147:18
**sets** 200:1
**setting** 95:8

**several** 86:18 105:6
    127:24 129:6,19
    130:11 133:8 148:8
    148:8 166:23
    166:23 167:6,15,17
    200:2
**sex** 143:17,19
**sexual** 107:24 141:12,
    22,25
**sexually** 141:9 142:9
**shake** 94:19 110:11
**Shannon** 76:11,13
    80:21,23 82:11
**shape** 12:22 146:8
**share** 13:13,14 27:6,
    7 38:12 43:13 75:6
    137:22 149:10
    163:5 189:15
**shared** 162:15 163:4
**sharing** 14:25 36:3
    162:7
**Shaw** 77:10
**sheet** 38:17 54:9,20
    68:21,24 70:11
    72:25 76:2,9,14
    78:8,13 79:13,14,
    17,23 80:10,16,17,
    20 81:4,8,24 82:1,
    14 83:12,18,23
    84:4
**sheets** 38:20 50:3
    55:16 65:21 69:2
    78:2 81:1,3 82:6,7,
    9,19 83:19
**Sheriff** 167:11
**Sheriff's** 167:9
**she's** 44:3 70:14
    82:7 85:25 86:7,11
    92:13 104:22,23
    107:4 109:23 113:5
    142:16 162:19
    163:1 182:4 193:11
**shift** 47:20,22 48:23,
    25 49:2 56:2,8
    70:25 71:4,6,8
    72:5,19 126:16,22,
    24
**shifts** 47:17 48:20
    71:2 71:2 111:14
    127:4 155:12,13

**shirt** 24:18,20
**shock** 88:8
**shooting** 98:4
**shop** 116:20
**shopping** 130:4
**shortly** 160:14
**shot** 92:17 190:7
**should** 8:8 10:8,10
    13:11 29:14 60:3,6,
    12,17,18,22,24
    61:19 62:14 70:6
    93:8,9,12 105:2
    122:1,2 138:2
    152:3 156:13,15,16
**show** 7:19 8:4 13:5
    27:4 68:19
**showed** 88:17 95:21
    120:8 186:9
**showing** 48:10 88:18
    204:19
**shown** 45:24 116:12
    128:1,15 139:8
    177:3 184:9 187:17
**shows** 75:18,22,24
**Sias** 133:6
**sic** 9:5 134:23
    167:11 174:10
    194:23
**sick** 30:11,16
**sign** 39:7,15 40:4
    50:3 57:23 74:1
    83:2,4 205:11
**signature** 55:8 69:7,
    8,14 70:16 73:20,
    23 74:21,22
**signatures** 55:13
    69:5 73:10
**signed** 41:4 55:9
    74:19 82:13 188:15
**significant** 49:8
    166:20
**sign-in** 54:9
**sign-on** 33:9
**signs** 55:22 145:21
**similar** 32:14 47:16
    89:17 140:23
**similarly** 33:10
**simple** 182:17
**simply** 34:1 204:17
**Sims** 77:10

**since** 19:16 44:8
47:22 52:7,17
122:4 165:15
166:21 168:3,5,22,
23 169:5 202:23
**sir** 6:14,19,23,25
7:11,23,25 19:16
53:5,10,14 65:7
77:18,22 84:14
84:14 170:13
**sit** 152:15 165:16
194:8 195:12,25
**situation** 156:14
157:7
**situations** 197:8
**six** 86:11 166:23
**skill** 147:18 148:25
200:1
**skills** 160:13 171:14
172:12 199:24
**skip** 30:19 51:22
52:20,21 68:18
**Skipping** 57:13
**slide** 139:8,24 140:3,
4
**slow** 28:20 29:3,5
**small** 89:20
**smart** 130:24
**smeared** 203:13
**Smith** 158:25
**so...okay** 191:13
**social** 160:15,17,19
165:24 200:7
**software** 6:3
**solely** 152:8
**some** 5:15 7:8,19
23:9 28:15 35:20
45:1 51:23 68:19
71:22 98:9,21,22,
24 99:4 108:2
112:3 117:24 118:2
127:5 128:4,7,18
129:1,2,4,23 130:2,
14 144:9 150:10
150:10 151:16,25
152:3,12 154:18,19
165:11,13 166:17
169:22 171:13
179:8 192:5 198:3
**somebody** 156:22

**someone** 56:23 73:9
78:17,19 112:5
133:25 140:11
160:2,18
**someone's** 48:3 160:8
**something** 14:12 26:9
37:20 38:1 40:24
41:9,13 47:9 49:1
57:19 72:9 82:10
83:18 94:13 95:22
102:19 104:4,5,8
107:22 110:2
115:20 117:5
119:16 120:19
122:20 123:23
126:17 132:24
133:11 136:14
137:6 139:13
154:12 155:1,16
156:9 160:8,18
162:18,24 163:24
166:19 168:16
171:7 177:19
178:13 179:11
188:24 191:1
200:16,22
**sometimes** 58:1 191:2
**somewhat** 198:3
**somewhere** 119:13
121:21 149:13
159:25
**soon** 119:10 161:25
170:2
**sorry** 5:8 10:3 12:2,
14,16,21 28:25
31:25 41:19 53:12
62:7 69:11 71:4,16
73:17 75:8 76:22,
23 83:1,18 86:23
105:12 106:15
113:25 114:9 123:1,
3 161:18,20 164:25
168:21 169:15
191:14 194:15,21,
25 195:5,6,11
204:5
**sort** 38:1 79:10
104:4 107:19 116:8
119:16 123:23
**sounds** 5:13 47:9

85:3
**sources** 164:22
**Southern** 4:6,14 5:21
9:4 28:17 79:18
85:13 89:23 91:19
98:23 169:7 180:17,
21 181:7 187:1,4
197:13,17 198:15
203:9,22
**Southwest** 174:12
**space** 118:11
**span** 167:4
**speak** 5:25 7:17
17:10,12,13,17
25:24 60:3,6,13,24
61:1,10,12,23 62:3
64:3,18 115:12
127:16 129:22
132:6 135:13,19,24
147:3,24
**speaker** 105:3
**speaking** 7:1 19:21
21:13 26:1,6,8,8,
11,13,17 40:1
63:20 64:1,12
154:5 172:7 201:15
**special** 37:5,11,12,
15,15,17,20,23
38:7,13,14,19,19
39:5 39:5,12,12,16,
18,20,23,23 40:9,
21,22 41:6,14,19
42:19,20,23 64:22
65:10,25 66:3,10,
11,16,17,21,24
69:19 70:1,8,9,10,
12 71:23 72:13,15,
24 73:4 74:2,3,5
75:1 77:5 80:18,19
83:7 84:7,8,12
**specialist** 174:11
**special-special**
40:23,24 41:2
**special-specials**
84:13
**specific** 17:25 23:17
92:8,11 127:18
131:11 161:3
**specifically** 89:8
95:9,12 97:23

105:13,19 107:10
114:23 128:11,18
130:9,14 132:19
133:22 137:3 154:8
178:6 193:7 198:2
**speculation** 161:16
194:5
**speech** 191:25
**spelling** 4:11
**spending** 123:20
**spoke** 18:14 61:22
63:7,8,12,14 64:11
66:9 94:2 117:21
119:23 125:2
129:13 130:9
**spokesperson** 145:2
**sports** 20:3
**spot** 122:13,14 142:2
**spotty** 6:3
**Spring** 167:14
**spurious** 31:6
**squad** 111:15
**staff** 28:18 128:23
144:19 145:11
159:8
**staffing** 145:5
**stake** 130:7
**stakeholders** 120:24
144:20
**stand** 99:4
**standard** 15:18 173:3
**standards** 199:18
**standing** 108:12
166:8
**standpoint** 175:2
**Starks** 50:2
**start** 47:3 104:9
109:1 161:8 171:4
176:3,22
**started** 72:5 117:17
117:17 128:14,17
185:11 196:13
**starts** 28:16
**state** 4:7 32:12 42:6,
7 50:18 60:22
88:23 91:15 96:25
97:5,7,16,17 99:8,
18 100:6,12 101:3,
4 102:11 145:1
172:20 173:25

203:12
**stated** 45:18 47:14
48:8 49:25 50:9
52:23 54:5,6 55:24
56:16 57:7,14
58:19 59:4 62:21
65:23 66:25 200:8
**statement** 11:24
29:25 30:2 45:17,
21 47:18,25 48:19
50:12,15,21 55:11
55:11 57:11,18
64:24 65:1,6 66:2
67:17 85:22,23
86:2,14,17 87:19
89:17,18,20,24
90:1,4,7,9,10,16
110:18 111:3
150:15,17 164:10
186:16
**statements** 28:15
31:16,18,19 51:23
187:22 188:4
**states** 11:16 52:8
58:19 60:2,16
88:22 146:3
**stay** 63:2 167:3
199:11 203:15
**stays** 123:21
**steady** 168:3
**step** 144:8 153:21
**steps** 156:12
**stick** 197:23
**sticks** 193:8
**still** 22:9,20 23:7,
10 62:10 63:24
79:8 97:9 111:22
131:17 134:12
141:6 153:4 163:17
184:11 197:21
202:13,22 203:12
**stock** 120:23
**stole** 200:9
**stood** 198:20
**stop** 14:25 35:14
36:3 45:19 53:1
**store** 118:4
**strange** 181:3
**strategies** 109:2,4,
15

**strategy** 189:13
**straw** 133:25
**street** 136:10 200:11
**streets** 107:21
**strength** 148:7
**stressful** 197:8
**strictly** 74:9 102:17
**strike** 58:15 134:7
151:10 178:1
192:15
**strong** 203:15
**struggled** 199:3
**student** 41:8 77:10,
12 92:17,18,24,25
93:14 190:7
**students** 28:18 99:5
107:20 111:19
144:17,18 145:11
150:2 169:25 170:6
200:9
**style** 104:21,24
**subject** 18:2 172:5
**subjects** 172:5
**submit** 81:7
**submits** 81:1 82:12,
21
**submitted** 82:6,8,19,
23 166:21
**submitting** 81:23
**subordinate** 18:7
**substance** 60:7
**succeeded** 133:18
**Such** 20:11 29:18
41:7 61:15 79:9
116:12 162:16
195:10
**suddenly** 33:3
**suggest** 92:7 110:2
191:18
**suggested** 109:2,4,9
**suggestion** 93:5,7
**suggestions** 191:3
**suite** 116:4
**summary** 45:10 46:22
60:2 62:19 65:2
**summer** 136:13
**Sunday** 86:5 87:3
**superceded** 21:8
**superseded** 9:23
10:11

supervised 197:18
supervisor 35:2
    39:25 41:6 49:15,
    21 50:19 51:10,16
    52:25 53:4,8,16,20,
    23 54:1,8 55:19
    56:24 62:19,21
    65:23 66:13,25
    68:12 74:18 78:19
    81:24 82:1 85:17
    88:8 106:8 109:23
    116:15 131:19,20
    132:4 132:4 149:6
    156:17,18,23,24
supervisor/lead
    64:21 65:11
supervisors 37:1
    38:21 39:9 41:8
    47:15,19 48:21,25
    51:4,18,20 55:17
    62:23,25 63:9,11,
    21 64:4 67:10
    73:22 81:2 82:25
    149:8
supervisor's 50:10
supervisory 171:14
    173:12
support 78:19,22,23
    79:6 144:22
supposed 5:14
supposedly 179:4
    196:14 203:16
sure 6:9,15 15:7
    16:13 18:24 26:14
    29:8 34:8,11 59:25
    83:21 103:13 125:4
    127:20 130:12
    134:4 170:11
    191:11 192:22
    195:24 204:16
    205:11
surfaced 196:8
surfacing 202:2
surrender 21:19
surrounding 144:16
switch 152:19
switching 176:25
sworn 110:18 147:10
    160:8 164:9
system 202:20

**T**

take 16:19 43:3
    48:24 84:23 89:1
    92:21 93:9,10,13
    109:22 116:19
    118:24 124:6
    131:19,25 132:3,13
    133:16 141:11,17
    143:2 144:8 146:1
    151:15 153:8,21,22
    158:6 164:12
    171:18 173:12
    194:19 203:9
take-home 21:22,23,
    24 22:1
taken 4:24 5:7,20
    162:17 173:10
    196:15
taker 79:10
takes 57:22 171:6
    172:4
taking 5:20 7:17
    49:7,9,19 118:4
    130:4 132:9,15
    162:10 180:22
talk 60:19,22 61:19
    62:11,14 64:17
    81:18 107:14
    109:24 110:16
    116:24 133:20
    139:15 144:8,9
    169:3 187:15
talked 62:9 86:19
    115:10 119:20
    139:5,6 175:17
    189:2
talking 6:8 24:6,25
    26:15,19 29:2
    46:16 59:16 63:17
    100:18 107:15
    125:13 138:23
    151:5 163:9,10,11,
    13,14 177:3 201:23
    202:8
taped 27:21 140:1
    168:23,25 169:5
Taren 170:20
targeted 198:2 203:5

tarnished 148:2
Teams 45:4,6,23
    46:15,16 59:11
    60:10,11,14,20
    61:7,22 135:8
    179:14 196:11
technical 78:18,22
    79:6
tedious 12:14
telephone 23:11
    185:17
tell 4:23 28:9 45:18
    47:4 53:2 55:24
    60:18 61:18 62:13
    68:2 85:18 87:9
    91:8,10 93:24
    94:15,22 95:4,24
    96:6,9,12 101:11
    103:6,18,21 104:12
    107:11 110:17,18
    112:23 117:4
    118:12 120:1,3
    136:13 138:9,12
    143:14 146:24
    147:25 148:14
    153:6,24 154:1
    160:1 161:6,10
    162:22 171:9,21
    176:1 189:25 192:6
    196:21 197:3
telling 23:1 39:16
    64:20 66:12 116:6
    137:21 157:11
    161:23 175:8
    194:15 196:6
temporarily 9:13,16
temporary 9:20 10:2,
    9,14,16,19 11:5,10,
    11 18:12,15,18,21,
    22 19:5,8,13 31:23
    33:24 36:13 140:19
    177:7,23,25 178:2,
    5,9,23,24 179:2,20
    180:7,11,13,16,20
    181:5,12,17,20
    182:5,21 183:1,4,8,
    15 184:5 186:3,4
ten 101:21 124:9,10
    170:1,2 175:25
tend 167:3

**ten-minute** 124:7
**Tennessee** 91:15
   96:25 97:5,6,17
   99:8,18 100:5,12
   101:3,4 102:10
**tent** 166:14
**tenure** 163:7
**term** 37:5 44:7 49:4,
   6,6,9 114:7,20
**terminate** 137:15,17
   138:4,7 140:6
   144:2
**terminated** 138:10
   139:23 164:3
   179:19,21 194:12
   195:17 196:7,12
   200:8 202:15
**terminating** 138:12
   163:22
**termination** 142:21
   168:4,5 178:7
   197:22 200:6
**terms** 30:23 31:1
   159:9
**Terrell** 133:8
**testified** 5:11 31:5
   73:13
**testify** 6:16,21 7:21
**testimony** 6:12 19:9
   46:22 52:11 53:21
   54:24 63:6,8 65:8,
   13 66:5,20 72:11
   79:12 132:22 188:7,
   10,19 198:10
**Texas** 4:6,14 5:21
   8:3 9:4 28:16
   42:14 79:18 85:13
   89:22 91:19 98:23
   139:16,19 169:6
   172:17,19,21
   180:17,21 181:7
   187:1,4 197:13,17
   198:15 203:8,22
**text** 112:1,8
**than** 25:6 46:9 49:9
   56:1,7 75:20 86:9
   99:24 101:23 102:7,
   8,16 115:17 121:13
   126:18,19 128:12,
   14 129:12 132:3

   133:23 142:9 150:1
   158:3 164:9 171:25
   200:15
**Thank** 4:12 29:6,7
   39:11 43:7 44:24
   46:25 58:12 63:25
   68:6 70:17 80:13
   83:10 110:7 114:1
   115:8 142:25
   143:10 152:18
   170:14,18,22
   194:21 202:16
   205:3,5,6,7,8,9
**thankful** 83:10
**thanks** 160:15,20
   170:21
**that's** 8:21 8:21 9:9
   11:25 12:19 14:24
   15:7,25 16:4 27:8
   27:8 28:12 37:15
   38:5 39:14 42:8
   43:6 44:6,8,9
   45:11 47:13,20
   49:19 51:2,5,5
   52:8 53:25 55:14
   56:25 57:5,20,23
   58:4,9 61:24 66:14
   67:7,18,18 68:14
   68:14 69:8 72:8
   80:17 83:22 84:3,5,
   11 87:6 88:10
   90:14,20 92:13
   93:20 94:17 100:14
   102:25 106:14,16,
   16 110:6,8,18
   111:12,20 113:20
   121:2 123:10 126:2
   127:2 131:7 135:1,
   10 136:8 137:15
   138:16 139:3,10,14
   142:6 144:3 149:5
   150:2,10,10 153:18
   153:18,19 155:18
   157:4,24 159:7,24
   160:16 162:22,25
   163:20 164:9 165:5
   166:15 167:7,8
   169:8,12 172:9,19,
   20 179:15 185:5,21
   186:6 188:20 190:7

   195:1 200:19
   202:14
**thefts** 107:23,24
**their** 38:19,20,21
   39:8 47:17,20
   48:21,25 49:20
   53:9 55:13,15,16
   56:2,8,18,21 57:22
   59:7,23 65:20
   66:14 70:25 71:2
   71:2,8 72:19 73:21
   77:3 81:1,2,2,3,24,
   24 91:5,9,22 92:5,
   10 94:7 96:20 97:8
   101:25 102:18
   103:11 108:20
   111:22 133:23
   139:7 141:14
   144:23 155:16
   159:1 169:2 175:6
   179:16 187:5
**themself** 188:12
**then** 39:17 40:22
   41:24 46:15,20,21
   47:10,11 52:15
   55:8 61:9,16 63:4,
   15 67:8 69:3 69:3
   70:3 74:19 77:11,
   12,13 80:6 82:14
   83:8 94:1,15 97:12
   100:11 110:12
   111:25 118:23
   119:8 143:3 145:8,
   17,20 149:14
   156:11 158:4,7
   162:21 164:13
   170:12 171:15
   172:9,24 185:7
   187:15 190:24
   191:3 194:18
   195:19 196:14,20
   197:10 199:12,13
   205:4
**there** 8:21 9:19,24
   10:10 14:15 19:5,
   16 24:15,18 27:14
   28:3 29:20 38:12
   39:4,14,16 40:5,6,
   22,22 41:14,23,24
   42:23 44:3,8 45:19

46:18 47:15 49:8,
10,22 50:18 51:1,
10,13,16 53:1
55:16 56:22 61:15
62:2 63:2 64:2,8,
16,18 70:8 75:7
76:18 78:1,19 79:5,
20 80:15 81:24
84:4,12 86:13,18,
22 89:16,19,23,24
90:8,11,17 92:1
96:24 97:3,14,21
98:4,10 99:6,22
101:5 102:6,8,15
103:10 105:10,22,
22 106:1,6 108:6,
11,19 111:12 115:2
117:4 121:6,7
125:10,12 127:10,
24 128:7 128:7,23
129:19 130:11
132:11 133:16,17
134:5,12 140:4,19
145:6,24 147:5
149:22 150:21
151:3,8,11 153:12
155:10,23 157:22
158:25 159:13
162:15 163:7
167:13 172:24
175:22 177:10,22
178:21 179:20
180:10 197:17
199:18,25 202:23
204:18,25
**thereafter** 160:14
**Therefore** 41:2
112:13 139:19
**There's** 10:8 38:8
78:22 107:16 122:1
130:13 143:21
145:6,12,25 153:16,
17 156:21 165:22
172:14 173:1
**these** 8:5 31:16,17,
19 36:24 47:21
53:7 56:4 59:21
62:24 63:4,9 65:9
67:5,10,21,24 68:2
69:9,11 72:13

73:18 76:16,21,23
78:18 80:1 84:1,18,
20 98:24 99:7
103:17 106:12
107:8 108:8 116:11,
14,15,16,18,25
127:3 130:10
132:12,13,14
137:13 139:6
146:11 149:21
162:6 163:5 171:18
182:1 186:1,10
187:18,21,25 188:4
189:23 190:5,17
191:3,9
**they'll** 37:2
**They're** 24:24 51:13
57:2 57:2 74:15
141:2 144:23
150:19 157:10
158:7 162:7 174:23
178:11 178:11
**they've** 74:21
**thing** 18:22 29:10
47:24 61:15 92:19
93:21 94:9 100:3
110:6 150:8 155:3,
13,19 163:15 190:7
191:24 192:3
199:13 200:23
**things** 72:1 79:9,10
87:2 92:6 98:13,22,
22 104:18 105:7,8
106:1,7 107:18
108:1,21 115:23,25
116:2,8,14,15,16,
18,20,22,23,23,25
117:8 118:4 128:4,
9 129:1,2,4 130:2,
5,12 132:13,14
142:10 145:7,15,16,
22 147:22 148:10,
11,13,13 149:9
151:15 152:12
153:11 158:9 163:5
165:13 169:22,23
172:6,8,10 174:15
179:9,18 188:14,16
189:12 191:18
192:5 197:15 198:3

200:14 203:16
**think** 5:3 13:21
14:14 15:22,23
16:10 16:10,21
26:2,3 29:10 38:6
45:4 57:5 58:2,6
62:5 66:19,20
67:15 68:18 78:1
79:17 88:17,19,19
95:6 102:22,24
106:8,18 117:3
118:15 120:25
122:8 123:21 124:6
126:22 127:24
128:4,14,16 129:18
130:13 132:9
134:18 139:12
142:17,18 143:1
149:19 151:16
153:20,21 158:1,11,
13,14,17 159:12,20,
24 160:17 163:15
163:15,16,20,22,23
170:4 171:7 173:13
177:12 178:17
179:14 183:18
190:22 192:4
193:18 200:19
202:8,16 204:11
**thinking** 158:2
**thir** 171:15
**third** 52:21 151:25
**Thirdly** 171:13
**thoroughfare** 90:13
**those** 5:1,6 7:8,10,
12,18,20 15:18,19,
19,21 17:3 39:10
40:14 41:8 59:18,
24 60:13 63:5 67:6
72:16 73:9 74:4
77:9 78:16 79:6,9,
19 82:18 83:25
91:12 92:4 97:1,11,
22 98:22 98:22
101:7 103:23,24
104:2 104:2,5
105:9 108:1 110:12
114:25 115:24
116:22,23,23
118:20 121:3

122:11 123:19
128:2,9 130:5
131:5 132:11
133:10,23 141:13
142:10 144:21
145:14,15,15,16
148:10 148:10,13,
13 150:12 151:15
152:4,12 153:13
158:9 167:2,3,3
172:6,10,11,25
173:3 175:3 186:24
187:3 188:16 197:4,
5 200:1 201:11
**though** 101:10
**thought** 24:6 98:15
99:20 105:14
117:25 140:7 154:9
165:2 168:20 169:9
**threat** 145:14
**threaten** 31:9,13
153:2
**threatened** 152:24,25
**threatening** 31:7
**three** 4:25 5:4,5
40:14 77:9 101:20
102:6,7,8 119:10
147:6 149:8 166:1
**through** 15:18 21:7
28:14 34:15 39:8
49:19 70:1 72:13
82:25 82:25 87:1
93:3 105:20 112:1
121:10,11 139:16
162:11 165:21
171:16 172:2,3,18,
21,22 182:25 184:5
185:11,14 192:18,
23
**throughout** 29:22
139:8 146:9 174:5
196:11 200:15
**throw** 102:15
**ticket** 79:10 122:4,5
**tickets** 149:23 150:2
**Tiger** 89:23 90:14
**time** 18:15,18,21
23:21 27:1 30:13,
17 33:1 35:2,19,20
38:17,20 39:2

45:19 46:12 47:4,8,
12 48:15 49:10
50:3 54:20,22,25
55:4,7,12,16 56:13,
18,21 57:2 59:7,10,
16,23 65:21 67:8,
13 68:19,21,24
69:2 70:11 72:25
74:20 81:1,9,12,18
82:5,7,17 83:8
88:9,15 89:17,21
92:13,15,20 94:10,
20 95:22 98:2,3,6,
9 100:2 105:14
111:12 112:1,7
119:23 122:6 123:5
126:6 129:21
131:19 136:8
138:13 141:14
143:11 151:21
154:4 162:23
163:11 170:18
179:8,22 190:15
198:7 199:24
**timekeeper** 52:3,4,5,
7,10,12 65:16,18
77:7 81:5,8,11,17,
21 82:2,12,21,23
83:5 83:5
**timekeeping** 52:16,18
**timeline** 119:9
136:16 154:3
**times** 4:23,25 6:4
46:18 56:1,2,7,7
69:1 97:25 98:2
99:2,3,6,15 100:25
101:6,15,16,22
102:8,16 103:22
105:22 111:11
115:2 123:14 147:6
149:19 167:2
171:16
**Timesheet** 65:24
**Tina** 62:20 65:3,6
**tired** 74:15
**title** 49:12 145:25
146:17 161:4,6
**today** 6:13,22 7:20
188:7,11,15,19
194:9 195:12,25

**together** 83:5 86:25
146:21 148:22
**told** 16:8 48:19
52:24 59:6,23
60:17 65:15,25
93:11,12,18,20,25
94:3,4 104:25
115:19 117:21
118:23 119:12,13,
14,19,20,23,24
125:14 128:3
137:25 154:10
155:1 159:22 162:1,
3 193:5 198:14
**too** 14:8 29:2 76:23
118:16 152:6
153:20 191:13
**took** 49:21 72:7
104:19 133:4
141:19 142:14,17
152:11 154:12
155:24 179:11
182:14 187:16
**toolbar** 184:21
**top** 53:8 169:21
172:1 176:2 176:2
**topic** 61:2,20 62:9,
14 63:3 94:13
152:20
**topics** 62:2,3 86:18
172:4 173:2 176:25
**tops** 36:24
**total** 58:17,20,23
**totally** 157:4
**touch** 199:12
**tournament** 122:19
**toward** 11:6 90:3
128:18 175:5
**towards** 193:16 194:3
197:19
**towed** 22:25
**town** 121:17,22
123:15 124:3
**traffic** 78:23
**trained** 153:19
**training** 46:17 50:5
56:17,21,22,23,24,
25,25 57:3,8 59:11,
17,20 60:10,25
61:24,25 62:10

135:9 171:13 172:4,
11,14,16,21,23
173:2,4,17 179:16
**transcript** 6:9
205:14
**transparency** 148:7
**transpired** 141:15
**travel** 15:1 121:16
123:8,13,14,16
124:2
**traveled** 121:17,22
**traveling** 111:10
122:19 123:11
**treating** 134:1
**treatment** 144:5
**tremendous** 169:22
**tried** 57:5 95:14
128:9
**trip** 122:15,17 154:6,
10,11,16,24 155:2
**trouble** 8:10 27:5
**Troy** 91:15
**true** 11:10 30:2
31:18 47:18,20
57:18 58:15 88:9
100:7 159:19 163:8
164:6
**truly** 146:12 152:7
152:7,15,15
**trust** 120:23
**try** 51:17 185:2
203:15
**trying** 16:4 19:24
66:4 68:5 86:25
89:5 92:1 100:11,
15 111:4 112:4
115:15 131:3
143:20 144:1
153:15 154:13
160:3 161:11 170:2,
3,6 188:25
**T-shirt** 24:10
**TSU-issued** 23:10
**TSU's** 29:20 31:8
85:16 150:22
**TSU-sanctioned**
19:17,20
**turn** 21:19 22:15
91:6 162:11
**turnaround** 123:21

**turned** 7:9
**twice** 165:16 174:6,7,
10
**two** 7:4 40:18 50:4
51:19 56:18,21
57:1,9 64:20 65:11
72:13 81:13 90:18
91:10 108:11 119:2,
10,10 124:21
130:16,22 131:5
141:13 149:7
154:14 166:1,2
167:24 177:10
178:9,12 180:10
203:8
**type** 24:3,10 32:14
40:15 107:2 116:11
122:20 165:11,14,
21 166:10 168:9
171:13 198:14
**typed** 188:12
**types** 40:19
**typical** 70:24 71:3,5,
11,16,20
**Typically** 71:20 81:5
**typo** 70:3

**U**

**Uh-huh** 9:22 10:7,25
11:3 16:6,24 18:11
24:19 25:21 37:4
38:2,11,22 40:3,13
46:4 47:10 55:18
61:9 64:10 68:7
73:24 78:4 80:14
81:15 84:6,16
110:10 111:23
113:16 115:21
123:9 125:24 126:6
128:10 129:24
130:18 135:23
136:2,11,15,24
137:9,11 138:9
140:2 143:24
146:16,24 155:25
156:4,8,13 166:25
167:19 168:24
183:23 185:1 189:4,
21 192:25 200:18

**ultimate** 140:7
**ultimately** 73:14
139:22 140:10
**unable** 13:12
**unacceptable** 157:5
**unbecoming** 117:22
**uncomfortable**
116:24
**under** 6:16 69:19
93:18 121:22,23
144:25 150:6,12
151:1,5 172:9
182:5,18 187:22,25
188:4,7 189:5
**undermined** 88:19,20,
25 131:18 132:1
162:20 197:23
**underneath** 149:11
**understand** 5:19 6:12,
15 11:9,25 19:4
21:12,14 26:14
34:1 42:3 53:23
58:5,18 60:21 62:1
64:1 66:4 67:17
80:7 83:20 84:4
98:17 106:23 111:4
113:9 115:22
118:25 119:17
121:4 129:19
132:18 134:2 149:9
152:16 158:19
168:12 179:8
**understanding** 21:11
88:1 109:6 148:18
196:1,3 201:8,10
**understands** 107:7
**understood** 42:17
116:10 191:8
**unemployment** 164:24
**unfamiliar** 39:19
**unfolding** 92:19
**uniform** 20:19,20
23:14 24:1,2,8
**unique** 144:14
**United** 146:3
**Univ** 167:17
**University** 4:6,15
5:21 9:4 28:17
77:6,7 79:18 85:14
87:1 89:23 90:14

91:15,19 96:25
97:12,18 102:11
106:19,24 107:16
111:7,8 115:4
119:1 122:17
122:17 130:7
141:11 142:17
144:15,17 145:11,
23 156:11 169:7
180:17,21 181:7
187:1,5 197:13
198:15 203:9,22
**university-owned**
12:11 20:5,8
**University's** 28:22
29:9
**unless** 21:9 94:23
95:5 125:10,12
165:11 172:22
**unlock** 20:16
**unlocked** 31:24
**Unmuted** 195:7
**until** 6:7 44:22
48:14 50:24 87:2
117:16 133:21
157:7 196:10
201:16 202:11,13
**upset** 155:1 162:9,12
**usage** 30:11
**use** 20:5,8 21:24
22:6 32:21 52:25
53:3 66:3 71:19
84:2 100:24 114:7,
20 159:2 161:2
**used** 6:13 20:16 22:8,
17 37:6 39:5,12,14,
20,21 44:7 54:7,20
79:13,15 80:17
100:18 117:6,7
132:25 133:12
137:6 141:10,16
158:17 159:9
162:12 168:4
177:18 192:1
**uses** 79:19
**usher** 79:9
**using** 30:16 49:12
52:2 54:15 120:7
154:20
**utilizing** 12:10

## V

**vacant** 167:3
**value** 21:15 101:25
141:21,24 142:8
166:20
**valued** 148:5
**Vanessa** 29:13 114:12
184:23 193:23
195:1
**various** 104:3 111:9,
10
**vary** 39:24
**vehicle** 21:2,5,19,22,
24,25 22:2,6,8,9,
13,14,17,22,25
23:2,8 104:8
157:18,20 158:7
185:16
**verbally** 56:17,20
**verbiage** 178:8,14,19
**verified** 188:19
**very** 36:17 39:10
46:2 55:22 59:16
71:19 74:11 87:12
89:6,12 92:11,15
98:16 103:23
104:14 113:3 115:3
134:20 138:25
161:14 167:1 168:6
174:12 181:3
**via** 31:5 60:10 61:22
69:2 179:13
**vice** 77:11 84:10
**videoconference** 6:3
**View** 167:17
**viewed** 39:8
**vigilant** 74:11,16
**violated** 30:23 31:1
**violation** 154:21,22
**visible** 27:14
**visit** 25:4 26:21
**visitor** 106:22
**visitors** 37:25 107:2
**voted** 147:5 198:11
**voter** 71:25
**voting** 38:8

## W

**wait** 6:7
**waiting** 203:8
**Walk** 89:23 90:14
107:21 203:14
**Walker** 167:12
**walking** 104:8 200:10
200:10
**Waller** 167:10
**want** 15:21 16:13
36:17 46:7 64:6,7,
17 70:13 71:19
80:6 100:5 101:21
102:12,14 120:25
124:8 129:18
136:16 139:13
146:12 148:12
149:20,21,22,24
154:9,23 175:16
176:11 180:2,3
188:24,25 190:25
190:25 191:12
195:23 196:16
205:11,14
**wanted** 53:13 69:18
78:5 79:4 80:9
86:6 89:3 91:5
98:19 100:4 101:24
102:18 105:19
111:12 115:22
116:13,17,21,24
117:9 118:10 119:5,
6 120:21 123:7,12
125:25 129:7 130:8
131:18,23 133:22
134:2 135:18 149:9
151:17 152:1
158:17 162:9,16
163:24 174:14
190:19 198:1
199:23 200:22
204:4,14
**wanting** 174:24
193:14 194:1
**Ward** 48:5 55:25 59:5,
13 62:22 63:9,22
64:4,20 65:10,18
68:23 70:9 72:12,
25 73:2 73:2,3
74:2,25

wasn't 33:23 52:10,
    11,12 67:25 81:11
    87:2 117:9 120:19
    140:18 146:17
    157:8 167:25
    191:25 198:7
way 50:22 88:2 93:19,
    21,22 110:22 176:2
    185:2,22 196:23
    201:14 204:17
ways 37:19
wear 20:19 105:1
wearing 23:25 24:10,
    13
Wednesday 67:1
week 59:4,9,14 72:9
    119:2
weekdays 15:18
weekends 72:10
weekly 47:24 55:7,12
    65:24 81:2,3,24
    82:9,18
weeks 154:14
welcome 44:25
well 5:3,13 6:11
    7:15 11:9 12:3
    16:2 20:6 21:20
    37:12,17 41:16
    52:4 63:17,25
    77:16 78:14,25
    79:15 81:18 83:15
    84:22 97:18 102:2
    113:22 119:19
    126:14 134:7 136:8
    138:19 139:24
    146:22 151:10
    152:18 162:19
    174:18 183:12
    197:9 200:19
    202:16 204:14
    205:3
we'll 47:3 85:1
    104:9 124:12
    170:10 178:21
well-known 174:12
went 22:1,4,8 24:9
    26:24 33:6 51:8
    69:12 125:6 133:24
    134:3 136:10,15
    157:17 183:25

186:9 188:22,23
    191:20 192:1
    198:20 199:16
we're 6:2 7:17 16:5
    24:25 43:2 45:11
    46:7 66:15 115:24
    142:13 143:2
    148:22 153:18
    186:2
We've 115:10 133:15
    165:25
whatever 67:8 83:6,8
    90:2 100:9 117:19
    135:21 139:7
    149:22 157:16
    158:15 158:15
    159:3 162:13
    197:19
what's 12:19 14:5
    30:1 66:16 107:1
    115:24 118:12
    157:25 158:5
    162:22 181:24
    186:14 193:19
whatsoever 146:4
whenever 16:25 32:14
    121:17 145:12
    150:9
whereas 42:1
Wherever 80:25
    175:21
whether 25:12 55:11
    56:3 57:10 71:13
    72:24 80:2 96:6,10,
    12 104:7 105:2
    134:23 145:4,5,14
    190:12 201:4
which 5:6 11:6 31:5
    36:18 59:19 72:3
    74:4 91:6 92:12
    109:14 122:7 124:8,
    25 156:19 172:24
while 7:16 19:7 20:6
    35:7 37:6 85:16
    118:24 144:23
    151:12 156:19
    187:8 197:12
White 127:11
Whitfield 81:12
who 12:23,24 30:12,

16 41:18 44:2
    49:20 51:24 59:6,
    22 66:9 76:16,21
    80:1,5 85:12 86:6
    90:10 91:13 103:6
    107:7 108:20
    119:17 130:9,14
    131:3 134:7,10
    140:5 145:13,19
    158:19 169:15
    198:21 203:2,15,17,
    19
whoever 73:11
whole 176:19 200:15
Whomever 73:9
who's 49:19 49:19
    107:6 107:6,7
why 6:20 22:12,14
    51:5 58:4,9 83:22
    84:4,5 87:9,15,24
    88:2 95:24 96:2
    98:17 100:9 120:1,
    3,4 121:2 123:10
    138:12 139:3
    142:12 143:21
    149:5 152:4 160:20
will 6:8 7:18 29:5
    79:25 110:5,18
    140:4 147:25
    148:13 155:17,18
    170:21 185:10,14
    194:16 197:23
    205:17
Williams 91:17
wish 173:4
wished 155:7
withdraw 193:21
within 18:22 80:4
    111:22 119:2 166:2
without 148:18 152:7
    161:7 203:7
witness 5:3,4 12:24
    26:15 31:12 170:19
    200:20
witnessed 26:5
witnesses 5:4
Women's 165:17
wonderful 148:1
    148:1
wondering 143:13

202:17
**won't** 199:17
**word** 24:14 49:13
57:6 71:20 99:19
117:7 117:7 162:12
168:4
**worded** 201:14
**words** 57:23 72:25
74:24 87:13 93:19
98:18 100:21 113:4
115:1 118:14,20
119:14 137:6,14
191:15
**work** 5:14 15:4,10,11,
14 16:3,8,8,9,17
17:3,5 18:17 22:1,
4,8 24:15 33:1
47:21 52:1 69:19
70:24 71:1,3,5,7
72:4 74:3,10 79:6,
9 80:9 85:15 87:14,
16 103:25 111:14,
16,21 116:3,10,10,
11 141:15 145:25
146:17 147:3,24
155:12 156:19,22,
23 165:11,14
166:10,14 179:9
181:14,21 182:19
184:3,4 185:14
186:6,9,19,21
187:7,13 189:16
189:16,17 196:19
**workday** 15:7,11
**workdays** 15:17,19
16:17
**worked** 35:20 38:15,
23,25 39:3 42:24
44:8 45:19 47:5,8,
11 51:25 54:8
69:21,22,25 70:23
72:2,6,18 73:10,12
74:8,11,17,23 75:1
77:10 81:13 82:15
85:25 86:7 87:13
98:10 106:6 113:5
114:25 120:23
146:2 146:2,18,18
150:12 159:13
193:11 198:20

202:23
**working** 20:9 40:8
41:18 49:15 52:3
64:21 65:11 70:10,
12 72:15 73:3,19
74:13 80:18,19
86:9 107:17 107:17
114:23 146:7,10
161:7,8
**works** 42:10 80:1
89:25 93:17 156:11
**worn** 24:17,21
**worry** 163:1
**worth** 58:24 198:5
199:25
**wouldn't** 49:20 64:17
95:15 109:21 155:2
**wrap** 170:12
**wrapped** 199:14
**write** 149:23
**writes** 57:22
**write-ups** 174:2
**writing** 150:1
**written** 50:22 57:20
57:20
**wrong** 58:2,3 119:9
138:18 155:16
203:24
**wrongful** 168:3,5
197:21 200:6
**wrote** 187:25

---

**Y**

---

**y'all** 83:16 114:15
164:14
**year** 119:7 147:6
173:8 174:5,7,8
196:11
**years** 7:5 90:19
122:10 130:17,23
131:5 147:4 160:13
166:2 167:4,24
170:1,2 173:21
198:8,9 203:8
204:2
**yes-or-no** 182:17
**yesterday** 190:9
**yet** 8:12 153:16
178:19 202:13,25

203:3,4,21
**you-all** 138:22
**you'll** 5:13 66:19
170:9
**young** 4:9,17 14:11,
15,21 27:15 43:15
57:15 62:22 66:1
70:19 85:9 89:25
94:2 95:20 132:7
146:8,11 157:9
159:13 164:21
169:12 170:17
176:16 185:10,18,
23 186:20 193:6
194:13 195:18,23
201:3 205:4
**you're** 6:15 9:15,24
13:12 15:22,24
16:7 18:9,14,17,20
19:20 21:13 26:5
39:16,19 40:1
43:16 44:25 48:3,
10 49:9,12 58:5
66:5,12 74:18 75:9
78:7 96:19 97:15
98:25 101:10,12,13
102:5,6,7,24
103:10 105:10
108:7 111:6 112:15
113:21 114:2 114:2
116:10 116:10
118:16 125:13
127:1 132:12 137:3
139:17 144:22,24
146:10,11 148:11
149:13 150:9
153:14,20 159:20,
24 160:5 160:5
171:17 178:14
178:14 199:20,21
**yourself** 147:1 172:8
**you've** 14:21 19:4
43:20 45:24 96:16
157:25 158:5

---

**Z**

---

**Zoom** 45:3 185:7

**CONFIDENTIAL**

Exhibit
Mary Young

**1**

02/27/25 VT



Texas Southern University
Division of Business & Finance
3100 Cleburne Street, Hannah Hall #116
Houston, Texas 77004
Phone: (713) 313-1382
Devi.Bala@tsu.edu | www.tsu.edu

December 1, 2022

Via E-mail: bhall@thlf.us, myteam@thlf.us

Ms. Mary Young
c/o Mr. Ben Hall, Esq.
The Hall Law Group, PLLC
530 Lovett Blvd.
Houston, Texas 77006

Subject:        Notice of Temporary Relief of Duties

Dear Chief Young:

On August 25, 2022, our Acting Chief Audit Executive, Ms. Darlene Brown, presented you with a signed written complaint. The complaint relates to your actions as the University's Chief of Police. Resulting from the investigation, there is evidence to prove the allegations of your misconduct, which violates the following policies:

- 02.05.06 – Fraud Policy,
- 02.05.05 – Ethics & Conflict of Interest,
- 02.02.01 – Pay Guidelines for Staff Employees, and
- 02.02.03 – Overtime/Compensatory Time.

Effective immediately, you are temporarily relieved of your duties as Chief of Police with pay until further notice. The University will make an ultimate decision on your employment status. Throughout the duration of this paid administrative leave, we request that you refrain from being on campus grounds, attending University-sanctioned events, and utilizing any University-owned items (e.g., vehicle, uniform, keys, computer, mobile telephone, etc.) until such a time as you are otherwise notified.

You are directed not to attempt to contact anyone concerning the above-identified investigation, anyone who has made allegations, anyone who is a witness to the allegations, or anyone providing information to the investigation and/or complaint. You are further directed not to retaliate in any shape, form, or fashion, against anyone who has made allegations, anyone who is a witness to the allegations, and/or anyone providing information to the investigation and/or complaint.

Retaliation is defined under University policies as any act, including an adverse personnel action, that has the effect of punishing a person for making a complaint or otherwise participating in an investigation of a complaint, including any act of intimidation, harassment, threats, coercion or discrimination. Any contact with or retaliation against persons involved in the matters identified above, in violation of the directives issued in this letter and University policies, will result in immediate disciplinary action.

1

CONFIDENTIAL

If you have any questions or concerns about this matter, please call Yolanda Edmond, Sr. Assoc. Vice President of Human Resources & Payroll Services. The Office of Human Resources is located in Hannah Hall, Suite 126, or (713) 313-7521. We appreciate your co-operation in this matter.

Sincerely,

Devi Bala
Vice President of Business & Finance/CFO

Enclosures:    Original Complaint and Signed Complaint

Cc:    Ms. Mary Young – E-mail, CMRRR & Regular Mail

2

YOUNG_001103

**CONFIDENTIAL**

The following matter was received via the EthicsPoint Hotline on 3/24/2022.

**Assigned to**
None entered

**Synopsis Notes**
None entered

**Case Details**
Since January 2022, while at a weekly supervisor meeting, Mary gave all the officers (names withheld) in the police department a directive that she would raise the pay for special officers (names withheld). Mary categorized the special officers as the lead officers (names unknown) and (first name unknown) McCefee, telecommunications officer, for security and telecommunications. Those officers were (first name unknown) Ward, security officer, McCefee, (first name unknown) Sawyer, police officer, (first name unknown) Holiday, security officer, (first name unknown) Jones, police officer, Tyrone Jones, police officer, and (first name unknown) Cantu, police officer.

Mary approved field training pay for the lead officers and McCefee so that the lead officers and McCefee would have higher pay that included the sum equivalent of two overtime hours per day, up to five days a week. The persons who were authorized by Mary to sign-off on the timesheets were (first name unknown) Bridges, lieutenant, (first name unknown) Jones, sergeant, (first name unknown) Barnett, sergeant, (first name unknown) Stark, lieutenant, (first name unknown) McCray, sergeant, (first name unknown) Brown, sergeant, and (first name unknown) John-Miller, police officer. Bridges, Jones, Barnett, Stark, McCray, Brown, and John-Miller signed the time sheets because they were told by Mary that Ward, McCefee, Sawyer, Holiday, Jones, Tyrone, and Cantu were entitled to those funds for the work that they did.

The president (name unknown) and the board of regents did not authorize these pay increases. This act appears to be illegal and unethical. The supervisors (names unknown) were operating according to Mary's directive, believing that Mary had the authority to do this. The supervisors that were present at the weekly supervisors' meeting were witnesses to this directive. There were no cameras that captured this incident. This matter may have been reported to management.

**Case Summary**
None entered

YOUNG_001104

**CONFIDENTIAL**

The following matter was received via the EthicsPoint Hotline on 3/24/2022.

**Assigned to**
None entered

**Synopsis Notes**
None entered

**Case Details**
Since January 2022, while at a weekly supervisor meeting, Mary gave all the officers (names withheld) in the police department a directive that she would raise the pay for special officers (names withheld). Mary categorized the special officers as the lead officers (names unknown) and (first name unknown) McCefee, telecommunications officer, for security and telecommunications. Those officers were (first name unknown) Ward, security officer, McCefee, (first name unknown) Sawyer, police officer, (first name unknown) Holiday, security officer, (first name unknown) Jones, police officer, Tyrone Jones, police officer, and (first name unknown) Cantu, police officer.

Mary approved field training pay for the lead officers and McCefee so that the lead officers and McCefee would have higher pay that included the sum equivalent of two overtime hours per day, up to five days a week. The persons who were authorized by Mary to sign-off on the timesheets were (first name unknown) Bridges, lieutenant, (first name unknown) Jones, sergeant, (first name unknown) Barnett, sergeant, (first name unknown) Stark, lieutenant, (first name unknown) McCray, sergeant, (first name unknown) Brown, sergeant, and (first name unknown) John-Miller, police officer. Bridges, Jones, Barnett, Stark, McCray, Brown, and John-Miller signed the time sheets because they were told by Mary that Ward, McCefee, Sawyer, Holiday, Jones, Tyrone, and Cantu were entitled to those funds for the work that they did.

The president (name unknown) and the board of regents did not authorize these pay increases. This act appears to be illegal and unethical. The supervisors (names unknown) were operating according to Mary's directive, believing that Mary had the authority to do this. The supervisors that were present at the weekly supervisors' meeting were witnesses to this directive. There were no cameras that captured this incident. This matter may have been reported to management.

**Case Summary**
None entered


Received:  May 25, 2028 via email

*Darlene Brown*

Darlene Brown
*Acting Chief Audit Executive*

CONFIDENTIAL



CONFIDENTIAL

Ms. Mary Young
2818 Sedona Creek Drive
Missouri City, TX 77459

YOUNG_001106

CONFIDENTIAL

**From:** Le, Hao <Hao.Le@tsu.edu>
**Sent:** Friday, December 2, 2022 6:45 PM
**To:** Benjamin Hall <bhall@thlf.us>; MyTeam <myteam@thlf.us>
**Subject:** Administrative Leave with Pay

Dear Ben:

I sent you correspondence yesterday on behalf of our VP of Business & Finance/CFO regarding your client being placed on immediate administrative leave with pay. I have been apprised that your client showed up today on the University campus in complete disregard of her administrative leave. I would ask that you advise your client and remind her regarding the conditions of her administrative leave, which is to refrain from:

1. Being on campus grounds,
2. Attending University-sanctioned events,
3. Utilizing any University-owned items (e.g., vehicle, uniform, keys, computer, mobile telephone, etc.), and
4. Retaliation.

**Hao Le**
*Chief Compliance Officer & General Counsel*



Office: 713-313-7470 | Fax: 713-313-1906
Hannah Hall, 340
3100 Cleburne Street, Houston, TX 77004
www.tsu.edu

This e-mail is confidential. Please do not forward. If this e-mail is delivered to an unintended recipient, please delete immediately without storing any of the content. Thank you.

Exhibit
Mary Young
**2**
02/27/25 VT

YOUNG_001011

<span style="color:red">**CONFIDENTIAL**</span>



Texas Southern University
Division of Business & Finance
3100 Cleburne Street, Hannah Hall #116
Houston, Texas 77004
Phone: (713) 313-1382
Devi.Bala@tsu.edu | www.tsu.edu

January 9, 2023

**Via Courier, CMRRR, Regular Mail, and E-mail (through counsel)**

Ms. Mary Young
2818 Sedona Creek Drive
Missouri City, Texas 77459

      **Subject:**      Notice of Employment Separation

Dear Ms. Young:

      As you know, Texas Southern University ("TSU") is committed to the safety of its students, faculty, and staff. That commitment is reflected in the creation and operation of the University's Department of Public Safety ("TSU DPS"). Such effective and efficient operation require a focus on safety. It has come to TSU's attention that there is confusion, divisiveness, dissention, and acrimony throughout TSU DPS — all caused by your actions despite repeated requests to cease. This has distressed TSU DPS's members, resulting in contemplated resignations and sick-leave usage. In addition, please see the specific findings regarding your fraudulent conduct detailed at length in the investigator's report that you have had in your possession.

      TSU no longer has the confidence that you can continue to be a contributing member of the TSU DPS with our ongoing focus on safety. You have intentionally violated the terms of your paid administrative leave communicated on December 1, 2022. In fact, multiple TSU DPS officers have testified via affidavit — which is on file in the spurious lawsuit you filed — that you and your counsel have gone so far as threatening them individually and in-person on TSU's campus.

      Accordingly, please allow this letter to serve as notice of immediate termination of your at-will employment with TSU. Through counsel, we will work to coordinate the return of all TSU property in your possession, including vehicle, keys, computer, access card, mobile telephone, credit and/or procurement cards. **Your presence on campus grounds or attendance at any TSU-sanctioned event is strictly prohibited**.

Exhibit
Mary Young
**3**
02/27/25 VT

1

CONFIDENTIAL

Through respective counsel, please contact the Office of Human Resources for information regarding any benefits for which you may be eligible *(e.g.*, TRS, COBRA, etc.) at (713) 313-7521.

Sincerely,

Devi Bala
Vice President of Business & Finance/CFO

Cc:     Human Resources Department
        Benjamin Hall (bhall@thlf.us)

2

YOUNG_001108

**CONFIDENTIAL**

Texas Southern University
3100 Cleburne Street
Houston, TX 77004
ATTN: H.R.


US POSTAGE PITNEY BOWES
ZIP 77004
02 4W
0000362906 DEC 01 2022
$ 000.57°

Ms. Mary Young
2818 Sedona Creek Drive
Missouri City, Texas 77459

7745984951 R032

YOUNG_001109



Exhibit
Mary Young

**4**

02/27/25 VT

# TSU

## TEXAS SOUTHERN UNIVERSITY
### Department of Internal Audit & Assurance Services
*Experience • Collaboration • Results*

**3100 Cleburne Street • Houston, TX 77004 • (713) 313-7454**

**Date:**   August 15, 2022

**From:**   Darlene Brown, Acting Chief Audit Executive

**To:** Texas Southern University Board of Regents

**Cc:**
President Crumpton-Young
Ms. Lisa McBride, TSU Board Counsel

**Re:** Internal Audit Investigation Report, TSU Department of Public Safety Time Recording Practices

Our conclusion to the allegation is stated on page six of this report.  Applicable policy violation discussions begin on page six of this report.  Examples of Weekly Time Reports related to this investigation are included in Appendix C on pages 15 and 16 of this report.

## <u>Allegation</u>

An anonymous report was submitted to Texas Southern University's Ethics Line on March 24, 2022.  This report alleged:

- The Chief of Police (Mary Young) verbally gave a directive at a supervisor's meeting in January 2022 that she would raise pay for "Lead Officers".
- The "Lead Officer" pay is two (2) hours a day for up to five (5) days a week for field training pay. (Note: The "Lead Officer" designation was created internally by the Chief of Police and is not an official job classification or pay category.  Through this investigation we determined that there were two distinct types of pay that the Chief of Police authorized; "Lead Officer" and Field Officer Training.)
- These pay types were not approved by the President or Board of Regents.
- Seven individuals were named in the anonymous report as receiving the "Lead Officer" pay:
  - <u>McAfee, Gaynell</u>
    - Officer McAfee received the $25/hr. additional pay for "Lead Officer" when filling-in for her supervisor.
    - Investigation Interview Summary: Officer McAfee stated that the Chief of Police did tell her that she will be compensated for the hours worked as a "Lead Officer".  The DPS timekeeper instructed Officer McAfee to record the hours either before or after the actual shift times worked. Officer McAfee still serves as "Lead Officer" but was told by Lt. J. Starks on behalf of Deputy Chief Brown and Captain Etheridge after this Internal Audit investigation started that they can no longer use the special code provided to receive additional compensation.

- Ward, James
  - Officer Ward received the $25/hr. additional pay for "Lead Officer" when filling-in for his supervisor.
  - Investigation Interview Summary: Officer Ward stated that he was told by Chief of Police (Mary Young) after a supervisor's meeting for himself and Officer McAfee to stay behind. It was then that the Chief of Police told them she would compensate them for doing a good job and that they should see the DPS timekeeper, to use the special code when acting as supervisor, and where to place the special work code on the Weekly Time Report. The DPS timekeeper told Officer Ward to record the hours for different days or time periods for when he did not actually work. Additionally, Officer Ward was told that a Compensation Request Form was not completed for these hours. Instead, the DPS timekeeper prepared a Supplemental Salary Form for him to sign and return each Monday morning. The DPS timekeeper also told Officer Ward to provide his Weekly Time Report to Lt. Bridges for approval instead of his direct supervisor.

    Officer Ward stated that the Chief of Police met with Officers Ward, McAfee, and Holiday after the weekly supervisors meeting during the week of July 4, 2022 and questioned them on who told them to record their time in the manner of which they were recording it. The Chief of Police then proceeded to tell them that going forward they have to work the additional four hours but that they can't put it on their Weekly Time Sheets until August 1st and that they would be only allowed four hours per pay period.
- Holiday, John
  - Officer Holiday received the $25/hr. additional pay for "Lead Officer" when filling-in for his supervisor.
  - Investigation Interview Summary: Officer Holiday stated that the Chief of Police told him around May 2022 that he will be compensated for the hours worked as a "Lead Officer". The DPS timekeeper instructed Officer Holiday to record the hours for different days or time periods for when he did not actually work.

    Officer Holiday stated that his immediate supervisor (Sgt. Allison) was not aware of the reason/purpose of the special code. Sgt. Allison did ask Officer Holiday, but Officer Holiday was instructed by Chief Young not to inform his supervisor. Officer Holiday was told by Chief Young to take his timesheet to Ms. Scruggs and the Chief would sign-off.
- Sawyer, Jujuana
  - Officer Sawyer received the two hours per day Field Training Officer pay for completing paperwork.
  - Investigation Interview Summary: Officer Sawyer stated that she was told by either the Sargent or Deputy Chief Brown that field training officers were allowed to record two additional hours a day to complete paperwork. Officer Sawyer stated that the hours she recorded were not always the same day that she had an officer assigned to her.
- Jones , Chevron
  - Officer Jones received the two hours per day Field Training Officer pay for completing paperwork.
  - Investigation Interview Summary: Officer Jones stated that he was told by Lt. Bridges that an additional two hours a day could be recorded for Field Officer Training to complete paperwork.
- Jones, Tyronne
  - Officer Jones received the two hours per day Field Training Officer pay for completing paperwork.
  - Investigation Interview Summary: Officer Jones stated that he was told by Lt. Bridges that an additional two hours a day could be recorded for Field Officer Training to complete paperwork. The two hours were recorded on the same day that an officer was

RESTRICTED (Access Limited to Authorized Personnel)

assigned to him for training, regardless of if it took the two hours to complete the paperwork.
- o Cantu, Bethany
  - Officer Cantu received the two hours per day Field Training Officer pay for completing paperwork.
  - Investigation Interview Summary: Officer Cantu stated that she was told by Lt. Bridges that an additional two hours a day could be recorded for Field Officer Training to complete paperwork as a pay incentive. The two hours were recorded on the same day that an officer was assigned to her for training, regardless of if it took the two hours to complete the paperwork.


- Six individuals were named in the anonymous report as authorized to sign the time sheets:
  - o Lieutenant Bridges, James
    - Lt. Bridges separated from TSU.
  - o Lieutenant Jones, Ivan
    - Investigation Interview Summary: Lt. Jones stated that he was not aware of the "Lead Officer" additional compensation or code used. Lt. Jones stated that Deputy Chief Brown and Lt. Bridges verbally communicated that Field Training Officers were allowed to record two additional hours a day to complete paperwork.
  - o Sergeant McCray, Brian
    - Did not interview as his assigned staff did not receive Field Training Officer extra pay or "Lead Officer Pay".
  - o Sergeant Barnett, Darren
    - Investigation Interview Summary:
      Sergeant Barnett stated that he is aware that the Chief of Police announced that Officers Ward and Holiday would be compensated for filling in for supervisors on their respective supervisor's days off.
      Sergeant Barnett stated that he is aware that Field Training Officers were told by the Chief of Police that they could add two hours a day to their time sheets for completing paperwork.
      After this investigation commenced, Sergeant Barnett informed TSU's Acting Chief Audit Executive that he received a telephone call from one of the TSU DPS officers that certain officers were being questioned about their time recording practices.
  - o Lieutenant Starks, Jamal
    - Investigation Interview Summary:
      Lt. Starks stated that he is aware that the Chief of Police announced Officers Ward and Holiday would be compensated for filling in for supervisors on their respective supervisor's days off.
      Lt. Starks stated that he is aware that Field Training Officers were told by the Chief of Police that they could add two hours a day to their time sheets for completing paperwork.
  - o Sergeant John-Miller, Curtis
    - Did not interview as his assigned staff did not receive Field Training Officer extra pay or "Lead Officer Pay".

00003

## Additional Interview Summaries

*Chief of Police Young Investigation Interview Summary:*

The Chief of Police stated that she would not tell officers to record time that was not worked and that according to policies they must have worked the time in order to record it.

The Chief of Police stated that there has been instances where supervisors (senior officers) have similar off days so others have had to cover their shifts. In these instances, the officers would work the shift but since they can't have a promotion they would receive compensation – it was not to be a daily or weekly thing. The Chief of Police authorized Officers Ward, McAfee, and Holiday that they can pick-up 8 hours bi-monthly not the 2 hours a day.

The Chief of Police stated that she did not direct Lieutenant Bridges, Lieutenant Jones, Sergeant Barnett, Lieutenant Starks, Sergeant McCray, Sergeant Brown, and Sergeant John-Miller to sign the timesheets for individuals to receive an additional two (2) hours per day field training pay.

The Chief of Police stated that all supervisor's meetings are recorded and that she would provide the Acting Chief Audit Executive with the recordings. She later called the Acting Chief Audit Executive to say that there were no supervisor meetings held in January 2022 (the time when the alleged verbal authorization for additional "Lead Officer" compensation occurred).

The Chief of Police asked if she should speak with the individuals that recorded overtime and I told her she should not.

*DPS Timekeeper (Ms. Chandra Scruggs) Investigation Interview Summary:*

Ms. Chandra Scruggs works in the Building & Grounds department but has also been serving as the DPS timekeeper since the end of October 2020 or November of 2020.

Ms. Scruggs stated that she was not told what the FTO paperwork/FTO Documentation acronym was for but that she did not question it when processing Weekly Time Reports because they were signed by the respective supervisors.

Ms. Scruggs stated that the Chief of Police told Ms. Scruggs to create a code for individuals to use if they are acting in a supervisor role and that they are to receive $25/hr on top of their regular hourly rate for the role. The Chief of Police told Ms. Scruggs that she can't promote them but wanted to compensate them. According to Ms. Scruggs, nobody was present for this conversation. Later, when the Dispatch Supervisor questioned the code on a Weekly Time Report the Chief's verbal answer to Ms. Scruggs was that they were to be paid the additional $25/hr.

Ms. Scruggs stated that the code HRSTLDR is used to identify the hours worked as a "Lead Officer"/shift supervisor and that she prepares a separate sign-in sheet each pay period for this. When preparing the payroll, she includes this along with the Weekly Time Reports to Command for signature and then she delivers the signed pay packages to Human Resources (Payroll). Ms. Scruggs stated that she did tell Officers Ward, McAfee, and Holiday that they have to record the HRSTLDR hours as different times than the times they recorded for their shift.

*Deputy Chief of Police Brown Investigation Interview Summary:*

The Deputy Chief of Police stated that he has been present when the Chief of Police verbally gave approval for Field Training Officers (FTO) to add two hours to their time each day. The Deputy Chief of Police stated that he may have repeated that Field Training Officers could record two hours for paperwork. It was supposed to be up to 2 hours, and he was not aware that this is a practice of recording time not worked but that they have to physically work the time.

The Deputy Chief of Police stated that Chief of Police Young advised leads (Lead Officers) that if they came in and were acting as a lead they could get compensated. He stated that the maximum allowed by the Chief of Police was a total of 16 hours a month.

The Deputy Chief of Police stated that he was present in a meeting the week of July 4, 2022 with Officers Ward, McAfee, and Ms. Scruggs when the Chief of Police asked who told them how to record their time.

*Dispatch Supervisor (Officer Tina Dorsey) Investigation Interview Summary:*

The Dispatch Supervisor stated that Chief Young held Officers McAfee and Ward over after a supervisors meeting in February 2022 and told them that for two of the five days working as a supervisor/"Lead Officer" they would receive "special event" pay but she did not provide instruction on how to do this and told them to see the DPS timekeeper (Ms. Scruggs).

The Dispatch Supervisor stated that when saw Officer McAfee's Weekly Timesheet with the special code she called Ms. Scruggs and was told that Chief Young authorized the code. Since then, the Dispatch Supervisor has stopped signing Officer McAfee's Weekly Time Report area where the special event code is located.

The Dispatch Supervisor stated that on Wednesday July 6, 2022, the Chief of Police held a meeting with Sgt. Jones, Officer McCray, and Officer Dorsey and told them that an investigation was coming up and instructed for Officer Holiday to join the meeting.

*Corporal Brian Auzenne Investigation Interview Summary:*

Corporal Brian Auzenne has assumed the Field Training Officer (FTO) coordinator role with the departure of Lieutenant Bridges. Corporal Auzenne stated that the former FTO coordinator stated that two additional hours could be recorded by Field Training Officers as part of training someone – either before or after the shift. Corporal Auzenne stated that it has not been directly communicated and that it was just understood that you can record two hours a day that you are with an officer.

Corporal Auzenne stated that Compensation Request Forms were not required to be completed for the two hours a day FTO paperwork completion but this has recently been mandated.

*Note: Prior to assuming the FTO coordinator role, Corporal Auzenne also submitted two hours a day for FTO paperwork completion.*

## Policies Applicable to this Allegation

Texas Southern University (TSU) approved four (4) Manual of Administrative Policies and Procedures (MAPP) that apply to time reporting, pay, fraud, and ethics. Applicable sections of these MAPPS are summarized below and were used to apply the investigation facts learned.

- 02.02.01 Pay Guidelines for Staff Employees
  Merit adjustments, equity adjustments, and reward-based increases must be part of the budget cycle and must meet approval of the Associate Vice President of Human Resources. All pay adjustments are subject to review, approval, and recommendation through established channels, including the Office of Human Resources.
  Interim assignments. A temporary pay increase may be granted for assuming additional responsibilities on an interim basis for a specified period of time or until the vacant job is filled. The employee may receive a temporary pay increase of up to 25% of salary for the duration of the assignment, as recommended by the hiring manager and approved by Human Resources.

- 02.02.03 Overtime / Compensatory Time
  All overtime and extra hours must be authorized in writing and in advance by the dean/director of the department.
  Supervisors are responsible for monitoring the work hours of employees under their supervision and for ensuring that information reported on timesheets is complete and accurate.

- 02.05.05 Ethics and Conflict of Interest Policy
  Employees shall avoid any actions that violate or would create the appearance that they are violating the law or ethical standards of Texas Southern University.

- 02.05.06 Fraud Policy
  Fraudulent or related dishonest activities include but are not limited to fraud;
  Forgery or alteration of documents (checks, promissory notes, time sheets, independent contractor agreements, purchase orders, budgets, etc.)
  Authorizing or receiving payments for hours not worked.
  Management should not attempt to conduct individual investigations, interviews, or interrogations to determine if a suspected activity is fraudulent, dishonest, or improper.
  Do not contact the suspected individual to determine facts or demand restitution. Under no circumstances should there be any reference to "what you did," "the crime", "the fraud," "the forgery," "the misappropriation," etc.

## Conclusion

Based upon the internal audit investigation procedures performed, the allegation received is substantiated and related to two (2) distinct types of additional compensation that Chief of Police Mary Young authorized verbally and when she signed the weekly time reporting packages provided by the DPS timekeeper. These compensation types are described below. Neither of these compensation types were discussed or approved by TSU Human Resources, the President, or the Board of Regents. MAPP 02.02.01 Pay Guidelines for Staff Employees requires review of pay adjustments by Human Resources.

*Compensation Types Involved in this Internal Audit Investigation:*

- "Lead Officer" compensation – This compensation is a flat $25/hour of additional compensation for security officers and dispatchers that were designated as the Lead Officer for a shift where their immediate supervisor was absent. Officers were instructed by the DPS Timekeeper (Ms. Chandra Scruggs) and/or Chief Young to use code HRSTLDR in the special events section of the weekly time report and record the actual number of hours worked as "Lead Officer" but to record it for different hours; either before their shift worked, after their shift worked, or on their day off.
- Field Training Officer compensation – This is an additional two (2) hours pay at the respective officer's overtime hourly rate, for each day that they were training an officer. This additional compensation was to complete paperwork associated with assessing an officer's performance during training.

Texas Southern University (TSU) Manual of Administrative Policies and Procedures (MAPP) 02.05.06 Fraud Policy defines fraud as:

> *Fraudulent or related dishonest activities include, but are not limited to:*
> *a. Theft of funds, securities, supplies or any other asset (including furniture, fixtures, or equipment);*
> *b. Fraud;*
> *c. Embezzlement;*
> *d. Bribery/rebate/kickback;*
> *e. Misapplication, destruction, removal or concealment of property, or conflicts of interest;*
> *f. Illegal or fraudulent handling or reporting of money transactions;*
> *g. Forgery or alteration of documents (checks, promissory notes, time sheets, independent contractor agreements, purchase orders, budgets, etc.);*
> *h. Forgery or alteration by employees, of student related items such as grades, transcripts, loans, fee or tuition documents, etc.;*
> *i. Acceptance or solicitation of any gift, favor or service that might reasonably tend to influence the employee in the discharge of his or her official duties;*
> *j. Destruction or disappearance of records, furniture, fixtures, or equipment where theft is suspected;*
> *k. Authorizing or receiving payments for hours not worked;*
> *l. Authorizing or receiving payments for goods not received or services not performed;*
> *m. Disclosing confidential information the employee is routinely privy to at the University;*
> *n. Any apparent violation of Federal, State, or local laws related to dishonest activities or fraud, and;*
> *o. Any similar or related activity.*

In applying the TSU MAPP 02.05.06 definition of fraud, Chief of Police Mary Young committed fraud against TSU through authorizing payments for hours not worked when she authorized two (2) hours of overtime to Field Training Officers each day that they had an officer assigned to them, even if it did not take the full two hours each day to complete the paperwork.

The police officers that recorded time for Field Officer Training paperwork when they did not actually work the two hours constitutes fraudulent reporting.  Officers stated that they did complete the required paperwork, but it did not always take the full two hours.  An example of the Weekly Time Sheet is included in Appendix C.

The Chief of Police told the "Lead Officers" that they were to record their actual hours worked in the top section of the Weekly Time Report and then use the special code and record their same hours in the bottom section of the Weekly Time Report.

The DPS timekeeper instructed individuals that served as "Lead Officers" that they were to record the actual hours worked as normal hours on the top section of the Weekly Time Report.  They then were to record the same number of hours on a different time period, or a different day than actually worked using a specially created code on the bottom section of the Weekly Time Report.  This code identified that they were acting as the supervisor for the respective number of hours and should receive the flat $25/hour for those hours.  The result is that for each day the respective officer filled in for the supervisor, they worked an eight-hour shift but recorded 16 hours; eight of the hours were paid at the standard hourly rate and eight hours were paid at the $25/hour rate.  This constitutes fraudulent reporting because it gives the appearance that the individual worked additional hours when they did not.  An example of the Weekly Time Sheet is included in Appendix C.

Individuals that recorded time for "Lead Officers" as instructed by the DPS timekeeper documented their time worked incorrectly.

RESTRICTED (Access Limited to Authorized Personnel)

## Policy Violations

The tables below describe the policy violations that occurred.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.05.06 | Fraud Policy | **III. Management's Responsibilities**<br>E. Management should not attempt to conduct individual investigations, interviews, or interrogations to determine if a suspected activity is fraudulent, dishonest or improper. The Office of Internal Audit & Fraud will conduct an investigation working in conjunction with internal or external departments, such as the University Office of General Counsel and law enforcement agencies.<br>F. Management is responsible for taking appropriate corrective actions to ensure adequate controls exist to prevent the occurrence of fraud or dishonest or improper activities.<br>I. Management's responsibilities in handling fraud or dishonest or improper activities include the following:<br>1. Do not contact the suspected individual to determine facts or demand restitution. Under no circumstances should there be any reference to "what you did," "the crime," "the fraud," "the forgery," "the misappropriation," etc.<br>ii. Take appropriate disciplinary action after consulting with the Office of Human Resources and the Office of General Counsel.<br>iii. Do not discuss the case, facts, suspicions or allegations with anyone outside the University unless specifically directed to do so by Internal Audit & Fraud or General Counsel.<br>iv. Do not discuss the case with anyone inside the University other than employees who have a "need to know," Internal Audit & Fraud or General Counsel.<br>v. Direct all inquiries from the suspected individual, his or her representative or his or her attorney to General Counsel.<br>VI. Direct all inquiries from the media to the Office of University Advancement. A proper response to such an inquiry should be, "I'm not at liberty to discuss this matter." |

**Violation(s) to this Policy**
1. The Chief of Police questioned certain officers about their time recording after interview with the Acting Chief Audit Executive and was told by the Acting Chief Audit Executive that she should not speak to the officers about this matter.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.05.05 | Ethics & Conflict of Interest | **III. Standards of Ethical Conduct**<br>G. Employees shall avoid any actions that violate or would create the appearance that they are violating the law or ethical standards of Texas Southern University. |

**Violation(s) to this Policy**
1. The Chief of Police took intentional actions to establish time recording practices that were not in compliance with TSU policies. These actions included authorizing two hours a day for Field Officer Training paperwork, instructing the DPS timekeeper to create a method for paying a flat rate of $25/hour additional compensation for "Lead Officers", and showing "Lead Officers" how to record their time worked in the supervisor role.
2. Police officers recording time as Field Officer Training paperwork for hours not worked violates TSU policies.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.01 | Pay Guidelines for Staff Employees | **V. Policy and Procedures Provisions – Employee Pay Adjustments** Decisions to grant merit or equity or reward-based increases must be part of the budget cycle plan and can be initiated at the division level, if funds are available. Division initiated merit increases must meet the approval of the Associate Vice President of Human Resources/Chief Human Resource Officer to ensure that compliance and equity across the university are preserved. **VII. Policy Provisions – General** D. All pay adjustments are subject to review, approval, and recommendation through established channels, including the Office of Human Resources. |
| **Violation(s) to this Policy** While the "Lead Officer" additional hourly rate is not technically a merit or equity-based increases by definition, Section VII was violated because this additional $25/hour rate was not reviewed, approved, or recommended through the established channels, including the Office of Human Resources. | | |

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.01 | Pay Guidelines for Staff Employees | **VI. Types of Pay Adjustments** I. Interim Assignment: A temporary pay increase may be granted for assuming additional responsibilities on an interim basis for a specified period of time or until the vacant job is filled. Normally interim assignments will not result in changes to exemption status as defined in FLSA regulations. 1. Interim Assignments: Nominations of employees to fill positions on an interim basis may be approved by the President and forwarded to Human Resources. Nominations may also be made by the employee's management in order to fill vacated positions where the work must continue until a permanent replacement is hired. Interim appointments must have the final approval of the President and/or Human Resources. 2. Interim Salary Increase Employees appointed to an interim position must perform the duties of the higher level job for at least 6 weeks before an interim personnel action is processed. The interim assignment should not exceed one (1) year. Within this timeframe the employee can be placed on the payroll with the interim title by means of a personnel action form. The employee may receive a temporary pay increase of up to 25% of salary for the duration of the assignment, as recommended by the hiring manager and approved by Human Resources. The interim salary should not exceed the salary of the previous incumbent or the budgeted amount for the position. The interim salary should not fall below the minimum, nor exceed the maximum of the pay grade established for the position, when applicable. |
| **Violation(s) to this Policy** While the "Lead Officer" was not an interim assignment to fill a vacancy, the officers assumed additional responsibilities to cover their respective supervisor's shift in their absence. This practice has been in effect for longer than six (6) weeks. Additionally, the $25/hour flat rate on top of their normal hourly rate represents more than 25% of their normal hourly rate. | | |

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.03 | Overtime / Compensatory Time | **IV. General Provisions** B. All overtime and extra hours must be authorized in writing and in advance by the dean/director of the department. Employees may not make unauthorized decisions to work overtime or extra hours. Working |

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| | | unauthorized time may subject the employee to disciplinary action, up to and including termination. Similarly, compensation, whether in the form of compensatory time off or pay for overtime or extra hours, may not be waived by the non-exempt employee.<br>**IV. General Provisions**<br>C. Supervisors are responsible for monitoring the work hours of employees under their supervision and for ensuring that information reported on timesheets is complete and accurate. |

**Violation(s) to this Policy**

1. The Chief of Police verbally authorized the additional compensation of $25/hour for "Lead Officers" and two hours overtime for Field Training Officers. This was not documented in writing and was not recorded as part of the normal supervisor meeting recordings. However, the Chief of Police did sign each payroll submission which included the completed timesheets.
2. The Chief of Police and the DPS Timekeeper collaborated to establish a special pay code and showed "Lead Officer" on how to complete their timesheet. The code that was created is for paper tracking only and was not setup in the Banner payroll system.
3. The Chief of Police did not inform the respective officer's supervisor that "Lead Officer" compensation had been authorized.
4. The DPS Timekeeper setup a time reporting and authorization process for "Lead Officers" that was outside of the customary way of processing overtime which is to record the actual day and time worked in the overtime section of the weekly time report and requires a Compensation Request form to be completed and submitted to the DPS Executive Assistant.
5. The Field Training Officer authorization that the Chief of Police implemented has been perpetuated through verbal communications from the Deputy Chief of Police and the Field Training Officer coordinator to Field Training Officers.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.03 | Overtime / Compensatory Time | **VI. Compensation for Overtime – Non-Exempt Employees**<br>A.  Compensation for non-exempt employees for overtime shall consist of either of the following methods:<br> 1.  Compensatory time off (leave) at the rate of one and one-half hours for each overtime hour worked; or<br>2. Cash payment at the rate of one and one-half time the employee's regular hourly rate of pay for all hours worked in excess of forty (40) in the work week, in addition to the regular pay for the pay period during which it was earned.<br>a. Cash payments may only be paid if the employee is not able to take the compensatory time within twelve (12) months of the time being earned, as noted in § V, B above; or if the employee has worked a campus event or special event job doing the same type of work as their primary job, and with the prior approval of both managers.<br>b. If the employee has worked a campus event or special event job doing different work than the primary job, payment can be based on approved event flat rates. Approval is subject to review by the compensation unit of the Department of Human Resources.<br>**IX. Reporting Additional Work and Compensatory Leave**<br>A.  Non-exempt employees shall report all additional work beyond the standard forty (40) hour work week on the appropriate dates, on the Time |

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| | | and Effort Report, using the correct time reporting category. Shift differential and overtime codes shall be reported, where appropriate.<br>B.    Overtime pay will be added to the employee's pay for the time period in which it was accrued and reported. The hourly rate for overtime pay will reflect the hourly pay rate recorded in the payroll/personnel system; State contributions for social security, retirement, and insurance benefits are not included in the calculation for the overtime rate. |

**Violation(s) to this Policy**
1. The "Lead Officer" does not qualify for a special event job doing different work than the primary job.
2. The $25/hour flat rate was not reviewed and approved by the compensation unit of the Department of Human Resources.
3. "Lead Officers" were instructed by the DPS Timekeeper to record the hours actually worked as normal on the Weekly Time Report and to record the hours that they were to receive the $25/hour flat rate for filling in the supervisor role in a separate section of the Weekly Time Report using different hours and/or dates than the day that they worked.
4. Field Officer Training paperwork hours were recorded on the Weekly Time Report for after a normal shift even if the hours were not worked.

| Policy Number | Policy Title | Policy Section and Description |
|---|---|---|
| 02.02.03 | Overtime / Compensatory Time | **X. Additional Compensation for Additional University Assignments**<br>B. All requests for payment of event pay or authorized overtime pay must be submitted on the appropriate Texas Southern University forms, in accordance with applicable policy and in accordance with published payroll deadlines. Failure to meet all documentation requirements and deadlines can result in delayed payment or denial of the request for payment.<br>D. All requests for payment of event pay or authorized overtime pay must be submitted on the appropriate Texas Southern University forms, with required support documentation, and in accordance with this policy (Sections V & VI). Failure to meet all documentation requirements and deadlines can result in delayed payment or denial of the request for payment. |

**Violation(s) to this Policy**
1. Overtime for Field Training Officers were completed on the required Application for Special Event or Overtime Pay Form but the Compensation Request Form is not completed.
2. Special hourly rate for "Lead Officers" did not complete the Compensation Request Form or the Application for Special Event or Overtime Pay Form.

### Fiscal Impact:

The total amount paid for Field Training Officer paperwork and "Lead Officer" between September 1, 2021 and June 20, 2022 was $27,960.82.

Field Officer Training summary – September 1, 2021 – June 20, 2022.  The respective officers did not keep track of the hours that they were completing the paperwork.  Instead of recording the actual hours, they recorded two each day. As a result, we are not able to determine how much of this time is valid.

RESTRICTED (Access Limited to Authorized Personnel)

000011

| Last Name | First Name | Total Paid | Total OT 1.5 Hrs | Total OT 1.0 Hrs | Total Hours |
|-----------|-----------|-----------|-----------|-----------|-----------|
| ⊟ Auzenne | Brian | $3,155.99 | 78 | 18 | 96 |
| ⊟ Cantu | Bethany | $2,460.89 | 63 | 11 | 74 |
| ⊟ Howard | James | $2,545.36 | 57 | 17 | 74 |
| ⊟ John-Miller | Curtis | $1,400.28 | 28 | 8 | 36 |
| ⊟ Jones | Chevon | $988.33 | 28 | | 28 |
| | Ivan | $251.58 | 6 | | 6 |
| | Tyrone | $911.89 | 26 | | 26 |
| ⊟ McCray | Brian | $642.90 | 10 | 8 | 18 |
| ⊟ Sawyer | Jujuana | $3,803.60 | 96 | 18 | 114 |
| **Grand Total** | | **$16,160.82** | **392** | **80** | **472** |

"Lead Officer" summary – September 1, 2021 – June 20, 2022. These are the hours that the respective individual used the designated code to identify hours they worked in the supervisor role. These hours were recorded on different dates or times than they actually worked.

| Last Name | First Name | Total Paid | Total Hours |
|-----------|-----------|-----------|-----------|
| ⊟ Holiday | John | $2,200.00 | 88 |
| ⊟ McAfee | Gaynell | $5,200.00 | 208 |
| ⊟ Ward | James | $4,400.00 | 176 |
| **Grand Total** | | **$11,800.00** | **472** |

RESTRICTED (Access Limited to Authorized Personnel)

000012

## Time Reporting Overview

The graphic below provides an overview of time recording practices for Field Training Officers (FTO) and "Lead Officers".



## Appendix A: EthicsLine Report Received

**From:** Nwankwo, DeAnna M
**Sent:** Thursday, April 14, 2022 6:56 PM
**To:** Parker-Thompson, Charla
**Subject:** Confidential - EthicsPoint Hotline Matter

*[handwritten:] - OT, Prior period to current Payroll period*

*[handwritten:] Fy 2020-21 FY 21-22*

Chief Audit Executive,
The following matter was received via the EthicsPoint Hotline on 3/24/2022. I apologize for the delay in forwarding the matter to your attention, but I was not alerted by the system that a report had been received. Please advise how you would like to proceed.

**Assigned to**
None entered

*[handwritten:] Data dump payroll, per payroll name - Employee to pay period, to hours recorded by work code, don't need pay rate.*

**Synopsis Notes**
None entered

**Case Details**
Since January 2022, while at a weekly supervisor meeting, Mary gave all the officers (names withheld) in the police department a directive that she would raise the pay for special officers (names withheld). Mary categorized the special officers as the lead officers (names unknown) and (first name unknown) McCefee, telecommunications officer, for security and telecommunications. Those officers were (first name unknown) Ward, security officer, McCefee, (first name unknown) Sawyer, police officer, (first name unknown) Holiday, security officer, (first name unknown) Jones, police officer, Tyrone Jones, police officer, and (first name unknown) Cantu, police officer.

Mary approved field training pay for the lead officers and McCefee so that the lead officers and McCefee would have higher pay that included the sum equivalent of two overtime hours per day, up to five days a week. The persons who were authorized by Mary to sign-off on the timesheets were (first name unknown) Bridges, lieutenant, (first name unknown) Jones, sergeant, (first name unknown) Barnett, sergeant, (first name unknown) Stark, lieutenant, (first name unknown) McCray, sergeant, (first name unknown) Brown, sergeant, and (first name unknown) John-Miller, police officer. Bridges, Jones, Barnett, Stark, McCray, Brown, and John-Miller signed the time sheets because they were told by Mary that Ward, McCefee, Sawyer, Holiday, Jones, Tyrone, and Cantu were entitled to those funds for the work that they did.

The president (name unknown) and the board of regents did not authorize these pay increases. This act appears to be illegal and unethical. The supervisors (names unknown) were operating according to Mary's directive, believing that Mary had the authority to do this. The supervisors that were present at the weekly supervisors' meeting were witnesses to this directive. There were no cameras that captured this incident. This matter may have been reported to management.

**Case Summary**
None entered

*[handwritten:] Requested DMN Follow email sent to Maria White 6/10/2022 6/13/2022 Victor Ihezukwu will provide in spreadsheet (email from M. White)*

DeAnna M. Nwankwo MJur., CCEP, MBEC
VP, Chief Compliance Officer

**Exhibit 1: EthicsLine Report.**
*Note: The yellow highlight and handwritten notes were made by VP, Chief Compliance Officer, DeAnna Nwankwo prior to providing the hardcopy to Acting Chief Audit Executive, Darlene Brown through Sr. Associate Vice President of HR and Payroll Services, Yolanda Edwards. Both Ms. Nwankwo and Ms. Parker-Thompson were separated from TSU prior to this internal audit investigation being assumed by Acting Chief Audit Executive, Darlene Brown.*

000014

## Appendix B: Internal Audit Investigation Procedures Performed

The following procedures were performed for this internal audit investigation:

- Conducted interviews via Microsoft Teams, cell phone, and in-person.
- Analyzed the time report file provided for period of September 1, 2021, through June 20, 2022.
- Reviewed a sample weekly time reports (WPR) completed by DPS staff and initially gathered by VP, Chief Compliance Officer, DeAnna Nwankwo.
- Reviewed a sample Application for Special Event or Overtime Pay for Non Exempt forms completed by DPS Timekeeper initially gathered by VP, Chief Compliance Officer, DeAnna Nwankwo.
- Reviewed a sample Department of Event Services Supplemental Salary Sign-In Sheet forms completed by DPS Staff and Timekeeper initially gathered by VP, Chief Compliance Officer, DeAnna Nwankwo.
- Reviewed a sample of Compensation Request forms completed by DPS staff initially gathered by VP, Chief Compliance Officer, DeAnna Nwankwo.
- Confirmed with Human Resources that the additional compensation request had not been requested, discussed, or granted by and to Chief of Police Mary Young.
- Reviewed the Texas Southern University Department of Public Safety Policies and Procedures, March, 2020, for overtime and special event time recording policies. Section 200.33 discusses overtime in detail. The procedures do not grant additional compensation for "Lead Officer" or "Field Training Officers".
- Reviewed applicable TSU MAPPS to determine compliance.

## Appendix C: Weekly Time Sheet Examples

### "Lead Officer" Weekly Timesheet Example

Below is an example of the "Lead Officer" Weekly Timesheet showing eight (8) hours worked each day for March 13, 2022, and March 14, 2022, at regular hours from 11pm to 7am (top portion of the document) and then the special code to indicate that they served as supervisor and should receive the additional $25/hour compensation on the bottom section of the document. These hours were recorded on March 13,2022 and March 14, 2022, from 3:00pm to 11:00pm although the individual only worked 11:00pm to 7am.

**TEXAS SOUTHERN UNIVERSITYꞱDEPARTMENT OF PUBLIC SAFETY**
***Weekly Payroll Report (WPR)***

NAME: _James W. Ward_ _____ ID. #: ▮▮▮▮▮

**PAYROLL PERIOD: _Mar. 13, 2022 thru Mar. 19, 2022 SHIFT 11pm to 7am_**

| | DATE | REGULAR HOURS WORKED | | | LEAVE | NOTE | APPROVAL |
|---|---|---|---|---|---|---|---|
| | | Start Shift | End Shift | Hours Worked | | | |
| Sun. | 03/13/2022 | 11pm | 7am | 8 | | Reg. Shift | |
| Mon. | 03/14/2022 | 11am | 7am | 8 | | Reg. Shift | |
| Tue. | 03/15/2022 | 11pm | 7am | 8 | | Reg. Shift | |
| Wed. | 03/16/2022 | 11pm | 7am | 8 | | Reg. Shift | |
| Thu. | 03/17/2022 | 11pm | 7am | 8 | | Reg. Shift | |
| Fri. | 03/18/2022 | | | | | Off Day | |
| Sat. | 03/19/2022 | | | | | Off Day | |
| | | TOTAL HOURS | | 40 | | TOTAL HOURS LEAVE | |

| | DATE | REGULAR OVERTIME/COMP HOURS | | | REASONS/ NOTES | PAID | | COMP TIME | | APPROVAL |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Start | End | Total Hours | | OTP (1.0) | OT (1.5) | OTP (1.0) | OT (1.5) | |
| Sun. | | | | | | | | | | |
| Mon | | | | | | | | | | |
| Tue. | | | | | | | | | | |
| Wed | | | | | | | | | | |
| Thu. | | | | | | | | | | |
| Fri. | 03/18/2022 | 11pm | 7am | 8 | Spring Break | X | | | | 926A |
| Fri. | 03/18/2022 | 7am | 11am | 4 | Relays | | X | | | 926A |
| Sat. | 03/19/2022 | 6am | 6pm | 12 | Relays | | X | | | 926A |

| | DATE | PAID CAMPUS EVENT HOURS | | | EVENT NAME | EVENT LOCATION | PAID | | APPROVAL |
|---|---|---|---|---|---|---|---|---|---|
| | | Begin Event | End Event | Total Hours | | | OTP (1.0) | OT (1.5) | |
| Sun. | | | | | | | | | |
| Mon. | | | | | | | | | |

| | DATE | SPECIAL EVENT WORK HOURS | | | EVENT NAME | EVENT LOCATION | APPROVAL |
|---|---|---|---|---|---|---|---|
| | | Begin Event | End Event | Total Hours | | | |
| Sun. | 03/13/2022 | 3pm | 11pm | 8 | HRSTLDR | | 926A |
| Mon. | 03/14/2022 | 3pm | 11pm | 8 | HRSTLDR | | 926A |
| Tue. | | | | | | | |
| Wed. | | | | | | | |
| Thu. | | | | | | | |
| Fri. | | | | | | | |
| Sat. | | | | | | | |

### Training Officer Weekly Timesheet Example

Below is an example of a Field Training Officer's Weekly Timesheet showing eight (8) hours worked each day for January 2, 2022 through January 8, 2022 at regular hours from 3pm to 11pm (top portion of the document) and then the overtime of FTO Paperwork for two hours on four of these days. These hours were recorded on the Timesheet from 1:00pm to 3:00pm. It is uncertain if the officer actually worked two hours prior to starting their normal shift.

RESTRICTED (Access Limited to Authorized Personnel)

# TEXAS SOUTHERN UNIVERSITY○DEPARTMENT OF PUBLIC SAFETY
## *Weekly Payroll Report (WPR)*

RECEIVE

JAN 25 2022

**NAME:** Cantu, Bethany    **ID. #:** 

**PAYROLL PERIOD:** Jan 2, 2021 - Jan 8, 2022    **SHIFT: 3:00pm-11:00pm**

| | REGULAR HOURS WORKED | | | LEAVE | NOTE | APPROVAL |
|---|---|---|---|---|---|---|
| | Start Shift | End Shift | Hours Worked | | | |
| Sun 01-02-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Mon 01-03-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Tue 01-04-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Wed 01-05-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Thu 01-06-2022 | 3:00 PM | 11:00 PM | 8 | | Regular Shift | |
| Fri 01-07-2022 | • | • | • | | OFF DAY | |
| Sat 01-08-2022 | - | - | - | | OFF DAY | |
| | | | 40 | | | |

| | | REGULAR OVERTIME/COMP HOURS | | REASONS/ NOTES | PAID | | COMP TIME | | APPROVAL |
|---|---|---|---|---|---|---|---|---|---|
| | DATE | Start | End | Total Hours | | OTP (1.0) | OT (1.5) | OTP (1.0) | OT (1.5) | |
| Sun | 01-02-2022 | 1:00 PM | 3:00 PM | 2 | FTO Paperwork | | X | | | |
| Mon | 01-03-2022 | 1:00 PM | 3:00 PM | 2 | FTO Paperwork | | X | | | |
| Tue | 01-04-2022 | 1:00 PM | 3:00 PM | 2 | FTO Paperwork | | X | | | |
| Wed | 01-05-2022 | | | | | | | | | |
| Thu | 01-06-2022 | 1:00 PM | 3:00 PM | 2 | FTO Paperwork | | X | | | |
| Fri | | | | | | | | | | |
| Sat | | | | | | | | | | |

| | | PAID CAMPUS EVENT HOURS | | | EVENT NAME | EVENT LOCATION | PAID | | APPROVAL |
|---|---|---|---|---|---|---|---|---|---|
| | DATE | Begin Event | End Event | Total Hours | | | OTP (1.0) | OT (1.5) | |
| Sun | | | | | | | | | |
| Mon | | | | | | | | | |
| Tues | | | | | | | | | |
| Wed | | | | | | | | | |
| Thu | | | | | | | | | |
| Fri | | | | | | | | | |
| Sat | | | | | | | | | |

| | | SPECIAL EVENT WORK HOURS | | | EVENT NAME | EVENT LOCATION | APPROVAL |
|---|---|---|---|---|---|---|---|
| | DATE | Begin Event | End Event | Total Hours | | | |
| Sun | | | | | | | |
| Mon | | | | | | | |
| Tues | | | | | | | |
| Wed | | | | | | | |

RESTRICTED (Access Limited to Authorized Personnel)

000017

CONFIDENTIAL

**Young, Mary**

| | |
|---|---|
| **From:** | Broussard, Shannon |
| **Sent:** | Tuesday, October 24, 2017 2:34 PM |
| **To:** | James, Shelia K.; Young, Mary; Brown, Frederick; Whitfield, Angelle; White, Maria A; Robinson-Davis, Chrystal; Shaw, Kimberly; Ellis, Kala; Sims, Kavaris E. |
| **Cc:** | Moffett, Raphael; Huewitt, Kenneth R.; McClelland, Ashlee |
| **Subject:** | RE: Personnel Fee Sheet |
| **Attachments:** | New Event Personnel Fee Sheet.pdf |

I'm Sorry.

I attached the wrong fee sheet.

Here is the New Sheet!


Mr. Shannon D. Broussard, MPA
Director of Facilities and Special Events
Division of Student Services
Texas Southern University
3100 Cleburne Street
Houston, Texas 77004
Tel: (713) 313-7759 | Fax: (713) 313-1054


**From:** Broussard, Shannon
**Sent:** Tuesday, October 24, 2017 1:54 PM
**To:** James, Shelia K. <James_SK@tsu.edu>; Young, Mary <Mary.Young@TSU.EDU>; Brown, Frederick <Frederick.Brown@TSU.EDU>; Whitfield, Angelle <whitfieldaa@TSU.EDU>; White, Maria A <White_MA@TSU.EDU>; Robinson-Davis, Chrystal <robinsondavisca@TSU.EDU>; Shaw, Kimberly <shawk@TSU.EDU>; 'Kala Ellis (ellisks@TSU.EDU)' <ellisks@TSU.EDU>; Sims, Kavaris E. <Kavaris.Sims@TSU.EDU>
**Cc:** Moffett, Raphael <Raphael.Moffett@TSU.EDU>; Huewitt, Kenneth R. <Kenneth.Huewitt@TSU.EDU>; McClelland, Ashlee <ashlee.mcclelland@tsu.edu>
**Subject:** Personnel Fee Sheet

Attached is the "New Approve Personnel Fee Sheet".

Please attach a copy to all time sheets submitted to the Budget and/or HR office.

If you have any questions please feel free to contact me directly.


Mr. Shannon D. Broussard, MPA
Director of Facilities and Special Events
Division of Student Services
Texas Southern University
3100 Cleburne Street

1

Exhibit
Mary Young
**5**
02/27/25 VT

YOUNG_000095

CONFIDENTIAL

Houston, Texas 77004
Tel: (713) 313-7759 | Fax: (713) 313-1054

YOUNG_000096

CONFIDENTIAL

## Texas Southern University Event Services Personnel Fee Sheet

| Event Personnel | Hourly Rate (Internal & External) Minimum of 4 Hours |
|---|---|
| **Admin, Technical Support** | |
| Event Manager | $30.00 |
| House Manager | $30.00 |
| Sound/Lighting Tech. | $40.00 |
| HVAC Tech. | $25.00 |
| Electrician | $25.00 |
| First Aid or Nurse (Event Cost) | $100.00/Day |
| Ticket Seller | $15.50 |
| Ticket Taker | $15.50 |
| Ushers | $15.50 |
| Safety Officer | $25.00 |
| **Security & Traffic Control** | |
| Police Officer | $40.00 |
| Police Special Occasion* | $50.00 |
| Police Commander / Supervisor | $50.00 |
| Police Commander / Supervisor* | $60.00 |
| Police Dispatcher | $25.00 |
| Traffic / Security Officer | $25.00 |
| Traffic / Security Officer Special Occasion* | $30.00 |
| **Building and Grounds Support Services** | |
| Custodian | $15.50 |
| Custodian (Food Event) | $18.50 |
| Custodial Supervisor | $21.50 |
| Grounds Keeper | $18.50 |
| Tiger Labor Force | $18.50 |
| Bus / Tram Driver | $20.00 |
| Clock Operator | $15.50 |
| Referee | $20.00 |
| Lifeguard | $25.00 |

*Special Occasion Events such as any major events held in the city. Requires Approval from Vice-President.

YOUNG_000097